UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 DEC 16  PM 2: 07

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. )   Case No. 2:21-cr-00113
)
LAWRENCE JACKSON, )
Defendant. )

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
EVIDENCE AND REQUEST FOR FRANKS HEARING**
(Doc. 38)

Pending before the court is Defendant Lawrence Jackson's motion to suppress

evidence seized pursuant to a search warrant for a residence at 55 Killington Avenue,

Apartment 2 in Rutland, Vermont (the "55 Killington Avenue warrant")[1] and for a Ford

Freestyle SUV (the "Ford Freestyle warrant"). (Doc. 38.) He requests a hearing pursuant

to *Franks v. Delaware*, 438 U.S. 154 (1978) because the affidavits in support of both

search warrants allegedly contained false or misleading statements.

On October 14, 2022, the government opposed Mr. Jackson's motion. On

November 14, 2022, the court held an evidentiary hearing at which both parties

introduced evidence but neither party presented witnesses. On that date, the court took

the pending motion under advisement.

Mr. Jackson is charged in a ten-count Second Superseding Indictment. Eight

counts pertain to Mr. Jackson and the remaining counts to his two co-defendants. He is

charged with: conspiring to distribute cocaine and cocaine base between January 2021

and November 23, 2021 in violation of 21 U.S.C. §§ 846, 841(a), 841(b)(1)(B), and

841(b)(1)(C) (Count I); distributing cocaine on August 21, 2020 in violation of 21 U.S.C.

---

[1] The Killington Avenue warrant affidavit in support of probable cause incorrectly describes 55
Killington Avenue as "55 Kellogg Street" in paragraph 14. (Defendant's Exhibit C at 7, ¶ 14.)
The remainder of the affidavit and warrant application contains the correct address, as does the
search warrant itself.

§§ 841(a), 841(b)(1)(C) (Count II); distributing cocaine base on September 24, 2020 in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C) (Count III); distributing cocaine base on September 29, 2020 in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C) (Count IV); possessing with the intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(C) (Count V); conspiring to use firearms during and in relation to, and to possess firearms in furtherance of, a drug trafficking crime in violation of 18 U.S.C. § 924(o) (Count VII); carrying and using firearms during and in relation to drug trafficking crimes, and possessing firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (ii) (Count VIII); and possessing a firearm knowing he had been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. §§ 922(g)(1), 942(e)(1) (Count IX).

The government is represented by Assistant United States Attorneys Jonathan A. Ophardt and Zachary B. Stendig. Mr. Jackson is represented by Robert S. Behrens, Esq.

**I.     Findings of Fact.**

The court makes the following findings of fact by a preponderance of the evidence.

**A.     Search of 55 Killington Avenue, Apartment 2.**

On November 23, 2021, Rutland City Police Department Detective Corporal Adam Lucia ("Detective Lucia") applied for a search warrant for the 55 Killington Avenue residence from the Vermont Superior Court (Defendant's Exhibit C). His warrant application included his affidavit in support of probable cause (the "Lucia affidavit"). Among other things, the Lucia affidavit stated that the "Rutland City Police Department . . . received information from numerous subjects that narcotics [were] being sold out of 55 Killington Avenue Apt. #2" and that "[s]ubjects had advised that [Mr. Jackson] . . . was staying at said residence." (Defendant's Exhibit C at 5, ¶ 6.) Detective Lucia described Mr. Jackson as "a known narcotics dealer in the Rutland City area" and stated that in the spring of 2021, another detective "received information from a confidential informant that [Mr. Jackson] was trafficking narcotics and also was in possession of numerous firearms." *Id.*

2

According to the Lucia affidavit, Morgan Gates, whose connection to Mr. Jackson was not identified, "showed officers from the Rutland City Police Department where [Mr. Jackson] was staying" in September 2021, and "[t]he residence she showed officers was 55 Killington Avenue." *Id.*

The Lucia affidavit identifies Travis M. Bunnell as "an active drug user . . . involved in the drug trade in Rutland" who is "a person of interest in an unrelated investigation." *Id.* at 4, ¶ 1. An informant told Detective Lucia that Mr. Bunnell and his girlfriend, Katherine H. Ebert, also identified as "an active user . . . involved in the drug trade in Rutland[,]" "were going to a redemption center to return bottles." *Id.* at ¶ 2. At the redemption center, Detective Lucia notified other officers that he "was beginning surveillance of [Mr. Bunnell] and [Ms.] Ebert." *Id.* at ¶ 3. Detective Lucia then contacted "Central Dispatch" and asked Officer Cornell to run a conditions of release check, which showed that Mr. Bunnell "had an active set of conditions of release" that included a 24/7 curfew at 100 South Street in Rutland, Vermont. (Defendant's Exhibit C at 4, ¶ 3.)

Officers stopped Mr. Bunnell after observing him and Ms. Ebert leave 55 Killington Avenue, at which point Mr. Bunnell was taken into custody for violating the conditions of his release. After waiving his *Miranda* rights, Mr. Bunnell provided Detective Lucia information about Mr. Jackson in a sworn recorded statement. He identified the 55 Killington Avenue residence as "Courtney Schaner's apartment[,]" *id.* at 6, ¶ 8, and advised that he had purchased "a couple bags of heroin" from Mr. Jackson and paid twenty dollars for two bags. *Id.* at ¶ 9. He said that he "[could] buy 'hard' and 'soft' from [Mr. Jackson,]" which Detective Lucia understood as "slang term[s] for [c]ocaine powder and [c]rack [c]ocaine." *Id.* at ¶ 9. Mr. Bunnell stated that he had just snorted heroin at the 55 Killington Avenue residence, that Mr. Jackson typically sold cocaine and crack cocaine rather than heroin, that "he bought an eight-ball from [Mr. Jackson][] a few days" prior, and that while at the residence he "observed a 'brick' of cocaine on the table." *Id.* He indicated that "the most he could buy at a time from [Mr. Jackson] [was] a half-ounce of cocaine" and that "the most he ha[d] bought was around [seven] grams of

3

[c]ocaine." *Id.* at ¶ 10. Mr. Bunnell told officers that he "use[d] his cellphone to communicate with [Mr. Jackson]" and provided officers with Mr. Jackson's telephone number, which was saved under the name "Bro." (Defendant's Exhibit C at 6, ¶ 10.)

The Lucia affidavit recounted Mr. Bunnell informing law enforcement that Mr. Jackson "had firearms inside the residence" and possessed "a .40 caliber handgun and .410 Judge revolver." *Id.* at ¶ 11. Mr. Bunnell further "advised [that Mr. Jackson] ke[pt] the drugs on his person, as well as a firearm inside his waistband[] at all times." *Id.* Detective Lucia noted that Mr. Jackson was "prohibited from possessing firearms" due to prior convictions from 1989 and 1994. *Id.*

Detective Lucia stated that he "spoke with Detective Sergeant Johnson from the Vermont State Police Narcotics Investigation Unit[,] who advised they [had] three pending charges on [Mr. Jackson] for sale of crack cocaine" stemming "from controlled buys in August and September of 2020." *Id.* at 7, ¶ 12.

On November 23, 2021, the Vermont Superior Court issued the 55 Killington Avenue warrant, and officers executed it that day. Mr. Jackson was not at the residence at that time. A "subject[] at the scene" told Detective Sergeant Johnson that Mr. Jackson "was in a red SUV rental vehicle with Vermont plates[,]" and "Officer Rice advised that he had recently encountered [Mr. Jackson] in a red SUV rental and said [Mr. Jackson] had removed the Vermont registration and placed Vermont temporary plate T14828 on the vehicle." *Id.* at ¶ 13. Officers "identified the vehicle as a red 2017 Ford Freestyle" and issued a "be on the lookout" for "[Mr. Jackson] and the red 2017 Ford Freestyle." (Defendant's Exhibit D at 7, ¶ 13) (internal quotation marks omitted).

## B.   Mr. Jackson's Arrest and the Search of the Ford Freestyle.

Approximately one hour after officers executed the 55 Killington Avenue warrant, law enforcement spotted the red Ford Freestyle as it passed 55 Killington Avenue. Officers stopped the vehicle, which Mr. Jackson was driving, and ordered him out of it. Mr. Jackson was arrested for selling cocaine base.

Officers performed a search incident to arrest and discovered $2,049.92 on Mr. Jackson's person, including a dollar bill that "was folded and found to contain a brown

4

colored substance which was later field tested" and "yielded a presumptive positive for fentanyl. Also on [Mr. Jackson's] person was a clear baggie containing a white rock-like substance" which was field tested and "yielded a presumptive positive for cocaine base." *Id.* at 7-8, ¶ 15. Five "Suboxone strips and a glass pipe commonly used to smoke cocaine base" were found on Mr. Jackson's person as well. *Id.* at 8, ¶ 15.

Danielle Currier, one of two female passengers in the car with Mr. Jackson at the time of his arrest, was questioned by Detective Lucia and provided a sworn recorded statement. She reported that "when [Mr. Jackson] was being stopped by the police, he had" the other passenger, Brianna Arnold, "'take his big bag of drugs' . . . and hide it under the passenger seat of the vehicle." *Id.* at ¶ 16. Ms. Currier indicated that the bag of drugs contained "a lot of [c]ocaine[,]" *id.* (internal quotation marks omitted), and that when she was at "a residence" with Mr. Jackson, "she observed [him] put the [c]ocaine in said bag." *Id.* She also stated that Mr. Jackson "offered her some of the [c]ocaine, but she does not use anymore." (Defendant's Exhibit D at 8, ¶ 16.) Ms. Currier described the bag of drugs as a "blue in color lunch style bag that zips up." *Id.*

Officers seized the Ford Freestyle and had it towed to the Vermont State Police Rutland Barracks. There, a canine alerted to the presence of illegal drugs. Detective Lucia applied to the Vermont Superior Court in Rutland for a search warrant for the vehicle on November 24, 2021. Detective Lucia's affidavit in support of the search warrant application contained the same information as his affidavit for the 55 Killington Avenue warrant, as well as information gleaned from Mr. Jackson's arrest and the canine alert.

In his application and affidavit, Detective Lucia identified the vehicle to be searched as a "Red 2017 Ford Freestyle four door SUV" and provided its registration and VIN number. *Id.* at 9, ¶ 19. Mr. Jackson and the government agree that the vehicle was a 2007 Ford Freestyle, not a 2017.

The Ford Freestyle search warrant was issued on November 24, 2021 and executed the same day.

### C.    The February 2019 Letter.

On February 26, 2019, former Rutland County State's Attorney Rosemary M.

5

Case 2:21-cr-00113-cr   Document 82   Filed 12/16/22   Page 6 of 20

Kennedy issued a letter to "Defense Counsel" "pursuant to the State's discovery obligation under V.R.Cr.P. 16, *Brady v. Maryland*, [373] U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972)" regarding a 2018 incident in an unrelated case. (Government's Exhibit 1 at 1.) The letter stated:

> The Rutland County State's Attorney's Office has received information that Officer Jimmy Pla[]kas from the Rutland City Police Department, in an affidavit of probable cause in *State v. Regimbald*, 545-5-18 Rdcr, wrote that the defendant struggled outside of handcuffs, when force was applied by Sgt. Adam Lucia. However, the video from the holding cell appears to show defendant remained in handcuffs. Sgt. Lucia's signature appears on the affidavit of probable cause as the supervisor/notary. To my knowledge, the Department handled this situation as a training issue and neither officer was disciplined.

*Id.* (the "February 2019 letter").

A video of the incident reflected in the February 2019 letter reveals a man in handcuffs being taken down to a holding cell floor by a uniformed officer. The handcuffed man appears to hit the floor face down. *See* Defendant's Exhibit A. Other information regarding the incident stated that the man "became irate and combative in a holding cell" following his arrest. (Doc. 63 at 6.)

In his Response to Resistance Report, Detective Lucia described the incident as follows:

> [Redacted] started to tense up with Officer Plakas and advised me to "shut the fuck up." I explained to [Redacted] we would be moving the cuffs to the back and not to fight with us. [Redacted] advised that he would "show us a fight."

> [Redacted] was told several times not to fight or tense up with officers and we would remove his handcuffs. While speaking with [Redacted], I detected the odor of intoxicants emanating from his person. I again advised [Redacted] not to fight. [Redacted] was still tensing up, and made comments which indicated he would indeed fight with officers. I advised [Redacted] we would be moving his hands behind his back to be handcuffed. [Redacted] again began to tense up and was told not to fight with me. I attempted to move [Redacted's] left hand from the handcuff. [Redacted] began to move his arm forward and tensed up. Fearing [Redacted] was about to try and break free and fight, I began to execute an armbar takedown to escort him to the ground.

6

. . .

> [Redacted] also provided a Preliminary Breath Sample (PBT) which
> yielded a .307% BrAC.

(Government's Exhibit 2 at 7.) The February 2019 letter does not reference Detective

Lucia's statement in the Response to Resistance Report.

The following day, the man "was charged with violations of Vermont law,

including resisting arrest," based on "the filing of a probable cause affidavit authored by

RPD Officer Jimmy Pla[]kas." (Doc. 63 at 6); *see also* Government's Exhibit 3.

The Plakas affidavit states in relevant part:

> The defendant made multiple statements about fighting us and resisting.
> The defendant was explicitly told not to fight. The defendant again tensed
> up his arms. I advised the defendant to relax. The defendant used profanity
> towards Sergeant Lucia, advising when the handcuffs are taken off "We'll
> see what happens mother fucker." Sergeant Lucia then took one of the
> handcuffs off of the defendant in attempt to put his arm behind his back.
> The defendant pulled his arm back toward his front and began to attempt to
> fight Sergeant Lucia. Sergeant Lucia used an arm bar takedown to get the
> defendant back under control. During the course of the takedown, the
> defendant suffered a laceration to his head, which resulted in him being
> transported to Rutland Regional Medical Center (RRMC). The defendant
> gave a sample of his breath which revealed a 0.307 BAC.

(Government's Exhibit 3 at 2-3, ¶ 7.) "Officer Pla[]kas swore to the accuracy of the

probable cause affidavit, and Detective Lucia notarized the document." (Doc. 63 at 6.)

## II.    Conclusions of Law and Analysis.

### A.    Whether Mr. Jackson is Entitled to Suppression of Evidence and/or a *Franks* Hearing.

A search warrant affidavit enjoys "a presumption of validity[,]" *Franks*, 438 U.S.

at 171, but "in certain circumstances a defendant is entitled to a hearing to test the

veracity of the affiant's statements." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir.

2008) (citing *Franks*, 438 U.S. at 171). To overcome the presumption of validity, a

defendant must make a "substantial preliminary showing" that (1) the warrant affidavit

contains a false statement, (2) the false statement was included knowingly and

intentionally or with reckless disregard for the truth, and (3) the false statement was

7

necessary to the probable cause finding. *Franks*, 438 U.S. at 155-56. The defendant must meet this standard by "a preponderance of the evidence[.]" *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008), *cert. denied*, 555 U.S. 1061 (2008). "The *Franks* standard is a high one[.]" *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171.

*Franks* also applies to "omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003) (internal quotation marks and emphasis omitted) (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)).

To determine whether an allegedly false statement was necessary to the finding of probable cause, the court engages in "a process of subtraction" whereby it "disregard[s] the allegedly false statements and determine[s] whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Id.* at 65 (internal quotation marks omitted). To assess materiality of omissions, the court engages in "a process of addition[,]" *United States v. Nakouzi*, 2005 WL 3211208, at *6 (D. Conn. Nov. 30, 2005), and "insert[s] the omitted truths[.]" *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotation marks omitted) (quoting *United States v. Ippolito*, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)). "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). If the remaining facts give rise to probable cause, "the

8

inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Id.* Indeed, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no [*Franks*] hearing is required." *Franks*, 438 U.S. at 171-72 (footnote omitted). Correspondingly, if "the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156.

The probable cause determination "is not overly strict." *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005). A judge:

> make[s] a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Probable cause exists when, "based on the totality of circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed[.]'" *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). It "is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238-39 (second alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

### B.   Whether Detective Lucia Had an Obligation to Disclose the February 2019 Letter in Applying for the Search Warrants.

Law enforcement must be "frank with the magistrate in proceedings to obtain [a] warrant—proceedings that are typically *ex parte*." *United States v. Reilly*, 76 F.3d 1271,

1273 (2d Cir. 1996) (citing *Franks*, 438 U.S. at 155-56). "Review for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause[.]" *Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013) (quoting *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012)). Officers are not required, however, to "determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989).

Mr. Jackson argues that because "[o]fficers have a duty to report information that detracts from probable cause[,]" the court must suppress evidence obtained as a result of the warrants authored by Detective Lucia "because [the affidavits] omit material information about [Detective Lucia's] truthfulness or diligence." (Doc. 38 at 4-5.) Mr. Jackson cites *United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984), for the proposition that "when a definite and material change *has* occurred in the facts underlying the magistrate's determination of probable cause, it is the magistrate, not the executing officers, who must determine whether probable cause still exists." *Id.* at 894. As a result, a "magistrate must be made aware of any material new or correcting information[,]" but the duty to report such information "does not arise unless the information is material to the magistrate's determination of probable cause." *Id.*

Vermont law does not require "*Brady/Giglio* letters" such as the February 2019 letter to be disclosed in a search warrant application, especially when the letter does not state that cases will no longer be received from a particular law enforcement officer or that the officer will no longer be called as a witness. At best, the February 2019 letter contends that Detective Lucia notarized an affidavit that did not accurately describe his use of force in an unrelated incident. Under Vermont law, a notary does not vouch for the truth of the contents of the document notarized. *See* 26 V.S.A. § 5304(10)(A) ("'Notarial act' means an act . . . that a notary public may perform under the law of this State. The term includes taking an acknowledgment, administering an oath or affirmation, taking a verification on oath or affirmation, attesting a signature, certifying or attesting a copy, and noting a protest of a negotiable instrument."). Detective Lucia made no sworn

10

statement himself that could be considered false or misleading.

Evidence that Detective Lucia notarized a partially false statement by Officer Plakas more than two years prior to the application for the 55 Killington Avenue warrant cannot be fairly characterized as "plainly exculpatory." While the February 2019 letter is not favorable to Detective Lucia, it makes no claim that he was affirmatively dishonest. Against this backdrop, the court is reluctant to impose an obligation to disclose "*Brady/Giglio* letters" when applying for a state or federal court warrant as neither Vermont nor federal law imposes that requirement, and there are valid reasons for not doing so.

*Colkley* is instructive. There, the district court had granted the defendant's request for a *Franks* hearing on the ground that the arrest warrant affidavit "was defective because it failed to note that numerous witnesses did not identify [the defendant] in a photographic spread[.]" 899 F.2d at 299. Reversing, the Court of Appeals for the Fourth Circuit held "the Fourth Amendment [does not] require[] an affiant to include all potentially exculpatory evidence in the affidavit[,]" or "to import the rule of *Brady v. Maryland* . . . into the warrant application process." *Id.* at 302. It explained that *Franks* and *Brady* impose different duties at different stages of a criminal investigation and prosecution:

> The *Brady* rule derives from due process and is designed to ensure fair criminal trials. . . . It is at trial that the accused is cloaked with the presumption of innocence and may put the state to its proof beyond a reasonable doubt. By contrast, the probable cause determination in *Franks*, which derives from the Fourth Amendment, involves no definitive adjudication of innocence or guilt. Because the consequences of arrest or search are less severe and irremediable than the consequences of an adverse criminal verdict, a duty to disclose potentially exculpatory information appropriate in the setting of a trial may be less compelling in the context of an application for a warrant.

*Id.*[2]

---

[2] Under *Brady v. Maryland*, the government has a constitutional duty to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment[.]" 373 U.S. 83, 87 (1963). This includes "*Giglio*" evidence, i.e., "evidence that is

11

The Fourth Circuit explained that the "obligation to disclose material exculpatory information in the *Brady* context attaches regardless of the intent of the prosecutor" while "[a] *Franks* violation . . . requires" a showing of "'deliberate falsehood' or 'reckless disregard for the truth.'" *Id.* at 303 (quoting *Franks*, 438 U.S. at 171). *Brady* is focused on the "justice of the finding of guilt[,]" *id.* (internal quotation marks omitted) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)), while *Franks* "recognizes that the information an affiant reports . . . may not ultimately be accurate, and is willing to tolerate such a result so long as the affiant did not deliberately mislead the magistrate." *Id.* (citing *Franks*, 438 U.S. at 165, 171-72). "[N]on-lawyers who normally secure warrants in the heat of a criminal investigation should not be burdened with the same duty to assess and disclose information as a prosecutor who possesses a mature knowledge of the entire case." *Id.*[3] For this reason, in *Colkley*, the defendant's arrest warrant "was not tainted by the affiant's failure to include within it all potentially exculpatory information." *Id.* at 298.

Detective Lucia did not mislead the issuing judge when he failed to include the February 2019 letter in his search warrant affidavits. Had he included the February 2019 letter, as demonstrated below, it would not have materially affected the probable cause analysis.

## C.     The 55 Killington Avenue Warrant.

Mr. Jackson identifies two paragraphs in the Lucia affidavit which he contends

---

useful to impeach the credibility of a government witness." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). Like *Brady*, *Giglio* is a trial rule and applies "[w]hen the reliability of a given witness may well be determinative of guilt or innocence[.]" *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

[3] Failure to disclose evidence regarding the affiant's credibility may be a *Brady* violation. In *United States v. Dreyer*, the court granted the defendant's motion to vacate his conviction and for a new trial when the prosecution failed to disclose under *Brady* "over 1,600 pages of impeachment material about" the detective affiant, which demonstrated a "pattern of deception and serious misconduct[,]" noting that inclusion of the impeachment material may have led to a different outcome at the defendant's *Franks* hearing. 2016 WL 3198277, at *1, 4 (W.D. Wash. June 9, 2016) ("The undisclosed impeachment evidence is material because admission of the evidence creates a reasonable probability of a different result.").

12

contain false or misleading information.

### 1. Paragraph 6: Allegedly Vague Statements Based on Detective Lucia's Credibility.

Mr. Jackson contends the Lucia affidavit contains vague statements with no support regarding Mr. Jackson's status as a "known narcotics dealer" and that "narcotics [were] being sold out of 55 Killington Avenue Apt. #2." (Defendant's Exhibit C at 5, ¶ 6.) Paragraph 6 of the Lucia affidavit states:

> It should be noted, the Rutland City Police Department had received information from numerous subjects that narcotics are being sold out of 55 Killington Avenue Apt. #2. Subjects had advised that [Mr. Jackson] . . . was staying at said residence. [Mr. Jackson] is a known narcotics dealer in the Rutland City area. In the spring of 2021, Det. Billings[] received information from a confidential informant that [Mr. Jackson] was trafficking narcotics and also was in possession of numerous firearms. In September of 2021, Morgan Gates ([Redacted] 1995) showed officers from the Rutland City Police Department where [Mr. Jackson] was staying. The residence she showed officers was 55 Killington Avenue.

*Id.*

Even if the court excluded Detective Lucia's statements regarding his general knowledge of Mr. Jackson's criminal activity, the remaining information from Detective Billings and a confidential informant supply similar information. *See United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008) (holding that a search warrant was supported by probable cause when it corroborated information "through multiple sources," including two cooperating witnesses). As a result, if statements based solely on Detective Lucia's credibility are excluded, the probable cause analysis remains unaffected.

### 2. Paragraph 12: Inaccurate Statement Regarding Pending Charges.

Paragraph 12 of the Lucia affidavit states that Detective Lucia "spoke with Detective Sergeant Johnson from the Vermont State Police Narcotics Investigation Unit[,] who advised they have three pending charges on [Mr. Jackson] for sale of crack cocaine. These charges stem from controlled buys in August and September of 2020." (Defendant's Exhibit C at 7, ¶ 12.) This statement is not accurate. Charges were not

13

pending when Detective Lucia signed the search warrant affidavit, although controlled buys from Mr. Jackson were currently under investigation. As corrected, the Lucia affidavit would state: "I spoke with Detective Sergeant Johnson from the Vermont State Police Narcotics Investigation Unit who advised that Mr. Jackson participated in three controlled buys in August or September of 2020, which are currently under investigation."

Although information regarding the allegedly pending charges could and should have been verified, when corrected, the statement does not materially affect the probable cause analysis. Pending charges for controlled buys that took place approximately fifteen months prior to the search warrant application are not typically the kind of information that would support a finding of probable cause. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. Perkins*, 850 F.3d 1109, 1120 (9th Cir. 2017) (explaining that while criminal history may be helpful in establishing probable cause, "a past conviction is relevant only to the extent it increases the likelihood that evidence of the suspected crime will be found"); *United States v. Williams*, 350 F. Supp. 3d 261, 267 (W.D.N.Y. 2018) ("A defendant's status as a drug dealer alone does not give rise to a fair probability that evidence of drug trafficking will be found in his home.").

### 3. Whether the "Corrected" Affidavit Provides Probable Cause for the 55 Killington Avenue Warrant.

Travis Bunnell, a known drug user who officers observed leaving 55 Killington Avenue, made highly self-incriminating sworn and recorded statements to law enforcement that he had just purchased heroin from Mr. Jackson, snorted heroin at 55 Killington Avenue, and previously purchased "an eight-ball" from Mr. Jackson. Mr. Bunnell not only provided information against his own penal interests, officers may hold him responsible if his claims about Mr. Jackson "turn out to be fabricated[.]" *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (stating that officers may assess the reputation of known

14

informants and may hold them responsible if it becomes clear that their statements were false).[4]

Mr. Bunnell also provided information regarding the types of drugs that Mr. Jackson typically sold and indicated that he "observed a 'brick' of cocaine on the table" inside the Killington Avenue residence. (Defendant's Exhibit C at 6, ¶ 9.) In addition to providing information about narcotics, Mr. Bunnell informed officers that Mr. Jackson "had firearms inside the residence[,]" including "a .40 caliber handgun and .410 Judge revolver[,]" and that Mr. Jackson "keeps the drugs on his person, as well as a firearm inside his waistband[] at all times." *Id.* at ¶ 11. These statements corroborated information Detective Billings "received . . . from a confidential informant that [Mr. Jackson] was trafficking narcotics and also was in possession of numerous firearms." *Id.* at 5, ¶ 6.[5]

In light of the close temporal proximity between Mr. Bunnell's statements and the execution of the search warrant, and the close physical proximity between Mr. Bunnell and the residence to be searched, Mr. Bunnell's statements alone were arguably sufficient to furnish probable case. *See In re Crawford*, 420 F. Supp. 2d 142, 143 (W.D.N.Y. 2006) (finding "ample probable cause" to support search warrant when reliable confidential informant made several purchases of cocaine from individuals at residence, observed firearms and cocaine inside, and informant's observations were confirmed by law

---

[4] *See also United States v. Feola*, 651 F. Supp. 1068, 1093 (S.D.N.Y. 1987) ("[A]dmissions against penal interest have been held sufficient to support a finding of probable cause even though the informant has little to lose and much to gain by supplying information to the police in which he incriminates himself.") (quoting *People v. Johnson*, 488 N.E.2d 439, 443 (N.Y. 1985)); *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster[.]").

[5] The Lucia affidavit further stated Mr. Jackson's prior convictions prevent him from legally possessing firearms. *See United States v. Dismuke*, 593 F.3d 582, 585, 587-88 (7th Cir. 2010), *abrogated on other grounds, as recognized in United States v. Miller*, 721 F.3d 435, 438-39 (7th Cir. 2013) (holding search warrant affidavit sufficient when an informant alleged firearm possession by a felon, described the guns as "a shotgun and two pistols[,]" stated that he had seen the guns firsthand within the week, and attesting officer corroborated the defendant's photograph, address, and criminal history).

enforcement); *United States v. McDaniel*, 2003 WL 22025872, at *5 (S.D.N.Y. Aug. 29, 2003) (finding probable cause to support search warrant when confidential informant "provided first-hand information about the presence of marijuana and crack cocaine and a firearm at the [p]remises" and law enforcement corroborated those claims with information from other officers and witnesses, examined the premises, and conducted a background check of defendant). Accordingly, even as "corrected," the Lucia affidavit in support of the 55 Killington Avenue warrant establishes "a fair probability that contraband or evidence of a crime" would be found there. *Gates*, 462 U.S. at 238.

For the reasons stated above, the court DENIES Mr. Jackson's request for a *Franks* hearing with regard to the 55 Killington Avenue warrant and DENIES his motion to suppress the fruits of that search.

### D.     The Ford Freestyle Warrant.

In addition to the same challenges he advances regarding the Lucia affidavit in support of the 55 Killington Avenue warrant (which is included in the Lucia affidavit in support of the Ford Freestyle warrant), Mr. Jackson contends that two additional statements are false or misleading.

#### 1.     Paragraph 2a: General Statement Regarding Where Drug Dealers Normally Keep Their Drugs.

Mr. Jackson contends that Paragraph 2a of the Lucia affidavit is false or misleading because it describes where drug dealers tend to keep their drugs but fails to claim that drug dealers normally keep their drugs in their vehicles. Paragraph 2a states:

> That drug dealers normally keep their drugs in their homes on their property or in hotel/motel rooms where they are staying, as well as on their person. Dealers do this to keep their products readily available to deal, and to provide security for their drugs as they are constantly vigilant of other drug users who would steal their products, and to help keep their activities concealed as their activity is illegal and they are constantly aware of law enforcement efforts to discover their activity.

(Defendant's Exhibit D at 3, ¶ 2a.)

The government counters that the statement about where drug dealers keep their drugs was "at best . . . negligent[] and likely the result of a mistake made when Detective

16

Lucia updated the apartment search warrant affidavit to address the request to search the Ford Freestyle." (Doc. 63 at 12.) The Lucia affidavit states that drugs would likely be found on Mr. Jackson's person, and recounts that law enforcement found $2,049.42 in a search incident to his arrest, including a dollar bill that "was folded and found to contain a brown colored substance which was later field tested" and "yielded a presumptive positive for fentanyl[,]" "a clear baggie containing a white rock-like substance" which was field tested and "yielded a presumptive positive for cocaine base[,]"as well as five "Suboxone strips and a glass pipe commonly used to smoke cocaine base." (Defendant's Exhibit D at 7-8, ¶ 15.) As there is no false or misleading statement in the Lucia affidavit regarding where drug dealers typically keep their drugs, it was not necessary to a finding of probable cause to include an additional statement that drug dealers normally keep drugs and other contraband in their vehicles.

### 2. Paragraphs 13 and 19: Incorrect Model Year of the Ford Freestyle.

Paragraphs 13 and 19 inaccurately identify the Ford Freestyle as a 2017. *See id.* at 7, 9, ¶¶ 13, 19. As corrected, Paragraph 13 states:

> A search warrant was granted by the Honorable Judge Toor for the above-mentioned residence. During the execution of said search warrant, Law Enforcement learned [Mr. Jackson] was not currently at the residence. Detective Sergeant Johnson spoke with one of the subjects at the scene who said [Mr. Jackson]was in a red SUV rental vehicle with Vermont plates. During conversations with officers at the scene, Officer Rice advised that he had recently encountered [Mr. Jackson] in a red SUV rental and said [Mr. Jackson] had removed the Vermont registration and placed Vermont temporary plate T14828 on the vehicle. After checking that specific incident in CAD, we identified the vehicle as a red 2007 Ford Freestyle which should be bearing Vermont GRNTH28. A "be on the lookout" (BOL) was issued for [Mr. Jackson] and the red 2007 Ford Freestyle.

Reflecting this same correction, Paragraph 19 states: "Based upon the information contained herein I believe there is probable cause for the court to issue a search warrant, allowing the search of Red 2007 Ford Freestyle four door SUV bearing VT registration T14828, VIN 1FMDK05167GA15676 . . . and to seize the following[.]"

The government contends that "2017" was "a mere typographical error[,]" (Doc.

17

63 at 12) which is immaterial because law enforcement arrested Mr. Jackson inside the vehicle, provided its license plate number and VIN, as well as its color, make, and model, all of which identified the vehicle with sufficient particularity. The court agrees. *See United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C. Cir. 1987) ("A vehicle search warrant ordinarily should include the license plate number on its face, but when this is not practicable a detailed description of the vehicle or a narrow geographical limit to the search may provide the requisite check on police discretion."); *United States v. Bailey*, 2016 WL 6995067, at *31 (W.D.N.Y. Nov. 29, 2016) (finding description of vehicle as "a black Nissan four door sedan" "sufficiently particular to permit the executing officers to identify the correct vehicle when executing the warrant" when officer identified where the vehicle typically parked, and phone calls and surveillance suggested a conclusion it was used in drug trafficking).

In this case, the Ford Freestyle was towed to the Vermont State Police Rutland Barracks after Mr. Jackson's arrest. There was thus no likelihood that the wrong vehicle would be searched. *Cf. Knott v. Sullivan*, 418 F.3d 561, 569 (6th Cir. 2005) (holding that where "virtually every descriptor of the vehicle included in the search warrant and accompanying affidavit was incorrect" including the make, model, VIN number, and license plate, there was "a reasonable probability that the wrong vehicle could have been mistakenly searched").

### 3. Whether the "Corrected" Affidavit Provides Probable Cause for the Ford Freestyle Warrant.

Because the evidence in support of probable cause for the search of the Ford Freestyle included not only the same information as the 55 Killington Avenue warrant, but also the fruits of that search, as well as the evidence gleaned from Mr. Jackson's arrest, the incriminating statements by a passenger, and a canine alert to the presence of illegal drugs in the vehicle, the evidence in support of probable cause was overwhelming.

Ms. Currier alerted officers to the presence of drugs inside the vehicle and provided a detailed description of where they would be found. In assessing the passenger's information, "'it is improper to discount' the information provided 'simply

18

because [the informant] has no proven record of truthfulness or accuracy.'" *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (alteration in original) (quoting *Canfield*, 212 F.3d at 719). Although "a criminal informer is less reliable than an innocent bystander with 'no apparent motive to falsify,'" *id.* (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002)), "there is no need to show past reliability when the informant . . . is in fact a participant in the very crime at issue." *United States v. Jackson*, 560 F.2d 112, 121 (2d Cir. 1977). Courts "evaluate whether the information an informant provides is corroborated by independent police investigation, . . . because an informant who is right about some facts is more likely to be right about others[.]" *Gagnon*, 373 F.3d at 236 (citing *Canfield*, 212 F.3d at 719-20; *Gates*, 462 U.S. at 244).

Ms. Currier spoke to officers face-to-face in a sworn recorded statement. Her statements were potentially self-incriminating as she confirmed her knowledge of a large quantity of drugs in the vehicle in which she was traveling. *See Salazar*, 945 F.2d at 50-51 (acknowledging reliability of a "face-to-face informant"); *see also United States v. Czuprynski*, 46 F.3d 560, 564 (6th Cir. 1995) (holding that affidavit from defendant's employee, which disclosed her own marijuana use including that she used with defendant, "was contrary to her penal interest and thus . . . bears intrinsic evidence of credibility.").

Following Mr. Jackson's arrest, a canine alerted to the presence of illegal drugs inside the Ford Freestyle. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246-47 (2013); *see also United States v. Zayas*, 2022 WL 16737223, at *10 (S.D.N.Y. Nov. 7, 2022) ("A canine's positive indication for narcotics is sufficient to provide probable cause.").

The totality of the evidence overwhelmingly supports the conclusion that probable cause existed for the search of the Ford Freestyle, even after the Lucia affidavit is "corrected." The court therefore DENIES Mr. Jackson's request for a *Franks* hearing with regard to the Ford Freestyle warrant and denies his motion to suppress evidence

gleaned from that search.

## CONCLUSION

Because Mr. Jackson has not made a preliminary showing that the search warrant affidavits contained a false material statement or omission, neither suppression of the evidence nor a *Franks* hearing is required. *See Franks*, 438 U.S. at 171-72 ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."); *Canfield*, 212 F.3d at 718 ("If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.").

For the foregoing reasons, Mr. Jackson's motion to suppress evidence and request for a *Franks* hearing is DENIED. (Doc. 38.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _16th_ day of December, 2022.

Christina Reiss, District Judge
United States District Court