UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA            )
                                    )
        v.                          )        Case No. 2:21-cr-00113
                                    )
LAWRENCE JACKSON,                   )
        Defendant.                  )

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
EVIDENCE AND REQUEST FOR *FRANKS* HEARING**
(Doc. 123)

Pending before the court is Defendant Lawrence Jackson's motion to suppress

evidence seized pursuant to a search warrant for a residence located at 55 Killington

Avenue, Apartment 2 in Rutland, Vermont (the "55 Killington Avenue Warrant"),[1] for a

Ford Freestyle SUV (the "Ford Freestyle Warrant"), and for three electronic devices (the

"Electronic Devices Warrant"). (Doc. 123.) He requests a hearing pursuant to *Franks v.

Delaware*, 438 U.S. 154 (1978) alleging the affidavits in support of the search warrants

contain false or misleading statements. He also seeks to suppress evidence obtained

pursuant to a search warrant for the "UConnect" system of a Jeep Cherokee (the

"UConnect Warrant"), arguing that it was obtained as a result of the three challenged

warrants and is therefore fruit of the poisonous tree.

On July 28, 2023, the government opposed Mr. Jackson's motion. On September

21, 2023, the court held an evidentiary hearing at which both parties introduced evidence

and Detective Sergeant Jason Johnson ("Detective Johnson") and Detective Corporal

Adam Lucia ("Detective Lucia") from the Vermont State Police as well as Department of

---

[1] The Killington Avenue Warrant affidavit in support of probable cause incorrectly describes 55
Killington Avenue as "55 Kellogg Street" in paragraph 14. (Defendant's Exhibit H at 7, ¶ 14.)
The remainder of the affidavit and warrant application contains the correct address, as does the
search warrant itself.

Homeland Security ("DHS") Special Agent Alex Zuchman testified. After receipt of the evidence, on October 6, 2023, the court took the pending motion under advisement.

Mr. Jackson is charged in an eight-count Third Superseding Indictment (Doc. 115) with: conspiracy to distribute cocaine and cocaine base between January 2021 and November 23, 2021 in violation of 21 U.S.C. §§ 846, 841(a), 841(b)(1)(B), and 841(b)(1)(C) (Count I); distribution of cocaine on August 21, 2020, in violation of 21 U.S.C. § 841(a), 841(b)(1)(C) (Count II); distribution of cocaine base on September 24, 2020 in violation of 21 U.S.C. § 841(a), 841(b)(1)(C) (Count III); distribution of cocaine base on September 29, 2020 in violation of 21 U.S.C. § 841(a), 841(b)(1)(C) (Count IV); possession with the intent to distribute cocaine and cocaine base on November 23, 2021 in violation of 21 U.S.C. § 841(a), 841(b)(1)(C) (Count V); conspiracy to use firearms during and in relation to, and to possess firearms in furtherance of, a drug trafficking crime between January 2021 and November 23, 2021 in violation of 18 U.S.C. § 924(o) (Count VI); possession and use of firearms during and in relation to drug trafficking crimes, and possession of firearms in furtherance of drug trafficking crimes between January 2021 and November 23, 2021 in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count VII); and possession of a firearm knowing he had been convicted of a crime punishable by imprisonment for a term exceeding one year between Spring of 2021 and November 23, 2021 in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) (Count VIII).

The government is represented by Assistant United States Attorneys Jonathan A. Ophardt and Nicole P. Cate. Mr. Jackson is self-represented. Robert S. Behrens, Esq. is standby counsel.

## I.      Findings of Fact.

The court makes the following findings of fact by a preponderance of the evidence.

### A.      Search of 55 Killington Avenue, Apartment 2.

On November 23, 2021, Detective Lucia of the Rutland City Police Department applied for a search warrant for the 55 Killington Avenue residence from the Vermont Superior Court (Defendant's Exhibit H). His affidavit in support of probable cause (the

"Lucia affidavit") stated that the "Rutland City Police Department . . . received information from numerous subjects that narcotics [were] being sold out of 55 Killington Avenue Apt. #2" and that "[s]ubjects had advised that [Mr. Jackson] . . . was staying at said residence." (Defendant's Exhibit H at 5, ¶ 6.) Detective Lucia described Mr. Jackson as "a known narcotics dealer in the Rutland City area" and stated that in the spring of 2021, another detective "received information from a confidential informant that [Mr. Jackson] was trafficking narcotics and also was in possession of numerous firearms." *Id.*

According to the Lucia affidavit, Morgan Gates, whose connection to Mr. Jackson was not identified, "showed officers from the Rutland City Police Department where [Mr. Jackson] was staying" in September 2021, and "[t]he residence she showed officers was 55 Killington Avenue." *Id.*

The Lucia affidavit identifies Travis M. Bunnell as "an active drug user . . . involved in the drug trade in Rutland" who is "a person of interest in an unrelated investigation." *Id.* at 4, ¶ 1. An informant told Detective Lucia that Mr. Bunnell and his girlfriend, Katherine H. Ebert, who was also identified as "an active user . . . involved in the drug trade in Rutland[,]" were headed to a redemption center to return bottles. *Id.* at ¶ 2. At the redemption center, Detective Lucia notified other officers that he was beginning surveillance of Mr. Bunnell and Ms. Ebert. He then contacted "Central Dispatch" and asked for a conditions of release check, which showed that Mr. Bunnell "had an active set of conditions of release," *id.* ¶ 3, set by a Vermont Superior Court judge for violations of state law, including a 24/7 curfew at 100 South Street in Rutland, Vermont.

Officers stopped Mr. Bunnell after observing him and Ms. Ebert leave 55 Killington Avenue, at which point Mr. Bunnell was taken into custody for violating his state court conditions of release. After waiving his *Miranda* rights, Mr. Bunnell provided a sworn statement describing Mr. Jackson's drug trafficking activities. Mr. Bunnell identified the 55 Killington Avenue residence as "Courtney Schaner's apartment[,]" (Defendant's Exhibit H at 6, ¶ 8) and advised that he had purchased "a couple bags of heroin" from Mr. Jackson and paid twenty dollars for two bags. *Id.* at ¶ 9. He said that he

3

"[could] buy 'hard' and 'soft' from [Mr. Jackson,]" which Detective Lucia understood as "slang term[s] for [c]ocaine powder and [c]rack [c]ocaine." *Id.* Mr. Bunnell stated that he had just snorted heroin at the 55 Killington Avenue residence, that Mr. Jackson typically sold cocaine and cocaine base rather than heroin, that "he bought an eight-ball from [Mr. Jackson][] a few days" prior, and that while at the residence he "observed a 'brick' of cocaine on the table." *Id.* He indicated that "the most he could buy at a time from [Mr. Jackson] [was] a half-ounce of cocaine[,]" "the most he ha[d] bought was around [seven] grams of [c]ocaine[,]" *id.* at ¶ 10, and that "he was supposed to go back to the residence later in the afternoon[] to buy an eight ball of cocaine" from Mr. Jackson, *id.* at ¶ 11. Mr. Bunnell told officers that he "use[d] his cellphone to communicate with [Mr. Jackson]" and provided officers with Mr. Jackson's telephone number, which was saved under the name "Bro[.]" (Defendant's Exhibit H at 6, ¶ 9.) He further advised that Mr. Jackson "trust[ed] him and [he] has gone on trips with [Mr. Jackson] to the 'city[.]'" *Id.* at ¶ 10.

The Lucia affidavit further recounted Mr. Bunnell's sworn statement that Mr. Jackson "had firearms inside the residence" and possessed "a .40 caliber handgun and .410 Judge revolver." *Id.* at ¶ 11. Mr. Bunnell "advised [that Mr. Jackson] ke[pt] the drugs on his person, as well as a firearm inside his waistband[] at all times." *Id.* Detective Lucia noted that Mr. Jackson was "prohibited from possessing firearms" due to a 1989 conviction for criminal sale of a controlled substance in the third degree and a 1994 conviction for assault in the second degree with a weapon/instrument. *Id.*

In his affidavit, Detective Lucia stated that he "spoke with Detective Sergeant Johnson from the Vermont State Police Narcotics Investigation Unit[,] who advised they [had] three pending charges on [Mr. Jackson] for sale of crack cocaine" stemming "from controlled buys in August and September of 2020."[2] *Id.* at 7, ¶ 12.

On November 23, 2021, the Vermont Superior Court issued the 55 Killington Avenue Warrant, and officers executed it the same day.[3] Mr. Jackson was not at the

---

[2] The charges were not pending; they were under investigation.

[3] Law enforcement found an Android Alcatel cell phone and a tablet with Mr. Jackson's face displayed on the lock screen in what appeared to be Mr. Jackson's bedroom at the 55 Killington

residence at the time of the execution of the 55 Killington Avenue Warrant, but a "subject[] at the scene" told Detective Johnson that Mr. Jackson "was in a red SUV rental vehicle with Vermont plates[,]" and "Officer Rice advised that he had recently encountered [Mr. Jackson] in a red SUV rental and said [Mr. Jackson] had removed the Vermont registration and placed Vermont temporary plate T14828 on the vehicle." (Defendant's Exhibit B at 4, ¶ 14.) Officers "identified the vehicle as a red 2007 Ford Freestyle" and issued a "be on the lookout" for "[Mr. Jackson] and the red 2007 Ford Freestyle." *Id.* (internal quotation marks omitted).

### B.    Mr. Jackson's Arrest and the Search of the Ford Freestyle.

Approximately one hour after officers executed the 55 Killington Avenue Warrant, at around 7:41 p.m., law enforcement spotted the red Ford Freestyle as it passed 55 Killington Avenue. Officers stopped the vehicle, which Mr. Jackson was driving, and ordered him out of it. Mr. Jackson was arrested for selling cocaine base.

Officers performed a search incident to arrest and discovered $2,049.92 on Mr. Jackson's person, including a dollar bill that "was folded and found to contain a brown colored substance which was later field tested" and "yielded a presumptive positive for fentanyl. Also on [Mr. Jackson's] person was a clear baggie containing a white rock-like substance[,] . . . which yielded a presumptive positive for cocaine base." *Id.* ¶ 17. Five "Suboxone strips and a glass pipe commonly used to smoke cocaine base" were found on Mr. Jackson's person as well. *Id.*

Danielle Currier, one of two female passengers in the car with Mr. Jackson at the time of his arrest, was questioned by Detective Lucia and provided a sworn recorded statement. She reported that "when [Mr. Jackson] was being stopped by the police, he had" the other passenger, Brianna Arnold, "'take his big bag of drugs' . . . and hide it

---

Avenue residence because documents with Mr. Jackson's name, including an application for a social security card, a Vermont Civil Violation Complaint dated October 30, 2021, and a Rutland City Police Department Warning dated October 30, 2021, were also found there. The 55 Killington Avenue Warrant also yielded the following additional evidence: a loaded Taurus Judge Revolver, a loaded 9mm caliber pistol, and an unloaded .380 caliber pistol, as well as ammunition.

under the passenger seat of the vehicle." *Id.* at 5 ¶ 18. Ms. Currier indicated that the bag

of drugs contained "a lot of [c]ocaine[,]" *id.* (internal quotation marks omitted), and that

when she was at "a residence" with Mr. Jackson, "she observed [him] put the [c]ocaine in

[the] bag." (Defendant's Exhibit B at 5, ¶ 18.) She also stated that Mr. Jackson "offered

her some of the [c]ocaine, but she does not use anymore." *Id.* Ms. Currier described the

bag of drugs as a "blue in color lunch style bag that zips up." *Id.*

Dashcam footage of the traffic stop depicts a law enforcement officer exiting the

passenger side of the Ford Freestyle approximately three seconds after the recording

starts. Detective Lucia testified he does not recall entering the vehicle.

Officers seized the Ford Freestyle and had it towed to the Vermont State Police

Rutland Barracks. Detective Lucia and Detective Johnson stayed with the vehicle until it

was towed and followed the tow truck to the barracks. There, a law enforcement drug

detection canine alerted to the presence of illegal drugs in the Ford Freestyle.[4] Detective

Lucia applied to the Vermont Superior Court in Rutland for a search warrant for the

vehicle on November 23, 2021. Detective Lucia's affidavit in support of the search

warrant application contained the same information as his affidavit for the 55 Killington

Avenue Warrant, as well as information gleaned from Mr. Jackson's arrest and the canine

alert.

In both the search warrant application and his affidavit, Detective Lucia identified

the vehicle to be searched as a "[r]ed 2017 Ford Freestyle" and provided its registration

and VIN number. (Doc. 38-2 at 1, 7, ¶ 13.) The parties agree that the vehicle was a 2007

Ford Freestyle, not a 2017.

The Ford Freestyle Warrant was issued on November 24, 2021. It does not include

---

[4] The affidavit in support of the Ford Freestyle Warrant references "Trooper Silva's
supplemental affidavit for further details," but the parties have not supplied the supplemental
affidavit to the court. (Doc. 38-2 at 8, ¶ 18.) Detective Lucia's affidavit in support of his
application for an arrest warrant for Mr. Jackson contains this same language and the copy of it
furnished to the court also does not include the attached exhibit. (Defendant's Exhibit B at 5,
¶ 20.)

a time of its issuance.[5] Detective Lucia and Detective Johnson executed the search warrant at approximately 12:38 a.m. on November 24, 2021 and found a blue Motorola cell phone in a cupholder in the center console and a blue bag underneath the driver's seat, which they photographed. Inside the blue bag, Detective Lucia found five plastic bags of suspected cocaine base, which weighed approximately 468.1 grams with packaging and were field tested with a "presumptive positive result[.]" (Defendant's Exhibit B at 6, ¶ 23.) The search also yielded a "dollar bill folded with suspected [c]ocaine inside[,] [a] single [g]abapentin pill[,] and other paraphernalia[.]" *Id.* at 5, ¶ 21. Detective Lucia collected the items found in the vehicle and gave them to Sergeant Charles Whitehead, who entered them into evidence.

### C.    Subsequent Search Warrants.

Homeland Security Investigations ("HSI")[6] Special Agent Joseph Dornbierer investigates narcotics trafficking and potential violations of federal law and executes search warrants as part of these investigations. His December 14, 2021 affidavit in support of the Electronic Devices Warrant contains a statement that he is "an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7)[;] that is, an officer of the United States who is empowered by law to

---

[5] *See* Vt. R. Crim. P. 41(d)(4)(C)(iii) ("Upon determining to issue the warrant, the judicial officer shall immediately sign the original warrant with any modifications, enter on its face the exact date and time it is issued, and transmit a copy by reliable electronic means to the applicant."). The purpose of the time stamp is to ensure the search takes place within the time period authorized. In this case, as the search took place within an hour of the warrant's issuance, it was well within the ten days allotted. The absence of the time stamp therefore does not invalidate the search warrant. *See United States v. Wright*, 2009 WL 1550852, at *5 (S.D. Ga. June 1, 2009) ("[T]he time discrepancy [on the search warrant] was a clerical error and did not invalidate the search."); *see also United States v. Waker*, 534 F.3d 168, 171 (2d Cir. 2008) (concluding "typographical errors," such as "the execution deadline on the search warrant [being] accidentally predated one year" and "[the affiant] mistakenly postdate[ing] facts included in the attached affidavit (April 26 instead of April 25)," did not "render the warrant invalid").

[6] HSI is responsible for investigating approximately four hundred federal statutes and operates within United States Immigration and Customs Enforcement ("ICE"), a component of DHS. ICE, and by extension HSI, is a separate component from United States Customs and Border Protection, although they both fall under DHS.

conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C.
§ 2516." (Defendant's Exhibit E at 2, ¶ 2.)

The Dornbierer affidavit states that the blue Motorola cell phone seized from the
Ford Freestyle "was located near the driver's seat and center console of the vehicle[]" and
"was transported back to the Vermont State Police Rutland Barracks by RCPD Detective
Corporal Adam Lucia and Vermont State Police Detective Sergeant Jason Johnson,
where it was secured in a temporary evidence locker" until it was processed and placed in
an evidence vault. *Id.* at 4, ¶ 9. It also states that HSI Special Agent Seth Fiore obtained a
criminal complaint in United States District Court charging Mr. Jackson with knowingly
or intentionally possessing with intent to distribute cocaine and cocaine base on
November 23, 2021.[7]

The criminal complaint, attached as "Exhibit 1" to the Electronic Devices
Warrant, was issued on December 2, 2021. It describes the execution of the 55 Killington
Avenue Warrant and the seizure of three firearms on November 23, 2021 as well as the
stop of Mr. Jackson's vehicle at "1941 hours that same day[.]" (Doc. 3-4 at 4, ¶ 9.) It
identifies the evidence and statements obtained from the traffic stop, including five
plastic bags of cocaine and cocaine base. The complaint notes that the Ford Freestyle
Warrant was executed "at approximately 0038 hours" on November 24, 2021, and
yielded, in addition to the cocaine and cocaine base, "drug paraphernalia, such as a glass
stem pipe and scales." *Id.* at 5-6, ¶ 12. It states that "those involved in distributing
controlled substances frequently use scales to measure quantities of controlled substances
for sale[,]" *id.*, and that the quantity of controlled substances found was "consistent with
distribution of controlled substances." *Id.* at 6, ¶ 15. A footnote in the criminal complaint
recites the following:

> On December 2, 2021, I spoke with Rutland City Police Detective Corporal
> Lucia who informed me that the 2017 Ford Freestyle described in his [s]tate
> search warrant was a typographical error on the model year and the vehicle
> is a 2007 model year. Detective Corporal Lucia informed me that the error

---

[7] It is undisputed that the relevant events transpired during the late night and early morning hours
of November 23-24, 2021.

was corrected and clarified in subsequent law enforcement and state court documents, to include that the vehicle's VIN number was consistently correct.

*Id.* at 5, ¶ 12 n.3. The complaint asserts that "there is probable cause to believe that on or about November 23, 2021," Mr. Jackson knowingly and intentionally possessed with the intent to distribute cocaine and cocaine base, both Schedule II controlled substances. *Id.* at 6, ¶ 17. The Electronic Devices Warrant was issued on December 14, 2021 and executed on December 21, 2021.

## II.    Conclusions of Law and Analysis.

Mr. Jackson contends that Detective Lucia's affidavits in support of probable cause for the 55 Killington Avenue Warrant and for the Ford Freestyle Warrant improperly recited Mr. Bunnell's statements without demonstrating Mr. Bunnell's reliability. He argues that evidence obtained pursuant to the Ford Freestyle Warrant must be suppressed because Detective Lucia's affidavit omits that he previously conducted a warrantless search of the vehicle. He cites inconsistencies in Special Agent Dornbierer's affidavit in support of probable cause for the Electronic Devices Warrant, which he alleges indicates that Detective Lucia seized a cell phone from the Ford Freestyle before obtaining a search warrant for the vehicle.

Regarding the Electronic Devices Warrant, Mr. Jackson challenges the authority of Special Agents Dornbierer and Fiore to participate in the investigation and Detective Lucia's ability to share investigative information with them, arguing HSI agents cannot investigate United States citizens for the crimes with which Mr. Jackson is charged. He requests suppression of all evidence because his state constitutional rights were violated, because his Fourth and Fourteenth Amendment rights were violated, and because the evidence against him is unreliable.

### A.    Whether Law Enforcement Improperly Relied on Information Obtained from Mr. Bunnell.

Mr. Jackson argues that Detective Lucia's affidavits in support of the 55 Killington Avenue Warrant and the Ford Freestyle Warrant improperly included the statements of Mr. Bunnell because Mr. Bunnell did not obtain permission from a court to

9

act as a confidential informant. The government opposes Mr. Jackson's argument on three bases: (1) Mr. Bunnell was not acting as a confidential informant; (2) the United States Sentencing Guidelines are inapplicable because Mr. Bunnell was not under federal supervision; and (3) to the extent Mr. Jackson challenges the veracity of Mr. Bunnell's statements, law enforcement was entitled to rely upon his statements in the facts and circumstances of this case.

Mr. Jackson cites the United States Sentencing Guidelines for the proposition that Detective Lucia needed court permission to make an agreement with Mr. Bunnell so that he could act as a confidential informant. *See* U.S. Sent'g Guidelines Manual § 5D1.3(c)(11) (U.S. Sent'g Comm'n 2004) ("The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court."). A "confidential source" is "[s]omeone who provides information . . . on the express or implied guarantee of anonymity." *Confidential Source*, *Black's Law Dictionary* (11th ed. 2019); *see also Roviaro v. United States*, 353 U.S. 53, 59 (1957) (explaining that confidential informants, or human sources, are used "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law"). Mr. Bunnell was not a confidential informant. He identified himself and provided a sworn recorded statement following his arrest.

The Sentencing Guidelines govern federal cases and do not apply to a person subject to state supervision such as Mr. Bunnell. *See United States v. Smith*, 896 F.3d 466, 468 (D.C. Cir. 2018) ("The United States Sentencing Guidelines establish a non-binding framework for determining criminal sentences in federal prosecutions.").

To the extent Mr. Jackson questions the credibility of Mr. Bunnell's statements, "[t]he veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (observing that the Second Circuit has "endorsed the proposition that an identified citizen informant

is presumed to be reliable") (internal quotation marks and citation omitted). The court thus starts from the presumption that Mr. Bunnell's statements were reliable. The fact that they were highly self-incriminating only underscores that presumption. *See United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) ("[T]he reliability of one of the informants is indicated by his statement, made against his penal interest, that he had personally purchased cocaine from [the defendant].").

. "[T]he informant's 'basis of knowledge' and 'veracity' (i.e., how he knows and why we should believe him) [are] highly relevant to a determination of either probable cause or reasonable suspicion." *Elmore*, 482 F.3d at 179 (citing *Alabama v. White*, 496 U.S. 325, 328-29 (1990)).

> In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances [courts] also evaluate whether the information an informant provides is corroborated by independent police investigation because an informant who is right about some facts is more likely to be right about others.

*United States v. Steppello*, 664 F.3d 359, 365 (2d Cir. 2011) (internal quotation marks omitted) (quoting *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004)).

In this case, officers observed Mr. Bunnell leave 55 Killington Avenue, a suspected site of drug trafficking which was described as Mr. Jackson's residence. When questioned after his receipt of *Miranda* warnings, Mr. Bunnell admitted he purchased cocaine from Mr. Jackson on multiple occasions, including that day.[8] He described Mr. Jackson's typical drug trafficking patterns, the prices he charged, and the quantities he distributed. He noted that Mr. Jackson "trust[ed] him" and Mr. Jackson had accompanied him on trips to the "city." (Defendant's Exhibit H at 6, ¶ 10) (internal quotation marks omitted). He described the amounts and types of drugs he had purchased and used and provided Mr. Jackson's telephone number. He stated that he knew Mr. Jackson kept drugs on his person as well as a firearm in his waistband at all times. He advised law

---

[8] *See United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975) (observing that the Supreme Court and Second Circuit "have recognized personal observation as a reliable basis for an informant's report").

enforcement that he had planned to go back to Mr. Jackson's residence later that afternoon to purchase "an eight ball of cocaine[.]" *Id.* at ¶ 11.

Mr. Bunnell's information was detailed, comprehensive, and sufficiently specific so that he could have been charged with providing false information to a police officer if he was untruthful.[9]

For the reasons stated above, Mr. Bunnell's statements had sufficient reliability to support probable cause for the 55 Killington Avenue Warrant. Mr. Jackson's motion to suppress because of the alleged unreliability of Mr. Bunnell's sworn statements is therefore DENIED.

### B.    Whether the Ford Freestyle Warrant Contains False or Misleading Statements Necessary to the Finding of Probable Cause.

Mr. Jackson asserts that Detective Lucia's affidavit was untruthful because it omitted the fact that he had already searched the Ford Freestyle without a warrant and seized the blue Motorola cell phone which was then transported back to the Rutland barracks. The government counters that no warrantless search occurred and, even if it had, this omission would not be material to the determination of probable cause because any results of the alleged warrantless search were not included in the warrant application.

"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing[.]" *Franks*, 438 U.S. at 164-65 (internal quotation marks and citation omitted). As the Supreme Court has explained:

---

[9] *See States v. Elmore*, 482 F.3d 172, 182 (2d Cir. 2007) (concluding 911 caller that identified himself by name and date of birth, disclosed his present location, and provided a phone number had provided "enough information about [him]self to allow [the police] to identify [him] and track [him] down later to hold [him] accountable if [his] tip proved false" and was reliable); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("'[A] tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated' is especially significant in establishing probable cause.") (alteration in original) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)); *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) (stating face-to-face informant is more trustworthy than anonymous informant "for the former runs the greater risk that he may be held accountable if his information proves false").

This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Id.* at 165.

A search warrant affidavit enjoys "a presumption of validity[,]" *id.* at 171, but "in certain circumstances a defendant is entitled to a hearing to test the veracity of the affiant's statements." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (citing *Franks*, 438 U.S. at 171). To overcome the presumption of validity, a defendant must make a "substantial preliminary showing" that (1) the warrant affidavit contains a false statement, (2) the false statement was included knowingly and intentionally or with reckless disregard for the truth, and (3) the false statement was necessary to the probable cause finding. *Franks*, 438 U.S. at 155-56. The defendant must meet this standard by "a preponderance of the evidence[.]" *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008), *cert. denied*, 555 U.S. 1061 (2008).

In terms of intent, *Franks* applies to "omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003) (internal quotation marks and emphasis omitted) (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)). Courts recognize that "[a]ffidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *Colkley*, 899 F.2d at 300 (internal quotation marks omitted). "[M]isstatements or omissions caused by 'negligence or innocent mistake[s]' do not warrant suppression." *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (quoting *Franks*, 438 U.S. at 171) (second alteration in original). "The *Franks* standard is a high one[.]" *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

To determine whether an allegedly false statement was necessary to the finding of probable cause, the court engages in "a process of subtraction" whereby it "disregard[s]

the allegedly false statements and determine[s] whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Awadallah*, 349 F.3d at 65 (internal quotation marks omitted). To assess materiality of omissions, the court conducts a "'process of' . . . addition[,]" *United States v. Nejad*, 436 F. Supp. 3d 707, 719 (S.D.N.Y. 2020) (quoting *Awadallah*, 349 F.3d at 65), and "insert[s] the omitted truths[.]" *Rajaratnam*, 719 F.3d at 146 (internal quotation marks omitted) (quoting *United States v. Ippolito*, 774 F.2d 1482, 1487 n.1 (9th Cir. 1985)). "The ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)).

If, after the process of subtraction or addition, the remaining facts give rise to probable cause, "the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Id.* Indeed, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no [*Franks*] hearing is required." *Franks*, 438 U.S. at 171-72 (footnote omitted). Correspondingly, if "the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156.

The probable cause determination "is not overly strict." *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005). A judge:

> make[s] a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Probable cause exists when, "based on the totality of circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that

14

are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed[.]'" *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). It "is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238-39 (second and third alterations in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

To demonstrate that Detective Lucia searched the Ford Freestyle before obtaining a search warrant, Mr. Jackson relies on a video showing a law enforcement officer exiting the Ford Freestyle.[10] He cites to Special Agent Dornbierer's Electronic Devices Warrant affidavit which states that the blue Motorola cell phone was "transported back" to the barracks by Detective Lucia and stored in an evidence locker as further evidence of the unlawful search. (Defendant's Exhibit E at 4, ¶ 9.)

The testimony of Detective Lucia and Detective Johnson, who both personally observed the Ford Freestyle at all relevant times, when considered in conjunction with photographs of the location of the blue Motorola cell phone at the time of the search, as well as the search warrant inventory, property, and chain of custody reports, all support a conclusion that the Ford Freestyle was seized but not searched at the scene of Mr. Jackson's arrest. It was then towed to a secure location and searched after the Ford Freestyle Warrant was obtained. As Detective Lucia acknowledged, Special Agent Dornbierer's affidavit contained either unartful wording or a misunderstanding of the sequence of events surrounding the blue Motorola cell phone's seizure by using the word "transported."

---

[10] Although Detective Lucia does not recall entering the vehicle, it is undisputed that the vehicle was prepared for towing. He credibly testified that, for certain vehicles, this requires placing the vehicle in neutral so as to avoid damage to the vehicle in the towing process. He also testified that during traffic stops, law enforcement needs to ensure that the vehicle's engine is turned off and it is placed in park.

If a law enforcement officer had entered the Ford Freestyle and seized a cell phone prior to the issuance of a search warrant, it would not have altered the probable cause determination. The Ford Freestyle Warrant detailed the evidence obtained from the 55 Killington Avenue Warrant, including firearms, narcotics, and drug trafficking paraphernalia, as well as Mr. Bunnell's sworn statements regarding his recent purchases of heroin and cocaine from Mr. Jackson. It noted that there had been three controlled buys from Mr. Jackson and that he was prohibited from possessing firearms because of his prior convictions. Against this backdrop, whether and when a law enforcement officer secured the cell phone and put it in an evidence locker is not material,[11] because no fruits of the alleged unlawful seizure of the blue Motorola cell phone in the Ford Freestyle were included in a search warrant affidavit.[12]

Mr. Jackson is correct that Special Agent Dornbierer's affidavit states that Special Agent Fiore filed a criminal complaint against Mr. Jackson on November 23, 2021 based on evidence seized during the search of the Ford Freestyle on November 24, 2021; however, the criminal complaint against Mr. Jackson was filed on December 2, 2021. Whether the criminal complaint was obtained on November 24 or approximately eight

---

[11] *See United States v. Montes-Medina*, 570 F.3d 1052, 1060 (8th Cir. 2009) ("[The defendant's] assertion that the affidavit omitted information that the officers had entered the residence prior to seeking a warrant does not present information that was clearly critical to or that affected the probable cause determination."); *see also Iverson v. United States*, 2020 WL 1986924, at *4 (W.D.N.Y. Apr. 27, 2020) ("[E]ven assuming that the officer omitted information about a prior entry into [the defendant's] apartment, '[a]n otherwise sufficient application for a search warrant need not relate unproductive or unsuccessful efforts in the course of the investigation[.]'") (quoting *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993) (third alteration in original)); *United States v. Kolokouris*, 2015 WL 7176364, at *19 (W.D.N.Y. Nov. 13, 2015) (declining to suppress evidence obtained pursuant to warrant that omitted law enforcement's warrantless entry because warrantless entry "produced fruits that were not necessary to the probable cause finding").

[12] *See United States v. Witherspoon*, 467 F. App'x 486, 491 (6th Cir. 2012) (affirming conclusion that officer's "failure to mention his unlawful search would not have affected the issuing judge's probable cause determination, because none of the evidence obtained as a result of the unlawful search was included in the affidavit"); *United States v. Johnson*, 265 F. App'x 757 (11th Cir. 2008) (per curiam) (concluding omission of alleged unlawful protective sweep was not material because affidavit was not based on any evidence allegedly obtained during alleged unlawful search).

days thereafter is immaterial to a probable cause determination. Any errors in Special Agent Dornbierer's affidavit thus do not negate probable cause. *See United States v. Waker*, 534 F.3d 168, 171 (2d Cir. 2008) ("In general, minor errors in an affidavit are not cause for invalidating the warrant that it supports.").

For the foregoing reasons, because the Ford Freestyle Warrant did not contain a materially false or misleading statement that altered the determination of probable cause, Mr. Jackson's motion to suppress as well as his request for a *Franks* hearing are DENIED.

## C. Whether HSI Agents Improperly Participated in the Investigation.

Mr. Jackson argues that HSI Special Agents Dornbierer and Fiore were not authorized to investigate the criminal laws with which he is charged and thus were not permitted to participate in the execution of the 55 Killington Avenue Warrant or obtain the Electronic Devices Warrant. He asserts that Detective Lucia shared criminal information with non-law enforcement allegedly in violation of federal regulations.

Under Fed. R. Crim. P. 41(d)(2)(A), "[w]hen a federal law enforcement officer . . . presents an affidavit in support of a warrant, the judge may require the affiant to appear personally and may examine under oath the affiant and any witness the affiant produces." For purposes of Rule 41, a "federal law enforcement officer" is "a government agent (other than an attorney for the government) who is engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant." Fed. R. Crim. P. 41(a)(2)(C).

The Attorney General has authorized agents of the United States Customs Service to request the issuance of a search warrant. 28 C.F.R. § 60.3(a)(7) (listing "U.S. Customs Service" as "hav[ing] law enforcement officers within the categories listed in § 60.2 of this part");[13] *see also id.* § 60.2(b) (including "[a]ny person who has been authorized to

---

[13] DHS has all the functions, legal authority, and operations of the former United States Customs Service. *See* 6 U.S.C. § 203(1) (transferring "to the Secretary [of DHS] the functions, personnel, assets, and liabilities of . . . the United States Customs Service"). The Secretary of DHS thus has the authority to designate "any agent or other person" to "perform any duties of an officer of the Customs Service." 19 U.S.C. § 1401(i). At the Secretary of DHS's direction, "an officer of the

17

execute search warrants by the head of a department, bureau, or agency (or his delegate, if applicable) pursuant to any statute of the United States" within "categories of federal law enforcement officers [who] are authorized to request the issuance of a search warrant"). "Under this language, in a general sense, customs officers may execute a search warrant for any crime." *Hallock v. United States*, 253 F. Supp. 2d 361, 365 (N.D.N.Y. 2003); *see also United States v. Bonner*, 2013 WL 6028301, at *5 (S.D. Cal. Nov. 13, 2013) (concluding that DHS agent who was "empowered to exercise the enforcement authority of a customs agent under 19 U.S.C. § 1589a" had authority to execute search warrant under Rule 41). For this reason, "[c]ustoms officers have been traditionally responsible for investigating wrongdoing on a national and even global stage," *Hallock*, 253 F. Supp. 2d at 365, including obtaining and executing search warrants for suspected drug trafficking and related criminal offenses.[14]

Because HSI Special Agents Dornbierer and Fiore are customs officers, they may lawfully execute search warrants for suspected violations of domestic drug trafficking laws, even if these violations are "not within the normal purview of what is traditionally thought to be a customs function . . . so long as the Secretary of [DHS] permits it." *Id.*

To the extent Mr. Jackson argues that Special Agent Dornbierer's affidavit for the Electronic Devices Warrant contained a material falsehood because of its citations to 18

---

customs may . . . execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States" and "perform any other law enforcement duty that the Secretary [of DHS] may designate." *Id.* § 1589a(2), (4).

[14] *See, e.g., United States v. Lambus*, 897 F.3d 368, 378 (2d Cir. 2018) (observing "HSI was designated the lead agency" in a drug trafficking investigation); *see also United States v. Esquivel-Carrizales*, 2023 WL 5133293, at *1 (5th Cir. Aug. 10, 2023) (per curiam) (stating HSI agents were investigating drug trafficking); *United States v. Rocha-Gomez*, 412 F. Supp. 3d 369, 372-73 (S.D.N.Y. 2019) (noting HSI agent submitted affidavit in support of probable cause and HSI agents executed search warrant in case involving "narcotics conspiracy"); *United States v. Lights*, 208 F. Supp. 3d 568, 573 (S.D.N.Y. 2016) (describing HSI agent filed affidavit in support of probable cause to search residence and business where agent believed locations contained "evidence and instrumentalities of narcotics trafficking"); *United States v. Filippi*, 2013 WL 208919, at *1-3 (S.D.N.Y. Jan. 16, 2013) (observing HSI agents submitted affidavits in support of probable cause for multiple warrants and participated in searches for investigation into suspected marijuana growing operation).

U.S.C. § 2510 and 18 U.S.C. § 2516, which relate to the interception of wire, oral, or electronic communications, the statutory source of Special Agent Dornbierer's authority was not required for probable cause. *See United States v. Rey*, 663 F. Supp. 2d 1086, 1121 (D.N.M. 2009) ("Information related to [the officer's] authority to operate in [the relevant jurisdiction] would not have changed [the judge's] analysis of probable cause because that information had nothing to do with whether [the officer] was presenting sufficient evidence of marijuana growing on [the defendant's] property . . . to justify the issuance of a search warrant.").[15] As a "law enforcement officer" under Fed. R. Crim. P. 41, Special Agent Dornbierer had the authority to seek the Electronic Devices Warrant, and thus there is no concern that the magistrate judge acted as a "rubber stamp[,]" (Doc. 123 at 10) for the police.[16]

Because Special Agents Dornbierer and Fiore were authorized to participate in the investigation into Mr. Jackson's alleged crimes, their involvement does not warrant the suppression of evidence obtained pursuant to any of the challenged warrants. Mr. Jackson's motion to suppress on this basis is DENIED.

### D.    Whether Law Enforcement's Alleged Violation of Mr. Jackson's State Constitutional Rights Requires Suppression.

Citing *State v. Walker-Brazie*, 2021 VT 75, 215 Vt. 492, 280 A.3d 24, Mr. Jackson argues that law enforcement violated his rights under the Vermont Constitution when they executed the 55 Killington Avenue Warrant and therefore "evidence obtained in violation of the Vermont Constitution may not be admitted at [trial] in a state prosecution because such evidence eviscerates Vermont's most sacred right[]s, impinges on individual privacy, [and] perverts the Judicial process and thus violates Article 11 of [the] Vermont Constitution[.]" (Doc. 123 at 6.) Mr. Jackson argues that these alleged

---

[15] *See also United States v. Jones*, 600 F.3d 847, 852-53 (7th Cir. 2010) (concluding that affidavit's citation to "invalid executive order" was "a clerical error" and was "not a reason to invalidate an otherwise proper warrant which is supported by ample probable cause[]" because updated executive order was "materially the same" as invalidated order).

[16] *See United States v. Clark*, 638 F.3d 89, 101 (2d Cir. 2011) ("[T]he law will not hastily assume a magistrate's surrender of his judicial independence to the police or prosecution.").

violations of the Vermont Constitution, in turn, violated the Fourth and Fourteenth
Amendments to the United States Constitution.

"[T]he touchstone of a federal court's review of a state search warrant secured by
local police officials and employed in a federal prosecution is the Fourth Amendment and
its requirements, and no more." *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993).
This remains true even if "the underlying investigation leading to prosecution was
conducted solely by state officials." *United States v. Pforzheimer*, 826 F.2d 200, 204 (2d
Cir. 1987). Accordingly, the Vermont Constitution does not apply. "[B]ecause the search
at issue satisfied the requirements of federal law, there [is] no need to determine whether
the search violated the Vermont constitution." *Smith*, 9 F.3d at 1014 (citing *Pforzheimer*,
826 F.2d at 204).

Mr. Jackson's reliance on a state court case from California that did not involve a
Fourth Amendment issue, *Manavian v. Dep't of Just.*, 239 Cal. Rptr. 3d 710 (Cal. Ct.
App. 2018), and on *Weeks v. United States*, 232 U.S. 383 (1914), *overruled by Mapp v.
Ohio*, 367 U.S. 643 (1961), does not alter that outcome. *Manavian* held that "[Public
Safety Officers Procedural Bill of Rights Act] protections were not triggered by the
termination of [plaintiff's] [career executive assignment] position" under California law.
239 Cal. Rptr. 3d at 714. It is therefore distinguishable. *Weeks* has been overruled and
merely held "'for the first time' . . . that 'in a federal prosecution the Fourth Amendment
barred the use of evidence secured through an illegal search and seizure.'" *Mapp*, 367
U.S. at 648 (quoting *Wolf v. Colorado*, 338 U.S. 25, 28 (1949)). Neither case offers
precedent, controlling or persuasive, that is applicable here.

For the foregoing reasons, Mr. Jackson's motion to suppress based on a violation
of the Vermont Constitution is DENIED.

### E.      Whether the Evidence in Support of Counts I, II, and III Is Unreliable.

Mr. Jackson contends that the evidence supporting Counts I-III of the Third
Superseding Indictment—conspiracy to distribute cocaine and cocaine base between
January 2021 and November 23, 2021 (Count I), distribution of cocaine on August 21,
2020 (Count II), and distribution of cocaine base on September 24, 2020 (Count III)—

does not pertain to him and is otherwise tainted, lost, or unreliable. The government responds that the quality of the evidence against Mr. Jackson on these counts is a determination reserved for the jury.

To the extent Mr. Jackson challenges the sufficiency of the evidence against him, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009) (internal quotation marks omitted) (quoting *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir.1998)); *see also United States v. Rankin*, 422 F. Supp. 3d 564, 578 (D. Conn. 2019) ("[T]he federal rules do not authorize judges to engage in a pre-trial inquest to decide if the prosecution will have enough evidence to prove its case at trial.") (citing *Costello v. United States*, 350 U.S. 359, 363-64 (1956)). There is no evidence that there has been a full proffer. Moreover, it is generally a jury, not the court, that evaluates the sufficiency of the evidence. *See United States v. McCourty*, 562 F.3d 458, 476 (2d Cir. 2009) ("It is the function of the jury to weigh the evidence and to assess the credibility of those witnesses who testify.").

At trial, Mr. Jackson will have the opportunity to request a judgment of acquittal at the close of the government's case-in-chief. *See* Fed. R. Crim. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). At this juncture, the court can neither evaluate the weight of the evidence nor the credibility of the witnesses. Mr. Jackson's motion to dismiss based on the insufficiency of the evidence is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Mr. Jackson's motion to suppress evidence and request for a *Franks* hearing is DENIED. (Doc. 123.)

21

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 7th day of November, 2023.

Christina Reiss, District Judge
United States District Court