UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NO. |
| | ) | 2:21-cr-00113-cr-1 |
| v. | ) | |
| | ) | |
| LAWRENCE JACKSON, | ) | |
| Defendant. | ) | |


JURY TRIAL EXCERPT
TESTIMONY OF ASHLEY LOBDELL
Wednesday, April 10, 2024
Burlington, Vermont


BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    District Judge, and a Jury


APPEARANCES:

JONATHAN A. OPHARDT, ESQ., and NICOLE P. CATE, ESQ., U.S.
    Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
    570, Burlington, VT 05402-0570, Counsel for the Government

LAWRENCE JACKSON, #82536-509, Northwest State Correctional
    Facility, 3649 Lower Newton Road, Swanton, VT 05488,
    Self-Represented

ROBERT S. BEHRENS, ESQ., Behrens Venman PLLC, 30 Elmwood
    Avenue, Burlington, VT 05401, Standby Counsel for the
    Defendant


Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

INDEX TO EXAMINATIONS

WITNESS                                                                    PAGE

ASHLEY LOBDELL
     Direct by Mr. Ophardt                                                  3
     Cross by Mr. Jackson                                                  30

INDEX TO EXHIBITS

GOVERNMENT

| EXHIBIT | DESCRIPTION | 1st ID | RECEIVED |
|---------|-------------|--------|----------|
| 6 | Photograph of Reginald Watson, Bates 795 | 7 | |
| 7 | Photograph of Courtney Schaner, Bates 1173 | 7 | |
| 16 | Photograph of Wendy Ashline and Lawrence Jackson, Bates 1174 | 6 | |
| 31F | Materials from Jackson's Phone - Ashley Lobdell, Bates 1219-1219.04 | 24 | 25 |
| 38 | Photograph of Orlando Cruz, Bates 215 | 11 | 12 |
| 57 | Photograph of 55 Killington Avenue, Bates 1200 | 7 | |

DEFENDANT

| EXHIBIT | DESCRIPTION | 1st ID | RECEIVED |
|---------|-------------|--------|----------|
| V | Excerpt from FBI Report, Bates 982.07 | 39 | 43 |

Ashley Lobdell - Direct

1  Wednesday, April 10, 2024

2       (The following was held in open court at 3:11 PM.)

3           MR. OPHARDT:  Your Honor, the United States calls

4  Ashley Lobdell.

5           COURTROOM DEPUTY:  Ms. Lobdell, I'm going to swear you

6  in.  Please raise your right hand.  State your full name for

7  the record.

8           THE WITNESS:  Ashley Lobdell.

9                    ASHLEY LOBDELL,

10      having been first duly sworn by the courtroom deputy,

11            was examined and testified as follows:

12           THE WITNESS:  Yes.

13                  DIRECT EXAMINATION

14  BY MR. OPHARDT:

15  Q    Good afternoon.  Ms. Lobdell, how old are you?

16  A    Twenty-six.

17  Q    Where did you grow up?

18  A    Rutland, Vermont.

19  Q    How long have you lived in Rutland, Vermont?

20  A    All my whole life.

21  Q    When did you begin abusing drugs?

22  A    When I was 17.

23  Q    What drugs were those?

24  A    Ritalin, cocaine.

25  Q    You started with cocaine at 17?

Ashley Lobdell - Direct

1  A    Well, started with Ritalin.

2  Q    Okay.  When did it switch over to harder drugs like

3  cocaine?

4  A    When I was about 20.

5  Q    And I'm sorry.  I forgot already what you said.  How old

6  are you now?

7  A    Twenty-six.

8  Q    Okay.  So that would have been about six years ago.

9  A    Yup.

10 Q    So by 2021, you were using cocaine quite regularly?

11 A    Yes.

12 Q    And at some point did you also begin using opiates?

13 A    Yes.

14 Q    When was that?

15 A    About a little -- three years ago, probably.

16 Q    So we're in 2024.  It would have been in 2021?

17 A    Yup.

18 Q    When you were using cocaine and -- well, when you were

19 using cocaine, was it powder cocaine or crack cocaine?

20 A    Crack cocaine.

21 Q    At your peak use, what was it?  What was the most you

22 would use in a one-day period?

23 A    Like three grams a day.

24 Q    And how about heroin?  Where did that peak out?

25 A    About three bundles a day.

Ashley Lobdell - Direct

1  Q     In 2021, who was providing you with cocaine and cocaine

2  base?

3  A     Boo-Bee.

4  Q     How did you meet Boo-Bee?

5  A     Through Courtney Schaner.

6  Q     And about when did that occur?

7  A     In the springtime of 2021.

8  Q     How much time did you spend with Boo-Bee after you met

9  him?

10 A     Quite a bit.

11 Q     Do you know Boo-Bee's real name?

12 A     Yes.

13 Q     Did you know that in 2021?

14 A     No.

15 Q     Do you see Boo-Bee in the courtroom today?

16 A     Yes.

17 Q     Where is he seated?

18 A     Directly behind you.

19 Q     Would you describe what he's wearing.

20 A     Kind of -- I don't have my glasses, but it looks like a

21 blue suit.

22 Q     Is he wearing glasses?

23 A     Yes.

24 Q     You're squinting.  Are you having trouble seeing?

25 A     Yeah.  I don't have my glasses.

Ashley Lobdell - Direct

1 Q    Okay.  Fair enough.

2        MR. OPHARDT:  Your Honor, may the record reflect an

3 identification of the defendant as Boo-Bee.

4        THE COURT:  I don't think it does reflect it.

5 Q    Where is that -- since you're having trouble seeing,

6 perhaps we could go with a photograph so it could be closer to

7 you.

8 A    Okay.

9 Q    Would that be helpful?

10 A    Yes.

11        MR. OPHARDT:  Could we have the ELMO up.

12        COURTROOM DEPUTY:  And what exhibit?

13        MR. OPHARDT:  Exhibit 16.  It's in evidence.

14        COURTROOM DEPUTY:  And it should be on.

15 Q    Ms. Lobdell, do you see Boo-Bee in that photograph?

16 A    Yes.

17 Q    Which person is Boo-Bee?

18 A    The one on the right.

19 Q    And who else is in the photograph?

20 A    His girlfriend, Wendy.

21 Q    In 2021, how often would you say you saw the man you knew

22 as Boo-Bee?

23 A    Just about every day.

24 Q    Where did you believe him to be residing?

25 A    On Killington Ave.

Ashley Lobdell - Direct

1  Q    Do you remember the street number?

2  A    No.

3  Q    Whose apartment was it?

4  A    Courtney Schaner's.

5  Q    Who was also staying at that apartment?

6  A    Courtney's boyfriend, Reggie, and Boo-Bee's girlfriend,

7  Wendy.

8  Q    Showing what's been previously admitted as Government's

9  Exhibit 6, do you recognize that person?

10  A    Yes.  That's Reggie.

11  Q    And Government's Exhibit 7, which has also been admitted,

12  do you recognize that person?

13  A    Yeah.  That's Courtney.

14  Q    Were you ever at 55 Killington Avenue -- I'm sorry.  You

15  just said you didn't know the number.

16     Were you ever at Courtney Schaner's residence on

17  Killington when Boo-Bee was there?

18  A    Yes.

19  Q    How many times would you say you were at 55 Killington?

20  A    Probably about ten times.  Maybe more.

21  Q    Would you recognize a photograph of it?

22  A    Yes.

23        MR. OPHARDT:  This has previously been admitted as

24  Government's Exhibit 57.

25  Q    Ms. Lobdell, do you recognize that building?

Ashley Lobdell - Direct

1  A    Yes.  That's the Killington Ave. residence.

2  Q    Which floor was the apartment on?

3  A    The second floor.

4  Q    I'm sorry.  I took 57 down too quick.  Put it back up.

5       Would you access the apartment through this door here on

6  the front with the little staircase?

7  A    No.

8  Q    Where would you access it?

9  A    Out back.  Up the driveway.

10 Q    When you were at the Killington Avenue residence, what, if

11 anything, did you see Boo-Bee doing with drugs?

12 A    I saw him cooking drugs up --

13 Q    What does that mean?

14 A    -- and selling them.

15      It means making cocaine into crack.

16 Q    You also said "and selling them"?

17 A    Yes.

18 Q    How many times do you recall seeing Boo-Bee cook cocaine

19 into crack?

20 A    About three times.

21 Q    How would he do it?  Would he --

22 A    He would use the stove or the microwave.

23 Q    Did Boo-Bee ever provide you with drugs at the Killington

24 Avenue residence?

25 A    Yes.

Ashley Lobdell - Direct

1 Q    In total, not just at Killington, how many times did you

2 obtain drugs from Boo-Bee?

3 A    Over ten times.

4 Q    What would you get in exchange -- I'm sorry.

5      What would you give in exchange for the drugs?

6 A    Money or sometimes sex.

7 Q    Other than at the Killington Avenue apartment, where in

8 Rutland do you remember seeing Boo-Bee?

9 A    Meadow Street Park and then, like, just kind of around

10 town at Highlander -- at Highlander Motel.

11 Q    The Highlander Motel, that's a motel in Rutland?

12 A    Yes.

13 Q    Do you remember -- do you recall where it is in Rutland?

14 A    I can't remember the street.

15 Q    When you were at the Highlander, whose room were you at?

16 A    Stephanie Horvath's.

17 Q    And was this a particular day that you're recollecting?

18 A    Yeah.

19 Q    That's a "yes"?

20 A    Yes.

21 Q    What happened that day in relation to drugs and Boo-Bee?

22 A    He had me do a couple sales in -- yeah.

23 Q    What does "doing sales" mean?

24 A    So I was running drugs outside for him and bringing the

25 money back for him.

Ashley Lobdell - Direct

1  Q    Where would you get the drugs from before you left?

2  A    Boo-Bee.

3  Q    And where would you bring them?

4  A    Outside to the people that he had pulling up.

5  Q    What would you give -- what would you do with the drugs

6  when you were outside?

7  A    I'd give them to the people -- the person that I was

8  meeting.

9  Q    And then what would you get from them?

10 A    I would get money.

11 Q    Where would you bring the money?

12 A    Back to Boo-Bee.

13 Q    Do you recall approximately how many times this happened

14 when you were at the Highlander?

15 A    Probably about five times.

16 Q    Any particular transaction stand out?

17 A    He had me do one sale of $500.

18 Q    Why does that stand out?

19 A    It was just because it was large for me.

20 Q    During the time you spent with Boo-Bee --

21        THE COURT:  So let's make sure we do have a time

22 frame.

23        MR. OPHARDT:  Yes, your Honor.  I apologize.

24 Q    You said you first met Boo-Bee in the spring of 2021; is

25 that correct?

Ashley Lobdell - Direct

1  A    Yes.

2  Q    How long did you interact with Boo-Bee?

3  A    About seven months.  Seven, eight months.

4  Q    Why did it stop?

5  A    Because he got arrested.

6  Q    During that time frame, who, if anyone, do you recall also

7  delivering drugs for Boo-Bee?

8  A    Angel.

9  Q    How many times did you see Angel?

10  A    Probably about six times, seven times.

11  Q    Would you recognize a photograph of him?

12  A    Yes.

13  Q    There's a binder in front of you.  It's the smaller

14  binder.  If you could look at Government's Exhibit 38.

15  A    Sorry.

16  Q    It's okay.  Take your time.

17  A    All right.  Found it.

18  Q    Without saying who it is, generally speaking, what's

19  depicted in the photograph?

20  A    It's Angel sitting there.

21  Q    So without saying who it is --

22  A    Oh.

23  Q    -- is it a man, a woman?

24  A    It's a man.

25  Q    Okay.

Ashley Lobdell - Direct

1          MR. OPHARDT:  Your Honor, I'd move to admit

2  Government's Exhibit 38 at this time.

3          THE COURT:  Any objection?

4          MR. JACKSON:  I don't know what he's admitted, your

5  Honor.  I can't see it.

6          THE COURT:  Make sure Mr. Jackson has a copy.

7          MR. JACKSON:  Okay.  That's fine.

8          THE COURT:  Any objection?

9          MR. JACKSON:  No objections, your Honor.

10          THE COURT:  Exhibit 38 is admitted.

11      (Government's Exhibit 38 was received in evidence.)

12          MR. OPHARDT:  Your Honor, may I publish?

13          THE COURT:  You may.

14  Q    BY MR. OPHARDT:  Ms. Lobdell, who's depicted in

15  Government's Exhibit 38?

16  A    That's Angel.

17  Q    Was there any other locations where you recall seeing the

18  man you knew as Boo-Bee in Rutland?

19  A    No.

20  Q    Was he always in a particular building?

21  A    Either Killington -- not really.  He was --

22  Q    Where else would you see him other than in a building or a

23  structure?

24  A    In a car.

25  Q    How often were you with him in a car?

Ashley Lobdell - Direct

1  A    Pretty often.

2  Q    What were the two of you doing in a vehicle?

3  A    Just driving around.

4        THE COURT:  So when you say something like "pretty

5  often," what do you mean?

6        THE WITNESS:  Probably, like, six, seven times.

7        THE COURT:  Thank you.

8  Q    When you two were in a vehicle together, what was

9  happening?

10  A    We were just smoking, getting high, doing sexual things.

11  Q    Getting high on what?

12  A    Cocaine.

13  Q    Would this be while driving or while stationary?

14  A    Both.

15  Q    When you were in the vehicle, anything else regarding

16  drugs going on while you're driving around Rutland?

17  A    Regarding drugs or --

18  Q    Yes.

19  A    He would be doing sales.

20  Q    When you were in the vehicle, did you ever see any

21  firearms?

22  A    Yes.

23  Q    Where?

24  A    In the glove box.

25  Q    What type of firearm?

Ashley Lobdell - Direct

1  A    It was kind of like a hand-held pistol.

2  Q    I want to move forward a little bit in time and talk with

3  you about the evening of September 25th, 2022, in the Jolley

4  Mart on Grove Street.  Do you know what I'm talking about?

5  A    Yes.

6  Q    What happened that night?

7  A    I did an armed robbery.

8  Q    What weapon did you use?

9  A    A knife.

10  Q    Why did you rob the store with a knife?

11  A    Because I owed somebody money.

12  Q    Who did you owe money?

13  A    Peeto.

14  Q    What was the money owed for?

15  A    Drugs.

16  Q    What type of drug?

17  A    Cocaine and heroin.

18  Q    Had you seen Peeto prior to robbing the store?

19  A    Yes.

20  Q    Having seen Peeto, was that connected to why you robbed

21  the store?

22  A    Yes.

23  Q    What happened?

24  A    I showed up there and he held a gun to me and told me I

25  owed him money and that we were going to figure a way to get it

Ashley Lobdell - Direct

1 back.

2 Q    Did anyone help you rob the store?

3 A    Yes.

4 Q    Who was that?

5 A    Darren Dwyer.

6 Q    What did he do to help?

7 A    He walked with me to -- well, to make sure that I pretty

8 much did it.

9 Q    Did he give you anything?

10 A    No.

11 Q    Where did you --

12 A    Well, he gave me the knife.

13 Q    He gave you the knife?

14 A    Yes.

15 Q    How much money did you get from the robbery?

16 A    A little over $400.

17 Q    And what happened to the money?

18 A    I gave it to Peeto.

19 Q    And you were arrested for this robbery in early October;

20 is that right?

21 A    Yes.

22 Q    When you were arrested, did you give a statement to law

23 enforcement?

24 A    Yes.

25 Q    What did you tell them about the robbery?

Ashley Lobdell - Direct

1  A    What I just told you.

2  Q    You told them what you told me?

3  A    Yes.

4  Q    What were you charged with in federal court?

5  A    Armed robbery.

6  Q    While that case was pending, did you stay detained?

7  A    No.  No.

8  Q    What happened?

9  A    I was released.

10  Q    What were you released for?

11  A    To go to rehab.

12  Q    How did that go?

13  A    Not so good.

14  Q    What happened?

15  A    I relapsed.

16  Q    After you relapsed, what did you do?

17  A    I went back to jail, and I was released again.

18  Q    After you were released again, what was the purpose for

19  that?

20  A    To go back to rehab and to go into sober living.

21  Q    Where were you in sober living?

22  A    Jenna's Promise.

23  Q    How had that been going until recently?

24  A    It was going really good until I relapsed.

25  Q    How long ago was that?

Ashley Lobdell - Direct

1  A     Two weeks ago now.

2  Q     Where did you obtain drugs?

3  A     Just some random guy outside the store.

4  Q     Close to Jenna's Promise?

5  A     Yeah.

6  Q     Where did you take them?

7  A     I took them back to Jenna's Promise.

8  Q     And what did you do with them?

9  A     I used them.

10 Q     Did you give any to anybody else?

11 A     No.

12 Q     After you relapsed, what did you tell your treatment

13 providers and your probation officer?

14 A     That I relapsed.

15 Q     So you told them the truth?

16 A     Yes.

17 Q     What happened to your sober living?

18 A     I was kicked out.

19 Q     After you were kicked out, where did you go?

20 A     Back to Rutland.

21 Q     During this time, was your probation officer trying to get

22 you to come in for a meeting?

23 A     Yes.

24 Q     Did you do what your probation officer asked?

25 A     Did I?  No.

Ashley Lobdell - Direct

1  Q    How long until -- after you were kicked out of Jenna's
2  Promise, how long after that did you start using cocaine again?
3  A    About three days after.
4  Q    While you were out of custody, where were you?  What city?
5  A    I was in Rutland.
6  Q    While you were in Rutland, what, if anything, did you know
7  about a warrant for your arrest?
8  A    I knew about it.
9  Q    Did you turn yourself in?
10 A    No.
11 Q    And so how is it that you wound up back in custody?
12 A    They found me.
13 Q    Law enforcement?
14 A    Yes.
15 Q    And how long ago was that?
16 A    Last -- this past Saturday.
17 Q    So a few days ago?
18 A    Yeah.
19 Q    When was the last time you used cocaine?
20 A    Saturday.
21 Q    Is your mind clear today, or is it foggy?
22 A    It's clear.
23 Q    You -- what's the status of your robbery charge?
24 A    What do you mean?
25 Q    Have you pled guilty?

Ashley Lobdell - Direct

1  A    Yes.

2  Q    When you pled guilty, as part of that guilty plea, did you

3  also have an agreement with the Government?

4  A    Yes.

5  Q    What was that agreement?

6  A    To postpone my sentencing out a year and to testify.

7  Q    Testify when the Government requested?

8  A    Yes.

9  Q    What was the purpose of postponing your sentencing for a

10 year?

11 A    To give me a chance to keep -- keep on track.

12 Q    We recently had another meeting; is that right?

13 A    Yes.

14 Q    After you were arrested on Saturday, I believe?

15 A    Yes.

16 Q    What, if anything, is your understanding of the agreement

17 with the Government, the cooperation agreement, your plea

18 agreement?

19 A    To give myself a chance to not have to spend forever in

20 jail.

21 Q    Have you been told whether or not the agreement's still in

22 effect?

23 A    Yes.

24 Q    What were you informed?

25 A    That it is.

Ashley Lobdell - Direct

1 Q    In addition to the robbery, were there other crimes that

2 you committed in relation to your drug use?

3 A    Petty theft.

4 Q    Approximately when was that?

5 A    Probably two years ago now.

6 Q    When -- I'm sorry.  Let me start the question again.

7      What happened with that charge?

8 A    It was dropped.

9 Q    As part of what?

10 A    I had to do community service.  I did it, and they dropped

11 the charge.

12 Q    Did you actually commit the theft?

13 A    Yes.

14 Q    I want to talk with you about one of the times you were in

15 a car with Boo-Bee in late November of 2021.  Do you recall

16 taking a trip with him?

17 A    Yes.

18 Q    Where did you go with Boo-Bee?

19 A    To Mass.

20 Q    What's Mass?

21 A    I don't know exactly -- Massachusetts.

22 Q    So Massachusetts, the state?

23 A    Yes.

24 Q    Do you recall exactly where?

25 A    I don't.

Ashley Lobdell - Direct

1  Q    Who was driving?

2  A    Boo-Bee.

3  Q    And where were you located in the vehicle?

4  A    In the passenger seat.

5  Q    While you were driving with Boo-Bee to Mass, what were you

6  doing?

7  A    We were getting high off cocaine.

8  Q    Do you recall whether you and Boo-Bee made any stops on

9  the way?

10  A    Yeah.  Just to the store, the gas station, to grab some

11  drinks and stuff.

12  Q    While you were stopped, what, if any, cash did you observe

13  Boo-Bee with?

14  A    Wads of cash.

15  Q    I know you said you didn't recall the city or town you

16  went to in Massachusetts.  Do you recall what type of building

17  you went to?

18  A    It was kind of like a hotel.  It looked like a hotel.

19  Q    Why do you say it looked like a hotel?

20  A    Just from the outside, it had a bunch of rooms, you know,

21  like a hotel setup.

22  Q    Did you go into this building?

23  A    No.

24  Q    What did you do?

25  A    I sat outside in the car for about an hour.

Ashley Lobdell - Direct

1  Q    Where was Boo-Bee?

2  A    Inside.

3  Q    When Boo-Bee came back to the car, did he have anything

4  with him?

5  A    Yeah.  He had two -- about two bricks of cocaine, crack

6  cocaine.

7  Q    You believed it to be crack?

8  A    Yes.

9  Q    You said two bricks.

10 A    Yeah.

11 Q    What did they look like?  How were they packaged?

12 A    They were in, like, freezer bags.

13 Q    What, if anything, did he ask you to do with the drugs?

14 A    To put them on my side of the car.

15 Q    What did you do with the drugs?

16 A    I put them on my side of the car.

17 Q    Where in particular?  Do you recall?

18 A    One in the glove box, one in the passenger side door.

19 Q    I'm just going to give you a warning before Judge Reiss

20 does.  Please wait until I'm done with the question to

21 answer --

22 A    Oh.

23 Q    -- so that we get a good transcript from the court

24 reporter.

25 A    Okay.

Ashley Lobdell - Direct

1 Q    Thank you.

2      After you had placed the drugs in those locations, where

3 did you and Boo-Bee go next?

4 A    We drove back to Vermont.

5 Q    Did you drive straight back without stopping?

6 A    No.

7 Q    What did you do along the way?

8 A    We stopped to get high a few times.

9 Q    When you say "get high," what drug?

10 A    Off crack.

11 Q    How were you both consuming it?

12 A    Smoking it.

13 Q    When did you arrive back in Vermont?

14 A    About 5:30 in the morning.

15 Q    Is that the exact time, or is that --

16 A    It's roughly.

17 Q    Was it still dark outside?

18 A    Yes.

19 Q    Where did you drive in Rutland?

20 A    He stopped at the -- we stopped at the Killington Ave.

21 apartment first.  He went upstairs.  I waited outside for a

22 little while.  Then he came back down and brought me back home.

23 Q    Where was home?

24 A    School Street in Rutland.

25 Q    Who lives there?

Ashley Lobdell - Direct

 1  A    My dad.

 2  Q    What's nearby?

 3  A    The park.

 4  Q    Which park?

 5  A    Meadow Street Park.

 6  Q    I'm sorry.  Which park?

 7  A    Meadow Street Park.

 8  Q    I'd like you to look at the bigger binder, if you could.

 9  A    Um-hum.

10  Q    It's Tab 31F.

11  A    Yup.

12  Q    I believe it's -- I believe it's four pages.  If you could

13 just turn through them, please.

14       Have you reviewed them?

15  A    Yup.

16  Q    Without telling us what the contents are at all -- without

17 telling us what the contents are, what are -- is the document

18 31F?

19  A    Messages between me and Boo-Bee.

20  Q    How do you know that -- first of all, how do you know that

21 you're one of the parties?

22  A    It says my name.

23  Q    Anything else about them?

24  A    I remember them.

25  Q    How do you know that they are with Boo-Bee?

Ashley Lobdell - Direct

1  A    Because it says "Boo Bee" on the top, and I remember these

2  messages between us.

3        MR. OPHARDT:  Your Honor, I move to admit 31F at this

4  time.

5        THE COURT:  Any objection?

6        MR. JACKSON:  No objections, your Honor.

7        THE COURT:  31F is admitted.

8      (Government's Exhibit 31F was received in evidence.)

9        MR. OPHARDT:  Your Honor, may I publish?

10       THE COURT:  You may.

11  Q    BY MR. OPHARDT:  So you can -- Ms. Lobdell, you can either

12  look at the ones in front of you or the monitor, whichever

13  one's easier for you without glasses.

14      Do you see the first message in blue?

15  A    Yes.

16  Q    What does it say?

17  A    "It's just me."

18  Q    And who was the sender of that message?

19  A    I was.

20  Q    Why did you send it?

21  A    To let him know that I was by myself.

22  Q    The green message, what does that say?

23  A    "Mass."

24  Q    And what's the one underneath that?

25  A    "Yes."

Ashley Lobdell - Direct

1 Q    What's your recollection as to -- what did you understand

2 those messages to mean?

3 A    He was asking me if I wanted to go to Mass and was

4 acknowledging that I was by myself.

5 Q    Ms. Lobdell, what's the date on this message?

6 A    11/21/22.

7 Q    I'm sorry.

8 A    So --

9 Q    If the -- can you just read the numbers from start to end?

10 A    21 -- "2021-11-22."

11 Q    Thank you.  Looking at Bates 1219.02, the blue message at

12 the top, that would have been your message, correct?

13 A    Yes.

14 Q    And what did you send?

15 A    "Yeah I can."

16 Q    What did you mean by that?

17 A    That I could go with him.

18 Q    The green box, what does that say?

19 A    "Ok coming now."

20 Q    What did you understand that to mean?

21 A    That he was on his way to pick me up.

22 Q    The next two blue boxes, those would have been from you,

23 correct?

24 A    Yes.

25 Q    And what do they say?

Ashley Lobdell - Direct

1 A    "Okay I'm just getting dressed quick"; "Meet me by the

2 park on meadow or the store down the road let me know when

3 close."

4 Q    So you said "let me know when close."  What does the

5 message actually say?

6 A    "Let me know when close."

7 Q    Okay.  So what you meant by that was "let me know when

8 close"?

9 A    Yes.

10 Q    Fair to say you're speaking in a language substantially

11 for younger people than I am?

12 A    Yes.

13 Q    Okay.  The green message back from -- well, the green

14 message, who would have been sending that?

15 A    Boo-Bee.

16 Q    And what does it say?

17 A    "Ok 16."

18 Q    What did you understand that to mean?

19 A    Sixteen minutes till -- before he got there.

20 Q    How did you respond?

21 A    "Kk."

22 Q    This is 1219.03, the next page.  What's the next green

23 square say?

24 A    "Act like u buying from me okay. "

25 Q    What did you understand that to mean?

Ashley Lobdell - Direct

1  A    To act like I was buying drugs from him.

2  Q    The next blue box, what does that say?

3  A    "Okay can you throw me a little for a hit when we meet up?

4  I need one bad will do whatever you need me to baby."

5  Q    What did you mean by "throw me a little for a hit"?

6  A    Throw me some crack for a hit.

7  Q    What did you mean by "I need one bad"?

8  A    I needed a hit bad.

9  Q    Why?

10 A    Because I was jonesing.

11 Q    What does that mean?

12 A    Like, really needing -- really wanting one.

13 Q    And "a hit" meaning cocaine base?

14 A    Yes.

15 Q    What did you mean by "whatever you need me to do baby"?

16 A    That I would do whatever he wanted me to.

17 Q    How did he respond?

18 A    "Kk."

19 Q    And how did you respond?

20 A    "Thanks."

21 Q    The next green message, if you could read that.

22 A    "I'll.  At park."

23 Q    What did you understand that to mean?

24 A    That he's at the park.

25 Q    How did you respond?

Ashley Lobdell - Direct

1  A    "Kk be right over."

2  Q    And on the next page, 1219.04, on the top right, the green

3  box, what does that say?

4  A    "Fast."

5  Q    What did you understand that to mean?

6  A    To hurry up.

7  Q    And there's some additional squares on this page.  Do you

8  recall any other messaging?

9  A    Yeah.  My kids' father found my phone, my messages on

10 Facebook, and started messaging Boo-Bee through my Messenger

11 and then deleted them.

12 Q    So that's your recollection of what -- of what happened.

13 Anything about the exhibit that tells you that?

14 A    What do you mean?

15 Q    I'm just asking is there anything on the exhibit that says

16 "deleted" or otherwise --

17 A    No.  You just can't read them, so it usually means it's

18 unsent.

19 Q    Okay.  And, Ms. Lobdell, is it your recollection that

20 these are the messages that arranged your meeting with Boo-Bee

21 before that trip to Massachusetts we were talking about?

22 A    Yes.

23         MR. OPHARDT:  Your Honor, I have no further questions

24 at this time.

25         THE COURT:  Any cross-examination?

Ashley Lobdell - Cross

1          MR. JACKSON:  Yes, ma'am.

2                    CROSS-EXAMINATION

3  BY MR. JACKSON:

4  Q     Hello, Ashley.

5  A     Hello.

6  Q     Ms. Lobdell, do you remember when I got arrested?

7  A     Yes.

8  Q     And before that, when was the last time I seen you?

9  A     The morning before you got arrested.

10 Q     Okay.  And that was the morning you're referring to these

11 text messages right here?

12 A     Yes.

13 Q     Do you recall you hit me up that morning and basically

14 asked me -- I know some of these messages got deleted.  You

15 asked me where I was at and I told you I was in Mass?

16 A     No.

17 Q     So where I was at?

18 A     I'm sorry.  Can you repeat that?

19 Q     I said when you text me and you said "It's just me," I

20 text you, and I said -- you hit me back and I said I'm in Mass,

21 and you said yes.  I'm on my way back from Mass.  But you're

22 telling the Government that you went with me to Massachusetts.

23 A     Because we did.

24 Q     When did you go with me to Massachusetts, Ms. Lobdell?

25 A     The night of these -- the morning of these -- the day of

Ashley Lobdell - Cross

1  these messages.

2  Q    Where in Massachusetts did you go?

3  A    I'm not really sure what town we went to.

4  Q    How long was the ride to Massachusetts?

5  A    About two hours, three hours.

6  Q    You don't know?  Two, three hours?

7  A    About two, three hours, yeah.

8  Q    Okay.  Ms. Lobdell, you mentioned that you seen me with a

9  gun.  When was this?  Can you give an approximate time that you

10 seen me with a gun, what month, week, day?

11 A    I'm not good with times, no.  It was one of the times we

12 were in the car together.  You asked me to hand it to you out

13 of the glove box.

14 Q    Hand it to me to do what?

15 A    To put -- you were taking it with you out of the car.

16 Q    And going where?

17 A    I'm pretty sure it was to go into the Highlander.

18 Q    Ms. Lobdell, all these accusations -- these alleged

19 accusations you made came after you was arrested for a Hobbs

20 Act robbery; is that true?  You made these proffer statements

21 to the Government?

22 A    Yes.

23 Q    In between that time, I haven't seen you in almost, what,

24 a year and a half?

25 A    Yup.  Yup.

Ashley Lobdell - Cross

1  Q    Didn't you contact with me after I got arrested?

2  A    I did add you on GTL.

3  Q    And do you remember what you told me?

4  A    Not really.  I think I was just checking in with you.

5  Q    Did you tell me that "I hope you're all right," "I miss

6  you," and "call me" --

7  A    Yes.

8  Q    -- "I want to hear your voice"?

9  A    Yes.

10  Q    All right.  So when you get busted on the Hobbs Act

11  robbery, did you use, like everybody used, the Boo-Bee

12  get-out-of-jail-free card?

13  A    Sorry.  Can you repeat that?

14  Q    When you approached -- when you first got approached, who

15  was you first approached by?  HSI Special Agent Dornbierer?

16  A    No.

17  Q    Who?

18  A    I can't remember his name.

19  Q    And the first question they asked you was about Boo-Bee?

20  A    No.

21  Q    No?

22  A    No.

23  Q    When did Boo-Bee come up?

24  A    Not till a little later when they approached me with the

25  messages and --

Ashley Lobdell - Cross

1  Q    Trying to make a deal?

2  A    Yeah.

3  Q    And your deal was to tell them anything you could about

4  Lawrence "Boo-Bee" Jackson so you could get out of jail?  Yes

5  or no?

6  A    I'm sorry.  I can't really hear you.

7  Q    I said you gave them -- when they asked you about me --

8  I'm sorry.

9            THE COURT:  It's not -- you're not -- it's not your

10 fault.

11           COURTROOM DEPUTY:  Hold on.

12           THE COURT:  Kill the mic and turn it on again.

13           COURTROOM DEPUTY:  That's not working.  One second.

14 Q    Ms. Lobdell --

15           THE COURT:  We'll wait till we get it -- we'll get IT

16 to fix it.

17           COURTROOM DEPUTY:  Judge, could you say something?

18           THE COURT:  Yes.

19           COURTROOM DEPUTY:  It might be fixed, but let's wait

20 for IT, okay?

21           THE COURT:  Well, let's just see if it works and we'll

22 tell them if we fixed it ourselves.

23           COURTROOM DEPUTY:  I still hear it.

24           THE COURT:  A little bit of feedback, but let's see if

25 we can go forward.  We can't be interrupting your questions or

Ashley Lobdell - Cross

1  the testimony.  Let's see how we do.

2  Q    Ms. Lobdell, when you were questioned, what officer were

3  you questioned by?  What law enforcement?

4  A    Honestly, I'm really bad with names.  I can't remember

5  their names.

6  Q    Was it Detective Adam Lucia?

7         THE COURT:  Chris -- so now we do need to fix it --

8  A    He was there, yes.

9         THE COURT:  -- because we don't want you to be

10 distracted.

11      Hold up.  Hold up.

12        COURTROOM DEPUTY:  Can you say something into the mic,

13 Mr. Jackson?

14        MR. JACKSON:  Hello?

15        THE COURT:  Go ahead.

16 Q    Okay.  Ms. Lobdell, did you ever have an interview with

17 Special Agent Joseph Dornbierer of Homeland Security

18 Investigations after your arrest?

19 A    Not that I remember.

20 Q    Who charged you federally?  Homeland Security, ATF, DEA?

21 A    That's a good question.

22 Q    It was Homeland Security.

23 A    It's probably something I should know.

24 Q    I have the paperwork.  It was Homeland Security, I

25 believe.  And at that time did any one of them ask you about

Ashley Lobdell - Cross

1  Lawrence "Boo-Bee" Jackson?

2  A     At some point, yes.

3  Q     At some point.  And this was over a year later, right --

4  A     Yes.

5  Q     -- I suppose, or past a year?

6  A     Yeah.

7  Q     And at that time you told them that you knew me and that

8  you sold drugs for me?

9  A     Yes.

10 Q     Ms. Lobdell, when have I ever gave you drugs to sell?

11 A     The one I can remember was when you handed me the -- quite

12 a few plays to go outside.

13 Q     And who did you sell it to?

14 A     I don't know who they were.  I never asked you.

15 Q     Do I have a drug problem?

16 A     Yeah.

17 Q     I smoked drugs with you a lot, right?

18 A     Yes.

19 Q     We both from Rutland, true?

20 A     Yeah.

21 Q     You know the same addicts I know, true?

22 A     For most -- some of them.

23 Q     Do you know the addicts of Rutland, Ms. Lobdell?

24 A     Not all of them.

25 Q     Do you know the ones I know?

Ashley Lobdell - Cross

1  A    Not all of the people you know.

2  Q    Ms. Lobdell, who did I give you drugs to go sell to?

3  A    I don't know their names.

4  Q    Ms. Lobdell, when have you ever gave me $500 for some

5  drugs?

6  A    Not me personally, but when I went outside the -- sorry.

7  Now I'm forgetting the hotel.

8  Q    Ms. Lobdell, Mr. Ophardt just asked you did you sell drugs

9  for me.  You said you went outside the Highlander Hotel --

10 A    Highlander.  Thank you.

11 Q    -- and brought me back $500.

12 A    Yes.

13 Q    When did that happen?

14 A    It was at night, and I think it was probably a week before

15 you were arrested.

16 Q    Ms. Lobdell, why are you making up these stories?

17 A    I'm not.

18 Q    It took you almost two years to report this?  I haven't

19 seen you in almost four years, and you come before a federal

20 judge, a federal jury because you got caught doing something

21 and you're making up a story about Lawrence "Boo-Bee" Jackson,

22 that I gave you drugs, I enticed you to do this or do that.

23     When have I ever touched you inappropriately?

24 A    Just about every time we hung out.

25 Q    I touched you?

Ashley Lobdell - Cross

1  A    Yeah.  We had sex several times.

2  Q    I asked you did I ever touch you inappropriately.

3  A    That's what I'm assuming you meant.

4  Q    That's not inappropriately.  Did I ever violate you?

5  A    Not unwillingly, no.

6  Q    Did I ever hit you?

7  A    No.

8  Q    Did I ever point a gun at you?

9  A    No.

10 Q    You stated to the Government that I put a gun to your

11 head.

12 A    Not you.

13 Q    In your report to Mr. --

14 A    That was Peeto.

15 Q    Excuse me.  In your report to Ms. Cate and Mr. Ophardt,

16 you said I pointed a gun at your head and said that you would

17 end up like somebody that was found dead behind Hannaford's.

18 A    Not to me.  That was to Reggie, I'm pretty sure, when

19 Reggie came in, into the house.

20 Q    Ms. Lobdell, you made a statement to two federal officers

21 that I pointed a gun at your head and I said to you that you

22 would end up like the person left behind Hannaford's.

23 A    Not me personally, no.  You didn't do it to me personally.

24 There must have been some confusion.  You said it to Reggie

25 when you guys were in some sort of argument.  That was at the

Ashley Lobdell - Cross

1  Killington Ave. apartment.

2  Q    So are you testifying before this court, in front of this

3  jury, that you didn't tell Mr. Ophardt that in a statement?  I

4  have the paperwork.  Did you tell Mr. Ophardt while you was in

5  the vehicle with me I pointed a gun to your head and told you

6  that you would end up like somebody that was found dead?

7  A    No.

8         MR. JACKSON:  Your Honor, can I get a second?

9         THE COURT:  Sure.

10         MR. OPHARDT:  Your Honor, I'm going to object to

11  Mr. Jackson just commenting on the witness' testimony

12  inappropriately.

13         THE COURT:  So --

14         MR. JACKSON:  I'm sorry, your Honor.  I apologize.

15         THE COURT:  Yes.  You can't do that.  I warned both

16  parties before.  It's not going to happen.  You don't respond

17  to the testimony.  You have a closing argument, and that's when

18  you make those statements, if at all.

19         MR. JACKSON:  Your Honor, could I request a ten-minute

20  recess?

21         THE COURT:  We just had a recess, so we'll wait until

22  you find what you're looking for.

23         MR. JACKSON:  Your Honor, I would like to refresh

24  Ms. Lobdell's memory.

25         THE COURT:  All right.  So we'll mark this as

Ashley Lobdell - Cross

1   Defendant's Exhibit --

2          COURTROOM DEPUTY:  V --

3          THE COURT:  V.

4          COURTROOM DEPUTY:  -- as in Victor.

5          THE COURT:  It doesn't need to be admitted.  It's just

6   for identification.

7          MR. JACKSON:  It was -- yes, your Honor.  I would like

8   to admit it.

9          THE COURT:  Well, we'll see.  I thought you were going

10  to use it for refreshing recollection.

11         MR. JACKSON:  Yes, I'll do that, because she made a

12  statement to the Government, so -- whatever the Court deems to

13  be just and proper.

14         MR. OPHARDT:  Your Honor, may I request to see the

15  exhibit prior to it being provided?

16         THE COURT:  Yes.

17         MR. OPHARDT:  Thank you.

18     Mr. Jackson, could I see the first page of this so I know

19  who the author is?

20         MR. JACKSON:  Sure.

21         THE COURT:  All right.  So I'll let the witness read

22  before I make a statement.

23     You tell me when you're done.

24         THE WITNESS:  Okay.

25         THE COURT:  All right.  You can use it to refresh

Ashley Lobdell - Cross

1  recollection.  You can offer it as a hearsay exception.  That's

2  your job to tell me how you want to offer it.  I didn't mean to

3  suggest that you had to just refresh recollection.  That's what

4  you told me you wanted to do.

5       So go ahead and ask your next question.

6  Q    BY MR. JACKSON:  Ms. Lobdell, did you read the paragraph I

7  was talking about?

8  A    Yes.

9  Q    Did it refresh your recollection?

10 A    Yeah.

11 Q    What did it say, ma'am?

12 A    The same thing I said, that you -- that you told somebody

13 that you were going to put a cap in them like you just did to

14 somebody behind Hannaford's.

15 Q    But does it --

16      MR. JACKSON:  Can I have that back?  Thank you, ma'am.

17      May I show this, your Honor?

18      THE COURT:  Are you seeking its admission?

19      MR. JACKSON:  Yes, ma'am.

20      THE COURT:  All right.  And under what hearsay

21 exception?

22      MR. JACKSON:  It was a direct statement to a police

23 officer.

24      THE COURT:  A direct statement -- it's an out-of-court

25 statement.

Ashley Lobdell - Cross

1              MR. JACKSON:  Yes.

2              THE COURT:  Offered for its truth, correct?

3              MR. JACKSON:  Yes.

4              THE COURT:  Not just impeachment?

5              MR. JACKSON:  Yes.  Impeachment, it would be.

6              THE COURT:  As impeachment.

7         Let's hear what the Government -- whether it has any

8    objection.

9              MR. OPHARDT:  Your Honor, this is an FBI 302, which is

10   an investigative report of an FBI agent.  This is not

11   Ms. Lobdell's own words.  This is an agent's report of an

12   interview that was conducted, so I don't have concerns with it

13   coming into evidence, but I do not understand how it's

14   admissible under the Rules of Evidence.  So if the Court is

15   willing to accept it under the residual clause of the hearsay

16   rules, that's fine by me.  I believe it to be reliable.  The

17   author will be testifying, FBI Task Force Officer Jeffrey

18   Stephenson, so we can also conditionally admit it pending him

19   providing additional foundation if the Court has additional

20   evidentiary concerns.

21             THE COURT:  All right.  In the Federal Rules we do

22   have a residual hearsay exception.  Is that the basis under

23   which you are offering it, Mr. Jackson?

24             MR. JACKSON:  Yes, ma'am.

25             THE COURT:  And it's Exhibit V?

Ashley Lobdell - Cross

1          COURTROOM DEPUTY:  V, as in Victor.

2          THE COURT:  All right.

3          MR. JACKSON:  Yes.

4          THE COURT:  And I will admit it for that purpose

5   subject to the Court determining whether or not there's a

6   problem with it.  I haven't seen it myself.  And I will make

7   sure the requirements of the residual exception are satisfied,

8   because even if there isn't an objection, the Court has an

9   independent duty to ensure that evidence is admissible.

10         MR. OPHARDT:  Your Honor, we do -- we did find a

11  better copy thanks to someone running downstairs.  I can

12  approach the podium as well, so if the Court would like to

13  review it.  I believe Mr. Jackson's just offering page 7 of 7.

14         THE COURT:  All right.  That would be helpful.  I'd

15  love to see another copy.

16         MR. OPHARDT:  Ms. Ruddy, I'll meet you right here at

17  the document camera.

18         COURTROOM DEPUTY:  Thank you.

19         MR. OPHARDT:  Thank you.

20         THE COURT:  I am going to not allow Exhibit 982.07 at

21  this point in time.  It contains many other statements other

22  than the one that you are seeking to impeach the witness with.

23  So I will allow the exhibit in a redacted form to be admitted,

24  and I understand we're on page 7, and there is the third

25  paragraph of page 7 that you want admitted, and I will allow

Ashley Lobdell - Cross

1  that to be admitted.  The remaining statements are from the FBI

2  agent.  They contain many extraneous facts, and under Rule 403,

3  the Court finds that the balancing test has not been satisfied.

4      So we'll create a new exhibit, and on that basis it will

5  be admitted.  Understood?

6          MR. JACKSON:  Yes, ma'am.

7          THE COURT:  All right.  Let's go to the next question.

8          MR. OPHARDT:  Your Honor, I'm sorry.  May I briefly

9  interject?  The Government does not have any objection to

10  Mr. Jackson or the witness reading those portions of the

11  exhibit that the Court just allowed.  I think that could be a

12  way to publish it prior to its redaction so we can keep moving.

13          THE COURT:  All right.  So I'm going to mark what I

14  think is what Mr. Jackson's using.  Ms. Ruddy will give it to

15  Mr. Jackson, and you may then give it to the witness and have

16  the witness read the tagged part.

17          COURTROOM DEPUTY:  Is that the correct part?

18          THE COURT:  Have I tagged it correctly?

19          MR. JACKSON:  Yes, ma'am.

20          THE COURT:  All right.  So let's have it presented to

21  the witness, and you may ask the witness to read it into the

22  record, and then we'll create an exhibit.

23          MR. JACKSON:  Yes.

24      (Defendant's Exhibit V was received in evidence.)

25  Q    BY MR. JACKSON:  Ms. Lobdell, can you read that paragraph

Ashley Lobdell - Cross

1  that she just -- your Honor just tagged, please.

2  A    Yes.  "Jackson told Lobdell he 'capped' somebody behind

3  Hannaford Supermarket or the mall in Rutland, Vermont.  During

4  a conversation between Jackson, Schaner, and Reggie LNU, he

5  said, 'just put -- just put a cap in someone's ass - don't make

6  me do it to you.'"

7  Q    Did I ever tell you that, ma'am?

8  A    What -- when I said "don't make me do it to you," you

9  weren't referring to me.  You were talking to Reggie.

10 Q    In the beginning of the paragraph, ma'am, it said I told

11 you that I "'capped' somebody behind Hannaford Supermarket or

12 the mall in Rutland."  That's what you stated --

13 A    Yes.

14 Q    -- to the FBI agent.  When did I ever tell you that?

15 A    It was -- I honestly can't remember the day, but we were

16 all upstairs at the Killington apartment and you came -- I was

17 just there and you came back all heated up about --

18 Q    And who got capped?

19 A    I don't know.

20 Q    Did you hear about anybody getting shot?

21 A    No.

22 Q    So why would you make a statement like that to a FBI

23 special agent?

24 A    Because that's what you said.

25 Q    I said -- I said what, ma'am?

Ashley Lobdell - Cross

1  A    What I just read to you here.

2  Q    Thank you, Ms. Lobdell.

3         MR. JACKSON:  I have no more questions, your Honor.

4         THE COURT:  All right.  Any redirect?

5         MR. OPHARDT:  No, your Honor.  Thank you.

6         THE COURT:  All right.  At this point we will take a

7  break.  We're going to stop at 4:30.  I do have something to

8  address with the attorneys.  I'm going to ask the witness to

9  remain seated, and we're going to excuse the jury.  I think it

10 will be about five minutes, but you've already figured out that

11 I can't tell time.

12        Don't talk about the case.  Don't let anybody talk to you

13 about the case.

14        (Jury out at 4:05 PM.)

15        THE COURT:  You can have Ms. Lobdell leave the

16 courtroom.

17        (The witness was excused.)

18

19                  C E R T I F I C A T I O N

20    I certify that the foregoing is a correct transcript from

21 the record of proceedings in the above-entitled matter.

22

23

24 April 19, 2024
                            _____
25                              Johanna Massé, RMR, CRR