UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NO. |
| | ) | 2:21-cr-113-1 |
| v. | ) | |
| | ) | |
| LAWRENCE JACKSON, | ) | |
| Defendant. | ) | |

MOTIONS *IN LIMINE*
Friday, April 5, 2024
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    District Judge

APPEARANCES:

JONATHAN A. OPHARDT, ESQ., and NICOLE P. CATE, ESQ., U.S.
    Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
    570, Burlington, VT 05402-0570, Counsel for the Government

LAWRENCE JACKSON, #82536-509, Northwest State Correctional
    Facility, 3649 Lower Newton Road, Swanton, VT 05488,
    Self-Represented

ROBERT S. BEHRENS, ESQ., Behrens Venman PLLC, 30 Elmwood
    Avenue, Burlington, VT 05401, Standby Counsel for the
    Defendant

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

1  Friday, April 5, 2024

2        (The following was held in open court at 1:05 PM.)

3            COURTROOM DEPUTY:  Your Honor, the matter before the

4  Court is criminal case number 21-CR-113-1, United States of

5  America v. Lawrence Jackson.  Representing the Government are

6  Assistant United States Attorneys Jonathan Ophardt and Nicole

7  Cate; the defendant is self-represented, and Robert Behrens is

8  here as standby counsel; and we are here for a hearing on the

9  motions *in limine*.

10            THE COURT:  Good afternoon.

11            MR. OPHARDT:  Good afternoon, your Honor.

12            MS. CATE:  Good afternoon, your Honor.

13            MR. BEHRENS:  Good afternoon, your Honor.

14            MR. JACKSON:  Good afternoon, your Honor.

15            THE COURT:  So I will try to take things up in a

16  logical order.  We have a lot to discuss.

17        We have 73 jurors reporting on Tuesday.  I am suggesting

18  that, because this is a long trial, we go with 16 jurors.  We

19  may not be able to get that many into the box.  We use podiums

20  on either side, but that's about the maximum we can accomplish.

21        So any thoughts about numbers of jurors?  Obviously we

22  want a jury of 12 at the end of the day.  We should be talking

23  about whether we retain alternates and what the plan is, and we

24  shouldn't wait till the last minute to do it.

25        So let's start with you, Mr. Jackson, first.  How many

 1 jurors do you think we should have through the trial in terms

 2 of -- we'll have 12, but we need alternates as well.

 3          MR. JACKSON:  Whatever the Court thinks I think would

 4 be sufficient.

 5          THE COURT:  Okay.

 6          MR. JACKSON:  Your Honor, you said 74 jurors?  I only

 7 had 64 questionnaires that were given to me.

 8          THE COURT:  Seventy-three are reporting.  So you

 9 should be getting additional questionnaires.

10          MR. JACKSON:  Okay.

11          THE COURT:  I'll put a note on that.

12          MR. JACKSON:  Okay.

13          THE COURT:  Mr. Ophardt?

14          MR. OPHARDT:  I think four alternates makes sense,

15 Judge.

16          THE COURT:  Okay.  So the next thing I want to tell

17 you is we're going to do the following to make sure that the

18 jury is not alerted to the fact that Mr. Jackson is

19 incarcerated.  My practice is to come into the courtroom before

20 the jury does, so that makes it easy.  They will be out of the

21 room when you come in, when incarcerated witnesses come in.

22 You will do -- both sides will do their questioning from behind

23 the tables unless you're using the podium and the ELMO.  And

24 when you do your questioning from the podium, you are behind

25 the podium.  Nobody is roaming around the podium or -- you are

1  behind that.  And that goes for both sides.

2      Mr. Behrens and whoever is not questioning on behalf of

3  the Government will be providing exhibits to Ms. Ruddy.  So we

4  aren't going to have people roaming around the courtroom,

5  because we don't want the marshals to have to get involved with

6  that.

7      We're going to have a court security officer and a marshal

8  sitting by the door there.  When somebody who is incarcerated

9  is testifying, they're going to do an individual assessment

10  about the security risk of taking off any form of restraints.

11  The Court's goal is to not have witnesses significantly

12  restrained, but, frankly, their preference is shackles,

13  handcuffs, belly chain, and that's their typical practice when

14  somebody is there because there's insufficient people to deal

15  with that witness.

16      Any thoughts about movement in the courtroom?

17      This time I'm going to start with the Government.

18      MR. OPHARDT:  I think your Honor said this, but just

19  to confirm my understanding, we're going to pre-position

20  custodial witnesses prior to the jury coming in?

21      THE COURT:  Yes.

22      MR. OPHARDT:  Okay.  One thing we had, I think, raised

23  informally that I think would be helpful to know:  Is the

24  Court -- can we put an exhibit binder with the witness?  Is

25  that acceptable with the Court?

1          THE COURT:  It's acceptable with me, and that's why I

2    think for some people the handcuffs are going to be a problem.

3          MR. OPHARDT:  Yes.

4          THE COURT:  Because if you're asking somebody to --

5    "Could you turn to page 22 in the binder," it's pretty

6    difficult to do it with handcuffs.  So that's -- that's my

7    concern.  And I can talk to the marshals about that, but you're

8    going to be asking them to do that, correct?

9          MR. OPHARDT:  With some of them, yes, your Honor.

10         THE COURT:  Okay.

11         MR. OPHARDT:  Not with all.

12         THE COURT:  All right.  I will talk to them about

13   making that assessment.  Our point person is Drew Rice on this

14   trial, and he will know who we can have latitude with and who

15   we cannot.  And I don't know of anybody who's going to be a

16   problem, so --

17         MR. OPHARDT:  Thank you, your Honor.  We can talk

18   directly with Deputy Rice as well.  I think we -- we can look

19   at our witness order and ascertain too whether or not we think

20   exhibits will be in evidence, because if we have them in

21   evidence, then we don't need the binder because we can use the

22   monitor, so that also might alleviate some of the need for

23   freedom of movement with hands.

24         THE COURT:  Okay.  Mr. Jackson, any thoughts on this

25   particular issue?

1          MR. JACKSON:  No, your Honor.

2          THE COURT:  All right.  I know that in advising

3   Mr. Jackson of the Court's concerns about self-representation,

4   we've had that conversation several times.  I had the

5   Government recite the applicable penalties and had Mr. Jackson

6   confirm that he had received that information.  I don't know if

7   I did it when we had the third superseding indictment.  I can't

8   remember when that occurred in the process, so I would like

9   that information repeated unless Mr. -- I want it repeated even

10  if Mr. Jackson is confident that he knows what the applicable

11  penalty is.  So I think the biggest change is brandishing is

12  out, and that has a seven-year mandatory minimum.

13         MR. OPHARDT:  That's correct, your Honor.  Your Honor,

14  are you looking for count by count or --

15         THE COURT:  You can do it count by count, but it's

16  important in evaluating the right to represent yourself, which

17  is a constitutional right, that you know the penalties, and I

18  know we had that conversation, but I can't remember the timing

19  of it.

20         MR. OPHARDT:  Yes, your Honor.  So your Honor's

21  correct that the third superseding indictment did reduce the

22  mandatory minimum, and it therefore also reduced the total

23  potential mandatory minimum.  I'll just proceed count by count.

24      Count 1 charges a drug conspiracy.  It includes an

25  allegation of 500 grams or more of a mixture or substance

1 containing a detectable amount of cocaine.  The statutory

2 penalties pursuant to 841(b)(1)(B) are five to 40 years.

3      Count 2, 3, and 4 all relate to -- well, Count 4 has been

4 dismissed.  Counts 2 and 3 relate to distribution of cocaine or

5 cocaine base.  The statutory penalties are zero to 20 years.

6      Count 5 relates to possession with intent to distribute

7 cocaine and cocaine base.  Those statutory penalties are zero

8 to 20 years.

9      Count 6 is the 924(o) charge.  That, I believe, is zero to

10 20, is my recollection.  Ms. Cate's going to double-check me.

11      924(c) charge in Count 7 is a mandatory minimum of five

12 years consecutive to any other term and punishable by up to

13 life in prison.

14      Count 8, the felon in possession count, is punishable by

15 zero to ten because at the time of the allegation, the

16 penalties in effect at the time, November 23rd, 2021, were zero

17 to ten.

18           THE COURT:  And we'll wait for Ms. Cate's

19 confirmation.

20           MR. OPHARDT:  And 20 years is correct as the maximum

21 for 924(o), your Honor.

22           THE COURT:  Mr. Jackson, were you aware of those

23 penalties?

24           MR. JACKSON:  Yes, your Honor.

25           THE COURT:  All right.  And do you need any more

1  information about that subject?

2          MR. JACKSON:  No, your Honor.

3          THE COURT:  So then I'm glad we've had this, because I

4  hadn't thought about it.  What do we do with regard to Count 4

5  in terms of describing to the jury what happened with regard to

6  Count 4?

7          MR. OPHARDT:  Your Honor, I know there's an

8  instruction in Sand's about kind of missing counts when we have

9  defendants who were charged together, so there may be some

10 inspiration there for an instruction to the jury if the Court

11 desires.  It hadn't struck me because I'm not particularly

12 concerned about it.

13         THE COURT:  I'm not either, but I did notice that if I

14 was a nosy juror, I would assume something got dismissed, which

15 is an assumption that's correct.

16         MR. OPHARDT:  That would be correct, Judge.  So I'm

17 not too concerned about prejudice, but if the Court would like

18 an instruction, I think Sand's probably has something close.

19         THE COURT:  Mr. Jackson, any thoughts about Count 4?

20         MR. JACKSON:  No, your Honor.

21         THE COURT:  All right.  So I'm going to just let it be

22 unless I find that there's a problem.

23      Okay.  Speaking of jury instructions, I read the

24 Government's support for vouching for the quantity of -- for

25 the quality of controlled substances, negotiating for and

1  receiving the price, and that's in the definition of

2  distribution.  I also looked at the case.  So the authority is

3  pretty scant.  It's old, it's a jury instruction, and it's

4  about a case in which the person who was charged with

5  distributing was riding in a car and actually at the sale.  I

6  didn't see anything in that case that would support vouching

7  for the quality of controlled substances alone as sufficient.

8  It was kind of a totality.

9       So I think that should be struck and it should include

10  "negotiating for or receiving the price," which is part of

11  distribution - that's the sale - "and supplying or delivering

12  the controlled substances may constitute distribution.  In

13  short, distribution requires a concrete involvement in the

14  transfer of the controlled substances."

15      And what I'm thinking about is, for example, suppose Jane

16  Wilson says, "That cocaine is the greatest I've ever had," and

17  she's, you know, not part of the transfer; she's not going to

18  get any proceeds; she's talking about her personal experience

19  with it.  I don't think anybody would say that's distribution.

20  It has to be somebody involved in the transfer.

21      So I'm not inclined to include "vouching for the quality

22  of controlled substances."  I know we've given that instruction

23  in the District of Vermont probably many times based on Sand's,

24  but it really gives me pause because I can think of many

25  circumstances where it wouldn't involve a concrete involvement

1 | in the transfer of the controlled substances.

2 |     So any thoughts about that, first from the Government?

3 |         MR. OPHARDT:  Your Honor, we do not object to that

4 | being struck in relation to the distribution charges.  I don't

5 | recall if it's in the "possession with intent to distribute"

6 | language.  I do view that as being a slightly different

7 | circumstance.

8 |         THE COURT:  I think that they may have a different

9 | definition.  So let me turn to it.  Remind me which count we're

10 | talking about.

11 |         MR. OPHARDT:  Count 5, your Honor.  But I'm not seeing

12 | it in the instruction.

13 |         THE COURT:  Yeah.  Intent to Distribute is on page 22,

14 | and it does not include the language that is concerning from

15 | the Court's perspective.

16 |         MR. OPHARDT:  Okay.  Thank you, your Honor.

17 |         THE COURT:  Mr. Jackson, anything that you want to say

18 | about that?

19 |         MR. JACKSON:  No.  I have no objections, your Honor.

20 |         THE COURT:  Okay.  Now let's talk about the voir dire,

21 | and we talked earlier about the Court giving general

22 | instructions about bias, and now the Government has supplied

23 | the transcript in the Dennis Martin case which the Court asked

24 | some questions about bias and racism.  I frankly did it in that

25 | case because both parties asked me to do it.  I thought there

1  could be an argument that it draws attention to something that

2  maybe people weren't thinking about, but both parties wanted

3  it, so I did it.

4     Now that you've seen the language that the Court used in

5  Dennis Martin, I'm going to turn to you, Mr. Jackson.  Do you

6  want the Court to engage in that voir dire?  Do you not want

7  the Court to engage in that voir dire?  What's your preference?

8        MR. JACKSON:  I have an objection to that, your Honor.

9  I don't think it's necessary.  Throughout the course of this

10  process, there's never been a race issue to me, so I don't

11  think that should be brought up.  I think, you know, we should

12  just proceed right down the middle with the case and argue the

13  case as it is.  I mean, I've been in Vermont 15 years, so I

14  know what I'm facing, so I don't think -- you know, I don't

15  have any objections with an all-white jury or all-Black jury.

16  I mean, if it's a bias that come up, I think we'll figure it

17  out then, but for now I don't think it's necessary.

18        THE COURT:  All right.

19        MR. OPHARDT:  Your Honor, we're fine with the Court

20  not addressing it.  We just thought it would be a helpful

21  suggestion.  We may still address some of those issues on our

22  own, in our own voir dire.

23        THE COURT:  You can.  But coming from me and me asking

24  people, you know, how much racism have you heard, really I

25  don't know that it does anything other than have people talking

1    about other examples of racism that have nothing to do with

2    this case.

3         MR. OPHARDT:  I understand your Honor's concerns.  We

4    weren't trying to force the Court to do anything.  We just

5    thought it would be a helpful suggestion.  We don't have a

6    fluid way to communicate directly with Mr. Jackson, so we made

7    the suggestion, and we'll handle it during our own voir dire.

8         THE COURT:  Okay.  So then I'm going to take the

9    motions *in limine* in the order in which they're filed.  I will

10   circle back around and make sure that I have covered

11   everything.

12        I have read everything that you've filed.

13        So the first one was filed by Mr. Jackson, I believe in

14   the order of which it was filed, and that's Document No. 211,

15   and that is the motion *in limine* seeking the Court's dismissal

16   of Counts 1, 5, 6, 7, and 8 of the third superseding

17   indictment.

18        You're not seeing that as --

19        COURTROOM DEPUTY:  Are you going in order of --

20        THE COURT:  Yes.

21        COURTROOM DEPUTY:  203 is the first.

22        THE COURT:  203.  Sorry.  I have 203, but this is

23   dated 3/25.  I'll do it in the order.  I'll put that aside.

24        The first one is 203, motion *in limine* to allow admission

25   of evidence regarding uncharged drug transactions.

1       Let's start with the moving party, which is the

2   Government, and then I will hear from the defendant.

3           MS. CATE:   Thank you, your Honor.

4       I'll start by stating I think that this motion was rather

5   inaccurately or at least inartfully titled.  As set forth in

6   the motion, our position is that evidence about Mr. Jackson

7   distributing controlled substances, and specifically cocaine

8   and cocaine base as alleged in Count 1, is actually fair game

9   for evidence in front of the jury because Count 1 charges on or

10  about beginning in January of 2021.  And the case law is clear

11  that the time frame that the evidence comes in at needs to be

12  reasonably near the charged time frame, but where, as here, the

13  exact date is not an element of the offense, the evidence can

14  be presented a bit outside of that time frame, and I think

15  we're squarely there here.  So that's sort of our primary

16  argument.

17      In addition, as stated, the sum of the evidence that we

18  anticipate coming in will help just lay the groundwork for how

19  the various witnesses came to know Mr. Jackson or the

20  interactions they had with him.

21      And finally, Mr. Jackson is also charged with two

22  distributions that are in 2020, in August and September of

23  2020, so his interactions either purchasing -- specifically

24  maybe purchasing narcotics that he then redistributed is

25  probative evidence of those charges also.

1          THE COURT:  So sometimes when there is just a
2     conspiracy charge, I have been asked to have a time frame that
3     allows for the start-up of the conspiracy and then the
4     unwinding, and the Court has gone as far as six months on
5     either side of the "on or about" date, and the case law that
6     you have suggested is that it should be a matter of months, not
7     a matter of years, and I think the farthest the Second Circuit
8     has gone is 16 months.  But I do think you have shifted your
9     theory, and it occurred to me that we were talking about 2020
10    anyway.  This isn't really going beyond the conspiracy because
11    there are charges in that September 2020 time frame.  The
12    earliest would be September 2020, correct?

13         MS. CATE:  I believe Count 2 is actually August of
14    2020.

15         THE COURT:  August of 2020?  Okay.  And then you are
16    not asking for any tail to come out.  So when -- on the other
17    side of it.

18         MS. CATE:  Mr. Jackson was arrested on November 23rd
19    of 2021, so that is the conclusion --

20         (Interruption by the reporter.)

21         MS. CATE:  We are not seeking to introduce drug
22    distribution after November 23rd of 2021.

23         THE COURT:  All right.  So the time period will be
24    August 2020 to November -- the date of the arrest in 2023.

25         Mr. Jackson, this motion at this point is unopposed, but

1    let's hear any verbal opposition you have to it.

2           MR. JACKSON:  Well, just to Count 1, your Honor, about

3    the conspiracy charge in general, this investigation took place

4    after my arrest, not before an arrest.  I was charged with

5    three sales on November 23rd, the day I got arrested, so there

6    was nothing mentioned as a conspiracy before that until after

7    November 23rd.

8       Now, from what I understand about conspiracy and reading

9    the statute and reading other cases about it, that a conspiracy

10   has to be before the fact unless there's something continuing.

11   There was nothing continuing after November 23rd, so the

12   investigation from, you know -- the way I'm looking at it is it

13   happened after -- the investigation happened after November

14   23rd.  Witnesses in between November 23rd came maybe six to

15   eight months later.  I believe there's one co-conspirator that

16   they have that's going to testify in court.  He came forward

17   with information eight months later, you know, alleged

18   information about a conspiracy, but I just don't see, you know,

19   conspiracy there.  I just don't see it.

20          THE COURT:  All right.  So we're talking about the

21   time frame of the behavior, not when people reported it, not

22   when it was investigated, not when it was discovered.  We're

23   talking about the behavior or the acts that the jury's going to

24   hear about, and originally the Government was asking the Court

25   to look at the conspiracy charge and do what many courts have

1  done, which is what I just said:  Okay.  There's a little bit

2  of period of winding up, like the first day of the conspiracy

3  is generally not when a sale occurs, because you have to have

4  people who know each other and have decided to do something

5  unlawfully, and so the courts usually allow activity both

6  before and after the "on or about."  We don't have to worry

7  about after because you were arrested, so you weren't doing

8  anything, although part of a conspiracy can be what happened

9  even after you were arrested, but they're not asking for that.

10      So this is what happened from August 2020 to the date of

11  your arrest, and it doesn't matter when somebody reported it.

12  That's what they're claiming is the activity that they want to

13  present to the jury.

14      So your response, if any, to that?

15          MR. JACKSON:  Well, Count 4 is dismissed, and that

16  would be the last date of any -- after September -- August,

17  September, so -- well, your Honor, I just don't see a

18  conspiracy in August.  Count -- and Count 4 was dismissed.

19  That would have happened in September.  So I don't know where

20  the Government is trying to figure out a conspiracy from that

21  point and who they're trying to figure out who I conspired

22  with.

23          THE COURT:  Any response?

24          MS. CATE:  It sounds as though Mr. Jackson is

25  challenging the sort of -- whether the Government can prove the

1  conspiracy, which is a different question than what evidence

2  can come in in an attempt to prove the conspiracy.  Beyond

3  that, I have no other response.

4          THE COURT:  All right.  The Court is going to allow

5  evidence of acts from August 2020 to the date of Mr. Jackson's

6  arrest subject to establishing that they are relevant.  This is

7  the time period in the third superseding indictment.  It is not

8  far apposed from the "on or abouts" in those counts.

9      In addition, this is not separate behavior.  This is

10 behavior that's inextricably intertwined with the charged

11 crimes, and therefore it is not something that the Government

12 is asking to go outside the normal period that would be

13 admissible evidence.

14     In addition, any prejudice is minor.  It's not

15 different-in-kind conduct from the conduct at issue.  It

16 doesn't involve a wholly different group of participants, and

17 so the Court's going to allow it.

18     But before this evidence comes in that is outside of a

19 charged event, and I don't think we're going to be hearing

20 that, I want you to make a proffer in terms of this, because

21 one of the things in this case is that there's an allegation

22 that the nature of the drug trafficking, the alleged drug

23 trafficking, changed when Mr. Jackson got new suppliers, and

24 that is the conspiracy that is charged in Count 1, correct?  So

25 the -- Mr. Jordan --

 1          MS. CATE:  Your Honor, in part, certainly we are

 2  alleging that Mr. Jackson's interactions with his suppliers is

 3  one part of the conspiracy.  We believe there will also be

 4  evidence about his interactions with folks in Rutland who were

 5  assisting him with drug transactions or enforcement that also

 6  is part of the conspiracy.

 7          THE COURT:  All right.  The Court's going to grant the

 8  Government's motion *in limine*, Document No. 203, and I will be

 9  asking for proffers as we proceed when the Court finds it's

10  necessary.

11      And, Mr. Jackson, you can also ask for proffers, and the

12  Court will decide whether or not that has to happen.

13      The next one is Document No. 204, motion *in limine* to

14  allow admission of evidence of defendant's actions with a

15  firearm.  This is the pistol-whipping of a person who has his

16  initials provided.

17      I've been told by the Government in their motion that

18  Mr. Jackson knows who this person is and that there are several

19  witnesses who watched that and that the purpose of the

20  pistol-whipping was twofold:  to collect a debt and also

21  because of this person's involvement with somebody who was

22  close to Mr. Jackson.

23      So I'm going to let the Government argue that motion

24  further now that I've identified which it was, and then we're

25  going to hear from Mr. Jackson.

1         MS. CATE:  Your Honor, one of the charges in the
2  indictment is a 924(c).  There are several prongs of that,
3  including that Mr. Jackson used a firearm during and in
4  relation to his drug trafficking activity.  Pistol-whipping a
5  customer or somebody who owes him a debt because of drug
6  trafficking is squarely in the heartland of evidence to prove
7  that he used that firearm in furtherance -- or during and in
8  relation to his drug trafficking.  The case law says that to
9  "use" a firearm, you need to "actively employ" it, and
10 certainly pistol-whipping would be an example of active
11 employment.  The anticipated evidence will put that event
12 squarely within the time frame that the 924(c) charge is, and
13 we just think that it's squarely probative, extremely
14 probative, and any perceived unfair prejudice is outweighed by
15 the probativeness for the 924(c) count.  We've made other
16 arguments, but that is the gist of it.

17        THE COURT:  Should the Court be giving a curative
18 instruction that although the jury can consider the
19 pistol-whipping in determining whether or not Mr. Jackson used
20 and possessed a firearm, it should not -- it need not find --
21 this isn't a case in which a pistol-whipping has been charged?
22 I'm just thinking about the differences between brandishing and
23 whether or not there should be any kind of curative
24 instruction.  Any thoughts about that?

25        MS. CATE:  I don't think there's an opposition to a

1  curative instruction necessarily.  I mean, the ask would be for

2  the jury to consider that evidence when considering the

3  elements of the charges that are -- that have been charged, not

4  to consider it for some other reason.

5          THE COURT:  There will be that instruction.

6          MS. CATE:  Right.  I'm not sure actually how else to

7  cure it.  One moment, your Honor.

8      Thank you, your Honor.  I think the Government's

9  perception is that the use is sort of -- it's like a bit of a

10 pyramid or a narrowing.  So there could be use or there could

11 be brandishing or there could be discharge, so charging the use

12 and putting in evidence of the use isn't problematic in any

13 way.  It's not like a separate charge than brandishing.

14         THE COURT:  It couldn't possibly from your perspective

15 trigger brandishing?

16         MS. CATE:  Whether it could or not, that hasn't been

17 charged, and we're certainly not seeking to have the jury find

18 brandishing.

19         THE COURT:  Okay.  And then we have an incident in

20 which Mr. Jackson allegedly pointed a firearm at a

21 co-conspirator, and that was The Judge firearm which you are

22 claiming is relevant to multiple counts, and let's hear from

23 you on that one.

24         MS. CATE:  Yes.  The Judge firearm is one of the

25 firearms envisioned for the 924(o) and the 924(c).  It is also

1  the firearm alleged in the felon in possession count, so the
2  Government needs to prove that Mr. Jackson possessed that
3  firearm.  It is a distinctive firearm, and it has words on it
4  that say "The Judge," so having a witness testify "I saw him
5  with that.  I know that because it was close to me; it was in
6  my face" is extremely probative of his possession.

7            THE COURT:  All right.  Mr. Jackson, any response?

8            MR. JACKSON:  Yes, your Honor.  From my understanding
9  of a 924(c) charge, in order for me to pistol-whip somebody, I
10 have to brandish the weapon.  You have to take the weapon out
11 to hit somebody with it.  The Government took brandishing out
12 of the second superseding indictment when they charged me in
13 the third superseding indictment.

14      And, you know, to clarify that, to sum all that up, they
15 know who Michael Washburn is.  The United States Government
16 know who this man is.  I know who he is.  There's no testimony,
17 no nothing from Michael Washburn that I ever touched him,
18 because it's not true.  You know what I mean?  This was a big
19 advertisement, a big rumor running around Rutland, Vermont,
20 that I pistol-whip people.  They know who this man is.  Bring
21 him to court.  Why do you need somebody to testify that they
22 seen me pistol-whip somebody and they know who this guy is?
23 They gave me a picture of the man, of who Michael Washburn is,
24 you know?  So bring Michael Washburn to court.  There's no way
25 you can say that I pistol-whipped somebody and I didn't

1 brandish the weapon.  You have to brandish a weapon in order to

2 hit somebody with it.

3      So I will leave it like that and let your Honor make her

4 decision.

5           THE COURT:  Well, you can certainly argue to the jury

6 in closing that "Where is Michael Washburn?"

7           MR. JACKSON:  Um-hum.

8           THE COURT:  That's fair game.  "We heard from people

9 who saw it, but, you know, where's the person who allegedly was

10 pistol-whipped?"  We're on a different part of the case right

11 now, and you are right, I think pistol-whipping probably is the

12 same as brandishing, but you are not being charged with

13 brandishing, nor would you want to, because that ups the

14 mandatory minimum penalty.

15      And I would compare it to this situation:  In a case, the

16 Court may charge -- or the Government may charge a defendant

17 with attempted murder.  When they get to trial, they say, "You

18 know what?  That -- I don't know.  That has a lot of intent

19 involved.  We're going to reduce it to attempted aggravated

20 assault, serious bodily injury."  That's all good for the

21 defendant, but then they don't have to prove attempted murder.

22      So they have taken away brandishing.  We're still at use.

23 And the Court has to find whether or not the pistol-whipping is

24 so prejudicial in describing the use and the pointing the

25 firearm is so prejudicial that its probative value is

1 substantially outweighed.  So that's what we're getting at

2 right now.

3      There is always going to be prejudicial -- prejudice from

4 negative facts.  I mean, the courts accept that.  But it has to

5 be under Rule 403 for the Court to exclude it if its probative

6 value is substantially outweighed by a danger of one or more of

7 the following:  unfair prejudice, confusing the issues,

8 misleading the jury, undue delay, wasting time, or needlessly

9 presenting cumulative evidence.  And I hear your argument is

10 bring in the person who was pistol-whipped.  They don't have to

11 do that.  They can prove it by an eyewitness, and it's fair

12 game for you to argue to the jury that "If this happened, why

13 isn't the person who was pistol-whipped, why wasn't he called

14 as a witness?"

15      Go ahead.

16      MR. JACKSON:  Yes.  Thank you, your Honor.  I'm going

17 to go with your attempted murder and assault, and that's a good

18 example, because regardless if they drop a charge like that

19 toward assault, both them elements require physical injury to

20 be proven; you understand?  If it's an attempted murder, it

21 requires physical injury, and if it's assault, it requires

22 physical injury to be proven, either which way that go.

23      THE COURT:  Not if it's attempt.

24      MR. JACKSON:  Well, if it's attempt, I mean, you know,

25 physical injury still has to happen.  I mean, you know, unless

1  there's something else -- another element with it, another

2  charge with it.  If it's -- somebody was acting in commission

3  of a felony or whatever the situation might be.  But my main

4  thing is this:  When you look at both these incidents with

5  Michael Washburn and Orlando Cruz, even though the Government

6  didn't bring a brandishing charge, they took it out, Orlando

7  Cruz stated in his statements that I pointed a gun at his face.

8  If I pointed a gun at his face, your Honor, that means I

9  brandished a weapon.  I think that would be unfair prejudice to

10  the jury for them to hear that when it's never been charged.

11  There's never been an incident like that.  He didn't say he

12  sustained any injuries.

13      These people are saying that Michael Washburn suffered a

14  broken nose, he was bleeding all over the place.  None of these

15  people throughout any one of their statements rendered aid,

16  called 911, did anything, so from that point on, it's like me

17  fighting a ghost.  It's like me, you know, arguing to the jury

18  that this never happened, even though these witnesses are

19  claiming this, but it never happened, because there's no proof

20  there that it did happen.  There's not a witness.  There's just

21  two people making allegations.

22      And there's no element to it.  You have to -- if I put a

23  gun in somebody's face, you have to brandish the weapon.  The

24  Government had that on the second superseding indictment.  They

25  took it out, because obviously somewhere at some point in some

1  proffer statement or discussion with one of the witnesses,

2  Mr. Ophardt probably didn't believe it to a certain point, you

3  know, so maybe it's a theory he can prove in another way, but

4  whichever way you look at it, your Honor, it's prejudice.  It's

5  unfair prejudice for a jury to hear that I put a gun in

6  people's face and I pistol-whipped somebody and I'm not charged

7  with it.  That's a heinous crime.

8           THE COURT:  All right.  Any response?

9           MS. CATE:  Your Honor, the case law is about unfair

10 prejudice as opposed to prejudice.  As the Court has pointed

11 out, the evidence of folks committing crimes is going to be

12 prejudicial.  This does not fall into the category of unfairly

13 prejudicial.  It would be perverse if the Government had to

14 charge the higher mandatory minimum in order to be able to

15 present evidence that would prove the straight 924(c).  That

16 would be a bit of a strange situation.

17     Maybe another analogy in addition to the one the Court

18 provided would be regarding quantities in a distribution -- in

19 a drug distribution conspiracy.  Even if the Government here

20 had not charged the 500-gram mandatory minimum, we would still

21 be putting in evidence of a lot of drug distribution, and it

22 wouldn't be right to not let that evidence in unless we charged

23 it.

24           THE COURT:  All right.  Here's how the Court's going

25 to rule:  There isn't any unfair prejudice with the

1  pistol-whipping and the pointing of the gun because there is no

2  way this jury is going to find brandishing because it's not

3  going to be asked to find brandishing.

4      A couple things that need to happen, however, is it's one

5  thing to say that the purpose of the pistol-whipping and the

6  pointing of the gun was related to drug debts.  I don't want

7  any mention of sex trafficking of a woman, and that's --

8  there's an allegation that Mr. Jackson pointed a firearm at a

9  co-conspirator because he allegedly attempted to sex traffic a

10 woman.  When he's not charged with sex trafficking, it's way

11 outside.  So I'm not going to allow a witness to say that.

12      In terms of whether or not this is something that a

13 curative instruction can address, I am going to provide at the

14 end of the trial a jury instruction that says that Mr. Jackson

15 is only charged with the crimes alleged in the third

16 superseding indictment; he's not charged with any other crimes;

17 he can't be punished for them.

18      I am thinking that a similar instruction at this --

19 whenever this evidence is introduced that "You're going to be

20 asked to find whether or not he used a firearm.  You are not

21 going to be asked if he pistol-whipped somebody with that

22 firearm, and you're not going to be asked if he pointed it at

23 somebody.  It is not offered for that.  You won't be asked to

24 make those determinations in this case."  I'm thinking

25 something of that sort may be appropriate so that the jury

1  understands why the evidence is introduced.

2      Any thoughts about that?

3      And I'll start with the Government this time.

4          MS. CATE:  Thank you, your Honor.

5      With regard to the sex trafficking allegation, the

6  Government does not intend to elicit testimony about that.

7  That was provided so the Court had the context about the

8  circumstances of that time the gun was pointed in Mr. Cruz's

9  face, but we are not seeking to have that testimony be elicited

10 during our direct examination.

11     With respect to the curative instruction, if the Court

12 wishes to do that, the Government has no objection.

13         THE COURT:  Mr. Jackson, any thoughts on this issue?

14         MR. JACKSON:  Well, yes, your Honor.  And that was a

15 good point you brought up too.  What if a juror do come back

16 with a question after that and they want to ask your Honor to

17 ask the Government did this happen?  What kind of response is

18 that going to be?  How is the Government going to answer that

19 when I've never been charged with that?

20         THE COURT:  Well, first, it's the jury's job.  So

21 they're going to decide what happened or not happened, and if

22 they decide it didn't happen, it may be harder for the

23 Government to prove that you used a firearm.  But they will --

24 I will not be making any factual findings when we get into the

25 trial unless they're related to evidence, which we're going to

talk about, like co-conspirators' statements.  The jury's going
to decide whether this happened.  But I'm saying at the end of
the day, they will not be allowed to find brandishing because
that's not been charged.  So the verdict form will never come
back with "brandishing" checked.

My question is whether or not we should have an
instruction at the time the evidence comes out that says "In
this case the Government must prove beyond a reasonable doubt
that Mr. Jackson used the firearm."  They don't need to prove
beyond a reasonable doubt that it was used for pistol-whipping
or pointing at somebody, but you may not want that kind of
curative instruction because you may want the jury to know that
"If you're going to say I did this to Mr. Washburn, where's
Mr. Washburn?"  So that's what we're talking about the curative
instruction.

Any thought about that?

MR. JACKSON:  I mean, just listening to your Honor, it
sounds like -- to me like it's coming both ways, so it's more
like a Catch-22 with a jury instruction for that.  It's like,
you know -- it's up in the air, did he have a -- did he use a
gun against somebody or didn't he?  So I would have to leave
that up to the Court.

THE COURT:  All right.  In a trial, there's a lot of
things like that.  So you may have a witness who is great for
you on subjects one, two, and three and terrible for you on

1 subject number four.  I mean, that's just life.

2      So in this particular case, under 403, the Court finds

3 that the evidence is probative.  We are not going to have any

4 mention of sex trafficking.  I will leave the issue of a

5 curative instruction undecided.  I will know at the time when I

6 hear the testimony if I think that it has the potential to

7 confuse the jurors or mislead them as to what's been charged.

8      So the Court conditionally grants the Government's motion

9 *in limine* with regard to defendant's actions with a firearm,

10 which is Document No. 204.

11      The next one is a motion *in limine* to allow admission of

12 evidence of occupancy.  This is Document No. 207.  The

13 Government wants to admit evidence of photographs and documents

14 bearing the name Lawrence Jackson found in a bedroom at 55

15 Killington Avenue, Apartment 2, in Rutland and testimony that a

16 man knocked on the door of 55 Killington Avenue, Apartment 2,

17 during the execution of a search warrant and said, "I'm looking

18 for Mr. Lawrence."

19      So these are materials -- the paper and the photographs

20 were obtained in the course of the search.  A person came

21 during the search.  The courts have held that questions are not

22 hearsay because they're not offered for the truth.  This seems

23 to be squarely within the evidence before the Court.

24      I understand that Mr. Jackson may introduce testimony that

25 the reason his paperwork was at the place was because his

1  girlfriend was helping him obtain some official documents, and

2  that's fair game for cross-examination and that's fair game if

3  there's evidence to support it in closing arguments, opening

4  arguments, but the issue is whether or not that information

5  should come in.

6       And let's hear from you, Mr. Jackson, about that.

7           MR. JACKSON:  Yes, your Honor.  I don't have any

8  problem with the mail or anything with my name on it, such as a

9  Social Security card or traffic, because it has my true

10 address, so if the Government want to introduce that, I plan to

11 use that anyway, so I'm good with that.

12          THE COURT:  All right.

13          MR. JACKSON:  With the man knocking on the door, I

14 don't know who would walk up on a raid with a hundred cops

15 outside and ask for a person.  I would think, you know, the way

16 I'm looking at it, if he made a statement or asked a

17 question -- I don't think that's more of a question.  I mean,

18 that's more of a statement the way the Government put it,

19 because they want to use -- use that to prove occupancy, and

20 nobody don't know who this mystery man is, so I think it's a

21 threshold for a confrontation clause right there.

22      If the Government plans to introduce that, I think they

23 should have to introduce that man for confrontation, because I

24 don't know who it is, and this is the first time I heard about

25 it, so -- just Wednesday, when I got this.  So this is the

1  first time I've heard about it, so, again, I leave that up to

2  the Court, but I have no problem --

3           THE COURT:  There's no mention in any of the police

4  reports that somebody showed up during the search warrant

5  and --

6           MR. JACKSON:  No.

7           THE COURT:  -- asked this question?

8           MR. JACKSON:  Not that I have.

9           THE COURT:  All right.

10          MR. JACKSON:  And I have over 3,000 pages, and I read

11 everything frequently, over and over and over again, and this

12 is the first time I ever seen that.

13          THE COURT:  All right.  And there is a -- from my

14 understanding, a lengthy video of the execution of the search

15 warrant; do I have that right?  Because we have a debate about

16 whether that whole video should be shown.

17     So let's hear the Government's response.

18          MR. OPHARDT:  Your Honor's correct.  There's a body

19 camera video.  Detective Jesse Dambrackas from the Vermont

20 State Police was wearing it.  It's a three-and-a-half-hour-long

21 video.  That is where -- I can't remember the last name he

22 gave.  I think the first name he gave was Rupert -- is depicted

23 knocking on the door.  The door -- well, the door's knocked

24 upon.  Sergeant Dambrackas opens the door, and a person is

25 there and engages in a conversation with law enforcement.

1    So there is no mention of it in a written report.  The

2  Government learned about it through viewing the body cam

3  footage itself.  We do not intend to show that clip itself

4  because there is additional information that the individual

5  provides about being owed money for a gold chain and those

6  sorts of things, which I think are unnecessary.  The

7  Government's intent is to have Detective Dambrackas testify

8  that this event occurred, that the individual was inquiring

9  about whether Lawrence was at the apartment, and then leave it

10  at that.

11    Mr. Jackson raised the confrontation clause.  Case law is

12  clear the confrontation clause requires it to be testimonial

13  hearsay in nature.  This was not testimonial hearsay in the

14  sense that it was not provided to law enforcement with the

15  intent of having it used in court at a later date.  It appears

16  that the individual who knocked on the door was unaware of law

17  enforcement's presence inside.  Certainly --

18       THE COURT:  So this is not my credibility

19  determination, and if there's a video, there's a video.

20  Mr. Jackson has a point.  I would assume there's cruisers out

21  front, and people do stupid things and come up in the middle of

22  something like that, but it is kind of unusual.

23       MR. OPHARDT:  It is unusual, your Honor.  My

24  understanding is scene security was not optimal during the

25  search because folks were out looking for Mr. Jackson and they

1  found Mr. Jackson very close nearby, so a lot of law

2  enforcement pivoted from security around 55 Killington to the

3  scene of the traffic stop to assist with his apprehension.  So

4  I think that explained why they were a little -- minimum

5  manning at the time.  The Government's not conceding there was

6  a lack of scene security.  That's why Detective Dambrackas was

7  there with the search team.

8       But when the Court hears the officers' testimony about

9  where this residence was located on the second floor with a

10  very covered stairwell from the back of the building, it's dark

11  out at the time, late November, during the execution of a

12  warrant, after 6:00 PM, it's not -- unsurprising that somebody

13  was able to walk up to the door.

14       But the Government does not have a concern as to

15  confrontation clause because this was not the type of statement

16  that was being offered -- in addition to not being hearsay, it

17  also was not the type of information being offered to law

18  enforcement with the purpose of them doing something with it

19  for charging purposes or other reasons that would fall within

20  *Crawford's* ambit for confrontation clause analysis.

21       THE COURT:  Mr. Jackson, you have this video because

22  one of the things you're asking the Court is to play the whole

23  video.

24       MR. JACKSON:  I don't want to play the whole video,

25  your Honor.  There's going to be played snippets out of the

1  video.  But I disagree with Mr. Ophardt about *Crawford v.*
2  *Washington*.  If you try to prove a certain fact and they want
3  that fact to come into evidence, even if it's from an officer
4  stating that, that is testimony.  They claim that Rupert came
5  to -- upstairs during the raid, knocked on the door during the
6  raid, Officer -- State Trooper Jesse Dambrackas opened the
7  door, and somebody asked for somebody during the raid, and they
8  want to prove occupancy.

9       If they want to prove something, his tes- -- his asking
10  for me, they want to use that as proof that I occupied that
11  apartment, that I lived there, so to me that's testimonial, and
12  I think that's right on the lines of Supreme Court Justice --
13  I'm sorry I'm pronouncing his name wrong, Justice Scalia,
14  however you pronounce it, I'm sorry, in *Crawford v. Washington*,
15  any testimony of it bearing proof, place, or things is
16  testimonial, so I don't -- I don't see how Mr. Ophardt look at
17  that differently when he want another officer to confirm Rupert
18  knocked on the door, asked for Jackson, and just by him asking
19  for me proves that Jackson lives there.  I think that's -- can
20  be part of confrontation, your Honor.

21          THE COURT:  The Sixth Amendment to the United States
22  Constitution sets out the defendant's right to confront their
23  accusers.  The relevant text of the confrontation clause of the
24  Sixth Amendment reads as follows:  "In all criminal
25  prosecutions, the accused shall enjoy the right . . . to be

1  confronted with the witnesses against him."

2      In *Crawford* the court changed the previous analysis as for

3  when prosecutors can use out-of-court statements against a

4  defendant.  "Before *Crawford*, the Supreme Court had held that

5  out-of-court statements did not violate the confrontation

6  clause as long as they were adequately reliable.  In *Crawford,*

7  the Court changed course and determined that defendants had a

8  right to cross-examine out-of-court statements, regardless of

9  whether or not the statements were reliable.

10     "After *Crawford,* the government cannot use out-of-court

11 statements that are offered as testimony against the defendant

12 unless the witness is unavailable and the defendant has a

13 previous opportunity to cross-examine the witness."

14     In this case, I'm not sure whether or not this is a

15 testimonial statement.  It's certainly offered against the

16 defendant.  It isn't hearsay because it's a question, and there

17 is ample case law that says questions posed do not constitute

18 hearsay.  There was actually a fairly recent summary order from

19 the Second Circuit in *United States v. Dominguez-Gabriel*, 511

20 F.App'x. 17, (2d Cir. 2013), that says just that:  "questions

21 posed . . . do not constitute hearsay."  This is based on prior

22 Second Circuit precedent.  Questions are ordinarily not

23 hearsay because they are not offered for the truth of the

24 matter.

25     Testimonial typically involves a statement at a police

1  station in which somebody is making an accusation.  So in

2  *Crawford*, if I'm remembering the facts correctly, it was a

3  domestic violence statement that was made at the police

4  station.

5      Let's talk -- let's focus on what are the requirements for

6  testimonial statements in *Crawford*, and I'm going to start with

7  the Government.

8          MR. OPHARDT:  Your Honor, it's been a bit since I

9  briefed the issue.  My recollection is that it looks to the

10  intent of the person providing the statement to whether or not

11  they are hoping for law enforcement to take particular action.

12  There's a lot of case law over 911 phone calls.  911 phone

13  calls for requests for assistance during an emergency are

14  deemed non-testimonial in nature, where those seeking to report

15  wrongdoing after the emergency is concluded are considered to

16  be testimonial.

17      I also know that the courts have -- I also submit to your

18  Honor that the courts have pretty routinely found that first

19  something has to actually be hearsay to be subject to the

20  confrontation clause analysis.  So if the Court is finding that

21  the individual statement "Is Lawrence" -- the individual

22  statement "I'm looking for Lawrence" to not be hearsay, then we

23  don't have a confrontation clause issue because it's not being

24  offered for the truth.

25      In order for something to be testimonial, it has to be

1  being offered by the Government for the truth of what's being

2  asserted.  It is unclear from the interactions whether or not

3  the declarant knew law enforcement would be present, but he

4  never asked law enforcement to take any action whatsoever in

5  relation to his allegation of being deprived of a chain or

6  money for the chain.  He doesn't file a police report.  He

7  doesn't request law enforcement's assistance.  He's simply

8  inquiring as to whether or not Mr. Jackson, by using his first

9  name Lawrence, was present at the apartment.

10      In addition, the Government is not intending to offer any

11  information about the purpose of the inquiry other than simply

12  that the inquiry was made as to whether or not "Lawrence" was

13  present.  That portion is, the Government submits,

14  non-testimonial in nature.  I think there could possibly be an

15  argument as to whether or not the additional statements

16  thereafter are testimonial in that the individual now

17  recognizes this is law enforcement and he is making a statement

18  about certain property that he believes he's been deprived of.

19      So I think the Court can safely bifurcate the two, and its

20  ruling that it is not hearsay largely dictates the outcome of

21  the confrontation clause analysis.

22          THE COURT:  Mr. Jackson, anything you want to say

23  about this further?

24          MR. JACKSON:  Yes.  Just one thing, your Honor.  The

25  Government is trying to offer proof of occupancy.  Now, I read

1  some of the -- a lot of the case law they put in here, and a

2  lot of case law that the Government used was the analysis of --

3  let's say credit card fraud or bank robbery or something or a

4  person signing bad checks and they got him going to the bank.

5  In those particular cases, they can prove a person was at a

6  particular place at a particular time for a particular reason.

7       In my case here, your Honor, with Mr. Rupert question,

8  they made it testimonial when they want to use it to prove that

9  I lived at 55 Killington Avenue because he came to 55

10  Killington Avenue, allegedly, looking for me.  So when you look

11  at it from that aspect, it's past hearsay if they want to use

12  it as testimonial, if they want an officer to testify to the

13  fact that Mr. Jackson lived at 55 Killington Avenue.  That

14  was -- I mean, that's a major part of the case, a major part of

15  the warrant where they say they have multiple witnesses say

16  that I live at 55 Killington Avenue.  But I think his statement

17  alone, if they want to use it, I think that -- that's subject

18  to cross-examination.

19       THE COURT:  Well, certainly you want confrontation,

20  though.  You want the witness here who made the statement.

21       MR. JACKSON:  Well, no, your Honor, it's not that I

22  want the witness here.  I don't want him here.  I'm just, you

23  know, arguing the fact that it shouldn't be used, you know.

24  That's all.

25       THE COURT:  So I have a good cheat sheet on *Crawford*,

but I just don't have it with me right now because I wasn't

seeing this as a confrontation clause issue.  It hadn't --

there was no response filed to this motion.

The question -- questions are not hearsay because they are

not offered for the truth.  They're offered for the purpose of

the person's state of mind.  He's asking, "Is Lawrence here?"

It doesn't establish that Lawrence is here.  It establishes

that the person was expecting to find Lawrence there, and that

can be used as proof of occupancy.

The confrontation clause issue is a little bit more

complicated, and it is being used against Mr. Jackson, so it is

being used to establish that he was an occupant.  I'm not sure

about whether it was testimonial.  I don't think the intent of

Rupert, whoever this was, was to provide information to law

enforcement that would result in it being used in a trial

against Mr. Jackson.  He was just looking for Mr. Jackson.  And

that's something that appears to distinguish it from somebody

going to the police station and reporting a crime, and that

seems to be the way the cases come out.

When you're calling 911, there's an emergency.  "You need

to come here.  Somebody's bleeding all over the floor."  You're

not thinking, typically, "Well, that's going to be used in a

prosecution."  You want somebody to come and render aid.  I'll

take a harder look at it and have a better answer for you prior

to our jury draw, but that's -- that's my concern is whether or

1 not it's testimonial or not.

2     Any further subjects?  So I'm going to defer ruling on

3 that part of it.  The Court finds the question itself is

4 non-hearsay.

5     There is no issue with regard to photographs, paperwork,

6 anything with Mr. Jackson's name on it.  Both parties intend to

7 use it, and there's -- Mr. Jackson does not object to that, and

8 that part of the motion *in limine* is granted.

9     Now let's go to the next one, which is admissibility of

10 admissions of the defendant, Document No. 208, and this is

11 about the messages that contained and whether the customer

12 statements are also adopted admissions -- or adoptive

13 admissions and whether or not the customer statements are

14 necessary to show -- to make the messages intelligible.

15     I'm going to hear from the Government, and then we'll hear

16 from Mr. Jackson.

17         MR. OPHARDT:  Thank you, your Honor.

18     The Government has laid out a sampling of messaging

19 between certain individuals who were seeking to obtain

20 controlled substances and the user of the phone that we

21 attribute to Mr. Jackson.  Each of the examples the Government

22 provides are examples of what we'd characterize as adopted

23 admissions.  These are not adoptions by silence, which there's

24 a substantial amount of case law about that, and so I want to

25 just distinguish the two.  The Government's argument is that

1  Mr. Jackson responds in a relatively timely manner to these

2  inbound messages in ways indicating he understood them and he

3  was agreeing to take certain actions in reliance upon those

4  statements.  And the case law is clear that those types of

5  responses turn the inbound messages into the admissions of

6  Mr. Jackson for purposes of analysis under 801(d) of the

7  Federal Rules of Evidence.

8        The case of *United States v. Shulman* lays out the

9  requirements that there be words or conduct that unambiguously

10  manifests adoption of the other person's statements.  In that

11  circumstance the content of the statement need not even be

12  against the declarant's interest.

13        So those are the -- that's the Government's argument here,

14  your Honor, is that there are timely responses from Mr. Jackson

15  that result in an adoption of Mr. Jackson of the inbound

16  messages.

17        I would also argue to the Court, as the Court outlined,

18  that they're also admissible for context.  So even if not being

19  offered for the truth of their own contents, they are being

20  offered to render intelligible the defendant's response.

21  There's case law supporting that concept as well on pages 14

22  and 15.

23        Finally, your Honor, similarly to what we were just

24  talking about as far as inquiries are concerned, a third reason

25  would be that some of these messages are simply questions, a

1 | question of whether they can obtain drugs and a certain

2 | particular amount of them.  In and of itself, that inquiry

3 | would not be hearsay, consistent with what the Court was just

4 | discussing in relation to the unexpected visitor to the search

5 | warrant location.

6 |         THE COURT:  Mr. Jackson, any response?

7 |         MR. JACKSON:  Yes, your Honor.  A lot of these text

8 | messages, your Honor -- I matched a lot of these text messages

9 | with a lot of the evidence that the Government turned over to

10 | me, and there's no corroboration with these text messages.  I

11 | have to prove it in front of a jury if your Honor grant it, but

12 | a lot of these text messages I didn't even make, but I did

13 | cross-reference a lot of these text messages with other people,

14 | and a lot of these text messages, like, say, for instance, from

15 | Paul or Sam, other people answered these text messages.

16 | Courtney Schaner clearly said that in a lot of her text

17 | messages, "I have this phone" and da-da-da-da, right -- you

18 | know, and I've matched the time and the dates of these text

19 | messages, so, you know, for me I think it would be highly

20 | prejudicial to introduce these text messages where there's no

21 | corroboration.

22 |     I can see if the Government's going to call some of these

23 | people to testify to these text messages.  I surely didn't

24 | respond to these text messages with these people, you know,

25 | talking about drugs and quantity and things like that, but, you

1  know, if your Honor allows it, I will be introducing

2  contradictory evidence to that that other people answered these

3  text messages, and I think the Government know about that from

4  Courtney Schaner's phone, text messages that she have, and she

5  clearly say "I have this phone," and a lot of these text

6  messages was -- other people answered that.  I never regularly

7  had this phone.  So -- then, again, I leave it up to the Court,

8  but --

9        THE COURT:  All right.  The Government was careful in

10  its motion, and correctly so, to describe this as messages from

11  a phone associated with you as opposed to your messages.  So

12  it's obviously fair cross-examination and argument to the jury

13  that other people had your phone and were answering it.

14        The question is that is there enough evidence for a jury

15  to find that you were the person who was answering these

16  messages and this conversation that's going on in the messages

17  are your adopted admissions or that they're necessary to

18  complete the conversation, and on that point the Court agrees

19  that they are, that -- the court in *Shulman* was the most

20  direct, but it held that a party-opponent adopts a

21  non-testifying person's statements when they do it "by words or

22  conduct that 'unambiguously manifests adoption of [the other]

23  person's statement'; in that circumstance, 'the content of the

24  statement need not be against his interest.'  This includes

25  discussions and negotiations for the purchase of drugs," and

1   the Government cites *United States v. Woods* from the Seventh

2   Circuit where confidential informant's statements during

3   recorded calls were admissible as adopted admissions of the

4   defendant.

5       In *United States v. Sorrentino*, similarly the court held

6   that where the Government seeks admissions of a conversation

7   between a confidential informant and the defendant, and the

8   defendant's statements are admissible as an opposing party's

9   statement, the confidential informant's statements are also

10  admissible when used to render what the defendant said in those

11  conversations intelligible.

12      So because this is a conversation and there is at least a

13  reliable factual basis, which the jury may well reject, that

14  communications coming from Mr. Jackson's phone were actually

15  from Mr. Jackson, the statements in response are adoptive

16  admissions.  They're necessary to make the conversation

17  intelligible, and they are admissible.  Mr. Jackson may produce

18  evidence at trial that shows that he did not possess his phone,

19  these messages were not from him, the recipient didn't even

20  care who was answering the phone as long as they got what they

21  wanted, but that is something for trial as opposed to a basis

22  for excluding this evidence, and on that basis the Court grants

23  the Government's motion *in limine*, Document No. 208.

24      Our next issue -- and, of course, 208 is granted subject

25  to authentication.  You have to provide a basis for the

1  Court -- or the jury, I should say, to find that a cell phone

2  belongs to Mr. Jackson, and the Court would have to establish

3  that it is admissible in trial before we get to the statements

4  on it.

5      Admissibility regarding co-conspirator statements.  This

6  is Document No. 209.  And in order for a co-conspirator's

7  statements to be admissible, there is a significant body of

8  evidence, and in our circuit and others, there has to be a

9  finding by a preponderance of the evidence, that there was a

10 conspiracy in existence, the declarant was a member of that

11 conspiracy, the defendant against whom the statement is offered

12 was a member of that conspiracy, the statement was made in

13 furtherance of the conspiracy, and the statement was made

14 during the course of the conspiracy.

15     In deciding whether this is in fact the case, the Court

16 may consider the statement itself after *Bourjaily v. United*

17 *States*, a Supreme Court case in 1987.  The Government may in

18 some cases introduce these statements subsequently linking up

19 all the other factors the Court needs to find, but let's start

20 with the Government as to how you intend to establish the

21 prerequisites for the admissibility of a co-conspirator

22 statement.

23        MR. OPHARDT:  Your Honor, the Government intends to

24 show the prerequisites through -- in part through witness

25 testimony.  The Government intends to offer these messages

1  after the testimony of two individuals who will establish

2  connections between Mr. Jackson and drug distributors using the

3  monikers S and Hodge.

4       In addition, there will be testimony in advance of the

5  admission of David Jordan being the individual who goes out the

6  window at 55 Killington Avenue, is apprehended shortly

7  thereafter with a large amount of cash on his person, white

8  powder on his hands.

9       In addition, there will be testimony from the officers who

10  executed the search warrant that Ms. Schaner and Ms. Ashline

11  were both present at the time that the warrant was executed.

12       There will also be testimony about 55 Killington Avenue

13  being a location where Mr. Jackson's drug trafficking

14  activities were occurring, Ms. Schaner being the primary tenant

15  of record at that residence.

16       All of this evidence will establish conspiracy involving

17  the people in the messages that the Government has outlined in

18  Document 209.

19       The case law is pretty clear, Judge, that you can

20  certainly wait to make this determination at trial.  The

21  Government does not have -- given the fact that our

22  anticipation is that Mr. Thornton won't testify until Thursday

23  at the earliest, we'll have -- late Thursday, I believe, on our

24  schedule, we'll have a substantial amount of testimony for the

25  Court to determine this mid trial if it so chooses, and we can

1 adjust exhibits pretty easily on the fly given the nature of

2 these exhibits.

3        THE COURT:  So you're planning on establishing the

4 basis prior to the admission of the statements and not linking

5 up thereafter?

6        MR. OPHARDT:  Primarily, your Honor.  There will be

7 additional testimony that comes thereafter in the sense that

8 Mr. Cruz will be testifying after we're seeking the admission

9 and Ms. Jones will as well, who will provide additional

10 testimony regarding certainly Ms. Schaner as well as

11 potentially other aspects of the conspiracy.

12        If the Court has concerns at the time that we offer them

13 through Mr. Thornton, we can certainly defer seeking their

14 admission to the jury and publication until after further

15 testimony.  I think these are the types of exhibits we can lay

16 the foundation with Mr. Thornton, then seek their admission

17 prior to Agent Gambone testifying.  He would be providing some

18 information to the jury about the meaning of jargon in some of

19 the messages, so we would need them admitted and published

20 prior to that, but this is certainly something the Court can

21 consider throughout the trial without concern from the

22 Government.

23        THE COURT:  All right.  Let me ask you if there's any

24 agreement between you and Mr. Jackson about using exhibits in

25 opening statement.

1          MR. OPHARDT:  Your Honor, we have not discussed that

2     with Mr. Jackson.  Ms. Cate's providing the Government's

3     opening, and she does not intend to use exhibits.

4          THE COURT:  Okay.  So the rule is unless the parties

5     both consent, we don't use exhibits in opening statements.

6          And let's stay on this issue, which is admissibility of

7     co-conspirator statements.  I could show my hand and tell you

8     I'm unlikely to rule definitively on this issue until the

9     testimony unrolls, because it may or may not establish the

10    requirements set forth by the Second Circuit and others that

11    there has to be a conspiracy.  The members need to include the

12    declarant and the party against whom the statement is offered,

13    which would be you, and that the statement was made during the

14    course of and in furtherance of the conspiracy.

15         Any response from you, Mr. Jackson?

16         MR. JACKSON:  Yes.  The co-conspirator statements,

17    from what the Government's provided to me is that, especially

18    with the third superseding indictment -- unlike the second

19    superseding indictment where I had co-defendants, basically

20    they were my co-conspirators, third superseding indictment

21    don't list any co-defendants, any co-conspirators, except

22    people who just came off the street or, you know, caught

23    charges or whatever and all of a sudden they make statements,

24    and I don't understand how the Government would like to use

25    expert witnesses to corroborate text messages for a conspiracy.

1  It just -- it behooves me that these text messages will come in

2  mentioning Hodge and all these other people and Mr. Jordan.

3      Mr. Jordan was a co-defendant at one point.  He's not here

4  now, of course.  But from what I understand and from the

5  evidence that I received is that none of these people were ever

6  around me, and all of a sudden one person is my co-conspirator,

7  and his statements -- I don't understand how they're going to

8  use that to justify these allegations.  But, you know, I

9  guess I'll go with the Court's -- you said you're going to

10 defer your decision until the Government do what they have to

11 do, so I guess I'll have to go with that, your Honor, but I

12 just don't see a co-conspirator statement that -- elicited some

13 two and a half years later by one witness, who was not a

14 co-conspirator, about OC, Orlando Cruz, who I haven't seen,

15 prior to November 23rd, in over two years, so I'm kind of

16 baffled about that, but, you know, I guess I'll have my chance

17 on cross-examination depending on what Honorable Judge Reiss

18 decides.

19      THE COURT:  All right.  I am going to defer ruling,

20 and I will wait till the evidence necessary to admit the

21 statements has been provided.  It's not going to be linked up

22 afterwards.

23      Mr. Thornton would be testifying, I believe, as to what he

24 found on the phone and what he found on different media

25 devices.  He would not be testifying about whether there was a

1 conspiracy or not.  That would have to come from participants.

2 But it is not necessary "that a conspiracy be charged in the

3 indictment."  The Second Circuit case on that is *United States*

4 *v. Doulin*, D-O-U-L-I-N, 538 F.2d 466.  It's a 1976 case.  "Nor

5 is it necessary that the declarant be charged as a

6 codefendant," so that's not required.  That's *United States v.*

7 *Jones*, 542 F.2d 186.  It's a Fourth Circuit case in 1976.

8       "It is sufficient that there be a joint venture."

9       "The joint venture on which admission of a coadventurer's

10 statement is based need not be the same one as the charged

11 conspiracy, if any, and it need not have an illegal objective,"

12 and that is *United States v. Layton*, 855 F.2d 1388 (9th Cir.

13 1988).

14       So the requirements, you don't have to have co-defendants.

15 You don't even have to be charged with a conspiracy for this

16 evidentiary rule to apply, and under 801(d)(2), a statement is

17 not hearsay when it is offered against an opposing party and

18 was made by the party in an individual or representative

19 capacity or was made by the party's co-conspirator during and

20 in furtherance of the conspiracy.

21       So I have to find that there was a conspiracy, that it's

22 offered against you, that both you and the declarant were

23 members of the conspiracy, and that the statement was during

24 the conspiracy, so when the statement was made, it was during

25 the conspiracy and it was in furtherance of the conspiracy.

1   And I'm going to wait till I hear the evidence to make those

2   findings.  The courts are mixed about whether or not it needs

3   to be formal as to whether the Court makes the findings or

4   whether or not, as long as the Court is ticking off in the

5   judge's head, yes, this has been met, that has been met.  It's

6   whether it's sufficient.  We're not going to get to much of

7   that evidence, I'm told, in terms of media, meaning like cell

8   phones and that, until we get to Mr. Thornton, but we may have

9   it a little bit earlier in a witness' testimony about jargon.

10      So I'll defer ruling on that, but it will not matter that

11  you -- you don't have co-defendants in order for the rule to

12  apply.

13      Our next one is, I believe, Mr. Jackson's motion - let me

14  make sure - *in limine* to exclude Counts 1, 5, 6, 7, and 8 of

15  the third superseding indictment.  This is Document No. 211.

16      And I'm going to start with you, Mr. Jackson.

17      MR. JACKSON:  I think your Honor covered it already

18  with the conspiracy charges, Count 1, in the Government's

19  motion *in limine*, I believe.

20      THE COURT:  So the way I read your motion was that the

21  Government was not going to be able to admit sufficient

22  admissible evidence to support the essential elements of these

23  counts, and the Government's response is "That's not your job,

24  Judge Reiss.  That's the jury's job."  So the sufficiency of

25  the evidence can be challenged at the close of the Government's

1 case, and I will be asking you if you have any motions at that

2 time, and we're going to have the jury leave and I'm going to

3 allow you to ask for a judgment of acquittal, but you're asking

4 from the Court's perspective for pretrial dismissal of these

5 counts, but I could be misreading what you want.

6     So go ahead and tell the Court anything that you want to

7 say about your motion.

8         MR. JACKSON:  I agree with what the Court said,

9 because, like I said, I think most of the things they

10 covered -- you covered in their motion *in limine*, so I'll leave

11 it like that, but I'll wait till the end of the Government's

12 case to make an argument.

13        THE COURT:  All right.

14        MR. JACKSON:  I think that will be sufficient and

15 fair.

16        THE COURT:  All right.  Any response from the

17 Government?

18        MR. OPHARDT:  No, your Honor.

19        THE COURT:  All right.  The sufficiency of the

20 evidence is generally for the jury to determine.  There is a

21 time to raise this at trial at the close of the Government's

22 evidence and also before the case is submitted to the jury.

23 I -- unlike some judges, I actively ask the parties if there

24 are any motions because sometimes in the press of trial people

25 forget to do that, so I will do that in this case as well, but

1 a court generally cannot dismiss a count within a criminal

2 indictment for insufficient evidence.  It can't even ask the

3 Government for a proffer.

4      Attacks on the weight of the evidence rather than its

5 admissibility are generally inappropriate for a motion *in*

6 *limine*, and therefore, the Court will await the presence of the

7 evidence and advise Mr. Jackson and the Government at the close

8 of the Government's case whether or not there are any motions,

9 and then it is up to you to present your evidence at that time.

10      This also includes a challenge, however, to Mr. Brimo's

11 qualifications as an expert.  This is Rule 702.  And,

12 Mr. Jackson, do you want to address that?  You point out,

13 correctly, that in grand jury testimony Mr. Ophardt said that

14 he was an expert on firearms, and he said he wasn't an expert

15 on firearms.  It's actually the Court that would decide whether

16 he was an expert and if he could testify, but the Government's

17 position is he has since acquired whatever evidence he needs at

18 this point to testify as an expert witness.

19      So let's turn it over to you, because it's your motion.

20 Anything you want to say about that issue?

21      MR. JACKSON:  Yes.  I don't believe Agent Brimo would

22 be an expert witness in this case.  Agent Brimo was a part of

23 this case from the beginning, from since the collection of --

24 of the evidence and him participating in this case with the

25 U.S. Attorney's Office and others.  To me, he was part of the

1   collection team of evidence when they handed him phones to

2   search, and I believe there's case law -- I don't have it right

3   now.  I think I forgot it in my van.  I'm very sorry about

4   that.  Usually I'd be on point, but . . .

5        You can't be an expert witness and be part of the case at

6   the same time - I think the Supreme Court disallowed that - as

7   an agent or a police officer being an expert and being part of

8   the case itself.  I think there's a big distinction with that,

9   and I believe Agent Brimo, like I said, he made a statement in

10  the grand jury to Mr. Ophardt that he wasn't an expert.  And on

11  top of that, he's very much been a part of this case, so I

12  think it would be highly prejudicial for him to be part of the

13  case and be an expert at the same time, your Honor.

14          THE COURT:  Well, let me ask you about that, because I

15  have not seen that case law, and that doesn't mean that it

16  doesn't exist, but I'm trying, as you're talking about it, to

17  think about the policy reasons.  So why would there be a

18  prohibition for somebody who's a police officer involved in the

19  case from also testifying as an expert witness that "I have

20  experience with firearms.  I know that there are several types.

21  The reason why, you know, a -- it's called a 9-millimeter is

22  because it has to do with the caliber of the bullet and the

23  barrel" or whatever they're going to say.  What would the

24  policy reason be that courts would say, "Oh, no, no, you can't

25  both investigate the crime and provide specialized testimony

1  about any aspect of it"?

2           MR. JACKSON:  I think -- I think there's a distinction

3  between somebody who would look at the evidence differently as

4  opposed to somebody who's prosecuting the case.  You know, not

5  to use Mr. Ophardt as an example, but Mr. Ophardt, he will

6  prosecute a case, but for him to testify --

7           THE COURT:  Well, he can't be --

8           MR. JACKSON:  Right.  Well, he can't testify to it,

9  so, you know, I look at it in that way:  For him to prosecute

10 the case and then present expert testimony to the evidence, I

11 think that should come from others.  There is case law on that.

12 I read it, your Honor, and I will get it to the Court and to

13 Mr. Ophardt as soon as possible.  You know, excuse my tardiness

14 on that, but it's a distinction, and the distinction is that,

15 you know -- you know --

16          THE COURT:  Are you sure that the case law you read,

17 though, was -- you are absolutely right there's an ethical rule

18 directly on point:  We would never allow a prosecutor to be a

19 witness in a case that the prosecutor was prosecuting.  That

20 would not happen.  You can't do -- an attorney cannot even

21 participate in a case where he or she may be called as a

22 witness because of those reasons.  You're saying to me, though,

23 that you think there's case law that says a police officer who

24 investigated the crime can't provide any --

25          MR. JACKSON:  Expert.

1          THE COURT:  -- testimony that would qualify as expert
2  witness testimony.
3          MR. JACKSON:  Right.
4          THE COURT:  Okay.  All right.  Let's hear from the
5  Government.
6          MR. OPHARDT:  Your Honor, Mr. Jackson is completely
7  correct that there are courts that have substantial concerns
8  over individuals testifying both as fact witnesses and experts.
9  I believe the Sixth Circuit has recommended that the individual
10 testify twice instead of once, once as a fact witness and then
11 the second time as an expert witness.
12         THE COURT:  But never in our circuit, is it?
13         MR. OPHARDT:  It's not been an issue addressed in our
14 circuit squarely, Judge.  This is why the Government has been
15 careful to choose experts who do not have underlying factual
16 knowledge about the case.
17     Agent Brimo was not involved in the search at 55
18 Killington Avenue, Apartment 2.  He does not have any firsthand
19 knowledge of the events that occurred during that search or the
20 search of the Ford Explorer.  His involvement in the case was
21 solely to review evidence that had already been seized.  He
22 reviewed the documents; documented their make, model, and
23 serial number; and provided that information to a different
24 special agent who at the time was a nexus expert.
25     Agent Brimo has since become a nexus expert himself, but

1    that type of ministerial documentation is not the type of

2    investigatory work that the Courts are concerned with having a

3    dual-hatted witness.

4           THE COURT:  So because you can recall a witness, that

5    can't be the reason why they're doing it.  So testifying twice,

6    you could have Agent Brimo testify in the beginning of the case

7    about something he did and recall him later in the case.  Is it

8    about the same subject matter?  So this is news to me, which is

9    great, learning something new.  I'm confident I have not seen

10   it in our circuit, but that doesn't mean that it doesn't exist.

11       What's the policy reason for doing that?

12          MR. OPHARDT:  Your Honor, I think the policy reason

13   stems from courts declaring someone an expert to the jury,

14   which is not this court's practice, is my understanding.  When

15   somebody certifies as an expert and the jury is instructed that

16   they are an expert in a particular field after a voir dire,

17   that provides an impetus -- excuse me.  Not impetus.

18   -- provides a bit of a, for lack of a better word, halo over

19   that witness as an expert.  My understanding is your Honor does

20   not do that, so that aspect of the concern I think is largely

21   mitigated.  I want to stress --

22          THE COURT:  That makes perfect sense to me, and I

23   actually think our circuit would find the same thing.  So if I

24   was saying to the jury this is an expert and then he is later

25   or she is later talking about facts, the jury may weigh the

1  credibility of their testimony differently because the judge

2  has just proclaimed that person an expert.  So that -- I think

3  our circuit would adopt that as well.

4         MR. OPHARDT:  Your Honor, so I think that your

5  practice to not do that, that drastically reduces the concern.

6  In addition, Agent Brimo's involvement in this case was not the

7  type the case law has indicated is problematic to have someone

8  be providing expert testimony.  Where this frequently comes up,

9  when I used to do racketeering and violent crime prosecutions

10 with the Organized Crime and Gang Section of the Department was

11 when we would have people testifying about the existence of a

12 particular gang and be an expert in gang nomenclature and

13 tattoos and things like that and then also be the investigator

14 in that particular case.

15      So what we've typically done is pull in an expert to come

16 in to testify who has nothing to do with the underlying

17 investigation.  That is why we have Agent Gambone testifying,

18 your Honor.  Agent Gambone had no role in interacting with

19 Mr. Jackson for controlled purchases.  He had no role in a 55

20 Killington Avenue search warrant.  I don't believe he's had any

21 role even in interviewing any of the witnesses in the case, is

22 my recollection.  So his testimony is untainted by the

23 underlying investigation.  He will simply be coming in to talk

24 about his understanding of drug jargon.  That's an example of

25 the Government's attempts to bifurcate the roles.

1          Agent Brimo, as I said, had no actual involvement in the

2    investigation other than the ministerial act of documentation.

3    His testimony before the grand jury was to relay that nexus

4    determination of another expert as well as the criminal

5    histories of both Mr. Jackson and Mr. Watson, who were charged

6    by the grand jury with being felons in possession of firearms.

7          At the time Agent Brimo was not a nexus expert.  He was

8    actively studying to obtain that nexus certification by ATF,

9    which explains why he responded the way he did.  He wanted to

10   be clear he had not yet obtained that certification.  He since

11   did.  I believe it was in February or March of 2022.

12         So the Government submits that Agent Brimo is sufficiently

13   qualified as an expert.  He did not have any activities in the

14   underlying case, and it would be problematic to have him be

15   called as an expert.  And finally, any concerns Mr. Jackson has

16   over that grand jury transcript can be explored during

17   cross-examination.

18              THE COURT:  Mr. Jackson, any response?

19              MR. JACKSON:  Yes.  I disagree with that, your Honor,

20   because at the beginning of this case - we're talking about the

21   ATF agent here - typical protocol, firearms was taken to him

22   for a nexus report, to him and the other agent.  Sorry.  I

23   forget his name.  But the phones was also given to the ATF

24   agent where he did the Cellebrite extraction on these

25   particular phones.  And I'm thinking it's all of them except

1 one.  I think -- I think Courtney Schaner's phone went to

2 Custom and Border Control of the Swanton section, if I'm not

3 mistaken.  I might be wrong, but, you know -- but all the rest

4 of the phones went to him.

5      So he had direct knowledge of this case.  He had hands on

6 in this case from the beginning, from the beginning of the

7 case.  He testified in the grand jury, and I don't remember all

8 his testimony, but he did relate to certain things in the case

9 that was part of the case that I deemed to be investigative

10 work.  So I'm looking at it that he was part of the team, and

11 now he's being separated to be called as a nexus expert in the

12 case.  So I just think there's a big distinction there, and I'm

13 thanking Mr. Ophardt for backing me up.  First time ever.

14 Appreciate it, you know.

15      THE COURT:  Well, let me ask you about that.  He's

16 backing you up in part.

17      MR. JACKSON:  Yeah.  In part.

18      THE COURT:  But my understanding is what he is

19 acknowledging in the case law is that if I said to the jury,

20 "Oh, there's Mr. Brimo.  He's an expert witness," and he's

21 testifying about firearms and nexus and all that other stuff,

22 and then he gets up on the witness stand and he's like, "Well,

23 we did a confidential buy and we had somebody outfitted with a

24 wire," now he's a fact witness, and I've just told the jury

25 this guy is an expert, and that's going to affect their

1  analysis of his credibility, because the judge just qualified

2  him as an expert.  I typically don't do that in criminal

3  trials.  Sometimes somebody asks me to, but I don't just do it

4  on my own, and the Government's not going to be asking me to do

5  that.  He does have to be an expert witness to testify, but you

6  don't have to offer them as an expert if they're otherwise

7  qualified.

8       The case law that you mentioned, you say that mere

9  participation in the investigation prevents you from being an

10  expert witness?

11          MR. JACKSON:  Yes.  Because it's a distinction.

12  You're going to testify to one part or the other.

13          THE COURT:  But what if you're not going to testify to

14  the investigation and you're only going to testify as an expert

15  witness?

16          MR. JACKSON:  Well, your Honor, I still think that

17  would be -- I think it stacks the deck even more.  I mean, you

18  know, 99 percent of all officers get on the stand and say, you

19  know, "Based on my training and experience," and things like

20  that, automatically puts them at a certain level of expertise

21  in that particular situation regardless of what crime it is.

22  So when you look at the expert testimony, I think that somebody

23  that's coming from the outside, apart from the case, looking at

24  it, reviewing the evidence, and stating things to the best of

25  their knowledge and their expertise about it and presenting

1  that to a jury; but in this particular case, I think Agent

2  Brimo was a part of the investigating team -- just, you know,

3  my own observation.  I think he was part of the team because he

4  was in it from the beginning of the case.

5       Homeland Security and Detective Lucia and the guys took

6  this evidence to him, they explained the case with him, and I

7  think it's -- you know, I think I have something he wrote

8  especially about the phones and things like that when he

9  received them and he was explained what was going on in the

10  case and things like that, so I think he knew a little bit

11  more.  I think he knew a little bit more -- I think he knows a

12  lot more about the case than the Government has exerted with

13  this.  You know, I think he was part of the case and not apart

14  from it.

15       THE COURT:  All right.  Here is the way I'm going to

16  rule.  I'm going to wait to see your case law.  We are not

17  going to have Agent Brimo both testify as a fact witness and an

18  expert witness.  He isn't going to be allowed to do that.  He

19  is going to be in one category or the other.  Because even if

20  the Court does not declare him an expert witness, the jury is

21  going to be instructed about expert witnesses in the case.

22       I would like to see the case law that says mere

23  participation in the investigation disqualifies somebody as an

24  expert witness, but maybe it exists, but you say that that's

25  what you read the cases to say.

1        In this particular case, you might open the door to it in

2   that if he testifies on direct about "This is all I'm talking

3   about is nexus and firearm and I'm not talking anything about

4   the investigation and I'm not doing any of this" and you start

5   asking him about the investigation in your cross, which you're

6   able to, you may open the door, and then it's on you because

7   you've opened the door.

8        MR. JACKSON:  Right.

9        THE COURT:  So in the direct examination, is Agent

10  Brimo only going to be talking in -- straight in the category

11  of expert witness?

12        MR. OPHARDT:  That's the Government's intent, your

13  Honor.  He'll be discussing going to Rutland City Police

14  Department I believe on December 15th of 2021; examining the

15  firearms; documenting their make, model, serial number;

16  providing a nexus determination on The Judge -- the Taurus

17  Judge firearm; discussing that they appear to be operable

18  firearms in his expert opinion.

19        He also will be looking at some photographs from the

20  search warrant to discuss some holsters that were present at 55

21  Killington Avenue in a desk drawer.

22        I don't have his expert report in front of me, but -- oh,

23  he'll also be talking about the Taurus firearm company's

24  website and the fact that he's been on that website as part of

25  his duties.

1    That's the Government's recollection of the expert

2 disclosure, Judge.

3         THE COURT:  All right.  So subject to Mr. Jackson

4 providing case law that suggests the mere participation in an

5 investigation disqualifies you as an expert witness, Agent

6 Brimo may testify only as an expert witness, not as a fact

7 witness.  He can testify about facts in the course of his

8 expert witness testimony, but they should be about the subject

9 matter of the expert witness testimony, not the investigation

10 at large, his interactions with Mr. Jackson or any of the

11 co-conspirators.  And I will reconsider if the case law

12 supports disqualifying him because he had some participation in

13 the investigation.

14    And, Mr. Jackson, was it your recall that the case law was

15 from the Second Circuit?  Was it outside the circuit?

16         MR. JACKSON:  No.  I think -- I think it was the

17 Supreme Court case that I read about the disqualification.  And

18 it might have came from the Sixth Circuit, like he said, but I

19 will check it again.  I have it in one of my other folders.

20         THE COURT:  Okay.

21         MR. JACKSON:  And I'm sorry about that, your Honor.

22    There's one more note I want to bring up too.  ATF agent,

23 he also extracted the Cellebrite from these phones, so I want

24 to note that for the Court as well.  Not Mr. Thornton.  I know

25 Mr. Thornton did some forensic work or whatever, but I'm pretty

1  much a hundred percent sure that he did the Cellebrite

2  extractions to these phones and outlined a lot of these text

3  messages.  So he was a part of the investigative team, so I

4  don't know how the Government's going to use Mr. Thornton where

5  he never used -- or somebody else about the extraction from --

6  I think it was three or four phones.  It was.  So ATF did do

7  that, and they did have them in their custody.  I have the

8  receipts for that.  But, you know, I'll let the Court and

9  Mr. Ophardt figure that out, but I just want to note that for

10  the Court.

11          MR. OPHARDT:  Your Honor, Agent Brimo did not do any

12  cell phone analysis in the case.  ATF Special Agent Matt

13  Ekstrom did have custody of some phones in the case and did do

14  some extractions.  It's a different ATF agent.

15          THE COURT:  Okay.  So he did the Cellebrite and Agent

16  Brimo had nothing to do with that?

17          MR. OPHARDT:  That's correct, your Honor.

18          THE COURT:  Okay.  I found a little bit about the

19  confrontation clause that you might want to look at, the

20  interesting issue that Mr. Jackson raised, and it says "The

21  Confrontation Clause does not require a showing of

22  unavailability as a condition for the admission of the

23  out-of-court statements of a nontestifying coconspirator when

24  those statements otherwise satisfy requirements of Federal Rule

25  of Evidence 801(d)(2)(E)," and that's what the Government was

1 saying is that there's no confrontation clause with

2 co-conspirator statements.  I don't know if Mr. Rupert could be

3 considered a co-conspirator, but this is what a U.S. Supreme

4 Court case said.  That was a U.S. Supreme Court case, *United*

5 *States v. Inadi*, 475 US 387 (1986).

6     "The Confrontation Clause does not require the court to

7 find that the declarant is unavailable in order to admit

8 testimony under the spontaneous-declaration and

9 medical-examination exceptions to the hearsay rule."  So that's

10 *White v. Illinois*, 502 U.S. 346 (1992).

11     And they're not directly on point, but they suggest to the

12 Court that there is a carve-out for non-hearsay statements in

13 terms of confrontation clause because they aren't testimonial

14 because they're not being offered for the truth, and that makes

15 me think that we may not have a proffer problem, but I will

16 look at it myself and have you look at it further.

17     Let's now turn to motion *in limine* 226 filed by

18 Mr. Jackson regarding his proposed exhibits.  This includes the

19 videotape, various other exhibits.

20     And that reminds me that we also need to have a

21 conversation about whether you're going to have an *Old Chief*

22 stipulation.

23         MR. OPHARDT:  Your Honor, Mr. Jackson has signed a

24 stipulation.

25         THE COURT:  Okay.  So I'm going to do this now so that

1  I don't forget it.  You do not have an obligation to stipulate

2  to any fact or to any element of an offense.  You have a right

3  under the constitution to have a jury decide beyond a

4  reasonable doubt whether or not that standard has been made,

5  whether that essential element has been stipulated to.  So you

6  need to know that you don't need to enter into a stipulation.

7  You have a right to have the jury decide whether or not you

8  have a felony and make that determination based on the

9  evidence, and if you enter into the stipulation, you are giving

10  up that jury trial right to have that element decided by the

11  jury.

12        Do you understand that?

13            MR. JACKSON:  Yes, your Honor.

14            THE COURT:  All right.  So we're going to have that.

15  Let's start with you on your exhibits, and including the body

16  cam footage, and let me see what else are the issues raised by

17  you.  There is a document sent to and from you to various

18  recipients, including CS.  It's 36 pages, and there is an

19  HSI-related exhibit and various other exhibits.

20        I want to say one thing about the HSI exhibit.  You made a

21  pretrial challenge to the authority of the investigating

22  officers.  Since this case is going to trial, you have

23  preserved that objection for appeal, so you can argue to an

24  appellate court, "Judge Reiss got it wrong.  These people

25  shouldn't have been allowed to participate because they're not

1 qualified to do so under the applicable law," but we typically

2 would not have them impeached for that purpose.  I'm going to

3 give you a fair amount of latitude in cross-examination, but

4 still, you have to follow all the same rules as an attorney,

5 and it has to be relevant.

6      So let's hear your argument on Document No. 226.

7          MR. JACKSON:  Yes, your Honor.  As far as HSI goes,

8 your Honor, you did make a ruling in the suppression hearing

9 that they're allowed to investigate certain things, but there

10 were things in the suppression hearing -- you told me before if

11 your Honor missed certain things, I can bring it to your

12 attention.

13     It was things in my suppression motion that your Honor

14 never answered, such as 28 USC 509, the Reorganization Plan of

15 1973, where Congress and the president took -- abolished the

16 Bureau of Customs Enforcement's Title 21 authority.  They

17 straight abolished it.  They have no more Title 21 authority

18 within that.  Your Honor never answered that.

19     Also, I think -- I strongly believe I raised a Tenth

20 Amendment claim, which I'm going to use at trial, I would like

21 to use at trial, for that purpose, that the rights of the

22 people belong to the people and their respective states.  Now,

23 you did mention one thing in a case I brought forth in the

24 Vermont Supreme Court.  I believe it was -- I'm sorry.  I'm

25 sorry.  I forgot the case, your Honor, but I think you know

1   what I'm talking about.  And you only mentioned one part of

2   that case.  In that case, the Vermont Supreme Court clearly

3   stated that the Court will only respect any collection of

4   evidence from government agencies that's respectively in their

5   jurisdiction to operate in that way, your Honor, so, you know,

6   I still strongly believe I have a Tenth Amendment argument that

7   I want to present to the jury.  I don't know if your Honor's

8   going to let me do it, have that latitude.

9        And then the Government mentioned -- I don't want to jump

10  all around the place with it, but I believe the Government

11  mentioned when Mr. Zuchman testified.  Mr. Zuchman is an agent

12  with HSI.  He's not a lawyer.  He's from -- he's from the

13  Department of Homeland Security, an administrative agency.

14  That's what the Department of Homeland Security is.  He can't

15  speak on behalf of the Government, which he did, so -- I mean,

16  I'm not making an objection to that, but he did do that, and

17  from my understanding, the only person that can speak for the

18  United States Government when it comes to matters of law is the

19  Attorney General and the United States Justice Department, and,

20  you know, so I'll just leave that there, but I believe that I

21  should have the right to present that before a jury because I

22  believe that some violations occurred with that.

23       And, you know, on top of that, you know, they came up in

24  the apartment under a state search warrant where the Vermont

25  Supreme Court said they're not allowed to do it.  They did it.

1  I presented it.  Maybe I didn't present it in a good way, but I

2  just think your Honor missed that part, and, you know, I'm not

3  pointing fingers or anything like that, so please don't think

4  I'm trying to be disrespectful.

5          THE COURT:  Believe me, the Court's capable of missing

6  things.  Go ahead and make your argument.  Don't worry about my

7  feelings.  I --

8          MR. JACKSON:  Okay.  All right.

9          THE COURT:  I have a tough skin, so don't worry about

10  that at all.  And I mischaracterized this as your motion.  It's

11  really the Government's motion to exclude your evidence.

12          MR. JACKSON:  Right.  That's what it was.  So I

13  believe I have a strong Ninth and Tenth Amendment argument on

14  that, and I think I'm missing -- I don't know, you know, if

15  Mr. Ophardt would have a problem.  I still would like to submit

16  my defense.  I don't think I did that.  I think I missed that

17  from the deadline.  So I don't know if the Government have a

18  problem like that, but I would like to submit that to the

19  Court, my defense to these charges and things like that, but,

20  yeah, your Honor, I think for the most part --

21          THE COURT:  Well, pleading not guilty is your defense,

22  so --

23          MR. JACKSON:  Okay.

24          THE COURT:  And the motions deadline is over with.

25          MR. JACKSON:  Right.

 1          THE COURT:  So the Court has extended it at least once
 2   and maybe twice, so we won't be having new motions.  That
 3   doesn't mean you can't object at trial or ask for a ruling.  Of
 4   course you can do that.
 5          MR. JACKSON:  Right.  But as far as the Homeland
 6   Security goes, your Honor, I think there was constitutional
 7   issues there that the Court didn't answer.  I think you
 8   answered two parts of it -- three parts of it, really, where
 9   you said the Court is only -- only have to answer the Fourth
10   Amendment violation, but I made an argument about the
11   Fourteenth Amendment.  Their investigative work, you said
12   they're allowed to conduct domestic cases.  Anyway, I believe
13   that's wrong.  So, you know, there's about three, four parts in
14   my suppression motion that your Honor didn't answer, so -- and
15   the Government was right; I was supposed to submit a
16   reconsideration motion, which the Court allowed me, said I
17   could, but I didn't because I felt it was going to go to the
18   point where your Honor would say, "Okay.  Well, let a jury
19   decide it.  Make your argument before a jury."  And so I took
20   that perspective of it.  I mean, I didn't take it in a mean
21   way, but I took it in that perspective of trying to figure out
22   how the Court operate, how Mr. Ophardt operate, so I looked at
23   it like that way.
24          THE COURT:  All right.  Well, that's a strategic
25   decision by you.  I'm going to stick on this point.  I'm on

1  Document 226 at page 3, and there's a helpful chart that the
2  Government set forth of what they're challenging, and one of
3  the things that caught my eye was obviously the Dambrackas body
4  cam video.  Maybe I can knock off that, because you don't plan
5  to present three hours of it, correct?

6          MR. JACKSON:  No, your Honor.  Absolutely not.

7          THE COURT:  All right.  And that satisfies your
8  concern, Mr. Ophardt?

9          MR. OPHARDT:  It largely does, your Honor.  I think we
10 can handle hearsay issues as they arise, so I think that the
11 Government's primary concern is three and a half hours of video
12 to the jury.

13         THE COURT:  Okay.  Then let's stay on the Government,
14 and Exhibit E is jail text messages to defendant Jackson, and
15 let's hear your argument as to why those should be excluded.

16         MR. OPHARDT:  Thank you, your Honor.

17      The description name is from the exhibit list provided to
18 the Government by the defense.  I think what's important here
19 is for the Court to understand that this 36 pages of messaging
20 includes messaging that Mr. Jackson himself sent.  So this is
21 not just messaging that's inbound to Mr. Jackson.  Messaging
22 that's sent by Mr. Jackson is hearsay.  It's hearsay because
23 they're statements he made out of court.  He's not testifying,
24 he stated previously, and he cannot offer his own statements
25 even simply to show that they were made.  He can't offer them

1  for the truth of the matter asserted.  The *Marin* case is on

2  point with those issues.  So Mr. Jackson can't get around

3  offering sworn testimony by offering into evidence statements

4  he made outside of court.  The statements --

5        THE COURT:  Let me ask you a couple questions.  One

6  thing that I have learned to do before an exhibit list gets

7  back to the jury in the jury room is make sure there aren't

8  references that shouldn't be.  So we don't want "Jail text

9  messages."  What do these messages look like?  Does the

10 Department of Corrections do what they do with phone calls and

11 have a -- something that shows that they're coming from a jail?

12       MR. OPHARDT:  Your Honor, there is a -- it's Defense

13 Exhibit E.  It's a pretty vanilla chart that looks somewhat

14 like an Excel spreadsheet.  The only thing that would really

15 indicate from my quick review is there's a title on top that

16 says "Inmate Messages Report."  That would be an easy redaction

17 if that's the Court's concern.  There are messages about a new

18 contact, but they don't say anything about Mr. Jackson's

19 incarcerative status, his detained status.  There's some

20 references to GTL, but I think only a very informed person

21 would know that that's the vendor for the prison.  So I don't

22 think that the Court's concerns really jump out from the way in

23 which they're presented.

24    Mr. Jackson makes statements and people inbound make

25 statements about his detained status, wishing he was out in the

1  community, him wishing he was out in the community, so -- but I

2  don't know what in this 36 pages Mr. Jackson is intending to

3  focus on with the jury.

4          THE COURT:  All right.  So let's start first with

5  relevance.  Looking through these, the relevance from the

6  Court's perspective is not necessarily immediately apparent.

7  So let's hear a proffer as to why this exhibit is relevant in

8  this case.  This is Exhibit E.

9          MR. JACKSON:  Yes, your Honor.  I'm only planning to

10  use a couple of them text messages in there, and they're from

11  witnesses that are going to be taking the stand in this case,

12  like Ashley Lobdell.  I believe the Government's going to call

13  her.  She's on the witness list.  And I want to present her

14  comments that she made to me after the fact and now all of a

15  sudden, you know, from out of nowhere I put a gun to her head,

16  you know.  So --

17          THE COURT:  Okay.  So you're going to use them for

18  impeachment purposes?

19          MR. JACKSON:  Yes.

20          THE COURT:  And the exhibit -- the whole exhibit

21  wouldn't be coming in, just the section with regard to that

22  person?

23          MR. JACKSON:  Just the section regarding to the people

24  I talked to.  That's it.

25          THE COURT:  Okay.

1          MR. JACKSON:  No other text messages.  Because they

2    have the names of them other people on there, so none of them

3    are on the witness list except Courtney Schaner and Ashley

4    Lobdell, I believe.

5          THE COURT:  And have you and Mr. Behrens created an

6    exhibit that shows just, like, what you want to use?  So we

7    call it a redaction.  This should be the big exhibit.  It

8    wouldn't be impossible to do.  We're talking about pages, not

9    36 pages, where you isolate out what you want to use and

10   they're not seeing a lot of irrelevant information.

11         MR. JACKSON:  That's easy, ma'am.  I'll do that.

12         THE COURT:  You can do that?

13         MR. JACKSON:  Yes.

14         THE COURT:  Okay.

15         MR. BEHRENS:  We did discuss that.  We'll provide

16   that, Judge.

17         THE COURT:  All right.  Any objection in light of that

18   proffer?

19         MR. OPHARDT:  Your Honor, I do not have an objection

20   to Mr. Jackson using the contents of them for purposes of

21   cross-examination.  I think there is a question of whether

22   extrinsic evidence is appropriately admitted to the jury in the

23   event of an inconsistency or alleged bias, impeachment --

24         THE COURT:  Bias is not subject to that as much.  It's

25   usually a very wide-open cross on bias.  So a prior

1  inconsistent statement, we get into whether it's collateral and

2  whether or not there's extrinsic evidence, but evidence of

3  bias, if he had a statement from Courtney Schaner who said, "I

4  think you are the most credible and honest person I've ever

5  met," I think I would be admitting it.

6          MR. OPHARDT:  Your Honor, for clarification,

7  Ms. Schaner is the defense's witness.

8          THE COURT:  I know.  I'm just saying that if she

9  changed her testimony on the witness stand and suddenly she was

10 an adverse witness and saying something else and he wanted to

11 impeach her on her bias towards him.  So we'll probably take it

12 up exhibit by exhibit, but it strikes the Court that if it is

13 with regard to a testifying witness, and he can impeach his own

14 witness, much of your concerns have gone away.

15         MR. OPHARDT:  That's correct, your Honor.  And we can

16 certainly take them up in a more limited fashion when we've got

17 a more limited exhibit.  I do -- that's fine, your Honor.

18         THE COURT:  Okay.  Now, Exhibit F, Emily Collins'

19 e-mail to Milleville dated 6/27/23, and let's hear the

20 relevancy of that -- a proffer on relevancy from you,

21 Mr. Jackson.

22         MR. JACKSON:  Can you repeat that?

23         THE COURT:  Sure.  It's Exhibit F.  It's Emily

24 Collins' e-mail to Milleville dated 6/27/23.

25         MR. JACKSON:  Well, your Honor, it's a bunch of

1  e-mails with the lab reports.

2         THE COURT:  Right.

3         MR. JACKSON:  And I have major concerns with that,

4  because I have the U.S. Attorney's Office telling an

5  independent agency how to weigh the evidence, who to put on the

6  lab report, and I have over 1,000 pages of lab reports.  This

7  evidence was tested, A, B, C, D, E, over six times, over and

8  over again.  I think in 2022 it was tested two or three times.

9  In 2023 it was tested two or three times.  And then I get the

10 final examination reports.  It said refer back to the first

11 examination reports, which was almost three years prior; you

12 know what I mean?  So I have a strong objection to these lab

13 reports for the mere fact that I'm -- your Honor, when it comes

14 out into evidence, to me it was tampered with.

15        THE COURT:  Okay.  So you want to show that these

16 people have had communications that go outside of the lab

17 reports and that there is some relationship between them.

18        MR. JACKSON:  Yeah.  Like they became part of an

19 investigation team.

20        THE COURT:  All right.  Any objection to Defendant's

21 Exhibit F with that proffer?

22        MR. OPHARDT:  Yes, your Honor.  Government's *[sic]*

23 Exhibit F -- first, your Honor, there are other messaging --

24 there is other messaging with the lab which the Government is

25 not objecting to.  This is -- we are objecting to particular

1  messages that, from the Government's view, lack probative value

2  even with the proposed purpose by Mr. Jackson.  Ms. Collins is

3  my legal admin specialist in the office, and she's simply

4  relaying information to the lab indicating that Mr. Jackson --

5  well, I only have one page of the proposed exhibit instead of

6  two, but Ms. Collins is simply relaying that the case is

7  anticipated to be scheduled for trial, and then we're

8  requesting the documentation from the lab.  This is a request

9  for discovery.  Mr. Rubin Goldberg then responds by attaching a

10 couple files and saying that the chemist will be providing

11 additional discovery.

12         Mr. Jackson has all the lab documentation because we sent

13 this e-mail.  This doesn't show anything about alleged

14 tampering, anything about alleged coaching from our office as

15 to particular -- about things we want done with the evidence.

16 This is simply asking for documentation, and it puts the

17 government -- two government employees who have really nothing

18 to do with the testing, nothing to do with what needs to be

19 tested before the jury.  It simply creates confusion as to that

20 issue.

21         THE COURT:  Would you agree with me it's an admission?

22         MR. OPHARDT:  No, your Honor.

23         THE COURT:  Why not?

24         MR. OPHARDT:  It's not an admission of a

25 party-opponent.

1          THE COURT:  Well, they're government agents working on

2  your behalf.

3          MR. OPHARDT:  Your Honor, there's substantial case law

4  on when an admission of a party-opponent applies to the

5  Government.  I'd request some time to brief that issue if the

6  Court desires.

7          THE COURT:  So I think that they have a good chance of

8  being admissions under the kind of master-servant rules, but

9  I'll let you do that.  I don't see any prejudice, and it's part

10  of his case.  So from the Court's perspective, it's "Put this

11  trial on your radar.  Do you have the chain of custody

12  reports?"  Mr. Jackson wants to use them for a purpose.  What

13  would be the prejudice in introducing these exhibits?

14          MR. OPHARDT:  It's distraction.  It's confusion.  It's

15  just additional materials for the jury to sift through to find

16  what matters.

17          THE COURT:  All right.  I'm going to allow it.  I

18  don't think that there is any prejudice.  It may have some

19  probative value, and according to Mr. Jackson, it's important

20  to his defense.

21      Let's look at Exhibit H, which is OC to CM text messages.

22      And, Mr. Jackson, let's start with you.

23          MR. JACKSON:  Yes, your Honor.  I believe Orlando Cruz

24  is going to be a witness, and his text messages from Marble

25  Valley Correctional Facility, I believe Officer Goodrich, had

1 me and him both on his radar because we was there at one point

2 at one time, together and he was speaking about a case where

3 him and his girlfriend allegedly got caught up in an assault

4 and robbery and another girl that we was texting text me and

5 told me what happened in his particular case, and I said that's

6 crazy, but I do have those documents because the Government

7 handed it over to me with that, and I intend to use that as

8 impeachment purposes on how, you know, he's using a Boo-Bee

9 get-out-of-jail-free card with the Government to get a good

10 plea for what they did and just, you know, bring up erroneous

11 testimony against me, so that was the purpose of that, your

12 Honor.

13          THE COURT:  All right.  These documents have

14 references to you being incarcerated, certainly.  I mean,

15 there's, like, a jail ID.

16          MR. JACKSON:  I think there was only one page on that,

17 your Honor.

18          THE COURT:  Okay.

19          MR. JACKSON:  There wasn't a whole bunch of pages with

20 him, but I just want to use that as an impeachment purpose.

21          THE COURT:  Okay.  The Government's response?

22          MR. OPHARDT:  Your Honor, there is a lot of

23 information in the proposed exhibit, Exhibit H, that is

24 inadmissible hearsay and does not relate to Mr. Jackson's

25 proposed purpose.  There is a -- first of all, there's a lot of

1  messaging here between Mr. Jackson and Ms. Kasey Misencik,

2  which is also in the other exhibit, and much better copies of

3  it.  You can't even see the responses from Mr. Jackson or

4  Ms. Misencik.  I don't recall the number of that exhibit.

5  Exhibit E of the defense, Judge.  The message outgoing from

6  Mr. Cruz to Ms. Misencik, we do not have an issue with that

7  being used, but you can't read it in this version.  There is a

8  better document the Government has provided, and we can provide

9  that again to Mr. Jackson that shows that whole communication,

10 and we do not have an issue with that being used with Mr. Cruz

11 when he testifies.

12      The rest of the document is statements from a Bureau of

13 Prisons employee, who is not on the witness list, who is making

14 conclusions and assumptions from the messaging contents

15 themselves and speculations as to what is meant.  I don't think

16 that that is admissible to the jury.  It's certainly hearsay,

17 and it's certainly not a party who's associated with the

18 federal government.  It's a DOC employee.  So we'd ask that

19 this e-mail and this proposed exhibit not be used.

20      We can provide Mr. Jackson with the better exhibit of that

21 message that's dated January 13th, 2022, at 11:56 AM from

22 Mr. Cruz for his purposes.

23          THE COURT:  Isn't that already in Exhibit E?  The

24 better copy?

25          MR. OPHARDT:  No, Your Honor.

1            THE COURT:  No?

2            MR. OPHARDT:  Because that is between Mr. Cruz and

3  Ms. Misencik.

4            THE COURT:  Oh.

5            MR. OPHARDT:  So it's not in the subset of Exhibit E.

6            THE COURT:  Okay.  I have substantial concerns about

7  pages -- the page with the big "Redacted," and this person will

8  not be testifying, so why would this page be admissible?

9  You're going to get a better copy of the message.  The

10 Government doesn't oppose that.  Why would we have this

11 redacted thing from Darrell Goodrich talking about him

12 monitoring messaging and coming to various conclusions about

13 who's doing what?  Why would that be admissible under the

14 evidence rules, Mr. Jackson?

15           MR. JACKSON:  I don't know why it's redacted, your

16 Honor, but I don't know if we're talking about the same -- just

17 give me one second.  I only plan to use a very small portion of

18 this, and that was from Cruz to Ms. Misencik -- yes.  And that

19 was from Cruz to Misencik, and that was on 1/13/22.  That's

20 about the only one I plan to use here.  So the rest of that, if

21 there's anything else, I don't know about.  I only meant to use

22 a certain portion for impeachment purposes.

23           THE COURT:  Okay.  Take a hard look at Exhibit H,

24 because the exhibit that shows up at trial needs to have only

25 admissible things in it.  It sounds like it's got stuff in it

1  that you don't even plan on using right now.

2         MR. JACKSON:  Well, I presented a small portion.  Let

3  me -- because the paralegal helped me out with this.  I had a

4  very small portion of it, your Honor, so I don't know why it's

5  all big like that.  I don't have it.  I probably had it in my

6  other folder, but it's very small for exhibit list.  So it

7  shouldn't be this big page, the front page from Mr. Goodrich,

8  the memo.

9         THE COURT:  All right.  So I'm not suggesting; I'm

10  telling you --

11         MR. JACKSON:  Yes.

12         THE COURT:  -- I want you to go through Exhibit H,

13  figure out what you need.  The Government's going to offer you

14  a better copy of the message that you want to use.  And when we

15  get to trial, which will be soon, that's what the exhibit has

16  to look like.

17         MR. JACKSON:  Okay.

18         THE COURT:  Okay?

19         MR. JACKSON:  Yes, ma'am.

20         THE COURT:  Let's move to I.  That's the memo of

21  understanding between HSI and Rutland Police Department dated

22  1/7/22.  I heard Mr. Jackson's argument about this.  I don't

23  necessarily have a problem with him making a factual record if

24  he thinks it's important to preserve this for an issue on

25  appeal.  It's not going to change the Court's ruling unless I

1  hear more evidence about it.

2      I wouldn't expect your witnesses to know a whole lot about

3  it, but let's hear the Government's response.

4          MR. OPHARDT:  Your Honor, as we outlined in our

5  motion, this goes to a legal question for the Court, similar to

6  a motion to suppress.  In essence, Mr. Jackson is seeking to

7  exclude certain evidence because of the involvement of law

8  enforcement officers that he doesn't believe were appropriately

9  involved in the investigation.  Determinations of competency of

10 evidence to be submitted to the jury are for the Court alone.

11         THE COURT:  But I'm not hearing him say that he's

12 going to use it for that purpose.  So he's not saying, "I want

13 to exclude it."  He wants to establish what he believes is some

14 form of factual predicate by introducing these exhibits not

15 only in the suppression hearing but at trial, and I assume he

16 wants to ask some questions about "Did you know that this law

17 was, you know, abolished?" or whatever he's going to be asking

18 about it.  I don't think he's asking that I dismiss the

19 charges, because we've already been through that.

20         MR. OPHARDT:  Your Honor, those questions don't go to

21 relevant issues for the jury to decide.  There is nothing

22 probative as far as particular elements of an offense that this

23 jury's going to be tasked with deciding.  Relevancy is linked

24 to materiality as to the charges, and whether or not certain

25 law enforcement officers were working within their statutory

authorities is a question for the Court to decide.  The Court's
already going to be instructing the jury that "certain searches
were conducted, and it's not for you to determine whether a
search was appropriate."  It's the same type of conception,
simply applied to Mr. Jackson's particular motion and concern
with HSI's authorities.

THE COURT:  All right.  Now I turn to you,
Mr. Jackson.  How is this relevant?  The issue's going to be
preserved for --

MR. JACKSON:  The purpose --

THE COURT:  Let me just finish, because we can't talk
at the same time.

MR. JACKSON:  I'm sorry, your Honor.

THE COURT:  You can file an appeal, argue that the
Court got it wrong, but why would we have these documents in
trial if the issue is preserved, and what contested issue that
the jury is going to decide?  So remember, I know you know that
the definition is:  Does it have some probative value for an
issue that's contested at trial or an issue at trial?  What
issue would this jury be considering?

MR. JACKSON:  The issue they would be considering, my
Tenth Amendment rights in the United States Constitution, and I
feel strongly about this, your Honor, and I respectfully
request that you allow me to present this.

These documents that I requested from the Government,

1  which they turned over, clearly states that they do not have
2  any Title 121 authority.  I don't know what type of conclusion
3  at that particular time or how HSI want to market their law
4  enforcement authority throughout states now, but the Tenth
5  Amendment is clear.  The rights of the people belong to the
6  people and to the states respectively, not to the federal
7  government and its agencies, and that's a strong argument I
8  would like to present for this jury based on that.

9      I believe there's a Fourth Amendment violation in there.
10 There's a due process right violated.  And there's a Fourteenth
11 Amendment procedural due process right in there that the jury
12 should hear about.  I'm not doing this to say, like Mr. Ophardt
13 said, "Oh, the Court should decide this."  The jury has a right
14 to decide has my constitutional rights been violated.

15        THE COURT:  No.  They won't be doing that in this
16 case.  They would be if you brought a 1983 action, but in this
17 case they're going to be deciding not guilty or guilty.  They
18 aren't going to be like, "This was a lawful search" or "I think
19 the Fourth Amendment was violated."  That's why we have the
20 pretrial motions.  Those are issues for the Court.

21     So knowing that the jury is not going to make a Tenth
22 Amendment determination and it's not going to be deciding
23 whether a search warrant was valid - and in fact, the Court's
24 going to be instructing the jury, "This is what you're supposed
25 to be considering:  whether or not the Government has proven

1  beyond a reasonable doubt the essential elements of the

2  charge" - do you still feel that this is necessary to -- and

3  what would be the probative value if the jury is not going to

4  make those determinations?

5          MR. JACKSON:  That HSI, who was acting under custom

6  laws, don't have a right to interfere with people's domestic

7  lifestyle, United States citizens, in their ordinary, everyday

8  life.  They're restricted by Congress, by statute, to certain

9  areas of law enforcement, so therefore they shouldn't be

10 probing on United States citizens' constitutional rights

11 withinside the states.  This is the only state where this is

12 happening at, and it's happening at a broad value.

13     The First Circuit, if you look at the case, I think it's

14 *Drewniak v. The Department of Homeland Security*, the district

15 court in that circuit - I think it's Judge Landya.  She's a

16 female judge, Judge Landya - she gave them an injunction not to

17 be doing this no more, no more searches.  The courts, just like

18 here -- not district court; the state courts over there, just

19 like here, said, "Any evidence collected by you all will not be

20 accepted in this court."  You know what I mean?  So over here

21 in the state of Vermont, they're continuously doing it.  You

22 know what I'm saying?  So I believe it's a civil rights

23 violation.

24          THE COURT:  Okay.  There are constitutional issues

25 that a jury might consider, including whether or not your

1  statements were voluntary.  I don't even know if you made any

2  statements.  But I'm going to allow you to use this evidence,

3  H, J, and K.  I'm not sure that it's relevant.  I'll know more

4  when it's being presented.  I'm having a hard time

5  understanding why this is something that the jury would hear as

6  opposed to the Court, but it's important to your defense, and

7  I'm going to allow it because I think there is no prejudice to

8  the Government.  There is a potential for confusion of the

9  jurors, but the Court can clarify that through the jury

10  instructions.

11      Exhibit 11 -- Exhibit L we have addressed, which is the

12  body cam video.  There's only going to be portions of it

13  provided from Mr. Jackson.

14      Correct, Mr. Jackson?

15          MR. JACKSON:  Say that again, ma'am?

16          THE COURT:  This is the Jesse Dambrackas body cam

17  video, Exhibit L.  You're only going to present to the jury

18  snippets from it, correct?

19          MR. JACKSON:  Yes, your Honor.

20          THE COURT:  Okay.  And that satisfies your concern on

21  the Government's side?

22          MR. OPHARDT:  Largely, yes, your Honor.  We may

23  have -- since we don't know the snippets, we don't know the

24  hearsay issues.  There is hearsay, as we stated in our

25  response -- or, excuse me, our motion.  So once we know which

1  snippets we're dealing with, we'll have a better idea as to

2  hearsay.

3          THE COURT:  I'm not so sure that, for example, in a

4  traffic stop video I have seen Government splicing out hearsay

5  from non-hearsay statements.  I think it just generally all

6  comes in and there's not a real redaction of the video.

7          MR. OPHARDT:  That could be fine, your Honor.  We'd

8  request a curative instruction that they're not being offered

9  for the truth of the statements.

10         THE COURT:  That it just happened.

11         MR. OPHARDT:  Correct.

12         THE COURT:  This is what happened.  Yes.

13         MR. OPHARDT:  We would be okay with that approach,

14  your Honor.

15         THE COURT:  Yes.  Okay.  You will be tasked with

16  reminding me to provide that.

17      Exhibit -- Defendant's Exhibit N is a supplemental

18  affidavit from Ann, looks like, McNeil, and let's hear the

19  Government's objection first.

20         MR. OPHARDT:  Your Honor, this supplemental affidavit

21  was attached to a search warrant for a Jeep that the Government

22  obtained a search warrant for when seeking evidence of an

23  uncharged crime.  This relates to the search of a Jeep where

24  law enforcement believes an individual was transported either

25  before or after he was killed that was associated with

1   Mr. Jackson.  Mr. McNeil is not on either party's witness list.

2       Now Commander Charles Whitehead is on our witness list,

3   and there is some hearsay in McNeil's affidavit in the second

4   paragraph, but it all relates to the missing person

5   investigation, the suspected human blood in the vehicle, and

6   that law enforcement was concerned there had been attempts to

7   clean the vehicle and requesting information from crime scene

8   technicians as to whether or not evidence could still be

9   obtained.

10       THE COURT:  All right.  Turning to you, Mr. Jackson,

11   why would it be in any way helpful to have you connected to

12   what may or may not be a missing person or an uncharged

13   homicide?

14       MR. JACKSON:  This goes straight to the point of HSI

15   abuse, and during the course of that investigation - I think I

16   was incarcerated four months at the time; I think it was

17   March - the U.S. Government gave me a warrant for a white Jeep

18   SUV, to which -- there was a warrant requested before that by

19   Detective Lucia, and I forgot who was the other investigator,

20   to Honorable Judge Fenster in the Vermont Superior Court.  He

21   denied the warrant.  He reminded the officers of Vermont rules

22   of hearsay.  He denied the warrant.

23       As I received the unredacted version -- I never had the

24   whole warrant.  I had a redacted version where I couldn't read

25   the whole warrant up until recently when the Government

1  provided me, maybe a month ago, with the unredacted warrant
2  where I could come and read everything, and that's when I found
3  out that a warrant was requested before that, and that warrant
4  came to the federal government to Honorable Judge Doyle where a
5  Homeland Security investigator and Mr. Ophardt went before
6  Doyle and got a warrant based on Mr. Jackson's drug activity
7  that he had killed somebody; there's blood and everything else
8  everywhere.  That's -- and the warrant that they received was
9  given to the same officers that Judge Fenster told, "No, you're
10 not.  You can't search this."  And they went ahead and got a
11 federal search warrant and searched.  These same officers who
12 were denied, local police and state police who were denied
13 access to the vehicle went and got a federal search warrant and
14 did the search anyway.  I feel that's probative value that this
15 is abuse of authority.
16     I've been accused -- Judge Reiss, I've been coming to see
17 you in this courtroom for almost 30 months.  I've been accused
18 of most every vile law there is.  Let's start from scratch
19 here:  selling drugs, conspiracy, torture, rape, murder,
20 kidnapping, everything in the book.  Enough is enough.  A judge
21 told them no.  I didn't know anything about this white Jeep,
22 but I was served with a warrant that was heavily redacted.
23 There wasn't nothing there.  Judge Fenster told them no, can't
24 search the vehicle.  They went anyway; Homeland Security Agent
25 Dornbierer and Mr. Ophardt got a warrant and searched the

1  vehicle.

2      Come to find out, all the witnesses that put me in that

3  place lied and even said at the conclusion of the

4  investigation, "Mr. Jackson don't even know this man."  I don't

5  know who Davis is.  I don't know who got killed.  You know what

6  I mean?  I feel this was abuse of authority, and this should be

7  introduced as part of this Homeland Security thing that they

8  just -- "If I can't get it here, we'll go here."

9          THE COURT:  All right.  Let me hear any response from

10  the Government.

11          MR. OPHARDT:  Your Honor, I think the Government's

12  concern -- Mr. Jackson, if he wants to use this, I think is

13  opening a lot of doors, and if he asks our law enforcement

14  witnesses about why they obtained the search warrant, they have

15  to be able to answer truthfully.  The Court cannot allow this

16  in while simultaneously excluding testimony about why it was

17  obtained.  We are risking a substantial sideshow as to a

18  still-open missing person and presumed homicide investigation

19  of the decedent James Bryant, not Davis.  Law enforcement is

20  still pursuing that investigation.  It's uncharged.

21      The warrant -- we're not using anything from the warrant.

22  We're not using anything from the Jeep.  We provided the

23  warrant to Mr. Jackson so that he would be aware of the

24  statements made within it by witnesses so that he could make

25  informed decisions about whether or not to call them to the

1  stand.  We did not disclose it because we were intending to use

2  evidence obtained during those searches.

3      This supplemental affidavit is just a sliver of that

4  investigation and opens up a complete can of worms as to what

5  Agent Dornbierer would be allowed to testify to, as to what

6  Detective Lucia would be allowed to testify to as to that

7  continuing investigation.  And my hunch is that trying to find

8  a middle ground here will require those detectives and agents

9  to be largely muzzled about what they were doing and why, which

10  would create substantial prejudice to the Government under 403.

11      THE COURT:  All right.  Mr. Jackson, you want to say

12  something more?

13      MR. JACKSON:  Yes, your Honor.

14      THE COURT:  Go ahead.

15      MR. JACKSON:  I totally disagree with Mr. Ophardt on

16  that part right there, because as of only recently, I have

17  received that information.  Every witness that they putting on

18  the stand, from Orlando Cruz to Ashley Lobdell and to all these

19  people, made accusation and claims that I told them that I beat

20  some homeless man in the head and left him behind Hannaford's

21  or some hotel, which was totally false, totally untrue.  They

22  went on a witch hunt.

23      Now, I know it was JB who got killed, and I don't know the

24  man, and I'm very sorry that happened to them, but Davis is

25  somebody else that I don't even know.  They say that I colluded

1  with him, kidnapped this man, put him in the Jeep, and killed

2  him and left his body somewhere.  These are the same witnesses

3  who said this, these people that's going to appear before this

4  court, so now if Mr. Ophardt and the Government got a problem

5  with opening up a can of worms, I didn't do this.  They did.

6          THE COURT:  Here's the problem, though, is I have an

7  obligation to make sure that we have a fair trial, and I will

8  preserve Defendant's Exhibit N for the record, and you may have

9  a subsequent constitutional violation claim against various

10 agents.  That's not my business.  Not this case.  Once we get

11 into uncharged conduct that includes a homicide, I will not be

12 able to cure that prejudice.  I will not.  And so, for

13 example -- I'm not here to prevent you from doing harm to your

14 own case.  That's your own business.  But I do need to make

15 sure this jury stays on the path and is not speculating about

16 everything else.

17         And so if you got up in front of the jury, and nothing's

18 going to stop you from doing it, and saying, "I've been accused

19 of kidnapping.  I've been accused of rape.  I've been accused

20 of murder.  These people will make up anything to pin the

21 charges on me," you have a substantial probability that at

22 least one juror may be thinking, "Well, did you rape somebody?

23 Did you kill somebody?"

24         So we don't do that.  We don't introduce extremely

25 inflammatory, prejudicial information that has nothing to do

1  with the charged -- the charges that the jury is going to

2  decide in a trial.  And if it -- if the door is opened by you,

3  the Government can walk through it and they can ask more

4  questions about it.

5      But looking at Defendant's Exhibit N, there is nothing in

6  it that is probative.  It's not relevant.  I'll preserve it for

7  the record so you'll have a record that it was offered at this

8  trial and the Court did not admit it.  This is not a murder

9  trial and it's not a kidnapping trial and it's not a sexual

10  assault trial.

11      So the Government's motion *in limine* is granted with

12  regard to Exhibit N subject to the Court's ruling that it will

13  be preserved in the record before the Court.

14      Now let's go to Exhibit O, e-mails from Alex Zuchman to

15  Jon Ophardt dated 8/12/20 and 12/12/23.

16      And let's start this time with you, Mr. Jackson.

17          MR. JACKSON:  Yes, your Honor.  This, again, is with

18  HSI and how they intend to grow their office through task

19  forces, through local police and state police.  They intend to

20  flex their authority through the states where I honestly

21  believe they don't have the authority to do so, and, you know,

22  just by reading this right here, it tells you.  And I just want

23  to read this certain part, if it's okay with the Court.  "HSI

24  is the second largest law enforcement on the United States

25  government."  They say that.  I'm sorry.  Excuse me.  Let me

1 | start from the top.

2 | "Jon, I hope all is well.  I want to follow up on a couple

3 | of conversations I had recently with both AUSAs and" --

4 | (Interruption by the reporter.)

5 | THE COURT:  So I have this and I've read it and I've

6 | seen it before because, remember, it came up at the suppression

7 | hearing.  I'm concerned that the last page of it talks about

8 | the suppression hearing, and I would not have the jury find

9 | that I had suppressed evidence, because that isn't going to be

10 | helpful, or not suppressed evidence for either party.  This is

11 | in the court's record, and so what is it going to be useful to

12 | introduce it as an exhibit?  So what's the relevance?  If it's

13 | in the court's record, it's part of the suppression motion.

14 | MR. JACKSON:  Well, I think it just shows that they're

15 | trying to flex authority, and I think that's -- you know, that

16 | has a lot of value to it that, you know, they're intervening on

17 | American citizens' lives, and they have that -- you know,

18 | they're not supposed to be a hundred miles away from the

19 | border, and for some reason they're, in the state of Vermont,

20 | as the ultimate police force, against the Vermont Supreme Court

21 | orders.

22 | THE COURT:  All right.  Mr. Ophardt?

23 | MR. OPHARDT:  Your Honor, we would request that

24 | Exhibit O be redacted from the middle of the page that's 1038

25 | down where -- from Agent Zuchman, it says "Not a problem Jon.

 1  Let me know what you need in advance."  Everything above that,

 2  the Government does not object to its admission into

 3  evidence --

 4           THE COURT:  All right.

 5           MR. OPHARDT:  -- given the Court's ruling on the other

 6  HSI documents.

 7           THE COURT:  All right.  I'll allow that.  We don't

 8  want the jury to be hearing about suppression hearings or

 9  anything like that.  So the document has to be cut off right

10  before it says "From:  Zuchman, Alex E," and it's dated

11  September 11th, 2023.  Okay?

12           MR. JACKSON:  Yes, your Honor.

13           THE COURT:  All right.

14           MR. OPHARDT:  Your Honor, I apologize.  I just noted

15  that there is another spot too.  At the top of the page, it

16  says "suppression hearing 9/21" in the subject line.

17           THE COURT:  Okay.

18           MR. OPHARDT:  So we may want a redaction there as

19  well.

20           THE COURT:  We will get one there.  Okay.  F -- sorry.

21  P is an e-mail from Wendy Alger dated 3/9/22.

22       Let's start with the Government this time.

23           MR. OPHARDT:  Your Honor, it's my understanding

24  Ms. Alger's been added to the defense's exhibit list, which I

25  think changes the analysis of this.  It is still somewhat

1 confusing that the Chief Deputy State's Attorney in Rutland is

2 communicating with the laboratory, but I think we can handle

3 that through our lab witnesses, even without Ms. Alger.

4          THE COURT:  All right.  So you have dropped your

5 objection to the admission of Exhibit P?

6          MR. OPHARDT:  Yes, your Honor.

7          THE COURT:  Okay.  That takes us to Exhibit S.  Let's

8 see.  R is not a problem?

9          MR. OPHARDT:  Your Honor, we are not objecting to

10 Exhibit R.

11          THE COURT:  Okay.  R is not a problem.  So Exhibit S

12 is our last one.

13      And let's start with the Government because you're on your

14 feet.

15          MR. OPHARDT:  Thank you, Judge.

16      The issue is not content.  The issue is duplication.

17 Everything that's in Defendant's Exhibit S is also in

18 Defendant's Exhibit B.  Defendant's Exhibit S is simply an

19 earlier e-mail exchange, which is incorporated into Defendant's

20 Exhibit B.  So I believe it's redundant.  It's not a gigantic

21 403 issue, but I do not think it adds any probative value

22 because it's in essence duplication.

23          THE COURT:  Mr. Jackson, do you agree with that?

24          MR. JACKSON:  Yes, your Honor, I agree with that.

25          THE COURT:  So we want to cut down on things that the

1  jury has to look at in deliberations, so let's just use Exhibit

2  B, and S will be excluded as redundant.

3      And I think those are all of our issues, but let me start

4  with the Government as to whether there are any issues we

5  didn't cover.

6      MR. OPHARDT:  I do not believe so, your Honor.  I

7  think we're set.

8      MR. JACKSON:  Yes, your Honor.  I believe it's two

9  subpoenas that I asked for late, one for Miss Wendy Alger and

10 one Walter Taylor III.  I believe calling both of these

11 witnesses will explain more, because after speaking to

12 Ms. Denise at the Vermont Forensic Laboratory, I wasn't

13 satisfied with her analysis, and so since the Government is --

14 their last lab report, final examination report, is referred

15 back to December 21st lab report, I think it's relevant for

16 Ms. Wendy Alger to testify.

17      THE COURT:  So I've been signing requests for

18 subpoenas the day I get them.  I can't do it any sooner.

19 People can file motions to quash and they can say it was served

20 too late.  I take that up if it comes.  I haven't had a motion

21 to quash yet unless it's hit the docket today, but I've been

22 signing things as soon as I get them from you.

23      MR. JACKSON:  Okay.

24      THE COURT:  So we'll just -- we'll deal with it in

25 terms of whether it's going to be a problem or not.

1          MR. OPHARDT:  Your Honor, I just want the Court to be

2    aware, Mr. Jackson to be aware, Ms. Alger has retired.

3          THE COURT:  Oh.

4          MR. OPHARDT:  She no longer works at the Vermont

5    Forensic Laboratory, so we -- she's not the type of VFL

6    employee that we can assist in obtaining her appearance.

7          THE COURT:  Okay.  I have a preliminary charge.  I'm

8    going to ask my law clerk to get it from chambers.  It's just

9    don't Google, don't look at the Internet, that kind of thing.

10   I give it in every case.  The Second Circuit has approved it.

11   You can go home with it and see if you have any issues with

12   regard to it.

13        Anything else that we haven't covered?

14         MR. JACKSON:  You already covered the subpoenas, so he

15   would have to send them to you.

16         THE COURT:  So we just need one for -- no, I don't

17   need one.  Mr. Jackson needs one, Mr. Behrens needs one,

18   Mr. Ophardt needs one, and Ms. Cate needs one.  And the rest

19   are for the jurors.  And you don't have to read them all in

20   here.  I will be providing that to the jurors at the beginning

21   of trial like I do in every other case.

22        Okay.  Here are a couple more notes.  Is there going to be

23   a request that we sequester witnesses?

24         MR. OPHARDT:  I'm sorry, your Honor.

25         THE COURT:  Is there going to be a request that we

1  sequester witnesses?

2              MR. OPHARDT:  Yes, your Honor.

3              THE COURT:  And so it's mandatory if there's a

4  request.  The Court's going to order that witnesses be

5  sequestered.  That means that other than the case agent and

6  Mr. Jackson, the witness cannot be in the courtroom before they

7  testify.  Once they've testified, they may remain in the

8  courtroom even if they're called on rebuttal.

9       Our jury coordinator has e-mailed the parties the

10 additional juror questionnaires, so those you should have by

11 now.  And I think that's it.  Anything else that you wanted to

12 bring to my attention?

13             MR. OPHARDT:  No, your Honor.  Thank you.

14             THE COURT:  Mr. Jackson, you all set as well?

15             MR. JACKSON:  No, not at this time, your Honor.

16             THE COURT:  Okay.  So you don't have anything

17 additional?

18             MR. JACKSON:  No.  I'll straighten it out with

19 Mr. Ophardt.

20             THE COURT:  Okay.  And I apologize to the staff and

21 the CSOs who are here without a break.  We kept going strong.

22 But really, it was a long haul.  Thank you for being efficient.

23        (Court was in recess at 3:45 PM.)

24

25

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

May 10, 2024

_____
Johanna Massé, RMR, CRR