VOLUME:     1
PAGES:  1-100

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NO. |
| | ) | 2:21-cr-113-1 |
| v. | ) | |
| | ) | |
| LAWRENCE JACKSON, | ) | |
| Defendant. | ) | |

JURY TRIAL
Tuesday, April 9, 2024
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    District Judge, and a Jury

APPEARANCES:

JONATHAN A. OPHARDT, ESQ., and NICOLE P. CATE, ESQ., U.S.
    Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
    570, Burlington, VT 05402-0570, Counsel for the Government

LAWRENCE JACKSON, #82536-509, Northwest State Correctional
    Facility, 3649 Lower Newton Road, Swanton, VT 05488,
    Self-Represented

ROBERT S. BEHRENS, ESQ., Behrens Venman PLLC, 30 Elmwood
    Avenue, Burlington, VT 05401, Standby Counsel for the
    Defendant

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

INDEX TO EXAMINATIONS

WITNESS                                                                          PAGE

CHARLES G. WHITEHEAD
     Direct by Mr. Ophardt                                                        15
     Cross by Mr. Jackson                                                         88

INDEX TO EXHIBITS

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---------|-------------|------|----------|
| 1 | Diamondback DB9 9mm Semi-Automatic Pistol | 76 | 77 |
| 1A | Photograph of Government Exhibit 1, Bates 1500 | 77 | 77 |
| 2 | Davis Industries P-380 .380 Caliber Semi-Automatic Pistol | 75 | 80 |
| 2A | Photographs of Government Exhibit 2, Bates 1501-1502 | 80 | 81 |
| 3 | Taurus The Judge .410/.45 Caliber Revolver | 83 | 84 |
| 3A | Photograph of Government Exhibit 3, Bates 1499 | 84 | 84 |
| 4 | Photographs of Taurus The Judge .410/.45 Caliber Revolver, Bates 224-227 | 87 | 87 |
| 5 | Floor Plan - 55 Killington Avenue, Bates 1527 | 24 | 25 |
| 10 | Photographs of Search of 55 Killington Avenue | 26 | 27 |
| 12 | Evidence Bag Containing RPD #1, 6, 12, 15, 31, 33-35 | 64 | 67 |
| 12A | Photographs of Government Exhibit 12, Bates 1535-1537 | 66 | 67 |

INDEX TO EXHIBITS
(Continued)

| GOVERNMENT EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 13 | Cash with Yellow Rubber Bands | 59 | 60 |
| 13A | Photograph of Government Exhibit 13, Bates 1538 | 60 | 61 |
| 14 | Cash with Black Rubber Band | 62 | 62 |
| 14A | Photograph of Government Exhibit 14, Bates 1539 | 63 | 63 |
| 17 | Box of .410 Shell Cartridges and One 9mm Round | 68 | 69 |
| 17A | Photographs of Government Exhibit 17, Bates 1542-1543 | 69 | 70 |
| 18 | Ammunition | 70 | 71 |
| 18A | Photographs of Government Exhibit 18, Bates 1544-1545 | 71 | 72 |
| 19 | Blue Bag with Ammunition | 84 | 86 |
| 19A | Photographs of Government Exhibit 19, Bates 1546-1547 | 86 | 86 |
| 32 | Scale | 72 | 72 |
| 32A | Photographs of Government Exhibit 32, Bates 1557-1558 | 73 | 73 |
| 40 | Ammunition from Diamondback | 81 | 82 |
| 40A | Photographs of Government Exhibit 40, Bates 1562-1563 | 82 | 82 |
| 47 | Rutland Police Department Property Report, Bates 890-897 | 57 | 92 |
| 57 | Photograph of 55 Killington Avenue, Bates 1200 | 18 | 18 |

```
                          INDEX TO EXHIBITS
                             (Continued)



DEFENDANT
EXHIBIT     DESCRIPTION                           I.D.   RECEIVED
U           55 Killington Avenue Search Warrant    89
            and Application




                       INDEX TO MISCELLANEOUS

                                                         PAGE
  Government Opening Statement                              5

  Defense Opening Statement                               14
```

1  Tuesday, April 9, 2024

2       (After juror orientation, a 16-person jury was drawn and

3  sworn, the Court delivered preliminary jury instructions, and

4  the following was held in open court with the jury present at

5  1:55 PM.)

6          COURTROOM DEPUTY:  Your Honor, the matter before the

7  Court is criminal case number 21-CR-113-1, United States of

8  America v. Lawrence Jackson.  Representing the Government are

9  Assistant United States Attorneys Jonathan Ophardt and Nicole

10 Cate; the defendant is present as self-represented with standby

11 counsel, Robert Behrens; and we are here for a jury trial.

12         THE COURT:  Good afternoon.  At this point in the case

13 we will start with opening statements, and as always, we start

14 with the Government.

15     And you may proceed.

16         MS. CATE:  Thank you, your Honor.

17     Good afternoon.  On November 23rd of 2021, the defendant,

18 Lawrence Jackson, had nearly a half brick of cocaine.  A half

19 brick is a half kilogram, which is over a pound of drugs.  As

20 you will learn throughout this trial, that is many thousands of

21 dollars of drugs.

22     Also on November 23rd, law enforcement searched a bedroom

23 that Mr. Jackson shared with his girlfriend.  There they found

24 a revolver called The Judge, which is designed to fire shotgun

25 shells and .45 long ammunition.  You will also learn during

1  this trial that The Judge was Mr. Jackson's favorite gun.

2      This is a case about Mr. Jackson's drug trafficking and

3  his possession of firearms and how he blended the two together.

4  This is also a case about Mr. Jackson's coordination with

5  others; that is, his conspiracy, to do both of those things:

6  the drug trafficking and the using guns to work with the drug

7  trafficking.

8      In the coming days, you will hear and see a variety of

9  evidence that gives you a view into the drug operation of the

10  defendant, who went by the name Boo-Bee.  This evidence begins

11  in the second half of 2020, and it goes through the following

12  year, ending in November of 2021.

13      Let's talk about the end of that time frame.  November

14  23rd of 2021.  The defendant was stopped and arrested that

15  night in Rutland.  When he was arrested, there were around 450

16  grams of cocaine and cocaine base in the car that he was

17  driving.  That car was a red Ford Freestyle, and two women were

18  riding with him.  The drugs were in five plastic baggies, all

19  stored in a blue zippered bag that was shoved under a front

20  seat.  You will see cruiser camera video footage of that

21  arrest, and you will see law enforcement officers search

22  Mr. Jackson and find over $2,000 in cash in his pockets.

23      Earlier that night, law enforcement had searched 55

24  Killington Avenue, Apartment 2, in Rutland.  In one of the

25  bedrooms there, in a dresser filled with men's clothing,

1  officers found a loaded revolver emblazoned with the words "The

2  Judge."  The gun was hidden among pairs of men's socks.  Made

3  by the firearm company Taurus, this revolver was loaded with

4  shotgun shells and .45 long bullets when law enforcement found

5  it in the dresser.

6      Directly next to the dresser was a desk.  Multiple boxes

7  of ammunition were in and on the desk and dresser.  And the

8  drawers of the desk were stocked with items used to package and

9  traffic drugs:  scales for measuring, razor blades for cutting,

10  baggies for packaging.  Also a firearm holster.  The desk also

11  contained paperwork.  And that paperwork had Lawrence Jackson's

12  name on it.  You'll see photos during trial of the men's

13  clothing, Mr. Jackson's paperwork from the desk, and the drug

14  distribution station that was in the desk drawers.  Although 55

15  Killington Avenue was not the address Mr. Jackson used on his

16  driver's license, the Government will prove in the coming days

17  beyond a reasonable doubt that Mr. Jackson possessed that Judge

18  revolver and the other items in that bedroom.

19      When law enforcement arrived at 55 Killington Avenue to

20  conduct a search that evening, there were five people in the

21  apartment, including the defendant's girlfriend, Wendy, and

22  also the official tenant and her boyfriend.  A man jumped out a

23  window of that second-story apartment and left piles of white

24  powder and bundles of cash on the ground.  A short time later,

25  a man named David Jordan was found near the building with white

1  powder on his hands, a large amount of cash on him, and

2  injuries from an apparent fall.

3      Throughout the apartment, in addition to the Judge

4  revolver and the drug trafficking station in Mr. Jackson's

5  bedroom, law enforcement also found two more guns and several

6  baggies of drugs.

7      After the searches, the evidence was brought to the

8  Rutland City Police Department to be logged into evidence.  The

9  drugs from the Ford Freestyle and from 55 Killington were

10  submitted to the Vermont Forensic Laboratory several times for

11  analysis and follow-up testing as the case unfolded and as the

12  original chemist retired.  You will hear testimony from a

13  Vermont Forensic Laboratory chemist about her analyses and

14  conclusions regarding these drugs.

15      The evidence in this case will prove that the defendant

16  dealt in two related types of drugs:  cocaine, also known as

17  powder cocaine, or "soft," and cocaine base, also known as

18  crack, or "hard."

19      Now, along with the evidence from November 23rd of 2021

20  showing you the finality of the defendant's drug and gun

21  crimes, you will learn about how he got there.  Back in late

22  2020, the defendant was a smaller-scale drug dealer.  You will

23  see evidence of two controlled purchases; that is, sales that

24  the defendant made, in August and September of 2020.

25  Controlled purchases are when a confidential informant, acting

1  at the direction of law enforcement, buys drugs from a drug

2  dealer.  You will get to see and hear the defendant conduct

3  these sales.  The evidence will include still images from

4  videos that were taken during the sales and audio recordings of

5  the defendant's voice arranging those transactions.

6      And between those 2020 sales and the seizure of guns and

7  drugs on November 21st of 2021 -- 23rd of 2021, you will hear

8  testimony about the defendant's drug and gun activities from

9  people who knew him during that time.  This includes people who

10 brought drugs from him, people who helped him with his drug

11 business, and also people who saw him with The Judge and other

12 guns.  Many of these witnesses committed drug or other crimes

13 themselves, and their testimony will be their recollections of

14 their interactions with the defendant from that time.

15     You will hear how, by early 2021, the defendant had become

16 connected with drug sources in western Massachusetts and began

17 bringing larger quantities of drugs to Rutland to sell.

18 Mr. Jackson would get half bricks or bricks; that is, half

19 kilograms or kilograms, from his out-of-state suppliers.  He'd

20 bring them back to Rutland and cook some of the cocaine into

21 cocaine base.  You will hear testimony that typically cocaine

22 can be cooked, is the word, "cooked," into crack by adding

23 water, baking soda, and heat.  Mr. Jackson cooked his crack

24 himself, and others cooked it for him.

25     Throughout 2021 the defendant stayed at and sold drugs out

of various locations. At first he was staying in various
Rutland area hotels, including the Quality Inn. Later he
crashed at people's houses and set up shop there. For a time
in mid 2021 the defendant stayed at a woman named Nicole
Jones's house on Lincoln Avenue in Rutland. By the time the
defendant was arrested in November of 2021, he was staying at
Courtney Schaner's house at 55 Killington Avenue.

Mr. Jackson's drug distribution activities included many
others: Nicole and Courtney, who hosted him and let him sell
drugs out of their homes; his Massachusetts suppliers, who went
by the names S and Hodge; Reggie Watson and Orlando Cruz, who
sold drugs for him and helped keep the business running. These
people and others who you will hear about throughout trial were
his co-conspirators in the drug trafficking business.

The defendant's drug distribution activities also included
guns. At any given time, Mr. Jackson may have had thousands of
dollars on him or thousands of dollars of product on him. To
protect his money and drugs, the defendant was usually armed,
and the defendant coordinated with his co-conspirators to
protect their drug trade together using guns.

The defendant is a convicted felon, and he was a convicted
felon in 2021. As Judge Reiss will instruct you when she
speaks to you about the law, it is illegal for a convicted
felon to possess any firearms.

On that note, let's talk about the charges in this case.

1  Mr. Jackson is charged with seven different counts.  Four of

2  the counts are drug offenses.  There's a sale of cocaine in

3  August of 2021 and a sale of cocaine base in September --

4  sorry, a sale of cocaine in August 2020 and a sale of cocaine

5  base in September of 2020.  Those are the two controlled

6  purchases that I mentioned earlier.

7      He's also charged with possessing cocaine and cocaine base

8  with the intent of distributing it on November 23rd of 2021.

9  That count relates to the drugs in the Ford Freestyle that we

10  talked about.

11      The fourth count is a drug conspiracy from approximately

12  January 2021 until November 23rd of 2021.

13      At the end of the trial, Judge Reiss will instruct you

14  that each type of charge has certain elements, which are facts

15  that the Government must prove beyond a reasonable doubt.  What

16  Judge Reiss tells you about the law is controlling.

17      For the drug conspiracy, she's expected to tell you that

18  the Government needs to prove two things:  first, that there's

19  an agreement between two or more people to distribute drugs.

20  Now, the members of the conspiracy can come and go, and they

21  could be at the higher level or at a lower level.  And second,

22  the Government must prove that the defendant knew -- knowingly

23  joined the conspiracy and what the conspiracy involved.

24      For the drug conspiracy in this case, you will be asked to

25  be considered a third question, and that question is in regard

1 to the quantity of drugs, specifically whether the Government

2 has proven beyond a reasonable doubt whether the conspiracy

3 involved 500 grams or more of cocaine; that is, a half kilogram

4 or more.

5     The other three counts in this case are firearm counts.

6 One count requires the Government to prove that the defendant

7 had a gun in connection with a drug conspiracy.  As Judge Reiss

8 will instruct you, this can be proven in a few different ways:

9 either that the defendant used or that he carried a gun during

10 and in relation to the drug conspiracy or that he possessed a

11 gun in furtherance of a drug conspiracy.

12     Another of the firearm counts is another conspiracy count,

13 and this time the defendant is being charged with conspiring

14 with others to use guns in connection with a drug conspiracy.

15     And finally, the defendant is charged with possessing the

16 Judge firearm while he was a convicted felon.

17     Over the course of this trial, the Government will prove

18 to you beyond a reasonable doubt that the defendant,

19 Mr. Jackson, committed all of these crimes through several

20 different types of evidence.  I've already previewed some of

21 those types for you.

22     Before I conclude, I want to speak with you about one more

23 type of evidence, and that is cell phone evidence.  In the Ford

24 Freestyle that the defendant was driving on November 23rd, law

25 enforcement found a blue Motorola cell phone in a cup holder in

1  the center console.  That cell phone contained a photo of the
2  defendant's driver's license, and it contained a selfie of the
3  defendant holding the driver's license, which you will hear was
4  taken at 55 Killington Avenue.  It contained pictures of the
5  defendant and his girlfriend, Wendy.  It contained messages
6  incoming to a person named Boo-Bee and a person named Lawrence.
7       The evidence will prove that the Motorola was the
8  defendant's cell phone.  As you will see, the defendant's cell
9  phone contains messages that provide real-time examples of his
10 drug trafficking business as he conducted it.  You will read
11 messages with customers.  You'll see Jackson arranging deals,
12 discussing where to meet, how much drugs somebody wants to buy,
13 and what he's going to charge.  You'll also read messages with
14 his supplier and with co-conspirators.  You will hear testimony
15 from some of the people who are in those messages also.
16      In addition to the text discussions, you will see photos
17 from the phone.  These include photos of items that folks
18 offered to Jackson for drugs, to do a trade, and photos of
19 drugs that Mr. Jackson sold on scales showing the weights.
20      The phone also provides evidence of the firearm offenses.
21 In Mr. Jackson's web history, you will see visits to a website
22 about the Judge revolver.  The phone also has screenshots from
23 YouTube videos about The Judge.
24      At the end of trial, after all the evidence has been
25 presented, we will have the opportunity to speak to you again,

1 and at that time we will ask you to return verdicts of guilty

2 on all counts.  Thank you.

3          THE COURT:  Opening statement by Mr. Jackson?

4          MR. JACKSON:  Yes.

5     Hello, ladies and gentlemen, again.  I want to start with

6 the first charge that Ms. Cate just talked about, conspiracy.

7 The Government's not going to be able to prove a conspiracy

8 charge because nobody conspired with me to sell drugs.  The

9 people you're going to hear from claiming that they was with

10 me, evidence will show that they wasn't with me.  Text messages

11 will show, phone calls will show that I barely had any contact

12 with these people.  Between January and November of 2021, there

13 was no conspiracy.  There's no sale of narcotics.  There's none

14 of that.

15     And, you know, just to let members of the jury know, I had

16 a drug problem.  I had a drug abuse problem.  So I was brought

17 into the mix of having drugs in my possession to get high.

18 You're going to hear evidence about drugs being found in the

19 car.  There was three people in the car, and it was here,

20 there, and everywhere else.  So I will leave that to the jurors

21 to judge once that evidence is received and you hear from the

22 witnesses that the Government's going to put up.

23     I don't have any witnesses.  I'm going to call two

24 witnesses, probably, and both of them work at the Vermont

25 Forensic Laboratory.  I'm going to prove to you how drugs were

Charles G. Whitehead - Direct

1  shifted around and at the coordination of the Government, how

2  it was told what to do with the drugs, how to weigh it, who to

3  add, who not to add, and, you know, just making me out to be

4  the culprit of this.

5      I'm going to let the evidence speak for itself and just

6  ask you, ladies and gentlemen of the jury, to keep an open mind

7  and judge this case fairly.

8      Thank you.

9          THE COURT:  The Government may call its first witness.

10         MR. OPHARDT:  Thank you, your Honor.  The United

11 States calls Commander Charles Whitehead of the Rutland City

12 Police Department.

13         COURTROOM DEPUTY:  And you can step right up front in

14 front of me.  Come all the way around.  Please raise your right

15 hand.  State your full name for the record.

16         THE WITNESS:  Charles Whitehead.

17                 CHARLES G. WHITEHEAD,

18     having been first duly sworn by the courtroom deputy,

19              was examined and testified as follows:

20         THE WITNESS:  I do.

21                 DIRECT EXAMINATION

22 BY MR. OPHARDT:

23 Q    Good afternoon, Commander Whitehead.  How are you?

24 A    Good.  How are you?

25 Q    Good.  Where are you currently employed, sir?

Charles G. Whitehead - Direct

1  A    Rutland City Police Department.

2  Q    How long have you been with the Rutland City Police

3  Department?

4  A    Since 2013.

5  Q    And your current position is a commander.  What does that

6  entail?

7  A    I oversee the patrol division.

8  Q    Patrol division.  Distinguish that in a police department.

9  What is that?

10  A    Meaning the police officers that go out on a daily basis

11  and take calls.

12  Q    Back in November 2021, what was your position then?

13  A    I was a detective sergeant.

14  Q    As a detective sergeant, what was your day-to-day role?

15  A    To oversee the Bureau of Criminal Investigations, so

16  overwatch the detectives that did advanced cases.

17  Q    What types of cases did -- the Bureau of Criminal

18  Investigations at Rutland City Police Department, what types of

19  cases did they investigate?

20  A    Gun cases, drug cases, sexual assaults.  It varied.

21  Q    A wide variety of matters?

22  A    Correct.

23  Q    As part of your duties in November of 2021, were you

24  familiar with the investigation of Lawrence Jackson?

25  A    Yes.

Charles G. Whitehead - Direct

1  Q    Were you the case agent for that case, or was that someone

2  working for you?

3  A    Someone working for me.

4  Q    And who was that?

5  A    Detective Lucia.

6  Q    What's Detective Lucia's full name?

7  A    Detective Adam Lucia.

8  Q    Thank you.  As part of that investigation, was a search

9  warrant obtained?

10 A    It was.

11 Q    Where was the search warrant for?

12 A    55 Killington Avenue.

13 Q    A particular apartment or the whole building?

14 A    Apartment 2.

15 Q    Let's take a step back.  What is required to obtain a

16 search warrant?

17 A    The officer has to do a search warrant application

18 accompanied by an affidavit.  It is then submitted to a judge

19 for review, and the judge either accepts it or denies it.

20 Q    For 55 Killington Avenue, Apartment Number 2, was a search

21 warrant obtained?

22 A    It was.

23 Q    And who was the affiant for that?

24 A    Detective Lucia.

25 Q    Are you aware who the authorizing judge was?

Charles G. Whitehead - Direct

1  A    Judge Toor.

2  Q    What did the warrant authorize law enforcement to look for

3  and to seize?

4  A    Illegal narcotics, documents related to the possession or

5  distribution of narcotics, firearms, ammunition, and

6  electronics.

7  Q    You've got some exhibit binders there, I believe.  If you

8  could look at Government's Exhibit 57.  Did you find it?

9  A    Yes.

10  Q    I'm sorry.  We are not numbered sequentially here, so

11  we're not starting with 1.  We're going to start with 57.  Do

12  you recognize that photograph?

13  A    I do.

14  Q    What is it?

15  A    55 Killington Avenue.

16  Q    That's the full structure, 55 Killington?

17  A    That's correct.

18        MR. OPHARDT:  Your Honor, I'd move to admit

19  Government's Exhibit 57 at this time.

20        THE COURT:  Any objection?

21        MR. JACKSON:  No, Your Honor.

22        THE COURT:  It's admitted.

23     (Government's Exhibit 57 was received in evidence.)

24        MR. OPHARDT:  Your Honor, may I publish?

25        THE COURT:  You may.

Charles G. Whitehead - Direct

1          COURTROOM DEPUTY:  And, Mr. Ophardt, you may need to

2  hit doc cam on the -- there you go.

3  Q    BY MR. OPHARDT:  Detective Whitehead, you testified that

4  this was 55 Killington Avenue.  Is this what it looked like

5  around the time of the search warrant?

6  A    Yes.

7  Q    You said that there's a search warrant for Apartment

8  Number 2.  There's a door here on the front.  Is that where you

9  would enter to get to Apartment Number 2, or is it at a

10  different location?

11  A    Different location.

12  Q    Can you see it on this photograph at all?

13  A    It's very difficult.

14  Q    Generally speaking, where is it?  If you could -- you are

15  able to circle on the screen in front of you.  Just the

16  approximate location where that door would be.

17          Thank you.  That's the back left of the structure.

18          Clear that.  Thank you.

19          As part of obtaining a search warrant and then executing a

20  search warrant, does Rutland City Police Department execute

21  them by themselves, or do they use other law enforcement to

22  assist?  How does that normally work?

23  A    We use other agencies to help with manpower.

24  Q    Okay.  So who did you coordinate for execution of this

25  search warrant?

Charles G. Whitehead - Direct

1  A    Homeland Security assisted us along with Vermont State

2  Police Drug Task Force and the Vermont State Police troopers.

3  Q    Is it common in Rutland City to have federal law

4  enforcement assist with the execution of a search warrant?

5  A    It is.

6  Q    When law enforcement is planning to execute a search

7  warrant on a residence, what roles, generally speaking, need to

8  be assigned?

9  A    The entry team, perimeter, interviews, search team, and

10 transport teams.

11 Q    So ballpark, how many officers are you looking to assist

12 with execution of a search warrant like this for a residence?

13 A    I would say as many as we can, but typically probably 10

14 to 20.

15 Q    So let's talk through the steps of executing a search

16 warrant on a residence.  After these roles are assigned, what's

17 the first step that law enforcement takes?

18 A    After the roles are assigned, we start to proceed to the

19 residence.  The -- at the same time the perimeter is getting

20 set up, the entry team also makes its way to the entry point.

21 At that point, once we're set, we knock and announce.  If

22 there's no answer, then we force our way into the residence.

23 Q    After law enforcement makes entry into the residence, what

24 happens inside the residence?

25 A    Inside the residence, if there is individuals that are

Charles G. Whitehead - Direct

1 encountered, we detain them and continue to search the

2 residence for other occupants for safety issues.

3 Q    Once the residence has been secured from safety issues,

4 what happens with the folks who've been detained?

5 A    It depends.  This particular case, there was two

6 individuals that had arrest warrants, so they were transported

7 away from the residence.  The -- there was two other

8 individuals that were there that were from out of state, I

9 believe New York.  One was kicked loose.  The other one had a

10 warrant.  And the two remaining individuals were held on scene,

11 detained until we completed the search.

12 Q    When you say "kicked loose," what do you mean?

13 A    Sorry.  Released.  They were free to go.

14 Q    Thanks.  So after we've kind of sorted folks out, who's a

15 resident, who's not, who has warrants, who doesn't, what

16 happens in the particular residence?

17 A    Then we conduct a search.

18 Q    How many officers assisted with entering and securing 55

19 Killington Avenue, Number 2?

20 A    Approximately eight.

21 Q    Were you part of the group that made entry?

22 A    I was.

23 Q    Would you describe for the jurors what the entry to the

24 second floor looked like.  You pointed out where it was

25 located, but generally what did it look like?

Charles G. Whitehead - Direct

1  A    So we had to go up a stairwell.  There was an exterior

2  door that we breached, forced entry into, and then it opened up

3  into a laundry room and then opened up into a kitchen area.

4  Q    How many people were inside the residence when the warrant

5  was executed?

6  A    Five.

7  Q    You testified a little bit about, you know, where they

8  wound up.  Who were the -- of the three people who were from

9  Vermont, not the two folks from New York, do you remember who

10  those three people were?

11  A    I do.  Courtney Schaner, Wendy Ashline, and Reginald

12  Watson.

13  Q    While law enforcement was securing the residence, what, if

14  anything, did you learn from the perimeter team regarding

15  another person who may have been in the residence?

16  A    That they jumped out the second floor.

17  Q    So the perimeter team reported that?

18  A    Correct.

19  Q    After the scene is secured, you talked about the five

20  occupants being moved around.  Who were the two residents that

21  stayed at the location?

22  A    Courtney Schaner and Wendy Ashline.

23  Q    Were they allowed to move about the residence, or were

24  they restricted in any way?

25  A    They were detained in the kitchen area.

Charles G. Whitehead - Direct

1  Q    Is that standard procedure?

2  A    Yes.

3  Q    Why is that?

4  A    For safety reasons.  We can't have people just walking

5  around.

6  Q    So you mentioned that at this point a search is going to

7  be conducted.  What roles are assigned to the law enforcement

8  officers as part of the search team?

9  A    So you have the search person or persons; somebody

10 documenting, taking photographs; and somebody collecting

11 evidence.

12 Q    Who was assigned to search?

13 A    Agent Dornbierer and Detective Billings.

14 Q    And Detective Billings is Rutland City Police Department?

15 A    Yes.

16 Q    Tyler Billings?

17 A    That's correct.

18 Q    And you said Agent Dornbierer.  That was HSI Special Agent

19 Joseph Dornbierer?

20 A    That's correct.

21 Q    Who was assigned to be the photographer?

22 A    I was.

23 Q    And who was the evidence collector and documentarian?

24 A    Detective Christopher Roy.

25 Q    And who was he with at the time?

Charles G. Whitehead - Direct

1  A    It was a sheriff's department.  I don't remember.  But he

2  was assigned to the Vermont Drug Task Force.

3  Q    Okay.  And your recollection was he was with the sheriff's

4  department?

5  A    Yes.

6  Q    As the photographer, were you generally familiar with the

7  layout of the apartment at the time of the search?

8  A    Yes.

9  Q    And you mentioned this was on the second floor?

10  A    Correct.

11  Q    How many bedrooms?

12  A    Three bedrooms.

13  Q    If you could look at Government's Exhibit 5 in the binder.

14  Did you find it?

15  A    Yes.

16  Q    Okay.  Sorry.  Do you generally recognize the layout in

17  Government's Exhibit 5?

18  A    Yes, I do.

19  Q    Is it a somewhat rudimentary layout of the apartment?

20  A    Yes.

21  Q    So when I say "rudimentary," not to scale; is that

22  correct?

23  A    Correct.

24  Q    From your time in the apartment, though, do you generally

25  recognize the layout as accurate?

Charles G. Whitehead - Direct

1  A    Yes.

2  Q    And what rooms does it depict that you were familiar with

3  in the apartment?

4  A    Well, bedrooms 1, 2, and 3; kitchen; the laundry room;

5  bathroom; storage room; and the closets.

6         MR. OPHARDT:  Your Honor, I'd move to admit

7  Government's Exhibit 5 at this time.

8         THE COURT:  Any objection?

9         MR. JACKSON:  No objections, your Honor.

10         THE COURT:  5 is admitted.

11     (Government's Exhibit 5 was received in evidence.)

12         MR. OPHARDT:  Your Honor, may I publish?

13         THE COURT:  You may.

14  Q    BY MR. OPHARDT:  Commander, we talked earlier about the

15  staircase where the entry team entered.  Can you circle on the

16  touch screen in front of you where that entrance was from the

17  staircase to the apartment.

18     So you circled the word "Staircase" and kind of part of

19  the storage room.  Is the entrance just there to the right of

20  your circle?

21  A    That's correct.

22  Q    And it's labeled "Entrance" on the diagram; is that right?

23  A    That's correct.

24  Q    Now, you mentioned that there are three bedrooms.  There's

25  one on the far left labeled "Bedroom 3."  Do you see that?

Charles G. Whitehead - Direct

1  A    I do.

2  Q    Why was that particular bedroom labeled number 3 on the

3  diagram?

4  A    That's just the number we gave it.

5  Q    So you assigned that number at the time of the search?

6  A    Yes.

7  Q    Is that standard to delineate particular bedrooms?

8  A    Yes.

9  Q    Okay.  So then at the top is bedroom 1.  Was that also a

10 number that you assigned?

11 A    Yes.

12 Q    And how about bedroom 2?

13 A    Same.

14 Q    Okay.  I'd like you to look at Government's Exhibit 10 in

15 the binder in front of you.  That is a larger exhibit -- well,

16 generally speaking, what is Government's Exhibit 10?

17 A    That's the point that we made entry into the residence.

18 Q    Oh, I'm sorry.  The whole packet, how would you describe

19 that whole packet?

20 A    Photographs that I took inside the residence.

21 Q    So during the search of 55 Killington on November 23rd,

22 2021?

23 A    Correct.

24 Q    You yourself took those?

25 A    I did.

Charles G. Whitehead - Direct

1 Q    Would you please look through them to be sure that you

2 recognize the photographs that are contained within it.

3 A    Yes.

4 Q    You've reviewed them?

5 A    Yes, sir.

6 Q    Are they -- do they fairly and accurately depict the areas

7 searched and the items you photographed that day at 55

8 Killington Avenue?

9 A    Yes.

10         MR. OPHARDT:  Your Honor, I move to admit Government's

11 Exhibit 10.

12         THE COURT:  Any objection?

13         MR. JACKSON:  No objection, your Honor.

14         THE COURT:  Exhibit 10 is admitted.

15     (Government's Exhibit 10 was received in evidence.)

16         MR. OPHARDT:  Your Honor, may I publish?

17         THE COURT:  You may.

18 Q    BY MR. OPHARDT:  Commander Whitehead, I'm going to refer

19 to these exhibits by the black number on them.  We call that a

20 Bates number in legal terms.  So I'll be referring to that

21 number throughout the exhibit.

22     This is Bates 97 of Exhibit 10.  Do you recognize that?

23 A    I do.

24 Q    What does this photograph depict?

25 A    That's the entry door.

Charles G. Whitehead - Direct

1  Q    What's the first room inside the entry door?

2  A    The laundry room.

3  Q    So this is the exterior staircase door directly into the

4  laundry room?

5  A    Correct.

6  Q    This is 97.07.  What does this photograph depict?

7  A    That is a picture of the hallway leading down to bedroom

8  number 3.

9  Q    And the door just -- the door here that's depicted with

10  the red curtain in the back, what room is that?

11  A    Bedroom 3.

12  Q    And there's an officer kind of standing here on the right

13  in another entryway.  What would that be to?

14  A    I believe the bathroom.

15  Q    Showing you what is Bates 97.08, do you recognize that

16  photograph?

17  A    I do.

18  Q    Where was it taken?

19  A    In the kitchen.

20  Q    There are items here depicted on this floral print cover

21  for the stove.  Do you know where these items came from?

22  A    I do.

23  Q    From where?

24  A    Courtney Schaner.

25  Q    When you say they came from Courtney Schaner, were they on

Charles G. Whitehead - Direct

1 her person?  Were they in her possession?

2 A     On her person.

3 Q     On the screen is 97.24.  Do you recognize that photograph?

4 A     I do.

5 Q     And where was that one taken?

6 A     That is bedroom number 3.

7 Q     Did you say bedroom number 3?

8 A     Yes, sir.

9 Q     So the one close to the bathroom?

10 A     Correct.

11 Q     This is 97.29.  Do you recognize that photograph?

12 A     I do.

13 Q     Where was it taken?

14 A     Also bedroom 3.

15 Q     And what is this piece of furniture that's here on the

16 left-hand side of the picture?

17 A     A desk.

18 Q     And to the right?

19 A     A dresser.

20 Q     This is 97.3 *[sic]*.  Where was this photograph taken?

21 A     Also bedroom 3.

22 Q     Another photograph of the desk?

23 A     That's correct.

24 Q     97.31.  Do you recognize that photograph?

25 A     I do.

Charles G. Whitehead - Direct

1  Q    Where was it taken?

2  A    Bedroom number 3.

3  Q    And what is this one depicting?

4  A    That is the top of the dresser.

5  Q    These photographs, these first photographs that we're

6  looking at, were these taken before law enforcement began to

7  search, during, or after?

8  A    During.

9  Q    During?

10    Are there particular items that are being photographed, or

11  is this just the overview of particular rooms?

12  A    The overview.

13  Q    Thank you.

14    Showing you what's marked as 97.32.  Do you recognize that

15  photograph as one you took?

16  A    I do.

17  Q    On the right is -- is that a doorway or a mirror?

18  A    I believe a mirror.

19  Q    And what's depicted kind of in the middle of the

20  photograph?

21  A    A knife.

22  Q    Where is the knife located?

23  A    By the light switch.

24  Q    While we're reviewing these photographs, are they in the

25  order that you recall taking them, generally speaking?

Charles G. Whitehead - Direct

1  A     Generally, yes.

2  Q     Okay.  So 97.36, what's this photograph depicting?

3  A     White powder outside on the ground.

4  Q     Why did you take that photograph?

5  A     That was in the area underneath bedroom number 2, where I

6  was advised a subject had jumped out the window.

7  Q     Just going back to Government's Exhibit 5 briefly, the

8  schematic, you mentioned bedroom number 2.  Would you just

9  circle with your finger on the screen which one that was.

10 Thank you.

11     And you've been testifying about a desk and a dresser in

12 bedroom number 3.  Where was that one?  Thank you.

13     This is back to Government's Exhibit 10, document 97.39.

14 Do you recognize that photograph?

15 A     I do.

16 Q     What is it?

17 A     More white powder outside of bedroom number 2's window on

18 the ground.

19 Q     Document 97.44 of Exhibit 10.  Do you recognize that

20 photograph?

21 A     I do.

22 Q     What is it?

23 A     That is the open window to bedroom number 2.

24 Q     What vantage point are you taking this from?  Where --

25 excuse me.  Better question.

Charles G. Whitehead - Direct

1        Where are you when you're taking this?

2   A    Outside.

3   Q    This is document 97.45 of Exhibit 10.  Do you recognize

4   that photograph?

5   A    I do.

6   Q    What is it?

7   A    That is cash that was found outside on the ground, outside

8   of bedroom number 2, that area.

9   Q    Do you recall approximately how much cash that was?

10  A    There was two found.  One was approximately 3,000.  One

11  was approximately 1200.

12  Q    This is 97.46 of Exhibit 10.  Is this the other bundle of

13  cash you just mentioned?

14  A    Yes, sir.

15  Q    So 97.51, we're back inside the apartment.  Which bedroom

16  is this?

17  A    This would be bedroom number 1.

18  Q    So we'll put Government's Exhibit 5 back up.  Bedroom

19  number 1 is the one here in the back behind the living room; is

20  that right?

21  A    That is correct.

22  Q    This is back to Exhibit 10, 97.57.  Do you recognize that

23  photograph?

24  A    I do.

25  Q    What's depicted kind of in the middle of the photograph on

Charles G. Whitehead - Direct

1  the floor?

2  A    A firearm.

3  Q    This is 97.58.  Do you recognize that photograph as well?

4  A    I do.

5  Q    What is it?

6  A    Same firearm.  It's a Diamondback.

7  Q    You said it's a Diamondback.  You're referring to the

8  photograph -- to the firearm itself?

9  A    Yes.

10  Q    Showing you 97.60 of Exhibit 10.  Do you recognize that

11  photograph?

12  A    I do.

13  Q    What is it?

14  A    The same Diamondback firearm.

15  Q    Are you able to read the serial number off of that

16  photograph in the firearm?

17  A    I can.

18  Q    What is it?

19  A    Y13315.

20  Q    The digit after the Y, could that be an I rather than a 1?

21  I know it's hard to tell with the photograph.

22  A    It could be.

23  Q    Okay.  Either an I or a 1?

24  A    Correct.

25  Q    I'm sorry.  I'm going to go back to 97.60.  Why does this

Charles G. Whitehead - Direct

1 firearm appear this way on the bed?

2 A    It was moved from its original location to, one, secure it

3 from being loaded and to get a better close-up photo of it.

4 Q    Okay.  The black thing up here, up top, what's that?

5 A    That's a magazine.

6 Q    And this kind of shiny metal object here in the middle,

7 what's that?

8 A    That's a round.  Ammunition round.

9 Q    When you say it was "secured," what does that entail?

10 A    Taking the magazine out and making sure that there's not a

11 bullet in the chamber.

12 Q    I show you 97.64 of Exhibit 10.  Do you recognize that

13 photograph?

14 A    I do.

15 Q    What room is that in the bedroom -- excuse me.

16      What room is that in the apartment?

17 A    That's the living room.

18 Q    Go back to Government's Exhibit 5.  Can you please point

19 out for the jurors where the living room is in that schematic.

20      Back to Exhibit 10, document 97.70.  What's that a

21 photograph of?

22 A    Inside bedroom number 2.

23 Q    There's kind of a red wall hanging of sorts there

24 predominantly on the wall.  What's behind that?

25 A    The window.

Charles G. Whitehead - Direct

1  Q    Was that window open or closed?

2  A    It was open.

3  Q    Is that the window you were photographing from the

4  exterior?

5  A    Yes, sir.

6  Q    Government Exhibit 10, document 97.71.  What does this

7  photograph depict?

8  A    A child's bed and a tote inside bedroom 2.

9  Q    So this is bedroom 2?

10  A    Correct.

11  Q    One warning, Commander.  When you turn to look at the

12  exhibit, you move away from the mic, so I just wanted to be

13  sure that we can hear you.  Thank you.

14       This is Exhibit 10, 97.78.  What is this a photograph of?

15  A    That is a photograph of the chair inside the living room

16  with suspected drugs in it.

17  Q    Who -- who spotted the suspected drugs in the living room

18  from the search team?

19  A    I did.

20  Q    Would you circle for the jurors, please, when you say

21  "suspected drugs," where they were in the couch.

22       And that's the white object kind of between the couch

23  cushion and the chair that you just circled; is that correct?

24  A    Yes, sir.

25  Q    I show you 99.16.  Do you recognize this as another

Charles G. Whitehead - Direct

1  photograph you took?

2  A     I do.

3  Q     Where was this located?

4  A     In the living room.

5  Q     Where is the chair in relation to the television that we

6  see?

7  A     I think more toward this side.

8  Q     So positioned to actually look at the television?

9  A     Correct.

10 Q     There's a black object next to a black bag here.  What is

11 this object here in the kind of center, just below the TV and

12 next to the black bag?

13 A     A scale.

14 Q     This is 99.022 of Exhibit 10.  Do you recognize that

15 photograph as well?

16 A     I do.

17 Q     What's that a photograph of?

18 A     The black bag that's on the TV stand.

19 Q     99.024.  Do you recognize that photograph?

20 A     I do.

21 Q     What is it?

22 A     That is the contents inside the black bag.

23 Q     There's something with a blue handle.  What do you

24 recognize that to be?

25 A     A knife.

Charles G. Whitehead - Direct

1  Q    What about the three white objects there?

2  A    Illegal narcotics.

3  Q    Suspected illegal drugs?

4  A    Yes.

5  Q    This is 99.027 of Exhibit 10.  Do you recognize this

6  photograph?

7  A    I do.

8  Q    Do you recall taking it?

9  A    I do.

10  Q    Where was this taken?

11  A    In the living room.

12  Q    Where were these two items found, generally?

13  A    In the -- on the TV stand.

14  Q    Do you recall whether they were on the TV stand, in the

15  bag?  Could be either?

16  A    Could be either.

17  Q    You don't have a specific recollection of it?

18  A    That's correct.

19  Q    This is Government's Exhibit 10, document 99.031.  Where

20  was this photograph taken?

21  A    In the living room.

22  Q    What is depicted in the photograph?

23  A    A dollar bill with white powder.

24  Q    Is there a playing card on the right?

25  A    Yes.

Charles G. Whitehead - Direct

1  Q    I'm going to go back to 97.64, which is kind of the

2  overview -- you testified it was the overview of the living

3  room.  Can you see where in that overview photograph that white

4  container with the dollar bill on it, where is that located?

5  A    If you're sitting in the chair, it's to the right.

6  Q    Directly on the right of the chair?

7  A    Correct.

8  Q    This is Exhibit 10, 99.034.  Do you recognize that

9  photograph?

10  A    I do.

11  Q    What is it?

12  A    It's a handgun.

13  Q    Do you recall what type of handgun it was?

14  A    A P-380.

15  Q    Do you recall whether or not this firearm was loaded or

16  unloaded at the time it was found?

17  A    I do not.

18  Q    Where was it located?

19  A    In room 2 -- bedroom 2.

20  Q    Do you recall where in bedroom 2?

21  A    I don't.

22  Q    If I provided you the kind of overview photograph of that

23  room, do you think that would be helpful?

24  A    Yes.

25  Q    I'm putting up 97.71.  Do you recognize the location where

Charles G. Whitehead - Direct

1  the firearm was at all in that photograph?

2  A    Yes.  On the child's bed.

3  Q    On the toddler bed?

4  A    Yes.

5  Q    So I have a couple photographs here.  99.046 - sorry.  Let

6  me zoom that out a little bit - and 99.56 *[sic]*.  Where were

7  those taken?

8  A    In the kitchen.

9  Q    This is 99.56.  What's this glass object here?

10  A    It's a Pyrex measuring cup.

11  Q    And this kind of metallic-looking object here?

12  A    It's a scrubbing agent.

13  Q    Is there a brand that folks use to describe that, like

14  Kleenex for tissue, that sort of thing?

15  A    Chore Boy.

16  Q    Okay.  So still on Exhibit 10, 99.067, there's a little

17  bit of a glare there, but can you see that one?

18  A    Yes.

19  Q    What's this photograph of?

20  A    That is a photograph in bedroom number 3.  There's a bag

21  with a zipper on it.

22  Q    Where in bedroom number 3 is this photograph of?

23  A    The dresser.

24  Q    Putting back up on the screen 97.31 of Exhibit 10, this

25  dresser?

Charles G. Whitehead - Direct

1  A    Yes, sir.

2  Q    Which spot was the -- this photograph we were just looking

3  at?  Where was it taken?

4  A    This area.

5  Q    I'm sorry?

6  A    This area right here.

7  Q    I'm not seeing anything you're touching, but there's a --

8  kind of a package of socks.  Is that where you were pointing?

9  A    Yes, sir.

10  Q    Okay.  In Exhibit 10, this is 99.068.  Do you recognize

11  that photograph?

12  A    I do.

13  Q    What is it?

14  A    It is the blue bag, and it's containing a Judge firearm.

15  Q    A Judge firearm?

16  A    Yes.

17  Q    99.069.  Do you recognize that photograph?

18  A    I do.

19  Q    What is it?

20  A    A picture of the Judge firearm on top of the blue bag.

21  Q    If you look closely at the cylinder of the revolver, what

22  can you see kind of in that breech area?

23  A    Ammunition.

24  Q    So was it loaded when it was located?

25  A    Yes.

Charles G. Whitehead - Direct

1  Q    This is 99.07.  Do you recognize this photograph?

2  A    I do.

3  Q    And what is it depicting?

4  A    Again, The Judge and serial number.

5  Q    If you could read the serial number off of the photograph.

6  A    It is LM389865.

7  Q    So you took photographs of the serial number on the

8  Diamondback and The Judge but not the P-380.  Do you recall

9  why?

10  A    I don't believe we could find it.

11  Q    So you couldn't find it on scene?

12  A    Correct.

13  Q    Were you able to find it before you logged it into

14  evidence later, to your recollection?

15  A    I don't believe so.

16  Q    One was eventually located on the firearm; is that

17  correct?

18  A    Correct.

19  Q    This is 99.073.  Do you recognize that photograph?

20  A    I do.

21  Q    On the -- on the left over here, what was located in that

22  kind of opening where socks are?

23  A    The blue bag with The Judge.

24  Q    What's here in this drawer that's open on the right?

25  A    Men's clothing.

Charles G. Whitehead - Direct

1 Q    99.075 - turn it right side up - do you recognize that

2 photograph as well?

3 A    I do.

4 Q    What's it depicting?

5 A    More men's clothing.

6 Q    Is that the same dresser or a different dresser?

7 A    Same.

8 Q    This is Bates 99.076.  Do you recognize that photograph?

9 A    I do.

10 Q    What's it depicting?

11 A    Ammunition.

12 Q    The two plastic boxes on the top, what's the caliber for

13 that ammunition?

14 A    .22.

15 Q    And the two cardboard boxes on the bottom, what are those

16 calibers?

17 A    .40.

18 Q    Do you recall where these were located?

19 A    I do not.  In bedroom 3.

20 Q    In bedroom 3?

21 A    Yes.

22 Q    Do you recall if they were in the dresser, the desk,

23 elsewhere?

24 A    I don't.

25 Q    I show you 99.077.  Do you recognize this photograph as

Charles G. Whitehead - Direct

1  one you took?

2  A    I do.

3  Q    What furniture item does this drawer relate to?

4  A    The desk.

5  Q    And which drawer on the desk?

6  A    The middle.

7  Q    Kind of where you sit?

8  A    Yes.

9  Q    This is Bates 97 -- excuse me, 99.078 from Exhibit 10.  Do

10  you recognize that photograph as well?

11  A    I do.

12  Q    What is it?

13  A    Another picture of scales.

14  Q    The scales that are in that drawer?

15  A    That's correct.

16  Q    Let's take a step back to 99.077, one previously.  What

17  else other than scales is depicted in this drawer from your --

18  from the overview picture?

19  A    Scissors; a knife; a spoon; batteries; a cup with a

20  saucer, looks like.

21  Q    How many scales do you see?

22  A    Five.

23  Q    This is 99.079.  What is this a picture of?

24  A    The same drawer.

25  Q    What's located just over this coin here at the bottom?

Charles G. Whitehead - Direct

1  A    A razor blade.

2  Q    And what are these kind of small white circles?

3  A    Rubber bands.

4  Q    This is Bates 99.080.  Where was this photograph taken?

5  A    Also bedroom 3.

6  Q    What's depicted here?

7  A    Black Adidas bag.

8  Q    And what's depicted here next to it?

9  A    Plastic bags.

10 Q    This is Bates 99.081 from Exhibit 10.  Which drawer of the

11 desk is this depicting?

12 A    The left-hand side middle drawer.

13 Q    And if you could just describe what items are located in

14 it.

15 A    Looks like a spoon, a Pyrex measuring cup and some other

16 measuring cups, and a plastic container.

17 Q    It would be fair to describe this item with a longer

18 handle as a ladle?

19 A    Yes.

20 Q    This is Bates 99.082.  Do you recognize that photograph as

21 one you took?

22 A    I do.

23 Q    What's it depicting?

24 A    Several different things to include sandwich bags, a box

25 of them.

Charles G. Whitehead - Direct

1  Q    Where -- where was that drawer located?

2  A    That is the top left drawer to the desk.

3  Q    Which bedroom?

4  A    Bedroom 3.

5  Q    This is 99.084.  Do you recognize that photograph?

6  A    I do.

7  Q    Which drawer is that?

8  A    That's the bottom drawer of the desk in bedroom 3.

9  Q    Do you recognize any items in it?

10 A    I do.  Appears to be a couple holsters, some Narcan, and

11 some condoms.

12 Q    I show you what is number 99.085.  Do you recognize that

13 photograph?

14 A    I do.

15 Q    What is it?

16 A    A picture of a Vermont civil violation ticket.

17 Q    Are you familiar with these from your patrol duties?

18 A    I am.

19 Q    The department name on this, what does it state?

20 A    Rutland City Police.

21 Q    And you probably know better than me, but is there a date

22 of violation on here?

23 A    October 30th, it looks like, 2021.

24 Q    Oh, that's where that is.  Would you circle the location

25 on the violation notice.

Charles G. Whitehead - Direct

1        And what name is on this violation notice?

2   A    Lawrence Jackson.

3   Q    This is 99.086.  Do you recognize that one as another copy

4   of the same violation notice?

5   A    Yes.

6   Q    Where was that item located, generally?

7   A    Bedroom 3.

8   Q    This is 99.087.  Do you recognize that document?

9   A    Yes.

10  Q    What is that?

11  A    It is a warning, ticket.

12  Q    Who's the person listed as having received the warning?

13  A    Lawrence Jackson.

14  Q    What is the date on that?

15  A    10/30/2021.

16  Q    Bates 99.089.  Do you recognize that photograph as one

17  that you took?

18  A    I do.

19  Q    It's a little blurry, the photograph is, but what do you

20  recall the photograph being of?

21  A    Ammunition, to include shotgun shells.

22  Q    And this is a -- like a plastic container that they were

23  located in?

24  A    Correct.

25  Q    This is Bates 99.091 of Exhibit 10.  Do you recognize that

Charles G. Whitehead - Direct

1 photograph?

2 A    I do.

3 Q    Where was it located?

4 A    Bedroom 3.

5 Q    And on top of what item of furniture?

6 A    The desk.

7 Q    Sorry.  I'm going to put that same document back up.

8 What's depicted right here in the middle?

9 A    A tablet.

10 Q    This is Bates 99.092.  Is that that same tablet?

11 A    It is.

12 Q    What's depicted on the lock screen of the tablet?

13 A    A picture of Mr. Jackson and Ms. Ashline.

14 Q    She's one of the people who was in the apartment at the

15 time of the search?

16 A    That's correct.

17 Q    This is 99.093.  Do you recognize that as a photograph you

18 took?

19 A    I do.

20 Q    Again, from the top of the desk?

21 A    Yes.

22 Q    What's depicted kind of just to the right of the middle of

23 the screen, metallic-looking object?

24 A    Right here?

25 Q    You can circle it.

Charles G. Whitehead - Direct

1      Yes.  What is the item you just circled?

2  A    A bullet.

3  Q    So I'm going to put up Bates 99.093 again and then Bates

4  99.096, which appears to be a drawer from the item we were just

5  looking at in a prior photograph.  Is that what it appears to

6  be to you as well?

7  A    Yes.

8  Q    Is that, to your recollection, from the search?

9  A    Yes.

10        THE COURT:  So let's make sure we're getting the

11 answer from the witness.

12        MR. OPHARDT:  Yes, your Honor.  Apologize.

13 Q    What item is depicted there in green?

14 A    A shotgun shell.

15 Q    This is Bates 99.097.  Do you recognize that as another

16 photograph you took?

17 A    I do.

18 Q    What's depicted in the middle there with the name Jody

19 Blanchard on it?

20 A    EBT card.

21 Q    What's an EBT card?

22 A    It's a card that is issued to people that get money from

23 the State.

24 Q    Public benefits?

25 A    Yes.

Charles G. Whitehead - Direct

1 Q    Bates 99.099.  There we go.  Do you recognize that as a

2 photograph you took during the search?

3 A    Yes.

4 Q    What's depicted here as kind of a lime green card?

5 A    Lawrence Jackson's name.

6 Q    Do you recall what type of card that was?

7 A    I do not.

8 Q    It's got a multiple-digit number and expiration date.

9 Just generally speaking, what type of card is that?

10 A    Some type of debit or credit card.

11 Q    I show you what's 99.100.  Do you recognize this as a

12 photograph you took during the search?

13 A    Yes.

14 Q    What is it a photograph of?

15 A    An application for a Social Security card.

16 Q    Who's the name of the applicant?

17 A    Lawrence Jackson.

18 Q    Is there a date under the "Today's Date," which is box 14?

19 A    10/12 of 2021.

20 Q    What phone number is listed?

21 A    802-417-4791.

22 Q    And what address?

23 A    157 Porter Place in Rutland.

24 Q    And that's listed as a mailing or residential address?

25 A    Mailing address.

Charles G. Whitehead - Direct

1  Q    Bates 99.101.  Do you recognize that as a photograph you
2  took?

3  A    I do.

4  Q    What is it of?

5  A    USPS Priority Mail stamp.

6  Q    And what's it addressed to?

7  A    Social Security office.

8  Q    In what city?

9  A    Rutland.

10 Q    And who is the return address -- well, who's listed as the
11 person on the return address?

12 A    Lawrence Jackson.

13 Q    Bates 99.102.  Do you recognize that photograph as one you
14 took?

15 A    I do.

16 Q    What's depicted in the middle there, the green box?

17 A    A box of shotgun shells.

18 Q    And where was that located?

19 A    Bedroom 3.

20 Q    I'm going to put back up 99.102.  Off here to the left,
21 just next to the tablet, what are these metallic-looking items
22 here?

23 A    A couple are shotgun shells, and it looks like one bullet.

24 Q    When your search was completed of 55 Killington Avenue,
25 Apartment Number 2, what happened to the evidence?

Charles G. Whitehead - Direct

1  A    It was brought back to the Rutland City Police Department.

2  Q    As law enforcement was searching, what was happening to

3  the evidence?

4  A    It was being bagged.

5  Q    Who was doing the bagging?

6  A    Detective Christopher Roy.

7  Q    So you said it was brought back to the Rutland City Police

8  Department.  Who brought it back?

9  A    He did.

10 Q    Detective Roy?

11 A    Correct.

12 Q    What did you do after the search was completed?

13 A    I went back to the Rutland City Police Department, where

14 we -- him and I both took the evidence and logged it into our

15 FileOnQ system.

16 Q    You said FileOnQ?

17 A    That's correct.

18 Q    Just -- what is that?  What's FileOnQ?

19 A    It's a database that we're able to log evidence in and out

20 of and also create labels that keeps track of the evidence.

21 Q    When you were processing the evidence for 55 Killington

22 Avenue, Apartment 2, where were you doing it at Rutland City

23 PD?

24 A    In the BCI office, which is upstairs.

25 Q    Is that close to the evidence room as well?

Charles G. Whitehead - Direct

1 A     That's correct.

2 Q     Who was helping you process the evidence?

3 A     Detective Roy.

4 Q     This process of searching and then processing the evidence

5 stretch for hours?

6 A     It does.

7 Q     Do you recall when you went home that night?  Was it --

8 was it before or after midnight?

9 A     After midnight.

10 Q     Well after or close to?

11 A     Well after.

12 Q     When you're entering evidence into FileOnQ, what type of

13 information do you have to put into FileOnQ?

14 A     The item, what it is, the location that it was found, who

15 it was found by, a description of the item, if you need lab

16 analysis, the time of recovery, the location of recovery.

17        THE COURT:  So I'm going to ask the jury to stand for

18 a few minutes and just shake out and get some blood going.  We

19 want you to all be awake.  It's been a power-packed day, but --

20        JUROR:  Your Honor, may we use the bathroom?

21        THE COURT:  Yes.  So you would like to take a break?

22 That's probably a good idea.  Okay.  It's about 3:10.  How

23 about we have you come back in 15 minutes.  We'll have the

24 attorneys remain in the courtroom and the parties remain in the

25 courtroom, and the jury will be excused.

Charles G. Whitehead - Direct

1          (Jury out at 3:08 PM.)

2          THE COURT:  I have a couple things to bring to your

3    attention before we take our own break.  I don't want a

4    reference to pistol-whipping.  I want "struck" instead of using

5    the word "pistol-whip."

6          We're going to need a new exhibit list from the

7    Government.  There's too many findings of fact in the witness

8    *[sic]* list.  So it says stuff like -- instead of "white

9    powder," it says "Cocaine found at 55 Killington Avenue" or

10   "Money taken from David Jordan."  There should be -- it should

11   be neutral:  "substance" -- you know, "white, powdery

12   substance."  A firearm is a firearm, but there shouldn't be

13   conclusions as to where things were found and who they came

14   from.

15         MR. OPHARDT:  Yes, your Honor.  We'll scrub the list.

16   I apologize.

17         THE COURT:  Okay.  That's okay.

18         And then I did my post-*Crawford* analysis of the statement

19   about the person coming into the search scene and asking

20   something to the effect of "Is Lawrence here?"  And the Court

21   has concluded that that statement is not testimonial, although

22   it appears to have been made to a government agent.  It was

23   initiated by the declarant, meaning the person coming to the

24   door.  It was spontaneous.  It wasn't in reference at this

25   point to any form of questioning.  It was a volunteered

Charles G. Whitehead - Direct

1 statement not subject to any form of interrogation.

2       Unless there is some other factual basis that I am

3 missing, this person just shows up at the door, correct?

4             MR. OPHARDT:  Yes, your Honor.

5             THE COURT:  Okay.  So Mr. Jackson raised a

6 confrontation clause issue.  I agreed to look at it further.  I

7 gave you my *Crawford* analysis chart that I use.  You should

8 feel free to use your own.  Those are my issues.

9       Any issues from you, Mr. Jackson?

10            MR. JACKSON:  No, your Honor.

11            THE COURT:  Any issues from the Government?

12            MR. OPHARDT:  No, your Honor.

13            THE COURT:  Okay.  We'll see you at about 20 after.

14       (A recess was taken from 3:10-3:24 PM.)

15            THE COURT:  Anything to bring to my attention before

16 we bring back the jurors?

17            MR. OPHARDT:  No, your Honor.

18            THE COURT:  No?

19            MR. JACKSON:  No, Your Honor.

20            THE COURT:  And no.

21       Let's bring back the jurors.

22            COURTROOM DEPUTY:  Bob, would you mind getting the --

23 yeah.  Thank you.

24       (Jury in at 3:25 PM.)

25            THE COURT:  We are back on the record in United States

Charles G. Whitehead - Direct

1 v. Jackson.  We have Commander Whitehead on the witness stand.

2 He is still under oath, and we are in the Government's direct

3 examination.

4      And you may resume.

5           MR. OPHARDT:  Thank you, your Honor.

6 Q    BY MR. OPHARDT:  Commander Whitehead, before we took the

7 break, we were starting to talk about EvidenceOnQ and the type

8 of information you have to put into the system.  After you put

9 that information into the system, what do you do next?

10 A    It prints out a bar code.  We put that on the evidence bag

11 and then place it into an evidence locker.

12 Q    How do you tell one item from another?  Is there a

13 particular thing on this sticker that's printed out that lets

14 you know?

15 A    It's numbered.

16 Q    Are there -- is there a bar code number as well as another

17 number?

18 A    That's correct.

19 Q    What's the other number?

20 A    It's generated by the -- by the system itself.

21 Q    The bar code number?

22 A    And the other number.

23 Q    Okay.  That other number is an item number?

24 A    Correct.

25 Q    When you were inputting things into EvidenceOnQ, what

Charles G. Whitehead - Direct

1  numbering were you mimicking from -- in order to make the

2  paperwork make a little more sense?

3  A    The evidence log.

4  Q    Who was making the evidence log?

5  A    That was Detective Roy.

6  Q    The steps of -- after you have items with the sticker on

7  it and the bar code -- let's take a step back.

8       What does the sticker go on?  Does it go on the item

9  itself?  Does it go on a bag?  Where does it go?

10 A    It goes on the evidence bag.

11 Q    After you have things with stickers on it, what happens to

12 the items?

13 A    They go into an evidence locker.

14 Q    One at a time, or is everything brought together?

15 A    It depends on how much we have, but it can go one at a

16 time or it can go together.

17 Q    Now, is that the permanent evidence storage?

18 A    No.  It can be transferred.

19 Q    This -- is there an evidence kind of technician at Rutland

20 City PD?

21 A    There is.

22 Q    Does that person work 24/7?

23 A    No.

24 Q    So what's their job after things are in the locker?

25 A    To scan them out and then place them where they go.

Charles G. Whitehead - Direct

1  Q    Where do they go?

2  A    Into the evidence room.

3  Q    Which is a secured location?

4  A    That's correct.

5  Q    Generally speaking, were those steps taken with the

6  evidence in this case?

7  A    Yes.

8  Q    Sitting here today, do you recall each Rutland City Police

9  Department item number assigned to each piece of evidence?

10 A    No.

11 Q    When you entered the information into the EvidenceOnQ

12 system, was the information about each piece of evidence, where

13 it was recovered, the number it was assigned, was that all

14 fresh in your memory?

15 A    Yes.

16 Q    Would printouts of the information from EvidenceOnQ

17 accurately reflect your knowledge of what was seized from where

18 at 55 Killington?

19 A    Yes.

20 Q    You have what is marked for identification only as Exhibit

21 47 in the binder in front of you.  Do you have it pulled up?

22 A    Yes, sir.

23 Q    Okay.  So do you recognize this document that's Government

24 Exhibit 47?

25 A    I do.

Charles G. Whitehead - Direct

1  Q    What is it?

2  A    A property report.

3  Q    For which case?

4  A    21RL10495.

5  Q    What information does this property report contain

6  generally?

7  A    The item number, the bar code, the type of item that it

8  is, brief description of the item, the location that it was

9  collected, who it was collected by, and then whether it needs

10 lab testing or not.

11 Q    All of that information in this report that relates to

12 items that you processed that night, who put that information

13 into the system?

14 A    I did.

15 Q    I'd like you to look at the number that's Bates 893 and

16 item number 3.  Let me step back a second.

17      Before you look at the document, do you recall what item

18 number 3 is?

19 A    I don't.

20 Q    Would referencing the EvidenceOnQ property report assist

21 you in recalling that information that you entered at the time?

22 A    Yes.

23 Q    So if you'd look at Bates 893 of Exhibit 47 and item

24 number 3, what's listed under the description that you put into

25 the system?

Charles G. Whitehead - Direct

1          THE COURT:  So do we have this in evidence yet?

2          MR. OPHARDT:  Your Honor, this is recorded

3 recollection of the witness.  Per the Rules of Evidence, we

4 cannot offer it.  Mr. Jackson can move it in himself if he'd

5 like, but --

6          THE COURT:  Okay.

7          MR. OPHARDT:  -- we were proceeding under that hearsay

8 rule.

9          THE COURT:  All right.

10 Q    So what's listed under the description?

11 A    "Currency - Paper" and "currency with two yellow rubber

12 bands."

13 Q    And where does your evidence log indicate it was located?

14 A    Lawn outside of residence.

15 Q    Putting up Government's Exhibit 10, number 97.45, is that

16 a photograph of what you logged as item number 3?

17 A    Yes.

18          MR. OPHARDT:  If we could have Agent Dornbierer bring

19 up Exhibit -- Government's Exhibit 13 to the clerk, please.

20 Q    Commander Whitehead, do you recognize Government's Exhibit

21 13?

22 A    I do.

23 Q    What is it?

24 A    Item number 3.

25 Q    How do you know it's item number 3?

Charles G. Whitehead - Direct

1  A    It's listed on the bag with the sticker from the FileOnQ.

2  Q    You recognize the sticker as being a Rutland City PD

3  sticker?

4  A    Yes.

5  Q    What's listed as the case number?

6  A    21RL10495.

7  Q    And what other information is listed on that -- that

8  sticker, generally speaking without reading the sticker?

9  A    Just says "Drug Offense, Currency."

10 Q    Okay.  Well, don't read the -- don't read the sticker.

11 What types of information are located on the sticker?

12 A    What type of item it is; a bar code.

13 Q    Okay.  Is that consistent with your recollection of the

14 information you entered in EvidenceOnQ?

15 A    Yes.

16       MR. OPHARDT:  Your Honor, I'd move to admit

17 Government's Exhibit 13 at this time.

18       THE COURT:  Any objection?

19       MR. JACKSON:  No objections, your Honor.

20       THE COURT:  13 is admitted.

21    (Government's Exhibit 13 was received in evidence.)

22 Q    BY MR. OPHARDT:  If you could look at the binder in front

23 of you at Government's Exhibit 13A.  Do you recognize

24 Government's Exhibit 13A?

25 A    Yes.

Charles G. Whitehead - Direct

1  Q    What is it?

2  A    Item number 3.

3  Q    A photograph of it?

4  A    Yes.

5  Q    Does it fairly and accurately depict the item that's up

6  there with you that's Exhibit 13?

7  A    Yes, it does.

8       MR. OPHARDT:  Your Honor, I move to admit Government's

9  Exhibit 13A at this time.

10      THE COURT:  Any objection?

11      MR. JACKSON:  No, your Honor.

12      THE COURT:  13A is admitted.

13   (Government's Exhibit 13A was received in evidence.)

14      MR. OPHARDT:  Your Honor, may I publish?

15      THE COURT:  You may.

16  Q   BY MR. OPHARDT:  So, Detective Whitehead, you were

17  testifying earlier about the sticker.  The case number, the

18  police department, the item number, is that what's depicted

19  here in this white rectangle?

20  A    That's correct.

21  Q    And remind the jurors, where does this sticker come from?

22  A    Our FileOnQ system.

23      MR. OPHARDT:  If I could have Agent Dornbierer please

24  bring Government's Exhibit 14 up to the clerk.

25      And if we could swap those, Madam Clerk, so we won't end

Charles G. Whitehead - Direct

1 up with a pile up there.

2 Q    Detective Whitehead, if you could look back at Exhibit 14,

3 Bates 895, and item number 4, what is listed on the property

4 report as to what item number 4 is?

5 A    Okay.  I'm sorry.  Which exhibit?

6 Q    I'm sorry.  Exhibit -- document number 895.

7 A    And which item number?

8 Q    4.

9 A    So it's listed as "Currency" and "money located outside

10 residence."

11 Q    Where did it say it was located?

12 A    "Lawn outside the residence."

13 Q    If you could look at Government's Exhibit 14.  Do you

14 recognize that?

15 A    Yes.

16 Q    What is it?

17 A    Money that was located outside the residence.

18 Q    How do you know that?  How do you know that?

19 A    "Item # 4."

20       MR. OPHARDT:  Your Honor, I move to admit Government's

21 Exhibit 14 at this time.

22       THE COURT:  Any objection?

23       MR. JACKSON:  No, your Honor.

24       THE COURT:  Exhibit 14 is admitted.

25       (Government's Exhibit 14 was received in evidence.)

Charles G. Whitehead - Direct

1  Q    BY MR. OPHARDT:  If you could look at -- I would keep a

2  hand in 47, but flip back to 14A.  What does Government's

3  Exhibit 14A depict?

4  A    A picture of item number 4.

5  Q    Does it fairly and accurately represent Exhibit No. 14

6  that's in front of you?

7  A    It does.

8        MR. OPHARDT:  Your Honor, we move to admit 14A at this

9  time.

10       THE COURT:  Any objection?

11       MR. JACKSON:  No objections, your Honor.

12       THE COURT:  14A is admitted.

13     (Government's Exhibit 14A was received in evidence.)

14       MR. OPHARDT:  Your Honor, may I publish?

15       THE COURT:  You may.

16  Q    BY MR. OPHARDT:  If we look back --

17       THE COURT:  Mr. Ophardt?

18       MR. OPHARDT:  Yes, your Honor.

19       THE COURT:  In cross-referencing the property list,

20  you do need to offer it to be admitted.  Rule 803(5):

21  "Recorded Recollection. . . .  If admitted, the record may be

22  read into evidence but may be received as an exhibit only if

23  offered by an adverse party."

24       MR. OPHARDT:  I apologize, your Honor.  I would offer

25  it into evidence -- well, mark and seek its admission at this

Charles G. Whitehead - Direct

1   time, your Honor.

2           THE COURT:  All right.  And what's the exhibit number?

3           MR. OPHARDT:  47.

4           THE COURT:  47.

5       Any objection?  It will not be used as an exhibit, but it

6   will be admitted into evidence.  Any objection, Mr. Jackson?

7           MR. JACKSON:  No objections, your Honor.

8           THE COURT:  It's admitted for that purpose.

9           MR. OPHARDT:  Thank you, your Honor.

10      (Government's Exhibit 47 was received in evidence for

11  demonstrative purposes only.)

12  Q    BY MR. OPHARDT:  If you could look at Exhibit 47 again.

13  And this time we're looking at 896, item number 6.  What does

14  the property report reflect item number 6 to be?

15  A    "Drug," "white substance in plastic bag suspected

16  cocaine."  "Chair in cushion in the living room."

17          MR. OPHARDT:  If we could have Exhibit 12, please,

18  brought up by Agent Dornbierer.  We can swap that with the

19  exhibit that's at the witness.

20  Q    Commander Whitehead, if you could look through Exhibit 12.

21  Tell me if you recognize any of the -- 12 is the physical

22  exhibit.  Do you see any of the evidence stickers on there for

23  item number 6?

24  A    I see one label on the paper bag, item number 6.

25  Q    Thank you.  And you recognize that as a Rutland City

Charles G. Whitehead - Direct

1  Police Department label?

2  A    Yes.

3  Q    If you could also, while looking at Exhibit 12, look for

4  Rutland City Police Department number 12, so 12 and 12.  You

5  have Exhibit 12 and Rutland City Police Department number 12.

6  A    Yes.  There seems to be two stickers that have 12 on them.

7  Q    How about item 15?  Is that also in that exhibit?

8  A    Yes, it is.

9  Q    Okay.  So if you can go back to -- if you can fold up that

10  large physical exhibit, go back to Exhibit 47, Bates 890 in the

11  binder.  Item 12, what's listed as item 12 in your property

12  inventory report?

13  A    It says "Bag - Miscellaneous," "Black bag containing white

14  substance suspected cocaine or heroin" located on "TV stand in

15  living room."

16  Q    When you were looking at Government's Exhibit 12, the big

17  plastic bag, is the black bag that you recall from the living

18  room, is that located in that exhibit?

19  A    No.

20  Q    The physical black bag itself?

21  A    So this is marked C3.

22  Q    If you could flip that whole thing over.  It's hard to see

23  with all that plastic.

24  A    There is a black bag.

25  Q    Okay.

Charles G. Whitehead - Direct

1  A    Yes.

2  Q    Thank you.  Is that the black bag you recall being in the

3  living room?

4  A    Yes.  It's consistent with it.

5  Q    Let me show you from Exhibit 10, this is 99.016, is it

6  consistent with this black bag here in this photograph that's

7  up on the screen now?

8  A    Yes, it is.

9  Q    Thank you.

10     So you testified previously item 15 was also in that large

11 plastic collection of evidence.  Would you please look at

12 Exhibit 47 on Bates 891, item 15, and read the description and

13 location located -- location collected off the exhibit.

14 A    It says "Drug" "dollar bill with white powder line"

15 collected at "stand next to chair in living room."

16 Q    Back to Exhibit 10, Bates 031, is that what you were

17 referencing in the PropertyOnQ, that location depicted in that

18 photograph?

19 A    Yes.

20     MR. OPHARDT:  If we could have Agent Dornbierer bring

21 up Exhibit 17, please, to the clerk and we can swap those out.

22 Actually, I'm sorry, before we -- before we do that, I

23 apologize.  I'm getting ahead of myself.

24 Q    If you can look at 12A in the binder.  12A is a

25 multiple-page exhibit.  Are you there at 12A?

Charles G. Whitehead - Direct

1  A    Yes, sir.

2  Q    What do those photographs depict?

3  A    The evidence to the left of me.

4  Q    So the physical exhibit of 12?

5  A    Correct.

6  Q    Do they fairly and accurately depict it?

7  A    Yes.

8         MR. OPHARDT:  Your Honor, I move to admit 12A at this

9  time.

10         THE COURT:  Any objection?

11         MR. JACKSON:  No objections, your Honor.

12         THE COURT:  12A is admitted.

13     (Government's Exhibit 12A was received in evidence.)

14         MR. OPHARDT:  I move to admit 12 as well.  I think I

15  forgot to do that.

16         THE COURT:  Any objection to the admission of 12?

17         MR. JACKSON:  No objections, your Honor.

18         THE COURT:  12 is admitted.

19     (Government's Exhibit 12 was received in evidence.)

20         MR. OPHARDT:  Getting ahead of myself again.  It's

21  been a long day, and I'm tired.  May I publish?

22         THE COURT:  Yes, you may.

23  Q    BY MR. OPHARDT:  Commander Whitehead, here at the top

24  right on the screen, is that the black bag we were talking

25  about from the living room?

Charles G. Whitehead - Direct

1  A    Yes, sir.

2  Q    Here at the bottom is a kind of a blue-handled item.  Do

3  you recognize that from the photographs as well?

4  A    I don't.

5  Q    I'll put up -- this is Exhibit 10, 99.024.  Do you now

6  recognize that item?

7  A    I do.

8  Q    What is it?

9  A    The knife.

10 Q    From the black bag?

11 A    Correct.

12 Q    So it's been removed from the bag, but it's still there in

13 the exhibit?

14 A    Correct.

15 Q    These -- this physical item, does this appear the way it

16 did at the time you put it into evidence?

17 A    No.

18 Q    Based on your experience with the evidence at Rutland City

19 PD, why is the evidence packaged this way?

20 A    If it's sent out to the lab, it gets tested and

21 repackaged.

22      MR. OPHARDT:  Now I think we're ready for Government's

23 Exhibit 17.  Agent Dornbierer, if you could swap them out,

24 please.

25 Q    Commander Whitehead, if you could look at your EvidenceOnQ

Charles G. Whitehead - Direct

1 property report, which is Exhibit 47, and take a look at Bates

2 893, item 28, for me.  And what's listed as the item seized and

3 where it was collected?

4 A    "Ammunition," "remmington box of 410 and one 9 millimeter

5 round" in "Bedroom Number 3."

6 Q    If you could look at Government's Exhibit 17, is that the

7 item of the description you just read?

8 A    Yes.

9 Q    Does it appear to be in the approximate condition it was

10 at the time of seizure?

11 A    Yes.

12        MR. OPHARDT:  Your Honor, I would move to admit

13 Government's Exhibit 17 at this time.

14        THE COURT:  Any objection?

15        MR. JACKSON:  No objections, your Honor.

16        THE COURT:  It's admitted.

17    (Government's Exhibit 17 was received in evidence.)

18 Q    BY MR. OPHARDT:  If you could look at 17A, please.  And

19 let me know once you've done so.

20        Is that a photograph of item 28, Government's Exhibit 17?

21 A    Yes.  Two of them.

22 Q    Two photographs?

23 A    Yes.

24 Q    Kind of a front and back?

25 A    Yes.

Charles G. Whitehead - Direct

1  Q    Does it accurately depict the item that's in the evidence
2  bag?

3  A    Correct.

4        MR. OPHARDT:  Your Honor, I'd move to admit 17A at
5  this time.

6        THE COURT:  Any objection?

7        MR. JACKSON:  No objections, your Honor.

8        THE COURT:  17A is admitted.

9    (Government's Exhibit 17A was received in evidence.)

10       MR. OPHARDT:  Your Honor, may I publish?

11       THE COURT:  You may.

12 Q    BY MR. OPHARDT:  Commander Whitehead, if you could look at
13 the screen, this is Exhibit 10, Bates 99.102.  What is that --
14 what's depicted in that photograph?

15 A    A box of Remington and a couple shotgun shells.

16       MR. OPHARDT:  If we could have Exhibit 18 brought up
17 and swapped out with 17, please.

18 Q    Commander Whitehead, if you could look at Bates 890, item
19 10, please.  That's Exhibit 47.  I apologize.  If you could
20 read the description under -- I'm sorry.  Did I say item number
21 23?  I might have given you the wrong Bates number.  I
22 apologize.  I think it's on Bates 892.

23 A    "Ammunition," "22 caliber and 40 caliber ammunition"
24 collected "Bedroom 3."

25 Q    If you'd look at the physical item, Exhibit 18, do you

Charles G. Whitehead - Direct

1 recognize that item?

2 A    I do.

3 Q    What is it?

4 A    The ammunition found in bedroom 3.

5        MR. OPHARDT:  Your Honor, I'd move to Exhibit

6 Government's Exhibit 18 at this time.

7        THE COURT:  Any objection?

8        MR. JACKSON:  No objections, your Honor.

9        THE COURT:  18 is admitted.

10     (Government's Exhibit 18 was received in evidence.)

11 Q    BY MR. OPHARDT:  If you could look at 18A in the binder.

12 It should be two photographs.  What is 18A?  What are they

13 photographs of?

14 A    Item number 23.

15 Q    And that's Government's Exhibit 18 in front of you?

16 A    That's correct.

17 Q    When it was being walked up to you, it appeared some of

18 the rounds may have come out of some of the packaging, is that

19 fair to say, for the Exhibit 18?

20 A    Yes.

21 Q    But for that change, do the photographs accurately depict

22 Government's Exhibit 18?

23 A    They do.

24        MR. OPHARDT:  Your Honor, I'd move to admit 18A at

25 this time.

Charles G. Whitehead - Direct

1          THE COURT:  Any objection?

2          MR. JACKSON:  No objections, your Honor.

3          THE COURT:  18A is admitted.

4      (Government's Exhibit 18A was received in evidence.)

5          MR. OPHARDT:  May I publish, your Honor?

6          THE COURT:  You may.

7          MR. OPHARDT:  If we could have Exhibit 32 brought up

8  and swapped with 18, please.

9  Q    BY MR. OPHARDT:  And, Commander Whitehead, if you could

10 look at Bates 47 -- I'm sorry, Exhibit 47, Bates 890, item 10,

11 and read into the record what's listed there.

12 A    It says "Drug Paraphernalia - Miscellaneous" "scale"

13 located in "Living Room tv stand."

14 Q    If you could look at Exhibit 32, which has just been

15 handed to you, do you recognize that item?

16 A    I do.

17 Q    What is it?

18 A    The scale that was located in the living room.

19         MR. OPHARDT:  Your Honor, I'd move Exhibit 32 at this

20 time into evidence.

21         THE COURT:  Any objection?

22         MR. JACKSON:  No objections, your Honor.

23         THE COURT:  32 is admitted.

24     (Government's Exhibit 32 was received in evidence.)

25 Q    BY MR. OPHARDT:  This is Exhibit 10, 99.106.  What's

Charles G. Whitehead - Direct

1  depicted next to the bag?

2  A    Item number 10, the scale.

3  Q    The exhibit that's -- physical exhibit that's currently up

4  with you?

5  A    Yes.

6  Q    If you can look at the binder at Exhibit 32A.

7        MR. OPHARDT:  Let me get a copy for Mr. Jackson.

8  Q    What is 32A?

9  A    Two photographs of item number 10 in the physical evidence

10  up here.

11        MR. OPHARDT:  Your Honor, I move to admit 32A at this

12  time.

13        THE COURT:  Any objection?

14        MR. JACKSON:  No objections, your Honor.

15        THE COURT:  It's admitted.

16    (Government's Exhibit 32A was received in evidence.)

17        MR. OPHARDT:  Your Honor, may I publish?

18        THE COURT:  You may.

19  Q    BY MR. OPHARDT:  Commander Whitehead, the items I've been

20  handing to you all have -- are all in a similar bag; is that

21  correct?

22  A    That's correct.

23  Q    What -- what is listed at the top on the red area of the

24  bag?

25  A    A seal.

Charles G. Whitehead - Direct

1  Q    And what does it say on the second line?

2  A    "Do Not Tamper."

3  Q    The items that have been handed up to you, what, if

4  anything, have you noticed about their seal?

5  A    They're all sealed.

6  Q    When you were processing this physical evidence that night

7  at BCI, who, if anyone, brought you additional items to be

8  processed?

9  A    Detective Lucia.

10 Q    And where were you when those items were brought in?  Do

11 you recall?

12 A    In BCI.

13 Q    What did you do with those items?

14 A    Logged them into our FileOnQ.

15 Q    And when you -- after you logged them in, what did you do

16 with them?

17 A    Same process.  They get a label as well and then placed

18 into the evidence locker.

19 Q    You had no role in seizing these items; is that correct?

20 A    That's correct.

21 Q    Your role was simply to process them and put them into

22 evidence?

23 A    Correct.

24 Q    When things were done being processed at the end of the

25 night, was anything left out in BCI, or where was everything

Charles G. Whitehead - Direct

1 located?

2 A    In the evidence lockers.

3 Q    I'd like to now turn to Exhibit -- Government's Exhibit 13

4 *[sic]* for you, Commander Whitehead.  47, Exhibit 47, Bates 890.

5 If you could read the description under item number 13.

6 A    It says "Weapon - Firearm," "Davis Industries P380 black

7 gun with black and orange magazine - no ammunition," located

8 "childs bed bedroom number 2."

9         MR. OPHARDT:  If you could -- if we could have that

10 item brought up, please.  That's Exhibit 2.

11 Q    Commander Whitehead, do you recognize the item you've just

12 been handed that's marked Government's Exhibit 2?

13 A    I do.

14 Q    What is it?

15 A    It's a firearm.

16         MR. OPHARDT:  Your Honor --

17 Q    Well, Commander Whitehead, are you able to -- to

18 adequately see that firearm while it's in the evidence bag?

19 A    No.

20         MR. OPHARDT:  Your Honor, I'd ask permission to have

21 the evidence bag opened so he can remove it.

22         THE COURT:  You may open the bag and remove it.

23         MR. OPHARDT:  Do we have scissors?  Agent Dornbierer,

24 if you could walk the scissors up to Madam Clerk and Madam

25 Clerk provide them to the witness.

Charles G. Whitehead - Direct

1    Thank you, ma'am.

2  Q   What number -- evidence sticker number is on the bag that

3  you just cut open?  It's going to be a yellow sticker on the

4  exterior part of the bag.

5  A   There isn't one.

6  Q   Okay.  What item are you looking at right now?  Would you

7  just describe the item, please.

8  A   It's a Diamondback firearm.

9        MR. OPHARDT:  Madam Clerk, may I approach with a

10  government exhibit sticker?  I apologize.

11        COURTROOM DEPUTY:  And, Mr. Ophardt, you want this

12  placed on the outside of this?

13        MR. OPHARDT:  Yes.  Not on the firearm itself.

14        COURTROOM DEPUTY:  That was 1 and not 2, correct?

15        MR. OPHARDT:  1, correct.

16  Q   BY MR. OPHARDT:  If you would look at your Exhibit 47,

17  Bates 896, item number 5, if you would read that, please.

18  A   "Weapon - Firearm," "Diamond Back Firearm Serial number

19  Y13315," "Brown with black slide and black magazine with one

20  round in chamber and 4 rounds in the magazine."  The serial

21  number on the gun, Y13315, collected "floor in bedroom number

22  1."

23  Q   If you would look at the firearm itself that's in front of

24  you, are you able to locate the serial number?

25  A   Yes.

Charles G. Whitehead - Direct

1  Q    What is the serial number on that firearm?

2  A    Y13315.

3        MR. OPHARDT:  Your Honor, I move to admit Government's

4  Exhibit 1 at this time.

5        THE COURT:  Any objection?

6        MR. JACKSON:  No objections, your Honor.

7        THE COURT:  Exhibit 1 is admitted.

8     (Government's Exhibit 1 was received in evidence.)

9  Q    BY MR. OPHARDT:  If you could look at 1A, please.  What's

10 depicted in the photographs of 1A?

11 A    The Diamondback firearm, Government Exhibit No. 1.

12       MR. OPHARDT:  Your Honor, I move to admit 1A.

13       THE COURT:  Any objection?

14       MR. JACKSON:  No objections, your Honor.

15       THE COURT:  1A is admitted.

16    (Government's Exhibit 1A was received in evidence.)

17       MR. OPHARDT:  Your Honor, may I publish?

18       THE COURT:  You may.

19 Q    BY MR. OPHARDT:  Is this a photograph of Government's

20 Exhibit 1?

21 A    Yes, it is.

22 Q    And the serial number, where is it located?

23    And you've circled kind of the bottom of the gun just to

24 the right of "DB"; is that correct?

25 A    That's correct.

Charles G. Whitehead - Direct

1          MR. OPHARDT:  If we can swap Exhibit 1 with Exhibit 2,

2   which is the -- well, let's be sure that we have a sticker on

3   it.  Would you provide Exhibit 2 to the clerk, please.

4          COURTROOM DEPUTY:  Mr. Ophardt, I was planning on

5   giving the scissors back, or should we keep them up here?

6          MR. OPHARDT:  I think we should keep them up there.

7   Thank you.

8   Q    Do you recognize Government's Exhibit 2?

9   A    I do.

10  Q    What is it?

11  A    The P-380.

12  Q    If you could look at Bates 890 of Exhibit 47 and read the

13  description for item 13.

14  A    "Weapon - Firearm" "Davis Industries P380 black gun with

15  black and orange magazine - no ammunition."

16  Q    Where was it located?

17  A    "Childs bed bedroom number 2."

18  Q    Does it appear consistent with the way you located it?

19  A    Yes.

20  Q    Were you able to locate a serial number during your

21  inventory?

22  A    I was not.

23  Q    Is that why no serial number is recorded in your property

24  report log?

25  A    That's correct.

Charles G. Whitehead - Direct

1  Q    I show Bates 99.034.  Do you recognize that photograph

2  from your earlier testimony?

3  A    Yes.

4  Q    What does it depict?

5  A    Exhibit No. 2.

6  Q    Exhibits 1 and 2, when you looked at them, did they have

7  magazines in them?

8  A    No.

9  Q    Based on your handling of the evidence, are 1 and 2 still

10 the way they would have been packaged at Rutland City Police

11 Department?

12 A    Yes.

13 Q    Were they -- based on the review of the bags, were they in

14 evidence at Rutland City PD recently, or have they been

15 transferred to another agency?

16 A    Transferred.

17 Q    Do you know which agency?

18 A    Homeland Security.

19        THE COURT:  So, Mr. Ophardt, let's have a definition

20 of magazine for those who are not familiar with firearms.

21        MR. OPHARDT:  Thank you, your Honor.

22 Q    Commander Whitehead, what's a magazine?

23 A    A magazine is the instrument that you use to put

24 ammunition in and then load into the gun, and then it feeds the

25 bullets through the gun when you shoot it.

Charles G. Whitehead - Direct

1  Q    Do all firearms have magazines?

2  A    Not all of them.

3       MR. OPHARDT:  Your Honor, I'd move to admit Exhibit 2

4  at this time.

5       THE COURT:  Any objection?

6       MR. JACKSON:  No objections, your Honor.

7       THE COURT:  Exhibit 2 is admitted.

8       (Government's Exhibit 2 was received in evidence.)

9  Q    BY MR. OPHARDT:  Commander Whitehead, if you could look at

10 2A.  There are two photographs for 2A.  Do you recognize those

11 photographs?

12 A    I do.

13 Q    What are they?

14 A    Exhibit No. 2.

15 Q    Are you able to read the serial number with the firearm in

16 the packaging?

17 A    No.

18       MR. OPHARDT:  Your Honor, may we open Exhibit 2 to

19 confirm the serial number on 2A?

20       THE COURT:  Yes.

21 Q    Where is that serial number located?

22 A    On the back of the handle, or the grip.

23 Q    Who was the law enforcement officer who eventually located

24 the serial number, if you know?

25 A    I do not.

Charles G. Whitehead - Direct

1  Q    Okay.  Thank you.

2          MR. OPHARDT:  Your Honor, I'd move 2A -- well, I'm

3  sorry.  One more question on 2A.

4  Q    Is the serial number on the firearm accurately depicted in

5  the second page of Exhibit 2A?

6  A    Yes.

7  Q    Thank you.

8          MR. OPHARDT:  Your Honor, I'd move to admit 2A at this

9  time.

10         THE COURT:  Any objection?

11         MR. JACKSON:  No objections, your Honor.

12         THE COURT:  2A is admitted.

13      (Government's Exhibit 2A was received in evidence.)

14         MR. OPHARDT:  Your Honor, may I publish?

15         THE COURT:  You may.

16         MR. OPHARDT:  Do we have Exhibit 40, physical exhibit?

17  If we could swap that for 2.

18  Q    BY MR. OPHARDT:  Commander Whitehead, if you could look at

19  Bates -- excuse me, Exhibit 47, item 5, which you read earlier,

20  what does that say about ammunition?  It's Bates 896, item 5.

21  A    It says "Weapon - Firearm" "Diamond Back Firearm Serial

22  number Y13315," "Brown with black slide and black magazine with

23  one round in the chamber and 4 rounds in the magazine.  Serial

24  Number on the gun Y13315."  Found in "floor in Bedroom Number

25  1."

Charles G. Whitehead - Direct

1  Q    So Exhibit 40 which you have in front of you, what's the

2  contents of Exhibit 40?

3  A    Appears to be five rounds.

4  Q    And what's the item number on the sticker for Exhibit 40?

5  A    Item number 5.

6        MR. OPHARDT:  Your Honor, I'd move to admit

7  Government's Exhibit 40 at this time.

8        THE COURT:  Any objection?

9        MR. JACKSON:  No objections, your Honor.

10       THE COURT:  Exhibit 40 is admitted.

11    (Government's Exhibit 40 was received in evidence.)

12 Q    BY MR. OPHARDT:  If you could look at 40A in the binder in

13 front of you.  What does 40A depict?

14 A    Two pictures of item number 40.

15 Q    Does it fairly and accurately represent the physical item

16 that's up there with you at the witness stand?

17 A    It is.

18       MR. OPHARDT:  Your Honor, I move to admit Government's

19 Exhibit 40A at this time.

20       THE COURT:  Any objection?

21       MR. JACKSON:  No objections, your Honor.

22       THE COURT:  It's admitted.

23    (Government's Exhibit 40A was received in evidence.)

24       MR. OPHARDT:  Your Honor, may I publish?

25       THE COURT:  You may.

Charles G. Whitehead - Direct

 1          MR. OPHARDT:  If we could have Government's Exhibit 3

 2 brought up and exchanged for 40, please.

 3 Q    BY MR. OPHARDT:  Commander Whitehead, if you could look at

 4 Exhibit 47, Bates 892, item 21, and read the description and

 5 location collected, please, from your property report.

 6 A    It says "Weapon - Firearm," "Taurus Judge Serial number

 7 LM389865," Revolver pistol loaded with three 45 colt rounds and

 8 two 410 rounds," collected "bedroom number 3."

 9 Q    If you could -- are you able to see the serial number on

10 Government's Exhibit 3?

11 A    No.

12          MR. OPHARDT:  Your Honor, may we open Government's

13 Exhibit 3?

14          THE COURT:  You may.

15 Q    What's the serial number on Government's Exhibit 3?

16 A    LM369865 .

17 Q    I'll put up Exhibit 10.  This is Bates 99.070.  It will be

18 on your screen, Commander Whitehead.  Is that serial number

19 also listed in that exhibit?

20 A    Yes.

21 Q    That's a photograph you took at the scene, correct?

22 A    Correct.

23          MR. OPHARDT:  Your Honor, I'd move to admit

24 Government's Exhibit 3 at this time.

25          THE COURT:  Any objection?

Charles G. Whitehead - Direct

1          MR. JACKSON:  No objections, your Honor.

2          THE COURT:  Exhibit 3 is admitted.

3     (Government's Exhibit 3 was received in evidence.)

4  Q    BY MR. OPHARDT:  Commander Whitehead, if you could look at

5  Exhibit 3A, please, in the binder, a single photograph.  Do you

6  recognize what's in the photograph?

7  A    Yes.

8  Q    What is it?

9  A    Exhibit 3.

10  Q    Does it fairly and accurately depict the physical exhibit

11  that's up there with you at the stand?

12  A    It does.

13          MR. OPHARDT:  Your Honor, I'd move to admit

14  Government's Exhibit 3A at this time.

15          THE COURT:  Any objection?

16          MR. JACKSON:  No, your Honor, no objections.

17          THE COURT:  It's admitted.

18     (Government's Exhibit 3A was received in evidence.)

19          MR. OPHARDT:  Your Honor, may I publish?

20          THE COURT:  You may.

21          MR. OPHARDT:  If we could have item -- I'm sorry,

22  Government's Exhibit 19 brought up to the witness and swapped

23  for Exhibit 3.

24  Q    BY MR. OPHARDT:  And, Commander Whitehead, if you could

25  look at Bates -- I'm sorry, Exhibit 47, Bates 892 you read

Charles G. Whitehead - Direct

1  earlier as item number 21.  Do you recall reading that?

2  A    I do.

3  Q    What -- you don't need to read the description again, but

4  what generally was item number 21?

5  A    The ammunition from the Taurus Judge.

6  Q    It was the -- well, why don't you just look at Bates 892,

7  item number 21, and just read the description again.

8  A    It was the Taurus Judge located in bedroom 3 "loaded with

9  three 45 colt rounds and two 410 rounds."

10 Q    So you now have Government's Exhibit 19.  What's the item

11 number that's listed there?

12 A    Item 21.

13 Q    The firearm is no longer located with it; is that correct?

14 A    That's correct.

15 Q    What is in item 21 now?

16 A    The bag and five rounds.

17 Q    Would you describe the bag, please.

18 A    It's the blue bag.

19 Q    And where was this blue bag?

20 A    In bedroom 3.  This is the bag that The Judge was in.

21       MR. OPHARDT:  Your Honor, I'd move to admit

22 Government's Exhibit 19 at this time.

23       THE COURT:  And 19 is the -- is the bag or the

24 firearm?

25       MR. OPHARDT:  Your Honor, 19 is the bag and the

Charles G. Whitehead - Direct

1  ammunition.

2         THE COURT:  All right.  Any objection to the admission

3  of 19?

4         MR. JACKSON:  No objections, your Honor.

5         THE COURT:  It's admitted.

6      (Government's Exhibit 19 was received in evidence.)

7  Q    BY MR. OPHARDT:  If you could look at 19A in the binder,

8  please.  What's depicted in 19A, Commander Whitehead?

9  A    Two photographs of the blue bag and rounds, consistent

10 with item number 19.

11        MR. OPHARDT:  Your Honor, I'd move to admit

12 Government's Exhibit 19A at this time.

13        THE COURT:  Any objection?

14        MR. JACKSON:  No objections, your Honor.

15        THE COURT:  19A is admitted.

16     (Government's Exhibit 19A was received in evidence.)

17        MR. OPHARDT:  Your Honor, may I publish?

18        THE COURT:  You may.

19        MR. OPHARDT:  We can retrieve the physical items from

20 the witness.  Agent Dornbierer, if you could come up and get

21 them from Madam Clerk, please.

22        COURTROOM DEPUTY:  And I'll take the scissors.

23        MR. OPHARDT:  Yes.  I'm done with the scissors.  Thank

24 you.  Well, I never used the scissors.

25 Q    BY MR. OPHARDT:  Commander Whitehead, one more exhibit I'd

Charles G. Whitehead - Direct

1  like you to look at.  It's Government's Exhibit 4 in the

2  binder.  Four photographs.  What does Government's Exhibit 4

3  depict?

4  A    The blue bag and the Taurus Judge.

5  Q    And where were these photographs taken?

6  A    In bedroom 3.

7  Q    Do they fairly and accurately represent the firearm and

8  ammunition as they were located on November 23rd, 2021?

9  A    Yes.

10          MR. OPHARDT:  Your Honor, I'd move to admit

11  Government's Exhibit 4 at this time.

12          THE COURT:  Any objection?

13          MR. JACKSON:  No objection, your Honor.

14          THE COURT:  Exhibit 4 is admitted.

15      (Government's Exhibit 4 was received in evidence.)

16          MR. OPHARDT:  Your Honor, may I publish?

17          THE COURT:  You may.

18          MR. OPHARDT:  Your Honor, may I have a moment?

19          THE COURT:  You may.

20          MR. OPHARDT:  Thank you, your Honor.  I pass the

21  witness at this time.

22          THE COURT:  Any cross-examination?

23          MR. JACKSON:  Yes.

24  /  /  /

25  /  /  /

Charles G. Whitehead - Cross

1                          CROSS-EXAMINATION

2  BY MR. JACKSON:

3  Q    Good afternoon, Sergeant White- -- I mean Commander

4  Whitehead.

5  A    Good afternoon, sir.

6  Q    I've just got a couple questions for you.  On November

7  23rd, Detective Lucia requested a warrant from Honorable Judge

8  Toor.  Do you remember that morning -- that evening?

9  A    Not particularly -- the evening?

10 Q    The day he requested the warrant.

11 A    Yes.

12 Q    Was that morning or evening?

13 A    I believe it was the afternoon.

14 Q    And do you remember, how did he request -- how did he

15 obtain that warrant?

16 A    Through an application.

17 Q    And in the application, sir, he listed 55 Killington

18 Avenue as the address to be searched, right?

19 A    I'd have to review the warrant.

20       MR. JACKSON:  I don't have it.  Do you have a copy,

21 Mr. Ophardt?

22       MR. OPHARDT:  Mr. Jackson.

23       MR. JACKSON:  Your Honor, can I pass this up to him?

24       THE COURT:  Sure.  What do you want to label it?

25 Defendant's Exhibit A?

Charles G. Whitehead - Cross

1          MR. JACKSON:  It can be Exhibit A, yes.

2          THE COURT:  All right.  Let's do that.  Or do we

3  already have an A, Mr. Behrens?  So Mr. Behrens will give us

4  the exhibit number.

5          MR. BEHRENS:  That would be Exhibit U.

6          THE COURT:  U.  Thank you.

7          MR. JACKSON:  And that's for the affidavit and the

8  warrant.

9          MR. BEHRENS:  That's for the affidavit, right?

10          MR. JACKSON:  And the warrant together.  It's the

11  warrant and affidavit together.

12      That's okay, right, your Honor?

13          THE COURT:  Sure.

14          COURTROOM DEPUTY:  And would you like me to present

15  this to Mr. Whitehead?

16          MR. JACKSON:  Yes.

17  Q    Commander Whitehead -- Mr. Whitehead, on that morning, he

18  didn't speak to you -- you wasn't commander at that time in

19  November, were you?  Or -- oh, you was.  I'm sorry.  You were

20  Sergeant Whitehead and Commander LaChance.  But you wasn't

21  commander on November 23rd, 2021?

22  A    That's correct, I was not.

23  Q    You was not.  Okay.  And at that time he advised you all

24  that he was beginning surveillance of one Travis Bunnell?

25  A    That I don't recall, that morning.

Charles G. Whitehead - Cross

1  Q    It's in the affidavit there.  Page -- I don't have a page.

2  69.04.

3  A    Yes, I have the affidavit.

4  Q    Okay.  Paragraph -- probable cause in this specific case,

5  paragraph 3.  Do you see they notified you and Commander

6  LaChance?

7           THE COURT:  So we don't read from a document that's

8  not been admitted, but if you're refreshing his recollection,

9  you're doing exactly what you should do.  Direct him to a

10 paragraph.  He reads it to himself, he turns it over, and then

11 he answers your question.

12          MR. JACKSON:  Yes, your Honor.

13 Q    Do you recall that, that he talked to you that morning,

14 sir?  On paragraph 3?

15 A    Yes.

16 Q    Okay.  55 Killington Avenue, sir, to your knowledge, has

17 there been any drug sales out of 55 Killington Avenue that

18 you're aware of?

19 A    That I don't -- do not know.

20 Q    Are you aware if there's been any incidence of violence

21 out of 55 Killington Avenue?

22 A    I am not aware.

23 Q    Are you aware, was there any 911 calls to Rutland Police

24 Department concerning any activity in 55 Killington Avenue?

25 A    I do not know that.

Charles G. Whitehead - Cross

1  Q    And that goes for anytime between January to November

2  23rd, 2024?

3  A    Yeah.  I could not tell you that.

4  Q    In your search of 55 Killington Avenue, sir, in your

5  property -- in your property report, sir -- this is not a chain

6  of custody report, right?

7  A    I don't know what you're looking at.

8  Q    Your property report.

9         THE COURT:  I believe it's Exhibit 47.

10        MR. JACKSON:  Yes.  Government Exhibit 47.

11 A    That's a property report.

12 Q    Property report, sir.  And you're listed as collecting a

13 lot of this evidence and putting it into evidence?

14 A    Not collecting it.  Logging it.

15 Q    Right.  Logging it.

16 A    Yes, sir.

17 Q    I want to bring your attention to the top of the lab

18 report, Government's Exhibit 47.

19        MR. JACKSON:  Can I publish this, your Honor?

20        THE COURT:  You may.

21        MR. JACKSON:  Thank you.

22        COURTROOM DEPUTY:  And, Mr. Jackson, it should switch

23 over.

24        MR. OPHARDT:  Your Honor, Government's Exhibit 47 was

25 not admitted into evidence.  It was --

Charles G. Whitehead - Cross

1          THE COURT:  But it was offered this time by

2   Mr. Jackson.

3          MR. OPHARDT:  I'm fine with that, your Honor.  I just

4   would like the record to formally reflect he's offering it into

5   evidence.

6          THE COURT:  He is.  It does.

7          MR. OPHARDT:  Thank you, your Honor.

8      (Government's Exhibit 47 was received in evidence.)

9          COURTROOM DEPUTY:  And, Mr. Jackson, we need to turn

10  on the doc cam.

11          THE COURT:  So 47, Mr. Ophardt, was admitted.  It just

12  wasn't created as an exhibit.

13          MR. OPHARDT:  Yes, your Honor.  It was admitted, but I

14  think it wasn't offered as in go back to the jury, but now that

15  Mr. Jackson's doing so, it will.

16          THE COURT:  Yes.

17          MR. OPHARDT:  Okay.  Thank you, your Honor.

18          COURTROOM DEPUTY:  Let's try that.  Give it a second.

19  Q    Sir, the top of your property report, there's listed a

20  suspect.  Can you please say the name of suspect 1?

21  A    Jordan, David.

22  Q    Okay.  And at the time of the search, was I at the

23  residence?

24  A    No.

25  Q    Was there any reports, to your recollection, that I lived

Charles G. Whitehead - Cross

1 at 55 Killington Avenue?

2 A    No, I do not know that.

3         THE COURT:  We're at the 4:30 mark, so we're going to

4 end for the day.  We'll resume with this witness tomorrow.

5         MR. JACKSON:  Okay.

6         THE COURT:  All right.  Ladies and gentlemen of the

7 jury, don't talk about the case.  Don't let anybody talk to you

8 about the case.  Don't do any research.  Don't look anything

9 up.  If your family members and friends ask you, you can tell

10 them you are sitting on a criminal case.  You cannot tell them

11 anything else.  They will supply information that you will then

12 have to disclose.

13     We cannot start without you, so we will start at 9:00

14 tomorrow, but we will not resume until we have all of the

15 jurors here.  I wish you a good evening.

16     I'll excuse the jurors, and I'll have the parties remain

17 in the courtroom.

18     (Jury out at 4:30 PM.)

19         THE COURT:  Commander, you may take a seat in the

20 gallery.

21     No talking to the witness from the Government or the

22 defendant while he is mid testimony.

23     Please confirm with Ms. Ruddy that she has the same things

24 admitted as you do.  I keep my own list, but it's much easier

25 to consult it right after it happened and it's fresh in my

1 mind.

2     If you need to talk to me tomorrow morning, I will be

3 here, so you just let Ms. Ruddy know.

4     Mr. Jackson, you can have Mr. Behrens e-mail Ms. Ruddy or

5 however you've worked out, and I will be here.  We will do that

6 before 9 o'clock.  Otherwise I'm going to assume we're ready to

7 go and we'll go right into your cross-examination.  We'll have

8 the witness resworn, and we'll resume at that point.

9     That's what I had to bring to your attention.  Anything

10 that you want to bring to mine?

11     And this time I'll start with Mr. Jackson.

12         MR. JACKSON:  Just one thing, your Honor.  I'm having

13 a problem with the subpoena going out to Ms. Wendy Alger, the

14 forensic expert, and Walter Taylor in Mississippi.  They're

15 having problems getting to them, so I think they need a writ.

16 I think he's incarcerated, probably, so I think there might be

17 an issue.  I don't know how the Court can address that.

18         THE COURT:  Well, here's what I can do.  The day you

19 get it, it goes into a red folder for me and I attend to it

20 right away.  Beyond that, you have to give the person enough

21 notice to actually get them into the courtroom.  So I don't

22 control those things other than to do my part of it.

23     So, Mr. Behrens, you want to weigh in on the subpoena

24 issue and advise me what I can do to help?

25         MR. BEHRENS:  Well, the only thing I can say, your

1  Honor, is the subpoenas were issued and I received an e-mail

2  from the U.S. marshal saying he's located Mr. Taylor down in

3  Mississippi in jail and would require a writ.  I think I

4  received that on Friday, right around there, informed

5  Mr. Jackson, and I was just telling him he's talking to the

6  Court.

7       Ms. Alger, same issue.  The only information I have, which

8  I supplied to -- they couldn't find her.  We thought she was in

9  Waterbury.  Turns out she's in Florida.  We found that out, I

10 believe, Friday, with an e-mail address only, so that was

11 supplied to Mr. Staley from the U.S. marshals.  I haven't heard

12 anything back on that yet.  But I'm just alerting Mr. Jackson

13 so he can talk to the Court, because I know it's late in the

14 game.  It's difficult.  But --

15          THE COURT:  The witness who's in Florida, that

16 person's not in custody?

17          MR. BEHRENS:  He is incarcerated in Mississippi.

18          THE COURT:  No.  One's incarcerated in Mississippi.

19 Ms. Alger's not incarcerated.

20          MR. BEHRENS:  She's not.  She's a retired chemist from

21 the State of Vermont.

22          THE COURT:  Okay.

23          MR. BEHRENS:  I believe he's held -- he's a Vermont

24 inmate, but he's located in Mississippi.  At least that's my

25 understanding.

1          THE COURT:  We will go to the clerk's office for the

2    template for a writ.  I'll sign what you need.  I can't

3    guarantee that's going to be enough for this person to come up

4    here because I don't know whose custody he is in, the person

5    from Mississippi.

6          The Florida person, they'll make an effort to serve that

7    person.  If they can, they can.  Typically you give the person

8    14 days' notice before they have to testify, so we're probably

9    cutting it pretty close, because if somebody's served in

10   Florida, they've got to make plane reservations, there might be

11   a challenge about whether or not the person's within the power

12   of the subpoena, that kind of thing, but I will wait till that

13   happens.

14         Anything the Government wants to say on this issue?

15         MR. OPHARDT:  Your Honor, I will just proffer to the

16   Court that we spoke -- well, we corresponded with Ms. Alger a

17   while ago.  That's one reason we resubmitted for lab testing,

18   because we knew she was in Florida.  She told the Government

19   that she doesn't fly, that she would end up having to drive up

20   here, and the circumstances of making those arrangements was

21   problematic for the Government, so we decided to submit for

22   retesting.  So I'm just flagging for the Court that I think

23   Ms. Alger will not be comfortable flying.  She says she just

24   does not get on airplanes, which I think will further

25   complicate if she can get here in a timely manner.

1          THE COURT:  Okay.  And that correspondence with

2   Ms. Alger has been shared with Mr. Jackson?

3          MR. OPHARDT:  I can share that, your Honor.

4          THE COURT:  Please do.

5          MR. OPHARDT:  I don't recall if it was via e-mail or

6   phone call, but we'll track it down.

7          THE COURT:  Okay.  All right.  Any other issues to

8   bring to my attention?

9          MR. OPHARDT:  Briefly, your Honor.  And I don't expect

10  Mr. Jackson to announce a decision on this today, but in his

11  opening he did not reference Ms. Schaner as being on his

12  witness list.  If he's changed his mind, I'd just like some

13  notice on that so we can stand down on a transportation plan

14  from Valley Vista where she currently is.

15         THE COURT:  So you don't have to commit, but typically

16  we -- one thing we do in voir dire, which I talked to you about

17  at the pretrial conference, is notify the jurors of the

18  witnesses in case they know a particular person.  Do you think

19  at this point in time we're going to need a transport order for

20  Ms. Schaner?

21         MR. JACKSON:  I doubt it, your Honor.

22         THE COURT:  Okay.  Is that clear enough for you?

23         MR. OPHARDT:  That's good enough, your Honor.  We'll

24  let HSI know that it's now very tentative, and if Mr. Jackson

25  changes his mind, I'd just ask he tell Mr. Behrens that soon so

1  that we can re-engage with that plan.

2       THE COURT:  All right.  So if you change your mind,

3  let Mr. Behrens know as soon as possible.  Then we'll

4  reactivate that plan.

5       Anything else to bring to my attention?

6       Mr. Jackson.

7       MR. JACKSON:  Yes.  I lost one of my older sisters.

8  She died on me last week, and Friday they're having a wake for

9  her, and I'm getting permission from Northwest to view it and

10  do a video visit, and that would be at 4 o'clock, so is it all

11  right, if Mr. Ophardt agrees, that we can shorten Friday day a

12  little bit?

13       THE COURT:  I think the jurors would be thrilled to

14  hear that's going to happen, not that I want to undermine what

15  an important event it is for you.

16       But let me ask the Government if you have any objection

17  to --

18       If we stopped at 4:00, would that give you enough time.

19  Or do you need to get back to Northwest?

20       MR. JACKSON:  I need to be back there about 4:00.

21       THE COURT:  You need to be back there by 4:00.

22       And then let me ask the marshals how long that's going to

23  take.  So we might end up stopping even earlier.  What's the

24  transport time from here to Northwest?

25       DEPUTY MARSHAL:  It takes about 45 minutes, your

1  Honor, but I have to see what we have on the schedule for

2  Friday going up to Northwest.  So we can get back to the Court

3  as soon as we find out this afternoon what we have going on.

4        THE COURT:  Okay.  All right.  So we'll do everything

5  that we can to accommodate it.  It looks like we'll end early

6  on Friday.  It's your job to kind of tell us what you're going

7  to need so people can react to it.

8      Do you have any objection to that?

9        MR. OPHARDT:  We don't, your Honor.  I'm just looking

10 at our list.  We do have one witness who has a flight that

11 afternoon, but we'll do what we need to to get her to testify

12 earlier in the day.  I would -- I would just propose that we

13 set a proposed time to conclude if the marshals can do

14 transport so that we just -- and it doesn't need to be this

15 afternoon, just so that we can plan and be sure that we get her

16 on and off the stand so that she doesn't have flight issues.

17       THE COURT:  So I would say tentatively we'll be ending

18 at 3:00, and I think that will give the marshals enough time.

19 You probably know this better than I do, Mr. Jackson, but it's

20 sometimes not just one person's being transported and they have

21 to --

22       MR. JACKSON:  Yes.

23       THE COURT:  -- figure out what's going on, but I don't

24 have a problem with ending at 3:00, and we'll see what the

25 marshals can do with that.

1         Anything else?

2              MR. OPHARDT:  No, your Honor.  Thank you.

3              MR. JACKSON:  No, your Honor.  Thank you.

4              THE COURT:  All right.  So remember you're going to

5    compare exhibits with Ms. Ruddy.  She'll just do it with you in

6    the courtroom right now.  If you need to talk to me prior to

7    9 o'clock, I will be here at your disposal.

8         (Court was in recess at 4:39 PM.)

9

10

11                 C E R T I F I C A T I O N

12      I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.

14

15

16   May 10, 2024                    _____

17                                   Johanna Massé, RMR, CRR

18

19

20

21

22

23

24

25