```
                                          VOLUME:      2
                                          PAGES: 101-346
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

```
UNITED STATES OF AMERICA            )      CRIMINAL ACTION NO.
                                    )      2:21-cr-113-1
          v.                        )
                                    )
LAWRENCE JACKSON,                   )
             Defendant.             )
```

JURY TRIAL
Wednesday, April 10, 2024
Burlington, Vermont

BEFORE:

     THE HONORABLE CHRISTINA C. REISS,
     District Judge, and a Jury

APPEARANCES:

JONATHAN A. OPHARDT, ESQ., and NICOLE P. CATE, ESQ., U.S.
     Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
     570, Burlington, VT 05402-0570, Counsel for the Government

LAWRENCE JACKSON, #82536-509, Northwest State Correctional
     Facility, 3649 Lower Newton Road, Swanton, VT 05488,
     Self-Represented

ROBERT S. BEHRENS, ESQ., Behrens Venman PLLC, 30 Elmwood
     Avenue, Burlington, VT 05401, Standby Counsel for the
     Defendant

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

INDEX TO EXAMINATIONS

WITNESS                                                        PAGE

CHARLES G. WHITEHEAD
        Cross by Mr. Jackson (Continued)                       112
        Redirect by Mr. Ophardt                                119
        Recross by Mr. Jackson                                 121

CHRISTOPHER F. ROY
        Direct by Mr. Ophardt                                  124
        Cross by Mr. Jackson                                   129

DANIELLE CURRIER
        Direct by Ms. Cate                                     138
        Cross by Mr. Jackson                                   153

ADAM J. LUCIA
        Direct by Ms. Cate                                     157
        Cross by Mr. Jackson                                   203

JASON P. JOHNSON
        Direct by Ms. Cate                                     261
        Cross by Mr. Jackson                                   271

ASHLEY LOBDELL
        Direct by Mr. Ophardt                                  279
        Cross by Mr. Jackson                                   305

ERIC BRIMO
        Direct by Mr. Ophardt                                  323

INDEX TO EXHIBITS

GOVERNMENT
EXHIBIT      DESCRIPTION                           I.D.    RECEIVED
6            Photograph of Reginald Watson,        200         200
             Bates 795

7            Photograph of Courtney Schaner,       199         200
             Bates 1173

16           Photograph of Wendy Ashline and       201         201
             Lawrence Jackson, Bates 1174

INDEX TO EXHIBITS
(Continued)

| GOVERNMENT EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 20 | Photographs of Search of Ford Freestyle | 149 | 176 |
| 21 | Evidence Bag Containing RPD #19 and RPD #32 | 193 | 194 |
| 21A | Photographs of Government Exhibit 21, Bates 1548-1553 | 194 | 194 |
| 22 | Evidence Bag Containing RPD #33, RPD #35, and RPD #43 | 191 | 192 |
| 22A | Photograph of Government Exhibit 22, Bates 1554 | 192 | 192 |
| 23 | Evidence Bag Containing RPD #34 | 195 | 196 |
| 23A | Photographs of Government Exhibit 23, Bates 1578-1580 | 196 | 196 |
| 29 | Photograph of David Jordan, Bates 790 | 202 | 202 |
| 31 | Motorola Cell Phone | 189 | 189 |
| 31A | Photographs of Government Exhibit 31, Bates 1120-1122 | 188 | 188 |
| 31F | Materials from Motorola, Ashley Lobdell Messages, Bates 1219-1219.04 | 299 | 300 |
| 33 | Blue Fanny Pack, Scale, Glass Item, and Notes | 151 | 152 |
| 33A | Photographs of Government Exhibit 33, Bates 1559-1560 | 152 | 152 |
| 34 | Digital Scale | 189 | 190 |
| 34A | Photograph of Government Exhibit 34, Bates 1561 | 190 | 191 |

INDEX TO EXHIBITS
(Continued)

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---------|-------------|------|----------|
| 38 | Photograph of Orlando Cruz, Bates 215 | 287 | 287 |
| 52A | 11/23/21 Plemmons Dash Cam Video Clip, 1:05-8:45 Minutes (No Sound) | 164 | 165 |

DEFENDANT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---------|-------------|------|----------|
| M | 11/23/21 Dash Cam Video of Detective Ryan Malmgren | 242 | 242 |
| S | Audio of Travis Bunnell Interview | 205 | 205 |
| V | Excerpt from FBI Report, Bates 982.07 | 315 | 319 |

INDEX TO MISCELLANEOUS

|  | PAGE |
|--|------|
| Court's Exhibit 1 - Juror Note | 106 |

1  Wednesday, April 10, 2024

2       (The following was held in open court at 8:56 AM.)

3          THE COURT:  This is United States v. Lawrence Jackson,

4  and we are in the courtroom without the jury.

5       I understand that Mr. Jackson has an issue.  I have a

6  couple minor things to bring to your attention.

7       First thing, I have your writ of habeas corpus to bring a

8  witness to the court, and I need you to fill in the date that

9  you need this witness, and you should consult with the

10 Government as to when they think they're going to finish their

11 case.  So I'm going to give this to Ms. Ruddy.  She'll give it

12 to Mr. Behrens.  You fill it in.  I will sign it.  I make no

13 promises as to whether it's going to work.

14      Second thing I wanted to raise with you is that I have

15 provided you with a special verdict form.  We never got to go

16 over it in our charge conference.  We will be doing so, but I'd

17 like you to take a look at it.  And also the forfeiture special

18 verdict form.  If you don't have copies of them, I will give

19 you new copies of them.

20      Third thing, I have a note from a juror, and it states as

21 follows:  "Your Honor:  Last night when I got home my wife said

22 she had gone online to look at the docket and saw Mr. Behrons

23 (sorry I don't know how to spell his name) was on the case.

24 He's a former client of hers from years ago.  Apparently, I met

25 him once at a hockey game but I don't remember this and I did

1    not recognize him.  She, Lori Shaw, my wife, is retired but she

2    has -- had a small business doing bookkeeping and business

3    solutions.

4         "I don't think this will effect my ability to be impartial

5    but I thought you should know."  And this is Anne Rodenrys,

6    who's Juror No. 1.

7         (Court's Exhibit 1 was marked for identification.)

8         I propose that we have her come in and we talk to her to

9    make sure that her wife didn't say anything else about the

10   case.  That was before juror selection and I told them we don't

11   do that in this case, so we want to make sure that there was

12   no -- any other -- no other information provided to this juror.

13        Anybody else object to that, agree with that?

14        I'll start with you, Mr. Jackson.

15        MR. JACKSON:  I agree with your Honor's assessment.

16        MR. OPHARDT:  That sounds good, Judge.

17        THE COURT:  All right.  Now, Mr. Jackson, I hear you

18   have an issue?

19        MR. JACKSON:  Yes, Your Honor.  Just one issue.

20   Before this trial started and charge conference, you said all

21   witnesses would be sequestered.

22        THE COURT:  Yes.

23        MR. JACKSON:  Yesterday Agent Dornbierer was here

24   handing out evidence.  I don't think that was appropriate.

25        THE COURT:  Except for the case agent.  So that is

1  the -- there's two exceptions, and when I said that, I told you

2  that there was an exception.  The case agent is like a party.

3  So it's the person who kind of represents the United States of

4  America.  Otherwise there's no real client for the Government.

5  An expert witness can also listen to testimony even if there is

6  sequestration, because they can actually form their opinion and

7  change their opinion based on what they're hearing in court.  I

8  do not anticipate having expert witness testimony where a

9  witness is sitting through this case and changing their opinion

10  about some fact, so I don't think that's going to happen, but

11  thank you for bringing that to my attention.

12          MR. JACKSON:  Thank you, your Honor.

13          THE COURT:  And, Mr. Ophardt, I answered the question,

14  but do you have anything to say on that issue?

15          MR. OPHARDT:  No, your Honor.  Thank you.

16          THE COURT:  All right.  Any other issues you need to

17  bring to my attention?

18          MR. OPHARDT:  No, your Honor.

19          THE COURT:  All right.  So --

20          MR. OPHARDT:  Oh.

21          THE COURT:  -- I'm going to ask that --

22          MR. OPHARDT:  I apologize.  Ms. Arena-Leene has a

23  better memory than me.  We found the e-mail traffic with

24  Ms. Alger.  Did the Court want a copy, or just provide it to

25  Mr. Jackson?

1          THE COURT:  I want it to go to Mr. Jackson.  I don't
2 need it.

3          MR. OPHARDT:  Thank you, your Honor.  With that
4 clarification, we'll provide it now.

5          THE COURT:  Okay.  We need to bring Anne Rodenrys
6 back.  Do we have our juror coordinator here?

7          COURTROOM DEPUTY:  We do not.  I can get her.  And I'm
8 not sure if Ms. Rodenrys has arrived yet, but I will find out.

9          THE COURT:  She should.

10         COURTROOM DEPUTY:  She's going to come through the
11 side.

12         THE COURT:  Yes.  Good.

13     Good morning, Ms. Rodenrys.  Am I saying your last name
14 correctly?

15         JUROR RODENRYS:  No, but that's okay.  Nobody does.
16 It's "Roden-rice," but --

17         THE COURT:  Rodenrys?  I like the "Reiss" part of
18 that, so I will remember that.

19     Okay.  You sent the Court a note.

20         JUROR RODENRYS:  Yes.

21         THE COURT:  Which I have read to the parties.  It's
22 exactly what you should do.  They may have some questions for
23 you, but my primary question is:  Did your wife provide any
24 other information about what she had seen in the docket?

25         JUROR RODENRYS:  No.  She just said she went, she read

1  the docket, and she didn't know who the case was about, but she

2  recognized the name, and -- and then we -- I'm like, "No, I'm

3  not talking about it.  I'm going to tell the judge tomorrow,"

4  and -- yeah.

5          THE COURT:  Okay.

6          JUROR RODENRYS:  So --

7          THE COURT:  And the name is Mr. Behrens' name?

8          JUROR RODENRYS:  Yes.  Yes.

9          THE COURT:  Okay.  And anything about that encounter,

10  anything about that information that would make it difficult

11  for you to be fair and impartial on this case?

12          JUROR RODENRYS:  I don't think so.  I didn't even

13  remember -- I didn't recognize yesterday, so no.

14          THE COURT:  All right.  Does the Government have any

15  questions for Ms. Rodenrys?

16          MR. OPHARDT:  No, your Honor.  Thank you.

17          THE COURT:  Does Mr. Jackson have any questions for

18  Ms. Rodenrys?

19          MR. JACKSON:  No, your Honor.

20          THE COURT:  Thank you for your candor.  Don't tell the

21  other jurors what we talked about, and you may go back with

22  them, and we will resume our trial.

23          JUROR RODENRYS:  All right.

24      (Juror Rodenrys exited the courtroom.)

25          THE COURT:  Anybody think we need to excuse the juror?

1           MR. OPHARDT:  No, your Honor.

2           MR. JACKSON:  No, your Honor.

3           THE COURT:  All right.  Let's bring back the jurors.

4           MR. OPHARDT:  Your Honor, would you like Commander
5 Whitehead on the stand before?

6           THE COURT:  He can be recalled, because he's going to
7 be resworn.

8           MR. OPHARDT:  Will do.  Thank you, your Honor.

9           COURTROOM DEPUTY:  Oh, do you have that ready?

10          MR. BEHRENS:  Yes, your Honor.

11          THE COURT:  It's fine to have Agent Dornbierer in the
12 courtroom now.

13          MR. OPHARDT:  You mean Commander Whitehead?

14          THE COURT:  Sorry.  Commander Whitehead.  We do have
15 the agent here.

16          COURTROOM DEPUTY:  And you can wait.  You'll be called
17 as soon as the jury's here.

18     (Jury in at 9:07 AM.)

19          COURTROOM DEPUTY:  Your Honor, the matter before the
20 Court is criminal case number 21-CR-113-1, United States of
21 America v. Lawrence Jackson.  Representing the Government are
22 Assistant United States Attorneys Jonathan Ophardt and Nicole
23 Cate; the defendant is self-represented with standby counsel,
24 Robert Behrens; and we are here for a jury trial.

25          THE COURT:  Good morning, members of the jury.  Has

1  anybody acquired any outside information; talked to anybody

2  about the case; had anybody talk to them about the case; done

3  any kind of research; in any way obtained facts, information,

4  law that has any relationship to this case, directly or

5  indirectly, that did not come from the courtroom yesterday?  If

6  so, please raise your hand.  Seeing no hands raised.

7      We'll resume our trial.  We have Commander Whitehead on

8  the witness stand, and we are in Mr. Jackson's

9  cross-examination.  Because it's a new day, we will have

10  Commander Whitehead resworn.

11          COURTROOM DEPUTY:  Good morning.  Please raise your

12  right hand and state your full name for the record.

13          THE WITNESS:  Charles Whitehead.

14                    CHARLES G. WHITEHEAD,

15     having been first duly sworn by the courtroom deputy,

16          was examined and further testified as follows:

17          THE COURT:  Mr. Jackson?

18          MR. JACKSON:  Yes.

19          THE COURT:  Are you prepared for your

20  cross-examination?

21          MR. JACKSON:  Yes, ma'am.

22          THE COURT:  If you need a few minutes, just let me

23  know.

24          MR. JACKSON:  If I can just get two minutes.  I have

25  some pictures I've got to get.

Charles G. Whitehead - Cross

1    THE COURT:  Sure.  No problem.

2    MR. JACKSON:  Ready, your Honor.

3    THE COURT:  All right.  You may proceed.

4    CROSS-EXAMINATION (CONTINUED)

5 BY MR. JACKSON:

6 Q    Good morning, Commander.

7 A    Good morning.

8 Q    I want to follow up with a question from yesterday.  When

9 you entered 55 Killington Avenue, at what point -- after

10 everybody was secured, at what point did you see guns on the

11 floor?

12 A    During the search.

13 Q    During the search.  And these was in plain view?

14 A    Correct.  Bedroom 1.

15 Q    And at the time when you all entered the apartment, I was

16 not located there?

17 A    That's correct.

18 Q    And these was found in plain view as somebody put them

19 there or threw them there when they heard you all banging on

20 the door?

21 A    That I cannot say.

22 Q    But they were on the floor in plain view?

23 A    Yes.

24 Q    People don't usually leave guns on the floor in plain view

25 inside a house, right?

Charles G. Whitehead - Cross

1  A    I can't testify to what other people do.

2  Q    Okay, then.  From your training and experience, would guns

3  usually be found on the floor in a house?

4  A    Depends.

5  Q    Depends on who has them?

6  A    That's correct.

7  Q    Okay.  So at no point would you think that I would have

8  any possession of these weapons?

9  A    You weren't in the residence, so I don't know that.

10 Q    Sir, can you answer the question?

11      THE COURT:  So make sure you're close to the

12 microphone, because I did get a note just now from the jury

13 coordinator that some of the jurors are having trouble hearing

14 Mr. Jackson.

15      So one thing is that's the interruption that I want.  So

16 if at any time you can't see or hear, just stand up and say,

17 "Could you speak louder?"  People get focused on what they're

18 doing and they move away from the microphone.  I do it myself

19 all the time.

20      Let's proceed, Mr. Jackson.  Your last question was:

21 "Okay.  So at no point would you think I would have any

22 possession of these weapons?"  There was an answer, and you

23 said, "Sir, can you answer the question?"

24 Q    If I wasn't in the apartment, sir, there's no way I could

25 have possession of weapons that was on the floor, is there?

Charles G. Whitehead - Cross

1  A    Previously you could have, yes.

2  Q    Can you pinpoint a time that you might know that I was in

3  the apartment?

4  A    I can't.

5  Q    So how could you say that I could previously have

6  possession of these weapons that were found on the floor of the

7  apartment?

8  A    I said you could have.

9  Q    How is that possible?

10  A    It is possible.  I don't know that.  I can't say that you

11  did and I can't say that you didn't.

12  Q    Was I the person that jumped out the window?

13  A    No.

14  Q    Was I in the apartment?

15  A    No.

16  Q    These guns was found on the floor when you all breached

17  the door at 55 Killington Avenue next to a bed?

18  A    One of them was.

19  Q    And where was the other one, sir?

20  A    On the child's bed.

21  Q    Next to a window where another person jumped out of?

22  A    Correct.

23  Q    So it's impossible for me to have possession of these

24  weapons?

25  A    At the time.

Charles G. Whitehead - Cross

1  Q    Commander, was I in the apartment?

2  A    No, you were not.

3  Q    How could I have possessions of weapons that was on the

4  floor inside the apartment?

5           MR. OPHARDT:  Your Honor, asked and answered.

6           THE COURT:  It is asked and answered.

7      So the jury will evaluate the question, and ask a new one,

8  please.  Remember, this is cross-examination, so there's a lot

9  of latitude, but it can't be argumentative.

10          MR. JACKSON:  And I understand that, your Honor, but

11 my question is a logical and simple question.  Guns were on the

12 floor in the apartment.  He's a well-trained officer.  He

13 stated that in his affidavit.  I was not in the apartment.  You

14 can't -- I can't allude to have the jury believe that I was

15 there previously and left guns on the floor.  There was five

16 people in the apartment.  I should be able to get a straight

17 answer, and this jury deserves a straight answer.

18          THE COURT:  So the Court's perception is that the

19 precise question that you are asking is being answered, and you

20 may want to ask in a different way, but he isn't going to be

21 continually asked the same question.  If he gives an answer and

22 the jury rejects it, that's the jury's function.

23          MR. JACKSON:  Okay, sir -- ma'am.  I'm sorry.

24 Q    At any point did anybody confess to these weapons?

25 A    That I don't know.

Charles G. Whitehead - Cross

1  Q    And in part of your knowledge of this case, did you know a

2  Reginald Watson?

3  A    Yes.

4  Q    At any point did he waive his *Miranda* rights with Officer

5  Lucia pertaining to these weapons?

6  A    I do not know that.

7  Q    And at no time did he tell the police that --

8           MR. OPHARDT:  Objection, your Honor.  Hearsay.

9           THE COURT:  Well, let's hear the question before I

10 hear the objection.

11          MR. OPHARDT:  Apologize.

12 Q    At any point did Detective Lucia and Homeland Security

13 Agent Joseph Dornbierer gain knowledge that Reggie Watson

14 stated to them in an open statement that he went to a

15 particular place -- particular place, picked up these weapons,

16 and brought them back to 55 Killington Avenue?

17 A    I do not know that.

18 Q    I want to bring your attention to the property report,

19 sir.  On your property report, you listed -- in Government's

20 Exhibit 47 --

21          MR. JACKSON:  May I show that, your Honor?

22          THE COURT:  You may.

23 Q    You listed one suspect up there, David Jordan --

24          COURTROOM DEPUTY:  And, Mr. Jackson, you can focus

25 that by using that wheel.  There we go.

Charles G. Whitehead - Cross

1  Q    You listed David Jordan as the only property -- person to

2  have this property?  This is on your property report?

3  A    His name is on there, correct.

4  Q    And my name is not on there; isn't that true?

5  A    That's correct.

6  Q    Okay.  Another question I want to ask you, sir.  When

7  property is confiscated off a person, say, for instance, on

8  November 23rd, is that listed as property on that same day or

9  that property could be held -- that evidence could be held and

10 listed for another day?

11 A    I don't understand what you're asking.

12 Q    If evidence is collected on the 23rd, is it listed to be

13 put in property on the 23rd, or is it listed as being property

14 after the 23rd?

15 A    It depends on when it's entered.

16 Q    Okay.  But it's never listed on the day that the property

17 is confiscated?

18 A    The recovery date would be the day that it's recovered.

19 Q    And you entered almost all this evidence into the property

20 office at the Rutland City Police Department; isn't that true?

21 A    That's correct.

22 Q    All right.  At my arrest at the vehicle, they took a glass

23 pipe, a dollar bill, and a smoking device with residue out of

24 my pocket on December 23rd -- I mean on November 23rd, 2021.

25 Why is it listed on your property report that it came out of

Charles G. Whitehead - Cross

1 the vehicle?

2 A    I would have to review the property report.

3 Q    Would you like to see it?  I have it right here.

4 A    Yes, please.

5         MR. JACKSON:  Is that okay, your Honor?

6         THE COURT:  Yes.  So let's have it -- it's probably

7 been previously marked?

8         MR. OPHARDT:  It is, your Honor, and it's in the

9 binders.

10        THE COURT:  It's not 47, though?  It's something else?

11        MR. OPHARDT:  It is 47.

12        THE COURT:  It is 47.  So we have 47 admitted into

13 evidence.

14    And, Mr. Jackson, just direct the witness to what portion

15 of the form you want him to see, and if you want to put it on

16 the ELMO, that's fine as well.

17        MR. JACKSON:  I believe it's 43 -- 43, 44, and --

18 Q    Do you see item number 32 on there, sir?  It says

19 "suspected crack cocaine" in the property report?

20 A    Yes, I do.

21 Q    And that was evidence that came out of my pocket.  Why is

22 it listed as "Lawrence's Vehicle"?

23 A    It was seized as part of the vehicle stop.

24 Q    But I was taken outside the vehicle; isn't that true, sir?

25 A    That I don't know.  I wasn't there.

Charles G. Whitehead - Redirect

1  Q     Item number 44 --

2           THE COURT:  Make sure -- it's hard to do.  Make sure

3  you're both close to the mic.  So you're pretty far from it

4  right now.  Right.

5  Q     Item number 33, there was crack cocaine that came out of

6  my pocket and is listed as "Lawrence's Vehicle"?

7  A     Correct.  It says "crack cocaine," "Lawrence Vehicle."

8  Q     So how could this stuff be in the vehicle if it's not,

9  it's in my pocket?

10 A     Again, it was from the traffic stop.

11 Q     Item number 44, and that's the same answer, sir?

12 A     Yes, sir.

13          MR. JACKSON:  I have no more questions, your Honor.

14          THE COURT:  All right.  Any redirect?

15          MR. OPHARDT:  Briefly, your Honor.  I can do it from

16 here.

17          THE COURT:  It's either at counsel desk or at the

18 podium, one or the other.

19          MR. OPHARDT:  Thank you, your Honor.

20                      REDIRECT EXAMINATION

21 BY MR. OPHARDT:

22 Q     Commander Whitehead, I'd ask -- like to ask a couple

23 questions about these items 32 through 35 and 44 that you were

24 just referring to.  So Bates 894 of the property report, which

25 is Exhibit 47.  Who does it say collected that evidence?

Charles G. Whitehead - Redirect

1  A     Would have been Detective Lucia.

2  Q     On your direct examination, you referred to some evidence

3  you logged which was brought to you at BCI while you were

4  processing the evidence from the Killington search.  Do you

5  recall that testimony?

6  A     Correct.

7  Q     Would these items be ones that you were referring to?

8  A     Yes.

9  Q     Were you present at the vehicle search?

10 A     I was not.

11 Q     Were you present at the arrest of Mr. Jackson?

12 A     I was not.

13 Q     So your data input on this property report, what were you

14 relying on?

15 A     Detective Lucia.

16 Q     And what he told you?

17 A     Correct.

18 Q     I'll note the collection date that's listed is 11/24/2021.

19 Do you recall how long the evidence process took at Rutland

20 City as far as about what time you left?

21         THE COURT:  So let's have a specificity as to which --

22 we're talking about the Killington search?

23         MR. OPHARDT:  I will rephrase, your Honor.

24         THE COURT:  Okay.

25         MR. OPHARDT:  Thank you.

Charles G. Whitehead - Recross

1  Q    While you were processing evidence at BCI the night of the

2  23rd, did it become the 24th?

3  A    It did.

4  Q    What do you know about the search of the vehicle based

5  upon the court records you've reviewed?

6  A    I guess I don't understand what you're asking.

7  Q    Do you know when a warrant was obtained for that vehicle?

8  A    I don't recall the specific time.

9  Q    While you were processing evidence, did it stretch past

10 midnight?

11 A    Yes.

12 Q    So the 23rd became the 24th?

13 A    Correct.

14      MR. OPHARDT:  No further questions, your Honor.

15      THE COURT:  Any recross?

16      MR. JACKSON:  Yes, ma'am.

17                    RECROSS-EXAMINATION

18 BY MR. JACKSON:

19 Q    Commander, at the time of the search of the 55 Killington

20 Avenue, you all also found a black bag.  It's listed as Bates

21 number 99.22.

22      MR. OPHARDT:  Your Honor, I object.  This is outside

23 the scope of redirect.

24      THE COURT:  This is outside the scope.  However, you

25 did ask about the search, so I'm going to give Mr. Jackson some

Charles G. Whitehead - Recross

1  latitude.

2  Q    You observed a black bag inside --

3  A    Which black bag?

4  Q    -- inside 55 Killington Avenue?

5  A    Which one?

6  Q    That one, sir.  Sitting by the TV?

7  A    Yes.

8  Q    And did that black bag contain drugs in it?

9  A    I believe so.  Suspected drugs.

10 Q    At any time could I have possessed that black bag?  Was

11 that black bag belong to me?

12 A    I do not know.

13 Q    There was nobody else charged with that black bag?

14 A    I do not know that.

15        THE COURT:  So the black bag, can you give me the

16 Bates number for the record?

17        MR. JACKSON:  The Bates number is 99.22.

18        THE COURT:  And this is part of Exhibit 10?

19        MR. JACKSON:  Yes, your Honor.

20        THE COURT:  Thank you.

21 Q    And 99.24.  This bag was found at the search with drugs in

22 it; is that correct, sir?

23 A    Correct.

24 Q    And I was not at the apartment?

25 A    Correct.

Charles G. Whitehead - Recross

1  Q    So there's no way possible I could have possession of that

2  bag?

3  A    I can't testify to that.

4  Q    You searched the house.  Was I there --

5  A    No.

6  Q    -- yes or no?

7       So is there any way I could have possession of that bag?

8  A    At that time, no.

9  Q    Is there any way possible I could have possessed any drugs

10 that was in that bag?

11 A    At the time, no.

12 Q    I wanted to direct your attention to a question

13 Mr. Ophardt just asked you, sir.

14       MR. JACKSON:  I'll leave that for another time.  I'm

15 done, your Honor.

16       THE COURT:  All right.  Any redirect?

17       MR. OPHARDT:  No, your Honor.

18       THE COURT:  Thank you, sir.  You may step down.

19    (The witness was excused.)

20       THE COURT:  The Government may call its next witness.

21       MR. OPHARDT:  Your Honor, the United States calls

22 Chris Roy to the stand.

23       COURTROOM DEPUTY:  Mr. Roy, you can step right up

24 front.  Please raise your right hand.  State your full name for

25 the record.

Christopher F. Roy - Direct

1    THE WITNESS:  Christopher Roy.

2                    CHRISTOPHER F. ROY,

3    having been first duly sworn by the courtroom deputy,

4            was examined and testified as follows:

5    THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7  BY MR. OPHARDT:

8  Q    Good morning.

9  A    Good morning.

10 Q    Mr. Roy, where are you currently employed generally?

11 A    I'm employed by GE Aviation.

12 Q    How long have you had that job?

13 A    Two weeks.

14 Q    Okay.  Well, congratulations on the change of employment.

15 A    Thank you.

16 Q    Where were you previously?

17 A    Previously I was with the Killington Police Department,

18 and prior to that I was with the Bennington County Sheriff's

19 Department.

20 Q    How long were you with the Bennington County Sheriff?

21 A    From approximately 2008 to 2022.

22 Q    What caused your change of employment?

23 A    My recent one?

24 Q    Yes.

25 A    I just decided to try something different.

Christopher F. Roy - Direct

1  Q    Fair enough.

2  A    Yeah.

3  Q    So back in November of 2021, where were you assigned?

4  A    I was assigned to the Vermont Drug Task Force.

5  Q    And how long did you work with the Vermont Drug Task

6  Force?

7  A    From -- for approximately a little over ten years.

8  Q    As part of that, did you function as a detective?

9  A    I did.

10  Q    What were your types of roles with the Vermont Drug Task

11  Force?

12  A    We had various roles:  investigating drug crimes, doing

13  controlled buys, and executing search warrants, and a long list

14  of things that we did.

15  Q    As part of that work, did you assist with the execution of

16  a search warrant in November of 2021 at 55 Killington Avenue,

17  Apartment 2, in Rutland?

18  A    Yes.

19  Q    After the residence was secured, what role did you play

20  during that search?

21  A    I assisted with evidence collection.

22  Q    While you're assisting with evidence collection, who are

23  you primarily assisting?

24  A    Commander Charles Whitehead.

25  Q    Was he commander at the time?

Christopher F. Roy - Direct

1  A    He wasn't.  He was in another role in BCI.

2  Q    Okay.  As you're assisting then Detective Sergeant

3  Whitehead, what did you do as part of your role as evidence

4  collector?

5  A    So I would essentially be with Commander Whitehead.  He

6  would take photographs of evidence that was found, and I would

7  collect evidence, put it in bags, and then we'd move on to the

8  next item.

9  Q    While you were collecting evidence and putting it in bags,

10 would you do any type of documentation?

11 A    Yes.

12 Q    What was that?

13 A    Just like an evidence inventory sheet where you would

14 document the time they found the item, the location where it

15 was found, who located the item, and I would write it down on

16 the evidence inventory sheet and the description of the item.

17 Q    How would you and Detective Sergeant Whitehead end up at a

18 particular location where evidence was to be photographed and

19 collected?  Just how did that work?

20 A    Usually one of the searchers would notify us that they

21 found something that was on the list to be seized and we would

22 go over there and Commander Whitehead would photograph it and

23 then I would document it, and then I would bag up the evidence.

24 Q    Did you do this for all of the items during that search of

25 55 Killington Avenue, Apartment 2?

Christopher F. Roy - Direct

1  A    Yes.

2  Q    After they had been bagged and you'd created the

3  inventory, what did you do next?

4  A    Transported the items back to the Rutland City Police

5  Department, where we finished processing the evidence items,

6  and Commander Whitehead entered the items into their computer

7  system, their evidence computer system.

8  Q    What was your role during this process while Commander

9  Whitehead was processing the evidence?

10  A    I was just assisting him.  I believe at one point I was

11  reading items off of the sheet so he could enter them into the

12  computer and assisting with whatever he needed during that

13  process.

14  Q    After you were -- after you'd all completed logging things

15  into the system, was anything left out in BCI?

16  A    No.

17  Q    Where were things put after they'd been logged into the

18  system?

19  A    There's evidence lockers at the Rutland City Police

20  Department.

21  Q    And that's where the items were placed?

22  A    Yes.

23  Q    You said you made a written inventory.  That was

24  handwritten while you were there at the scene?

25  A    That's correct.

Christopher F. Roy - Direct

1  Q    Real time?

2  A    Yes.

3  Q    Did you have an opportunity to compare that to the

4  official property report?  I can put it up on the screen,

5  because it's in evidence.  This is Government's Exhibit 47.  Do

6  you recognize this document?

7  A    Yes, I do.

8  Q    Did you have an opportunity to compare your own

9  handwritten notations with Exhibit 47?

10  A    Yes.

11  Q    Was the numbering the same as far as item number between

12  the two?

13  A    Yes.  Item numbers - I believe it was 1 through 30 - are

14  the same as the items -- item numbers on my handwritten

15  inventory list.

16  Q    And so this property report prints out in a kind of funny

17  way, jumping from 1 to 10.  It seems to favor the first digit

18  in its ordering; is that fair to say?

19  A    Yes.

20  Q    Okay.  So looking to Bates 893, item number 30, those were

21  the items that --

22          THE COURT:  So make sure it's not a leading question.

23          MR. OPHARDT:  Yes, your Honor.

24  Q    When it runs through item number 30, what is your

25  recollection of this as compared to your handwritten inventory?

Christopher F. Roy - Cross

1  A    As far as the item numbers go?  They're consistent with

2  items in my handwritten inventory list.

3  Q    When you were doing your comparison, what, if anything,

4  were you looking to be sure was consistent?

5  A    The item number, the description of the item, and as well

6  as the location of the item.

7  Q    Any discrepancies that you noted during your review?

8  A    I don't think it was word for word, but I didn't --

9  generally I didn't notice any discrepancies comparing the two

10 of them.

11 Q    How long did the processing of evidence take with you and

12 Commander Whitehead?

13 A    I don't remember the exact time period.

14 Q    If you had to approximate, would it be minutes, hours,

15 days?

16 A    Probably hours.

17        MR. OPHARDT:  Thank you, your Honor.  No further

18 questions.

19        THE COURT:  Any cross-examination?

20        MR. JACKSON:  Yes.

21                      CROSS-EXAMINATION

22 BY MR. JACKSON:

23 Q    Good morning, sir.

24 A    Good morning.

25 Q    You were there at the search of 55 Killington Avenue the

Christopher F. Roy - Cross

1  day of November 23rd, not 21st.  Mr. Ophardt made a mistake.

2  The 23rd.  You were there, right?

3  A    The 23rd.

4  Q    You were there at the search?

5  A    Yes, I was there at the search.

6  Q    The search of 55 Killington Avenue?

7  A    Yes.

8  Q    And at that time, sir, I was not at the apartment, was I?

9  A    You were not where?

10 Q    At that apartment.

11 A    No.  I don't recall you being --

12 Q    There were five subjects in that apartment, right, sir?

13      And how long --

14          THE COURT:  So you have to answer "yes" or "no."  You

15 can't nod.

16          THE WITNESS:  Oh, okay.  Sorry, your Honor.

17          THE COURT:  So the question was:  "There were five

18 subjects in that apartment, right, sir?"

19          THE WITNESS:  Okay.

20 A    I don't recall exactly how many subjects were in the

21 apartment, but I did not see you there.

22 Q    Okay.  And, sir, you said you was a police officer for how

23 long?

24 A    I started with the Bennington County Sheriff's Department

25 in March of 2008.

Christopher F. Roy - Cross

1  Q    2008.  So a long career.

2  A    Yes.

3  Q    You've been involved in plenty of executions of search

4  warrants in homes --

5  A    Yes.

6  Q    -- I'm sure, right?

7  A    Yes.

8  Q    And during the course of that time, based on your training

9  and experience, sir, how many times have you been in an

10 apartment where you've just seen guns on the floor during the

11 course of an entrance where people are in the apartments, it's

12 a melee, so people just throw stuff around so it's in plain

13 view?

14 A    So what's your question?  I'm sorry.

15 Q    My question is:  How many times have you seen that

16 throughout your career?

17 A    Many.

18 Q    Many times.  And from your training and experience, sir,

19 is it possible for me at any time, Lawrence Jackson, to have

20 possession of any one of them weapons that was in 55 Killington

21 Avenue the day that you all raided it, sir?

22 A    Is it possible that --

23 Q    Did I have any possession of the weapons that were found

24 in plain view on the floor at 55 Killington Avenue on November

25 23rd?

Christopher F. Roy - Cross

1  A    I didn't see you there, so no.

2  Q    So there's no way I could have had possession of no

3  weapons?

4  A    At that time?

5  Q    Right.  At that time.

6  A    Of the execution of the search warrant?

7  Q    Right.  And by being them guns was found on the floor in

8  plain view, it's obvious that one of the -- or whoever of the

9  subjects inside that apartment had control and possession of

10 them weapons?

11 A    Yeah.  I don't know who had possession of the weapons, but

12 they --

13 Q    Somebody had them?

14 A    They were located in the residence.

15        THE COURT:  So one thing that is happening, because

16 I'm watching the transcript being produced, you are both

17 jumping in on each other's answers and not completing it.  So

18 just take a pause and make sure the question is completely out,

19 even if you know the answer, and make sure the answer is

20 completely out even if you feel like the answer is complete.

21 Let the witness complete it.  Let the questioner complete it.

22        MR. JACKSON:  Yes, your Honor.

23        THE WITNESS:  Yes, your Honor.

24 Q    Sorry about that, Mr. Roy.  Again, based on your

25 experience, there's no way that I could have had possession of

Christopher F. Roy - Cross

1  any one of them weapons?

2  A     With you not being there, no.

3  Q     Right.  But from your training and experience and where

4  the guns were found, it's obvious that somebody else had

5  possession of the weapons?

6  A     I don't know if anybody had possession of the weapons at

7  that time.

8  Q     They were on the floor in plain view.

9  A     Um-hum.

10        THE COURT:  Is that a "yes"?

11  Q     So they were on the floor --

12        THE COURT:  So stop.  Stop.  This is actually -- the

13  record is important.  "Um-hum" means yes, means no, means we

14  don't know.  So you nodded your head.  So I say -- the question

15  was:  "They were on the floor in plain view?"  You said,

16  "Uh-huh."  I said, "Is that a 'yes'?"

17        Go ahead and tell us.

18  A     So I don't recall if all of the weapons were in plain

19  view.

20        MR. JACKSON:  One second, your Honor.  Again, I would

21  like to refer to Government's Bates 97.58.  Is that okay?

22        THE COURT:  Yes.  This is part of Exhibit 10?

23        MR. JACKSON:  Yes.

24        THE COURT:  Thank you.

25  Q     That's a gun on the floor inside 55 Killington Avenue.  Do

Christopher F. Roy - Cross

1  you remember that, sir?

2  A    Yes.

3  Q    Just on the floor, right before you breached the

4  apartment?

5  A    That's when we got called over to collect evidence.

6  Q    So that's not normal for people to have guns on the floor

7  in their house.  Any normal house, would you see a gun on the

8  floor at any particular time like that?

9  A    I would say that's not normal, no.

10  Q   So it's obvious somebody had possession of the weapon

11  based on your training as a police officer and being a part of

12  many executions of search warrants in the past?

13  A   Somebody in the residence could have had possession of

14  that weapon.

15  Q   Can you give me a definite answer?

16  A   I --

17  Q   Not "could have."

18  A   They could --

19  Q   Did somebody have possession of them weapons the day that

20  you all entered 55 Killington Avenue?  Based on your

21  experience, were the guns just placed there on the floor by the

22  bed?

23        MR. OPHARDT:  Your Honor, asked and answered.

24        THE COURT:  It is asked and answered, but we'll have

25  the question pending answered and then we'll move to a new one.

Christopher F. Roy - Cross

1    "Did somebody have possession of the weapons the day that
2  you entered 55 Killington Avenue?  Based on your experience,
3  were the guns just placed there on the floor by the bed?"
4  A    Somebody in the residence could have had possession of one
5  of those weapons.
6  Q    I would like to show you another picture, sir.  This is
7  Government Bates 97.57.  This is a better picture.  That's
8  where the gun was located when you all entered the apartment,
9  sir?
10  A    I believe so.
11  Q    So can we -- from your training and experience, can we not
12  speculate if somebody had possession?  Can you give me a direct
13  answer?  Did somebody -- one of them subjects at 55 Killington
14  Avenue have possession of that weapon that's sitting beside the
15  bed?
16        MR. OPHARDT:  Your Honor, objection.  Asked and
17  answered.  Also calls for speculation.
18        THE COURT:  We don't have the witness speculate about
19  what the evidence may be.  Possession is going to be a legal
20  concept that the Court is going to explain to the jurors at the
21  end of the case, and so that may be why the answer is -- is
22  less direct than you want.  So let's move to a different
23  question, because this has been asked and answered.
24        MR. JACKSON:  Yes, ma'am.
25  Q    Detective Roy, I'm going to show you a picture of

Christopher F. Roy - Cross

1  Government's Bates number 97.78.  It's a picture of a couch

2  inside 55 Killington Avenue.  Do you see what's in the corner

3  there, sir?

4  A     Yes.

5  Q     It appears to be drugs, right?

6  A     It appears to be a baggy with white substance in it.

7  Q     Is there any way possible that I could have put them drugs

8  there without being in that apartment?

9  A     Well, that's where we found the drugs.  I -- and you were

10  not in the apartment, if that's what you're asking.

11  Q     Right.  So it's impossible for me to put that there?

12  A     I would say, yeah, unless you put it there prior to,

13  but --

14  Q     I would like to show you a picture of Government Exhibit

15  99.22.  It's a picture of a black bag.  Do you recall that

16  black bag, sir?  Do you recall that black bag being in the

17  apartment, sir?

18  A     I don't specifically remember that bag.

19  Q     I'd like to present another picture, 99.016.  That's the

20  same black bag, but now it's on the TV stand.  That's a better

21  picture.  Does that refresh your memory a little bit, sir?

22  A     I don't recall that bag.  That was a long time ago.

23  Q     Okay.  Fair enough.  I'm going to show you another

24  picture, sir, the same black bag, 99.024.  It's the same black

25  bag.  Do you recall taking that picture with Commander

Christopher F. Roy - Cross

1  Whitehead, sir?

2  A    I did not take that picture.

3  Q    Okay.

4  A    Commander Whitehead did.

5  Q    Do you recall seeing drugs in that black bag?

6  A    I specifically don't remember.

7  Q    Okay.  So based on your training and experience and since

8  I wasn't in that apartment, I had no possession of the drugs

9  that was left in that apartment?

10  A    You were not in that apartment when I was there, correct.

11  Q    Right.  So there's no way I could have had possession of

12  that black bag with the drugs located in it?

13  A    Correct.

14  Q    Thank you, sir.

15  A    You're welcome.

16        MR. JACKSON:  No other questions, your Honor.

17        THE COURT:  Any redirect?

18        MR. OPHARDT:  No, your Honor.  Thank you.

19        THE COURT:  Thank you, sir.  You may step down.

20        THE WITNESS:  Thank you.

21      (The witness was excused.)

22        THE COURT:  The Government may call its next witness.

23        MS. CATE:  The Government calls Danielle Currier.

24        COURTROOM DEPUTY:  Good morning.  You can step right

25  in front of me.  Just behind this table right here.  Please

Danielle Currier - Direct

1  raise your right hand.  State your full name for the record.

2       THE WITNESS:  Danielle Currier.

3                     DANIELLE CURRIER,

4       having been first duly sworn by the courtroom deputy,

5              was examined and testified as follows:

6       THE WITNESS:  I do.

7                     DIRECT EXAMINATION

8  BY MS. CATE:

9  Q    Good morning.

10 A    Good morning.

11 Q    Can you please state your name for the jurors.

12 A    Danielle Currier.

13 Q    Where did you grow up, Ms. Currier?

14 A    Granville, New York.

15 Q    How long did you live in Granville, New York?

16 A    Twenty-three years.

17 Q    Where did you go after Granville, New York?

18 A    Aiken, South Carolina.

19 Q    Where do you live now?

20 A    Aiken, South Carolina.

21 Q    How old are you?

22 A    Thirty.

23 Q    What is your level of education?

24 A    I just got my GED.

25 Q    And what have you done for work throughout your life?

Danielle Currier - Direct

1  A    I was a housekeeper for most of it, and then when I moved
2  to South Carolina, I got my own business.
3  Q    I want to direct your attention to November 23rd of 2021.
4  Were you in a car that was stopped by law enforcement that
5  night?
6  A    Yes.
7  Q    What town was that in?
8  A    Rutland, Vermont.
9  Q    Why were you in Rutland, Vermont, in November of 2021?
10 A    I was there because I gave birth to my -- well, fourth
11 child, so I was there visiting.
12 Q    Explain that a little bit more.
13 A    Okay.
14 Q    Where were you living at the time?
15 A    I was living in South Carolina, but I came down to -- to
16 New York to give, you know, birth to my child and then was
17 going back to South Carolina.
18 Q    And when was your child born?
19 A    November 8th.
20 Q    And in the time after November 8th, where were you?
21 A    After November 8th?  Until about the end of November, I
22 was in Rutland, Vermont, and then went back to South Carolina.
23 I want to say the 26th of November.
24 Q    And when you were in the car that was stopped, who else
25 was in the car with you?

Danielle Currier - Direct

1  A    Brianna and Beamer.

2         THE COURT:  So "when were you in the car that was

3  stopped" assumes facts not in evidence.  I don't believe we had

4  any testimony about -- we were on the birth of the child.

5         MS. CATE:  I believe she had testified that on

6  November 23rd she was in a car that was stopped.

7         THE WITNESS:  Yes.

8         MS. CATE:  And that it was in Rutland.

9         THE COURT:  Oh, okay.  Thank you.

10  Q    And you had testified that a person named Brianna was in

11  the car and a person named Beamer?

12  A    Um-hum.  Yes.

13  Q    How would you spell Beamer?

14  A    B-E-E-M-E-R.

15  Q    And did you know Beamer by any other names?

16  A    I usually only know him by that, but he's been called

17  Boo-Bee before.

18  Q    You said Boo-Bee?

19  A    Um-hum.

20  Q    And when had you first met the person you knew as Beamer?

21  A    At the end of December in 2020.

22  Q    How did you meet him?

23  A    Through a mutual friend.

24  Q    And what was the purpose of the mutual friend introducing

25  you to Beamer?

Danielle Currier - Direct

1  A    I used to be a user, and she introduced me to him to get

2  the drug of choice I used.

3  Q    When you say a "user" --

4  A    Crack.

5  Q    -- what were you using?

6  A    Crack.

7  Q    And so this friend introduced you to Beamer?

8  A    Yes.

9  Q    So that you could get crack?

10  A    Yes.

11  Q    And where did that meeting take place?  What town?

12  A    Rutland, Vermont.

13  Q    And that was, you said, in December of 2020?

14  A    The end of December, yes.

15  Q    And how long did you stay in Rutland after that?

16  A    From the end of December to about the end of February

17  of -- it would be '21.

18  Q    Where did you go at the end of February of 2021?

19  A    Back -- back to South Carolina.

20  Q    So focusing on the time from December of 2020 until the

21  end of February 2021, how often did you interact with Beamer?

22  A    Often.  I want to say a few times a week.

23  Q    And where did those interactions take place?

24  A    Usually in Rutland, Vermont.

25  Q    Specific places in Rutland?

Danielle Currier - Direct

1  A    Usually at a hotel right across from the mall that's in

2  Rutland.  I don't recall the name of the hotel, but it's

3  directly across from the mall.

4  Q    Any other locations that you interacted with Beamer at?

5  A    They were just, you know -- it would be at -- I met him at

6  his apartment a few times and just behind usually, you know,

7  little places.  I mean, just random stops in, you know,

8  Rutland.

9  Q    Do you recall the street that his apartment was on?

10  A    Killington Avenue.

11  Q    Do you see the person you knew as Beamer in the courtroom

12  today?

13  A    I do.

14  Q    And can you describe where he's sitting and what he's

15  wearing?

16  A    Right behind you in a black coat and white shirt.

17        MS. CATE:  May the record reflect that the witness has

18  identified the defendant.

19        THE COURT:  The record so reflects.

20  Q    What was the purpose of the interactions that you had with

21  Beamer when you were seeing him several times a week between

22  December of 2020 and February of 2021?

23  A    To buy crack.

24  Q    I'm going to just say your voice sometimes dips.

25  A    Okay.  Sorry.

Danielle Currier - Direct

1 Q    Which is tricky for the court reporter and also for the
2 jurors.
3 A    Okay.
4 Q    So can you repeat that answer?
5 A    It was to buy crack from . . .
6         THE COURT:  From?
7         THE WITNESS:  From Beamer.
8 Q    Thank you.  Was it always Beamer that you bought crack
9 from, or were there other people also?
10 A    I met -- he had other people.  He sent other people
11 sometimes that I would meet.
12 Q    Do you recall their names?
13 A    Mike.  I know Mike and his girlfriend, Brittany.
14 Q    What, if anything, did you see Beamer have in his
15 waistband when you interacted with him?
16 A    He always had a gun.  A weapon/gun, gun/weapon.
17 Q    Where on his waistband was it?
18 A    It was usually in the front.
19 Q    And what did that gun look like?
20 A    It was chrome and black.
21 Q    I want to turn back to November 23rd of 2021.
22 A    Okay.
23 Q    You had testified that you were in Rutland and you were in
24 a vehicle that was stopped.
25 A    Yes.

Danielle Currier - Direct

1 Q    That Beamer and Brianna were in the vehicle.  Why were you

2 with Beamer that night?

3 A    We -- I was -- he saw me in Rutland a few nights prior, so

4 we were just hanging out, and he was going to give me a ride

5 back to where I was staying in Rutland.

6 Q    And how did you -- where did you encounter him on November

7 23rd?

8 A    I don't recall where exactly, but he -- I had him pick me

9 up because I was walking, and I met him, and then we went to a

10 house that was right up the road from where I was staying.

11 Q    And after he brought you to that house, where did you go

12 next?

13 A    We ended up back in the car, and then it got pulled over.

14 Q    Okay.  So let's talk about the time at that house.

15 Approximately how long were you at the house, if you remember?

16 A    An hour.

17 Q    And what, if anything, did Beamer have with him when you

18 were at the house?

19 A    Just his bag of drugs.

20 Q    And what did that bag look like?

21 A    It was small and blue and zipped up.

22 Q    And how did you know there were drugs in the bag?

23 A    Because I saw them in there.

24 Q    How would you describe the amount of drugs in the bag?

25 A    It was different baggies inside of the -- it was like a

Danielle Currier - Direct

1  lunch box-looking bag.  There was all these different baggies

2  inside of it.

3  Q    And would you have characterized that as a lot of drugs or

4  a little bit of drugs?

5  A    I would say a lot.

6  Q    And how did you know that the items in the bag were drugs?

7  A    Because they were being smoked and stuff.  I mean, I don't

8  know.  It's just -- also, I know what crack is.  I used to use

9  it, so --

10 Q    Did you use it on November 23rd?

11 A    No.

12 Q    Had you seen that blue bag before, or was that the first

13 time that you saw the blue bag?

14 A    Every time I've ever met up with him, he had that bag.

15 Q    And you testified you were at that house for around --

16 A    About an hour.

17 Q    An hour.

18 A    Yeah.

19 Q    And then why did you leave the house?

20 A    Somebody came to the house and said that we weren't

21 allowed to be there and that if we didn't leave they were going

22 to call law enforcement, so we left.

23 Q    And who were the people who left the house?

24 A    Me, Brianna, and Beamer.

25 Q    And when you left, you all left in a vehicle?

Danielle Currier - Direct

1  A    Yes.

2  Q    And what's your recollection of what the vehicle looked

3  like?

4  A    I know it was, like, a small SUV-looking thing and it was

5  blue and four doors.

6  Q    And where did you and Beamer and Brianna sit in the

7  vehicle?

8  A    I was in the back behind the passenger, Brianna was in the

9  passenger, and Beamer was driving.

10 Q    So Brianna was in the front passenger?

11 A    Yes.  And I was directly behind her.

12 Q    And where -- where was that blue bag when you all left the

13 house?

14 A    In between the passenger in the front seat, like in the

15 middle console.

16 Q    And blue lights came on because the car was getting pulled

17 over?

18 A    Yes.

19 Q    Where were you headed when you left the house, by the way?

20 A    He was supposed to be bringing me back to where I was

21 staying, but he drove past his apartment, and he was going

22 really slow for some reason past it, and we saw all the cops

23 outside of there, and then not even a block later we got pulled

24 over.

25 Q    And when the blue lights came on, what happened with that

Danielle Currier - Direct

1 blue bag?

2 A    He asked Brianna to put it -- or hide it, and she put it

3 under the passenger seat.

4 Q    Now, you testified that you had been a crack user in your

5 life?

6 A    Yes.

7 Q    Had you also used other drugs in your life?

8 A    I -- yes, I have.

9 Q    What type?

10 A    Opiates.

11 Q    And in the period from December of 2020 to February of

12 2021, what drug or drugs were you using?

13 A    Crack.  Just crack.

14 Q    And approximately how much crack were you using per day at

15 that point?

16 A    I want to say at least -- it was a lot by that time.  It

17 was about two grams a day.

18 Q    And how did you ingest the crack?

19 A    I would smoke it.

20 Q    And approximately how much would it cost to get two grams

21 of crack?

22 A    Anywhere between 20 and $80.  It all depends on what I

23 would get.

24 Q    And you have a criminal history?

25 A    I do.

Danielle Currier - Direct

1  Q    And that involves some drug convictions?

2  A    Back in -- yes.  Back in 2014, I have a possession charge.

3  Q    And other criminal convictions?  What other criminal

4  convictions do you have?

5  A    When I was living in New York, I have a menacing charge

6  and a couple petty larcenies; and then down in South Carolina,

7  I have a petty larceny and a disorderly conduct.

8  Q    How did you come to be here testifying today?

9  A    Got subpoenaed.

10 Q    So from your perspective, was it voluntary or was it

11 required?

12 A    Required.

13 Q    And in the -- in the time since you were served with the

14 subpoena until now, has it always been easy for law enforcement

15 to interact with you, or has there been times when it's been

16 hard to track you down or find you?

17 A    It was hard to find me a couple times.

18 Q    And you didn't want to get on a plane to come up here?

19 A    Correct.

20 Q    Why is that?

21 A    I have some personal matters going on at the same time

22 that I thought were more important than coming here.

23 Q    And what agency do those personal matters involve?

24 A    Department of Social Services, so to do with my children.

25 Q    And what have the HSI agents told you that they would do

Danielle Currier - Direct

1  to -- with respect to those issues with DSS?

2  A    That they would just make them a phone call and let them

3  know that I had no choice, I had to be here, that I wasn't, you

4  know, skipping out on Social Services down in South Carolina.

5  Q    I'd like to have you look at the binder -- there are two

6  binders in front of you, and one of them should have a tab

7  that's Exhibit 20.  So if you could take a peek inside.

8  Open --

9  A    This one?

10  Q    It's the smaller one.  It should be the one right in front

11  of you.  So you can flip that right open.

12  A    Okay.

13  Q    And there should be a tab that says 20.

14  A    Okay.  Got it.

15  Q    And within 20, there are some black numbers on the bottom

16  right.  I'd like you to flip to the page that says at the

17  bottom 98.16.

18  A    Okay.

19  Q    Now, do you recognize -- this is a photograph, right?

20  A    Yes.

21  Q    And do you recognize the item in that photograph?

22  A    Yes.  This is the blue lunch box bag that he always had.

23  Q    And I'd like you to turn to 98.27.

24  A    Okay.  It's another picture, and that was what was inside

25  of the blue bag.

Danielle Currier - Direct

1  Q    Okay.  So you recognize that --

2  A    Yes.

3  Q    -- as items from November 23rd?

4  A    Yes.

5  Q    And finally, 98.31.

6          THE COURT:  So let's make sure she's just saying,

7  "It's a photograph.  There's an item in it," and then you can

8  offer it and she can testify to the contents.

9          MS. CATE:  Okay.  It's part of a larger exhibit, but

10  we could offer those few pages?

11          THE COURT:  Yes.  However you want to do it.  But she

12  should not testify to the contents of something that hasn't

13  been admitted.

14          MS. CATE:  Yes, your Honor.

15  Q    So looking at 98.31, do you recognize the items in that

16  photograph?

17  A    Yes.

18  Q    And without saying what they are, how do you recognize

19  them?

20  A    I mean, because I physically saw them in the vehicle in

21  that bag.

22          MS. CATE:  I will actually leave that alone for now.

23      Can I have Exhibit 33 brought up to the witness, please.

24          COURTROOM DEPUTY:  That's -- hold on one second.  That

25  is not in.

Danielle Currier - Direct

1      MS. CATE:  It is not in.

2      COURTROOM DEPUTY:  No.  33.  Correct?

3      MS. CATE:  Yes.

4      THE COURT:  That's fine.  She can still see it, yes.

5      MS. CATE:  I agree.

6      COURTROOM DEPUTY:  Sorry about that.

7      MS. CATE:  That's okay.

8  Q    So, Ms. Currier, take a moment and look at the item.  Look

9  at what's in your hand, and you can flip it over and look at

10 both sides.

11 A    Okay.  Okay.

12 Q    Do you recognize the item that you're holding?

13 A    Yes.

14 Q    How do you recognize it?

15 A    It was in the vehicle.

16 Q    And are all of the items in your hand in the vehicle, or

17 are there items that were not in the vehicle that you recall

18 from that night?

19 A    I recall them all being in the vehicle.

20 Q    What about the exterior packaging?

21 A    That was not.

22 Q    Aside from that exterior packaging, are the items in your

23 hand in substantially the same condition they were that night

24 in the vehicle?

25 A    Yes.

Danielle Currier - Direct

1          MS. CATE:  The Government moves to admit item 33.

2          THE COURT:  Any objection?

3          MR. JACKSON:  No objections, your Honor.

4          THE COURT:  33 is admitted.

5      (Government's Exhibit 33 was received in evidence.)

6  Q    BY MS. CATE:  And, Ms. Currier, last item I'm going to

7  have you look -- you can be done with that physical item or you

8  can just set it to the side, and then if you turn in the binder

9  to 33A.

10 A    Okay.  I'm there.

11 Q    Do you recognize item 33A?

12 A    Yes.

13 Q    And what is that?

14 A    The -- right here.  This evidence right here that was

15 inside the vehicle.

16 Q    And so this -- this is a photograph --

17 A    Yes.

18 Q    -- of Exhibit 33 that's next to you?

19 A    Yes.

20         MS. CATE:  Your Honor, move to admit Exhibit 33A.

21         THE COURT:  Any objection?

22         MR. JACKSON:  No objection, your Honor.

23         THE COURT:  33A is admitted.

24     (Government's Exhibit 33A was received in evidence.)

25         MS. CATE:  Permission to publish?

Danielle Currier - Cross

1          THE COURT:  You may.

2          MS. CATE:  No further questions.  Thank you.

3          THE WITNESS:  What do I do?  Oh.

4          THE COURT:  Mr. Jackson, any cross-examination?

5          MR. JACKSON:  Yes, ma'am.

6                        CROSS-EXAMINATION

7   BY MR. JACKSON:

8   Q    Good morning, Ms. Currier.

9   A    Good morning.

10  Q    I want to refer your direction back to November 23rd, on

11  that day.  Ms. Cate just asked you where did you see me with

12  the bag.  First you said you seen it in the house; isn't that

13  true?

14  A    Yes.

15  Q    You just said you just seen the bag inside the car, that's

16  the only place you seen it.  You just testified to that.

17  A    She asked me what -- I mean, how do I answer?  She asked

18  me what I saw you with at the house, and then she also asked me

19  what was in -- where the bag was in the vehicle, so I answered

20  both questions correctly.

21  Q    On that day, Ms. Currier, you stated to the police in the

22  sworn statement that you seen me with a bag and then I handed

23  it to Brianna Arnold and she put it underneath the passenger

24  seat.

25  A    Yes.

Danielle Currier - Cross

1  Q    Is that your sworn testimony --

2  A    Yes.

3  Q    -- in this court?

4  A    Yes.

5  Q    Detective Lucia stated that he found the bag underneath

6  the driver's seat.

7  A    Okay.

8  Q    How is that possible?

9  A    I mean, you'd have to ask Detective Lucia that.  I saw her

10 put it under the passenger seat.

11 Q    And that's your sworn statement that you seen the bag --

12 seen me --

13 A    Hand it to her.

14 Q    -- pass a bag to Brianna Arnold and Brianna Arnold put it

15 underneath the passenger seat?

16 A    Yes.

17 Q    Detective Lucia said you're lying.

18 A    Okay.

19       MS. CATE:  Objection, your Honor.

20       THE COURT:  At this point we don't have that

21 testimony, so we have to frame it as a hypothetical:  If

22 Detective Lucia testified that he found it under such and such,

23 would that be inaccurate?

24       MR. JACKSON:  Well, I have the sworn testimony from

25 Detective Lucia right here, your Honor, from the suppression

Danielle Currier - Cross

1  hearing.

2        THE COURT:  Right.  But we don't have it in evidence

3  yet, and the jury hasn't heard him testify, so you may link it

4  up afterwards, but we ask it in a hypothetical way until that

5  testimony is present in the courtroom.  So you can say, "If

6  Detective Lucia testified or provided a sworn statement, would

7  you disagree with it?"  That's how it's phrased at this point

8  in the case until we've had that testimony.

9        MR. JACKSON:  Yes, your Honor.

10 Q    So if Detective Lucia said that he found that bag

11 underneath the driver's seat, then that bag was planted

12 underneath the driver's seat, from your perception, ma'am?

13 A    I can't answer that.  I don't know how to answer that.  I

14 mean, I know that she put it under the passenger seat.

15 Q    And that's your sworn testimony?

16 A    Yes.

17 Q    But Detective Lucia said he found it underneath the

18 driver's seat.  So --

19 A    Well, then I would disagree with that.

20 Q    Excuse me?

21 A    I would disagree with that.

22 Q    Okay.  So from your -- so just by -- from that question

23 right there, you would say that bag was planted underneath the

24 driver's seat?

25 A    I --

Danielle Currier - Cross

1          MS. CATE:  Objection, your Honor.

2          THE COURT:  Sustained.

3          MS. CATE:  That was not the testimony.

4  A    What is --

5  Q    You don't know?

6          THE WITNESS:  What does "sustained" mean?

7          THE COURT:  So the objection is sustained, so you

8  don't have to ask it.

9      And there will be a new question, and you'll answer that

10 one.

11         THE WITNESS:  All right.

12 Q    You stated that you seen me -- that you bought drugs off

13 of me.

14 A    Yes.

15 Q    I only recall seeing you one time in my life, Ms. Currier,

16 so how did you buy drugs off me frequently?

17 A    Well, you're lying, because I know for a fact I bought

18 drugs off you.

19 Q    Well, the Government has my phone records.

20 A    Okay.

21 Q    You're not in it, not one time.  So how did you contact

22 me?

23 A    Whatever number you were using at the time.

24 Q    I only had one phone number, ma'am.

25 A    That's incorrect.

Adam J. Lucia - Direct

1          MR. JACKSON:  I have no more questions for this

2 witness.

3          THE COURT:  All right.  Any redirect?

4          MS. CATE:  No, your Honor.  Thank you.

5          THE COURT:  Thank you.  You may step down.

6      (The witness was excused.)

7          THE COURT:  Ms. Ruddy, would you get the evidence from

8 the witness stand and give it to the case agent.  Thank you.

9      The Government may call its next witness.

10          MS. CATE:  The Government calls Adam Lucia.

11          COURTROOM DEPUTY:  Mr. Lucia, you can step right in

12 front.  Good morning.  Please raise your right hand.  State

13 your full name for the record.

14          THE WITNESS:  Adam James Lucia.

15                    ADAM J. LUCIA,

16      having been first duly sworn by the courtroom deputy,

17              was examined and testified as follows:

18          THE WITNESS:  I do.

19                    DIRECT EXAMINATION

20 BY MS. CATE:

21 Q    Good morning.

22 A    Good morning.

23 Q    Can you please state your name for the jurors.

24 A    Yup.  Adam Lucia.

25 Q    Where do you work?

Adam J. Lucia - Direct

1  A    With the Rutland City Police Department.

2  Q    How long have you been with the Rutland City Police

3  Department?

4  A    Just over 12 years.

5  Q    Did you have any prior law enforcement experience prior to

6  being at the Rutland City Police Department?

7  A    Just military law enforcement in the Air Force.

8  Q    How long did you do that?

9  A    It was six years.

10 Q    What is your title at the Rutland City Police Department?

11 A    I'm a detective corporal.

12 Q    Do you have any other titles currently?

13 A    I do.  I'm an HSI task force officer as well.

14 Q    What does it mean to be an HSI task force officer?

15 A    It allows me to enforce federal statutes and also be the

16 affiant on federal search warrants and federal affidavits.

17         THE COURT:  So, Ms. Cate, let's have a definition of

18 affiant just for the record, please.

19 Q    What does it mean to be an affiant?

20 A    Writer.  Or author, I guess, of search warrants and

21 affidavits.

22 Q    And in addition to doing the writing, is there anything

23 else -- what else do you do with respect to the document that

24 you've written?

25 A    Investigate the -- what I'm writing.

Adam J. Lucia - Direct

1  Q    And is there also a swearing that happens?

2  A    Yes.  Swearing by a judge.

3  Q    When did you become an HSI TFO?  Or is task force officer

4  also known as TFO?

5  A    Yes.

6  Q    And when did you become an HSI TFO?

7  A    In January 2024.

8  Q    So in November of 2021, did you have any titles with

9  respect to HSI?

10  A    No.

11  Q    And in November of 2021, did any of your Rutland City

12  Police Department colleagues have HSI TFO status?

13  A    No.

14  Q    How long have you been a detective?

15  A    Since April of 2021.

16  Q    So your title in November of 2021 was what?

17  A    Detective corporal.

18  Q    And can you just explain to the jurors briefly what your

19  responsibilities are as a detective corporal.

20  A    Yup.  I'm the frontline supervisor just underneath the

21  sergeant for the other detectives that are assigned.  So when

22  the sergeant is unavailable, essentially I become in charge of

23  the unit, and we investigate all -- all felonies to include

24  violent crime and narcotics trafficking.

25  Q    Are you familiar with an investigation involving a

Adam J. Lucia - Direct

1  residence at 55 Killington Avenue, Apartment 2, in Rutland?

2  A    Yes, I am.

3  Q    What was your role in the investigation of that apartment?

4  A    I was the affiant on the search warrant for the apartment.

5  Q    So what does that mean you did?

6  A    Oh.  That means I wrote an affidavit and submitted it to

7  the Court for a search warrant for the apartment in question.

8  Q    And did the judge grant the search warrant?

9  A    Yes.

10 Q    What judge was that, if you recall?

11 A    It was Judge Helen Toor.

12 Q    And who was the suspect associated with 55 Killington

13 Avenue?

14 A    Lawrence Jackson.

15 Q    And the search warrant was executed?

16 A    Yes.

17 Q    When the search warrant was executed, what was your role?

18 A    I was part of the entry team into the residence, and my

19 role on the entry team was that of the breacher.

20 Q    What's the breacher?

21 A    So the breacher is the person in the -- what we call the

22 stack or formation going up to the residence that ultimately,

23 if a door is locked or secured, that we force entry into the

24 door or residence.  Or if it's a vehicle, if we had to force

25 our way into a vehicle, we take care of that.

Adam J. Lucia - Direct

1  Q    What, if any, steps do you take before attempting to force
2  entry?

3  A    Knock and announce our presence as police officers.

4  Q    And did that happen in this case?

5  A    It did.

6  Q    And did you have to go ahead and take on the breacher
7  role?

8  A    I did.  And attempted to get into the door, but after some
9  unsuccessful attempts, the -- one of the residents ended up
10 opening the door and we gained access to the apartment.

11 Q    Now, when you left 55 Killington Avenue, was the search
12 ongoing, or was it already done?

13 A    It was still ongoing.

14 Q    So why did you leave?

15 A    I left because Mr. Jackson wasn't located inside the
16 residence, and we were attempting to locate him at --

17 Q    What -- sorry.

18 A    No.  -- at his whereabouts.

19 Q    What, if anything, did you learn about his whereabouts?

20 A    We learned that he may be operating a red 2007 Ford
21 Freestyle SUV.

22 Q    So when you learned that information, what did law
23 enforcement do?

24 A    We were canvassing the area looking for that vehicle.

25 Q    And was that vehicle located?

Adam J. Lucia - Direct

1  A    It was.

2  Q    Where was it located?

3  A    Right around the corner on Lafayette Street from the

4  residence at Killington Avenue.

5  Q    And who located the vehicle?

6  A    I believe it was Corporal Heter and Sergeant Plemmons of

7  the Rutland City Police Department.

8  Q    Did you also arrive where the vehicle was?

9  A    Yes, I did.

10  Q    When in connection to when the vehicle was located did you

11  arrive?  Was it a long time later or short time later?

12  A    It was shortly after.

13  Q    And who, if anyone, were you with when you went to the

14  Ford Freestyle?

15  A    I was with Detective Sergeant Jason Johnson of the Vermont

16  State Police Narcotics Investigation Unit.

17  Q    And when you arrived, the vehicle was stopped?

18  A    Yes.

19  Q    And what was going on on the scene at that point?

20  A    At that point they were having Mr. Jackson step out of the

21  vehicle, and we proceeded to clear the rest of the vehicle of

22  the occupants.

23  Q    And how many occupants were in the vehicle?

24  A    There were three, and that's including Mr. Jackson.

25  Q    What were the names of the other two folks in the vehicle?

Adam J. Lucia - Direct

1  A    Brianna Arnold and Danielle Currier.

2  Q    And which part of the vehicle was Mr. Jackson in?

3  A    He was operating the vehicle.  He was the driver.

4  Q    And after the vehicle was stopped, you had arrived, you

5  said they were getting Mr. Jackson out of the vehicle, what

6  happened with Mr. Jackson?

7  A    He was placed into custody for drug sale charges that the

8  Narcotics Investigation Unit had into him previously.

9  Q    And was he initially charged in state court or federal

10  court after he was arrested that night?

11  A    State court.

12  Q    And when he was taken out of the vehicle, was he searched?

13  A    He was.

14  Q    And what, if anything, was found on him?

15  A    There was what I would describe as a large sum of cash

16  taken off of his person as well as some suspected narcotics.

17  Q    Let's talk about the other two occupants of the vehicle.

18  You said Brianna Arnold was another of the people in the

19  vehicle?

20  A    That is correct.

21  Q    What happened with her that night after she was taken out

22  of the vehicle?

23  A    She was placed into custody.  She had a few outstanding

24  state warrants.

25  Q    And was she searched?

Adam J. Lucia - Direct

1 A    She was.

2 Q    And was any cash found on her?

3 A    No.

4 Q    And what happened with Ms. Currier after she came out of

5 the vehicle?

6 A    She was -- she was released from the scene.  She didn't

7 have any paraphernalia or anything on her.

8        MS. CATE:  At this point I'd like to show the witness

9 Exhibit 52A, which is a DVD.

10 Q    Do you recognize Exhibit 52A?

11 A    I do.

12 Q    How do you recognize it?

13 A    My initials and the date are on the disc.

14 Q    And what is the contents of that disc?

15 A    It is video from the traffic stop.  It's a cruiser camera.

16 Q    And you've reviewed that video?

17 A    I did.

18 Q    And is that video a fair and accurate representation of

19 the events the evening of November 23rd of 2021?

20 A    Yes, it is.

21 Q    And Exhibit 52A, is that the entirety of the cruiser

22 camera video?

23 A    No.  I believe it's just a portion of it.

24        MS. CATE:  Your Honor, the Government moves to admit

25 Exhibit 52A.

Adam J. Lucia - Direct

1          THE COURT:  Any objection?

2          MR. JACKSON:  No objections, your Honor.

3          THE COURT:  52A is admitted.

4      (Government's Exhibit 52A was received in evidence.)

5          MS. CATE:  Your Honor, may we publish?

6          THE COURT:  You may.

7          COURTROOM DEPUTY:  Hold on one second.  It should

8  switch over.

9  Q    BY MS. CATE:  And, Detective Lucia, is there audio in this

10 video or no audio?

11 A    I believe in this video there is no audio.

12 Q    So we're just going to watch?

13 A    Yes.

14 Q    Okay.  Thank you.

15     (Government's Exhibit 52A was played in open court.)

16         MS. CATE:  AUSA Ophardt, can you pause the video?

17     And for the record, we've paused it at around 1 minute and

18 12 seconds.

19 Q    BY MS. CATE:  Detective Lucia, can you just identify for

20 us the people that we see in the video at this point.

21 A    Yes.  Pointing at my screen, that is Sergeant Plemmons.

22 Q    And that's all the way on the left, the person on the

23 left?

24 A    On the left, yes.  The male next to him that he has his

25 hands behind his back, that is Mr. Jackson.  This is Trooper

Adam J. Lucia - Direct

1 Gardner with the Vermont State Police.  That is myself over to

2 the far right.  And then Corporal Heter is, I believe, just

3 above in front of Trooper Gardner.

4 Q    And what are you doing in this video?

5 A    I am going to be attempting to tactically clear the rest

6 of the vehicle to make sure that no other individuals either

7 jump out or are armed or just to make sure the scene remains

8 safe.

9         MS. CATE:  You can play.

10    (Government's Exhibit 52A was played in open court.)

11 Q    BY MS. CATE:  I'm going to pause again.  We just saw

12 somebody backing up.  Who was that individual?

13         MS. CATE:  We paused at 1 minute and 21 seconds.

14 A    That was Brianna Arnold.

15 Q    Okay.

16         MS. CATE:  You can play.

17    (Government's Exhibit 52A was played in open court.)

18         MS. CATE:  And can we pause again, please.  We paused

19 at 2 minutes and 1 second.

20 Q    BY MS. CATE:  There is a couple more individuals who were

21 not in the screen last time we talked.  There seems to be a

22 woman sort of in the middle of the screen with a pattern on her

23 pants.  Who's that?

24 A    That is Danielle Currier.

25 Q    And there's another law enforcement officer over to the

Adam J. Lucia - Direct

1 right of the vehicle near where you are.  Who's that?

2 A    That is Detective Sergeant Johnson with the Vermont State

3 Police.

4 Q    And what do you and other law enforcement officers have in

5 your hands?

6 A    I believe I have my radio in my hand at that point.  I

7 think -- yeah.  I believe I'm calling something in on my radio.

8         MS. CATE:  You can play.

9      (Government's Exhibit 52A was played in open court.)

10         MS. CATE:  AUSA Ophardt, can you pause, please.

11      And for the record, we've paused at 4 minutes and 30

12 seconds.

13 Q    BY MS. CATE:  Who are the folks on the screen right now,

14 Detective Lucia?

15 A    That is Mr. Jackson, myself, Detective Sergeant Johnson to

16 my right, and Sergeant Plemmons to my left -- or to

17 Mr. Jackson's left.

18 Q    Thank you.  And what is Mr. Jackson wearing in that --

19 that evening?

20 A    He's wearing a -- appears to be a black jacket with a

21 white hoodie with Jerry the Mouse from *Tom and Jerry*.

22         MS. CATE:  You may play.

23      (Government's Exhibit 52A was played in open court.)

24         MS. CATE:  AUSA Ophardt, can you pause at 4:55 --

25 4:56.  Thank you.

Adam J. Lucia - Direct

1  Q    BY MS. CATE:  So on this part of the footage, there's an

2  item in front of Mr. Jackson that's sort of moving that was

3  taken out of his pockets.  Do you see that?

4  A    Yes.

5  Q    What was that?

6  A    I believe that's the large sum of cash that I was speaking

7  about before.

8  Q    And it was sort of blowing a bit?

9  A    Yes.

10        MS. CATE:  You can play.

11      (Government's Exhibit 52A was played in open court.)

12        MS. CATE:  AUSA Ophardt, can you pause?

13  Q    BY MS. CATE:  So the person all the way on the left,

14  that's Detective Sergeant Jason Johnson?

15  A    Yes.

16  Q    At what --

17  A    He ended up putting a face mask on.

18  Q    And what's the item in his hand?

19  A    It's an evidence bag.

20  Q    And why does he have an evidence bag?

21  A    He's placing the items that were taken off Mr. Jackson

22  into it.

23  Q    Thank you.

24      (Government's Exhibit 52A was played in open court.)

25        THE COURT:  Is this a logical breaking point for our

Adam J. Lucia - Direct

1  midmorning break?

2          MS. CATE:  Yes, your Honor.

3          THE COURT:  All right.  Mr. Gonyaw, am I saying your

4  last name correctly?

5          JUROR GONYAW:  Pardon?

6          THE COURT:  Am I saying your last name correctly?

7          JUROR GONYAW:  "Gon-ya."

8          THE COURT:  Gonyaw.  What time would you like us to

9  end on April 16th so you may get to your doctor's appointment

10  and you are not driving fast on the interstate?

11          JUROR GONYAW:  Noon would be probably the latest I

12  could stay.

13          THE COURT:  All right.  Perfect.

14      We're going to come back in approximately 15 minutes.

15  Don't talk about the case.  Don't let anybody talk to you about

16  the case.  I wish you a good break.

17      And we'll have the parties remain in the courtroom.

18      (Jury out at 10:28 AM.)

19          THE COURT:  Anything to bring to my attention before

20  we take our own break?

21      This time I'll start with you, Mr. Jackson.

22          MR. JACKSON:  No, ma'am.

23          THE COURT:  Anything from the Government?

24          MR. OPHARDT:  No, your Honor.

25          THE COURT:  All right.  We'll see you in 15.

Adam J. Lucia - Direct

1       (A recess was taken from 10:29-10:50 AM.)

2           THE COURT:  We are back on the record in United States

3   of America v. Jackson.

4       There is an issue with one of Mr. Jackson's witnesses.

5   Getting that person to trial is going to be very difficult.  I

6   know John Curtis from the Marshals Service talked to both the

7   Government and Mr. Jackson and Mr. Behrens about this issue.

8   What I was -- what was reported back to me was that Mr. Jackson

9   was fine with a WebEx appearance.  The Government may not be.

10      There is a confrontation clause issue, but it is

11  Mr. Jackson who has the right to confront his accusers, and so

12  I'm going to do some research about it.  The Government needs

13  to do some research about it.  Mr. Jackson may want to do his

14  research about it.  But the sooner we get an answer to the

15  marshals, the easier it will be for them to accommodate this

16  issue.  So I will be taking it up with you again.

17      It just came up on the break, so I don't expect you to

18  fully inform the Court now, but do I have the respective

19  positions of the Government and Mr. Jackson correct?

20      Mr. Jackson?

21          MR. JACKSON:  Yes, your Honor, you do.

22          THE COURT:  Mr. Ophardt?

23          MR. OPHARDT:  Your Honor, we simply haven't -- we

24  simply haven't thought about it, so we didn't indicate pro or

25  con.  We just wanted time.

Adam J. Lucia - Direct

1           THE COURT:  Oh, okay.  I was -- it was reported the

2  Government may have a problem with it, and --

3           MR. OPHARDT:  I think that -- I'm sorry to interrupt,

4  your Honor.  I think that's fair.  I just -- we haven't had a

5  chance to really think or look at it, so just if we could have

6  till tomorrow morning, is that okay, or do you want to talk

7  about it this afternoon, Judge?

8           THE COURT:  Tomorrow morning will be fine.  It's

9  easier for me to address it if you are wanting to investigate

10 it other than you're coming out -- or you're coming up to the

11 batting cage with a firm no.  I need to look at it as well.

12 Mr. Jackson and Mr. Behrens may want to look at it.  But

13 tomorrow morning we should have it decided.  Okay?

14          MR. OPHARDT:  Yes, your Honor.

15          THE COURT:  All right.  Anything else to bring to my

16 attention before we bring back the jury?

17          MR. OPHARDT:  Not from the Government, your Honor.

18          MR. JACKSON:  No, your Honor.

19          THE COURT:  All right.  Let's bring back the jurors.

20      (Jury in at 10:54 AM.)

21          THE COURT:  We are back on the record in United States

22 v. Jackson.  We have Detective Lucia on the witness stand.  He

23 is still under oath, and we are in the Government's direct

24 examination.

25          And you may resume.

Adam J. Lucia - Direct

1          MS. CATE:  Thank you, your Honor.

2  Q    BY MS. CATE:  Now, before the break we had watched footage

3  roadside, and you had testified that all the occupants of the

4  Ford Freestyle had left.  Mr. Jackson and Ms. Arnold were taken

5  into custody and Ms. Currier was allowed to leave, right?

6  A    That is correct.

7  Q    After all those occupants left, what did you do?

8  A    I awaited on scene for Carrara's Towing to arrive and take

9  the vehicle back to the Vermont State Police barracks, where we

10 were going to apply for a search warrant.

11 Q    And why were you going to apply for a search warrant for

12 the vehicle?

13 A    We learned information that there may be suspicion of

14 criminal activity within the vehicle.

15 Q    And why was the vehicle being taken back to the police

16 barracks?

17 A    That was a secure location for us to put it while I

18 applied for a search warrant.

19 Q    And how was the vehicle -- Was the vehicle brought to the

20 VSP barracks?

21 A    Yes, it was.

22 Q    And how was it brought there?

23 A    It was brought there by Carrara's Towing.  And once at the

24 barracks, it was placed in a secure garage at the Agency of

25 Transportation right behind the barracks.

Adam J. Lucia - Direct

1  Q    And while you were waiting roadside, who, if anyone, was

2  with you?

3  A    Detective Sergeant Johnson was with me.

4  Q    And you said that it went to the police barracks and went

5  into the Agency of Transportation garage?

6  A    Yes.

7  Q    And once it was there, what happened with the vehicle?

8  A    The vehicle was photographed and secured with evidence

9  tape, and the garage was also secured.

10  Q    And what do you mean "secured with evidence tape"?

11  A    Like, evidence tape was placed on the exterior of the

12  vehicle of all the entrance points.

13  Q    And once the vehicle was at the garage and secured, what

14  did you do?

15  A    I applied for a search warrant.

16  Q    And was that application granted?

17  A    It was.

18  Q    And was a search warrant executed?

19  A    Yes, it was.

20  Q    Where was it executed?

21  A    It was executed at the state police barracks inside the

22  garage that we stored the vehicle in.

23  Q    And what day was it executed?  What was the date?

24  A    It was the 24th of November.

25  Q    What time of day was it?

Adam J. Lucia - Direct

1  A    It was just after midnight.

2  Q    So it had been stopped in the evening of the 23rd, and by

3  the time the search warrant execution occurred, it was early

4  morning hours of the 24th?

5  A    That is correct.

6  Q    And who was involved in executing the search warrant?

7  A    Myself and members of the Southern Vermont Drug Task

8  Force.

9  Q    And can you just describe for the jury generally what is

10  the process of executing a search warrant on a vehicle?

11  A    So we take photos of the vehicle.  Once the warrant's

12  granted, we go back to where in this case the vehicle is.

13  Photos are taken of us unsealing the vehicle, and interior

14  photos are taken of the vehicle and items that we look to

15  seize, where they lie in the vehicle.

16  Q    And if you find items that are closed within a vehicle,

17  such as a briefcase or a bag, what do you do?

18  A    We photograph and we search those as well.

19  Q    Was that process followed here?

20  A    Yes.

21  Q    And who executed the search of the vehicle?

22  A    Myself and members of the Southern Vermont Drug Task

23  Force.

24  Q    And what of particular note was found in the Ford

25  Freestyle?

Adam J. Lucia - Direct

1 A    Found a cell phone, and we also found some drug

2 paraphernalia and a blue fanny pack-style/type bag that

3 contained suspected cocaine and cocaine base.

4 Q    And let's talk about where those items were found.  Where

5 was the cell phone found?

6 A    That was in the center console of the vehicle.

7 Q    And what about the drug paraphernalia you referenced?

8 A    It was throughout the vehicle.  There was some in the back

9 of the vehicle, and then the drugs themselves were found

10 underneath the driver's side of the vehicle.

11 Q    And where was the blue bag containing the suspected

12 narcotics found?

13 A    It was underneath the driver's seat of the vehicle.

14 Q    Who found that item?

15 A    I did.

16 Q    I'd like you to look in the binder in front of you at

17 Exhibit 20.  It's a multipage exhibit.  Can you just page

18 through that exhibit.

19      Are you done?

20 A    Yes.

21 Q    Do you recognize the pages of Exhibit 20?

22 A    I do.

23 Q    And what are they, generally speaking?

24 A    Photos of the vehicle and the items that we seized from

25 the vehicle.

Adam J. Lucia - Direct

1  Q    Where were these photos taken, if you know?

2  A    This was in the Agency of Transportation garage bay that

3  we secured the vehicle in.

4  Q    And do these -- when were they taken?  What day?

5  A    I believe the 23rd going into the 24th.

6  Q    And do these photographs fairly and accurately depict the

7  way the items looked on November 23rd and 24th of 2021?

8  A    Yes.

9        MS. CATE:  Your Honor, the Government moves to admit

10 Exhibit 20.

11        THE COURT:  Any objection?

12        MR. JACKSON:  No objection.

13        THE COURT:  It's admitted.

14    (Government's Exhibit 20 was received in evidence.)

15        MS. CATE:  Your Honor, may we publish?

16        THE COURT:  You may.

17        MS. CATE:  I'm going to put it on the screen for the

18 jurors to see.  This is the first page of Exhibit 20.

19 Q    BY MS. CATE:  What is this?

20 A    This is the Ford Freestyle that we seized that Mr. Jackson

21 was driving.

22 Q    And the surroundings are the AOT garage you testified

23 about?

24 A    Yes.

25 Q    Another picture of the Ford Freestyle?

Adam J. Lucia - Direct

1  A    Yes.

2  Q    And the third page is another picture of the Ford

3  Freestyle?

4  A    That is correct.

5  Q    And this is Bates number 98.04, another picture of the

6  Ford Freestyle?

7  A    Yes.

8  Q    And on the -- sort of between the -- between the windows,

9  what is that item that's between the windows in that page?

10 A    That is evidence tape.

11 Q    And so that's tape so that the doors -- you would know if

12 the doors were opened?

13 A    Correct.

14 Q    The next page, 98.09, what does this show?

15 A    This is the front driver area of the vehicle.

16 Q    98.12, what does this show?

17 A    This is the center console of the vehicle.  It shows a

18 cell phone, a cigarette pack, I believe that's a type of

19 lighter tucked in between the seat right there, and then two

20 drink bottles in the cup holders.

21 Q    And there's a touch screen next to you.  Can you circle

22 the cell phone that you testified about.

23      So you're circling in the middle of the page the sort of

24 black item?

25 A    Yes, ma'am.

Adam J. Lucia - Direct

1  Q    Next page is 98.04.  What is this a picture of?

2  A    This is the back seat from the driver's side perspective

3  of the vehicle.

4  Q    And who took these pictures?

5  A    I did.

6  Q    Why did you take this picture?

7  A    Because this is where I located the blue bag that -- the

8  fanny pack-style bag that I was talking about.

9  Q    And are you able to see it in the version of the picture

10 that's next to you?

11 A    Not -- not well, no.

12 Q    Have you reviewed an electronic version of this

13 photograph?

14 A    Yes, I have.

15 Q    And what could you see in that?

16 A    The blue fanny-type/style bag.

17 Q    Can you circle for the jurors on the screen the

18 approximate location of the blue fanny-style bag.

19 A    Yes, I can.

20 Q    I might change your color.  Can you try circling again

21 with a --

22 A    Yes.

23 Q    -- hopefully better color?

24     So you've circled sort of the dark area in the middle of

25 the page?

Adam J. Lucia - Direct

1  A    That is correct.

2  Q    Thank you.  What is this next page, 98.15?

3  A    That is the back driver's seat portion of the vehicle as

4  well.

5  Q    The -- which portion of the vehicle?

6  A    I believe it's the -- the back driver's portion as well.

7  Q    Okay.  What is this item, 98.16?

8  A    That is the photo of the bag that was taken from the --

9  behind the driver's seat of the vehicle.

10 Q    And 98.20, what is this?

11 A    That is from the back on the passenger side of the

12 vehicle.

13 Q    And what is the sort of -- item that is partially white on

14 the -- in that photo?

15 A    Next to the -- the blue item?

16 Q    Yes.

17 A    That is a glass stem pipe.

18 Q    Next is 98.27.  What is this showing?

19 A    That is a bag of suspected cocaine that was taken from the

20 blue fanny-style bag.

21 Q    And in the top left of this page, what is that?

22 A    That is the blue fanny-style bag with other items in it.

23 Q    98.28, what is this showing?

24 A    That is suspected -- bag of suspected cocaine that was

25 taken from that same bag.

Adam J. Lucia - Direct

1  Q    98.31, what's in this photo?

2  A    The blue fanny-type/style bag and suspected cocaine and

3  cocaine base.

4  Q    And how many plastic bags are depicted here?

5  A    There are five.

6  Q    And where did those come from?

7  A    From the blue fanny-type/style bag.

8  Q    What is the background?  What was this photo taken --

9  where was it taken?

10 A    This was taken on the hood of the vehicle.

11 Q    What's the item to the left that's somewhat shiny looking?

12 A    That is a Chore Boy.  Chore Boy copper scrub.

13 Q    Thank you.  98.33, what is this?

14 A    That is the bag that was -- or the, I guess, wallet-type

15 item that was on the back seat as well, and it has a lighter,

16 what appears to be some sort of card, and a rubber container.

17 Q    98.38 -- whoops.  Sorry.  What's this?

18 A    That is a photo of items taken from the vehicle.  It is a

19 scale; again, a glass stem pipe; a pill, which was determined

20 to be gabapentin; and some loose-leaf paper with a phone number

21 for a person named D.

22 Q    98.39 is a bit blurry, but can you see what's in this

23 photo?

24 A    Yes.

25 Q    What is that?

Adam J. Lucia - Direct

1  A    It's a digital scale.

2  Q    Also found in the vehicle?

3  A    Yes.

4  Q    98.42, what's this?

5  A    That is the cigarette container that was located in the

6  vehicle with a dollar bill with plastic wrap around it.

7  Q    98.43, what's that?

8  A    Is the same dollar bill that was located in the cigarette

9  box with a dollar bill inside of it.

10  Q    98.44, another blurry photo, but what is this?

11  A    That is the cell phone that was located inside the center

12  console of the vehicle.

13  Q    98.56, what's this?

14  A    Those are the bags of suspected cocaine and cocaine base

15  taken from the vehicle.

16  Q    And what's that piece of paper behind those bags?

17  A    It's evidence -- it's a piece of paper that was for

18  evidence for the -- for the photos taken that Detective

19  Sergeant Johnson printed out.

20  Q    And what's the case number on that piece of evidence

21  paper?

22  A    It is 21RL10495.

23  Q    And it reflects the date of offense and the detective?

24  A    Yes, it does.

25  Q    What's 98.57?

Adam J. Lucia - Direct

1  A    It's the same type of piece of paper with the gabapentin

2  pill; the Chore Boy scrub; glass pipe; and two digital scales,

3  one with residue.

4  Q    Where were these photos taken?

5  A    These were taken inside the Vermont State Police barracks.

6  Q    So just -- how -- you conducted the search and took

7  photographs that we saw of the -- of the items in the Ford

8  Freestyle and on the hood of the Ford Freestyle.  Then what did

9  you do with the items?

10  A    We transferred the items that we seized over to the --

11  just to the next building over, to the Vermont State Police

12  barracks.

13  Q    Why did you bring them there?

14  A    Because that's where our processing equipment was.

15  Q    And what processing steps did you take?

16  A    Field-testing, weighing of the suspected items, and then

17  the photos that you're seeing right here.

18  Q    Let's look at 98.58.  What's this?

19  A    This is a cell phone taken from the vehicle.

20  Q    And 98.60, what's this?

21  A    That is the digital scale with residue.  And above it is a

22  field-testing wipe that we commonly use for cocaine residue,

23  and the blue indicator right there indicates that it's a

24  presumptive positive result for cocaine.

25  Q    And what about 98.61?

Adam J. Lucia - Direct

1  A    That is the same photo.  However, it's -- the -- a photo

2  of the back of the wipes that we used were taken.

3  Q    What's 98.62?

4  A    That is the dollar bill that was located in that plastic

5  wrap inside the cigarette pouch.

6  Q    And there's a white powder substance in -- folded into

7  that dollar bill?

8  A    Correct.

9  Q    What's 98.64?

10 A    That is one of the bags of suspected cocaine taken from

11 the blue fanny-type/style bag from the vehicle.

12 Q    And what is it on at this point?

13 A    It is on a digital scale.

14 Q    And that scale is reflecting the weight of not only the

15 substance in the bag but also the bag itself; is that right?

16 A    That is correct.

17 Q    98.65, what's that?

18 A    That is a photo of one of the other bags taken from the

19 blue fanny-style/type bag that was located inside the vehicle.

20 Q    And 98.66?

21 A    Same.  Third bag that was taken from the fanny-style/type

22 bag located inside the vehicle.

23 Q    And 98.67?

24 A    That was another bag that was located inside the

25 fanny-type/style bag inside the vehicle.

Adam J. Lucia - Direct

1  Q    And 98.68?

2  A    That is another bag that was located in the

3  fanny-type/style bag located inside the vehicle.

4  Q    And I'm going to go back to 98.64.  Just to state for the

5  record, what is the weight depicted on the scale in this photo?

6  A    It is 327.9 grams.

7  Q    And what about in this next photo?

8  A    105.7 grams.

9  Q    And what about in this next photo?

10 A    23.4 grams.

11 Q    Next?

12 A    Eight grams.

13 Q    And the final photo?

14 A    1.6 grams.

15 Q    Now, after the items were processed at the VSP barracks,

16 what happened with them next?

17 A    They were placed into evidence bags and transferred to the

18 Rutland City Police Department.

19 Q    Who did that?

20 A    Myself.

21 Q    With anybody else?

22 A    Yeah.  With the help of Detective Sergeant Johnson.

23 Q    So I guess I can break that down.  Who placed the items

24 into evidence bags?

25 A    Detective Sergeant Johnson.

Adam J. Lucia - Direct

1  Q    Were you there with him?

2  A    Yes.

3  Q    And then you brought the items to the Rutland City Police

4  barracks?

5  A    Yes.

6  Q    And where specifically at the Rutland City Police barracks

7  did you take the items when you got there?

8  A    We brought them up to the -- our office at the Bureau of

9  Criminal Investigations.

10 Q    And when you left the VSP barracks to go back to your own

11 police department, did you take all of the items from the Ford

12 Freestyle with you, or did you leave some behind?

13 A    I believe I took all of them with me.

14 Q    And so you said you went to BCI.  What did you do with

15 them when you got to BCI?

16 A    They were transferred over to, at the time, Detective

17 Sergeant Whitehead, who entered them into FileOnQ, which is our

18 evidence system.

19 Q    After the items were logged into the evidence system, did

20 you know where they went within the Rutland City barracks?

21 A    They were placed into an evidence locker.  And then

22 subsequently after, they were transferred over to the Vermont

23 Forensics Lab.

24 Q    Which of the items went to the Vermont Forensics Lab?

25 A    I believe the suspected cocaine.

Adam J. Lucia - Direct

1 Q    And when -- and then after it went to the Vermont

2 Forensics Lab, did it come back to Rutland City PD?

3 A    It did.

4 Q    And when it came back -- when items come -- let me

5 rephrase.

6      Based on your experience in the police department, when

7 items come back from the Vermont Forensic Laboratory, how are

8 they packaged?

9 A    They come back packaged in a big vacuum-sealed reseal bag

10 but still secured in their original packing.

11 Q    And is that what happened with the items from this case?

12 A    Yes.

13 Q    So they came back to the Rutland PD in that big reseal

14 bag?

15 A    Correct.

16 Q    And over the course of this case, were the items

17 resubmitted to the Vermont Forensic Lab?

18 A    They were.

19 Q    And when they were resubmitted, who handled the

20 resubmission?

21 A    Myself and evidence techs.

22 Q    And when they were resubmitted to the lab, how, if at all,

23 were they changed from the way they came back from the lab?

24 A    The only way they were changed was they were taken out of

25 the reseal bag but kept in their original sealed compartments

Adam J. Lucia - Direct

1  and then re-sent to the Vermont Forensics Lab.

2  Q    You said "kept in their original sealed" what?

3  A    Evidence bags.

4  Q    And why had they been taken out of the Vermont Forensic

5  Lab larger reseal bags?

6  A    Because the Vermont Forensic Lab was only asking for

7  certain items.

8  Q    I want to talk about the cell phone that you testified

9  about.  Where did that go?  Was that one of the items that came

10 back to the Rutland City Police Department?

11 A    Yes.

12 Q    And did it remain in the Rutland City Police Department

13 custody until today?

14 A    It was transferred over to the ATF's custody briefly and

15 then returned back to the Rutland City Police Department.

16 Q    Why did it go to ATF's custody?

17 A    To -- because a warrant was applied and granted for it and

18 they had the technology to download the data from the phone.

19 Q    Can you turn in your binder to Exhibit 31A.

20 A    Yes.  I do not have a 31A.

21        COURTROOM DEPUTY:  I'm sorry.  Thank you.  I didn't

22 want to make it super crowded up there.

23        MS. CATE:  Oh, yes.  A lot of binders.

24        COURTROOM DEPUTY:  There you go.

25        MS. CATE:  Thank you.

Adam J. Lucia - Direct

1          THE WITNESS:  Thank you.

2  Q    Do you see 31A?

3  A    Yes.

4  Q    And that's a multipage exhibit.  Do you recognize that?

5  A    I do.

6  Q    And how do you recognize it?

7  A    That is the cell phone that was seized from the vehicle.

8  Q    Who took -- these are photographs?

9  A    Yes.

10  Q    And who took them?

11  A    I did.

12  Q    And how, if at all, do -- does the cell phone depicted in

13  these images differ from the way it looked when you seized it

14  from the vehicle?

15  A    The SIM card is taped to the back.  There's a Bureau of

16  Alcohol, Tobacco and Firearms sticker and then another sticker

17  above the SIM card.

18          MS. CATE:  Your Honor, the Government moves to admit

19  Exhibit 31A.

20          THE COURT:  Any objection?

21          MR. JACKSON:  No objections, your Honor.

22          THE COURT:  31A is admitted.

23      (Government's Exhibit 31A was received in evidence.)

24          MS. CATE:  May I publish?

25          THE COURT:  You may.

Adam J. Lucia - Direct

1  Q    BY MS. CATE:  So this is the first page of 31A.  What is

2  that -- you don't -- what is that number in 31A?

3  A    This is an IMEI number for the cell phone.

4  Q    And can you see it well enough to read it?

5  A    Yes, I can.  It is 355568111409139.

6  Q    And this is the second page.  And the third page.

7       I'd like to show you Exhibit 31, which is a physical

8  exhibit.  Do you recognize that?

9  A    I do.

10 Q    What is that?

11 A    That is the cell phone that was taken from the vehicle.

12 Q    And how can you tell?

13 A    I can tell by the stickers on the vehicle *[sic]* and also

14 by the evidence tag on item 38.

15      MS. CATE:  Your Honor, the Government moves to

16 Exhibit -- admit Exhibit 31.

17      THE COURT:  Any objection?

18      MR. JACKSON:  No objections, your Honor.

19      THE COURT:  Exhibit 31 is admitted.

20    (Government's Exhibit 31 was received in evidence.)

21      MS. CATE:  I'd like to swap out Exhibit 31 for Exhibit

22 34.

23 Q    BY MS. CATE:  Do you have Exhibit 34 in front of you?

24 A    Yes, I do.

25 Q    And do you recognize that?

Adam J. Lucia - Direct

1  A    Yes, I do.

2  Q    What is it?

3  A    That is one of the digital scales seized from the vehicle.

4  Q    How can you tell?

5  A    Based on the item number and the evidence tag that we

6  have.

7  Q    Is that -- the item itself in substantially the same

8  condition it was when you seized it from the vehicle on

9  November 24th of 2021?

10  A    Yes, it is.

11        MS. CATE:  Your Honor, the Government moves to admit

12  Exhibit 34.

13        THE COURT:  Any objection?

14        MR. JACKSON:  No objections, your Honor.

15        THE COURT:  34 is admitted.

16    (Government's Exhibit 34 was received in evidence.)

17  Q    BY MS. CATE:  So now I'm going to have you look in the

18  binder at 34A.  Do you see that?

19  A    Yes.

20  Q    And what is that?

21  A    That is a photo of Exhibit No. 34.

22        MS. CATE:  The Government moves to admit Exhibit 34.

23        THE COURT:  Any objection?

24        MR. JACKSON:  No objections, your Honor.

25        THE COURT:  34 is admitted.

Adam J. Lucia - Direct

1            MS. CATE:  May I publish, your Honor?

2            THE COURT:  You may.

3        Our court reporter thinks it's 34A.

4            MS. CATE:  34A, yes.

5            THE COURT:  You moved to admit 34.  I agreed with you

6    and readmitted 34.  So a double mistake.

7        Thank you, Johanna.

8            MS. CATE:  Yes.  I intended to -- thank you.  I

9    intended to seek to admit 34A, the photograph of Exhibit 34.

10           THE COURT:  And I assume there's no objections?

11           MR. JACKSON:  No objection.

12           THE COURT:  34A is admitted.

13       (Government's Exhibit 34A was received in evidence.)

14           MS. CATE:  And that's what I published.  Thank you.

15       All right.  Next I'd like to show you -- swap out Exhibit

16   34 for Exhibit 22.

17   Q    BY MS. CATE:  Do you recognize Exhibit 22?

18   A    I do.

19   Q    And what is that?

20   A    That is some of the suspected drugs taken from the blue

21   fanny-type/style bag from the vehicle.

22   Q    How can you tell?

23   A    By the bar codes and the items themselves.

24   Q    And what is that -- well, how do the drugs differ --

25   suspected drugs differ from when you seized them from the blue

Adam J. Lucia - Direct

1  fanny-style pack bag?

2  A    So they're in one of the reseal bags that we spoke about

3  before, and the difference with this reseal bag is that they

4  are in separate other bags that the lab has marked, I believe

5  indicating that they were tested.

6         MS. CATE:  The Government moves to admit Exhibit 22.

7         THE COURT:  Any objection?

8         MR. JACKSON:  No objections, your Honor.

9         THE COURT:  22 is admitted.

10      (Government's Exhibit 22 was received in evidence.)

11  Q    BY MS. CATE:  And now, Detective Lucia, if you can look at

12  22A in the binder.  What is Exhibit 22A?

13  A    22A is a photograph of Exhibit 22.

14         MS. CATE:  The Government moves to admit 22A.

15         THE COURT:  Any objection?

16         MR. JACKSON:  No objection.

17         THE COURT:  22A is admitted.

18      (Government's Exhibit 22A was received in evidence.)

19         MS. CATE:  May I publish?

20         THE COURT:  You may.

21  Q    BY MS. CATE:  So, Detective Lucia, can you just show for

22  the jurors the repack bag that you testified about.  Which

23  one's that?

24  A    The repack bag is this -- the larger -- may I circle it

25  or --

Adam J. Lucia - Direct

1  Q    Yes.

2  A    Okay.  It's this larger vacuum-sealed bag that the items

3  are contained in.

4  Q    And can you also show for the jurors the evidence bags

5  that the drugs were originally -- suspected drugs were

6  originally packaged in.

7  A    Yes.

8  Q    Thank you.  And you made three circles around the evidence

9  bag -- the bags that say "Evidence" on them with the kind of

10 blue markings at the top?

11 A    Correct.

12 Q    Thank you.

13       MS. CATE:  I'd like to swap out Exhibit 22 for Exhibit

14 21, please.

15 Q    Detective Lucia, do you recognize Exhibit 21?

16 A    I do.

17 Q    What is that exhibit?

18 A    It contains some of the cocaine -- or suspected cocaine

19 that was taken from the blue fanny-type/style bag that was

20 located inside the vehicle.

21 Q    Is that the only thing within Exhibit 21?

22 A    No.

23 Q    Go ahead.

24 A    I'm sorry.

25 Q    How -- can you -- where on Exhibit 21 is the suspected

Adam J. Lucia - Direct

1  cocaine that came out of the vehicle?

2  A    For me looking at it right this minute, it's on the -- my

3  far left side.

4  Q    And how do you know it's suspected cocaine that came out

5  of the vehicle?

6  A    From the photographs that we took earlier and also the

7  evidence bags that we have inside the re- -- repackaged bag

8  from the lab.

9       MS. CATE:  The Government moves to admit Exhibit 21.

10      THE COURT:  Any objection?

11      MR. JACKSON:  No objections, your Honor.

12      THE COURT:  21 is admitted.

13    (Government's Exhibit 21 was received in evidence.)

14  Q    BY MS. CATE:  And, Detective Lucia, I'm going to have you

15  look at -- if you can set Exhibit 21 out of the way and then

16  take a look at Exhibit 21A in the binder.  And that's a

17  multipage exhibit?

18  A    Yes.

19  Q    And what is 21A?

20  A    It is photographs of Exhibit 21.

21      MS. CATE:  The Government moves to admit 21A.

22      THE COURT:  Any objection?

23      MR. JACKSON:  No objection, your Honor.

24      THE COURT:  21A is admitted.

25    (Government's Exhibit 21A was received in evidence.)

Adam J. Lucia - Direct

1           MS. CATE:  May I publish?

2           THE COURT:  You may.

3  Q    BY MS. CATE:  So on the screen I'm placing the first page

4  of 21A.  Can you circle for the jurors the item that is the

5  suspected cocaine that came out of the blue bag in the Ford

6  Freestyle.

7       And for the record, you're circling the white item that

8  is -- has written on it A8-1 and V21-1924?

9  A    That is correct.

10 Q    Thank you.

11          MS. CATE:  And I'd like to swap out Exhibit 21 for 23,

12 please.

13 Q    Do you recognize Exhibit 23?

14 A    I do.

15 Q    What is that?

16 A    That is items that were also -- suspected cocaine that was

17 also taken out of the blue fanny pack out of the vehicle.

18 Q    And again, how do you know?

19 A    Based on the evidence bag and our evidence sticker on it.

20          MS. CATE:  The Government moves to admit Exhibit 23.

21          THE COURT:  Any objection?

22          MR. JACKSON:  You said 23A?

23          MS. CATE:  23, the actual physical exhibit.

24          MR. JACKSON:  There's nothing in it.

25       No objections, your Honor.

Adam J. Lucia - Direct

1        THE COURT:  23 is admitted.

2    (Government's Exhibit 23 was received in evidence.)

3  Q    BY MS. CATE:  And, Detective Lucia, can you flip in the

4  binder to 23A.

5  A    Yes.

6  Q    What's 23A?

7  A    23A is photographs of Exhibit 23.

8        MS. CATE:  The Government moves to admit 23A.

9        THE COURT:  Any objection?

10       MR. JACKSON:  No objection, your Honor.

11       THE COURT:  23A is admitted.

12   (Government's Exhibit 23A was received in evidence.)

13       MS. CATE:  May I publish?

14       THE COURT:  You may.

15  Q    BY MS. CATE:  And this is Bates 1578 of 23A.  Detective

16  Lucia, can you circle for the jurors the suspected drugs that

17  came out of the Ford Freestyle.

18       So you're circling the white item near the bottom that's

19  labeled C5-4?

20  A    Yes.

21  Q    And I'd like you to turn in the binder to what's already

22  been admitted as Government Exhibit 33A.  What's that item?

23  A    That item is the -- photos of the blue fanny-type/style

24  bag.  In that photo also is the Chore Boy, glass stem pipe,

25  scale, and the loose-leaf paper containing the phone number.

Adam J. Lucia - Direct

1  Q    Detective Lucia, I'd like to take you back to 55

2  Killington Avenue.  Are you familiar with the entrance to that

3  residence?

4  A    Yes, I am.

5  Q    And specifically Apartment 2?

6  A    Yes.

7  Q    Can you describe how you get into 55 Killington Avenue,

8  Apartment 2.

9  A    Yup.  You have to take a -- it's like a stairway entrance

10 up, and at the top of the stairway, there's the door to the

11 apartment.

12 Q    And have you seen video footage of that stairwell area?

13 A    I have.

14 Q    And is that footage other than from, like, law enforcement

15 videos like body cameras or something?

16 A    Yes.

17 Q    Where did those videos come from?

18 A    They were taken from Courtney Schaner's cell phone.

19 Q    And what's your impression of how those videos came to

20 exist?

21 A    It was -- her phone was dumped for evidentiary purposes

22 and obtained.

23 Q    And the -- what was the angle that the videos showed of

24 the stairwell?

25 A    So it shows the top of the stairway as if you were looking

Adam J. Lucia - Direct

1  down the stairs, and it shows also the entrance to, I guess --

2  well, the doorway to the apartment.

3  Q    And do you recall watching a video that depicted a man

4  wearing a white hoodie?

5  A    Yes.

6  Q    And who did you see in that video?

7  A    Mr. Jackson.

8  Q    Were others in the video?

9  A    Yes.

10 Q    Who were they?

11 A    April Campeau, Brent Poczobut, David Jordan, Wendy

12 Ashline, and Stephanie Barbagallo.

13 Q    And where -- you listed a number of folks.  Where did

14 Mr. Jackson come from in that video?

15 A    From Apartment -- from Apartment 2 of 55 Killington Ave.

16 Q    And who, if anyone, else came from Apartment 2?

17 A    I believe Wendy Ashline came from there as well, as well

18 as Ms. Barbagallo and Mr. Jordan.

19 Q    And you listed some other folks that didn't come out of

20 that apartment?

21 A    Correct.

22 Q    And who were they?

23 A    There was Brent Poczobut and April Campeau.

24 Q    And where were they moving in the video?

25 A    They were coming up the stairs towards the apartment door.

Adam J. Lucia - Direct

1 Q    And what was Mr. Jackson's reaction in the video to the

2 people approaching?

3 A    He seemed pretty hostile towards them.

4 Q    And did the people enter the apartment?

5 A    No.

6 Q    Why not?

7 A    Mr. Jackson had them not enter the apartment and had them

8 go away.

9         MS. CATE:  Your Honor, may I have one moment?

10        THE COURT:  Yes.

11 Q    And in the video that you testified about, did that --

12 what Mr. Jackson was wearing, had you seen that on him any

13 other times?

14 A    Yes.  I believe it was what he was wearing when he was

15 arrested -- at least the sweat shirt portion, when he was

16 arrested the night of the 23rd.

17 Q    I'd like to look at some exhibits with you starting with

18 Exhibit 7.  What's -- do you recognize Exhibit 7?

19 A    Yes.

20 Q    What is that?

21 A    It is a photo of Courtney Schaner.

22        MS. CATE:  The Government moves to admit Exhibit 7.

23        THE COURT:  Any objection?

24        MR. JACKSON:  Yes, I object, your Honor.  I don't see

25 no purpose in admitting a picture of Courtney Schaner.  What's

Adam J. Lucia - Direct

1  the purpose?

2         THE COURT:  Well, let's have an offer of proof.

3         MS. CATE:  Your Honor, there's already been testimony

4  in this trial regarding Courtney Schaner being present in the

5  residence of 55 Killington.

6         THE COURT:  All right.  The Court's going to admit it

7  on that basis.  Government's Exhibit 7 is admitted.

8      (Government's Exhibit 7 was received in evidence.)

9         MS. CATE:  May I publish?

10        THE COURT:  You may.

11 Q    BY MS. CATE:  And I'd like you to look at Exhibit 6.  Do

12 you recognize that exhibit?

13 A    Yes, I do.

14 Q    What is that?

15 A    That is a photo of Reginald Watson.

16        MS. CATE:  The Government moves to admit Exhibit 6.

17        THE COURT:  Any objection?

18        MR. JACKSON:  Again, I object, your Honor.  I don't

19 see no basis for it.

20        THE COURT:  All right.  The Court's going to admit it

21 for the same reason.  There has been testimony about Reginald

22 Watson.

23     (Government's Exhibit 6 was received in evidence.)

24        THE COURT:  When the witness identifies the photo, it

25 should be "a photograph of a man" as opposed to describing the

Adam J. Lucia - Direct

1 contents.  So elicit that way.  And I will be asking you on the

2 break about the contents of Courtney Schaner's cell phone.

3       So Government Exhibit 6 is admitted.

4            MS. CATE:  Thank you, your Honor.  May I publish?

5            THE COURT:  You may.

6 Q   BY MS. CATE:  I'd like you to turn to Exhibit 16.  Without

7 testifying about who is in that photograph, do you recognize

8 the people in that photograph?

9 A    I do.

10           MS. CATE:  The Government moves to admit Exhibit 16.

11           THE COURT:  Any objection?

12           MR. JACKSON:  Yes, your Honor.  No basis.

13           THE COURT:  The Court's going to admit Government's

14 Exhibit 16.  Let's hear a proffer before I do so.  Is the

15 allegation -- what, if any, role do these people play in this

16 case?

17           MS. CATE:  The people -- one of the people is -- the

18 people are associated with 55 Killington.

19           THE COURT:  All right.  I will admit Government

20 Exhibit 16.

21       (Government's Exhibit 16 was received in evidence.)

22           MS. CATE:  May I publish?

23           THE COURT:  You may.

24 Q   BY MS. CATE:  Detective Lucia, who are the people in that

25 photograph?

Adam J. Lucia - Direct

1  A    Mr. Jackson and Wendy Ashline.

2  Q    I'd like you to turn to Exhibit 29.  Do you recognize the

3  person in that photograph?

4  A    Yes, I do.

5  Q    And how, if at all, is that person associated with this

6  case?

7  A    He was part -- he was inside the residence when the

8  initial warrant was conducted.

9       MS. CATE:  Your Honor, the Government moves to admit

10 Exhibit 29.

11      THE COURT:  Any objection?

12      MR. JACKSON:  Yes, your Honor.  I object.  There's no

13 basis for it.

14      THE COURT:  All right.  The Court's going to admit it

15 on -- based on the Government's representation that this

16 individual was at the 55 Killington Avenue apartment when it

17 was searched.

18      (Government's Exhibit 29 was received in evidence.)

19      MS. CATE:  May I publish?

20      THE COURT:  You may.

21 Q    BY MS. CATE:  Detective Lucia, who is that in Exhibit 29?

22 A    It is David Jordan.

23 Q    Thank you.

24      MS. CATE:  May I have a moment, your Honor?

25      THE COURT:  You may.

Adam J. Lucia - Cross

1           MS. CATE:  Nothing further for this witness, your

2    Honor.

3           THE COURT:  Any cross-examination?

4           MR. JACKSON:  Yes, your Honor.

5                       CROSS-EXAMINATION

6    BY MR. JACKSON:

7    Q    Good morning, Detective Lucia.

8    A    Good morning, sir.

9    Q    Detective Lucia, on November 23rd, 2021, you obtained a

10   search warrant for 55 Killington Avenue.  Based off what

11   information was that warrant obtained, sir?

12   A    It was based off information provided to us by a male,

13   Travis Bunnell, and also other information from sources that we

14   had.

15   Q    And what sources were that, sir?

16   A    One was Morgan Gates, and another was one of Detective

17   Billings' confidential informants.

18   Q    And who was that, sir?

19   A    I do not know the identity of that person.

20          MR. JACKSON:  Your Honor, I would respectfully request

21   the Court order Detective Lucia answer that question.  If the

22   evidence --

23          THE COURT:  If he knows the answer, he must provide

24   it.  If he doesn't know the answer, that's an appropriate

25   answer.

Adam J. Lucia - Cross

1        So do you know who that person is?

2            THE WITNESS:  I do not.

3            MR. JACKSON:  I just wanted it noted for the record.

4   Q    In that conversation you discussed things with Travis

5   Bunnell, such as him being in violation of his curfew; isn't

6   that true, sir?

7   A    That is true.

8   Q    And he was arrested for that, and at that particular time

9   he waived his rights to talk to you?

10  A    That is correct.

11  Q    In his conversation with you, you asked him -- excuse me.

12       When you first started the conversation with Mr. Bunnell

13  after he waived his rights, was he distraught?

14  A    Was he what?  I'm sorry.

15  Q    Was he distraught?  Was he in a right state of mind?

16  A    I believe he was.

17  Q    Was he crying?

18  A    He was crying.

19  Q    Can you tell the Court why he was crying?

20  A    I imagine it was because he was upset he was just

21  arrested.

22  Q    Okay.  And at the time he was arrested, you asked him what

23  was going on with him, and he explained to you that "Just

24  normal things, nothing going on," and you asked him what he did

25  this morning, and he said to you that he went to work, went and

Adam J. Lucia - Cross

1 got something to eat, returned some bottles, and came home.  Do

2 you recall that conversation, sir?

3 A    I do recall that, yes.

4 Q    Is that what was said?

5 A    I believe so.  I would have to watch the recording or the

6 video to --

7 Q    Okay.  That's fair.  And at that time did you tell Travis

8 Bunnell that he was lying to you?

9 A    Again, I would have to watch the recording to recall the

10 information of what I said to him.

11        MR. JACKSON:  Okay.  Your Honor, I move to admit the

12 conversation between Travis Bunnell and Detective Lucia.  It's

13 Defense Exhibit U, I believe.

14        MR. OPHARDT:  S.

15        MR. JACKSON:  S.  Defense Exhibit S.

16        COURTROOM DEPUTY:  S, as in Sam, correct?

17        MR. JACKSON:  S, as in Sam.

18        THE COURT:  All right.  Any objection to Defendant's

19 Exhibit S?

20        MS. CATE:  No, your Honor.

21        THE COURT:  It's admitted.

22     (Defendant's Exhibit S was received in evidence and played

23 in open court to minute 5:31.)

24 Q    BY MR. JACKSON:  Detective Lucia, do you recall that

25 conversation?

Adam J. Lucia - Cross

1  A    The portion I listened to, yes.

2  Q    Okay.  And at that -- and at that particular time, sir,

3  did you have other information that Travis Bunnell was

4  somewhere else?

5  A    We did.

6  Q    And where was that somewhere else?

7  A    55 Killington Avenue.

8  Q    In your affidavit you stated that you received information

9  from a source informant that Travis Bunnell was at the Howe

10  Center returning bottles.

11  A    Yes.

12  Q    So what information you had that he was at 55 Killington

13  Avenue?

14  A    We surveilled him to that location.

15  Q    After you surveilled him at the Howe Center?

16  A    Correct.

17  Q    So your information about he was at 55 Killington Avenue

18  was not the truth?

19  A    No, that's not correct.

20  Q    Sir, you just stated -- I asked you what information led

21  you to believe that he was not telling the truth.  You said you

22  had information that he was at 55 Killington Avenue.  Isn't

23  that true?

24  A    We did have information he was at 55 Killington Ave.  That

25  was our information that we surveilled him there.

Adam J. Lucia - Cross

1  Q    In your affidavit, sir, you stated that you received a

2  phone call from a source informant that informed you that

3  Travis Bunnell was at the Howe Center.

4           MS. CATE:  Objection, your Honor.

5           THE COURT:  Basis?

6           MS. CATE:  He's speaking about something not in

7  evidence.

8           THE COURT:  Pardon me?

9           MS. CATE:  He's talking about hearsay.

10          THE COURT:  He is attempting to impeach the witness,

11 and I'll allow him some latitude.

12          MR. JACKSON:  Thank you, your Honor.

13 Q    You state in your affidavit that you received information

14 from a source informant.  Who was that source informant?

15 A    I don't recall who that source informant was.

16 Q    And that source informant told you that Travis Bunnell

17 left his residence at 100 South Street to go return bottles at

18 the Howe Center.  Do you recall that, sir?

19 A    Yes.

20 Q    Okay.  In your affidavit you also stated, sir, that you

21 seen him at the Howe Center, then you followed him to 55

22 Killington Avenue.  Isn't that true, sir?

23 A    Correct.

24 Q    So why would you tell this jury that you had information

25 that he was at 55 Killington Avenue when he wasn't?

Adam J. Lucia - Cross

1 A    Because we did have information he was at 55 Killington

2 Avenue, because we surveilled him at that location.

3 Q    After you received information that he was at the Howe

4 Center returning bottles.  There's no way -- what information

5 did you receive that he was at 55 Killington Avenue, sir?

6 A    Sir, we watched him at the residence.

7 Q    After you received information that he was at the Howe

8 Center, you followed him to 55 Killington Avenue?

9 A    Correct.  That's what I said.

10 Q    That's not what you said.  You said you had information

11 that he was at 55 Killington Avenue.  You never mentioned the

12 Howe Center.

13 A    I'm confused at what you're asking me, sir.  It's in my

14 affidavit clearly that we received source information he was at

15 the Howe Center.  We surveilled Mr. Bunnell from the Howe

16 Center to 55 Killington Ave.  He left 55 Killington Ave., where

17 we conducted an arrest on him shortly after.

18 Q    Sir, that wasn't just your statement.  I asked you

19 specifically how did you know he was lying about where he was

20 at.  You said you received information that he was at 5- --

21 excuse me.  You said you received information that he was at 55

22 Killington Avenue.  That means somebody told you that he was at

23 55 Killington Avenue.  You didn't say you surveilled him to 55

24 Killington Avenue.  You said you received information that he

25 was at 55 Killington Avenue.

Adam J. Lucia - Cross

1            MS. CATE:  Objection.

2            THE COURT:  Basis?

3            MS. CATE:  There is not a question being asked.  This

4 is just argumentative.

5            THE COURT:  So it's in the form of cross-examination,

6 so you can ask this.  The answer could be yes or no.  What you

7 can't do is argue with the witness.  So whatever the answer is,

8 the jury evaluates it for credibility.

9        We're at the noon hour.  Is this a logical breaking point?

10            MR. JACKSON:  Yes, your Honor.

11            THE COURT:  All right.  So we'll take our noon break.

12        Ladies and gentlemen of the jury, don't talk about the

13 case.  Don't let anybody talk to you about the case.

14        A couple things.  Mr. Kent, I looked at your

15 questionnaire, and you have a doctor's appointment.  Is that

16 all taken care of, or do we need to accommodate that?

17            JUROR KENT:  I canceled that, so I'm all set.

18            THE COURT:  You canceled it.  Well, what a civic

19 citizen.

20            JUROR KENT:  It was a yearly check.

21            THE COURT:  Good to hear.  All right.

22            JUROR KENT:  I'll wait the eight months to get another

23 one.

24            THE COURT:  He was eager to go.

25        Don't talk about the case.  Don't let anybody talk to you

Adam J. Lucia - Cross

1  about the case.  Don't do any research.  Don't talk to your

2  family members.  I wish you a good lunch.  I'll see you back

3  here at 1:00.

4      I'll have the attorneys remain in the courtroom.

5      (Jury out at 11:57 AM.)

6          THE COURT:  I'm going to ask Detective Lucia if you

7  would leave the courtroom.  You haven't done anything wrong,

8  but I want to talk to the parties about an evidentiary issue

9  that I don't want you to be privy to, so if you'll leave the

10 courtroom, we'll see you back here at 1:00.

11         THE WITNESS:  Yes, ma'am.  Thank you.

12         THE COURT:  All right.  So I have one issue for you.

13 I was thinking about why the recording of the interview with

14 Travis Bunnell was admissible.  There was no objection to it.

15 It appeared that you were offering it for impeachment purposes,

16 so I was less concerned about that, but there has to be an

17 evidentiary basis for the admission of any evidence.

18     So any thoughts about that from you, Mr. Jackson?

19         MR. JACKSON:  Yes, your Honor.  As the conversation

20 were going and that, Travis Bunnell clearly stated that he seen

21 me with guns inside 55 Killington Avenue.  He mentioned a gun

22 that was never recovered, and then in Detective Lucia's report,

23 again, he said that Travis Bunnell told him it was a Judge

24 revolver.  The recording will tell something totally different.

25         THE COURT:  All right.  So it's for impeachment

Adam J. Lucia - Cross

1  purposes.

2           MR. JACKSON:  Yes, ma'am.

3           THE COURT:  All right.  That satisfies my question for

4  you.

5      My question for the Government is:  We had the witness

6  describe the contents of a video shown on Courtney Schaner's

7  cell phone.  Let's hear about why that would be admissible.

8           MS. CATE:  He was describing the -- the actions that

9  he saw on the cell phone.  He didn't describe, you know,

10  hearsay on the cell phone.  The video itself depicts

11  Mr. Jackson hitting a woman who was trying to enter the

12  apartment and yelling at her.  In light of where we were with

13  our motion *in limine* previously about the acts of violence, we

14  chose not to actually introduce that video so as not to appear

15  going in a different direction than we had previously

16  represented, so we had him simply testify about his review of

17  those contents.

18           THE COURT:  All right.  So my concern was that he was

19  testifying to the contents of a video that was not in evidence,

20  but the reason why you had him do that way as opposed to

21  admitting the video is because it depicts violence?

22           MS. CATE:  Yes.  It depicts Mr. Jackson hitting a

23  woman and yelling.

24           THE COURT:  All right.  There was no objection.

25      Any thoughts on this issue from you, Mr. Jackson?

Adam J. Lucia - Cross

1          MR. JACKSON:  Yes.  I was notified the other day about

2    the video, to which Homeland Security and Mr. Ophardt gave over

3    to me, and I will object to that video being shown to the jury

4    because I think your Honor ruled on that already, and on top of

5    that, I was charged with that, and Ms. Campeau -- they sealed

6    that.  The state court dismissed and sealed that case, so I

7    don't see any reason why they should be able to bring it up.

8    It was a domestic dispute, and, you know, if there's any

9    responsibility for that, I will have to accept that, but I

10   don't see any reason to show that to the jury.

11          THE COURT:  It's not my business to force you to show

12   exhibits to the jury, so -- but it is my job to make sure only

13   admissible evidence comes from either side, even if there's no

14   objection.  So on that we have some latitude, and this is

15   something he viewed on the video, you both agree that the video

16   itself should not be admissible because when the Court does the

17   Rule 403 balancing test, the probative value is outweighed by

18   the danger of unfair prejudice because there's an assault

19   that's uncharged in this case and, according to Mr. Jackson,

20   has not been the subject of a conviction depicted.  I just need

21   to make sure the basis for that.

22          Do I have that right, Ms. Cate?

23          MS. CATE:  I think you're right, your Honor.  And

24   whether it would be admissible under the 403 balancing test, in

25   light of our motions *in limine* and having not addressed this in

Adam J. Lucia - Cross

1  the motion *in limine*, we are not seeking to admit it now.  I
2  don't think the Government would concede that it wouldn't have
3  been admissible, but we are not -- because we did not seek to
4  get it admitted previously, we are not --

5          THE COURT:  So my concern is a technical one:  having
6  somebody testify to the contents of something that has not been
7  admitted.  I'm certainly not going to make you admit the video.
8  That's what caught my attention.

9          MS. CATE:  Yes.  Understood.

10         THE COURT:  Mr. Jackson, any thoughts on this?

11         MR. JACKSON:  No.  I mean, we both agree that the
12  video's not going to be shown, so, I mean, I don't think there
13  was any harm done.

14         THE COURT:  Okay.  Just doing my job.

15      And then the last thing I have to bring to your attention
16  is before the *Old Chief* stipulation is introduced to the jury,
17  I need to have a colloquy again with Mr. Jackson about whether
18  it's knowing and voluntary, whether he wants to waive his right
19  to a jury on that.  So I don't know when it's coming in, but I
20  want you to know that we're going to have that conversation
21  before it does.  And if you want to do it after a break or out
22  of sequence, that's fine with me, but that needs to happen.

23      Those were my issues.  Let's hear -- let's start with you,
24  Mr. Jackson.  Any issues from you?

25         MR. JACKSON:  Not at this moment, your Honor.

Adam J. Lucia - Cross

1          THE COURT:  The Government, any issues?

2          MS. CATE:  No, your Honor.

3          THE COURT:  All right.  We'll see you back here at

4  1:00.

5      (A lunch recess was taken from 12:03-1:00 PM.)

6          THE COURT:  We are back on the record in United States

7  v. Jackson.

8      Anything to bring to my attention from the defendant?

9          MR. JACKSON:  No, not at this time, your Honor.

10          THE COURT:  Anything from the Government?

11          MR. OPHARDT:  No, your Honor.

12          THE COURT:  We are ready to bring back the jurors,

13  Todd.

14          MR. JACKSON:  I'm sorry.  Judge Reiss?

15          COURTROOM DEPUTY:  Judge.

16          THE COURT:  What?

17          MR. JACKSON:  I have a dash cam video I would like to

18  have admitted.

19          THE COURT:  All right.  So we admit evidence in front

20  of the jury, and you are in the midst of cross-examining this

21  witness, so we'll stick on that issue.  Is the dash cam related

22  to this witness' cross-examination?

23          MR. JACKSON:  Yes.

24          THE COURT:  So just move to admit it.  I'll see if

25  there's any objection.  We'll go from there.  Okay?

Adam J. Lucia - Cross

1          MR. JACKSON:  Thank you, ma'am.

2          THE COURT:  Go ahead and bring back the jurors.

3      (Jury in at 1:02 PM.)

4          THE COURT:  We are back on the record in United States

5  of America v. Lawrence Jackson.  We are in Mr. Jackson's

6  cross-examination of Detective Lucia, who is on the stand and

7  is still under oath.

8      And you may resume.

9  Q    BY MR. JACKSON:  Good afternoon, Detective Lucia.

10 A    Good afternoon.

11 Q    Where we left off was in your affidavit of Travis Bunnell,

12 I think we were at the point where your source informant

13 informed you that Travis Bunnell has left 100 South Street to

14 go return bottles.  Is that true, sir?

15 A    I believe that's where we left off, yes.

16 Q    Okay.  And after he returned these bottles, you observed

17 him go towards 55 Killington Avenue?

18 A    I would have to recollect my memory from the affidavit.

19         MR. JACKSON:  Does he have it in one of those books?

20         MR. OPHARDT:  (Shakes head).

21         MR. JACKSON:  Do you have a copy?

22         MR. OPHARDT:  Mr. Jackson -- your Honor, may I

23 converse?

24         THE COURT:  Yes.  So what we'll do is we'll mark it

25 for identification.  It doesn't get admitted into evidence for

Adam J. Lucia - Cross

1  refreshing recollection.

2      What's the letter we should be using it for?

3          MR. OPHARDT:  Your Honor, I believe this already is

4  Exhibit U.

5          THE COURT:  Exhibit U.  Okay.  So we're all set.

6          MR. OPHARDT:  My recollection is Commander Whitehead

7  referred to it to refresh his recollection during his

8  testimony.

9          THE COURT:  All right.  And --

10         COURTROOM DEPUTY:  And it's not admitted.

11         THE COURT:  It's not admitted.  He's using it for

12 refreshing recollection.  But do we have Exhibit U floating

13 around so that you don't need to get it from the Government?

14 We should.

15     Mr. Behrens, do you have Exhibit U?

16         MR. JACKSON:  I have one copy here, your Honor.

17         THE COURT:  That's fine.  Go ahead and show the --

18 give it to Ms. Ruddy, who will, please, take it to the witness.

19     And for refreshing recollection, Mr. Jackson will tell you

20 what portion of the exhibit he wants you to read to yourself,

21 and we have a fussy rule about it.  You read it to yourself,

22 you turn it over, he asks you "Did that refresh your

23 recollection," you say yes or no, and then you testify from

24 your refreshed recollection.

25 Q    That would be paragraph 3 under probable cause in the

Adam J. Lucia - Cross

1 specific case.  Item number 69.04.

2 A    I'm sorry.  You said paragraph 3?

3 Q    Paragraph 3.

4      Oh, are you finished?

5 A    Yes, sir.

6 Q    Okay.  At that particular time, you knew based on

7 information you received from Detective Whitehead and Commander

8 LaChance that Travis Bunnell was in violation of his

9 conditions; isn't that true, sir?

10 A    That is not true.

11 Q    At what point did you find that Travis Bunnell was in

12 violation of his conditions?

13 A    That's when we contacted Communications Operator Cornell,

14 I believe, and he verified that he was in violation of his

15 conditions.

16 Q    And that was in paragraph 3, the one I just had you read,

17 right?

18 A    To my best recollection, yes, it was.

19 Q    All right, sir.  After that, that's when you started

20 surveilling Travis Bunnell?  That's according to your

21 affidavit.  Isn't it true, sir?

22 A    In paragraph 3, it just states that we began surveilling

23 him after the conditions check was confirmed, yes.

24 Q    Can you read paragraph 5.

25 A    Do you want me to read it out loud or in --

Adam J. Lucia - Cross

1 Q    Yes, please.

2 A    "While surveilling Bunnell, detectives observed him walk

3 through the Howe Center to the area of the River Street Bridge.

4 At the River Street Bridge, Bunnell and Ebert climbed the bank

5 near the bridge and crossed Strongs Avenue, traveling eastbound

6 on to Madison Street.  On Madison Street, Bunnell and Ebert

7 continued eastbound and crossed over to Killington Avenue.  On

8 Killington Avenue, Bunnell and Ebert continued eastbound

9 through the intersection of East Street.  Once through the

10 intersection, Bunnell and Ebert traveled eastbound for

11 approximately three to four residence and entered a driveway on

12 the north side of the roadway.  Where Bunnell and Ebert entered

13 the driveway is near 55 Killington Avenue."

14 Q    Sir, according to your affidavit -- you knew he was in

15 violation of his conditions while you observed him walk through

16 the Howe Center, according to your affidavit.

17 A    Well, I would believe that it was -- we just did not feel

18 it was time to approach him.

19 Q    Oh.  Okay.  And his curfew violation was issued by a

20 judge, wasn't it?

21 A    It was.

22 Q    And judge -- when judge make rulings, that's the law,

23 isn't it?

24 A    Typically, yes.

25 Q    So Honorable Fenster made a ruling about Travis Bunnell

Adam J. Lucia - Cross

1  being in violation of conditions and you didn't honor that?

2  A    No, we did.  We ended up arresting him for his conditions

3  violation.

4  Q    When you saw Travis Bunnell at the Howe Center, he was in

5  violations of his court-ordered conditions issued by Judge

6  Fenster; isn't that true?

7  A    That is true.

8  Q    You didn't honor it?  Yes or no?

9  A    We did honor it.  We ended up arresting him.

10 Q    Sir, at that particular time you seen Travis Bunnell at

11 the Howe Center, he was in violation of his conditions ordered

12 by Honorable Judge Fenster.  Did you or did you not honor the

13 court orders and arrest Travis Bunnell for being in violation

14 of his conditions at the Howe Center?

15 A    Not at the Howe Center, no.

16 Q    Okay.  So you didn't follow court orders?

17 A    No, we did.

18 Q    How did you do that, sir?

19 A    Because we arrested him later for his conditions

20 violation.

21 Q    So you're supposed to arrest him at the Howe Center.  He

22 was under court-ordered conditions.

23 A    There's -- there's nothing that says that we need to

24 arrest him at that point.

25 Q    Okay.  So there was nothing saying that you -- don't

Adam J. Lucia - Cross

1  follow court orders?

2  A    That's not -- we did follow court orders.  We arrested

3  him --

4  Q    When you wanted to.

5         MS. CATE:  Your Honor, objection.  The witness needs

6  to answer the question fully before the next question is posed.

7         THE COURT:  Make sure we allow the witness to complete

8  the sentence and also the questioner to complete the sentence.

9  I'm sure our court reporter would agree that everybody,

10  including the judge, is kind of trailing off and not finishing

11  sentences, so we've got to be more careful about that.

12         MR. JACKSON:  Yes, ma'am.

13  Q    Detective Lucia, when a judge issue an order for anybody,

14  me, you, anybody, are them orders supposed to be followed

15  promptly at the time that they're given?  Yes or no, sir?

16  A    Yes.

17  Q    Was Travis Bunnell outside of 100 South Street where he

18  was on a 24-hour curfew?  He was on 24/7 curfew at 100 South

19  Street.  You seen Travis Bunnell twice.  You seen him day

20  before, on the 22nd of November, and you didn't arrest him, and

21  you seen him on the 23rd at the Howe Center and didn't arrest

22  him, so you really want these people to believe that you're

23  honoring court orders?

24  A    I was honoring a court order.  We ended up arresting him

25  on a conditions of release violation for violating his 24/7

Adam J. Lucia - Cross

1  curfew.

2  Q    And at that particular day that morning, sir, what time

3  did you observe Travis Bunnell at the Howe Center?

4  A    I would have to refresh my memory with the affidavit.

5  Q    You can look at paragraph 1 in your probable cause in your

6  affidavit, sir.

7  A    This is at 10:57 hours.

8  Q    That you received a phone call from source information --

9  source informant; isn't that true?

10  A    That is correct.

11  Q    How far after 10:57 that morning did you see Travis

12  Bunnell at the Howe Center?  What was the time distance between

13  that you received that phone call and the time you seen Travis

14  Bunnell at the Howe Center?

15  A    I don't recall the time delay.

16  Q    Oh, okay.  And who surveilled Travis Bunnell to 55

17  Killington Avenue?

18  A    Myself and detectives with the Rutland City Police

19  Department.

20  Q    Can you tell me which detectives?

21  A    I believe Detective Billings was present.  Detective -- I

22  believe Commander LaChance was out.  To the best of my

23  recollection, Detective Sergeant Whitehead at the time was out

24  as well, and I believe Detective Maguire may have been out as

25  well.

Adam J. Lucia - Cross

1  Q    How far is the Howe Center to 55 Killington Avenue?

2  A    Without a map in front of me to give approximate distance,

3  less than a mile.

4  Q    So maybe about a 30-minute walk?

5  A    It's not a 30-minute walk, no.

6  Q    How far do you think, sir?

7  A    I would say a five-to-ten-minute walk, if -- if that.

8  Q    To 55 Killington Avenue?

9         THE COURT:  So that's a good example.  A

10 10-to-15-minute walk, if -- if -- oh, you did complete it.  "If

11 that" is what you're saying?

12        THE WITNESS:  Yeah.  Yes, ma'am.

13        THE COURT:  Okay.

14 Q    And at that time that you all were observing 55 Killington

15 Avenue, did you see me come in or out 55 Killington Avenue?

16 A    I did not, no.

17 Q    Did Detective Billings see me come in or out 55 Killington

18 Avenue?

19 A    Not to my knowledge, no.

20 Q    Did any other detectives report that they seen me come in

21 or out of 55 Killington Avenue?

22 A    Not to my knowledge, no.

23 Q    Okay.  But Travis Bunnell did lie to you, didn't he?  He

24 said he never -- he said he went to work, came home, got

25 something to eat, and returned some bottles?

Adam J. Lucia - Cross

 1  A     That is correct, he did lie.

 2  Q     So at what time he was at 55 Killington Avenue?

 3  A     I don't recall the exact time.

 4  Q     You observed him.  He was -- you received a phone call at

 5  10:57.  So you don't know what time you surveilled him to 55

 6  Killington Avenue, how long he stayed there, and what time he

 7  left?

 8  A     I do not have those times in front of me, no.

 9  Q     What time was Travis Bunnell arrested that morning, that

10  afternoon, or evening?

11  A     He was -- he was arrested shortly after he had left 55

12  Killington Ave.

13  Q     And what time was that, sir?

14  A     I would have to look at a radio log or -- to recollect my

15  memory, refresh my memory.

16  Q     But you're sure it was in the morning?  Travis Bunnell

17  said he was at 55 Killington Avenue that morning?

18  A     To my best of my recollection, it was between midmorning

19  and close to the afternoon.

20  Q     Even though he told you he went to work?

21  A     I -- I don't understand what you --

22  Q     In his conversation you just heard, he said he got up,

23  went to work, went and got something to eat, came back to his

24  house, got some bottles, and went to the Howe Center.

25  A     Correct.  But you're asking me about him leaving 55

Adam J. Lucia - Cross

 1 Killington Ave. versus -- I'm confused at what you're exactly

 2 asking me.

 3 Q    You didn't believe where he was at.  You told him he was

 4 lying.  You told him you knew he wasn't at work.

 5 A    That is correct.

 6 Q    But you knew where he was at.

 7 A    Yes.  Because we were surveilling him.

 8 Q    Detective Lucia, we're going through this again.  You only

 9 knew he went to the Howe Center.  You didn't know he was at 55

10 Killington Avenue until after you surveilled him.

11 A    I believe I said that.

12 Q    No, you didn't.  You just said something totally

13 different, sir.  You said that he was at 55 Killington Avenue.

14 You didn't mention nothing about the Howe Center.

15 A    Sir, you're --

16        MS. CATE:  Objection.  It's a mischaracterization of

17 the testimony, and these seem asked and answered.

18        THE COURT:  So we're not allowed, nobody is allowed,

19 to argue with the witness, and you're not also allowed to

20 respond to the witness.  So -- because the attorney's not under

21 oath, if a witness says, "Well, I think it was a sunny day in

22 January," you're not allowed as the attorney to be like, "No,

23 it wasn't.  It was a cloudy day in February."  That's not part

24 of it.  It's a question, question, question and answer, and

25 then it's up to the jury to decide whether or not the

Adam J. Lucia - Cross

1  testimony's credible.

2        So just ask your next question.  Don't argue with the

3  witness.  And you're doing fine.  Let's proceed.

4            MR. JACKSON:  Yes, your Honor.  And I'm sorry about

5  that.

6  Q    Sorry, Detective Lucia.  So I'm going to move on to your

7  testimony with -- your conversation with Travis Bunnell that

8  was recorded.

9            MR. JACKSON:  And I would like to play the rest of

10  that tape, please, restart it, if it's okay.

11            THE COURT:  And this is Exhibit --

12            COURTROOM DEPUTY:  This was S.

13            THE COURT:  S, for the record.

14        Thank you, Ms. Ruddy.

15            MR. JACKSON:  S.  It's a continuation.

16        Just one more question before we start that.

17  Q    In your conversation with Travis Bunnell, you asked him

18  why he came to 55 Killington Avenue; isn't that true?

19  A    I would have to recollect my memory with the recording.

20  Q    You have the affidavit right in front of you.  Is that

21  good?  Can you read off that?

22  A    If the judge allows it.

23            THE COURT:  Sure.  You direct him to which paragraph

24  of the affidavit you want him to read to himself, and then you

25  can ask him the question again.

Adam J. Lucia - Cross

1  Q    Paragraph 9, sir.

2       Are you finished?

3  A    Yes, sir.

4  Q    Do you believe he bought two bags of heroin from me, sir?

5  A    That is what he told me in his statement.

6  Q    He never gave you two bags of heroin or anything like

7  that, was he -- did he?

8  A    He did not.  I believe it said that he snorted it at the

9  residence.

10 Q    And at the time from the residence that he claimed that he

11 snorted at the residence and you picked him up, he had to be

12 high at that time; wouldn't that -- is that fair to say?

13 A    Everybody's different, and I don't think I can testify to

14 what somebody else's body would do under the influence of

15 drugs.

16 Q    That's fair to say.  Did he appear to be high or anything

17 at that moment?

18 A    Not when I was speaking to him, no.

19 Q    Okay.  I want to direct your attention to paragraph 11.

20 Can you read that out loud, sir, please.

21       MS. CATE:  Objection, your Honor.

22       THE COURT:  Basis?

23       MS. CATE:  This is not a document in evidence.

24       THE COURT:  The document isn't in evidence, and I

25 believe it may be for impeachment purposes, but it is also a

Adam J. Lucia - Cross

1  prior statement under oath, and it may fall within the residual

2  hearsay exception.

3      I'll ask Mr. Jackson the basis for offering to have this

4  witness repeat his affidavit to the jury.

5          MR. JACKSON:  I tell you what.  I'll just -- I'll ask

6  a question.

7          THE COURT:  Fine.

8  Q    While Mr. Bunnell was -- when you talked to Mr. Bunnell,

9  he advised you that there was firearms inside the residence;

10 isn't that true?

11 A    That is correct.

12 Q    And Mr. Bunnell mentioned a .40 caliber handgun and a .410

13 Judge revolver?

14 A    That is correct.

15 Q    And that's what Travis Bunnell told you out of his mouth?

16 A    Correct.

17 Q    Okay.  You never told Travis Bunnell that it was a .410

18 revolver in that house?

19 A    I don't recall that I did.

20 Q    Okay.

21         MR. JACKSON:  Can we play the tape, please.

22     (Defendant's Exhibit S was played in open court from

23 minute 5:31 through 13:24.)

24 Q    BY MR. JACKSON:  Detective Lucia, I just asked you a

25 minute ago did you tell Travis Bunnell it was a .410 Judge

Adam J. Lucia - Cross

1 revolver.  You said no.  We just heard you on the tape telling

2 Travis Bunnell it was a .410 revolver, because he didn't know

3 what it was.

4 A    I believe I said that.

5 Q    Is that true, sir?

6 A    I don't think that's true.  I believe I said I didn't

7 recall if I had said that.

8        MR. JACKSON:  Can we have a read-back of the

9 testimony, your Honor, please?

10       THE COURT:  Sure.  I'll tell Ms. Massé where to look.

11     (The record was read as follows:

12     "QUESTION:  Okay.  You never told Travis Bunnell that it

13 was a .410 revolver in that house?

14     "ANSWER:  I don't recall that I did.")

15 Q    BY MR. JACKSON:  Now do you recall that you did that?

16 A    Yes.  From the video, it sounds like he describes it as

17 well.

18 Q    He said a .44 Magnum.  That's not a .410 shotgun.  That's

19 not a Judge.

20 A    He said -- I believe he said one that takes shotgun

21 shells.

22 Q    So using your examination, when people are telling

23 something about that, you give them a heads-up of what it was?

24 You told him a .410 Judge revolver.  He didn't -- he didn't

25 tell you that, sir, and you just stated on the record that you

Adam J. Lucia - Cross

1   didn't tell him that.

2           MS. CATE:  Objection.  It's argumentative.  It's not a

3   question.

4           THE COURT:  So the jury's recollection of the evidence

5   is what counts.  We just had a read-back.  So make sure you're

6   asking questions as opposed to making statements.

7           MR. JACKSON:  Okay.  I'll move on from that.  The jury

8   heard it.

9   Q    Detective Lucia --

10          MR. JACKSON:  Can you finish playing that tape,

11  please.

12      (Defendant's Exhibit S was played in open court from

13  minute 13:24 through 16:17.)

14  Q    BY MR. JACKSON:  Detective Lucia, from January 2021 up

15  until November '21, have you heard -- you said Detective

16  Billings received information from numerous subjects that

17  narcotics were being sold out of 55 Killington Avenue; isn't

18  that true, sir?  That's your affidavit, paragraph 6.  Want to

19  take a look at it?

20  A    That is what it states, yes.

21  Q    Okay.  And we consider spring what month, you would say?

22  A    I would what?  I'm sorry.

23  Q    What month would start spring?

24  A    March.

25  Q    Say March?  Okay.  So from March to November would be

Adam J. Lucia - Cross

1  eight months, between March and November?

2  A    Right around that, yes.

3  Q    All right.  And the Rutland Police Department, Detective

4  Billings, including yourself, knew drugs was being sold out of

5  this apartment for eight months?  Yes?  No?

6  A    We had information of it, yes.

7  Q    Right.  And was that information that I lived at 55

8  Killington Avenue?

9  A    According to the affidavit, it says that you were staying

10  at the residence.

11  Q    Okay.  At any time during the spring or before the spring

12  of 2021, I was approached by you and Detective Billings when I

13  was in the car with Sarah from Bellevue?  Do you remember that

14  day, sir?

15  A    I don't remember that day, no.

16  Q    Okay.  And during the course of this investigation, after

17  you arrested me, you looked at my license, right?

18  A    I just said I don't recall that day.

19  Q    Okay.  So you don't know if I have another address or

20  where do I live at in Rutland?

21  A    As far as I know, you were staying at 55 Killington Ave.,

22  according to my affidavit.

23  Q    From your investigation, how long I been living in

24  Vermont, sir?

25  A    Can you repeat the question?

Adam J. Lucia - Cross

1 Q    Do you know how long I've been living in Vermont, in

2 Rutland, Vermont?

3 A    I don't know.  I just know that through previous

4 interactions with people, your name has come up throughout the

5 years.

6 Q    So you never knew I lived in Vermont for almost 14 years,

7 I was a permanent resident with a child in Rutland?

8 A    I did not know that.

9 Q    And at no time did you all do an investigation on 55

10 Killington Avenue or me at that time, did you, from, say, March

11 to November 23rd?

12 A    We didn't have any -- if you're asking if you were under

13 investigation by us, just because we have information about a

14 residence doesn't necessarily mean we're going to act on it

15 yet.  It takes a while to build information.

16 Q    During the course -- during the course of the eight

17 months, you stated in your affidavit that it was known that I

18 lived in 55 Killington Avenue, that the subject advised that

19 Lawrence Jackson was staying at said residence for eight

20 months, and according to the Government, according to you, I

21 was moving massive amounts of cocaine.  Isn't that true?

22 A    It says that we had received information from numerous

23 subjects that narcotics were being sold out of 55 Killington

24 Avenue, Apartment Number 2, and that subjects had advised us

25 that you, Lawrence Jackson, was staying at the residence.

Adam J. Lucia - Cross

1 Q    So all these subjects.  Are any of these the subjects --
2 from March to November, are any of these the subjects:  Angel
3 Cruz, Orlando Cruz?  Was he a subject that gave you that
4 information at that time?  Yes?  No?
5 A    He --
6 Q    Was Danielle Currier a person that gave you information
7 that I was selling drugs out of 55 Killington Avenue between
8 March of 2021 and November 23rd, sir?
9          MS. CATE:  Objection.  I don't think we got an answer
10 to the question before that.
11          THE COURT:  We didn't.  So the first question, which
12 was not answered, not because the witness wouldn't answer but
13 because we went on to a different question -- you can withdraw
14 the question.  It was about Angel Cruz, Orlando Cruz, or you
15 can ask that question, but it's just kind of hanging.
16          MR. JACKSON:  I'll withdraw the question and ask
17 again.
18          THE COURT:  Okay.  Go ahead.
19 Q    You know who Orlando Cruz is, yes?
20 A    I do.
21 Q    Okay.  Anytime between March 2021 and November 23rd, did
22 he give you any information that I was selling drugs out of 55
23 Killington Avenue?
24 A    No.
25 Q    Has Danielle Currier given you any information that I was

Adam J. Lucia - Cross

1 selling drugs out of 55 Killington Avenue between March of 2021

2 and November of 2021?

3 A    No.

4 Q    Did Nicholas Doane give you any information that I was

5 selling drugs from March of 2021 to November of 2021?

6 A    No.

7 Q    Has Nicole Jones given you any information that I was

8 selling drugs from March of 2021 to November of 2021, sir?

9 A    No.

10 Q    Has Ashley Lobdell given you any information that I was

11 selling between March of 2021 and -- to November of 2021?

12 A    No.

13 Q    Has David Markie given you any information that I was

14 selling drugs from March to November of 2023 -- I mean 2021?

15 A    You're talking about during that time frame --

16 Q    Yes.

17 A    -- correct?

18 Q    From March to November of 2021.

19 A    No.

20 Q    Okay.  Has Thomas Rougier given you any of that

21 information from March of 2021 to November 2021?

22 A    Not during that time frame, no.

23 Q    Has Walter Taylor given you any of that information?

24 A    No.  Not during that time frame.

25 Q    So you basically had no information that I was selling

Adam J. Lucia - Cross

1 drugs except Travis Bunnell on November 23rd?

2 A    That's not true.

3 Q    Well, I just listed -- I just gave you all the witnesses

4 that the Government's going to bring before this jury, and you

5 just said none of these people ever gave you any information

6 that I was selling drugs between March 2021 to November 23rd.

7 A    Correct.  During that time frame between March 2021 and

8 November 2023, none of those subjects -- between that time

9 frame, none of those subjects did give information during that

10 time that you were selling drugs there.  That is correct.

11 Q    Okay.  But, however, all these subjects did give

12 information after November 23rd?

13 A    Correct.

14 Q    When these subjects caught their own criminal cases?

15 A    Yes.

16 Q    Okay.  And these subjects' criminal cases I had nothing to

17 do with?  It's a "yes" or "no," sir.

18 A    I guess can you rephrase that question for me?

19 Q    The witnesses I just named, you said they never gave you

20 any information that I was selling drugs --

21 A    During that time period.

22 Q    During -- from November -- I mean from March 2021 to

23 November 23 -- to November 23rd, 2021.  They never gave you any

24 information about me.  You said no.

25 A    Correct.  During that time period.

Adam J. Lucia - Cross

1 Q    After November of 2021, that's when all these people gave

2 you information about me?

3 A    Correct.

4 Q    Alleged information about me.

5 A    Correct.

6 Q    After these very people caught their own cases, drug

7 cases, robbery cases, or what have you.

8 A    Correct.

9 Q    Did I have anything to do with any one of these

10 individuals or participate in a crime with any one of these

11 individuals from March of 2021 up until the time each one of

12 these people got arrested?

13 A    Did you have involvements with them or cases with them?

14 Q    Did I have involvement in any crime with them during the

15 course of that time till the last person got arrested, whoever

16 that was?

17        MS. CATE:  Objection, your Honor.  There's just kind

18 of a compound question.  There's a lot of people being

19 discussed right now, and I think it could be confusing to talk

20 in those broad strokes.

21        MR. JACKSON:  Well, your Honor --

22        THE COURT:  So the question -- when the judge is

23 talking, nobody else is talking.

24     The question is framed "Did any one of them" -- "Did I

25 have involvement in any crime with them during the course of

Adam J. Lucia - Cross

1 that time till the last person got arrested, whoever that was?"
2 So it's for any of them, and the witness is allowed to answer
3 if he can, and you can ask a follow-up question, and Ms. Cate
4 can ask redirect questions.

5      So go ahead and answer if you can.
6 A    I would say that their arrests that they had, you directly
7 had no involvement in their arrests; however, the information
8 that they provided, you were involved in criminal activity with
9 them between that time frame.

10 Q    Detective Lucia, that's -- you said that none -- that I
11 was not involved with these people from -- you received no
12 information from November 2021 to November of 2021 from any one
13 of these individuals until after they got arrested for whatever
14 crime they got arrested for, they gave you information about me
15 saying that they did this, selling drugs for me or I gave them
16 drugs.

17 A    Correct.  That's -- that's what I'm stating.  They're
18 stating that during that -- during that time frame, between
19 March -- you're saying March and November of 2021 --
20 Q    Um-hum.
21 A    -- if any of them came in and gave us information.  That
22 is -- you're correct in saying that, and I said no, they did
23 not.

24      However, the next part of your question, you stated after
25 they were arrested, did they provide information which -- that

Adam J. Lucia - Cross

1 you were involved -- you know, first you said with their

2 arrest, and I said no, you were not involved directly with

3 their arrest; however, you were involved -- I am saying they

4 disclosed information that you were involved in criminal

5 activity during that time between, we'll say, March and

6 November with them.

7 Q    With them.

8 A    With -- with those individuals.

9 Q    Okay.  I'm going to move on.

10      At the end of your conversation with Travis Bunnell, you

11 asked him has he ever been arrested for forgery, lying, any

12 things in that nature of committing any crime.  Do you remember

13 that?

14 A    I would have to listen to the recording.

15 Q    I'm going to move on, Mr. -- Detective Lucia.

16          MR. BEHRENS:  I'm sorry.

17          MR. JACKSON:  Excuse me.

18 Q    The Government just showed you some videos of me being

19 arrested.  I believe it was Lafayette Street?

20 A    Yes.

21 Q    Do you recall that?  You was on there?

22 A    Yes.

23 Q    During the course of that arrest, Danielle Currier gave

24 you information when she got out the car claiming that I passed

25 a bag to Brianna Arnold and Brianna Arnold hid it under the

Adam J. Lucia - Cross

1 driver's seat.  Is that true?

2 A    I'm sorry.  I couldn't hear you.  It broke up.

3 Q    Danielle Currier testified before this jury that I passed

4 a bag to Brianna Arnold and she placed it underneath the

5 driver's seat.  Do you recall that -- I mean -- and do you

6 recall her giving you that same information in her interview

7 with you at the scene?

8 A    I believe actually in my affidavit it says that she passed

9 it, it was under the passenger seat.

10 Q    Under the passenger seat.  And you believed her statement?

11 A    I did.

12 Q    And you presented that statement to Honorable Judge Toor

13 to get a search warrant for the vehicle?

14 A    That and along with Trooper Silva's K-9 alert on the

15 vehicle.

16 Q    I'm just talking about Danielle Currier right now, sir.

17 A    Okay.

18 Q    You passed that information along in your affidavit to get

19 a search warrant for the vehicle?

20 A    That was part of the affidavit, yes.

21 Q    Okay.  Upon searching that vehicle, did you find a blue

22 bag under the passenger seat, sir?

23 A    No.  We located it under the driver's seat.

24 Q    Danielle Currier no less than two hours ago testified

25 before this jury that she seen me pass the bag and the girl in

Adam J. Lucia - Cross

1 the front seat put it under the driver's seat *[sic]*.

2 A    I was not present for her testimony.

3 Q    You took her testimony -- oh, I'm talking about you took

4 her statement at the scene.  It's recorded.

5 A    Correct.  But when you say that she -- she talked to the

6 jury, I don't know what she said to the jury here.

7         MR. JACKSON:  If I may, your Honor, can I have

8 Detective Lucia identify somebody in the courtroom, please?

9         THE COURT:  You may do so.

10 Q    Do you know who Special Agent Dornbierer is?

11 A    I do.

12         MR. JACKSON:  Mr. Dornbierer, can you stand up,

13 please.

14 Q    He was part of your investigation in this case, right?

15 A    He was.

16 Q    Okay.  Thank you.

17         MR. JACKSON:  Thank you, sir.  Appreciate it.

18 Q    He testified before a grand jury.  Are you aware of that?

19 A    Yes.

20 Q    Okay.

21         MR. JACKSON:  Just give me one second, your Honor.

22 I'm just trying to find something.

23         THE COURT:  Certainly.

24 Q    Detective Lucia, in Special Homeland Security Agent

25 Dornbierer's testimony before the grand jury, Mr. Ophardt,

Adam J. Lucia - Cross

1  sitting right here, asked him:  "Okay.  What, if anything, was

2  found under the passenger seat?"

3      He said, "I'm sorry.

4      "What, if anything, was found under the passenger seat?

5  What was found?"

6      He said, "Yes.  A blue bag.  A zip bag.  A fanny pack was

7  found under the passenger seat."

8      So did Mr. Dornbierer commit perjury in front of the grand

9  jury?

10 A   I don't believe he committed perjury.  He was probably

11 just mistaken.

12 Q   He did this testimony a month after the incident.  He knew

13 the report.  He would know what you wrote in your report and

14 everything.  He didn't write that.  He wrote what Danielle

15 Currier said.  How did that bag get underneath the driver's

16 seat?

17 A   Well, I -- from -- from a witness that's not on the list,

18 they advised that they placed that bag underneath the driver's

19 seat.

20 Q   What witness advised that, sir?  There was three people in

21 the vehicle:  me, Brianna Arnold, and Danielle Currier.  There

22 was a bag full of narcotics planted underneath the driver's

23 seat.  According to your testimony and your affidavit, you said

24 when you searched this vehicle, you found that bag under the

25 driver's seat, in the back under the driver's seat.

Adam J. Lucia - Cross

1  A    Which we did.

2  Q    Sir, so she committed perjury in Judge Reiss's courtroom

3  just less than two hours ago?

4  A    I was not present for her testimony.  I do not know what

5  she said.

6  Q    Okay.  Well, we all were, and they heard her testimony.

7        MS. CATE:  Objection.  That's not a question.

8        THE COURT:  We're going to strike the last remark.

9        MR. JACKSON:  Yes, your Honor.

10        THE COURT:  You are not allowed to respond to the

11  testimony.  You'll have an opportunity to do that in closing

12  argument.

13        So when the Court strikes something, you disregard it as

14  if it didn't happen.

15        Go ahead, Mr. Jackson.

16  Q    At the scene -- do you remember testifying in this court

17  before at the suppression hearing?

18  A    I did.

19  Q    And during that suppression hearing, I asked you did you

20  go in that vehicle at any point.  You testified no.  Is that

21  correct?

22  A    That is correct.

23  Q    And is that -- did you review video of State Trooper

24  Malmgren's dash cam from his car?

25  A    I don't recall reviewing that video.

Adam J. Lucia - Cross

1  Q    Okay.  Well, we're going to show it to you today.

2           MR. JACKSON:  Your Honor, I move to admit State

3  Trooper Malmgren's dash cam video into evidence.

4           THE COURT:  And the exhibit number is -- or letter?

5           MR. BEHRENS:  M.

6           MR. JACKSON:  Exhibit M.

7           THE COURT:  Any objection to the admission of Exhibit

8  M?

9           MS. CATE:  M, as in Michael?

10          THE COURT:  Yes.

11          MS. CATE:  No objection.

12          THE COURT:  M is admitted.

13       (Defendant's Exhibit M was received in evidence.)

14 Q    BY MR. JACKSON:  And just for the record, you never

15 entered the vehicle; is that true, sir?

16 A    I believe on the other dash cam video, you didn't see me

17 enter the vehicle, that is correct.

18 Q    Excuse me?  Say that again, sir, please.

19 A    From the video that we saw earlier, I did not enter the

20 vehicle in that video, no.

21 Q    I'm not asking about the video, sir.  At any point at the

22 traffic stop, did you enter that vehicle?

23 A    I don't recall entering the vehicle, no.

24          COURTROOM DEPUTY:  Is there audio on this?

25          MR. JACKSON:  There's no audio on this, but can you

Adam J. Lucia - Cross

1  show me how to zoom in on this?

2       COURTROOM DEPUTY:  You can't, actually.  Mr. Behrens

3  may have that function, but -- no, he does not look like -- I

4  don't believe we have that as a function.

5       (Defendant's Exhibit M was played in open court.)

6       MR. JACKSON:  Mr. Behrens, can you put it back in the

7  beginning?

8       Your Honor, if it's okay, direct the jury on to the part

9  where they can look at it and see Detective Lucia getting out

10 of the vehicle when the car pull up?

11      THE COURT:  So a couple things are going on that

12 doesn't work out.  We can't have conversations at the same time

13 the jury's viewing the evidence.  So when that happens, just

14 like you did it before, stop and then ask your questions, and

15 that includes conversing with the courtroom deputy, because

16 nobody can do two things at once.

17      The jury can watch the whole thing, they can watch part of

18 it, but I can't tell them, "Hey, look at this" or "Don't look

19 at that," because that's not my role.

20      MR. JACKSON:  Okay, your Honor.

21      THE COURT:  I don't have anything to do with the

22 facts.  It's up to the jury to make that determination.

23      MR. JACKSON:  Can I just direct the jury to look at

24 the back of the red vehicle?

25      THE COURT:  You may do so.

Adam J. Lucia - Cross

1          MR. JACKSON:  We just had it.  That came up pretty

2  close.  I think we can focus in some more.

3          You can stop.  I think the jury's seen it.

4          Is that okay, your Honor?

5          THE COURT:  It's your case, so that's fine.  If you're

6  satisfied, it's fine with me.

7  Q    Okay.  Detective Lucia, the video that you just seen from

8  dash cam video from State Trooper Malmgren's car shows you

9  clearly getting out of the vehicle at the traffic stop from the

10 passenger side.  Did you just see that, sir?  Did you just

11 observe that yourself?

12 A    I did not.

13 Q    You did not see yourself getting out the vehicle?

14 A    No, I did not.

15         MR. JACKSON:  Your Honor, I think I need to make a

16 legal argument outside the presence of the jury.

17         THE COURT:  Well, we won't do it right now, but we're

18 going to be taking a break pretty soon.  Do you want to take

19 the break now?  Do you want to continue your questioning and

20 then take a break?  It's 2 o'clock, so we've only been going

21 for about an hour, and I usually break at about 2:30.

22         MR. JACKSON:  I think we should take the break now,

23 your Honor.

24         THE COURT:  All right.  We'll take our midafternoon

25 break at this time, approximately 15 minutes.

Adam J. Lucia - Cross

1    Members of the jury, don't talk about the case.  Don't let
2 anybody talk to you about the case.  I wish you a good break.
3    I'll have the parties remain in the courtroom.
4    (Jury out at 1:58 PM.)
5    THE COURT:  I assume, Mr. Jackson, you want the
6 witness excused from the courtroom?
7    MR. JACKSON:  Yes.
8    THE COURT:  All right.  We'll do that.
9    Mr. Jackson, you wanted to raise something?
10    MR. JACKSON:  Yes.  Your Honor, I want to refer back
11 to the Court's decision, and I respectfully request that the
12 Court hold Detective Lucia in contempt.  You clearly stated in
13 your -- you observed the video yourself, and in your denial of
14 the *Franks* hearing, you clearly stated that Detective Lucia was
15 seen getting out the vehicle, out of that vehicle.
16    THE COURT:  So let's hear the Government's response.
17    MR. OPHARDT:  Your Honor, I've never had anyone ever
18 in a trial ask for the Court to hold someone in contempt for
19 testifying as to what they believe to be the truth, so I'm very
20 confused by the request.  I don't have a copy of the Court's
21 suppression ruling.  My recollection is that the Court set out
22 the facts as Mr. Jackson articulated them.  However, the
23 Court -- I'll be frank, Judge.  I have no idea who was close to
24 the car at the time of that --
25    THE COURT:  I don't know that I did either, and

Adam J. Lucia - Cross

1 looking at that clip, I can't make an identification myself.  I
2 saw the issue at the *Franks* hearing as somebody went into the
3 car, or it looks like somebody went into the car, but, you
4 know, I'm certainly not going to find that the witness is in
5 contempt.  The jury can evaluate.  The jury just saw the clip
6 that you want them to see.  They can make an identification as
7 to whether that's Detective Lucia or not.
8         So you showed them what we saw at the suppression hearing,
9 and the jury can decide whether or not Detective Lucia has been
10 testifying untruthfully in that respect or any other respect,
11 but I'm not going to hold him in contempt.  He would have to
12 disobey a court order.  I'd have to give him a warning.  I'd
13 have to find that he has somehow flouted the Court's authority,
14 and I don't have any basis for doing that, so the motion to
15 hold him in contempt is denied.
16         MR. JACKSON:  Okay.  Well, your Honor, if I may, you
17 clearly stated in your *Franks* hearing denial that the video
18 depicts Detective Lucia getting out the vehicle.
19         THE COURT:  So why don't you read me from that
20 decision.  Depicts him getting out of the vehicle.
21         MR. JACKSON:  The video depicts.  And I'm pretty much
22 sure I have that, your Honor.
23         THE COURT:  Mr. Jackson, we'll pull it from the
24 docket.  You know, one of the possibilities is I could be wrong
25 about that, but I want to see what the Court says.  My

Adam J. Lucia - Cross

1   recollection of the suppression hearing is there was an issue

2   about whether maybe somebody went into the car to prepare it

3   for towing back to the station, Detective Lucia didn't remember

4   going into the car and thought he did not.

5            MR. JACKSON:  Yes, your Honor.  You did give him -- at

6   the suppression hearing you did give him the benefit of the

7   doubt when the Court asked -- I have it right here, your Honor.

8            THE COURT:  Okay.

9            MR. JACKSON:  This is the suppression hearing.  Not

10  your decision but the suppression hearing.

11           THE COURT:  So on page 6, which is Document No. 151,

12  "Dashcam footage of the traffic stop depicts a law enforcement

13  officer exiting the passenger side of the Ford Freestyle

14  approximately three seconds after the recording starts.

15  Detective Lucia testified he does not recall entering the

16  vehicle."  So that's all the Court found in terms of findings

17  of fact.

18           MR. JACKSON:  Yes.  And that's true, your Honor, but

19  the Court did recognize somebody got out of that vehicle, and

20  the person that was next to that vehicle that got out of that

21  vehicle, it was Detective Lucia.

22           THE COURT:  So either he did and he doesn't remember

23  it or he didn't and he's right.  I don't -- I never found that

24  he was the person.  Quite frankly - it will be the jury that

25  decides this - I couldn't see much from that clip.  I saw

Adam J. Lucia - Cross

1  exactly what you saw.  I saw a body next to the car, and it
2  looked like the passenger door was open.  That's about all I
3  saw.
4        MR. JACKSON:  Right.  But, your Honor, as soon as he
5  popped his head out the vehicle, I could tell it was Detective
6  Lucia.  I'm looking right at the video.
7        THE COURT:  Okay.  Well, maybe the jury has the same
8  conclusion as you and will find that Detective Lucia either
9  testified falsely that he was in the car or that he didn't
10 remember that he was in the car and that he was, and that's
11 their job.
12       MR. JACKSON:  Yes.
13       THE COURT:  That's their job.
14       MR. JACKSON:  Your Honor, in his statement that he
15 made at the scene, the video, he straight denies the fact that
16 he didn't get out that vehicle.  It's either two things.  I
17 know I maybe went a little way with the contempt, but, you
18 know, he's committing perjury.  He's lying in front of this
19 jury, and he's lying in front of this court.  The tape is clear
20 that's Detective Lucia getting out that car, Honorable Judge
21 Reiss.
22       MS. CATE:  Your Honor, I think the Court has -- has
23 accurately summarized where we are.  There is a video that is
24 difficult to depict.  The witness has given testimony.  The
25 accusation that it's perjury is significant, and I think

Adam J. Lucia - Cross

1  there's not a basis for it here.

2          MR. JACKSON:  I stand by that, your Honor.  I stand by

3  my perjury accusations because he sits on the stand -- my

4  argument is this, your Honor.  I'm just making an argument,

5  just trying to defend myself here.  I'm not trying to be

6  disrespectful.  I would never do that to anybody.  And even

7  Detective Lucia, I don't want to see him get into trouble or

8  anything like that, but there's well-trained people in this

9  courtroom, U.S. prosecutors and judges.  He's sitting on the

10 stand.  There's a video shown, and he's still denying the fact,

11 even after Special Agent Dornbierer report.

12         He testified before the grand jury that this bag was

13 supposed to be underneath the passenger seat.  There's more

14 videos, Honorable Judge Reiss, that Sergeant Jason Johnson, who

15 was on the scene, who helped him search the vehicle, said that

16 this bag was under the passenger's seat.  They're lining me up

17 and putting the bag underneath the driver's seat.

18         THE COURT:  So here's the Court's ruling, and this is

19 how things are going to unroll.  You have preserved your

20 objection for the record.  Perjury is a charge that can be

21 brought after the trial.  I would commit error myself if I told

22 this jury how to evaluate somebody else's credibility.  That's

23 their job.  So I would never tell the jury this person lied.

24         And if you remember from the jury instructions, remember

25 that there are inconsistencies in testimony.  Somebody might

Adam J. Lucia - Cross

1 testify that a house was yellow when it was white.  It might be

2 a big thing:  "I found the gun in a holster.  It was in a fanny

3 pack."  "No, it wasn't.  It was on the floor."  That's the

4 jury's job.  The jury's job is to evaluate credibility.  I

5 can't do that for them, and I cannot tell them this person is

6 lying.  It's just not something that happens in court, because

7 then I'm taking their role and I'm telling them how the

8 evidence should be viewed.

9     You've preserved your objection.  You can continue your

10 cross-examination.  I'll let you know if I think it's improper.

11 You seem to be doing a fine job.  And you can make that

12 argument in closing argument.  You can say, "I think he

13 perjured himself."  That's appropriate in closing argument.

14 It's going to be the jury, though, that decides whether or not

15 that's a truthful statement, not me.

16         MR. JACKSON:  Okay, your Honor.  Well, can I just

17 state for the record as well and it be noted that the

18 Government is, I believe, suborning perjury?

19         THE COURT:  You can make that objection for the

20 record, and it's preserved, and we have a court reporter taking

21 it down.

22     Anything to bring to my attention before we take our own

23 break?

24         MS. CATE:  Not from the Government.  Thank you.

25         THE COURT:  Mr. Jackson, are you all set for the break

Adam J. Lucia - Cross

1 as well?

2          MR. JACKSON:  Oh, yes, ma'am.

3          THE COURT:  Okay.

4     (A recess was taken from 2:13-2:23 PM.)

5          THE COURT:  We are back on the record in United States

6 v. Jackson.

7     I understand there are two issues.

8     And, Mr. Ophardt, let's start with you.

9          MR. OPHARDT:  Thank you, your Honor.

10     We've conferred and we are agreeable to the defense

11 witness from Mississippi, who I believe is Walter Taylor III,

12 appearing virtually.  We have concerns about the scope of the

13 examination, but the way in which he appears -- the way in

14 which he appears, we do not object.

15          THE COURT:  All right.  And I will have the marshals

16 relay that message to Deputy Marshal Curtis, who is arranging

17 that, and he said he wanted to know as soon as possible, so

18 this is great.

19     Then you had another issue with a witness that you want in

20 the courtroom before the jury comes in, correct?

21          COURTROOM DEPUTY:  That was a marshal who --

22 Mr. Curtis asked me that specifically.

23          THE COURT:  Oh, sorry.

24          COURTROOM DEPUTY:  He wants it that way.

25          THE COURT:  So we're going to have Ms. Nodell --

Adam J. Lucia - Cross

1          COURTROOM DEPUTY:  Lobdell.

2          THE COURT:  -- Lobdell in the courtroom before the

3 jury comes in because she is incarcerated.

4          MR. OPHARDT:  Yes, your Honor.  That is perfectly fine

5 with the Government.  She is not our next witness, though.

6          THE COURT:  Okay.

7          MR. OPHARDT:  If we get to her today, that's our hope.

8          THE COURT:  Okay.

9          MR. OPHARDT:  But we've kind of slowed down a little

10 bit.

11          THE COURT:  Just give me the heads-up and then we'll

12 do what we need to do.

13          MR. OPHARDT:  She would be -- we have Detective

14 Sergeant Johnson next and then Ms. Lobdell.

15          THE COURT:  All right.  Then one issue I have for you.

16 I heard from the marshals in order to accommodate Mr. Jackson's

17 request to attend the web service for his older sister, I

18 believe we have to end at 2:00.  Does that sound familiar?

19          MR. JACKSON:  Yes, your Honor.  Because it starts at

20 4:00.

21          THE COURT:  Yes.  But -- but I want to make sure that

22 the time that we have to stop is 2 o'clock?

23          DEPUTY MARSHAL:  Anytime between 2:00 to 2:30.  2:00

24 works best, ma'am.

25          THE COURT:  Okay.  So 2 o'clock.  Any problem with

Adam J. Lucia - Cross

1  that from anybody?

2            MR. OPHARDT:  No, your Honor.

3            THE COURT:  All right.  I will tell the jury that

4  we're going to end early on Friday at approximately 2 o'clock.

5  I will not tell them why.  It's not their affair.

6       Anything from you, Mr. Jackson, to bring to my attention?

7            MR. JACKSON:  No, your Honor.

8            THE COURT:  All right.  Let's have the jury come back.

9       (Jury in at 2:26 PM.)

10           THE COURT:  We are back on the record in United States

11 of America v. Lawrence Jackson.  We have Detective Lucia on the

12 witness stand.  He is still under oath, and we are in

13 Mr. Jackson's cross-examination.

14      And you may resume.

15 Q   BY MR. JACKSON:  Detective Lucia, I want to go back to

16 that video again.

17           COURTROOM DEPUTY:  Did you want -- Mr. Jackson, sorry.

18 Did you want the video displayed?

19           MR. JACKSON:  Yes, ma'am.

20      (Defendant's Exhibit M was played in open court.)

21           MR. JACKSON:  Stop right there.  Can you go back a

22 little bit?

23      (Defendant's Exhibit M was played in open court.)

24           MR. JACKSON:  Stop right there.

25 Q   BY MR. JACKSON:  Detective Lucia, from the monitor, can

Adam J. Lucia - Cross

1  you circle the individual we see at the back of the red Jeep

2  right there.

3      And who is that, sir?

4  A   Based on the color of the exterior carrier, that looks

5  like Sergeant Plemmons.

6  Q   Sergeant Plemmons.  So Sergeant Plemmons was inside the

7  Jeep?

8  A   I would have to watch that again.

9          MR. JACKSON:  Can you go back?

10         (Defendant's Exhibit M was played in open court.)

11 Q   BY MR. JACKSON:  Did you see it?

12         MR. JACKSON:  Can you stop it?

13 Q   Did you see Sergeant Plemmons get out of the seat, out of

14 the vehicle?

15 A   I don't see him get out of the seat of the vehicle.  I see

16 him bent over and then he stands back up near the vehicle.

17 Q   Bent over inside the vehicle?

18 A   Well, bent over near the vehicle.

19         MR. JACKSON:  Can we start from the beginning again?

20         (Defendant's Exhibit M was played in open court.)

21         MR. JACKSON:  Stop.

22 Q   BY MR. JACKSON:  Why would he be bent over in front of a

23 vehicle, sir?  His body came out of the vehicle.

24 A   I have no idea why he would be bent over near the vehicle.

25 Q   But you did state that nobody was inside that vehicle, and

Adam J. Lucia - Cross

1 we clearly see from the video that somebody was inside that

2 vehicle.

3 A    The only persons that were inside the vehicle when I was

4 there and witnessed inside the vehicle were Ms. Currier and

5 Ms. Arnold.

6 Q    At the traffic stop, sir, from what we just showed you in

7 this video, that was a police officer.  Is there any reason why

8 he should be in that video -- in that vehicle?

9 A    I do not see him inside the vehicle, like I said.  I see

10 him bent over near the vehicle by the passenger door area.

11 Q    How could he bend over an SUV, sir?

12 A    He's bent over near the passenger door area of the SUV.

13 That's my testimony.  I'm not -- I can't answer that any

14 further.

15 Q    Okay.

16        MR. JACKSON:  I would like to move on, your Honor.

17 Let me get my exhibits.

18 Q    Detective Lucia, I would like to bring your attention when

19 the vehicle was towed back to the state police barracks.  Do

20 you know what time that you all reached the state police

21 barracks?

22 A    I don't recall.  I would have to have a radio log in front

23 of me.

24 Q    Okay.  You stated when -- Ms. Cate asked you was the

25 vehicle taped with evidence tape on all the doors.  Isn't that

Adam J. Lucia - Cross

1  true, sir?  You said that you taped them?

2  A    We did, yes.

3  Q    Evidence tape, every door, all the way around the vehicle?

4  A    As far as I recollect, yes.

5  Q    Okay.

6        MR. JACKSON:  Your Honor, I would like to show

7  Government Exhibit 20.  Is that okay?

8        THE COURT:  And it's been admitted?

9        MR. JACKSON:  Yes.

10       THE COURT:  And yes.  Of course you can.

11 Q    That's the vehicle right there, sir, right?

12 A    That is correct.

13 Q    And this was the first picture you took when the car came

14 back to the police barracks?

15 A    I believe so.  That was one of the pictures that we took,

16 yes.

17 Q    And all the pictures was in sequence around the vehicle?

18 A    I know some of the photos, I believe, were out of

19 sequence, but that is one of the photos that was taken.

20 Q    Okay.  By the time the car got back to the police

21 barracks, it was all taped with evidence tape, every door?

22 A    When we -- when we put it into the garage, it was taped

23 up, that is correct.

24 Q    I want to look at Exhibit 98.02.  I believe that's a

25 Government -- it's been admitted into evidence.  You see the

Adam J. Lucia - Cross

1 driver's door, sir?

2 A    I do.

3 Q    Does the driver's door have tape on it, sir?

4 A    Not in that picture, it does not, no.

5 Q    But you did say you put tape on all the doors?

6 A    Yes.  That's standard procedure.

7 Q    Before you started taking pictures, you put tape on all

8 the doors?  That's standard procedure?

9 A    It could be when you're taping the doors as you're going

10 along or it can be after it's done.

11 Q    No, sir.  Before you started taking pictures of the

12 vehicle, did you put tape around all the doors to secure the

13 vehicle?

14 A    I don't recall if we did it that way or if we started

15 putting tape on and then were taking pictures as we were going

16 along, sir.

17 Q    But for the record, you don't have tape on the driver's

18 door?

19 A    It does not appear that there is a piece on at that time,

20 no.

21 Q    Okay.  98.03.  That's the back door, isn't that, sir?

22 A    That is it.

23 Q    Okay.  And there's tape, seals, on both sides of the back

24 door, isn't there, sir?

25 A    Correct.

Adam J. Lucia - Cross

1  Q    Okay.  The tow truck is still there at the same time while

2  the car's sitting there, right?  You see the tow truck in front

3  of it?

4  A    It would appear that is a tow truck getting ready to

5  leave, yes.

6  Q    The passenger side of the vehicle, sir.  The back door has

7  tape on it.  True?  Evidence tape?

8  A    Yes.

9  Q    The passenger door has two pieces of tape, and both of

10  them seals look broken.  Can you explain that, sir?

11  A    To me that would be that you feel it looks broken.  To me

12  I don't see how it looks broken.

13  Q    Why is there two pieces of tape on the passenger door,

14  sir?

15  A    I don't have the answer to that.

16  Q    Is that because somebody was in the vehicle?

17  A    No.

18  Q    Who's this officer right here?

19  A    That looks like Detective Sergeant Johnson of the state

20  police.

21  Q    Okay.

22        THE COURT:  All right.  And let's make sure we have

23  the Bates number for the record.

24        MR. JACKSON:  Yes.  The Bates number is 98.04.

25  Q    Can you tell what this Sergeant Johnson or whatever state

Adam J. Lucia - Cross

1  trooper that is have in his hand right there?

2  A    I cannot, no.

3  Q    So you don't know what that is?

4  A    No.

5  Q    So that wasn't a blue bag that allegedly came out the car

6  with the items that was in it?

7  A    Not to my knowledge, it was not, because the warrant

8  wasn't executed.

9  Q    Okay.  Well, you were standing right there.  This is you

10 right here, right, sir?

11 A    I can honestly not tell if that's me or not.

12 Q    Okay.

13        (Government counsel and the defendant conferred.)

14        COURTROOM DEPUTY:  When Mr. Jackson's ready, I'll put

15 it back on.  Are you ready?

16        MR. JACKSON:  Yes.

17    (Government's Exhibit 52A was played in open court.)

18 Q    BY MR. JACKSON:  Detective Lucia, that's Sergeant Plemmons

19 right there, sir?

20 A    That is correct.

21        THE COURT:  And the record should reflect we are

22 playing 52A.

23    (Government's Exhibit 52A was played in open court.)

24        MR. JACKSON:  Can we stop it right there.  Thank you.

25 Q    BY MR. JACKSON:  Detective Lucia, while you were standing

Adam J. Lucia - Cross

1  at the Jeep on the driver's side, you looked in the back seat.

2  You kneeled down with your flashlight and looked.  And from

3  when you took the picture, did you notice a bag underneath the

4  back seat when you was looking at it right there at the traffic

5  stop?

6  A    I don't recall if I did or not.

7  Q    So I will take it that's a no.

8  A    It's an "I don't recall."

9        MR. JACKSON:  Your Honor, I would like to show this

10  picture.

11        COURTROOM DEPUTY:  We need to switch -- Judge,

12  Mr. Jackson is asking to show a picture.

13     Mr. Jackson, which picture is that?

14        MR. JACKSON:  98.14.

15        COURTROOM DEPUTY:  So part of Exhibit 20?

16        MR. JACKSON:  Yes.

17        COURTROOM DEPUTY:  One second.  It should turn on.

18  Q    In the angle we just was looking at, Detective Lucia, from

19  the driver's back seat, in the angle that you look, that bag is

20  clearly in the back seat that I can see from right here in

21  plain view.  Did you notice a bag?

22  A    I'm telling you I did not recall seeing a bag.  I do not

23  recall whether I did or not.

24        MR. JACKSON:  Okay.  I have no more questions, your

25  Honor.

Jason P. Johnson - Direct

1          THE COURT:  All right.  Any redirect?

2          MS. CATE:  No, your Honor.

3          THE COURT:  Thank you, sir.  You may step down.

4      (The witness was excused.)

5          THE COURT:  The Government may call its next witness.

6          MS. CATE:  The Government calls Jason Johnson.

7          COURTROOM DEPUTY:  Mr. Johnson, you can step right in

8  front of me.  Please raise your right hand.  State your full

9  name for the record.

10          THE WITNESS:  Jason Johnson.

11                      JASON P. JOHNSON,

12      having been first duly sworn by the courtroom deputy,

13              was examined and testified as follows:

14          THE WITNESS:  I do.

15                      DIRECT EXAMINATION

16  BY MS. CATE:

17  Q    Good afternoon.

18  A    Good afternoon.

19  Q    Can you please state your name for the jurors.

20  A    Jason Johnson.

21  Q    Where do you work?

22  A    For the Vermont State Police.

23  Q    How long have you worked for the Vermont State Police?

24  A    Since July of 2011.

25  Q    Prior to July of 2011, had you had other law enforcement

Jason P. Johnson - Direct

1  experience?

2  A    Yes.

3  Q    Where?

4  A    I worked for Rutland City from 2006 until 2009 as a

5  uniformed patrolman; and from 2009 to 2011, I was assigned to

6  the Drug Task Force.

7  Q    What is your title at the Vermont State Police?

8  A    Detective sergeant.

9  Q    How long have you been a detective sergeant?

10  A    Since 2018.

11  Q    What is your particular assignment as a detective

12  sergeant?

13  A    I supervise the Southwest Vermont Drug Task Force.

14  Q    And generally speaking, what tasks do you do as a

15  detective sergeant supervising the Southwest Drug Task Force?

16  A    I supervise the investigators that are assigned to the

17  unit, and we predominantly conduct narcotics investigations.

18  Q    I'm going to direct your attention to November 23rd of

19  2021.  Were you working that day?

20  A    I was.

21  Q    And what investigation were you working on?

22  A    I was involved with the Lawrence Jackson investigation.

23  Q    And broadly speaking over the course of that investigation

24  on November 23rd, what -- what steps did that involve?

25  A    The -- prior to November?

Jason P. Johnson - Direct

1  Q    Well, no.  In November -- on November 23rd of 2021,

2  what -- what general steps did you take?

3  A    I was assisting with the residential search warrant on

4  Killington Avenue.

5  Q    And what role did you have with the residential search

6  warrant?

7  A    I was part of the entry team.

8  Q    And you stated that that was an investigation into

9  Lawrence Jackson?

10 A    Yes, ma'am.

11 Q    What investigation, if any, had you participated in prior

12 to November of 2021 regarding Mr. Jackson?

13 A    The Drug Task Force had conducted an investigation into

14 him involving the distribution of controlled substances.

15 Q    And what actions did the Drug Task Force take as part of

16 that investigation?

17 A    We conducted controlled buys.

18 Q    What are controlled buys?

19 A    A controlled buy is a law enforcement operation, usually

20 involving the use of a confidential informant who, at the

21 direction of law enforcement, purchases controlled substances

22 from the target of the investigation.

23 Q    What months did the Drug Task Force conduct controlled

24 buys into Mr. Jackson?

25 A    August and September of 2020.

Jason P. Johnson - Direct

1  Q    And what was your role for those controlled buys?

2  A    I was the supervisor in charge, and I also primarily

3  assisted with surveillance.

4  Q    And in your role assisting with surveillance, did you see

5  the target or the person who sold the drugs in those buys?

6  A    Yes.

7  Q    And how did you come to see that person?

8  A    Through surveillance.

9  Q    And what specifically did you see when you were

10 surveilling?

11 A    For one of the buys, I observed him seated near the bus

12 stop at the -- next to the Dunkin' Donuts on Woodstock Avenue

13 and that he was observed during the second buy walking from the

14 Rodeway Inn.

15 Q    And based on your observations and your subsequent

16 investigation, were you able to identify who sold the drugs in

17 those buys?

18 A    Yes.

19 Q    Who was that?

20 A    Lawrence Jackson.

21 Q    Turning back to November 23rd of 2021, while you were

22 there executing the search warrant at 55 Killington, was

23 Mr. Jackson there?

24 A    He was not.

25 Q    What did you learn about his whereabouts?

Jason P. Johnson - Direct

1  A    We learned that he was not at the residence and he was out

2  and about.

3  Q    What did you do after hearing that?

4  A    We had checked the area, and then we were notified that

5  the vehicle that we believed he was in was observed traveling

6  by the residence on Killington Ave.

7  Q    So what did you do?

8  A    We responded to the area of the traffic stop where the

9  vehicle was stopped.

10  Q    And who's "we"?  Who were you with?

11  A    Me and Detective Corporal Lucia.

12  Q    And you responded to the area?

13  A    To the scene of the stop on Lafayette.

14  Q    And when you responded, what was going on there?

15  A    As we were arriving, he was being placed in custody.

16  Q    And what was the vehicle that he had been in?

17  A    It was a maroon Ford.  I forget the model.  It was a

18  maroon Ford.

19  Q    And how many people total were in the vehicle?

20  A    Three.

21  Q    And you said Mr. Jackson was being placed into custody?

22  A    Yes.

23  Q    Why was he being placed into custody?

24  A    For distribution, sale of controlled substances,

25  specifically suspected cocaine.

Jason P. Johnson - Direct

1  Q     And what was that based on?

2  A     The controlled buys that we had conducted.

3  Q     And after he was taken out of the vehicle, was he

4  searched?

5  A     Yes, he was.

6  Q     And what of note was found on him?

7  A     A little over $2,000 in cash, a glass pipe commonly used

8  to smoke cocaine, five Suboxone strips, his identification, and

9  a couple bank cards, I believe.

10 Q     And after those items were found, who took custody of

11 those items?

12 A     At the scene of the stop?

13 Q     Yes.

14 A     I did.

15 Q     Why?

16 A     Because they were connected -- well, his arrest was

17 connected to our investigation.

18 Q     And so you took custody of the items.  And where did they

19 go after -- after the stop?

20 A     Back to the state police barracks.

21 Q     And what happened with the U.S. currency after it was back

22 at the police barracks?

23 A     It was temporarily stored in a safe at the state police

24 barracks, and then it was later turned over to HSI.

25 Q     Now, ultimately the -- the three people who had been in

Jason P. Johnson - Direct

1  the Ford Freestyle, they all left the scene?

2  A    Yes.

3  Q    And where did the Ford go?

4  A    It was towed back to the state police barracks.

5  Q    Why?

6  A    Because we anticipated applying for a search warrant.

7  Q    Let's talk about before it was towed back.  What was your

8  role sort of at the scene?

9  A    Just -- we were observing what was in plain view in the

10 vehicle, trying to coordinate transport, trying to determine

11 who was going to go where, checking the other individuals for

12 wants and warrants, and that was essentially it.

13 Q    And how did the vehicle get to the barracks?

14 A    It was towed.

15 Q    Why?

16 A    Because we anticipated applying for the search warrant.

17 Q    And who towed the vehicle?

18 A    It was towed by Carrara's.

19 Q    And when a vehicle is towed, might there be a circumstance

20 where people need to get into the vehicle?

21 A    Yes.  Sometimes.

22 Q    Why?

23 A    Often they'll -- if we have the keys to get into the

24 vehicle, they'll want to put it in neutral so they can avoid

25 having to drag the vehicle.  In some cases they'll physically

Jason P. Johnson - Direct

1  drive the vehicle up onto the flatbed, again, to avoid having
2  to drag it.
3  Q    So do you recall if you had the keys in this -- this night
4  for this car?
5  A    I believe we did, yes.
6  Q    So the vehicle was towed to the barracks?
7  A    Yes, ma'am.
8  Q    And where did you go?
9  A    With it.  We followed it.  Detective Corporal Lucia and I
10 followed it.
11 Q    And when you got to the barracks, what did you do?
12 A    The vehicle was secured in the AOT garage, it was
13 photographed, and then evidence tape was placed on the doors.
14 Q    What does "AOT" mean?
15 A    Agency of Transportation.
16 Q    After it was photographed and evidence tape was placed on
17 the doors -- or what ultimately ended up happening with the
18 vehicle?
19 A    It was secured in the garage, and then Detective Corporal
20 Lucia applied for the search warrant.
21 Q    And that was granted?
22 A    Yes.
23 Q    And were you part of the search warrant execution team?
24 A    I was.
25 Q    And what was your role?

Jason P. Johnson - Direct

1  A    Searching the vehicle.

2  Q    Who else was searching the vehicle?

3  A    Detective Corporal Lucia.

4  Q    What do you remember finding in the vehicle?

5  A    Suspected cocaine, cell phone; there was a crack pipe in

6  plain view on the back floor.  I think that was pretty much it.

7  Q    And you mentioned suspected cocaine.  Who found that?

8  A    Detective Corporal Lucia.

9  Q    And how -- what was it in?

10 A    Just a small bag.

11 Q    And where -- you mentioned a cell phone also.  Where was

12 that?

13 A    That was in the cup holder in the center console.

14 Q    And as you're both searching, what were you doing if you

15 found something of note?

16 A    Photographing it.

17 Q    After items -- after the search was completed, what did

18 you and Detective Lucia do with the items?

19 A    We walked them over to the state police barracks, which is

20 right across the parking lot.

21 Q    And what did you do with them?

22 A    They were processed, photographed, field-tested, and then

23 secured in evidence bags.

24 Q    Were you part of that process?

25 A    Yes.

Jason P. Johnson - Direct

1 Q    And who took custody of them?

2 A    Detective Corporal Lucia.

3 Q    Why did he take custody of them?

4 A    Because it was their investigation.

5 Q    I'm going to show you what's already in evidence as

6 Government's Exhibit 20.  This is Bates 98.12.  Do you

7 recognize this?

8 A    I do.

9 Q    And what's that black item in the center of the picture?

10 A    Cell phone.

11 Q    And that's the cell phone you testified was found?

12 A    Yes.

13 Q    And I'm going to show you Bates 98.16 from Exhibit 20,

14 also already in evidence.  Do you recognize this?

15 A    I do.

16 Q    What is it?

17 A    It's the bag containing the suspected cocaine.

18 Q    And Bates 98.31, also from Exhibit 20.

19 A    Yes.

20 Q    Do you recognize this?

21 A    I do.

22 Q    What is that?

23 A    It's the cocaine that was found inside the bag.

24        MS. CATE:  Your Honor, may I have a moment?

25        THE COURT:  You may.

Jason P. Johnson - Cross

1  Q    Going back in time to when the vehicle arrived at the AOT

2  garage, you had testified that the vehicle was taped?

3  A    Yes.

4  Q    Who did the taping?

5  A    I did.

6        MS. CATE:  Nothing further.

7        THE COURT:  Any cross-examination?

8        MR. JACKSON:  Yes, your Honor.

9                    CROSS-EXAMINATION

10 BY MR. JACKSON:

11 Q    Good afternoon, Sergeant Johnson.

12 A    Good afternoon.

13 Q    Sir, do you remember the suppression hearing that you sat

14 in in this very courtroom not too long ago?

15 A    I do.

16 Q    Okay.  And at that time I asked you did anybody search the

17 vehicle, and you said no?  Do you remember that?

18 A    Searched the vehicle when, sir?

19 Q    At the traffic stop.  I'm sorry.  At the traffic stop.

20 A    Yes.

21 Q    Did you observe Sergeant Plemmons enter that vehicle?

22 A    I did not.

23 Q    I'm going to show you a . . .

24        COURTROOM DEPUTY:  And what exhibit is this,

25 Mr. Jackson?

Jason P. Johnson - Cross

 1          MR. JACKSON:  Is it S?  Exhibit M.

 2          COURTROOM DEPUTY:  M?

 3          MR. JACKSON:  Yes.

 4          COURTROOM DEPUTY:  Whoops.  Sorry.  I didn't switch

 5 over.  It should be on you now.  There you go.

 6 Q    Sergeant Johnson, can I have your attention on the monitor

 7 right there, sir?

 8 A    Yes, sir.

 9      (Defendant's Exhibit M was played in open court.)

10 Q    BY MR. JACKSON:  Do you see the red vehicle?

11 A    I do.

12 Q    Did you see who just came out the red vehicle?

13          MR. JACKSON:  Can we stop that right there?

14 Q    Can you identify this person right here, sir?

15 A    From that image, no, but from prior review of another

16 cruiser camera, I believe that to be Sergeant Plemmons.

17 Q    Sergeant Plemmons.  So do you agree that Sergeant Plemmons

18 was inside the vehicle?

19 A    I do not.

20          MR. JACKSON:  Can we start from the beginning again?

21      (Defendant's Exhibit M was played in open court.)

22 Q    BY MR. JACKSON:  Did you just see that, sir?

23 A    It looked like he stood upright.

24 Q    From where?  He stood up from where?

25 A    Based on the review of the cruiser cam from Sergeant

Jason P. Johnson - Cross

1 Plemmons' video, he had done the same thing on the driver's

2 side.  He had knelt down or bent down and was looking inside

3 the vehicle from the outside.

4 Q    But kneeling down --

5 A    It's fair to say he had done the same thing on the

6 passenger side.

7 Q    If he had kneeled down, he would be doing this, right?

8 A    Sure.

9 Q    Bending over, he would be doing this, right?

10 A    Sure.

11 Q    Does the video show him kneeling down or bending over?

12 A    It's really difficult to tell on that side.

13 Q    Okay, sir.

14       MR. JACKSON:  I'm sorry, your Honor.  Just give me a

15 second.

16 Q    Sergeant Johnson, I want to bring your attention to --

17 Ms. Cate just asked you when the vehicle arrived at the

18 transportation garage, that's where it was stored?

19 A    The AOT garage, yes.

20 Q    So when the vehicle got there, you put the tape on all the

21 vehicles?

22 A    On all the doors, yes.

23 Q    Okay.

24       COURTROOM DEPUTY:  One second, Mr. Jackson.

25       MR. JACKSON:  Oh, I'm sorry.

Jason P. Johnson - Cross

1         COURTROOM DEPUTY:  No, you're good.  I'm going to

2   switch over.  This is part of 20, I believe.

3         MR. JACKSON:  Um-hum.

4         THE COURT:  So make sure we have the Bates stamp

5   number.

6         MR. JACKSON:  Yes, ma'am.  98.

7   Q    That's the vehicle right there, right, sir?

8   A    Yes.

9   Q    Okay.  Bate number 98.02, do you see the driver's side of

10  the vehicle, sir?

11  A    I do.

12  Q    Can you explain why there wasn't any evidence tape on the

13  driver's door?

14  A    I suspect the photo was taken prior to -- prior to there

15  being tape placed on that door.

16  Q    Wouldn't that be the first door that would be secured,

17  usually?

18  A    Not -- not necessarily.

19  Q    What would usually be the first door to be secured?

20  A    No, not necessarily.

21  Q    I said what usually would be the first door normally to be

22  secured?

23  A    There's really no set order.

24  Q    You start from the back, front, wherever?  Okay.

25        THE COURT:  Does that -- you have to answer the

Jason P. Johnson - Cross

1 question.

2 A    It -- you could start wherever.  It doesn't -- it doesn't

3 matter which door you start with.

4 Q    Okay.  Back doors was taped.  You can see that, right,

5 sir?

6 A    Yes, sir.

7 Q    The passenger side of the vehicle, sir.  The back door,

8 the back passenger door, is taped, right, sir?

9 A    Yes, sir.

10 Q    Okay.  And the passenger door, why is there two pieces of

11 evidence tape there, sir?

12 A    Can't say for sure, but my suspicion would be maybe the

13 first tape -- piece of tape had ripped and we just placed a

14 second one to make sure that it was secure.

15 Q    How would the first one be ripped unless the door was

16 opened?

17 A    If you've ever handled that type of tape, it's not super,

18 super strong, so it easily can tear when you're trying to place

19 it on the door.

20 Q    So that's what happened there?

21 A    I'm not saying for sure, but I'm just saying that's a

22 potential.

23 Q    Okay.  Detective Lucia identified that's you standing

24 right by the vehicle, sir?

25 A    It is.

Jason P. Johnson - Cross

1   Q    Okay.  Can you tell the jury what you had in your hand

2   right there?

3   A    I -- I really can't tell from that angle.

4   Q    Was it anything out -- from inside the vehicle?

5   A    Are you asking me if I'm holding something from inside the

6   vehicle?

7   Q    Yes.

8   A    No.

9   Q    But you don't know what that was?

10  A    No.

11  Q    Thank you, Sergeant Johnson.

12  A    Thank you.

13       MR. JACKSON:  I'm finished, your Honor.

14       THE COURT:  All right.  Any redirect?

15       MS. CATE:  No, your Honor.

16       THE COURT:  All right.  The Government -- you may step

17  down.

18       THE WITNESS:  Thank you.

19    (The witness was excused.)

20       THE COURT:  And the Government may call its next

21  witness.

22       MR. OPHARDT:  Your Honor, I apologize to do this, but

23  I'm in need of a quick restroom break, if we could.

24       THE COURT:  All right.  Yes.  And I want to talk to

25  you about timing.

1    We're going to probably end early on Friday, and I want to

2  communicate with the parties about that.  So we will take a

3  shorter break, about ten minutes.

4    Don't talk about the case.  Don't let anybody talk to you

5  about the case.  To speed things up, I'm going to make sure the

6  next witness is on the stand ready to go as soon as we come in.

7    Does that work for everybody?

8    MR. OPHARDT:  Yes, your Honor.

9    MR. JACKSON:  Yes, your Honor.

10    THE COURT:  All right.  Let's excuse the jury.

11    (Jury out at 3:03 PM.)

12    THE COURT:  Let me ask the marshals how you would like

13  to do this.  Do you want to clear the courtroom?  How do you

14  want to address the witness' arrival?

15    DEPUTY MARSHAL:  As far as I know, Judge, they're

16  already getting her into her shackles and everything, and we

17  can walk her -- take the elevator up, come down the same stairs

18  we always do, and get her seated right into the seat over

19  there.

20    THE COURT:  Okay.  The rest of us will just stay until

21  that happens, and we'll let the jury come back as soon as we

22  are ready.

23    MR. OPHARDT:  Your Honor, I was not fibbing about

24  needing a restroom break.

25    THE COURT:  Go ahead and take one.  I thought you were

1  fibbing.  I thought that was overkill.

2          MR. OPHARDT:  It was multipurpose, Judge.

3          THE COURT:  Overkill.

4      (A recess was taken from 3:04-3:09 PM.)

5          THE COURT:  All right.  We are ready to bring back the

6  jurors.  Everybody's here.

7      Thank you, Bob.

8          THE COURT:  Ms. Lobdell, you do not need to stand when

9  we have the jurors come in.  You can remain seated.

10          THE WITNESS:  Okay.

11      (Jury in at 3:10 PM.)

12          THE COURT:  We are back on the record in United States

13  v. Lawrence Jackson.

14      The Government may call its next witness.

15          MR. OPHARDT:  Your Honor, the United States calls

16  Ashley Lobdell.

17          COURTROOM DEPUTY:  Ms. Lobdell, I'm going to swear you

18  in.  Please raise your right hand.  State your full name for

19  the record.

20          THE WITNESS:  Ashley Lobdell.

21                      ASHLEY LOBDELL,

22      having been first duly sworn by the courtroom deputy,

23              was examined and testified as follows:

24          THE WITNESS:  Yes.

25  /  /  /

Ashley Lobdell - Direct

1                          DIRECT EXAMINATION

2   BY MR. OPHARDT:

3   Q    Good afternoon.  Ms. Lobdell, how old are you?

4   A    Twenty-six.

5   Q    Where did you grow up?

6   A    Rutland, Vermont.

7   Q    How long have you lived in Rutland, Vermont?

8   A    All my whole life.

9   Q    When did you begin abusing drugs?

10  A    When I was 17.

11  Q    What drugs were those?

12  A    Ritalin, cocaine.

13  Q    You started with cocaine at 17?

14  A    Well, started with Ritalin.

15  Q    Okay.  When did it switch over to harder drugs like

16  cocaine?

17  A    When I was about 20.

18  Q    And I'm sorry.  I forgot already what you said.  How old

19  are you now?

20  A    Twenty-six.

21  Q    Okay.  So that would have been about six years ago.

22  A    Yup.

23  Q    So by 2021, you were using cocaine quite regularly?

24  A    Yes.

25  Q    And at some point did you also begin using opiates?

Ashley Lobdell - Direct

1  A    Yes.

2  Q    When was that?

3  A    About a little -- three years ago, probably.

4  Q    So we're in 2024.  It would have been in 2021?

5  A    Yup.

6  Q    When you were using cocaine and -- well, when you were

7  using cocaine, was it powder cocaine or crack cocaine?

8  A    Crack cocaine.

9  Q    At your peak use, what was it?  What was the most you

10 would use in a one-day period?

11 A    Like three grams a day.

12 Q    And how about heroin?  Where did that peak out?

13 A    About three bundles a day.

14 Q    In 2021, who was providing you with cocaine and cocaine

15 base?

16 A    Boo-Bee.

17 Q    How did you meet Boo-Bee?

18 A    Through Courtney Schaner.

19 Q    And about when did that occur?

20 A    In the springtime of 2021.

21 Q    How much time did you spend with Boo-Bee after you met

22 him?

23 A    Quite a bit.

24 Q    Do you know Boo-Bee's real name?

25 A    Yes.

Ashley Lobdell - Direct

1 Q    Did you know that in 2021?

2 A    No.

3 Q    Do you see Boo-Bee in the courtroom today?

4 A    Yes.

5 Q    Where is he seated?

6 A    Directly behind you.

7 Q    Would you describe what he's wearing.

8 A    Kind of -- I don't have my glasses, but it looks like a

9 blue suit.

10 Q    Is he wearing glasses?

11 A    Yes.

12 Q    You're squinting.  Are you having trouble seeing?

13 A    Yeah.  I don't have my glasses.

14 Q    Okay.  Fair enough.

15        MR. OPHARDT:  Your Honor, may the record reflect an

16 identification of the defendant as Boo-Bee.

17        THE COURT:  I don't think it does reflect it.

18 Q    Where is that -- since you're having trouble seeing,

19 perhaps we could go with a photograph so it could be closer to

20 you.

21 A    Okay.

22 Q    Would that be helpful?

23 A    Yes.

24        MR. OPHARDT:  Could we have the ELMO up.

25        COURTROOM DEPUTY:  And what exhibit?

Ashley Lobdell - Direct

1    MR. OPHARDT:  Exhibit 16.  It's in evidence.

2    COURTROOM DEPUTY:  And it should be on.

3 Q    Ms. Lobdell, do you see Boo-Bee in that photograph?

4 A    Yes.

5 Q    Which person is Boo-Bee?

6 A    The one on the right.

7 Q    And who else is in the photograph?

8 A    His girlfriend, Wendy.

9 Q    In 2021, how often would you say you saw the man you knew

10 as Boo-Bee?

11 A    Just about every day.

12 Q    Where did you believe him to be residing?

13 A    On Killington Ave.

14 Q    Do you remember the street number?

15 A    No.

16 Q    Whose apartment was it?

17 A    Courtney Schaner's.

18 Q    Who was also staying at that apartment?

19 A    Courtney's boyfriend, Reggie, and Boo-Bee's girlfriend,

20 Wendy.

21 Q    Showing what's been previously admitted as Government's

22 Exhibit 6, do you recognize that person?

23 A    Yes.  That's Reggie.

24 Q    And Government's Exhibit 7, which has also been admitted,

25 do you recognize that person?

Ashley Lobdell - Direct

1  A    Yeah.  That's Courtney.

2  Q    Were you ever at 55 Killington Avenue -- I'm sorry.  You

3  just said you didn't know the number.

4       Were you ever at Courtney Schaner's residence on

5  Killington when Boo-Bee was there?

6  A    Yes.

7  Q    How many times would you say you were at 55 Killington?

8  A    Probably about ten times.  Maybe more.

9  Q    Would you recognize a photograph of it?

10 A    Yes.

11      MR. OPHARDT:  This has previously been admitted as

12 Government's Exhibit 57.

13 Q    Ms. Lobdell, do you recognize that building?

14 A    Yes.  That's the Killington Ave. residence.

15 Q    Which floor was the apartment on?

16 A    The second floor.

17 Q    I'm sorry.  I took 57 down too quick.  Put it back up.

18      Would you access the apartment through this door here on

19 the front with the little staircase?

20 A    No.

21 Q    Where would you access it?

22 A    Out back.  Up the driveway.

23 Q    When you were at the Killington Avenue residence, what, if

24 anything, did you see Boo-Bee doing with drugs?

25 A    I saw him cooking drugs up --

Ashley Lobdell - Direct

1  Q    What does that mean?

2  A    -- and selling them.

3       It means making cocaine into crack.

4  Q    You also said "and selling them"?

5  A    Yes.

6  Q    How many times do you recall seeing Boo-Bee cook cocaine

7  into crack?

8  A    About three times.

9  Q    How would he do it?  Would he --

10 A    He would use the stove or the microwave.

11 Q    Did Boo-Bee ever provide you with drugs at the Killington

12 Avenue residence?

13 A    Yes.

14 Q    In total, not just at Killington, how many times did you

15 obtain drugs from Boo-Bee?

16 A    Over ten times.

17 Q    What would you get in exchange -- I'm sorry.

18      What would you give in exchange for the drugs?

19 A    Money or sometimes sex.

20 Q    Other than at the Killington Avenue apartment, where in

21 Rutland do you remember seeing Boo-Bee?

22 A    Meadow Street Park and then, like, just kind of around

23 town at Highlander -- at Highlander Motel.

24 Q    The Highlander Motel, that's a motel in Rutland?

25 A    Yes.

Ashley Lobdell - Direct

1  Q    Do you remember -- do you recall where it is in Rutland?

2  A    I can't remember the street.

3  Q    When you were at the Highlander, whose room were you at?

4  A    Stephanie Horvath's.

5  Q    And was this a particular day that you're recollecting?

6  A    Yeah.

7  Q    That's a "yes"?

8  A    Yes.

9  Q    What happened that day in relation to drugs and Boo-Bee?

10 A    He had me do a couple sales in -- yeah.

11 Q    What does "doing sales" mean?

12 A    So I was running drugs outside for him and bringing the

13 money back for him.

14 Q    Where would you get the drugs from before you left?

15 A    Boo-Bee.

16 Q    And where would you bring them?

17 A    Outside to the people that he had pulling up.

18 Q    What would you give -- what would you do with the drugs

19 when you were outside?

20 A    I'd give them to the people -- the person that I was

21 meeting.

22 Q    And then what would you get from them?

23 A    I would get money.

24 Q    Where would you bring the money?

25 A    Back to Boo-Bee.

Ashley Lobdell - Direct

1  Q    Do you recall approximately how many times this happened
2  when you were at the Highlander?
3  A    Probably about five times.
4  Q    Any particular transaction stand out?
5  A    He had me do one sale of $500.
6  Q    Why does that stand out?
7  A    It was just because it was large for me.
8  Q    During the time you spent with Boo-Bee --
9         THE COURT:  So let's make sure we do have a time
10 frame.
11        MR. OPHARDT:  Yes, your Honor.  I apologize.
12 Q    You said you first met Boo-Bee in the spring of 2021; is
13 that correct?
14 A    Yes.
15 Q    How long did you interact with Boo-Bee?
16 A    About seven months.  Seven, eight months.
17 Q    Why did it stop?
18 A    Because he got arrested.
19 Q    During that time frame, who, if anyone, do you recall also
20 delivering drugs for Boo-Bee?
21 A    Angel.
22 Q    How many times did you see Angel?
23 A    Probably about six times, seven times.
24 Q    Would you recognize a photograph of him?
25 A    Yes.

Ashley Lobdell - Direct

1  Q    There's a binder in front of you.  It's the smaller

2  binder.  If you could look at Government's Exhibit 38.

3  A    Sorry.

4  Q    It's okay.  Take your time.

5  A    All right.  Found it.

6  Q    Without saying who it is, generally speaking, what's

7  depicted in the photograph?

8  A    It's Angel sitting there.

9  Q    So without saying who it is --

10 A    Oh.

11 Q    -- is it a man, a woman?

12 A    It's a man.

13 Q    Okay.

14        MR. OPHARDT:  Your Honor, I'd move to admit

15 Government's Exhibit 38 at this time.

16        THE COURT:  Any objection?

17        MR. JACKSON:  I don't know what he's admitted, your

18 Honor.  I can't see it.

19        THE COURT:  Make sure Mr. Jackson has a copy.

20        MR. JACKSON:  Okay.  That's fine.

21        THE COURT:  Any objection?

22        MR. JACKSON:  No objections, your Honor.

23        THE COURT:  Exhibit 38 is admitted.

24     (Government's Exhibit 38 was received in evidence.)

25        MR. OPHARDT:  Your Honor, may I publish?

Ashley Lobdell - Direct

1          THE COURT:  You may.

2  Q    BY MR. OPHARDT:  Ms. Lobdell, who's depicted in

3  Government's Exhibit 38?

4  A    That's Angel.

5  Q    Was there any other locations where you recall seeing the

6  man you knew as Boo-Bee in Rutland?

7  A    No.

8  Q    Was he always in a particular building?

9  A    Either Killington -- not really.  He was --

10 Q    Where else would you see him other than in a building or a

11 structure?

12 A    In a car.

13 Q    How often were you with him in a car?

14 A    Pretty often.

15 Q    What were the two of you doing in a vehicle?

16 A    Just driving around.

17          THE COURT:  So when you say something like "pretty

18 often," what do you mean?

19          THE WITNESS:  Probably, like, six, seven times.

20          THE COURT:  Thank you.

21 Q    When you two were in a vehicle together, what was

22 happening?

23 A    We were just smoking, getting high, doing sexual things.

24 Q    Getting high on what?

25 A    Cocaine.

Ashley Lobdell - Direct

1  Q     Would this be while driving or while stationary?

2  A     Both.

3  Q     When you were in the vehicle, anything else regarding

4  drugs going on while you're driving around Rutland?

5  A     Regarding drugs or --

6  Q     Yes.

7  A     He would be doing sales.

8  Q     When you were in the vehicle, did you ever see any

9  firearms?

10  A     Yes.

11  Q     Where?

12  A     In the glove box.

13  Q     What type of firearm?

14  A     It was kind of like a hand-held pistol.

15  Q     I want to move forward a little bit in time and talk with

16  you about the evening of September 25th, 2022, in the Jolley

17  Mart on Grove Street.  Do you know what I'm talking about?

18  A     Yes.

19  Q     What happened that night?

20  A     I did an armed robbery.

21  Q     What weapon did you use?

22  A     A knife.

23  Q     Why did you rob the store with a knife?

24  A     Because I owed somebody money.

25  Q     Who did you owe money?

Ashley Lobdell - Direct

1  A    Peeto.

2  Q    What was the money owed for?

3  A    Drugs.

4  Q    What type of drug?

5  A    Cocaine and heroin.

6  Q    Had you seen Peeto prior to robbing the store?

7  A    Yes.

8  Q    Having seen Peeto, was that connected to why you robbed

9  the store?

10 A    Yes.

11 Q    What happened?

12 A    I showed up there and he held a gun to me and told me I

13 owed him money and that we were going to figure a way to get it

14 back.

15 Q    Did anyone help you rob the store?

16 A    Yes.

17 Q    Who was that?

18 A    Darren Dwyer.

19 Q    What did he do to help?

20 A    He walked with me to -- well, to make sure that I pretty

21 much did it.

22 Q    Did he give you anything?

23 A    No.

24 Q    Where did you --

25 A    Well, he gave me the knife.

Ashley Lobdell - Direct

1  Q    He gave you the knife?

2  A    Yes.

3  Q    How much money did you get from the robbery?

4  A    A little over $400.

5  Q    And what happened to the money?

6  A    I gave it to Peeto.

7  Q    And you were arrested for this robbery in early October;

8  is that right?

9  A    Yes.

10  Q    When you were arrested, did you give a statement to law

11  enforcement?

12  A    Yes.

13  Q    What did you tell them about the robbery?

14  A    What I just told you.

15  Q    You told them what you told me?

16  A    Yes.

17  Q    What were you charged with in federal court?

18  A    Armed robbery.

19  Q    While that case was pending, did you stay detained?

20  A    No.  No.

21  Q    What happened?

22  A    I was released.

23  Q    What were you released for?

24  A    To go to rehab.

25  Q    How did that go?

Ashley Lobdell - Direct

1  A    Not so good.

2  Q    What happened?

3  A    I relapsed.

4  Q    After you relapsed, what did you do?

5  A    I went back to jail, and I was released again.

6  Q    After you were released again, what was the purpose for

7  that?

8  A    To go back to rehab and to go into sober living.

9  Q    Where were you in sober living?

10 A    Jenna's Promise.

11 Q    How had that been going until recently?

12 A    It was going really good until I relapsed.

13 Q    How long ago was that?

14 A    Two weeks ago now.

15 Q    Where did you obtain drugs?

16 A    Just some random guy outside the store.

17 Q    Close to Jenna's Promise?

18 A    Yeah.

19 Q    Where did you take them?

20 A    I took them back to Jenna's Promise.

21 Q    And what did you do with them?

22 A    I used them.

23 Q    Did you give any to anybody else?

24 A    No.

25 Q    After you relapsed, what did you tell your treatment

Ashley Lobdell - Direct

1  providers and your probation officer?

2  A    That I relapsed.

3  Q    So you told them the truth?

4  A    Yes.

5  Q    What happened to your sober living?

6  A    I was kicked out.

7  Q    After you were kicked out, where did you go?

8  A    Back to Rutland.

9  Q    During this time, was your probation officer trying to get

10 you to come in for a meeting?

11 A    Yes.

12 Q    Did you do what your probation officer asked?

13 A    Did I?  No.

14 Q    How long until -- after you were kicked out of Jenna's

15 Promise, how long after that did you start using cocaine again?

16 A    About three days after.

17 Q    While you were out of custody, where were you?  What city?

18 A    I was in Rutland.

19 Q    While you were in Rutland, what, if anything, did you know

20 about a warrant for your arrest?

21 A    I knew about it.

22 Q    Did you turn yourself in?

23 A    No.

24 Q    And so how is it that you wound up back in custody?

25 A    They found me.

Ashley Lobdell - Direct

1  Q    Law enforcement?

2  A    Yes.

3  Q    And how long ago was that?

4  A    Last -- this past Saturday.

5  Q    So a few days ago?

6  A    Yeah.

7  Q    When was the last time you used cocaine?

8  A    Saturday.

9  Q    Is your mind clear today, or is it foggy?

10 A    It's clear.

11 Q    You -- what's the status of your robbery charge?

12 A    What do you mean?

13 Q    Have you pled guilty?

14 A    Yes.

15 Q    When you pled guilty, as part of that guilty plea, did you

16 also have an agreement with the Government?

17 A    Yes.

18 Q    What was that agreement?

19 A    To postpone my sentencing out a year and to testify.

20 Q    Testify when the Government requested?

21 A    Yes.

22 Q    What was the purpose of postponing your sentencing for a

23 year?

24 A    To give me a chance to keep -- keep on track.

25 Q    We recently had another meeting; is that right?

Ashley Lobdell - Direct

1  A    Yes.

2  Q    After you were arrested on Saturday, I believe?

3  A    Yes.

4  Q    What, if anything, is your understanding of the agreement

5  with the Government, the cooperation agreement, your plea

6  agreement?

7  A    To give myself a chance to not have to spend forever in

8  jail.

9  Q    Have you been told whether or not the agreement's still in

10 effect?

11 A    Yes.

12 Q    What were you informed?

13 A    That it is.

14 Q    In addition to the robbery, were there other crimes that

15 you committed in relation to your drug use?

16 A    Petty theft.

17 Q    Approximately when was that?

18 A    Probably two years ago now.

19 Q    When -- I'm sorry.  Let me start the question again.

20      What happened with that charge?

21 A    It was dropped.

22 Q    As part of what?

23 A    I had to do community service.  I did it, and they dropped

24 the charge.

25 Q    Did you actually commit the theft?

Ashley Lobdell - Direct

1  A    Yes.

2  Q    I want to talk with you about one of the times you were in

3  a car with Boo-Bee in late November of 2021.  Do you recall

4  taking a trip with him?

5  A    Yes.

6  Q    Where did you go with Boo-Bee?

7  A    To Mass.

8  Q    What's Mass?

9  A    I don't know exactly -- Massachusetts.

10 Q    So Massachusetts, the state?

11 A    Yes.

12 Q    Do you recall exactly where?

13 A    I don't.

14 Q    Who was driving?

15 A    Boo-Bee.

16 Q    And where were you located in the vehicle?

17 A    In the passenger seat.

18 Q    While you were driving with Boo-Bee to Mass, what were you

19 doing?

20 A    We were getting high off cocaine.

21 Q    Do you recall whether you and Boo-Bee made any stops on

22 the way?

23 A    Yeah.  Just to the store, the gas station, to grab some

24 drinks and stuff.

25 Q    While you were stopped, what, if any, cash did you observe

Ashley Lobdell - Direct

1  Boo-Bee with?

2  A    Wads of cash.

3  Q    I know you said you didn't recall the city or town you

4  went to in Massachusetts.  Do you recall what type of building

5  you went to?

6  A    It was kind of like a hotel.  It looked like a hotel.

7  Q    Why do you say it looked like a hotel?

8  A    Just from the outside, it had a bunch of rooms, you know,

9  like a hotel setup.

10 Q    Did you go into this building?

11 A    No.

12 Q    What did you do?

13 A    I sat outside in the car for about an hour.

14 Q    Where was Boo-Bee?

15 A    Inside.

16 Q    When Boo-Bee came back to the car, did he have anything

17 with him?

18 A    Yeah.  He had two -- about two bricks of cocaine, crack

19 cocaine.

20 Q    You believed it to be crack?

21 A    Yes.

22 Q    You said two bricks.

23 A    Yeah.

24 Q    What did they look like?  How were they packaged?

25 A    They were in, like, freezer bags.

Ashley Lobdell - Direct

1  Q    What, if anything, did he ask you to do with the drugs?

2  A    To put them on my side of the car.

3  Q    What did you do with the drugs?

4  A    I put them on my side of the car.

5  Q    Where in particular?  Do you recall?

6  A    One in the glove box, one in the passenger side door.

7  Q    I'm just going to give you a warning before Judge Reiss

8  does.  Please wait until I'm done with the question to

9  answer --

10  A    Oh.

11  Q    -- so that we get a good transcript from the court

12  reporter.

13  A    Okay.

14  Q    Thank you.

15       After you had placed the drugs in those locations, where

16  did you and Boo-Bee go next?

17  A    We drove back to Vermont.

18  Q    Did you drive straight back without stopping?

19  A    No.

20  Q    What did you do along the way?

21  A    We stopped to get high a few times.

22  Q    When you say "get high," what drug?

23  A    Off crack.

24  Q    How were you both consuming it?

25  A    Smoking it.

Ashley Lobdell - Direct

1  Q    When did you arrive back in Vermont?

2  A    About 5:30 in the morning.

3  Q    Is that the exact time, or is that --

4  A    It's roughly.

5  Q    Was it still dark outside?

6  A    Yes.

7  Q    Where did you drive in Rutland?

8  A    He stopped at the -- we stopped at the Killington Ave.

9  apartment first.  He went upstairs.  I waited outside for a

10 little while.  Then he came back down and brought me back home.

11 Q    Where was home?

12 A    School Street in Rutland.

13 Q    Who lives there?

14 A    My dad.

15 Q    What's nearby?

16 A    The park.

17 Q    Which park?

18 A    Meadow Street Park.

19 Q    I'm sorry.  Which park?

20 A    Meadow Street Park.

21 Q    I'd like you to look at the bigger binder, if you could.

22 A    Um-hum.

23 Q    It's Tab 31F.

24 A    Yup.

25 Q    I believe it's -- I believe it's four pages.  If you could

Ashley Lobdell - Direct

1  just turn through them, please.

2        Have you reviewed them?

3  A    Yup.

4  Q    Without telling us what the contents are at all -- without

5  telling us what the contents are, what are -- is the document

6  31F?

7  A    Messages between me and Boo-Bee.

8  Q    How do you know that -- first of all, how do you know that

9  you're one of the parties?

10 A    It says my name.

11 Q    Anything else about them?

12 A    I remember them.

13 Q    How do you know that they are with Boo-Bee?

14 A    Because it says "Boo Bee" on the top, and I remember these

15 messages between us.

16        MR. OPHARDT:  Your Honor, I move to admit 31F at this

17 time.

18        THE COURT:  Any objection?

19        MR. JACKSON:  No objections, your Honor.

20        THE COURT:  31F is admitted.

21      (Government's Exhibit 31F was received in evidence.)

22        MR. OPHARDT:  Your Honor, may I publish?

23        THE COURT:  You may.

24 Q    BY MR. OPHARDT:  So you can -- Ms. Lobdell, you can either

25 look at the ones in front of you or the monitor, whichever

Ashley Lobdell - Direct

1  one's easier for you without glasses.

2       Do you see the first message in blue?

3  A    Yes.

4  Q    What does it say?

5  A    "It's just me."

6  Q    And who was the sender of that message?

7  A    I was.

8  Q    Why did you send it?

9  A    To let him know that I was by myself.

10 Q    The green message, what does that say?

11 A    "Mass."

12 Q    And what's the one underneath that?

13 A    "Yes."

14 Q    What's your recollection as to -- what did you understand

15 those messages to mean?

16 A    He was asking me if I wanted to go to Mass and was

17 acknowledging that I was by myself.

18 Q    Ms. Lobdell, what's the date on this message?

19 A    11/21/22.

20 Q    I'm sorry.

21 A    So --

22 Q    If the -- can you just read the numbers from start to end?

23 A    21 -- "2021-11-22."

24 Q    Thank you.  Looking at Bates 1219.02, the blue message at

25 the top, that would have been your message, correct?

Ashley Lobdell - Direct

1  A    Yes.

2  Q    And what did you send?

3  A    "Yeah I can."

4  Q    What did you mean by that?

5  A    That I could go with him.

6  Q    The green box, what does that say?

7  A    "Ok coming now."

8  Q    What did you understand that to mean?

9  A    That he was on his way to pick me up.

10  Q    The next two blue boxes, those would have been from you,

11  correct?

12  A    Yes.

13  Q    And what do they say?

14  A    "Okay I'm just getting dressed quick"; "Meet me by the

15  park on meadow or the store down the road let me know when

16  close."

17  Q    So you said "let me know when close."  What does the

18  message actually say?

19  A    "Lmk when close."

20  Q    Okay.  So what you meant by that was "let me know when

21  close"?

22  A    Yes.

23  Q    Fair to say you're speaking in a language substantially

24  for younger people than I am?

25  A    Yes.

Ashley Lobdell - Direct

1 Q    Okay.  The green message back from -- well, the green

2 message, who would have been sending that?

3 A    Boo-Bee.

4 Q    And what does it say?

5 A    "Ok 16."

6 Q    What did you understand that to mean?

7 A    Sixteen minutes till -- before he got there.

8 Q    How did you respond?

9 A    "Kk."

10 Q    This is 1219.03, the next page.  What's the next green

11 square say?

12 A    "Act like u buying from me ok."

13 Q    What did you understand that to mean?

14 A    To act like I was buying drugs from him.

15 Q    The next blue box, what does that say?

16 A    "Okay can you throw me a little for a hit when we meet up?

17 I need one bad will do whatever you need me to baby."

18 Q    What did you mean by "throw me a little for a hit"?

19 A    Throw me some crack for a hit.

20 Q    What did you mean by "I need one bad"?

21 A    I needed a hit bad.

22 Q    Why?

23 A    Because I was jonesing.

24 Q    What does that mean?

25 A    Like, really needing -- really wanting one.

Ashley Lobdell - Direct

1  Q    And "a hit" meaning cocaine base?

2  A    Yes.

3  Q    What did you mean by "whatever you need me to do baby"?

4  A    That I would do whatever he wanted me to.

5  Q    How did he respond?

6  A    "Kk."

7  Q    And how did you respond?

8  A    "Thanks."

9  Q    The next green message, if you could read that.

10 A    "I'll.  At park."

11 Q    What did you understand that to mean?

12 A    That he's at the park.

13 Q    How did you respond?

14 A    "Kk be right over."

15 Q    And on the next page, 1219.04, on the top right, the green

16 box, what does that say?

17 A    "Fast."

18 Q    What did you understand that to mean?

19 A    To hurry up.

20 Q    And there's some additional squares on this page.  Do you

21 recall any other messaging?

22 A    Yeah.  My kids' father found my phone, my messages on

23 Facebook, and started messaging Boo-Bee through my Messenger

24 and then deleted them.

25 Q    So that's your recollection of what -- of what happened.

Ashley Lobdell - Cross

1 Anything about the exhibit that tells you that?

2 A    What do you mean?

3 Q    I'm just asking is there anything on the exhibit that says

4 "deleted" or otherwise --

5 A    No.  You just can't read them, so it usually means it's

6 unsent.

7 Q    Okay.  And, Ms. Lobdell, is it your recollection that

8 these are the messages that arranged your meeting with Boo-Bee

9 before that trip to Massachusetts we were talking about?

10 A    Yes.

11          MR. OPHARDT:  Your Honor, I have no further questions

12 at this time.

13          THE COURT:  Any cross-examination?

14          MR. JACKSON:  Yes, ma'am.

15                    CROSS-EXAMINATION

16 BY MR. JACKSON:

17 Q    Hello, Ashley.

18 A    Hello.

19 Q    Ms. Lobdell, do you remember when I got arrested?

20 A    Yes.

21 Q    And before that, when was the last time I seen you?

22 A    The morning before you got arrested.

23 Q    Okay.  And that was the morning you're referring to these

24 text messages right here?

25 A    Yes.

Ashley Lobdell - Cross

1  Q    Do you recall you hit me up that morning and basically

2  asked me -- I know some of these messages got deleted.  You

3  asked me where I was at and I told you I was in Mass?

4  A    No.

5  Q    So where I was at?

6  A    I'm sorry.  Can you repeat that?

7  Q    I said when you text me and you said "It's just me," I

8  text you, and I said -- you hit me back and I said I'm in Mass,

9  and you said yes.  I'm on my way back from Mass.  But you're

10 telling the Government that you went with me to Massachusetts.

11 A    Because we did.

12 Q    When did you go with me to Massachusetts, Ms. Lobdell?

13 A    The night of these -- the morning of these -- the day of

14 these messages.

15 Q    Where in Massachusetts did you go?

16 A    I'm not really sure what town we went to.

17 Q    How long was the ride to Massachusetts?

18 A    About two hours, three hours.

19 Q    You don't know?  Two, three hours?

20 A    About two, three hours, yeah.

21 Q    Okay.  Ms. Lobdell, you mentioned that you seen me with a

22 gun.  When was this?  Can you give an approximate time that you

23 seen me with a gun, what month, week, day?

24 A    I'm not good with times, no.  It was one of the times we

25 were in the car together.  You asked me to hand it to you out

Ashley Lobdell - Cross

1  of the glove box.

2  Q    Hand it to me to do what?

3  A    To put -- you were taking it with you out of the car.

4  Q    And going where?

5  A    I'm pretty sure it was to go into the Highlander.

6  Q    Ms. Lobdell, all these accusations -- these alleged

7  accusations you made came after you was arrested for a Hobbs

8  Act robbery; is that true?  You made these proffer statements

9  to the Government?

10 A    Yes.

11 Q    In between that time, I haven't seen you in almost, what,

12 a year and a half?

13 A    Yup.  Yup.

14 Q    Didn't you contact with me after I got arrested?

15 A    I did add you on GTL.

16 Q    And do you remember what you told me?

17 A    Not really.  I think I was just checking in with you.

18 Q    Did you tell me that "I hope you're all right," "I miss

19 you," and "call me" --

20 A    Yes.

21 Q    -- "I want to hear your voice"?

22 A    Yes.

23 Q    All right.  So when you get busted on the Hobbs Act

24 robbery, did you use, like everybody used, the Boo-Bee

25 get-out-of-jail-free card?

Ashley Lobdell - Cross

1  A    Sorry.  Can you repeat that?

2  Q    When you approached -- when you first got approached, who

3  was you first approached by?  HSI Special Agent Dornbierer?

4  A    No.

5  Q    Who?

6  A    I can't remember his name.

7  Q    And the first question they asked you was about Boo-Bee?

8  A    No.

9  Q    No?

10  A    No.

11  Q    When did Boo-Bee come up?

12  A    Not till a little later when they approached me with the

13  messages and --

14  Q    Trying to make a deal?

15  A    Yeah.

16  Q    And your deal was to tell them anything you could about

17  Lawrence "Boo-Bee" Jackson so you could get out of jail?  Yes

18  or no?

19  A    I'm sorry.  I can't really hear you.

20  Q    I said you gave them -- when they asked you about me --

21  I'm sorry.

22        THE COURT:  It's not -- you're not -- it's not your

23  fault.

24        COURTROOM DEPUTY:  Hold on.

25        THE COURT:  Kill the mic and turn it on again.

Ashley Lobdell - Cross

1    COURTROOM DEPUTY:  That's not working.  One second.

2 Q    Ms. Lobdell --

3    THE COURT:  We'll wait till we get it -- we'll get IT

4 to fix it.

5    COURTROOM DEPUTY:  Judge, could you say something?

6    THE COURT:  Yes.

7    COURTROOM DEPUTY:  It might be fixed, but let's wait

8 for IT, okay?

9    THE COURT:  Well, let's just see if it works and we'll

10 tell them if we fixed it ourselves.

11    COURTROOM DEPUTY:  I still hear it.

12    THE COURT:  A little bit of feedback, but let's see if

13 we can go forward.  We can't be interrupting your questions or

14 the testimony.  Let's see how we do.

15 Q    Ms. Lobdell, when you were questioned, what officer were

16 you questioned by?  What law enforcement?

17 A    Honestly, I'm really bad with names.  I can't remember

18 their names.

19 Q    Was it Detective Adam Lucia?

20    THE COURT:  Chris -- so now we do need to fix it --

21 A    He was there, yes.

22    THE COURT:  -- because we don't want you to be

23 distracted.

24    Hold up.  Hold up.

25    COURTROOM DEPUTY:  Can you say something into the mic,

Ashley Lobdell - Cross

1 Mr. Jackson?

2          MR. JACKSON:  Hello?

3          THE COURT:  Go ahead.

4 Q    Okay.  Ms. Lobdell, did you ever have an interview with

5 Special Agent Joseph Dornbierer of Homeland Security

6 Investigations after your arrest?

7 A    Not that I remember.

8 Q    Who charged you federally?  Homeland Security, ATF, DEA?

9 A    That's a good question.

10 Q    It was Homeland Security.

11 A    It's probably something I should know.

12 Q    I have the paperwork.  It was Homeland Security, I

13 believe.  And at that time did any one of them ask you about

14 Lawrence "Boo-Bee" Jackson?

15 A    At some point, yes.

16 Q    At some point.  And this was over a year later, right --

17 A    Yes.

18 Q    -- I suppose, or past a year?

19 A    Yeah.

20 Q    And at that time you told them that you knew me and that

21 you sold drugs for me?

22 A    Yes.

23 Q    Ms. Lobdell, when have I ever gave you drugs to sell?

24 A    The one I can remember was when you handed me the -- quite

25 a few plays to go outside.

Ashley Lobdell - Cross

1 Q    And who did you sell it to?

2 A    I don't know who they were.  I never asked you.

3 Q    Do I have a drug problem?

4 A    Yeah.

5 Q    I smoked drugs with you a lot, right?

6 A    Yes.

7 Q    We both from Rutland, true?

8 A    Yeah.

9 Q    You know the same addicts I know, true?

10 A    For most -- some of them.

11 Q    Do you know the addicts of Rutland, Ms. Lobdell?

12 A    Not all of them.

13 Q    Do you know the ones I know?

14 A    Not all of the people you know.

15 Q    Ms. Lobdell, who did I give you drugs to go sell to?

16 A    I don't know their names.

17 Q    Ms. Lobdell, when have you ever gave me $500 for some

18 drugs?

19 A    Not me personally, but when I went outside the -- sorry.

20 Now I'm forgetting the hotel.

21 Q    Ms. Lobdell, Mr. Ophardt just asked you did you sell drugs

22 for me.  You said you went outside the Highlander Hotel --

23 A    Highlander.  Thank you.

24 Q    -- and brought me back $500.

25 A    Yes.

Ashley Lobdell - Cross

1  Q    When did that happen?

2  A    It was at night, and I think it was probably a week before

3  you were arrested.

4  Q    Ms. Lobdell, why are you making up these stories?

5  A    I'm not.

6  Q    It took you almost two years to report this?  I haven't

7  seen you in almost four years, and you come before a federal

8  judge, a federal jury because you got caught doing something

9  and you're making up a story about Lawrence "Boo-Bee" Jackson,

10 that I gave you drugs, I enticed you to do this or do that.

11      When have I ever touched you inappropriately?

12 A    Just about every time we hung out.

13 Q    I touched you?

14 A    Yeah.  We had sex several times.

15 Q    I asked you did I ever touch you inappropriately.

16 A    That's what I'm assuming you meant.

17 Q    That's not inappropriately.  Did I ever violate you?

18 A    Not unwillingly, no.

19 Q    Did I ever hit you?

20 A    No.

21 Q    Did I ever point a gun at you?

22 A    No.

23 Q    You stated to the Government that I put a gun to your

24 head.

25 A    Not you.

Ashley Lobdell - Cross

1  Q    In your report to Mr. --

2  A    That was Peeto.

3  Q    Excuse me.  In your report to Ms. Cate and Mr. Ophardt,

4  you said I pointed a gun at your head and said that you would

5  end up like somebody that was found dead behind Hannaford's.

6  A    Not to me.  That was to Reggie, I'm pretty sure, when

7  Reggie came in, into the house.

8  Q    Ms. Lobdell, you made a statement to two federal officers

9  that I pointed a gun at your head and I said to you that you

10 would end up like the person left behind Hannaford's.

11 A    Not me personally, no.  You didn't do it to me personally.

12 There must have been some confusion.  You said it to Reggie

13 when you guys were in some sort of argument.  That was at the

14 Killington Ave. apartment.

15 Q    So are you testifying before this court, in front of this

16 jury, that you didn't tell Mr. Ophardt that in a statement?  I

17 have the paperwork.  Did you tell Mr. Ophardt while you was in

18 the vehicle with me I pointed a gun to your head and told you

19 that you would end up like somebody that was found dead?

20 A    No.

21          MR. JACKSON:  Your Honor, can I get a second?

22          THE COURT:  Sure.

23          MR. OPHARDT:  Your Honor, I'm going to object to

24 Mr. Jackson just commenting on the witness' testimony

25 inappropriately.

Ashley Lobdell - Cross

1          THE COURT:  So --

2          MR. JACKSON:  I'm sorry, your Honor.  I apologize.

3          THE COURT:  Yes.  You can't do that.  I warned both

4  parties before.  It's not going to happen.  You don't respond

5  to the testimony.  You have a closing argument, and that's when

6  you make those statements, if at all.

7          MR. JACKSON:  Your Honor, could I request a ten-minute

8  recess?

9          THE COURT:  We just had a recess, so we'll wait until

10  you find what you're looking for.

11          MR. JACKSON:  Your Honor, I would like to refresh

12  Ms. Lobdell's memory.

13          THE COURT:  All right.  So we'll mark this as

14  Defendant's Exhibit --

15          COURTROOM DEPUTY:  V --

16          THE COURT:  V.

17          COURTROOM DEPUTY:  -- as in Victor.

18          THE COURT:  It doesn't need to be admitted.  It's just

19  for identification.

20          MR. JACKSON:  It was -- yes, your Honor.  I would like

21  to admit it.

22          THE COURT:  Well, we'll see.  I thought you were going

23  to use it for refreshing recollection.

24          MR. JACKSON:  Yes, I'll do that, because she made a

25  statement to the Government, so -- whatever the Court deems to

Ashley Lobdell - Cross

1  be just and proper.

2          MR. OPHARDT:  Your Honor, may I request to see the

3  exhibit prior to it being provided?

4          THE COURT:  Yes.

5          MR. OPHARDT:  Thank you.

6      Mr. Jackson, could I see the first page of this so I know

7  who the author is?

8          MR. JACKSON:  Sure.

9          THE COURT:  All right.  So I'll let the witness read

10 before I make a statement.

11     You tell me when you're done.

12         THE WITNESS:  Okay.

13         THE COURT:  All right.  You can use it to refresh

14 recollection.  You can offer it as a hearsay exception.  That's

15 your job to tell me how you want to offer it.  I didn't mean to

16 suggest that you had to just refresh recollection.  That's what

17 you told me you wanted to do.

18     So go ahead and ask your next question.

19 Q   BY MR. JACKSON:  Ms. Lobdell, did you read the paragraph I

20 was talking about?

21 A   Yes.

22 Q   Did it refresh your recollection?

23 A   Yeah.

24 Q   What did it say, ma'am?

25 A   The same thing I said, that you -- that you told somebody

Ashley Lobdell - Cross

1  that you were going to put a cap in them like you just did to

2  somebody behind Hannaford's.

3  Q    But does it --

4         MR. JACKSON:  Can I have that back?  Thank you, ma'am.

5      May I show this, your Honor?

6         THE COURT:  Are you seeking its admission?

7         MR. JACKSON:  Yes, ma'am.

8         THE COURT:  All right.  And under what hearsay

9  exception?

10        MR. JACKSON:  It was a direct statement to a police

11 officer.

12        THE COURT:  A direct statement -- it's an out-of-court

13 statement.

14        MR. JACKSON:  Yes.

15        THE COURT:  Offered for its truth, correct?

16        MR. JACKSON:  Yes.

17        THE COURT:  Not just impeachment?

18        MR. JACKSON:  Yes.  Impeachment, it would be.

19        THE COURT:  As impeachment.

20     Let's hear what the Government -- whether it has any

21 objection.

22        MR. OPHARDT:  Your Honor, this is an FBI 302, which is

23 an investigative report of an FBI agent.  This is not

24 Ms. Lobdell's own words.  This is an agent's report of an

25 interview that was conducted, so I don't have concerns with it

Ashley Lobdell - Cross

1  coming into evidence, but I do not understand how it's

2  admissible under the Rules of Evidence.  So if the Court is

3  willing to accept it under the residual clause of the hearsay

4  rules, that's fine by me.  I believe it to be reliable.  The

5  author will be testifying, FBI Task Force Officer Jeffrey

6  Stephenson, so we can also conditionally admit it pending him

7  providing additional foundation if the Court has additional

8  evidentiary concerns.

9          THE COURT:  All right.  In the Federal Rules we do

10  have a residual hearsay exception.  Is that the basis under

11  which you are offering it, Mr. Jackson?

12          MR. JACKSON:  Yes, ma'am.

13          THE COURT:  And it's Exhibit V?

14          COURTROOM DEPUTY:  V, as in Victor.

15          THE COURT:  All right.

16          MR. JACKSON:  Yes.

17          THE COURT:  And I will admit it for that purpose

18  subject to the Court determining whether or not there's a

19  problem with it.  I haven't seen it myself.  And I will make

20  sure the requirements of the residual exception are satisfied,

21  because even if there isn't an objection, the Court has an

22  independent duty to ensure that evidence is admissible.

23          MR. OPHARDT:  Your Honor, we do -- we did find a

24  better copy thanks to someone running downstairs.  I can

25  approach the podium as well, so if the Court would like to

Ashley Lobdell - Cross

1  review it.  I believe Mr. Jackson's just offering page 7 of 7.

2         THE COURT:  All right.  That would be helpful.  I'd

3  love to see another copy.

4         MR. OPHARDT:  Ms. Ruddy, I'll meet you right here at

5  the document camera.

6         COURTROOM DEPUTY:  Thank you.

7         MR. OPHARDT:  Thank you.

8         THE COURT:  I am going to not allow Exhibit 982.07 at

9  this point in time.  It contains many other statements other

10  than the one that you are seeking to impeach the witness with.

11  So I will allow the exhibit in a redacted form to be admitted,

12  and I understand we're on page 7, and there is the third

13  paragraph of page 7 that you want admitted, and I will allow

14  that to be admitted.  The remaining statements are from the FBI

15  agent.  They contain many extraneous facts, and under Rule 403,

16  the Court finds that the balancing test has not been satisfied.

17     So we'll create a new exhibit, and on that basis it will

18  be admitted.  Understood?

19         MR. JACKSON:  Yes, ma'am.

20         THE COURT:  All right.  Let's go to the next question.

21         MR. OPHARDT:  Your Honor, I'm sorry.  May I briefly

22  interject?  The Government does not have any objection to

23  Mr. Jackson or the witness reading those portions of the

24  exhibit that the Court just allowed.  I think that could be a

25  way to publish it prior to its redaction so we can keep moving.

Ashley Lobdell - Cross

1          THE COURT:  All right.  So I'm going to mark what I

2     think is what Mr. Jackson's using.  Ms. Ruddy will give it to

3     Mr. Jackson, and you may then give it to the witness and have

4     the witness read the tagged part.

5          COURTROOM DEPUTY:  Is that the correct part?

6          THE COURT:  Have I tagged it correctly?

7          MR. JACKSON:  Yes, ma'am.

8          THE COURT:  All right.  So let's have it presented to

9     the witness, and you may ask the witness to read it into the

10    record, and then we'll create an exhibit.

11         MR. JACKSON:  Yes.

12      (Defendant's Exhibit V was received in evidence.)

13    Q    BY MR. JACKSON:  Ms. Lobdell, can you read that paragraph

14    that she just -- your Honor just tagged, please.

15    A    Yes.  "Jackson told Lobdell he 'capped' somebody behind

16    Hannaford Supermarket or the mall in Rutland, Vermont.  During

17    a conversation between Jackson, Schaner, and Reggie LNU, he

18    said, 'just put -- just put a cap in someone's ass - don't make

19    me do it to you.'"

20    Q    Did I ever tell you that, ma'am?

21    A    What -- when I said "don't make me do it to you," you

22    weren't referring to me.  You were talking to Reggie.

23    Q    In the beginning of the paragraph, ma'am, it said I told

24    you that I "'capped' somebody behind Hannaford Supermarket or

25    the mall in Rutland."  That's what you stated --

Ashley Lobdell - Cross

1  A    Yes.

2  Q    -- to the FBI agent.  When did I ever tell you that?

3  A    It was -- I honestly can't remember the day, but we were

4  all upstairs at the Killington apartment and you came -- I was

5  just there and you came back all heated up about --

6  Q    And who got capped?

7  A    I don't know.

8  Q    Did you hear about anybody getting shot?

9  A    No.

10 Q    So why would you make a statement like that to a FBI

11 special agent?

12 A    Because that's what you said.

13 Q    I said -- I said what, ma'am?

14 A    What I just read to you here.

15 Q    Thank you, Ms. Lobdell.

16      MR. JACKSON:  I have no more questions, your Honor.

17      THE COURT:  All right.  Any redirect?

18      MR. OPHARDT:  No, your Honor.  Thank you.

19      THE COURT:  All right.  At this point we will take a

20 break.  We're going to stop at 4:30.  I do have something to

21 address with the attorneys.  I'm going to ask the witness to

22 remain seated, and we're going to excuse the jury.  I think it

23 will be about five minutes, but you've already figured out that

24 I can't tell time.

25      Don't talk about the case.  Don't let anybody talk to you

1  about the case.

2       (Jury out at 4:05 PM.)

3       THE COURT:  You can have Ms. Lobdell leave the

4  courtroom.

5       (The witness was excused.)

6       COURTROOM DEPUTY:  Mr. Ophardt, I'm going to give this

7  back to you.

8       MR. OPHARDT:  Yes.  If the Court's good with that.

9       THE COURT:  So under Rule 801, in order for a

10  co-conspirator's statement to be admissible, the Court must

11  find that there was a conspiracy in existence, the defendant

12  was a member of the conspiracy, the defendant against -- the

13  declarant was a member of the conspiracy, excuse me, the

14  defendant against whom the statement is offered was a member of

15  that conspiracy, the statement was made in furtherance of the

16  conspiracy, and the statement was made during the course of

17  that conspiracy.

18       The Government offered into evidence Exhibit 31F, which

19  the Court admitted under the co-conspirator exception to the

20  hearsay rule, which means it's non-hearsay, and the Court makes

21  the following findings to provide the basis for that admission.

22       Ms. Lobdell testified that she would work with the

23  defendant to sell drugs and to pick up drugs.  The statements

24  were made during the time period of the conspiracy.  They were

25  in furtherance of the conspiracy if her testimony is credited

1  that she went to Massachusetts with the defendant to pick up

2  drugs.  She indicated that she worked with the defendant to do

3  sales during the time period the statement is offered against

4  the defendant, who is allegedly also a member of that same

5  agreement with her, and on that basis the Court admitted the

6  statement as a co-conspirator statement in furtherance of the

7  conspiracy.  The messages themselves may be considered for that

8  purpose, and they indicate that the parties are agreeing to

9  undertake certain action which involves something to do with

10  regard to Massachusetts, and I will let the jury decide what,

11  if anything, those messages mean beyond that point.

12          We have Ms. Lobdell out of the courtroom.  And do you have

13  a witness ready?

14                  MR. OPHARDT:  We do, your Honor.

15                  THE COURT:  All right.  So we'll have the jury come

16  back and we'll call our next witness.

17          That document contains all sorts of things that have been

18  excluded, so I want just that paragraph on a white sheet, and

19  that's it.  Page 7.

20                  MR. BEHRENS:  Got it.

21          (Jury in at 4:09 PM.)

22                  THE COURT:  We are back on the record in United States

23  of America v. Jackson.

24          The Government may call its next witness.

25                  MR. OPHARDT:  Your Honor, the United States calls

Eric Brimo - Direct

1  Special Agent Eric Brimo.

2          COURTROOM DEPUTY:  Mr. Brimo, you may step right in

3  front of me.  Good afternoon.  Please raise your right hand.

4  State your full name for the record.

5          THE WITNESS:  Eric Brimo.

6                          ERIC BRIMO,

7      having been first duly sworn by the courtroom deputy,

8              was examined and testified as follows:

9          THE WITNESS:  Yes.

10                     DIRECT EXAMINATION

11 BY MR. OPHARDT:

12 Q    Good afternoon.

13 A    Good afternoon.

14 Q    Agent Brimo, where are you currently employed?

15 A    I'm a special agent with the Bureau of Alcohol, Tobacco,

16 Firearms and Explosives, the ATF.

17 Q    How long have you been with ATF?

18 A    About eight years.

19 Q    Prior to ATF, any other law enforcement experience?

20 A    Yes.  I was a special agent with the U.S. Department of

21 State Diplomatic Security Service and a detective with the Vero

22 Beach Police Department in Vero Beach, Florida.

23 Q    In total, how many years in law enforcement?

24 A    About 17.

25 Q    In addition to your law enforcement experience, do you

Eric Brimo - Direct

1  have any academic degrees?

2  A    Yes.  I completed my master's degree in criminal justice

3  in 2005.  I completed my master's degree in diplomacy and

4  international terrorism in 2008.  And I completed my doctoral

5  work with a Ph.D. in 2012 in public safety focusing on law

6  enforcement tactical teams, studying those types of teams.

7  Q    What institution was your Ph.D. from?

8  A    Capella University.

9  Q    As part of being an ATF agent, is there training that most

10 ATF agents get?

11 A    Yes.  There's a basic program in Glynco, Georgia, at the

12 Federal Law Enforcement Training Center.

13 Q    Have you received that training?

14 A    Yes.  I went through that program.

15 Q    What other training have you had through ATF pertinent to

16 firearms?

17 A    I went through and completed the advanced interstate nexus

18 training program.

19 Q    When did you complete that?

20 A    I completed that in early 2022.

21 Q    Do you recall the month you completed it?

22 A    I believe February, yes.

23 Q    What does that training entail?

24 A    It is an advanced research methods program.  It teaches

25 you to use quality sources of information to identify firearms,

Eric Brimo - Direct

1  identify firearm types, where they're manufactured, and

2  potentially when they were manufactured.

3  Q    What goes into being accepted for that training program?

4  A    It's -- you have to be on the job for at least five years.

5  I applied and I was selected as the top candidate in all six

6  New England states.  Once accepted into the program, I was

7  then -- I went to the training, which was in West Virginia.

8       Just to walk in the door, I had to take and complete an

9  examination demonstrating my knowledge of firearms and firearm

10 nomenclature, firearm safety, and I completed that, passed

11 that, and then I attended the training, which, again, focusing

12 on research and quality sources.

13      And then at the end of the training program, you have to

14 complete another examination demonstrating that you understood

15 the training and that you understand the materials, and I

16 completed that as well.

17 Q    How long prior to taking that entrance exam, if you will,

18 had you been studying?

19 A    I had expressed interest, so a while, but approximately

20 three months that I knew I was going, and I was studying very

21 vigorously for it.

22 Q    I want to talk with you a little bit about just being a

23 regular old ATF agent here in Vermont.  How much of your work

24 is with state and local law enforcement partners?

25 A    Almost all of it.

Eric Brimo - Direct

1  Q    Why is that?

2  A    That's primarily who ATF works with.  We work with state

3  and local agencies around.  We partner with them to assist with

4  three key areas of violent crime:  firearms, arson, and

5  explosives.

6  Q    As part of that work, have you ever gone along on a state

7  search warrant execution?

8  A    Yes.  Many.

9  Q    You said many?

10 A    Yes.

11 Q    Why is that?

12 A    Many times due to some of the more technical issues with

13 identifying firearms, I'm asked to accompany law enforcement on

14 a search warrant if they believe in their criminal

15 investigation that firearms may be present in a search or as

16 part of an investigation.  So I frequently get asked to

17 accompany them just in the event that firearms are located, and

18 if they are, then I can assist with, again, identifying and

19 providing tactical assistance.

20 Q    How often does your attendance at a state or local search

21 warrant and providing this technical assistance turn into a

22 federal investigation and federal charges?

23 A    Not that often, frankly.  Several times a year, but most

24 of the time either it would stay at the state level or it

25 just -- there are no firearms discovered on the search.

Eric Brimo - Direct

1  Q    I want to talk with you about December 15th, 2021.  Was

2  this prior to you being a nexus qualified expert?

3  A    Yes.

4  Q    What, if anything, did you do that day in Rutland?

5  A    I was asked to identify some firearms that were part of an

6  investigation.

7  Q    Had you been a part of the investigation up to this point?

8  A    No.

9  Q    What were you asked to do in relation to those particular

10 firearms, generally speaking?

11 A    To identify them.  And then in particular, one of the

12 firearms the investigators had challenges locating a serial

13 number, and so I was assisting them with that.

14 Q    What did you do with the information you obtained during

15 that visit to Rutland City PD?  Did you provide it to another

16 law enforcement officer?

17 A    Yes.  There was -- Homeland Security and Rutland Police

18 Department were there jointly and provided the firearms, and I

19 just provided it to them there.

20 Q    When you had that information, did you also relay it to a

21 different ATF agent who was a nexus expert?

22 A    Yes, I did.

23 Q    And why did you do that?

24 A    Because at the time I was not qualified under the nexus

25 program, and so I sent the information to him and he provided

Eric Brimo - Direct

1 his assessment.

2 Q    So in order to relay that information, you had to record

3 it and kind of know -- know the information so that he could

4 rely on it?

5 A    Yes.  Well, I had to relay the correct information, that

6 this is what the firearm is, correctly identifying it was the

7 manufacturer and the model, going that way and providing that

8 correct information to him.

9 Q    Did there come a time later on where you were asked to do

10 your own nexus analysis of those firearms?

11 A    Yes.

12 Q    When was that?

13 A    It was January, I believe, of this year.

14 Q    What did you use to kind of refresh your recollection of

15 what those firearms looked like?

16 A    I was provided photographs from Homeland Security

17 Investigations.

18 Q    And were they consistent with your recollections of the

19 firearms you'd looked at in December of '21?

20 A    They were consistent with -- yes, with those three.

21        MR. OPHARDT:  Your Honor, if we could have Agent

22 Dornbierer bring up Government's Exhibit 1, the physical item.

23 Q    Agent Brimo, I believe Government's Exhibit 1 is open if

24 you need to take a better look at it.  Do you recognize that

25 item?

Eric Brimo - Direct

1  A    Yes, I do.

2  Q    What is it?

3  A    This is a Diamondback firearm.  This is one of the

4  firearms I was asked to identify.

5  Q    I'm also going to put up 1A on the screen so that --

6        COURTROOM DEPUTY:  One second.

7        MR. OPHARDT:  Thank you.

8        COURTROOM DEPUTY:  Okay.  There you go.

9  Q    -- so that folks can follow along.

10       When you're asked to do a nexus analysis of a firearm,

11  what types of markings are you looking at?

12  A    So ATF regulations require firearm manufacturers and

13  firearm importers to mark the firearm on the frame of the

14  receiver, and typically you're looking for the manufacturer's

15  name, manufacturer's location, and a serial number.

16  Q    Looking at Government's Exhibit 1 or 1A, whichever's

17  easier for you, where are those markings on this item?

18  A    On this item, this is -- the frame is the tan-colored

19  portion of the firearm, so what we have is at the top is

20  "Diamondback Firearms, Cocoa, Florida," and then down below,

21  right next to what appears to be another DB logo, is the serial

22  number.

23  Q    And that's right here at the bottom of the firearm

24  beginning with Y?

25  A    Yes.  And it's recessed, as many of them are -- do, so

Eric Brimo - Direct

1  that way the serial number does not become damaged.

2  Q    As doing a nexus assessment, can you rely strictly on the

3  stamp of a firearm as to where it was manufactured?

4  A    No.  ATF allows for marking variances.  This is where

5  manufacturers may request with ATF the ability to have a

6  firearm made elsewhere but mark it a certain way, and this is

7  because their company brand or marketing is usually tied to a

8  certain area, and so they want to have it marked a certain way

9  versus where the firearm is actually made.

10  Q    Does Diamondback have such a waiver?

11  A    Yes, they do.  They have a marking variance.

12  Q    So their marking variance allows them to stamp them as

13  Cocoa, Florida, even though they're not all manufactured in

14  Cocoa, Florida?

15  A    That's correct.  They're initially manufactured in

16  New York, and then they are shipped out for complete

17  manufacturing in Cocoa, Florida.

18  Q    At any point in time, is the firearm manufactured in

19  Vermont if it's a Diamondback firearm?

20  A    No Diamondback is manufactured here, no.

21  Q    How often have you encountered Diamondbacks as part of

22  your ATF experience here in Vermont?

23  A    This is the first and only one I have, and I noticed it

24  because Cocoa is near my hometown in Florida.

25  Q    How often have you encountered firearms as part of your

Eric Brimo - Direct

1  day-to-day work here in the past --

2  A    Frequently.

3  Q    Was it eight years?

4  A    Yes.  Eight years.  Frequently as part of my duties.

5  Q    How many firearms have you seized, approximately?

6  A    Personally, over 500.

7  Q    I'm sorry.  We'll put 1A back up on the screen.  And you

8  still have 1 with you.  What type of ammunition does this

9  firearm take?

10 A    This takes 9-by-19 millimeter, also known as 9-millimeter

11 Luger.

12 Q    When you were examining this firearm in December of 2021,

13 what was your assessment as to whether or not the firearm was

14 operable?

15 A    It appears to be.  There's no clear defects on it.  There

16 doesn't appear to be anything that would disrupt the action of

17 this firearm.  I have not personally test-fired it, but there

18 does not -- nothing stands out to me that would disrupt the

19 operation of this firearm.

20 Q    Based on your assessment, what would you say about whether

21 it was capable of discharging a projectile with an explosive?

22 A    This is a firearm, and, yes, it could do that, yes.

23 Q    So I just used a bunch of fancy words.  What does it mean

24 to discharge a projectile with an explosive?

25 A    When a firearm is functioning, there's many different

Eric Brimo - Direct

1  types, many different styles, but generally speaking, it is a

2  controlled explosion.  The firearm is being struck where the

3  round then is discharged within, so there is this fire, heat,

4  and energy that is occurring that is contained with here, where

5  the projectile, often called a bullet, will then continue out,

6  outward of the muzzle.

7          MR. OPHARDT:  If we could have Exhibit 2 brought up to

8  exchange with Agent Brimo, please.

9  Q    Agent Brimo, I couldn't help but notice that you were

10 manipulating the firearm just now.  What were you doing?

11 A    Checking to render it safe, just making sure there was no

12 ammunition in it, making sure there's no loaded magazine.  If

13 you do it the same way every time, there's no accidents.

14 Q    Is this another one of the firearms you recall reviewing

15 at Rutland City PD?

16 A    Yes.

17 Q    And again, you provided a nexus assessment of this firearm

18 after you completed your training?

19 A    Yes.

20 Q    I put Government's Exhibit 2A on the screen.  And you can

21 take out 2.  Do you recognize that photograph as one depicting

22 the exhibit in front of you?

23 A    Yes.

24 Q    So what markings would you be looking at here to do your

25 assessment?

Eric Brimo - Direct

1  A    This is a little different as the -- the slide and frame
2  are sort of one together, but still again looking for the
3  manufacturer's writing on it, looking for the manufacturer's
4  location, and which this one is Davis Industries out of
5  California.
6  Q    Where is the serial number?
7  A    It's actually below further.  I have it here, obviously,
8  but it's on the bottom of the grip.  It's kind of hard to see
9  in this photo.
10 Q    So this is a second photograph.  Is that the serial number
11 there?
12 A    Yes.  That is the serial number.  That is where it is
13 located on the grip.
14 Q    What, if anything, do you know about Davis Industries
15 firearms and where they're manufactured?
16 A    They were manufactured from the 1990s into the early 2000s
17 in California.  It was part of four -- at least four other
18 associated companies that were making a large volume of
19 low-cost firearms.  There was several significant issues
20 between the companies, and Davis went under.
21 Q    At any point in time were Davis Industries firearms
22 manufactured in the state of Vermont?
23 A    No.
24        MR. OPHARDT:  If we could swap Exhibit 2 for Exhibit
25 3.

Eric Brimo - Direct

1  Q    Do you recognize Exhibit 3?

2  A    Yes.

3  Q    Was that also one of the firearms you looked at at Rutland

4  City PD?

5  A    Yes.

6  Q    What's different between the first two firearms and this

7  firearm?

8  A    This is a revolver.  It's a unique revolver in that it is

9  chambered to fire shotgun shells.

10  Q    When you say "revolver," what's the difference between a

11  revolver and the other two firearms?

12  A    The other two firearms are pistols where the chamber is

13  permanently in line with the bore, or the inside of the barrel,

14  where a revolver there's a cylinder where the chambers are part

15  of this cylinder and they revolve as part of the action of the

16  firearm.  So when you pull the trigger, typically it will spin

17  the cylinder one round, although there are several different

18  designs.

19  Q    Put 3A up on the screen.  Now, what are the markings

20  you're looking at here to do a nexus assessment?

21  A    So this is, again, looking for the manufacturer.  But

22  knowing this manufacturer - it's a multinational corporation -

23  looking to see if this is manufactured in the United States or

24  elsewhere, was this imported.

25  Q    And any markings on this one that would help guide your

Eric Brimo - Direct

1  analysis?

2  A    Yes.  Because the importer markings must be accurate, so

3  it says "Made in Brazil," and then also that it is manufactured

4  by Taurus, which I know personally are manufactured in Brazil,

5  and then also imported by them as well.

6  Q    And the serial number on this firearm is located where?

7  A    It's above the writing -- it's just above the "Made in

8  Brazil."

9  Q    That will suffice.  Thank you.

10     I show you Government's Exhibit 10, Bates 99.076, which is

11 in evidence.  What's depicted in the middle of that photograph?

12 A    Appears to be boxes of ammunition.

13 Q    What caliber is the top box?

14 A    .22.

15 Q    And what caliber is the bottom box?

16 A    .40 caliber.

17 Q    Any of the three firearms we were looking at, do they take

18 that type of ammunition?

19 A    No.  It would be incredibly dangerous to use ammunition

20 that was not chambered for the firearm.

21 Q    I asked you about the Diamondback.  I didn't ask about the

22 Davis Industries P-380.  What type of ammunition does that

23 take?

24 A    380, which is a form of 9-millimeter.

25 Q    And then the Judge, which type of rounds?  You said

Eric Brimo - Direct

1  shotgun shells and regular rounds.  What are they actually?

2  A    .45 caliber long Colt.  It's a slightly larger, longer

3  version of standard .45 caliber.

4  Q    And what type of shotgun shell?

5  A    .410.

6  Q    If someone was to load in a -- try to load in a .40

7  caliber bullet into a 9-millimeter, would that be possible?

8  A    No.  It would not fit.

9  Q    How about .22?

10  A    It would rattle around inside.  I think it would be pretty

11  loose.  But the bigger issue is, again, the function of a

12  firearm is a controlled explosion.  You're taking the control

13  away now.  So it's incredibly dangerous.  All this fire, heat,

14  and energy must go somewhere, and you could have a catastrophic

15  failure?

16  Q    What does "catastrophic failure" mean?

17  A    Death or serious injury.

18  Q    How about The Judge?  Could you load any of this ammo in

19  The Judge?

20  A    You could potentially try to load .40, but again, it would

21  rattle around and I would be very, again, concerned for safety

22  of doing so given that it is not chambered for it.  The .22

23  would be too small.  It would roll around and rattle around.

24  So both would not fit correctly in this firearm.

25  Q    I'm going to show you another page from Exhibit 10.  It's

Eric Brimo - Direct

1  Bates number 99.084.  What's depicted in that photograph?

2  A    It appears to be a drawer containing two handguns

3  holsters -- handgun firearm holsters.

4  Q    What's a holster?

5  A    It is a device that's usually designed to be worn on the

6  person that can fit a firearm.

7  Q    Anything about these holsters tell you whether firearms

8  you've looked at today would work in those holsters?

9  A    I couldn't make that assessment.  In particular, many

10  holsters are designed to fit multiple firearms, so it would be

11  incredibly challenging to do so.  They just appear to be

12  handgun holsters.

13        MR. OPHARDT:  May I have a moment, your Honor?

14        THE COURT:  Yes.

15        MR. OPHARDT:  Your Honor, I have no further questions.

16        THE COURT:  All right.  We're at the 4:30 mark.

17  Mr. Jackson, how much cross-examination do you think you have?

18        MR. JACKSON:  Probably about 20 minutes -- excuse me.

19  I'm sorry, your Honor.

20        THE COURT:  That's all right.  About 20 minutes?  All

21  right.

22     We're going to resume tomorrow.  On Friday we're going to

23  end at 2:00.  So we're not going to be able to start without

24  you.  You've all been super prompt.  9 o'clock tomorrow.

25        Don't talk about the case.  Don't let anybody talk to you

1  about the case.  Don't do any research.  Come back as the same

2  attentive, diligent jurors that you were today.  I wish you a

3  good evening.

4      I'll have the parties remain in the courtroom.

5      (Jury out at 4:29 PM.)

6          THE COURT:  Anything to bring to my attention before

7  we break?  And I'll start this time with the Government.

8          MR. OPHARDT:  No, your Honor.

9          THE COURT:  Anything from you, Mr. Jackson?

10          MR. JACKSON:  Just one thing, your Honor.  In your

11  Honor's ruling as far as Ashley Lobdell being a co-conspirator,

12  I didn't see that anywhere.  You made a ruling that she was a

13  co-conspirator.

14          THE COURT:  So I don't -- I don't make the ruling so

15  that the jury's going to hear that.  I do it outside the

16  presence of the jury.  Because in order for the Government to

17  have the text messages admitted between you and Ms. Lobdell,

18  her part of it -- yours are admissions, so they're admissible.

19  Her part of it has to be admissible because it's an

20  out-of-court statement offered for the truth, and so I have to

21  make certain factual findings just for the record, nothing that

22  the jury's going to hear, about the basis under which they

23  would be admitted.  And it just has to be sufficient evidence

24  that there was a conspiracy, that both the declarant and the

25  person against whom the statement is offered were members of

1  the conspiracy, that the statement was made during the

2  conspiracy, and that it was in furtherance of the conspiracy.

3  So it's an evidentiary ruling that the jury never hears about,

4  and that's why I do it outside the presence of the jury.

5          MR. JACKSON:  Okay.  Can I just note my objection for

6  the record?

7          THE COURT:  So go ahead and make your objection as to

8  why you don't think that evidence rule is satisfied.  Keep in

9  mind that you did not object to the exhibit that contained

10 those.

11         MR. JACKSON:  Well, that's true too, your Honor, but I

12 didn't know -- I haven't seen anywhere in the Government's

13 paperwork or discovery they had listed Ashley Lobdell as a

14 co-conspirator.  I understand your evidentiary ruling, but to

15 my recollection, they only listed one person as a

16 co-conspirator, and that was Orlando Cruz, so this ruling

17 caught me a little by the blind side, so that's why I would

18 like to note my objection for the record, your Honor.

19         THE COURT:  All right.  So that's a good question, and

20 fortunately, the courts have answered that question.  So in

21 order for the statement to be admissible, it does not require

22 that the person be found to be a co-conspirator in court

23 documents.  So I'll read you some case law.  "Defendants are

24 not entitled to discover co-conspirator statements before

25 trial.  The co-conspirator or declarant need not be present for

1  cross-examination as a prerequisite."  That's not actually what

2  I'm looking for.

3          It is not necessary, however, that a conspiracy be charged

4  in the indictment.  So that's from the Second Circuit, *United*

5  *States v. Doulin*, D-O-U-L-I-N, 538 F.2d 466.

6          Nor is it necessary that the declarant be charged as a

7  co-defendant.  That's *United States v. Jones*, 542 F.2d 186,

8  from the Fourth Circuit, 1976.

9          It's sufficient that there be a joint venture.  The "joint

10  venture on which admission of a coventurer's statement is based

11  need not be the same as the charged conspiracy, if any," and

12  "need not have an illegal objective."  *United States v. Layton*,

13  855 F.2d 1388 (9th Cir. 1988).

14          So that is not required.  It does not require that the

15  person be charged as a co-conspirator, identified as a

16  co-defendant, as long as there is an agreement between the

17  defendant and one or more person to engage in the conspiracy in

18  which -- which is charged and the statement is in furtherance

19  of that joint venture.  So on this basis the Court found that,

20  at least based on the testimony, the factual requirements for

21  admission have been satisfied.  That doesn't mean that I'm

22  making that decision.  It's one about admissibility of

23  evidence.

24          MR. JACKSON:  Okay.

25          THE COURT:  Does that make sense?

1            MR. JACKSON:  Yes, ma'am.

2            THE COURT:  Anything else to bring to my attention

3 before we come back tomorrow?

4            MR. OPHARDT:  No, your Honor.

5            THE COURT:  No.  And you're all set as well?

6            MR. JACKSON:  No, your Honor.

7            THE COURT:  All right.  Thank you.

8        (A recess was taken from 4:35-4:38 PM.)

9            THE COURT:  We are back on the record in United States

10 of America v. Jackson.

11        And, Mr. Jackson, you had something that you forgot to

12 tell me.  Go ahead.

13            MR. JACKSON:  Yes, ma'am.  Your Honor, I would like to

14 issue -- have a subpoena issued for Sergeant Plemmons of the

15 Rutland Police Department.

16            THE COURT:  Sergeant who?

17            MR. JACKSON:  Plemmons.

18            THE COURT:  Plemmons.  Okay.  Your team is preparing

19 those subpoenas, and I will sign off on it as soon as you need

20 it.

21        Mr. Ophardt, you're on your feet.

22            MR. OPHARDT:  I am, your Honor.  Sergeant Plemmons has

23 a long-planned family vacation from April 20th through --

24 excuse me, April 12th through April 20th.  He's been --

25 Mr. Jackson has been aware of Sergeant Plemmons' role on this

1  for a very long time.  I do not believe that Sergeant Plemmons

2  is going to be willing to cancel his vacation.

3          THE COURT:  Well, also is he on your exhibit list?

4  Because -- I mean witness list?  Because if he's not, you

5  can't -- you can't do that.

6          MR. JACKSON:  Well, no.  I'm intending to add it, your

7  Honor, because at first I thought that was Detective Lucia on

8  that videotape, but now Detective Lucia testified that it was

9  Sergeant Plemmons.  I would like to --

10          THE COURT:  Well, it needed to be -- he needed to be

11  on your witness list.  You have the same rules as the

12  Government.  I'm going to -- we can see if we can do it this --

13  you can see if he's available.

14      Would you do that, Mr. Ophardt?

15      If he's not, he's not.  I will -- the subpoenas need to go

16  out generally 14 days in advance of somebody testifying.

17  That's in the rules.  So we don't usually do that because

18  they've got to be served and we've got people who have to go

19  out and find those people, so I can't guarantee that's going to

20  happen.

21          MR. OPHARDT:  Your Honor, we're checking to see if

22  Sergeant Plemmons is available tomorrow.  I don't know what his

23  obligations are in Rutland.  I'll just observe that this issue

24  has been on Mr. Jackson's radar since the suppression hearing,

25  and the cruiser camera from Sergeant Plemmons was made

 1  available to him in custody.  We'll do our best to see if we
 2  can get him here.  I have no issue with calling him in our case
 3  in chief.  I don't think he's going to hurt our case at all.
 4  We can proceed with him as a government witness if he's
 5  available, but I do not want to waive the notice issue because
 6  I don't know if the Court's aware, southern Vermont has a
 7  different school break than northern Vermont, so I think this
 8  is a family vacation for Sergeant Plemmons.

 9          THE COURT:  All right.  If -- generally the rule is
10  across the board, and I tell you this at the pretrial
11  conference.  You don't list an exhibit, you don't identify a
12  witness, they do not testify, the exhibit does not come in
13  except for its impeachment.  It's not what I would call
14  impeachment testimony.

15      If it can be accommodated, I will allow the Government to
16  call him in their case if they're willing to accommodate you
17  like that.  They don't have to.  They can say you can wait till
18  your case, and it might be too late for you to do it, and you
19  can work out among yourselves whether or not we're going to
20  take the witness out of turn, in which event Mr. Jackson would
21  be doing a direct examination.  It probably is a hostile
22  witness.  We'll get there.  But that's about as much as I can
23  do.

24      And I'd be happy to sign a subpoena as well, but there is
25  a right to have -- to question the subpoena and quash it, and I

1 don't really want marshals serving subpoenas in the middle of

2 trial.  They've got other activities that they need to do to

3 make sure this trial goes smoothly.

4          MR. OPHARDT:  Your Honor, I apologize for stepping

5 away while you were speaking.  Detective Lucia has confirmed

6 that Sergeant Plemmons is not available tomorrow.  He cannot be

7 up here in Burlington.

8          THE COURT:  Okay.  Is he -- I don't remember what you

9 said about his vacation.  When does the vacation start?

10          MR. OPHARDT:  I believe it starts Friday, your Honor.

11 I don't know if he's on the clock tomorrow, if this is work

12 related.  I can have more detail for the Court after I've had

13 time to talk with him directly.  The communications are via

14 text right now and not prone to substantial information.

15          THE COURT:  All right.  So that's where we are.

16          MR. JACKSON:  Okay.  I just want to note for the

17 record, your Honor, if I may, that, yes, I did have the video,

18 but I never knew it was Sergeant Plemmons, so my identification

19 of who that officer was getting out of the vehicle or leaning

20 out of the vehicle, whichever way it was, like I said, I

21 thought it was Detective Lucia.  Then Detective Lucia testified

22 that it was Sergeant Plemmons.  I would like to cross-examine

23 him on that, you know, so --

24          THE COURT:  Well, that's understood.  He could have

25 been on your witness list.  You knew he was part of this search

1  team.  And he's not on your witness list.  We're in the middle

2  of the trial.  This is somebody who is -- may be unavailable.

3  And we'll do the best we can to see if we can accommodate that.

4  Understand that the prosecution doesn't have any obligation to

5  assist in that.  And I'm not going to pull somebody out of a

6  family vacation with a subpoena for somebody who's not on a

7  witness list.

8          MR. JACKSON:  Your Honor, I never knew he was part of

9  the search team or anything.  They never had him listed as

10 anything but taking me out of the vehicle.  That's it.  He

11 wasn't on -- listed as searching the vehicle.  He wasn't listed

12 as searching 55 Killington Avenue.

13         THE COURT:  So you knew he was there at the scene.

14         MR. JACKSON:  Yes.

15         THE COURT:  Okay.  So what role he played, I've seen

16 the video; you've seen the video.  If you can identify who's

17 who, you're far better off than I can.  It's dark.  It's hard

18 to see people.  I don't know who it is.  He's not on your

19 witness list.  You have the same rules as the Government.  Just

20 like I wouldn't let Mr. Ophardt or Ms. Cate say to the Court,

21 "Listen, we didn't list this person who's got this testimony

22 that we think is really important.  It's not for impeachment.

23 Let's have the new witness come in."  The jury hasn't even

24 heard that name as somebody who's going to testify, so there's

25 been no voir dire on that subject, and that's where we end up.

1  I understand how you found it out, but you could have been

2  protective and put him on the witness list just in case you

3  might have needed him for some purpose.  I'm hearing all of

4  this in real time myself.

5        All right.  Anything further?

6            MR. OPHARDT:  No, your Honor.  Thank you.

7            MR. JACKSON:  No, your Honor.

8        (Court was in recess at 4:45 PM.)

9

10

11              C E R T I F I C A T I O N

12     I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14

15

16  May 10, 2024                    _____

17                                  Johanna Massé, RMR, CRR

18

19

20

21

22

23

24

25