VOLUME:      3
PAGES: 347-584

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA            )      CRIMINAL ACTION NO.
                                    )      2:21-cr-113-1
            v.                      )
                                    )
LAWRENCE JACKSON,                   )
            Defendant.              )


JURY TRIAL
Thursday, April 11, 2024
Burlington, Vermont


BEFORE:

     THE HONORABLE CHRISTINA C. REISS,
     District Judge, and a Jury


APPEARANCES:

JONATHAN A. OPHARDT, ESQ., and NICOLE P. CATE, ESQ., U.S.
     Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
     570, Burlington, VT 05402-0570, Counsel for the Government

LAWRENCE JACKSON, #82536-509, Northwest State Correctional
     Facility, 3649 Lower Newton Road, Swanton, VT 05488,
     Self-Represented

ROBERT S. BEHRENS, ESQ., Behrens Venman PLLC, 30 Elmwood
     Avenue, Burlington, VT 05401, Standby Counsel for the
     Defendant


Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

INDEX TO EXAMINATIONS

WITNESS                                                          PAGE

ERIC BRIMO
      Cross by Mr. Jackson                                       357

TRAVIS M. BUNNELL
      Direct by Ms. Cate                                         362
      Cross by Mr. Jackson                                       393

JONATHAN C. HALL
      Direct by Mr. Ophardt                                      418

NICHOLAS DOANE
      Direct by Mr. Ophardt                                      426
      Cross by Mr. Jackson                                       437
      Redirect by Mr. Ophardt                                    441
      Recross by Mr. Jackson                                     442

FRANCIS J. THORNTON, JR.
      Direct by Mr. Ophardt                                      452

JOSEPH DORNBIERER
      Direct by Mr. Ophardt                                      510
      Cross by Mr. Jackson                                       527

JESSE R. DAMBRACKAS
      Direct by Mr. Ophardt                                      555

INDEX TO EXHIBITS

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 9 | Photographs of Paperwork Found at 55 Killington Avenue, Bates 1129-1133, 1135-1137, and 1139 | 516 | 517 |
| 27 | Evidence Bag Containing 8/21/20 Substance | 570 | |
| 30 | Appendix A of Frank Thornton Expert Report, Bates 1126.09-1126.20, 1126.22, 1126.24-1126.29, and 1126.31-1126.33 | 471 | 472 |

INDEX TO EXHIBITS
(Continued)

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---------|-------------|------|----------|
| 30A | Photograph from Motorola Phone, Bates 1123.10 | 485 | 486 |
| 31B | Materials from Motorola Web History, Bates 991-991.02 | 501 | 503 |
| 31C | Materials from Motorola, Tara Messages, Bates 993-993.108 | 491 | |
| 31C-1 | Materials from Motorola, Tara Messages, Bates 993, 993.069-071 | 492 | |
| 31D | Materials from Motorola, Sami Hayyat Messages with Attachments, Bates 1159-1159.06, 1160-1160.71 | 492 | |
| 31D-1 | Materials from Motorola, Sami Hayyat Messages with Attachments (Excerpt of Government Exhibit 31D) | 492 | |
| 31E | Disc Containing Video from Motorola | 501 | |
| 31G | Materials from Motorola, Dillon Sanderson Messages, Bates 1220-1220.03 | 493 | |
| 31G-1 | Materials from Motorola, Dillon Sanderson Messages, Bates 1220, 1220.03 | 493 | |
| 31H | Materials from Motorola, Hodge Messages, Bates 1224-1225 | 493 | |
| 31I | Materials from Motorola, Jernn Paul Messages, Bates 1221-1221.39 | 494 | |
| 31I-1 | Materials from Motorola, Jernn Paul Messages (Excerpt of Government Exhibit 31I) | 494 | |
| 31J | Materials from Motorola, Laurie Messages with Attachments, Bates 1226-1226.95 and 1227 | 494 | |

INDEX TO EXHIBITS
(Continued)

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| 31J-1 | Materials from Motorola, Laurie Messages with Attachments (Excerpt of Government Exhibit 31J) | 494 | |
| 31K | Materials from Motorola, Nikki Messages, Bates 1222-1222.29 | 494 | |
| 31K-1 | Materials from Motorola, Nikki Messages (Excerpt of Government Exhibit 31K) | 495 | |
| 31L | Materials from Motorola, Wendy Ashline Messages, Bates 1223-1223.24 | 495 | |
| 31L-1 | Materials from Motorola, Wendy Ashline Messages (Excerpt of Government Exhibit 31L) | 495 | |
| 31M | Materials from Motorola, Paul Messages, Bates 1127-1127.08 | 495 | |
| 31M-1 | Materials from Motorola, Paul Messages, Bates 1127, 1127.05-1127.08 | 496 | |
| 31N | Materials from Motorola, Travis Bunnell Text Messages with Attachments, Bates 1168-1168.17, 1167, 1167.02-1167.04 | 380 | 382 |
| 41 | Still Shot from 8/21/20 Video, Bates 11 | 571 | 572 |
| 44 | Photograph of Suspected Crack Cocaine from 8/21/20 Controlled Purchase, Bates 7 | 567 | 568 |
| 45 | Photograph of Scale Reading "0.6g," Bates 12 | 568 | 569 |
| 46 | Photograph of $100, Bates 6 | 561 | 561 |

INDEX TO EXHIBITS
(Continued)

GOVERNMENT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---------|-------------|------|----------|
| 48 | Rutland City Police Department Evidence Collection Form, Bates 69.08-69.09 | 533 | |
| 49 | Stipulation of Prior Felony, Bates 1529 | 443 | 450 |
| 50 | Disc Containing Audio of 8/21/20 Controlled Purchase | 573 | |
| 50A | Disc Containing 8/21/20 Audio Clip, Minute 8:43-10:00 | 573 | 575 |
| 50B | Disc Containing 8/21/20 Audio Clip, Minute 11:10-12:00 | 573 | 575 |
| 50C | Disc Containing 8/21/20 Audio Clip, Minute 6:28-7:40 | 573 | 575 |
| 56 | Photograph of $100, Bates 19 | 578 | 579 |
| 60 | Diamondback Magazine | 522 | 523 |
| 60A | Photograph of Government Exhibit 60, Bates 1572 | 523 | 524 |
| 61 | P-380 Magazine | 524 | 525 |
| 61A | Photograph of Government Exhibit 61, Bates 1571 | 525 | 526 |
| 68 | Frank Thornton Expert Report | 498 | |

DEFENDANT

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---------|-------------|------|----------|
| A1 | Agent Dornbier's 12/15/21 Grand Jury Transcript | 548 | |
| J | HSI Directive 18-02, Bates 1150-1150.19 | 539 | 543 |

INDEX TO EXHIBITS
(Continued)

| DEFENDANT EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| O | 8/12/20 and 12/12/23 E-mails Between Alex Zuchman and Jon Ophardt, Bates 1037, 1038-1038.02 | 543 | 543 |
| V1 | Unredacted FBI Report Excerpt, Bates 982.07 | 353 | |
| W | Brimo Report of Investigation | 358 | |
| X | 7/8/22 Travis Bunnell Police Contact | 406 | |
| Y | Travis Bunnell-Chris Sumner Police Contact | 413 | |
| Z | HSI's Mission and Authority | 547 | |

INDEX TO MISCELLANEOUS

|  | PAGE |
|---|---|
| Court's Exhibit 2 - Juror Note | 354 |
| *Old Chief* Stipulation | 443 |

1  Thursday, April 11, 2024

2       (The following was held in open court at 9:04 AM.)

3            THE COURT:  We are back on the record in United States

4  v. Jackson.

5      I have two short things to address with you.  The first is

6  Exhibit V, we're going to get a redacted Exhibit V, but,

7  Mr. Behrens, I want you to prepare V1, which will not be

8  admitted into evidence.  That is the unredacted copy of it.

9  Mr. Jackson actually offered the entire exhibit.  The Court

10  excluded it, finding it had all sorts of extraneous and very

11  highly inflammatory and prejudicial information that this jury

12  should not see, but we should have the exhibit as offered and

13  the exhibit as redacted, at least for the record.

14      And, Ms. Ruddy, I'm going to make sure that you keep V1

15  out of the stack.

16            COURTROOM DEPUTY:  Um-hum.

17            THE COURT:  It's just going to be the record before

18  the Court.

19      Any objections or comments on that?

20            MR. OPHARDT:  No, your Honor.

21            MR. JACKSON:  No, your Honor.

22            MR. BEHRENS:  Sorry, Judge.  V, and V1 -- V1 will be

23  the entire thing.

24            THE COURT:  Exactly.  Just that page, though.  Page 7

25  was what was offered.

 1          MR. BEHRENS:  Gotcha.

 2          THE COURT:  All right.  I have a note from a juror.

 3 "Your Honor, yesterday I saw a person that works here that I

 4 know.  He worked yesterday afternoon.  I don't know him well

 5 but he was the family member to one of my former residents that

 6 lived where I work.  I don't even remember his name, however,

 7 he did play Santa for our residents a few times.  I remember

 8 his family fondly, however, this would in no way affect my

 9 ability to do jury duty.  Sincerely, Elizabeth Fogg."

10      Anybody have any problem with the note?

11      And this time I'll start with the Government.

12          MR. OPHARDT:  No, your Honor.  I don't believe

13 additional inquiry is required.

14          THE COURT:  Mr. Jackson?

15          MR. JACKSON:  I agree with Mr. Ophardt.

16          THE COURT:  All right.  Those are my issues.

17      Jen, here's the --

18          COURTROOM DEPUTY:  Thank you.

19      (Court's Exhibit 2 was marked for identification.)

20          THE COURT:  Anything that you have to bring to my

21 attention?

22          MR. OPHARDT:  Not from the Government -- I'm sorry.

23          THE COURT:  Mr. Jackson, are you all set as well?

24          MR. OPHARDT:  One second.  Ms. Cate flagged an issue,

25 but I don't think we need it for your Honor.  We are thinking

1  of a time to do the stipulation around Mr. Doane's testimony,

2  because we're going to need to clear the courtroom anyways, so

3  I think after him we would do the colloquy and then be able to

4  do the stip and not lose much time.  So I'm glad Ms. Cate

5  interrupted me, because I had forgotten that.

6          THE COURT:  All right.  Perfect.

7      Mr. Jackson, any issues before we bring back the jury?

8          MR. JACKSON:  No, your Honor.

9          THE COURT:  All right.  Let's bring back the jury.

10  Todd, I think you're up.

11      (Jury in at 9:09 AM.)

12          COURTROOM DEPUTY:  Your Honor, the matter before the

13  Court is criminal case number 21-CR-113-1, United States of

14  America v. Lawrence Jackson.  Representing the Government are

15  Assistant United States Attorneys Jonathan Ophardt and Nicole

16  Cate; the defendant is self-represented, and Robert Behrens is

17  present as standby counsel; and we are here for a jury trial.

18          THE COURT:  Good morning, ladies and gentlemen of the

19  jury.  One of the members of the jury sent me a note about some

20  of the subjects I talked to you about in orientation.  I have

21  reviewed that note with the parties.  We agree there's no

22  problem with it.  You are doing exactly what I asked you to do.

23  If there's any issues, we can deal with them right on the spot.

24  So thank you for being so attentive to the Court's

25  instructions.

1        Have any of you acquired any outside information; done any

2   research; talked to anybody about the case; had anybody talk to

3   you about the case; in any way acquired information, directly

4   or indirectly related to this case, outside the courtroom?  If

5   so, please raise your hand.  Seeing no hands raised.

6        We will resume.  Does anybody need a new notebook?

7        Yes.

8            JUROR KENT:  I just -- I just want to ask for all of

9   us if everybody would stay close to the mics and speak up,

10  because it kind of goes in and out as the day goes on.

11           THE COURT:  All right.

12           JUROR KENT:  It's difficult sometimes.  We'll raise

13  our hand, but just wanted to --

14           THE COURT:  Perfect.  Interrupt right when it's

15  happening.  As I told you in orientation, that person who said,

16  "Yeah, I didn't get to hear all of it," I almost had a heart

17  attack on the spot.  So don't -- don't do that.  Just

18  interrupt.  We all appreciate it.  We all wander away from the

19  microphone.  I know I can be very hard to hear, and I always

20  thought that was something of a blessing for other people, but

21  we want you to be able to hear everything.

22       Does anybody need a notebook?

23           COURTROOM DEPUTY:  And we do have some hearing

24  assistance devices.  We have a couple of them if anybody would

25  like to wear a set of head sets that funnels in the sound.

Eric Brimo - Cross

1          JUROR KENT:  If everybody stays close to the mics, I
2    think we're perfect.

3          THE COURT:  Does anybody need notebooks?

4          JUROR CHASTENAY:  Can I have a pen?

5          COURTROOM DEPUTY:  And anybody running low on their
6    notebook pages?  No.  Okay.

7          THE COURT:  We have Agent Brimo on the witness stand.
8    It's a new day, so I will have him resworn, and we are in
9    Mr. Jackson's cross-examination, which had not yet begun when
10   we finished yesterday.

11         COURTROOM DEPUTY:  Please step right up front.  Please
12   state your full name for the record.

13         THE WITNESS:  Eric Brimo.

14                          ERIC BRIMO,

15      having been first duly sworn by the courtroom deputy,

16         was examined and further testified as follows:

17         THE WITNESS:  Yes, I do.

18         THE COURT:  Mr. Jackson.

19                      CROSS-EXAMINATION

20   BY MR. JACKSON:

21   Q    Good morning, Agent Brimo.

22   A    Good morning, sir.

23   Q    I've just got a couple of questions for you.  You did your
24   report, your National Tracing Center report, on January 3rd,
25   2022; is that correct, sir?

Eric Brimo - Cross

1  A    I'm sorry.  A tracing report?

2  Q    Yes.  Well, your report of investigation.

3  A    Oh, yes.  There's a report of investigation.

4  Q    Right.  It says Department of Justice, Bureau of Alcohol,

5  National Tracing Center?

6  A    I don't recall specifically if there's a way to see it.

7  So we have a National Tracing Center which produces national --

8  our trace summaries of firearms.

9        THE COURT:  All right.  Let's have it marked if it

10  isn't already marked as an exhibit.

11        MR. JACKSON:  I don't recall Mr. Ophardt submitting

12  this as --

13        THE COURT:  So what we do, we mark everything just for

14  the record, and if you're refreshing his recollection, it

15  doesn't go into evidence, but we mark it so that there's a

16  record of what was shown to the witness.  Mr. Ophardt or

17  Ms. Cate can ask to see it before it's shown to the witness,

18  and we'll get an exhibit number.

19     And, Mr. Behrens, what exhibit number are we up to?

20        MR. BEHRENS:  W.

21        THE COURT:  W.  Thank you.

22        COURTROOM DEPUTY:  And you would like me to take this

23  up to the witness, correct?

24        MR. JACKSON:  Yes.  Just to refresh his recollection,

25  and I'll take it back.

Eric Brimo - Cross

1          THE WITNESS:  Thank you.

2          THE COURT:  And what page, Mr. Jackson, do you want

3  Ms. Ruddy to direct his attention to?  I mean --

4          MR. JACKSON:  I just want him to see the -- let me see

5  that again, ma'am.

6          THE COURT:  Yeah.

7          MR. JACKSON:  I'm sorry.  He'll know what it is.  His

8  report back here.

9      Can I have it back?

10          COURTROOM DEPUTY:  Yup.

11          MR. JACKSON:  Thank you.

12  Q    Do you remember that, sir?

13  A    Yes, sir.  My apologies.  Yes, sir.

14  Q    That's all right.  Just a couple of questions.  Yesterday

15  Mr. Ophardt talked to you about the nexus transfer of gun from

16  manufacturers to coming across state lines and commerce.  As I

17  noticed on page 1 of 1 of the page I just showed you, these

18  guns was transferred into Vermont, and they was transferred

19  into retail gun stores?

20  A    Correct.  That's what the trace shows, but the tracing

21  center is adamant that their records do not equate to a nexus,

22  and I believe that is on the form too.  That's standard.

23  Q    Yeah.  But I'm just -- as far as it coming across state

24  lines, it came into the state of Vermont to a gun store?

25  A    It must have come in by its presence being here, because

Eric Brimo - Cross

1 none of the three firearms were manufactured in Vermont, so

2 yes.

3 Q    So they didn't cross state lines in an illegal manner?

4 A    I'm not sure how they crossed.  If they were part of

5 lawful commerce, yes, they would have crossed legally into

6 Vermont, but again, I'm not certain a hundred percent how they

7 crossed into --

8 Q    If they were sold in Vermont, obviously they crossed state

9 lines in a legal manner?

10 A    Correct.  If it was sold in Vermont out of a federal

11 firearms licensee where the trace would go back to, then, yes,

12 the manufacturer, likely through a distributor of some sort,

13 would have shipped it to a -- the gun store, the federal

14 firearms licensee.

15 Q    Okay.  Have you ever heard of Alstead Gun Shop,

16 Incorporated, in Bellows Falls, VT?

17 A    I have not, no.

18 Q    Okay.  What about United Trade in Bomoseen, Vermont?

19 A    I have.  And I've actually toured their facility, yes.

20 They are also a manufacturer of firearms.  That's why I toured

21 them.

22 Q    Okay, sir.  And what about -- I think it's Seiple's Shoot

23 Shop?

24 A    Seiple's, yes.

25 Q    Seiple's?  In Belmont, Vermont?

Eric Brimo - Cross

1  A    Correct.  He has since moved to Rutland, but, yes, I'm

2  familiar with both his prior location and current location.

3  Q    Okay.  I want to bring your attention to the Diamondback,

4  serial number YI3315, DB9 model.  That was sold in Alstead Gun

5  Shop to a certain individual.  I don't want to mention his name

6  out here.  Had that gun been reported stolen, to your

7  knowledge?

8  A    I'm not aware.  When I do my interstate nexus, I'm not --

9  it's independent of that.  That would be up to the other

10  investigators to look to see if a firearm has been reported

11  stolen.

12  Q    Okay.  When you received these firearms, did you check for

13  my fingerprints?

14  A    That's, again, not part of interstate nexus.  No forensic

15  examination of that --

16        (Interruption by the reporter.)

17        THE COURT:  So we're on the witness' answer.  It

18  ended -- you were jumping in on each other, but this is what

19  you said before that happened.  And our court reporter

20  appropriately stopped it.

21        "That's, again, not part of interstate nexus.  No forensic

22  examination of that sort of" . . .

23        THE WITNESS:  My train of thought was no forensic

24  examination such as DNA or fingerprints are done as part of

25  nexus.  My assessment is simply based on my knowledge and

Travis M. Bunnell - Direct

1  research of firearm manufacturers, firearm locations, and

2  firearm identification.

3          MR. JACKSON:  Thank you, sir.

4      I have no more questions, your Honor.

5          THE COURT:  All right.  Any redirect?

6          MR. OPHARDT:  No, your Honor.  Thank you.

7          THE COURT:  Thank you, sir.  You may step down.

8      (The witness was excused.)

9          THE COURT:  The Government may call its next witness.

10         MS. CATE:  The Government calls Travis Bunnell.

11         COURTROOM DEPUTY:  Good morning.  You can step right

12  in front of me.  Please raise your right hand.  State your full

13  name for the record.

14         THE WITNESS:  Travis Moore Bunnell.

15                  TRAVIS M. BUNNELL,

16      having been first duly sworn by the courtroom deputy,

17              was examined and testified as follows:

18                  DIRECT EXAMINATION

19 BY MS. CATE:

20 Q    Good morning.

21 A    Good morning.

22 Q    Where did you grow up, Mr. Bunnell?

23 A    Rutland, Vermont.

24 Q    Where do you live now?

25 A    Rutland, Vermont.

Travis M. Bunnell - Direct

1  Q    And what level of education do you have?

2  A    I have a GED.

3  Q    What have you done for work in your life?

4  A    I've been a cook, done painting, other odds and ends.

5  Carpentry.

6  Q    And who is in your family?

7  A    I mean, I was in foster care for a while, but I'm still in

8  contact with my mother, but other than that, just me.

9  Q    I'm going to turn your attention to November of 2021.

10 Where were you living then?

11 A    On South Street in Rutland.

12 Q    Do you recall the address?

13 A    100 South Street.

14 Q    And specifically directing your attention to November 23rd

15 of 2021, what, if any, law enforcement interaction did you have

16 that day?

17 A    I was stopped and placed under arrest walking back to my

18 house.  I can't remember the exact time.

19 Q    And why were you placed under arrest?

20 A    For violating my conditions of release.

21 Q    And what was -- what condition or conditions of release

22 had you violated?

23 A    I was under a 24-hour curfew.

24 Q    Where were you supposed to be?

25 A    At my house.

Travis M. Bunnell - Direct

1  Q    And where were you instead?

2  A    I was -- I had just left Killington Avenue walking back to

3  my house.

4  Q    And why -- where on Killington Avenue were you?

5  A    I don't know the exact number, but I was at the residence

6  that Mr. Jackson stays at.

7  Q    And whose residence was that?

8  A    Courtney Schaner's.

9  Q    And why were you at that residence?

10 A    I was there to purchase some drugs.

11 Q    What kind of drugs were you purchasing?

12 A    Heroin.

13 Q    How much heroin did you purchase?

14 A    Just a couple bags.

15 Q    Who was the heroin for?

16 A    For myself.

17 Q    And what did you do with the heroin when you purchased it?

18 A    I used it.

19 Q    Where?

20 A    Right there.

21 Q    So let's talk for a minute about drug use.  You used

22 heroin that day.  What types of drugs have you used in your

23 life?

24 A    I've used cocaine, both powder form and crack cocaine;

25 I've used heroin; I've used prescription pills; marijuana; some

Travis M. Bunnell - Direct

1  psychedelics.  I think that's it.

2  Q    And generally what period of your life has been your

3  heaviest use period?

4  A    The time between 2019 and 2022, I think.

5  Q    And what were your drugs of choice -- let's focus even on

6  2021.  What were your drugs of choice in 2021?

7  A    Cocaine and heroin.

8  Q    And how much cocaine were you using on a given day when

9  you were in that period of heavy use?

10 A    Anywhere from a gram to seven grams.

11 Q    And what form of cocaine was that?

12 A    Rock cocaine.

13 Q    And how did you ingest it?

14 A    Smoking it.

15 Q    And -- and how much heroin were you using in that period,

16 in 2021, of heavier use?

17 A    Anywhere from a bundle to six or seven bundles.

18 Q    And how were you ingesting that?

19       THE COURT:  So let's have a definition of a bundle,

20 please.

21       MS. CATE:  Thank you.

22       THE COURT:  And -- and rock cocaine as well.  So when

23 somebody uses a term that the jurors may or may not be familiar

24 with, let's have a definition from the witness, please.

25       MS. CATE:  Thank you, your Honor.

Travis M. Bunnell - Direct

1  Q    Let's go back to rock cocaine.  What other terms do you

2  know that by?

3  A    Crack cocaine.

4  Q    And you had said the term "bundle."  What's a bundle?

5  A    It is approximately a half a gram in ten individual bags.

6  Q    Of what substance?

7  A    Heroin.

8  Q    And I think I had asked how were you ingesting the heroin?

9  A    I was shooting up, so intravenously.

10 Q    How much did it cost in a given day to purchase the amount

11 of rock cocaine and bundles that you were using?

12 A    A few hundred dollars.

13 Q    How did you get the money to support that habit?

14 A    By selling drugs, committing crimes.  Anything I had to

15 do.

16 Q    And if you didn't have the money and weren't able to get

17 the drugs, how did that feel?

18 A    Horrible.  I would be in severe detox.

19 Q    Now, I want to go back to Schaner's place on November

20 23rd.  You said you bought bundles.  Who did you buy them from?

21 A    Sorry.  I bought bags, not bundles.

22 Q    Bags.  Thank you.  Thank you.  And what's a bag?

23 A    It's less than a half gram.

24 Q    Of?

25 A    Heroin.

Travis M. Bunnell - Direct

1  Q    And who did you buy them from?

2  A    Mr. Jackson.

3  Q    Where did that interaction happen?

4  A    At Courtney Schaner's residence in the room that he was

5  staying in.

6  Q    And can you describe how you get into Courtney Schaner's

7  residence?

8  A    When you pull into the driveway, to the right there's a

9  staircase that goes up to the second floor apartment.

10 Q    And within that apartment, which was the bedroom that you

11 understood to be Mr. Jackson's?  How would you get there?

12 A    You walk through the first room into the kitchen, take a

13 left, and it was right there straight ahead, almost.

14 Q    And why did you believe Mr. Jackson to live in that

15 bedroom?

16 A    Because that's where we always were hanging out.

17 Q    So you had been there prior to November 23rd?

18 A    Yes.

19 Q    How often?

20 A    At least five days a week.

21 Q    And who did you interact with when you were there?

22 A    Mr. Jackson -- whoever -- whoever was in there at the

23 time.

24 Q    Who else did you know to stay at Courtney Schaner's place?

25 A    Angel, Reggie, Wendy.

Travis M. Bunnell - Direct

1  Q    Who was Angel?

2  A    One of, I guess, our acquaintances.

3  Q    And who was Reggie?

4  A    Same.  One of our acquaintances.

5  Q    And who was Wendy?

6  A    Mr. Jackson's girlfriend.

7  Q    And when you were in that bedroom and purchased those

8  bags, what, if anything, else did you see in the bedroom that

9  day?

10  A    What I thought to be a brick of cocaine, other

11  paraphernalia, and a firearm.

12  Q    Where was the brick of cocaine, what you thought to be the

13  brick of cocaine?

14  A    Sitting on the desk in front of him.

15  Q    And what types of paraphernalia did you see?

16  A    Bongs, pipes, scales.

17         THE COURT:  So let's have -- sorry.  I didn't mean to

18  interrupt you.  Let's have a definition of brick of cocaine.

19  What does that mean?

20         MS. CATE:  Thank you, your Honor.

21  Q    Going back, you said a brick of cocaine.  What does that

22  mean to you?

23  A    That would be 1,000 grams.

24  Q    And how --

25         THE COURT:  And then I interrupted you, and I should

Travis M. Bunnell - Direct

1  have just waited till you were finished.  And you were

2  answering the question "And what type of paraphernalia did you

3  see?"  And you had said, "Bongs, pipes, scales."  And if you

4  have anything else to say to that - I'm sorry for the

5  interruption - go ahead and provide it.

6  A    Just other paraphernalia used in the sale and the smoking

7  of crack cocaine.

8  Q    And you said you saw a firearm?

9  A    Yes.

10 Q    Do you recall any more about that firearm, what it looked

11 like?

12 A    It's -- I mean, it's probably nine inches in length.  I

13 think it's -- it's a Judge is what it is.

14 Q    And had you seen that Judge prior to that day?

15 A    Yes.

16 Q    Where?

17 A    On Mr. Jackson's person or in the vehicle or in the room.

18 Q    And do you recall where it was in the room when you saw it

19 that day?

20 A    Not exactly, but it was in -- it was in arm's reach of

21 where we were sitting.

22 Q    And I want to show you what has already been entered into

23 evidence -- this is Government Exhibit 10, Bates number 97.29.

24          COURTROOM DEPUTY:  And you may need to adjust the head

25 of the ELMO.  It seems --

Travis M. Bunnell - Direct

1          MS. CATE:  Thank you.

2          COURTROOM DEPUTY:  There you go.

3          MS. CATE:  Great.

4  Q    Mr. Bunnell, do you recognize the -- what's depicted in

5  that photo?

6  A    Yeah.  That's the desk that was located in Mr. Jackson's

7  bedroom.

8  Q    So that's the desk where you saw what you believe to be a

9  brick of cocaine?

10  A    Yes.

11  Q    Now, when you interacted with Mr. Jackson and bought those

12  bags that day, what, if any, plans did you make to see him

13  later in the day?

14  A    I was supposed to -- I was actually supposed to go to work

15  and then come back and see him when I was done.

16  Q    Why were you going to see him later in the day?

17  A    To purchase cocaine.

18  Q    How much?

19  A    Anywhere from an eight ball to a quarter ounce depending

20  on what I made at work that day.

21  Q    So you were going to go to work, make some money, and then

22  bring the money back to purchase cocaine?

23  A    Yes.

24  Q    Now, instead, though, you were arrested?

25  A    Yes.

Travis M. Bunnell - Direct

1  Q    And when you were arrested, did you speak with law
2  enforcement that day?

3  A    I did.

4  Q    Why?

5  A    I initially spoke with them because I didn't want to go to
6  jail.

7  Q    And what were you hoping when speaking with them?

8  A    That I would go home.

9  Q    And did you end up going home that day?

10 A    I did.

11 Q    And at the beginning of that conversation, were you
12 truthful with the officer?

13 A    I was not.

14 Q    Why not?

15 A    I guess I was trying to tell him what he wanted to hear at
16 first, or what I thought he might have wanted to hear.

17 Q    And then when that didn't work, what did you do?

18 A    I was just honest.

19 Q    And you were arrested for violating conditions of release
20 and specifically your curfew.  Why were you on conditions of
21 release?

22 A    For prior charges that I had received.  I was out on bail.

23 Q    What court were those charges out of?

24 A    Rutland County.

25 Q    State or federal court?

Travis M. Bunnell - Direct

1  A    State.

2  Q    And are your pending cases resolved now, or do you still

3  have pending cases?

4  A    They -- I'm actually -- I have a sentencing hearing coming

5  up.

6  Q    So you still have not been sentenced for charges?

7  A    No.

8  Q    And what are the -- how many charges are we talking about?

9  A    I don't know the exact number, but it's -- it's numerous

10  charges.

11  Q    What are some of those numerous charges?

12  A    DLSs --

13  Q    I'm going to pause you.  Sorry.  Not to break your train

14  of thought, but what does "DLS" mean?

15  A    Driving with a suspended license.

16  Q    What else?

17  A    Aggravated assault, simple assault, possession.

18  Q    Possession of what?

19  A    Heroin.

20  Q    What else?

21  A    Failure to appear and violating conditions of release.

22  Q    And were there also some charges involving uttering a

23  forged instrument?

24  A    Yes.

25  Q    What does that mean?

Travis M. Bunnell - Direct

1  A    Writing bad checks.

2  Q    And how were you hoping to have had those charges

3  resolved?

4  A    I was hoping to complete treatment court.

5  Q    What's -- and what court was that treatment court in?

6  A    Rutland County.

7  Q    And so, again, state court, not federal?

8  A    Yes.

9  Q    And so you had been in Rutland treatment court for some

10 time?

11 A    Yes.

12 Q    How did that go?

13 A    It did not go well.  In the beginning I was using very

14 heavily and not making the right choices, not putting forth the

15 effort that I should have, which resulted in me being

16 discharged.

17 Q    And you have a sentencing coming up?

18 A    Yes, I do.

19 Q    And what's your understanding of the sentence that you are

20 facing?

21 A    I'm facing a two-to-five-year sentence.

22 Q    And what's your understanding of how your testimony today

23 impacts those state court charges of that upcoming sentence?

24 A    It does not.

25 Q    Let's turn from your pending charges to criminal

Travis M. Bunnell - Direct

1 convictions.  You also have criminal convictions, right?

2 A    Yes.

3 Q    And what charges do you have criminal convictions for?

4 A    Burglaries, theft of firearms, theft, receiving stolen

5 property, possession of marijuana.  There may be a few more.

6 I'm not positive.

7 Q    And what states are those charges from?

8 A    Ohio.

9 Q    And also from Vermont, do you have a conviction for

10 leaving the scene of a crash?

11 A    Yes.

12 Q    And have you served time for those convictions?

13 A    I have.

14 Q    Approximately how long?

15 A    I did eight years and ten months.

16 Q    Where was that?

17 A    In Ohio.

18 Q    Was that state court or federal court?

19 A    State.

20 Q    I'm going to go back in time to your interactions with

21 Mr. Jackson.  When did you first meet him?

22 A    2019, I believe.

23 Q    Okay.  And I'm going to fast-forward you, then.  You met

24 him in 2019.  I'm going to fast-forward you to late 2020.  In

25 late 2020, what was the nature of your relationship with

Travis M. Bunnell - Direct

1  Mr. Jackson at that point?

2  A    We were actually -- we were hanging out quite often.  I

3  was riding with him often in the car.  I was running different

4  things for him -- different drugs for him, running sales for

5  him.  Sometimes I would hold firearms for him.  I would hold

6  different drugs.

7  Q    And I'm going to go back to some of those things, but

8  first, so that was in late 2020.  How long did that continue,

9  that relationship and those things you were talking about?

10 A    Off and on till he was arrested.

11 Q    Okay.  So you said you were running different drugs.  What

12 did that look like?

13 A    Like, I might get a call for -- that somebody needed

14 something, and I would grab it from him and drop it off and

15 bring the money back.

16 Q    When you say "something," what does that mean?

17 A    Cocaine.

18 Q    And what sort of amount would -- would you get a call for

19 that you'd go get from him?

20 A    Usually anywhere from a gram to -- it was never much more

21 than a half ounce at the most, which would be 14 grams.

22 Q    And how much did a half ounce cost?

23 A    It depended on what -- how good the product was, what --

24 what prices were at the time.  Anywhere from 600 to 800.

25 Q    And who decided the price?

Travis M. Bunnell - Direct

1  A    Mr. Jackson.

2  Q    You also talked about driving.

3  A    Yup.

4  Q    Where would you drive with Mr. Jackson?  What states?

5  A    New York, Massachusetts, New Jersey, and Vermont.

6  Q    And let's focus on Massachusetts.  Why did you drive

7  Mr. Jackson to Massachusetts?

8  A    To pick up cocaine.

9  Q    Where in Massachusetts was that?

10 A    In Worcester.

11 Q    And who would do the driving?

12 A    Both of us.

13 Q    And who were you going down to meet with?

14 A    Who I believe to be S and Hodge.

15 Q    Why did you believe them to be S and Hodge?

16 A    That's what I was told.

17 Q    By who?

18 A    Mr. Jackson.

19 Q    And when you went down there, how much was being purchased

20 from S and Hodge?

21 A    Anywhere from a quarter brick, so that would be 250 grams,

22 to 1,000 grams.

23 Q    And what substance was being purchased?

24 A    Cocaine.

25 Q    And then approximately how many times did you and

Travis M. Bunnell - Direct

1 Mr. Jackson drive down to Massachusetts to meet with S and

2 Hodge and purchase?

3 A    I only drove with him to Massachusetts two or three times.

4 Q    And when -- who was actually -- I've been saying the "we"

5 and "you" both, but can you break down who was doing the

6 purchasing and how that transaction looked?

7 A    Mr. Jackson.  I would usually sit in the car and wait

8 while Mr. Jackson went in to meet with them and pick up

9 whatever he was picking up.

10 Q    And how did you know what he was picking up then?

11 A    Because I would see it when it came -- when he came back

12 to the car usually to cook some into crack cocaine.

13 Q    What does it mean to "cook some into crack cocaine"?

14 A    To add water and baking soda and heat it until it rocks up

15 into a hard substance.

16 Q    And why -- why would one cook cocaine into that rocked-up

17 hard substance?

18 A    Because that's -- that's how you smoke it.

19 Q    And where would this cooking happen?

20 A    In the car usually.

21 Q    How do you go about doing that?

22 A    With a metal measuring cup or metal spoon and a torch.

23 Q    And when -- when -- after being in Massachusetts, where

24 would you go?

25 A    Sometimes back home, sometimes to New York depending on

Travis M. Bunnell - Direct

1  what needed to be done.

2  Q    And who would have the drugs when you got back to -- say

3  if you went back home?

4  A    The majority of them Mr. Jackson would have, but I would

5  always have something.

6  Q    And how -- how did you get it from him?  Like, why did

7  he -- did you have to pay for it or --

8  A    I was usually paid for driving or doing whatever I did for

9  him.  I was paid in drugs.

10 Q    And that's -- would it be crack?

11 A    Cocaine, yes.

12 Q    Okay.  And when you say "going back home," where was that

13 specifically?

14 A    Either the Cortina Inn or the Quality Inn and then

15 Killington Ave.

16 Q    And whose home was that?

17 A    Mr. Jackson's.

18      THE COURT:  So you named three places.

19      MS. CATE:  Yup.  Thank you.

20      THE COURT:  And he answered, and we don't know what

21 his answer pertains to.

22 Q    So you talked about the Cortina.  Who was staying at the

23 Cortina?

24 A    Mr. Jackson and myself.

25 Q    And you mentioned the Quality Inn?

Travis M. Bunnell - Direct

1  A    Mr. Jackson.

2  Q    Were you also staying there, or no?

3  A    Occasionally.  I had a girlfriend that stayed there.

4  Q    And you mentioned Killington Ave.

5  A    Yes.

6  Q    Whose home was that?

7  A    That was Courtney Schaner's.  But he had a room there.

8  Q    And you testified earlier about seeing the Judge firearm

9  on November 23rd.  And you had seen that before?

10 A    Yes.

11 Q    And did you see any other firearms that Mr. Jackson had?

12 A    At -- that day I hadn't seen it, but usually there was

13 another firearm -- a pistol around that was referred to as John

14 Wick.

15 Q    Why was it referred to as John Wick?

16 A    I'm not really sure, but it was just a nickname that it

17 was given.

18 Q    And you had seen that pistol?

19 A    Yes.

20 Q    And who -- who handled that pistol?

21 A    Multiple people.  I have, Mr. Jackson, Reggie, Angel.

22 Q    And what would be the context of, for example, you

23 handling that pistol?  Like, why would you have it?

24 A    More or less to make sure nothing happened.  For our

25 safety.

Travis M. Bunnell - Direct

1  Q    What do you mean "for your safety"?

2  A    I mean, when -- when you're selling drugs or living that

3  lifestyle, it's dangerous.  I mean, anything can happen, so --

4  Q    So the pistol was for protection?

5  A    Yes.

6  Q    And that was when you were handling it, but what about

7  when Reggie was handling it?

8  A    I mean, I would -- I would assume the same.

9  Q    And what about Angel?

10 A    The same.

11 Q    And did Mr. Jackson also handle the John Wick?

12 A    Yes.

13 Q    What was your understanding of why he had that?

14 A    The same.

15 Q    And what about The Judge?

16 A    The same.

17 Q    When you were not in the same place as Mr. Jackson, how

18 did you communicate with him?

19 A    Either through phone calls or text messages.

20 Q    I'm going to have you flip -- there's two binders in front

21 of you, and one of them has a tab that's 31N.  I think it's the

22 larger one.  So in that larger binder, it might take a moment,

23 but can you flip to Tab 31N.

24       COURTROOM DEPUTY:  And that's N, as in Nancy?

25       MS. CATE:  Yes.

Travis M. Bunnell - Direct

1              COURTROOM DEPUTY:  Yup.  Okay.

2    Q    Do you see that?

3    A    Yes.

4    Q    Okay.  Can you look through -- that's a multipage exhibit.

5    Can you look through that and just look up at me when you're

6    done.

7    A    Yes.

8    Q    You're done?

9    A    Yes.

10   Q    Now, without describing what this is, do you recognize it?

11   A    Yes.

12   Q    And how do you recognize it?

13   A    Because it is -- they are from my phone.

14   Q    And so who -- who are these messages -- or who are -- this

15   is text messages, right?

16   A    Yes.

17   Q    Or electronic messages?  And who were they between?

18   A    Me and Mr. Jackson.

19   Q    And how can you tell that?

20   A    Because I recognize the phone number and what's being

21   said.

22              MS. CATE:  Your Honor, the Government moves to admit

23   31N.

24              THE COURT:  Any objection?

25              MR. JACKSON:  No objections.

Travis M. Bunnell - Direct

1      THE COURT:  31N is admitted.

2      (Government's Exhibit 31N was received in evidence.)

3      MS. CATE:  May I publish?

4      THE COURT:  You may.

5   Q   BY MS. CATE:  So you can look -- there's a screen next to

6   you, or if it's easier for you to follow along with the binder,

7   you can do that.  I'm going to zoom in a fair amount.

8      So this is a multipage exhibit that is a string of

9   messages between you and Mr. Jackson.

10  A   Yes.

11  Q   Okay.  So we're going to go through these.  And can you

12  read the -- the number there?

13  A   2021-11-8.

14  Q   So does that mean this is a message from approximately

15  November 8 of 2021?

16  A   Yes.

17  Q   And this actually appears to be blank, but below that

18  there's a blue message.  Who wrote the blue messages?

19  A   I did.

20  Q   And who wrote the green messages that we will see?

21  A   Mr. Jackson.

22  Q   By the way, did you know Mr. Jackson to have any

23  nicknames?

24  A   Yes.

25  Q   What was that?

Travis M. Bunnell - Direct

1  A    Boo-Bee.

2  Q    So let's read what you said on November 8th.  You said --

3  can you read that message?

4  A    It says "Bro I can come to you I have the car."

5  Q    And why did you say that, if you recall?

6  A    I was, I think, at the time using my son's mother's car.

7  Q    And why did you want to come to him?

8  A    To purchase cocaine.

9  Q    And he responded "Yes"?

10 A    Yes.

11      MR. JACKSON:  Your Honor, I have to object to that.  I

12 don't see anywhere where I responded "Yes."

13      THE COURT:  It's on the preceding page.

14    Ms. Cate, would you put that back up?

15      MS. CATE:  Yes, your Honor.  We're looking at the

16 bottom of Exhibit 31N.

17      MR. JACKSON:  Okay.  Thank you, your Honor.

18      MS. CATE:  Bates 1168.

19 Q    Mr. Bunnell, what did you say in the top of the following

20 page?

21 A    "Where you want me to go"?

22 Q    And Mr. Jackson responded where?

23 A    "Lincoln."

24 Q    What's that?

25 A    It was another place that he would be at sometimes.

Travis M. Bunnell - Direct

1  Q    Do you recall whose place it was?

2  A    I want to say Craig Tallman.

3  Q    And you wrote back "Your old spot"?

4  A    Yes.

5  Q    Why did you say "Your old spot"?

6  A    Because it was not where he was staying at the time, but

7  it was where I had met him previously.

8  Q    And the next page, you say, "I'm right here driving

9  around," and then can you read the second message on that page?

10 A    "Like I said it's my boss he has like 1500 on him so once

11 he sees how good it is he won't stop lol."

12 Q    What did you mean by that?

13 A    More or less once my boss started using, he would spend a

14 lot of money.

15 Q    And so the 1500 was referring to?

16 A    His money, yes.

17 Q    And you were seeking to do what?

18 A    To purchase cocaine from Mr. Jackson.

19 Q    For your boss?

20 A    Yes.

21 Q    And at the bottom it says, you again, "At the door"?

22 A    Yes.

23 Q    Indicating what?

24 A    That I was there to buy cocaine.

25 Q    Top of the next page says -- can you read that?

Travis M. Bunnell - Direct

1  A    Yeah.  It says "Brt can you put a half g in a bag for me

2  and the rest in another one."

3  Q    What does that mean?

4  A    It means be right there and I was asking for my cut to be

5  placed into a separate bag than what I was purchasing for

6  somebody else.

7  Q    And when we're talking about all this, what are we talking

8  about?

9  A    Cocaine.

10  Q    And then you said, "So I don't have to sit there for ya go

11  back to work lok"?

12  A    Yeah.

13  Q    What does that mean?

14  A    More or less so it was quick so I didn't have to sit there

15  wasting time, I could just go right back to work.

16  Q    And then you said "Be there in 5"?

17  A    Yes.

18  Q    And then this is November 9th; is that right?

19  A    Yes.

20  Q    Of 2021.

21  A    Yup.

22  Q    And you say, "Want this for a half."

23  A    Yes.

24  Q    And then your message on this page there looks like two

25  thumbnails; is that right?

Travis M. Bunnell - Direct

1  A    Yes.

2  Q    And having flipped through all of Exhibit 31N, do you see

3  bigger versions of those thumbnails in it?

4  A    Yes.

5  Q    Let's turn to those.  Is the first of those thumbnails on

6  Bates 1167?

7  A    Yes.

8  Q    And what is that?

9  A    It is the tag to a jacket.

10 Q    And let's look at the second thumbnail.  And who's --

11 actually, who's holding -- looks like there's a hand there.  Do

12 you know whose hand that is?

13 A    Mine.

14 Q    And the second thumbnail, what is that?

15 A    That is a picture of the jacket that the tag is for.

16 Q    And why are you sending him these two pictures?

17 A    I was trying to trade the jacket for cocaine.

18 Q    And so when you said "Want this for a half," what does

19 that mean?  Translate.

20 A    For a half gram.

21 Q    Where did the jacket come from?

22 A    It was stolen from, I think, T.J. Maxx.

23 Q    Who stole it?

24 A    I think I may have.

25 Q    The next message appears to be blank.  And then at the top

Travis M. Bunnell - Direct

1  of the following page, so now we're on Bates 1168.06, is

2  another thumbnail.  So if we look in the back, will we see the

3  larger version of that picture?

4  A    Yes.

5  Q    Is that Bates 1167.04?

6  A    Yes, it is.

7  Q    And what is that a picture of?

8  A    The same jacket.

9  Q    Okay.  And then the bottom of -- going back to the text

10  screen, the bottom of 1168.06 says, again, "Want this for a

11  half"?

12  A    Yes.

13  Q    And another thumbnail?

14  A    Yes.

15  Q    And you're sending him pictures of the same jacket?

16  A    Yeah.

17  Q    And then at the bottom of 1168.07, you say, "You back

18  yet"?

19  A    Yeah.

20  Q    And this next page, what's going on on this page?

21  A    I was asking where he wanted me to meet him, and then I

22  was letting him know I was pulling in and after that let him

23  know that I actually parked down the street and walked up

24  instead of pulling into the driveway.

25  Q    And this is the following day?  This is November 10th,

Travis M. Bunnell - Direct

1 approximately?

2 A    Yes.

3 Q    The top of the following page, Bates 1168.09, you said, "I

4 need a basket where do I need to go."  What does that mean?

5 A    An eight ball, or 3-1/2 grams.

6 Q    A basket is an eight ball, or 3-1/2 grams?

7 A    Yes.

8 Q    Of?

9 A    Cocaine.

10 Q   Mr. Jackson responded and said, "George Eddie."  What's

11 that?

12 A    It's actually a typo.  It's Giorgetti Park in Rutland,

13 Vermont.

14 Q   So he's telling you where to meet?

15 A    Yes.

16 Q   And then he says, "same price as yesterday."

17 A    Yes.

18 Q   And then the following page you say, "How much"?

19 A    Yes.

20 Q   And he says, "275"?

21 A    Yes.

22 Q   So what does that mean?

23 A    It means that the eight ball, or the 3-1/2 grams, was

24 $275.

25 Q   And you say, "K"?

Travis M. Bunnell - Direct

1  A    Yes.

2  Q    Top of the next page, you say, "Just waiting for him to

3  come scoop me up"?

4  A    Yes.

5  Q    What does that mean?

6  A    I was waiting for my ride to come get me.

7  Q    And Mr. Jackson says back, "Thanks bro"?

8  A    Yup.

9  Q    And you say, "I'm on my way don't leave"?

10 A    Yes.

11 Q    And then you say, "He gotta pick the kids up that's why I

12 gotta be quick I'm here"?

13 A    Yes.

14 Q    So you're telling Mr. Jackson this needs -- this --

15 A    Yeah.  Just that it needs to be quick.

16 Q    Sorry.  We're talking over each other, which I think is my

17 fault, but we'll try not to do that.

18       The next message you -- what do you say?

19 A    That "I'm about to run to the Indian store to grab

20 cigarettes real quick unless" he was pulling in.

21 Q    So you're trying to, again, arrange this so it happens

22 quickly so you can go?

23 A    Yes.

24 Q    The bottom of that page, what do you say?

25 A    "Bro you do .7 hard and the rest soft."

Travis M. Bunnell - Direct

1  Q    What do you mean by that?

2  A    Meaning can .7 of what I'm purchasing be cooked into rock

3  cocaine and the rest of it powder cocaine.

4  Q    The top of the next page, Mr. Jackson responds, "K"?

5  A    Yes.

6  Q    And then you say, "where you at"?

7  A    Yes.

8  Q    Mr. Jackson says, "park"?

9  A    Yes.

10 Q    Following page, you say, "Okay I'm pulling in."

11 A    Yes.

12 Q    And then the next message in the middle of that page,

13 which is Bates 1168.14, is now November 14th of 2021?

14 A    Yes.

15 Q    You say, "Yo you got some soft"?

16 A    Yes.

17 Q    What do you mean by that?

18 A    Powder cocaine.

19 Q    And why are you asking for powder cocaine?

20 A    At that time I don't know.  I mean, it could have been so

21 I could cook it myself or because the person that I was

22 purchasing it for wanted powder cocaine instead of rock

23 cocaine.

24 Q    Then at the bottom you say, "Bro I need a basket hit me

25 back when you get this"?

Travis M. Bunnell - Direct

1  A    Yes.

2  Q    And again, a basket is what?

3  A    3-1/2 grams.

4  Q    And Mr. Jackson responds?  What does that say?

5  A    "I got u."

6  Q    Then you say, "Where you at" and "Yo"?

7  A    Yes.

8  Q    Trying to track him down?

9  A    Yeah.

10 Q    You said -- at the top of Bates 1168.16, you say, "Need a

11 buck."  What does that mean?

12 A    A hundred piece of cocaine.

13 Q    How much is that?

14 A    Anywhere from .7 to a gram.

15 Q    And the next message, can you read that to us?

16 A    "Do you guys need anything before I get there I am right

17 at the bottom of the hill on route 7 so I can run in Mobile if

18 you need anything."

19 Q    From reading that message, can you tell where you were

20 headed?

21 A    Yeah.  I was headed to Killington Ave.

22 Q    How can you tell that?

23 A    Because that's the store that's right up the street, and

24 I'd stop there before going there on occasion.

25 Q    And when you say "Killington Ave.," what do you mean?

Travis M. Bunnell - Direct

1  A    Ms. Schaner's house, or the spot where Mr. Jackson was

2  staying.

3         THE COURT:  Mr. Bunnell, I'm going to ask you to

4  scooch close to the microphone.  You're a little bit far away

5  from it, and the jury has reminded us that we're all too far

6  from the microphones at times.

7         MS. CATE:  Thank you, your Honor.

8         THE COURT:  Thank you.

9  Q    The bottom of that page, you say, "Yeah well I am

10 outside," right?

11 A    Yes.

12 Q    What does that mean?

13 A    I was outside at the -- at the house on Killington Avenue.

14 Q    And the final message, which is on Bates 1168.17, on

15 November 17th of 2021, you say what?

16 A    "Yo I'm outside."

17 Q    And again, you mean outside Ms. Schaner's place?

18 A    Yes.

19 Q    I want to go back.  Earlier you testified about a John

20 Wick.

21 A    Yes.

22 Q    A firearm that folks called the John Wick.  Who called it

23 that?

24 A    Me, Mr. Jackson, Reggie, Angel.  I guess the -- our close

25 acquaintances.

Travis M. Bunnell - Cross

1  Q    And can you describe the John Wick?

2  A    It was a black .40 caliber handgun.

3         MS. CATE:  May I have one moment, your Honor?

4         THE COURT:  You may.

5         MS. CATE:  Nothing further.

6         THE COURT:  Any cross-examination?

7         MR. JACKSON:  Yes, your Honor.

8                    CROSS-EXAMINATION

9  BY MR. JACKSON:

10  Q    Good morning, Mr. Bunnell.

11  A    Good morning.

12  Q    How are you doing today, sir?

13  A    Pretty good.  How are you?

14  Q    I'm here.

15     I want to refresh your recollection to November 23rd,

16  2021.  And I want you to --

17         MR. JACKSON:  Mr. Behrens, do you have the audio?

18     Your Honor, I would like to play the audio from

19  Mr. Bunnell.

20         THE COURT:  You may do so.  And this is Exhibit --

21         COURTROOM DEPUTY:  S.  S, as in Sam, correct,

22  Mr. Behrens?

23         MR. BEHRENS:  Yes.

24         COURTROOM DEPUTY:  All right.  I'm going to switch

25  over.

Travis M. Bunnell - Cross

1          (Defendant's Exhibit S was played in open court through

2     minute 5:12.)

3               MR. JACKSON:  Stop.

4     Q    BY MR. JACKSON:  Mr. Bunnell, do you remember that

5     conversation with Detective Lucia?

6     A    Yes, I do.

7     Q    And you told him that you went to work, came home, got

8     something to eat; isn't that true, sir?

9     A    Yes.

10    Q    So why would you stand in this courtroom today and lie and

11    said you came to 55 Killington Avenue to see me?

12    A    Because I had lied to Detective Lucia about where I was.

13    Q    You lied to get out of jail?

14    A    I lied because I was on curfew and was trying to avoid a

15    curfew violation.

16    Q    So basically you lied to get out of jail?

17    A    Yeah.

18    Q    And at that particular moment, you would have said

19    anything to get out of jail?

20    A    I guess, yeah.

21    Q    Okay.

22              MR. JACKSON:  Can you continue?

23         (Defendant's Exhibit S was played in open court from

24    minute 5:12 through 5:40.)

25              MR. JACKSON:  Stop.

Travis M. Bunnell - Cross

1 Q    BY MR. JACKSON:  At that particular time, between that

2 pause where he asked you that "I know you're not telling me the

3 truth.  I know where -- you were not there," you took a long

4 pause to figure out to say Killington Ave.  Why did you do

5 that, sir?

6 A    To decide if I was going to tell the truth or continue to

7 try and lie.

8 Q    You just wanted to say something you know could get you

9 out of trouble and something he wanted to hear because it was

10 about Lawrence "Boo-Bee" Jackson?

11 A    No.

12 Q    So what was it, then, sir?

13 A    I was deciding if I wanted to continue to lie or tell the

14 truth.

15 Q    And at that particular moment, Detective Lucia stated in

16 his affidavit, sir, that he received a phone call knowing that

17 you was at the Howe Center.

18 A    I was at the Howe Center prior to going to Killington

19 Avenue.

20 Q    So before that?

21 A    Yes.

22 Q    Right.  So Detective Lucia say he know it was a lie, he

23 know you was at the Howe Center, not at 55 Killington Avenue.

24 A    I didn't say he said I was at Killington Ave.

25 Q    No.  You took a long pause before you came up with the

Travis M. Bunnell - Cross

1  answer to 55 Killington Avenue.

2  A    Because that was the truth about where I was.

3  Q    And who did you see at 55 Killington Avenue?

4  A    You.

5  Q    You sure about that?

6  A    Absolutely.

7  Q    Because the Government got my phone pinged in

8  Massachusetts on the morning of November 23rd.

9  A    I absolutely am sure I saw you.

10          MR. JACKSON:  Can we continue?

11      (Defendant's Exhibit S was played in open court from

12  minute 5:40 through 7:24.)

13          MR. JACKSON:  Stop.

14  Q    BY MR. JACKSON:  Mr. Bunnell, you stated to Detective

15  Lucia that I don't sell dope, but you claimed that I gave you

16  two bags of dope on that morning.

17  A    Yes.

18  Q    Do you recall what time you were arrested by Rutland PD

19  that day?

20  A    I don't recall the exact time, no.

21  Q    Okay.  Was it late afternoon?

22  A    It could have been, yeah.

23  Q    Late afternoon?  So it definitely wasn't in the morning,

24  right?

25  A    No.  It was in the afternoon.

Travis M. Bunnell - Cross

1  Q    Late afternoon, maybe 3:00, 4 o'clock?

2  A    Maybe.  Might have even been a little earlier.

3  Q    Give me an estimated time.

4  A    I think it was around lunchtime, actually.

5  Q    So 1:00, 2:00?

6  A    Yeah.

7  Q    Okay.  And between that time, sir, you stated to this jury

8  right here that you're absolutely 100 percent telling the truth

9  now.

10 A    Yes.

11 Q    And why should this jury believe you?

12 A    Why shouldn't they?

13 Q    Why should they?  I'm asking you a question, sir.

14 A    Because I'm sitting here telling the truth.

15 Q    But you just told this jury that you told -- that you tell

16 multiple lies.

17 A    I said I told multiple lies?  I told a lie.

18 Q    Sir, you got out of jail -- you would say anything to get

19 out of jail.  You just stated that a minute ago.

20 A    That doesn't mean it's a lie.  It doesn't mean that I

21 won't say anything that's the truth.

22 Q    At that time did you say anything to get out of jail?

23 A    Yeah.  The truth.

24 Q    Did you tell Detective Lucia that you do whatever you

25 want, you say whatever you need to get out of jail?

Travis M. Bunnell - Cross

1  A     No.

2        MR. JACKSON:  Okay.  Can we continue that?

3     (Defendant's Exhibit S was played in open court from

4  minute 7:24 through 13:00.)

5        MR. JACKSON:  Stop.

6  Q   BY MR. JACKSON:  Mr. Bunnell, at that particular -- when

7  Detective Lucia asked you was there any weapons in there, you

8  stated that there was a .40 caliber.  At any time did Detective

9  Lucia tell you -- mention another gun to you?

10 A    I don't think he mentioned it to me, no.

11 Q    So you told him it was a .40 caliber and what other gun?

12 A    And a Judge.

13 Q    And you told him just like that, sir, "I seen a .40

14 caliber and The Judge"?

15 A    I don't recall exactly how I said it, but --

16 Q    You mentioned to him a Judge?

17 A    Yes.

18       MR. JACKSON:  Okay.

19    (Defendant's Exhibit S was played in open court from

20 minute 13:00 through 13:19.)

21       MR. JACKSON:  Stop.

22 Q   BY MR. JACKSON:  Mr. Bunnell, you just stated before this

23 jury that you told him it was a Judge.  I just asked you did

24 you tell Detective Lucia about a .40 caliber and a Judge.  I

25 asked you two times.  You just stated before the jury that he

Travis M. Bunnell - Cross

1 did not tell you it was a Judge.  You heard the conversation.

2 A    No.  I said that I said it was a Judge.

3 Q    Right.  But we know you didn't.

4 A    I -- I did.  After -- after it was -- after I -- it was

5 explained, I -- I thought of the name.  I couldn't think of the

6 name at the time.

7 Q    So he told you it was a Judge?

8 A    If that's how you want to put it, yeah.

9 Q    You just heard the conversation.

10 A    But I still knew -- I still knew what the firearm was.

11 Q    Mr. Bunnell --

12        MS. CATE:  Object.  The witness needs to --

13        THE COURT:  Let him finish his answer, and don't argue

14 with him, please.

15 A    I still knew what was firearm was.  I maybe didn't give

16 the exact spelling or the -- but I still knew what the pistol

17 was, and when the name was described, I was like, "Yes, it's

18 The Judge."

19 Q    Okay.  The question is this:  Did Detective Lucia tell you

20 it was The Judge?  Yes or no?

21 A    Yes.

22 Q    Thank you.

23        MR. JACKSON:  Can we continue?

24    (Defendant's Exhibit S was played in open court from

25 minute 13:19 through 13:47.)

Travis M. Bunnell - Cross

1 Q    BY MR. JACKSON:  Mr. Bunnell, he asked you have you ever

2 seen me use a weapon on anybody, and you said no.  Is that

3 true, sir?

4 A    Yes.

5 Q    Have you ever seen me pull a gun out on anybody?

6 A    Not on anybody, no.

7 Q    Have you ever seen me hit anybody with a gun?  Yes or no?

8 A    No.

9         MR. JACKSON:  Continue.

10     (Defendant's Exhibit S was played in open court from

11 minute 13:47 through 15:46.)

12 Q    BY MR. JACKSON:  Mr. Bunnell, I believe that's the third

13 time you explained to Detective Lucia that I don't sell heroin

14 and I don't have heroin, but on that morning of November 23rd,

15 you claimed that I sold you two bags of heroin for $20.

16 A    Yes.

17 Q    Why would you make that statement, sir, and you just

18 stated that I don't sell heroin, I hate heroin, "He doesn't

19 like heroin, and he resents it"?

20 A    Also in that statement I said that sometimes you trade for

21 heroin, trade cocaine for heroin, and when you do, I've been

22 sick and -- or you -- whatever and you've called and said,

23 "Bro, I got this.  Come grab it."  That was also in that

24 statement.

25 Q    So what you're trying to tell this jury is that I

Travis M. Bunnell - Cross

1 supported your drug habit?

2 A    Not that you supported it but you helped me out on

3 occasion.

4 Q    Such as how, Mr. Bunnell?

5 A    Get me unsick.

6 Q    And when have I ever did that?

7 A    I can't give you an exact day.

8         MR. JACKSON:  May I rephrase, your Honor?

9         THE COURT:  Pardon me?

10        MR. JACKSON:  May I rephrase the question?

11        THE COURT:  Yes, you may.

12 Q    When have I ever --

13        THE COURT:  So you withdraw the question and rephrase

14 it, and go ahead.

15        MR. JACKSON:  Say that again, ma'am.

16        THE COURT:  You withdrew the question.

17        MR. JACKSON:  Yes.

18        THE COURT:  And you rephrase it.

19        MR. JACKSON:  Yes.

20 Q    When have I ever took you to buy heroin, Mr. Bunnell?  Can

21 you give this jury an exact time --

22 A    You've never --

23 Q    -- time period?

24 A    -- taken me to buy heroin.

25 Q    Have I ever given you money to go buy heroin?

Travis M. Bunnell - Cross

1  A    Yes.

2  Q    And when did I ever do that?  Can you give the jury an

3  exact time, sir?

4  A    I could not give you an exact time, no.

5  Q    So you don't know an exact time --

6  A    No.

7  Q    -- that I ever gave you money to go buy heroin?

8  A    No, I do not know an exact date and time.

9  Q    Do you have an exact time, sir, when I ever gave you

10 heroin?

11 A    Not an exact day and time, no.

12 Q    Do you have an exact time whenever you seen me trade

13 somebody for some heroin to give to you?

14 A    Not an exact day and time.

15       (Defendant's Exhibit S was played in open court from

16 minute 15:46 through 15:53.)

17 Q    BY MR. JACKSON:  Did you hear that, Mr. Bunnell?

18 A    Yup.

19       (Interruption by the reporter.)

20          MR. JACKSON:  I asked Mr. Bunnell did he hear his last

21 statement.  And I'm asking him now:

22 Q    BY MR. JACKSON:  You stated that you buy heroin from me,

23 that I don't give you money to go buy heroin.

24 A    When did I say that?

25 Q    That's what we just heard on the tape.

Travis M. Bunnell - Cross

1  A    I didn't say --

2  Q    You said you buy heroin from me.

3  A    I said I did once.

4  Q    When was that, sir?

5  A    I said that morning I bought heroin.  I didn't say any

6  other time.

7        MR. JACKSON:  Can you just go back?

8        THE COURT:  So I'm just going to ask you to pull the

9  microphone closer to you.  Make sure you don't talk over each

10 other.  It's really hard to remember when you're in the zone

11 what your last question was, and so just take a pause after the

12 question and answer it, and make sure that the witness has

13 completed his or her answer before you jump in with the next

14 question.  Everybody's doing it.  We'll try to all stop that.

15       MR. JACKSON:  Yes, your Honor.

16    (Defendant's Exhibit S was played in open court from

17 minute 15:47 through 15:50.)

18       MR. JACKSON:  Thank you.

19 Q    BY MR. JACKSON:  You heard that, Mr. Bunnell?

20 A    Yes.

21 Q    That you always pay for it?

22 A    I didn't say always.  I said, "I pay him for it."  That's

23 not always.

24 Q    Okay.  We can move on, Mr. Bunnell.

25    Ms. Cate asked you about your criminal history.  How many

Travis M. Bunnell - Cross

1 open cases you have right now, Mr. Bunnell?

2 A    I -- I can't give you an exact number, but I have numerous

3 open cases, as I stated before.

4 Q    From the time of November 23rd, 2021, when you gave

5 Mr. Lucia, Detective Lucia, your original statement, I have a

6 record here, 15 cases.

7 A    Are those cases or police contact?

8 Q    Fifteen criminal cases.

9 A    Okay.

10 Q    This whole thing right here is you, Mr. Bunnell.

11 A    I'm sure it is.

12 Q    Fifteen cases.  So you would lie and say anything to get

13 out of jail.

14 A    No.

15 Q    Why would you say no?  What makes you believable?

16 A    What makes me not believable as compared to the next

17 person?

18 Q    Sir, what makes you believable?

19 A    Because --

20          THE COURT:  So -- so the question was asked.

21          MR. JACKSON:  Yes, ma'am.

22          THE COURT:  And you received your answer.  Let's have

23 another question.

24          MR. JACKSON:  Yes, ma'am.

25 Q    Who's Stephanie Elridge *[sic]*?

Travis M. Bunnell - Cross

1  A    My son's mother.

2  Q    Did she ever call the cops on you?  Do you recall July 8,

3  2022, that she made a 911 call about you?

4  A    I don't recall, no, but --

5  Q    Do you remember getting arrested?

6  A    I don't remember getting arrested for it, no.

7  Q    Okay.  I'm going to read this to you.

8         MR. JACKSON:  If it's okay, your Honor.

9         MS. CATE:  Objection, your Honor.

10        MR. JACKSON:  It goes straight to credibility.

11        THE COURT:  Well, you can -- what is it that you're

12 reading?  So that's -- it has to be admissible, and you're

13 using it for impeachment?

14        MR. JACKSON:  Yes.  The nature of the charge and --

15        THE COURT:  Okay.  I'll allow it.

16        MR. JACKSON:  Okay.

17 Q    "On July 8, 2022, Stephanie Elridge advised she believe

18 her partner, whom she identified as Travis Bunnell, had come

19 into the residence sometime during the night and had taken her

20 child" --

21        MS. CATE:  Objection, your Honor.  I thought we were

22 talking about the nature of the charge.

23        MR. JACKSON:  Yes.  Stealing from his child.

24        MS. CATE:  As opposed to reading the statement.

25        THE COURT:  So I'm going to have Ms. Ruddy bring what

Travis M. Bunnell - Cross

1  you're reading from.  I'll take a look at it.  It may or may

2  not be admissible, but I will need to see it first.

3          COURTROOM DEPUTY:  Which section?

4          MR. JACKSON:  Right here.

5          COURTROOM DEPUTY:  Okay.

6          THE COURT:  I'm going to allow it for impeachment

7  purposes, and you may read the statement and ask the witness if

8  he agrees with it.

9          MS. CATE:  Your Honor, just for the record, can we

10 have a number for that and also the Bates number read out?

11         MR. JACKSON:  The Bates number -- the Bate number is

12 1362.11.

13         MS. CATE:  Thank you.

14         THE COURT:  And then let's have an identification of

15 it for the record.

16         MR. BEHRENS:  That would be X, your Honor.

17         THE COURT:  All right.

18     Go ahead, Mr. Jackson.

19 Q   Yes.  Mr. Bunnell, do you remember on July 8, 2022, when

20 Stephanie Elridge called the police and accused you of coming

21 into the residence sometime during the night and had taken her

22 child Ritalin medication?

23 A   I do not recall that.

24 Q   But you were arrested for it.  You don't remember that

25 arrest?

Travis M. Bunnell - Cross

1 A    I was not arrested for that or charged.

2 Q    We have a police report right here, sir.

3 A    There's no charge, and I was not arrested.  That's a

4 complaint made.

5         THE COURT:  Mr. Jackson, I'm not trying to rush you.

6 I'm just trying to time the break.  How much more do you have?

7         MR. JACKSON:  It's going to be a little while longer,

8 so if you want to take a break, I'm fine with that, your Honor.

9         THE COURT:  All right.  This is a good time to break.

10    Members of the jury, don't talk about the case.  Don't let

11 anybody talk to you about the case.  We'll excuse the jury.

12    I'll have the witness exit the courtroom because there's

13 an issue -- an evidentiary issue I want to talk to about the

14 parties, and the parties will remain in the courtroom, and

15 we'll come back in approximately 15 minutes.

16    (Jury out at 10:32 AM.)

17         THE COURT:  Mr. Bunnell, if you wouldn't mind stepping

18 out.  I just need to address an issue.  It has nothing to do

19 with you.

20    Similar to the Court's out-of-court ruling with regard to

21 the prior alleged statements between co-conspirators, the Court

22 needs to find that there was a conspiracy in existence, the

23 declarant was a member of that conspiracy, the defendant

24 against whom the statement is offered was a member of that

25 conspiracy, the statement was made in furtherance of the

Travis M. Bunnell - Cross

1  conspiracy, and the statement was made during the course of the

2  conspiracy.

3      The Government offered 31N, as in Nancy, without

4  objection.  The Court finds that the evidence supports its

5  admission as follows:  Mr. Bunnell testified he ran drugs for

6  the defendant; he dropped them off and returned the proceeds;

7  he drove to a source in Massachusetts to pick up drugs; he held

8  drugs and firearms for the defendant off and on during the time

9  period from late 2020 until the defendant's arrest.

10     31N contains messages from Mr. Bunnell's phone to

11 defendant, text messages.  The messages are in furtherance of

12 drug trafficking and were made in conjunction with Mr. Bunnell

13 obtaining drugs from the defendant, allegedly, and for the

14 purpose of meeting up to exchange those drugs, and on that

15 basis the Court admitted them.  They were for what appeared to

16 be Mr. Bunnell's personal use, but he also testified that he

17 was frequently paid in drugs by the defendant, and on that

18 basis the Court admitted them.

19     That's the only issue I have for you.  Any issues you have

20 for me?

21         MS. CATE:  No, your Honor.  Thank you.

22         MR. JACKSON:  Not at this time, your Honor.

23         THE COURT:  And then I got a note from Ms. Ruddy that

24 we cannot have Mr. Taylor Tuesday afternoon, but I thought

25 Tuesday afternoon was the juror who was going to be gone

Travis M. Bunnell - Cross

1   anyway, so that's good news.  Tuesday morning works.

2          MR. OPHARDT:  Your Honor, I do not know if we'll be

3   done with our case Monday.  If we keep on our current pace, we

4   should be, but that's my only concern.

5          THE COURT:  Well, let's just schedule it --

6          MR. OPHARDT:  That's fine.

7          THE COURT:  -- and get a lock on it.

8       And does Tuesday morning work for you as well,

9   Mr. Jackson?

10         MR. JACKSON:  What is that for, your Honor?

11         THE COURT:  So Mr. Taylor, your witness --

12         MR. JACKSON:  Oh, yes.

13         THE COURT:  -- who's going to testify by WebEx.

14         MR. JACKSON:  Yes.

15         THE COURT:  I am going to afford Mr. Jackson some

16  latitude if we can nail down a time.  We did a lot to arrange

17  this, and we're dealing with people we -- correctional

18  facilities that we do not control.  So Tuesday morning that

19  will be the testimony regardless of whose case we're in.

20      Any objections to that approach?

21         MR. OPHARDT:  Your Honor, I do not have an objection

22  to taking things out of turn.  We'll agree to that.  Will the

23  Court be instructing the jury that this is Mr. Jackson's

24  witness?

25             THE COURT:  I will.

Travis M. Bunnell - Cross

1          MR. OPHARDT:  In addition, your Honor, we should

2    schedule some time, whether it's Monday afternoon or Tuesday

3    morning, outside the presence of the jury to discuss the scope

4    of this examination.  My understanding is that this is being

5    offered as, in essence, a negative character witness for our

6    confidential informant, Walter Taylor, Jr.  This is his son.

7    So the manner in which character evidence can be offered is

8    pretty narrow.  So I don't know how Mr. Taylor's going to --

9    the elder Mr. Taylor is going to testify.  That's probably on

10   Friday.  That will also give us an idea of the scope of the

11   direct examination allowable under the Rules of Evidence.

12          THE COURT:  All right.  I will direct both parties'

13   attention to the evidence rules, and there are rules governing

14   character evidence.  I expect you to follow them.  If you don't

15   have a copy, I have an excellent evidence book.  I've done it

16   for attorneys and parties before.  I will copy the sections

17   that you ask me to, and they have the cases after them, and I'm

18   happy to provide that resource to either side, but we can

19   address that.  I think we will have time to do it.  I'm

20   thinking that we can do it Friday morning; we can do it Monday

21   morning.  We'll figure out a time.

22          MR. OPHARDT:  Your Honor, with Friday early end and

23   also the fact that I think the elder Mr. Taylor's testimony

24   will be helpful to frame the issue, I'd just suggest Monday

25   morning --

Travis M. Bunnell - Cross

1          THE COURT:  Monday morning.

2          MR. OPHARDT:  -- as a proposal.

3          THE COURT:  Does that work for you, Mr. Jackson?

4          MR. JACKSON:  Yes.  Also, I would like to add, your

5  Honor, that I understand about the Rules of Evidence and the

6  character evidence, but there are also some Second Circuit

7  precedents about confidential informants abusing their position

8  and committing crimes while they're working for the police and

9  things like that that I would like to present, so I'm going --

10  Monday morning will be good, because then I could have that

11  case law.

12          THE COURT:  All right.

13          MR. JACKSON:  Then I think I could ask the Court to

14  dig a little bit deeper than what it is.

15          THE COURT:  All right.  I have been affording the

16  defendant in particular latitude.

17          MR. JACKSON:  Yes.

18          THE COURT:  I still have to follow the Rules of

19  Evidence.  We all have to do that.  But it's always great for

20  me to have the case law.  Then -- then I can look at it myself

21  and see what you're referring to.  So we'll do it that way.

22      Anything else to bring to my attention before we take our

23  own break?

24          MR. OPHARDT:  No, your Honor.

25          MR. JACKSON:  No, your Honor.

Travis M. Bunnell - Cross

1          THE COURT:  All right.

2      (A recess was taken from 10:38-10:54 AM.)

3          THE COURT:  Anything to bring to my attention before

4  we bring back the jury?

5          MS. CATE:  No, your Honor.

6          THE COURT:  Mr. Jackson, you all set as well?

7          MR. JACKSON:  Yes, ma'am.

8          THE COURT:  All right.  Todd, let's bring back the

9  jury.

10      (Jury in at 10:56 AM.)

11          THE COURT:  We are back on the record in United States

12  of America v. Lawrence Jackson.  We have Mr. Bunnell on the

13  witness stand.  He is still under oath, and we are in

14  Mr. Jackson's cross-examination.

15      And you may proceed.

16          MR. JACKSON:  Thank you, your Honor.

17  Q    BY MR. JACKSON:  Mr. Bunnell, I want to refresh your

18  recollection back to June 30 of 2021.  Were you arrested in the

19  state of Vermont at that time?

20  A    I may have been.  I don't know the exact date.

21  Q    Would you like me to refresh your recollection?

22  A    Sure.

23          THE COURT:  So, Ms. Ruddy, let's have this as A1.

24          COURTROOM DEPUTY:  A1.  Sure.

25          THE COURT:  Oh, we are up to -- we're Z.

Travis M. Bunnell - Cross

1           COURTROOM DEPUTY:  Y.

2           MR. BEHRENS:  Y.

3           THE COURT:  Okay.  Okay.  Sorry.

4           COURTROOM DEPUTY:  Would you like to see this first or

5    anything?

6           THE COURT:  No.  It's -- the prosecutors have a right

7    to see it.  I don't need to see it ahead of time.

8           MR. JACKSON:  I'm sorry.

9           MS. CATE:  Thank you.

10          COURTROOM DEPUTY:  Do you need this right back?

11          MR. JACKSON:  Yes.

12          COURTROOM DEPUTY:  Okay.  I'll wait.

13          MR. JACKSON:  It's just to refresh his recollection.

14   I'll admit it in a minute.

15   A    Yes, I remember it.

16   Q    And do you remember what that case was about, sir?

17   A    I do.

18   Q    Can you please explain to the jury what you was arrested

19   for that day?

20   A    I was arrested for an assault and robbery.

21   Q    Against what person, sir?

22   A    Allegedly Chris Sumner.

23   Q    And did he suffer injuries?

24   A    I'm not sure exactly.

25   Q    At any time during the course of that assault and robbery,

Travis M. Bunnell - Cross

1  did you and your co-defendant ask him why he was running his

2  mouth?

3  A    I can't speak for my co-defendant, but I did not.

4  Q    Okay.  And at that -- at that time Detective Trooper

5  Malmgren stated in his report that you and your co-defendant

6  asked him why he was running his mouth and then you all both

7  unzipped your pants and told him --

8          MR. JACKSON:  Excuse my French, your Honor.

9      Excuse my French, ladies and gentlemen of the jury.

10  Q    -- and you and your co-defendant told this man to suck you

11  all dicks.  Do you recall that?

12  A    Allegedly.

13  Q    Do you recall that, sir?  Yes or no?

14          THE COURT:  Well, so is this a pending case, or is

15  this a conviction?

16          MR. JACKSON:  No.  This is a conviction.

17          THE WITNESS:  This is a pending case.

18  Q    You're up for sentencing on this case now, ain't you?

19          THE COURT:  So yes.  But -- so he has a privilege

20  against self-incrimination, and if it's a pending case, it's

21  not a conviction.  You may impeach him as to a prior statement.

22  It doesn't sound like a crime of dishonesty to me.

23          MR. JACKSON:  Your Honor, he was on drug court for

24  this.  He just stated that he's off drug court, so he pleaded

25  guilty to get drug court to get this case, so this is not a

Travis M. Bunnell - Cross

1 pending case.

2      THE COURT:  All right.  But it's not a conviction

3 because it hasn't been sentenced yet.

4      MR. JACKSON:  Okay.

5      THE COURT:  Okay.

6 Q    And at that time did you do --

7      MR. JACKSON:  So I can't ask him that question, your

8 Honor?

9      THE COURT:  Well, you can ask him questions about his

10 criminal record.  Ms. Cate asked on direct.  We are really

11 mostly interested in convictions for crimes of dishonesty and

12 some felonies, but you can consult the evidence rules and make

13 your determination.

14      MR. JACKSON:  Okay.

15 Q    At the end of Detective Lucia's examination with you,

16 Detective Lucia asked you have you ever been convicted of

17 fraud, dishonesty, anything in that kind of that nature right

18 there.  Do you remember what you told him?

19 A    I don't recall what I told him.

20 Q    Okay.  I believe you told him no.  Was that the truth,

21 sir?

22 A    I don't have a fraud charge.  As far as dishonesty, I

23 don't recall a case.

24 Q    So you never had -- you don't have a fraud charge?

25 A    Not that I know of.

Travis M. Bunnell - Cross

1          THE COURT:  So let's make sure we're not blending
2  charge and conviction.
3          MR. JACKSON:  Okay.  Right.
4  Q    Have you ever been convicted for fraud?
5  A    No.
6  Q    Have you ever been convicted of forgery, sir?
7  A    Yes, I have.
8  Q    Okay.  Do you remember that time when you was convicted of
9  forgery?
10 A    I don't recall exactly, no.
11 Q    In the state of Ohio, was you convicted of forgery?
12 A    Yup.
13 Q    Okay.  And that's not dishonest?
14 A    I mean, I guess.
15 Q    You guess?  So you lied to Detective Lucia when he asked
16 you was you ever been convicted of deceit, fraud, lying,
17 anything like that?
18 A    I did not recall the case.  It was a 27-count indictment,
19 so there was a lot of charges.  And I may not have actually
20 been convicted of that one.  Some of them were thrown out and
21 some of them were convictions.
22         MR. JACKSON:  Your Honor, can you instruct the witness
23 to, you know, talk when he's asked a question?
24         THE COURT:  Well, he was completing his answer, but I
25 can understand your point of view, because there was a pause.

Travis M. Bunnell - Cross

1    But, Mr. Bunnell, just wait for the question.  I didn't

2  think you did anything improper, so we'll just wait for the

3  next question for the next answer.

4  Q    And one of your pending cases right now, do you have --

5  Ms. Cate asked you was you charged with writing bad checks?

6  A    Yes.

7  Q    And you have a pending case doing that now, right?

8  A    Yes.

9  Q    And where did that check come from?

10  A    My grandfather.

11  Q    So you stole a check from your grandfather and was cashing

12  checks?

13  A    Allegedly.

14  Q    And at that same time, Mr. Bunnell, did you sneak back

15  into your grandfather's house and broke into his house?

16  A    No.

17  Q    You was never charged with that?

18  A    No.

19  Q    There was never a complaint filed on you for that?

20  A    There may have been a complaint, but I was not charged or

21  arrested.

22         MR. JACKSON:  Your Honor, I have no more questions for

23  this witness.

24         THE COURT:  All right.  Any redirect?

25         MS. CATE:  No, your Honor.

Jonathan C. Hall - Direct

1          THE COURT:  All right.  I'll just wait for Mr. Jackson

2  to have his materials removed from the podium.

3      Mr. Bunnell, you are excused.

4      (The witness was excused.)

5          THE COURT:  And the Government may call its next

6  witness.

7          MR. OPHARDT:  Your Honor, the United States calls

8  Trooper Jonathan Hall.

9          COURTROOM DEPUTY:  You can step right in front of me.

10  Come all the way around.  Good morning.

11          THE WITNESS:  Good morning.

12          COURTROOM DEPUTY:  Please raise your right hand.

13  State your full name for the record.

14          THE WITNESS:  Jonathan Hall.

15                    JONATHAN C. HALL,

16      having been first duly sworn by the courtroom deputy,

17              was examined and testified as follows:

18          THE WITNESS:  I do.

19                    DIRECT EXAMINATION

20  BY MR. OPHARDT:

21  Q    Good morning.

22  A    Good morning.

23  Q    Trooper Hall, where are you currently employed?

24  A    Vermont State Police.

25  Q    How long have you been with VSP?

Jonathan C. Hall - Direct

1  A    Since 2015.

2  Q    What's your current role with VSP?

3  A    Patrol.

4  Q    What do you do on patrol?

5  A    I respond to calls of service, motor vehicle accidents,

6  stuff on the road.

7  Q    Are you assigned to a particular barracks?

8  A    The Rutland barracks.

9  Q    How long have you been assigned there?

10  A    Since I started.  2015.

11  Q    I want to take you back in time a bit to November 23rd of

12  2021.  Do you recall being asked to assist with a search

13  warrant that day?

14  A    I do.

15  Q    And do you recall where the search warrant was?

16  A    Killington Ave. in Rutland City.

17  Q    What was your role as part of the warrant?

18  A    I was on perimeter.

19  Q    What does that mean?

20  A    So I was preventing civilians to enter into the scene of

21  the search warrant and preventing anyone from leaving the

22  scene.

23  Q    As part of that role, at some point did you receive word

24  that there was a person who appeared to have fled the

25  residence?

Jonathan C. Hall - Direct

1  A    I did.

2  Q    What did you hear?

3  A    I heard over the radio that an individual jumped out of a
4  second-story window and was heading towards my direction.

5  Q    After you heard that, what did you do?

6  A    Exited my patrol car and attempted to locate the
7  individual.

8  Q    And where did you go to do that?

9  A    On Killington Ave.

10  Q    While you were working your way up Killington Avenue,
11  what, if anything, did you observe?

12  A    I observed Officer Rice headed towards me, and he pointed
13  me in the direction of an individual going into the bushes in
14  front of a residence.

15  Q    About how far from the search warrant location was this
16  bush?

17  A    I'd have to estimate a few houses up the road.

18  Q    After you saw the person who had been pointed out to you
19  in the bush, what did you do then?

20  A    I started giving the individual commands to show me their
21  hands.

22  Q    Was the person compliant?

23  A    They weren't responding to commands.

24  Q    After they were not responding, what did you do then?

25  A    Once I had cover from the other officer, I took the

Jonathan C. Hall - Direct

1  individual into custody, handcuffed him.

2  Q    After the person was in custody, where did you bring them?

3  A    I brought them to the front of my cruiser.

4  Q    Once the person was in front of your cruiser, what did you

5  do then?

6  A    I conducted a pat-down of his person.

7  Q    Why?

8  A    To make sure he had no weapons on him.

9  Q    What, if anything, did your pat-down reveal?

10 A    I located a pair of glasses, and when I removed the

11 glasses, there was a large amount of cash.

12 Q    Where was the cash on the person?

13 A    In their pocket.

14 Q    What type of pocket?  Was it in their pants, front, back,

15 jacket?

16 A    I believe it was a pants pocket.  Front pocket.

17 Q    Any other cash observed while you were trying to do this

18 pat-down?

19 A    Yes.  There -- he was wearing a hoodie, so in the front

20 pocket of the hoodie, you could visually see the cash.

21 Q    Was that cash removed as well?

22 A    At a later time, yes.

23 Q    While -- after you had conducted this pat-down for safety

24 purposes, what, if anything, did you note about the person's

25 appearance?

Jonathan C. Hall - Direct

1  A    I observed a white powder on his hands.

2  Q    What, if anything, did you note about his face?

3  A    There was blood on his face and there was, like, a white

4  powder smear on his face as well.

5  Q    Did the injuries cause you some concern?

6  A    Yes.  I contacted medical.

7  Q    After you contacted medical, did you -- did medical

8  eventually arrive?

9  A    They did.

10  Q    Prior to that arrival, what, if anything, did you ask the

11  person?

12  A    I asked if he had any injuries and what they were so I

13  could advise medical.

14  Q    And what did he tell you?

15  A    Facial injuries.

16  Q    At any point did the individual provide his or her name?

17  A    Yes.

18  Q    What was it?

19  A    David C. Jordan.

20  Q    While you were waiting for medical, did you request

21  consent from Mr. Jordan to search him?

22  A    I did.

23  Q    And how did he respond?

24  A    He gave me consent.

25  Q    What did your search reveal?

Jonathan C. Hall - Direct

1  A    A large amount of cash.

2  Q    Did you do this search by yourself, or was there another

3  officer helping you?

4  A    Officer Rice was on the other side of the individual.

5  Q    So you both conducted a search, one on each side?

6  A    Correct.

7  Q    When you say "a substantial amount of cash," what was the

8  approximate amount?

9  A    I would approximate about $5,000.

10  Q    You spent enough time with this individual, you would

11  recognize a photograph of him?

12  A    Yes.

13  Q    In addition, did you have some cruiser footage that you

14  were able to review before your testimony today?

15  A    Body camera and cruiser footage, yes.

16  Q    And that also assists you in remembering what the

17  individual looked like?

18  A    Correct.

19  Q    I show you what's been previously admitted into evidence

20  as Government's Exhibit 29.

21          COURTROOM DEPUTY:  It should switch over in a second.

22          MR. OPHARDT:  Thank you.

23  Q    Who's depicted in the photograph on the screen to your

24  left?

25  A    David Jordan.

Jonathan C. Hall - Direct

1          THE COURT:  Yes.

2          JUROR RODENRYS:  Our screen isn't working, this screen

3   right here.  Okay.  Thank you.

4          THE COURT:  Thank you.  And that's exactly the kind of

5   interruption we like, and we're glad you fixed it yourself.

6   Q    While Mr. Jordan was being checked out by emergency

7   medical technicians, did he confirm for them how he was

8   injured?

9   A    He did.

10  Q    What did he confirm?

11  A    The -- I believe it was an EMT asked if the injuries were

12  from a fall, and he said yes.

13         MR. OPHARDT:  Thank you, your Honor.  No further

14  questions.

15         THE COURT:  Any cross-examination?

16         MR. JACKSON:  I have no questions, your Honor.

17         THE COURT:  All right.  Thank you, sir.  You may step

18  down.

19         THE WITNESS:  Thank you.

20      (The witness was excused.)

21         THE COURT:  For the next witness, I have a pressing

22  matter I need to take care of in chambers.  I think it's going

23  to take me approximately ten minutes, so I'm going to excuse

24  the jury, have the attorneys remain in the courtroom.  It will

25  just take a few minutes.  So you'll get an extra break.  And,

1  ladies and gentlemen of the jury, don't talk about the case or

2  let anybody talk to you about the case.

3      Please excuse the jury.

4      (Jury out at 11:13 AM.)

5      THE COURT:  My understanding is that we are going to

6  have -- Mr. Rice, we're going to have Mr. Doane come?  How

7  would you like us to position ourselves?  I'm going to go into

8  chambers just for a few minutes and attend to something, and

9  would you like the parties to stay right where they are?

10      DEPUTY MARSHAL:  That's fine.

11      THE COURT:  Okay.

12      (A recess was taken from 11:13-11:19 AM.)

13      THE COURT:  We are back on the record in United States

14  of America v. Lawrence Jackson.

15      And is Mr. Doane going to have to page through anything?

16      MR. OPHARDT:  I don't believe so, your Honor.

17      THE COURT:  Okay.  I wanted to tell you that I

18  reviewed the Government's revised exhibit list.  That's exactly

19  what I'm looking for, so that's fine.

20      All right.  Anything to bring to my attention before we

21  bring back the jury?

22      MR. OPHARDT:  No, your Honor.

23      MR. JACKSON:  No, your Honor.

24      THE COURT:  Let's do that.

25      (Jury in at 11:21 AM.)

Nicholas Doane - Direct

1          THE COURT:  We are back on the record in United States

2   of America v. Lawrence Jackson.

3       The Government may call its next witness.

4          MR. OPHARDT:  Your Honor, the United States calls

5   Nicholas Doane to the stand.

6          COURTROOM DEPUTY:  Mr. Doane, please raise your right

7   hand.  Please state your full name for the record.

8          THE WITNESS:  Nicholas Doane.

9                        NICHOLAS DOANE,

10       having been first duly sworn by the courtroom deputy,

11             was examined and testified as follows:

12          THE WITNESS:  Yes, ma'am.

13          THE COURT:  Mr. Doane, you are soft-spoken, so I'm

14   going to ask you to really project your voice.  Scoot up right

15   next to the mic, and we should be able to hear you fine.  Thank

16   you.

17       Go ahead, Mr. Ophardt.

18          MR. OPHARDT:  Thank you, your Honor.

19                      DIRECT EXAMINATION

20   BY MR. OPHARDT:

21   Q    Mr. Doane, how long have you lived in the Rutland area?

22   A    On and off since 2003.

23   Q    What types of ties do you have to Rutland County?

24   A    My parents, grandparents, children.

25   Q    Family ties?

Nicholas Doane - Direct

1  A    Yes.

2  Q    Are you currently residing there?

3  A    Yes.

4  Q    Are you currently detained?

5  A    Yes.

6  Q    So you're in marshal's custody?

7  A    Yes, sir.

8  Q    And that's been since you were arrested in September of

9  last year?

10  A    Yes, sir.

11  Q    Where were you arrested in September of '23?

12  A    At a residence that I was living at on Plain Street in

13  Rutland.

14  Q    So you got a little gravelly voice going on this morning.

15  A    Sorry.

16  Q    It's okay.  It sounds like you may have gotten up early to

17  get here?

18  A    Yes.

19  Q    When you were last arrested, were you using controlled

20  substances?

21  A    Yes, sir.

22  Q    What drugs?

23  A    Cocaine and heroin.

24  Q    How much?

25  A    Five grams of cocaine, gram or two of heroin a day.

Nicholas Doane - Direct

1  Q    Are you currently in treatment?

2  A    Yes, sir.

3  Q    While incarcerated?

4  A    Yeah.  I'm on the MAT program, medicated-assisted

5  treatment.

6  Q    What does MAT entail?

7  A    Suboxone, Subutex.

8  Q    How long have you been abusing drugs?

9  A    As long as I can remember.

10  Q    So back in late 2020, November-December time frame, were

11  you abusing drugs then?

12  A    Yes, sir.

13  Q    What were you doing to obtain the funds for your

14  substantial drug habit?

15  A    Usually I sold drugs to sustain my habit daily.

16  Q    Who was one of the people you were selling to in that time

17  frame?

18  A    A lot of people.

19  Q    Was one of them nicknamed Boo-Bee?

20  A    I dealt with him a couple times, yes.

21  Q    Do you see him in the courtroom today?

22  A    Yes, sir.

23  Q    Would you please describe what he's wearing, where he's

24  seated?

25  A    Dark jacket, glasses.

Nicholas Doane - Direct

1  Q    Seated over here behind me?

2  A    Yeah.  To the left, yes.

3        MR. OPHARDT:  Your Honor, may the record reflect an

4  identification of Mr. Jackson?

5        THE COURT:  The record so reflects.

6  Q    So those interactions with Mr. Jackson, what type of drug

7  were you selling him?

8  A    Cocaine.

9  Q    Where did these transactions occur?

10 A    The Quality Inn in Rutland.

11 Q    Where is the Quality Inn?

12 A    On Main Street.  South Main Street.

13 Q    Is that also Route 7?

14 A    Yes.

15 Q    How much did you sell the man you knew as Boo-Bee?

16 A    I believe it was 14 grams.

17 Q    How many times, approximately?

18 A    Once or twice.

19 Q    What did you charge for the 14 grams?

20 A    I think it was eight or $900.

21 Q    As you -- as time progressed through the rest of 2021 into

22 2022, did you continue drug trafficking activity?

23 A    Yes.

24 Q    In November -- late November 2022, after Thanksgiving, do

25 you remember when you ran out of gas?

Nicholas Doane - Direct

1  A    Yes.

2  Q    In your car?

3  A    Yes.

4  Q    Who was with you?

5  A    A friend of mine, Stephanie.

6  Q    How much drugs did you have with you at the time?

7  A    850 grams of powder cocaine, 150 grams of crack cocaine,

8  150 grams of fentanyl.

9  Q    How much cash?

10  A    About 15,000.

11  Q    Who found you that night?

12  A    Game warden.

13  Q    When the game warden located your vehicle, were you --

14  were you well?  Did you have medical issues going on?

15  A    I said that I had medical issues going on so I didn't

16  really want to give my information or whatnot, and I figured an

17  ambulance ride was a better ride.

18  Q    You lied about your name?

19  A    Yes, sir.

20  Q    What happened to the drugs that were in the car?

21  A    I didn't know at the time.  I didn't find out till later,

22  but I guess the tow truck driver had gone through the car and

23  found some and then contacted the police.

24  Q    Was Ms. Horvath still with you when the game warden showed

25  up?

Nicholas Doane - Direct

1  A    Yes.

2  Q    What did you learn about her and some of the drugs that

3  were in the car after the fact?

4  A    That she had -- she had taken some of the drugs.

5        THE COURT:  So --

6  A    I had thrown some into the woods on the other side of the

7  road.

8        THE COURT:  So we have this person identified as

9  Stephanie.  Is that who we're talking about?

10       MR. OPHARDT:  I apologize, your Honor.

11 Q    Do you have Stephanie's last name?

12 A    Horvath.

13 Q    Okay.

14       MR. OPHARDT:  Thank you, Judge.

15 Q    So you had put some of the drugs in the woods to hide

16 them?

17 A    Yes, sir.

18 Q    And were they there when you went back to look for them?

19 A    No, sir.

20 Q    So you concluded what?

21 A    That Stephanie had got back -- gone back and taken them.

22 Q    Were you ever charged for those drugs?

23 A    No, sir.

24 Q    So what was your federal arrest for in September of 2023?

25 A    Felon in possession of a firearm.

Nicholas Doane - Direct

1  Q     Between these drugs getting both seized and stolen and
2  that arrest, what happened with your drug trafficking business?
3  A     It slowed down.
4  Q     Why is that?
5  A     Because I had to start over.
6  Q     You had lost so much?
7  A     Yeah.
8  Q     How much were those drugs worth?  How much did you pay for
9  them?
10 A     About $40,000.
11 Q     What were you doing with the money you were making from
12 drug sales?
13 A     Supplying my habit and day-to-day living.
14 Q     Did you buy anything for your family?
15 A     I got stuff for my kids and, you know, maybe my mother and
16 whatnot, but nothing substantial.  The biggest thing I bought
17 was a car for my son.
18 Q     How old was your son when you bought it for him?
19 A     Seventeen.
20 Q     So your arrest for unlawfully possessing a firearm, was
21 that around the time of your arrest, or was the actual
22 possession further back in time?
23 A     The -- it happened in March of 2022.
24 Q     Where were you when law enforcement encountered you with
25 that firearm?

Nicholas Doane - Direct

1  A    Walgreens in Rutland.

2  Q    Where had you gotten the gun?

3  A    I had someone get it for me at the store.

4  Q    When law enforcement encountered you, what were you doing?

5  A    I was sleeping in the car.

6  Q    Where was the gun?

7  A    It was on my lap.

8  Q    What was your intent that day?

9  A    No intent.

10  Q    Just fell asleep?

11  A    Yup.

12  Q    Why did you have the gun?

13  A    Means of protection.

14  Q    What's happened to your federal case?  Have you pled

15  guilty?  Have you been sentenced?  What's the status?

16  A    I've pled guilty.  I haven't been sentenced yet.

17  Q    As part of your guilty plea, what agreement did you enter

18  into with the Government?

19  A    Twenty-one to 27 months and drug court.

20  Q    I'm sorry.  Twenty-one to 27 months?

21  A    Yeah.  It was my guidelines, I guess.  And -- and possibly

22  getting into drug court.

23  Q    So you're hopeful to go to a federal drug court in

24  Rutland?

25  A    Yes, sir.

Nicholas Doane - Direct

1  Q    What's your understanding of where that process stands?

2  A    I'm not sure right now.  I think we did the screening.

3  I'm not sure if I was accepted or not yet.

4  Q    Have you been in custody since your September '23 arrest?

5  A    Yes, sir.

6  Q    And so your hope is that you could -- you would be let out

7  and go to this treatment court?

8  A    Yes, sir.

9  Q    What does that require?

10 A    Remain drug free, abide by all appointments, counseling.

11 I'm not sure of all the specifics.  I just know a little bit.

12 Q    In addition to the hopes for drug treatment court, you

13 entered into a cooperation agreement with the Government; is

14 that right?

15 A    Yes, sir.

16 Q    That's why you're here testifying today?

17 A    Yup.

18 Q    What does that agreement require you to do?

19 A    Be honest, show up when I'm supposed to.  Pretty much what

20 I'm doing right now.

21 Q    When you're ultimately sentenced, are you aware that the

22 judge will know about the kilo of cocaine and the fentanyl that

23 was seized?

24 A    Yes, sir.

25 Q    I'm going to go back in time to that November-December

Nicholas Doane - Direct

1 time frame of 2020. Who was your primary drug source at that
2 time?

3 A    A guy named ST. I don't know his real name.

4 Q    Did he also go by just S?

5 A    Sometimes, I think so, yes.

6        THE COURT: So let's make sure that the answers are
7 coming from the witness.

8        MR. OPHARDT: Yes, your Honor.

9 Q    What nicknames did this person -- did your source use at
10 the time?

11 A    I believe it was ST.

12 Q    Okay. Where was ST located?

13 A    Springfield, Mass, as far as I knew.

14 Q    Where had you met him?

15 A    I met him in Rutland.

16 Q    Well, when you first met him, where was that?

17 A    When I first met him was at the Rutland jail.

18 Q    Okay. And what were you in the Rutland jail for?

19 A    I believe I was there on lack of residence. I was on
20 furlough at the time.

21 Q    What was your prior felony for?

22 A    Burglary.

23 Q    So you met this person in the Rutland jail, and after you
24 were released, you started a drug relationship with him?

25 A    Yes.

Nicholas Doane - Direct

1 Q    Where would you go to pick up drugs for -- from ST?

2 A    I would go down to Massachusetts and meet him, or

3 sometimes he'd come to Rutland.

4 Q    At any point in time, did you introduce Boo-Bee to ST?

5 A    I wasn't personally there for the meeting, but I told him

6 about the other one, yes.

7 Q    And how did they connect?

8 A    They met each other at the Quality Inn.

9 Q    Okay.  Did you provide any information to either of them

10 to facilitate that meeting?

11 A    Not really other than just "This person is someone that

12 you might be interested in talking with."

13 Q    Did you provide a phone number, a contact method, anything

14 like that?

15 A    No.  No.

16 Q    Did you ever receive anything from ST for making that

17 introduction?

18 A    He provided me with $500.

19 Q    Do you know why Boo-Bee wanted to meet ST?  Did you learn

20 that?

21 A    I don't know why he wanted -- it was more because I was --

22 I wasn't dealing with that person anymore and he wanted

23 somebody else to deal with in the Rutland area, so that was

24 someone that I knew at the time.

25 Q    Why weren't you dealing with ST anymore?

Nicholas Doane - Cross

1  A    I was starting to deal with somebody else.

2         MR. OPHARDT:  Thank you, your Honor.  I have no

3  further questions.

4         THE COURT:  Any cross-examination?

5         MR. JACKSON:  Yes, your Honor.

6                    CROSS-EXAMINATION

7  BY MR. JACKSON:

8  Q    Good morning, Mr. Doane.

9  A    Good morning.

10 Q    Mr. Doane, U.S. Attorney Mr. Ophardt just asked you a

11 bunch of questions.  Has any of your drug activity in December

12 '19 and 2020, did that have anything to do with me?

13 A    No, sir.

14 Q    Did I sell you anything?

15 A    No, sir.

16 Q    Have you ever seen me with any drugs during that time?

17 A    No, sir.

18 Q    And you never sold me no drugs during that time?

19 A    Not during that time, no, sir.

20 Q    Okay.  Thank you, sir.  In your interview report with the

21 police, Vermont State Police, I believe it was --

22        THE COURT:  Yes.  We have --

23        JUROR GONYAW:  We can't hear him.

24        THE COURT:  Mr. Jackson, you are too far from the mic.

25 Thank you.

Nicholas Doane - Cross

1        MR. JACKSON:  I'm sorry, sir.

2        JUROR GONYAW:  Thank you.

3  Q    You did an interview with Mr. Dambrackas, Mr. Ophardt, and

4  Kirwan at that time?  Do you remember that?  It was on

5  1/24/2024, looks like?

6  A    Vaguely.

7  Q    Three months ago?

8  A    Yeah.  A little bit, yes.

9  Q    They showed you a picture of me at that time; do you

10  recall that?

11  A    Yes.

12  Q    And in that statement you said that you gave me a drug

13  source known as S out of Springfield, Massachusetts.  That's

14  correct?

15  A    ST, not S, but yes.

16  Q    Right.  You just stated right here in front of the jury,

17  Mr. Ophardt asked you that you didn't make an introduction,

18  that you never introduced us.

19  A    Yeah.  No.  I was never personally there for an

20  introduction or nothing like that, no, sir.

21  Q    But you stated that you plugged me up with him because you

22  couldn't supply me no more.  That was your statement to

23  Mr. Dambrackas, Mr. Ophardt, and Mr. Kirwan in your interview

24  on 1/24/24.  And you stated in this courtroom today that you

25  did none of that.  Isn't that true?

Nicholas Doane - Cross

1  A    I -- I was not there for an introduction.  I just simply

2  told him about -- you know what I mean, gave him the

3  information of a person to meet with.  I wasn't personally

4  there for that introduction, no.

5  Q    You stated that you sold me half ounces of drugs.

6  A    That I did so on that occasion, yes.  Not numerous times.

7  Q    And, Mr. Doane, on what occasion was that, sir?  Can you

8  give approximate time that I ever bought some drugs from you?

9  A    2020.

10 Q    2020 when?

11 A    Fall time.

12 Q    Mr. Doane, when you got arrested on this case, you were

13 approached by numerous federal officials and state troopers;

14 isn't that true?

15 A    Yes, sir.

16 Q    And you agreed to cooperate?

17 A    Yes, sir.

18 Q    And within that cooperation agreement, when they brought

19 up Lawrence "Boo-Bee" Jackson, you basically got a

20 get-out-of-jail-free card?

21 A    No, sir.

22 Q    No, sir.  Okay.  You were never charged with 800 -- let me

23 get this correct.

24      You were never charged with three sales of cocaine -- from

25 2019, December, to March of 2020, you had three sales of

Nicholas Doane - Cross

1  cocaine and one sale of fentanyl.  You was never charged with

2  that.

3  A    No.  That's a state case.

4  Q    Regardless.

5  A    I was still charged with it, yes.

6  Q    In December 20- -- I'm sorry.  Excuse me.

7        In November of 2022, you were in your car and a game

8  warden pulled up on you; isn't that true?

9  A    Yes, sir.

10 Q    Later on at Carrara Towing Company, they found almost a

11 brick of cocaine in your car; isn't that true?

12 A    Yes.

13 Q    I had nothing to do with that, did I?

14 A    No, you did not.

15 Q    Did I sell it to you?

16 A    No.

17 Q    Did I plug you up with a connect?

18 A    No.

19 Q    Okay.  And you were never charged with that?

20 A    No.

21 Q    Okay.  Immediately after that, you was released after that

22 as well, right?

23 A    I never got arrested that day.

24 Q    Okay.  Immediately after that you got arrested for a gun

25 charge?

Nicholas Doane - Redirect

1  A    I got arrested on the gun charge before that.

2  Q    Oh, before that.  I'm sorry.  You're absolutely right.

3  And they let you go?

4  A    They let me go, yes.

5  Q    So you said you don't have a get-out-of-jail-Boo-Bee-free

6  card?

7  A    No.  They never showed me your picture until a few months

8  ago.

9        MR. JACKSON:  Okay.  I have no more questions for this

10  witness, your Honor.

11        THE COURT:  Any redirect?

12        MR. OPHARDT:  Briefly, your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. OPHARDT:

15  Q    Mr. Doane, you were arrested at the Walgreens when you had

16  the firearm; is that right?

17  A    Yes, sir.

18  Q    And that was March 2022?

19  A    Yes, sir.

20  Q    What were you initially charged with for that arrest?

21  A    Violating conditions of release.

22  Q    Because you had the gun?

23  A    Yes.

24        MR. OPHARDT:  No further questions, your Honor.

25        THE COURT:  Any recross?

Nicholas Doane - Recross

1          MR. JACKSON:  Yes.  Just one question.

2                      RECROSS-EXAMINATION

3   BY MR. JACKSON:

4   Q    Back to the gun, you mentioned to Mr. Ophardt that you

5   sent somebody into the gun store to buy a gun.

6   A    Yes.

7   Q    And you were a convicted felon at the time?

8   A    Yes.

9   Q    So you knew that was illegal for you to do that?

10  A    Yes.

11  Q    Who was that person that you sent into the store to buy a

12  gun?

13  A    I sent a girlfriend of mine in.

14  Q    What's her name, sir?

15  A    Raven.

16  Q    Raven what?

17  A    Blanchard.

18          MR. JACKSON:  Thank you.  I have no other questions.

19          THE COURT:  Any redirect?

20          MR. OPHARDT:  No, your Honor.  Thank you.

21          THE COURT:  All right.  I think that we should take a

22  break now and come back at 1:00 -- quarter of 1:00, 12:45 also

23  known as, and do it that way, just do it a little bit earlier,

24  because I want to talk to the parties about timing.

25          Does that work for both the attorneys?

1          MR. OPHARDT:  Yes, your Honor.

2          THE COURT:  It works for you, Mr. Jackson, as well?

3          MR. JACKSON:  Yes, your Honor.

4          THE COURT:  All right.  So we're going to come back at

5   12:45.  I wish you a good early lunch.  Don't talk about the

6   case.  Don't let anybody talk to you about the case.  Don't do

7   any research.

8      We'll excuse the jury.  We'll have the witness remain

9   seated, and we'll have the attorneys remain in the courtroom.

10       (Jury out at 11:43 AM.)

11          THE COURT:  Mr. Doane, you're excused.  Thank you.

12        (The witness was excused.)

13          THE COURT:  Anything to bring to my attention before

14  we take our own lunch break?

15          MR. OPHARDT:  Your Honor, just flagging that I think

16  it makes sense to do the colloquy before we bring the jury in

17  and then read the stip then.

18          THE COURT:  All right.  So let's do that right now.

19  And this is the *Old Chief* stipulation that indicates that

20  Mr. Jackson has been convicted of a crime which carries a

21  penalty of imprisonment of more than one year?

22          MR. OPHARDT:  Yes, your Honor.  It's Government's

23  Exhibit 49.

24          THE COURT:  All right.  So, Mr. Jackson, as you know,

25  you are presumed innocent of this charge.  The Government has a

1    burden under the law to prove that charge beyond a reasonable

2    doubt, meaning each essential element, including the fact that

3    you were convicted of a felony, that you knew at the time you

4    allegedly possessed a firearm that you were convicted of the

5    felony.  You may waive your right to a jury trial, but you have

6    a right to have these 12 jurors unanimously conclude that the

7    Government has proven beyond a reasonable doubt that you --

8    that you actually had a felony and you knew at the time of the

9    possession that you had a felony.

10        Typically we have a written waiver of the right to a jury

11   trial.  This is just on a single element.  You're not asking to

12   waive the entire trial.  But I would prefer that you and

13   Mr. Behrens prepare a written waiver if this is what you would

14   like to have happen.  And so there's a case on point that says

15   "The rule's requirement of a written stipulation has been

16   deemed procedural, and courts have found oral stipulations

17   valid when the defendant gave knowing and intelligent consent

18   in open court."  So I would like a written waiver.  It doesn't

19   have to come at this point in time.

20        But is this something that you want to do, having

21   considered your constitutional right to have the jury decide

22   this issue and to have the Government prove this issue beyond a

23   reasonable doubt?

24        MR. JACKSON:  Your Honor, I just want to have a clear

25   understanding of the *Old Chief* case.  I've read it quite a few

1  times, and my understanding is the stipulation agreement after

2  consulting with Mr. Ophardt is that the Government can let the

3  jury know that I have been convicted of a felony before, not --

4          THE COURT:  It's just the stipulation and nothing

5  else.

6          MR. JACKSON:  Not that I was in possession of a weapon

7  and I knew that?

8          THE COURT:  So your stipulation doesn't go to knowing

9  possession of the weapon while he had the felony?

10         MR. OPHARDT:  That's correct, your Honor.  I can put

11 it under the ELMO if everyone would like to read it.

12         THE COURT:  Sure.  That would be helpful.

13         MR. OPHARDT:  And the purpose of it from the

14 Government's perspective is solely to establish the prior

15 felony and the *Rehaif* knowledge requirement.

16         THE COURT:  So --

17         MR. JACKSON:  Can you say that again, Mr. Ophardt?

18         THE COURT:  Just let me finish --

19         MR. JACKSON:  Oh, I'm sorry.

20         THE COURT:  So number 1 is that you've been previously

21 convicted of a crime punishable by a term of imprisonment

22 exceeding one year, so that's that you have a felony.

23     Number 2 is that on particular dates you knew that you had

24 a felony.

25     And so, you're right, there's not a direct connection to

1  the possession of a firearm.  That's a connection the

2  Government wants to make through other proof.

3       But have you read the stipulation?

4       MR. JACKSON:  Yes.  I have the stipulation right here,

5  your Honor.  I signed it, but, you know, I just want to make a

6  clear understanding.  It's just to let the jury know that I've

7  been convicted of a felony before, not any of my past criminal

8  history?

9       THE COURT:  So it's not your past criminal history.

10  It is exactly what it is.  So there's two components to it.  1

11  is that you have a felony conviction.  2 is during a particular

12  time period you knew you had been convicted of a crime

13  punishable by a term of imprisonment exceeding one year.

14  That's all it says.  That's all the jury's going to hear.

15       I need to hear if this is something that you knowingly,

16  intelligently, and voluntarily want to enter into knowing that

17  you have a jury trial right on this and you have the right to

18  have the Government prove your guilt beyond a reasonable doubt

19  on these essential elements and also to have the jury decide

20  that issue.

21       MR. JACKSON:  Yeah, I agree to the stipulation, your

22  Honor, knowingly and intellectually, but I also believe in the

23  Government's opening arguments they told the jury I was a

24  convicted felon before.

25       THE COURT:  They did, and I was concerned about that,

1 but you had both advised the Court in advance that you would

2 have an *Old Chief* stipulation.

3          MR. JACKSON:  Right.

4          THE COURT:  So if -- if you decide now that you don't

5 want to enter into it, I will strike that statement from the

6 record from the Government.

7          MR. JACKSON:  Well, the jury already know, so I don't

8 think I have a problem with it now unless they want to bring it

9 back up in closing arguments or make a case out of it.

10         MR. OPHARDT:  Your Honor, I just want to be clear, the

11 Government has to be able to reference the fact that he has the

12 felony to prove its case.

13         THE COURT:  Understood.

14         MR. OPHARDT:  I don't know if Mr. Jackson understands

15 that.  Whether we proved it through stipulation or court

16 records, it's perfectly fine for us to say in opening -- I

17 don't think Ms. Cate said he stipulated.

18         THE COURT:  No.  But she said he had a felony.

19         MR. OPHARDT:  Correct.  And we have to prove that,

20 so --

21         THE COURT:  You do have to prove it.

22     So here's the way it can happen.  They can prove it by

23 court records or they can prove it through a stipulation.

24 Court records, they don't need your consent.  Stipulation, they

25 do.

1          So today all I want to know is whether or not you have --
2    this is your own free will, you've considered the case law,
3    this is what you want to do.  And, yes, you are right, this
4    stipulation means we are not going to hear what charge you have
5    a felony for or -- and we're not going to hear your criminal
6    history unless you testify, and there may be some issues about
7    impeaching you for your convictions, but I'll take that up at
8    some later point in time.  Right now this is something that
9    would remove the Government's burden of proving an essential
10   element of the case against you, and you can either agree to it
11   or not.

12          MR. JACKSON:  I agree to it, your Honor.

13          THE COURT:  All right.  I'm going to find that this is
14   a knowing and intelligent waiver.  I'm just going to ask you a
15   couple questions, Mr. Jackson.

16          Is there anything interfering with your mental processes,
17   your decision-making, or your judgment?

18          MR. JACKSON:  No, your Honor.

19          THE COURT:  Do you have any questions for me about
20   this?

21          MR. JACKSON:  No, your Honor.  I think I talked to
22   Mr. Ophardt quite a few times about it, and I believe he'll
23   stick to his word, so --

24          THE COURT:  All right.  And have you had an
25   opportunity to consult with Mr. Behrens on this as well?

1          MR. JACKSON:  Yes.  I spoke to him about it as well.

2          THE COURT:  All right.  And this is of your own free

3 will?

4          MR. JACKSON:  Yes, your Honor.

5          THE COURT:  All right.  I'm going to accept your

6 stipulation.  It can be introduced to the jury.  That is what's

7 going to be presented in terms of the felony.

8      Anything else to bring to my attention before we take our

9 own break?

10     And I'll charge you, Mr. Behrens, with providing the Court

11 with a written waiver.

12         MR. BEHRENS:  Waiver to be decided -- the issue to be

13 decided by a jury?

14         THE COURT:  Yes.

15         MR. OPHARDT:  No issues, your Honor.

16         THE COURT:  Mr. Jackson, you're all set?

17         MR. JACKSON:  No issues, your Honor.

18         THE COURT:  All right.  Thank you.

19     (A lunch recess was taken from 11:50 AM-12:48 PM.)

20         THE COURT:  We are back on the record in United States

21 of America v. Lawrence Jackson.

22     Anything to bring to my attention?

23         MR. OPHARDT:  Not from the Government, your Honor.

24         MR. JACKSON:  No, your Honor.

25         THE COURT:  We completed Mr. Doane, correct?

1          MR. OPHARDT:  Yes, your Honor.

2          THE COURT:  Okay.  Let's bring back the jury.

3      (Jury in at 12:50 PM.)

4          THE COURT:  We are back on the record in United States

5  of America v. Lawrence Jackson.

6      The Government may call its next witness.

7          MS. CATE:  Your Honor, the Government moves to admit

8  Exhibit 49, which is a stipulation between the parties.

9          THE COURT:  All right.  Any objection?

10          MR. JACKSON:  No, your Honor.

11          THE COURT:  49 is admitted.

12      (Government's Exhibit 49 was received in evidence.)

13          MS. CATE:  May I publish?

14          THE COURT:  You may.

15          MS. CATE:  So I put 49 on the ELMO, and I'll just read

16  it.  "Stipulation."

17          JUROR:  We don't have -- we can't see that here on our

18  screen.

19          COURTROOM DEPUTY:  Oops.  So a lot of time the cords

20  get a little disconnected.

21          THE COURT:  All right.  So --

22          COURTROOM DEPUTY:  All good?

23          JUROR:  We got it.

24          THE COURT:  Does everybody have a screen with a

25  document on it?  If not, raise your hand.  No hands raised.

1         Go ahead, Ms. Cate.

2              MS. CATE:  Thank you.

3         "Stipulation.  It is Hereby Stipulated and Agreed by and

4    between the undersigned parties that:

5         "1.  As of January 1, 2021, Lawrence Jackson had

6    previously been convicted of a crime punishable by a term of

7    imprisonment exceeding one year.

8         "2.  As of January 1, 2021, and continuing through

9    November 23, 2021, Lawrence Jackson knew that he had been

10   convicted of a crime punishable by a term of imprisonment

11   exceeding one year.

12        "3.  This stipulation is admissible as evidence at trial."

13             THE COURT:  All right.  You may call your next

14   witness.

15             MR. OPHARDT:  Your Honor, the United States calls

16   Frank Thornton to the stand.

17             COURTROOM DEPUTY:  You can step right in front of me.

18   Good afternoon.  Please raise your right hand.  Please state

19   your full name for the record.

20             THE WITNESS:  Francis Joseph Thornton, Jr.

21                      FRANCIS J. THORNTON, JR.,

22        having been first duly sworn by the courtroom deputy,

23                 was examined and testified as follows:

24   /  /  /

25   /  /  /

Francis J. Thornton, Jr. - Direct

1                        DIRECT EXAMINATION

2   BY MR. OPHARDT:

3   Q    Good afternoon.

4   A    Good afternoon.

5   Q    Mr. Thornton, where are you currently employed?

6   A    I'm currently self-employed.

7   Q    What type of work?

8   A    I do digital forensics.

9   Q    How long have you done that type of work?

10  A    It's been in excess of 20 years now.

11  Q    Do you have a name for your company?

12  A    It -- I actually have two D/B/A's:  Blackthorn Information

13  Security and Blackthorn Digital Forensics.

14  Q    What's a D/B/A?

15  A    Doing business as.

16  Q    Prior to your establishing your business, did you have any

17  law enforcement experience?

18  A    Yes.  I had over 20 years as a law enforcement officer and

19  investigator.

20  Q    Do you have any formal education in digital forensics?

21  A    I have both master's- and bachelor-level courses in

22  digital forensics.

23  Q    Do you have any certifications concerning digital

24  forensics?

25  A    I've held a number of certifications over the years.

Francis J. Thornton, Jr. - Direct

1  Currently I have several.  The big one, if you will, is my --

2  I'm certified as a Certified Computer Examiner through the

3  International Association of Forensic Computer Examiners.

4  Q    So what is, generally speaking, digital forensics?

5  A    Very generally, it is looking into devices for information

6  that can be presented as evidence in a courtroom situation.

7  Q    And when you say "devices," you mean electronic devices?

8  A    Electronic devices.  Typically cell phones, computers,

9  tablets.

10 Q    Have you also completed some continuing education courses

11 in relation to digital forensics?

12 A    Yes.  I'm required, to maintain my certifications, to do

13 continuing education.

14 Q    Any publications?

15 A    I've got 15 books in a variety of areas that I've

16 published -- or have been published.  Mostly in security work

17 pertaining to electronic devices.

18 Q    Have you taught any classes?

19 A    I have.  I've taught at the National Cybercrime Conference

20 that's held every year in Massachusetts.

21 Q    How about prior testimony?  Have you testified in other

22 cases?

23 A    Yes.  A number of times.  I think something on the order

24 of 12 or 13 times in this circuit.

25 Q    Meaning this district?

Francis J. Thornton, Jr. - Direct

1  A     This district, yes.

2  Q     Do you do just criminal work, civil work, both?

3  A     I do both.

4  Q     How about prosecution versus defense?

5  A     Mostly prosecution and occasionally defense.

6  Q     Do you have any upcoming defense testimony?

7  A     I do.  Next week.

8  Q     What's your relationship like with the United States

9  Attorney's Office, my office?

10 A     It's a -- I have a subcontract through Gary Kessler

11 Associates to provide digital forensic examinations to the U.S.

12 Attorney's Office.

13 Q     Is that pretty regular work?

14 A     Very regular work, yes.

15 Q     As part of that contract, what's the hourly rate for your

16 work?

17 A     It -- it's on a floating scale.  It varies, but it works

18 out to something on the order of 100 to $150 an hour.

19 Q     Does part of that also cover some software requirements?

20 A     Yes.

21         THE COURT:  What do you mean "covers software

22 requirements"?

23         MR. OPHARDT:  I can ask a follow-up, your Honor.

24 Q     What do you mean by the "yes" to software requirements?

25 What type of software?

Francis J. Thornton, Jr. - Direct

1  A    We are required under the contract to maintain a copy of

2  Cellebrite, which is a cellular extraction software, and that's

3  part of what's needed for dealing with the U.S. Attorney's

4  Office.

5  Q    So that's factored into the rate?

6  A    Yes.

7  Q    In your work in digital forensics, how often have you

8  examined cell phones yourself?

9  A    Hundreds into the thousands of times.

10  Q    How about additional work involving extractions other

11  folks have done from cellular devices?

12  A    Yes.  I do that.

13  Q    How many times?

14  A    Certainly, again, into the hundreds of times.

15  Q    Based on this experience, do you know what a -- an IMEI

16  number is?

17  A    Yes.

18  Q    What is it?

19  A    It is the International Machine -- or International Mobile

20  Equipment Identifier.

21  Q    Rather than just what the acronym stands for, what does it

22  mean in practicality?

23  A    In practicality it's essentially an electronic serial

24  number that's assigned to each individual device, such as a

25  cell phone.  It's typically used in cell phones, but you see it

Francis J. Thornton, Jr. - Direct

1 occasionally in other cellular-equipped devices, such as

2 tablets.

3 Q    How unique is it?

4 A    It's supposed to be unique to each individual device.

5 Q    Is it possible to spoof or fake an IMEI?

6 A    It does happen occasionally, yes.

7 Q    And "spoofing" simply means to pretend to be a different

8 IMEI than the device actually has?

9 A    Yes.

10 Q    An IMEI, it's different than a phone number?

11 A    Yes, it is.

12 Q    When someone changes a phone number on a cellular device,

13 does the IMEI number change?

14 A    It does not.

15 Q    So you mentioned Cellebrite just now, and you generally

16 stated what it is, but what's it used for?

17 A    Well, in detail what it does is it pulls information from

18 a cell phone and it puts it on to a computer so that you can

19 break it down and examine it.  It pulls out things like contact

20 lists, it pulls out the telephone numbers, it pulls out the

21 IMEI, it pulls out other numbers that are internal to the

22 machine.  It pulls out just about anything that's on a given

23 cellular device or computer/tablet that you're using it on and

24 pulls it into another format so it can be examined in detail.

25 Q    Does the use of Cellebrite in extracting data from a

Francis J. Thornton, Jr. - Direct

1  cellular device, does it change the data at all?

2  A    It does not.

3  Q    Can you print a Cellebrite report?

4  A    Yes, you can.

5  Q    How big would it be?

6  A    It ranges from several thousand pages up to -- I've seen

7  it go as high as close to 100,000 pages per device.

8  Q    How long has Cellebrite been used?

9  A    It has been on the market for at least 25 years that I'm

10  aware.

11  Q    What was its original purpose?

12  A    Originally it started off being used in retail stores when

13  you couldn't directly transfer information from phone to phone

14  when you buy a new one, and Cellebrite came up with a way -- it

15  was actually a little electronic box, and it was used to

16  transfer things like your contact list from your old phone to

17  your new phone.

18  Q    Its use has changed over the years?

19  A    Yes.  As far as I know, it's entirely forensic oriented at

20  this time.

21  Q    How widely accepted is it in the use by the digital

22  forensics community?

23  A    It's very widely accepted.  It's pretty much the gold

24  standard for this.

25  Q    You mentioned earlier that a Cellebrite extraction pulls

Francis J. Thornton, Jr. - Direct

1  off a lot of different data.  What types of data -- that a user

2  would see on a cell phone typically in using it, what types of

3  data is it pulling off of that content?

4  A    It will pull off things like the contact list, it will

5  pull off photographs, it will pull off information that's

6  internal to an app, and it then puts it in and breaks it down

7  and says this is the contact list, this is the chats, this is

8  the photographs, and it lays it out in a logical order so you

9  can -- someone like me can then go in there and determine

10 what's going on with the phone and how it's being used.

11 Q    How automated is the Cellebrite extraction process?

12 A    It is semiautomated in that you have to know a little bit

13 about how cell phones work, you have to know different cabling.

14 Sometimes you have to get very down into the nitty-gritty of

15 the phone and actually go down to the chip level to extract

16 data.  Other times it just -- it's just plug it in and it runs.

17 Q    Is it common for -- is it common for detectives in law

18 enforcement to use Cellebrite to just extract a phone

19 themselves?

20 A    It's becoming more and more common, yes.

21 Q    Now, looking at the data, it may take some expertise to

22 parse it out and understand it; is that fair to say?

23 A    Yes.

24 Q    In particular, I want to talk with you about -- well,

25 before I do that, how about -- we talked about the content that

Francis J. Thornton, Jr. - Direct

1 the user might see on the phone.  What about deleted content?

2 Is it possible to have that extracted via Cellebrite?

3 A    Yes.  Sometimes deleted data is left behind.  In fact,

4 most often when it is merely removed from the user's view, it's

5 still internal to the phone or the device, and then it is

6 marked for extraction -- or for deletion later.  And during

7 essentially what is housekeeping duties by the phone internally

8 in the operating system, it will go out and clear out those

9 things that are marked for deletion.  But until that

10 housekeeping function occurs, the data still stays there.  It's

11 just not visible to the user.

12 Q    How long can that type of data stay on a phone?

13 A    Depends a lot on the application.  It depends on the phone

14 itself, the operating system.  So it can -- it can be months.

15 It can be literally years.

16 Q    I want to talk with you a little bit about the additional

17 data that needs some interpretation from someone with your

18 background.  What is metadata?

19 A    Metadata is data about data.  It is information that is

20 typically contained somewhere in the file or within the

21 operating system about a given file.  Very common, for

22 instance, is metadata within photographs.  They will typically

23 have information that says this was taken on this device, it

24 had this camera setting, it had the time and the date, and all

25 that is embedded within the file, and then someone like myself

Francis J. Thornton, Jr. - Direct

1  can go back and look at it and verify that in fact all of that

2  is true.

3  Q    Can Cellebrite obtain metadata from a cellular device?

4  A    Yes.

5  Q    Can metadata be altered or removed from a particular file?

6  A    I'm sorry?

7  Q    Can metadata be altered or removed from a particular file?

8  A    Oh, yes, it can.  Occasionally it happens if -- it depends

9  on how it is happening.  For instance, if a photograph is

10 edited in something like Photoshop or another photo

11 application, it will actually append some of the metadata so

12 that you know the original -- when the original was taken, when

13 it was modified.

14 Q    I want to talk with you briefly about folder structure.

15 What does "folder structure" mean in a forensic term?

16 A    When computers first started off, they were just basically

17 full of files, and the organization got to be a little bit

18 unwieldy, so back in the early '80s they really started

19 focusing on organization within operating systems, and files

20 are now placed within folders so that you can figure out where

21 things are staying.

22     It's analogous to an accordion folder.  You put files

23 inside, and then you know that folder's got this information,

24 the next folder's got the next information, and you can go

25 through and find which file -- or which folder has which

Francis J. Thornton, Jr. - Direct

1 information and then dig down into the file itself.

2 Q    Are there any particular folders that are important for

3 photographs and videos?

4 A    Typically in cell phones they're organized into what is

5 known as the DCIM folder, and that's where photos that are

6 taken on a particular phone are stored within the phone.

7 Q    As opposed to photographs that someone may have received

8 from someone else?

9 A    Yes.  Typically if those come in on something else, such

10 as an app, they're stored within folders with the app.

11 Q    What about smartphones that have Internet browsers?  What

12 does Cellebrite help you parse as far as data related to

13 Internet browsing?

14 A    It does.  It will retain information such as the site it's

15 gone to; it will retain things like some of the content of the

16 pages.  Depends on how it's held.  Some things like photographs

17 also.

18 Q    You just mentioned photographs.  Why is it that a phone

19 might contain photographs from various websites?

20 A    Well, typically websites contain a lot of photographs, and

21 when you go to a website, essentially you're downloading at

22 least that page on to your phone, and -- or your device, and if

23 it includes photographs, those will be downloaded and contained

24 within the phone at that time.

25 Q    Is there a particular name for where they're stored?

Francis J. Thornton, Jr. - Direct

1  A     It's usually stored in what's known as a cache.  It's a

2  short-term storage area.

3  Q     I want to talk with you a little bit about messaging data.

4  When you look at data about messaging, what type of information

5  can you see?

6  A     Typically you will see information such as the users that

7  are involved in the messaging; you will see the date and time

8  that the messages are going back and forth; you will see

9  attachments if they're there, such as photographs.

10 Q     How about the date and time of messaging?  Is that on the

11 data?

12 A     Yes.  The date and time stamp is usually appended to each

13 message as it comes in or goes out.

14 Q     Related to time, what is UTC?

15 A     UTC is the universal time constant.  It's based on

16 Greenwich Mean Time.  It's a universal standard that never

17 changes, essentially.

18 Q     What types of organizations use UTC?

19 A     Well, cellular companies use it extensively on the phones.

20 But it's used in a lot of different things.  Military typically

21 uses it just so they always have the same time being noted in

22 reports and so forth.

23 Q     What's the adjustment between UTC and time here in

24 Vermont?

25 A     Vermont is in the Eastern Standard zone, so it is either

Francis J. Thornton, Jr. - Direct

1  four hours or five hours depending upon whether we're using

2  Daylight Savings at any given time.

3  Q    So when the time changes in early November, the UTC

4  variation changes as well?

5  A    Well, the UTC stays the same.  The localized version

6  will -- will either go from four to five hours depending upon

7  which way we're going.

8  Q    So what were you asked to do in this case?

9  A    In this case I was given an extraction on an Android

10 phone.  I was asked to look at it and determine what I could

11 pertaining to the information I usually look at, things like

12 contact lists, chats, photographs.

13 Q    In addition to the extraction from the Android phone, were

14 you provided any additional information?

15 A    I was given some photographs and a file from another

16 phone.

17 Q    Those photographs, what generally did they depict?

18 A    They depicted the phone as it had been received in as

19 evidence.

20 Q    So your understanding was it was the phone relating to the

21 extraction?

22 A    Yes.

23 Q    Previously entered into evidence as 31A.

24        COURTROOM DEPUTY:  It should switch over.  Try hit- --

25 there you go.

Francis J. Thornton, Jr. - Direct

1        MR. OPHARDT:  There we go.

2   Q    Do you recognize this photograph?

3   A    Yes.

4   Q    Is it one of the ones you were provided?

5   A    Yes, it was.

6   Q    There's a long number that's listed here towards the top.

7   What's that number?

8   A    That is the IMEI.

9   Q    And where is it located on the phone?  What's this aspect

10  of the phone right here?

11  A    What you're actually looking at and you're seeing is the

12  SIM tray.  It's the tray that holds the SIM card within the

13  phone.

14  Q    What's a SIM card?

15  A    The SIM card is the device -- it's an electronic little

16  microcard that internally holds information that talks to the

17  system, the cellular system.  So it tells the system what the

18  phone is, what the number is, and so forth.  So the SIM card is

19  then placed on this tray, and that tray is inserted into the

20  phone.

21  Q    This is Bates 1121 of the same exhibit.  Do you recognize

22  this photograph?

23  A    Yes, I do.

24  Q    This small white rectangle that appears taped to the

25  device, what's that?

Francis J. Thornton, Jr. - Direct

1  A    That's the SIM card.

2  Q    And what type of phone is this?

3  A    It's a Motorola phone.

4  Q    There's also a kind of bar code, QR code, here.  What

5  agency's code is that?

6  A    It's the Bureau of ATF.

7  Q    Alcohol, Tobacco, and Firearms?

8  A    Yes.

9  Q    When you received these photographs, did you compare any

10 of the information on them to the extraction you were provided?

11 A    Yes, I did.

12 Q    And what from the photographs led you to believe that the

13 extraction was from the same device?

14 A    The IMEI and the fact that it was a Motorola phone were

15 both included in the extraction information, and it all

16 matched.

17 Q    What about who had done the extraction?  Was that

18 information on the extraction itself?

19 A    Yes, it was.

20 Q    And how did that relate to the photographs of the

21 evidence?

22 A    It was done by a special agent of the ATF.

23 Q    Based upon the extraction?

24 A    Yes.

25 Q    Of those indicators that you had the same phone, which was

Francis J. Thornton, Jr. - Direct

1  the most important in your assessment?

2  A    The fact that the IMEI matches, I essentially know that it

3  has been -- it's the same phone that I'm looking at in the

4  photographs and the information is from that phone.

5  Q    As part of the extraction, were you able to determine the

6  cellular phone numbers that were used?

7  A    Yes.

8  Q    And how is it that those phone numbers are associated with

9  that particular device?  How do they come to be associated with

10  that particular device?

11  A    When a SIM card is inserted into a phone, the phone

12  records that internally and says that this number is now

13  associated with this device.  It's done as part of the way the

14  system works.

15  Q    From your review of the extraction, what did you determine

16  as far as how many cellular numbers had been associated with

17  the device?

18  A    There had been two.

19  Q    Based on your review, were you able to ascertain whether

20  there was one used more often than the other?

21  A    Yes.

22        MR. OPHARDT:  If I could have a second, your Honor.  I

23  apologize.

24        THE COURT:  You may.

25        MR. OPHARDT:  There we go.  If I looked at my notes, I

Francis J. Thornton, Jr. - Direct

1  would have known what I was looking for.

2  Q    Putting up Exhibit 10, Bates 99.100, which is in evidence.

3  Mr. Thornton, here at the "Daytime Phone Number" area field of

4  this paperwork, do you see that phone number?

5  A    Yes.

6  Q    Was that one of the phone numbers listed on the device?

7  A    Yes, it was.

8  Q    Was that the one used by the device more often or less

9  often?

10  A    Less often.

11  Q    How is it that someone might be able to switch back and

12  forth between phone numbers?

13  A    As long as the SIM card has been accepted by the system --

14  and usually that has to be done via some service with the

15  system.  You have to call the service department or support.

16  As long as the SIM card has been associated with the system, it

17  can be swapped back and forth, typically.

18        THE COURT:  So let's have a little bit more

19  explanation about that.  Are you swapping SIM cards?  How do

20  you have two telephone numbers for one device?  Can they be on

21  the phone at the same time?

22        THE WITNESS:  Yes, your Honor.  Some can be on the

23  phone at the same time.  In this type of situation, though,

24  you've only got one SIM card that's available, so the given

25  card that is in the phone is the one that's being used at that

Francis J. Thornton, Jr. - Direct

1  time.  You can't switch back and forth between numbers with a

2  single card in there.  Some cards -- some phones will take two

3  cards.

4          THE COURT:  All right.  So this has one card.  And

5  then how do you get to two phone numbers?

6          THE WITNESS:  When you switch out to the other

7  phone -- or the other SIM, it will have the other phone number,

8  and that's being used at that time.

9  Q    Mr. Thornton, I'm going to put back up on the screen 31A.

10 This piece that's sticking out from the phone, is that always

11 sticking out from the phone?

12 A    No, it's not.

13 Q    What is the purpose of that piece ejecting from the side

14 of the phone?

15 A    That is what locks the SIM card into the phone.

16 Q    And on 1121, you testified previously that's the SIM card;

17 is that right?

18 A    That's correct.

19 Q    So what would an individual do with that card in order to

20 be able to use the phone?

21 A    You would have to physically take that and put it into

22 that tray where the IMEI number is and lock it into the phone.

23 Q    How challenging is it to swap SIM cards?

24 A    You can do it with a paper clip.  It's -- as long as --

25 you have to have gotten it approved somehow on the system, call

Francis J. Thornton, Jr. - Direct

1  customer service, say "I'm switching SIMs," and then you swap

2  the SIM and you've got a new phone number.

3  Q    How easy is it for someone to purchase a SIM for use on a

4  new cellular network?

5  A    Relatively easy.  You can typically buy them from

6  supermarkets on the order of $10.

7  Q    If I wanted to change providers from Verizon to AT&T but I

8  didn't want to buy a new phone, would that be one reason why I

9  would swap out SIM cards?

10  A    It's typically the reason that type of thing is done, yes.

11  Q    Based on your review of the phone and its contents, did

12  you, without saying what your conclusion was, reach a

13  conclusion as to who was the primary user of the phone?

14  A    Yes.

15  Q    Did you also determine the approximate timeline of usage,

16  meaning when the majority of the usage of the phone occurred?

17  A    Yes.

18  Q    What was that period of use?

19  A    It would have been fall of 2021.

20  Q    How do you define the beginning of fall?

21  A    September through to December.

22  Q    Thank you.  What -- you said you have a conclusion as to

23  who the phone belonged to.  What was it that provided you the

24  information to reach that conclusion?  What types of

25  information from the extraction?

Francis J. Thornton, Jr. - Direct

1  A    Well, there's -- things like the owner's name can be

2  included in there.  There was also some other photographs and

3  so forth that helped me make that conclusion.

4  Q    What about those photographs -- without talking in

5  particular about the contents, what about those photographs

6  were helpful to your analysis?

7  A    The information contained within the photographs matched

8  the information I was seeing on the phone.

9  Q    Okay.  So some of those photographs, do they contain

10  identification documents?

11  A    Yes.

12  Q    What types of identification documents?

13  A    Driver's license.

14  Q    Any of those other photographs depict the same person who

15  was on that driver's license?

16  A    Yes.

17  Q    Did you also review messaging to see if it was

18  consistent -- if names used was consistent with that

19  identification document?

20  A    Yes.

21  Q    So these are the types of things that led you to your

22  conclusion?

23  A    Yes.

24  Q    What was your conclusion as to who the operator of the

25  phone was?

Francis J. Thornton, Jr. - Direct

1  A    It was Lawrence Jackson based on that.

2  Q    If you could look in your exhibit binder.  I think it's in

3  the smaller one.  Exhibit 30, please.  If you could look

4  through Exhibit 30, just thumb through the pages and confirm

5  for me you recognize each of them.

6  A    Yes, I do.

7  Q    And where did you locate the photographs depicted in

8  Government's Exhibit 30?

9  A    These were all contained within the phone.

10 Q    Are some of the photographs the ones you're referring to

11 as far as how you came to a conclusion of who the operator of

12 the phone appeared to be?

13 A    Yes.

14 Q    In addition to the photographs, is there also information

15 associated with the photographs included in Exhibit 30?

16 A    Yes.

17 Q    And who authored -- who -- who summarized that

18 information?

19 A    I did.

20 Q    And where did it come from?

21 A    It came from within the phone.

22 Q    So you've simply put on the exhibit in a visible-friendly

23 way the information that was on -- located on the phone?

24 A    Yes.

25          MR. OPHARDT:  Your Honor, I move to admit Government's

Francis J. Thornton, Jr. - Direct

1  Exhibit 30 at this time.

2          THE COURT:  Any objection?

3          MR. JACKSON:  No, your Honor.

4          THE COURT:  30 is admitted.

5      (Government's Exhibit 30 was received in evidence.)

6          MR. OPHARDT:  Your Honor, request permission to

7  publish.

8          THE COURT:  You may.

9  Q   BY MR. OPHARDT:  This is Bates 1126.09 of Exhibit 30,

10 first page.  What's depicted in the photograph?

11 A   It's a driver's -- Vermont driver's license.

12 Q   And who appears to be the -- who's listed as the holder of

13 the license?

14 A   Lawrence Jackson.

15 Q   The information that you included at the bottom, let's

16 talk through what these fields mean.  What's the "Name" field,

17 and where does it come from?

18 A   The name is the file name, and it comes from -- internally

19 from the phone.

20 Q   How about the "Path"?

21 A   The path indicates the name and the folder that it was

22 contained in within the phone.

23 Q   This one includes --

24 A   Folders.

25 Q   Sorry.  We're talking over each other.  Apologize to the

Francis J. Thornton, Jr. - Direct

1  court reporter.

2      "DCIM" is listed on this folder.  We talked about that

3  earlier.  What does that indicate?

4  A    That is typically where photographs are taken on a phone

5  and are stored.  It's the folder area that they're stored in.

6  Q    And then ".trashed" with a longer string of digits and

7  characters, what does the ".trashed" indicate to you?

8  A    Usually it indicates that a photograph has been deleted or

9  is marked for deletion.

10  Q    "Date Taken."  Where does that data come from?

11  A    That's internally in the photograph itself.

12  Q    And meaning that's some metadata associated with the

13  photograph?

14  A    Yes, that would be metadata.

15  Q    And "Date Modified"?

16  A    Also metadata.  And that's also contained within the

17  phone.

18  Q    Here they match or at least appear to match; is that

19  accurate?

20  A    Yes.

21  Q    Do they always match?

22  A    Not always.  If -- if it has -- a photograph has been

23  modified through some other means, whether it's been sent on a

24  messaging app or it's been used through something like a

25  photograph program or app, it will have a different modified

Francis J. Thornton, Jr. - Direct

1  date.

2  Q    So the modified date is followed by a time and in

3  parentheses "UTC+0."  What does that indicate?

4  A    That it was the universal time constant.

5  Q    And what does that relate to?

6  A    Again, that would have been when the photograph was taken

7  and when it was taken in UTC time.

8  Q    Why does it say "+0"?

9  A    To indicate that it had been on the UTC time, that it's a

10  zero variant from that.

11  Q    "Camera Make."  What's that listed as?

12  A    It is listed as a Motorola.

13  Q    And where does that information come from?

14  A    That's also contained within the metadata of the phone --

15  or the file of the photograph.

16  Q    And "Camera Model."

17  A    It's "moto g play" and followed by the model number, which

18  is also metadata contained within the file.

19  Q    The camera make and the camera model, the cellular device

20  make and model, if you will, are they consistent with the cell

21  phone extraction that you reviewed?

22  A    Yes.

23  Q    What does that mean?

24  A    It means that it was taken on this particular phone.  It's

25  a Motorola phone.  It's a moto g model, and it was contained in

Francis J. Thornton, Jr. - Direct

1  the DCIM folder.

2  Q    So reading those three fields together, the "Path" with

3  "DCIM," the "Camera Make," and "Camera Model," is what supports

4  your conclusion it was taken with the phone from which the

5  extraction was created?

6  A    Correct.

7  Q    The next page, which is 1126.10, do you recognize this

8  photograph?

9  A    Yes, I do.

10  Q    From where?

11  A    This was also found on the phone.

12  Q    Looking down at the summary chart of the metadata that you

13  created, based on the path name and the camera make and model

14  name, what can you conclude about this photograph?

15  A    This photograph was taken on another phone.  It was sent

16  via a messaging app and sent as an attachment in the messaging

17  app.

18  Q    And that other phone was likely an Apple iPhone?

19  A    It was an Apple iPhone.  That metadata indicated that it

20  was taken on an Apple iPhone.

21  Q    For this photograph there's some location information

22  associated with the photograph.  Where did that come from?

23  A    On the particular Apple iPhone used, the GPS information

24  was turned on.  That was recorded also as part of the

25  information -- metadata in the photographic file and was

Francis J. Thornton, Jr. - Direct

1  recorded into that photograph.

2  Q    Next to the -- well, this location information is a string

3  of numbers and then in parentheses an address.  Where did this

4  string of numbers come from?

5  A    That's the latitude and longitude, the actual position on

6  Earth as determined by the geographic satellite system, the

7  GPS.

8  Q    And where did the address information come from?

9  A    The address information was something I looked up.  I

10  looked up that longitude and latitude, and I determined it came

11  back to the location of an address of 55 Killington Avenue.

12  Q    In what city and state?

13  A    Rutland, Vermont.

14  Q    Next is 1126.11 of the same exhibit.  Do you recognize

15  that photograph?

16  A    Yes, I do.

17  Q    Based on your review of the driver's license photographs

18  we were looking at, who do you believe is depicted in that

19  photograph?

20  A    It appears to be Mr. Jackson.

21        THE COURT:  So we're going to take a break.  Everybody

22  in the courtroom stand up and move.  I feel like you are dozing

23  off.  You should not be.

24    Mr. Ophardt, you may resume.

25        MR. OPHARDT:  Thank you, Judge.

Francis J. Thornton, Jr. - Direct

1  Q    Based on the metadata information, what do you -- what can

2  you conclude about this photograph as far as how it wound up on

3  the phone?

4  A    This was not taken on the phone.  It was sent somehow as a

5  Google app, and it was held in a cache.

6  Q    This is Bates 1126.12.  Do you recognize this photograph?

7  A    Yes, I do.

8  Q    From where?

9  A    This was also from the phone.

10  Q    Based on the metadata, where do you -- what can you

11  conclude about this photograph?

12  A    This also came through an app as an attachment.  Appears

13  to have been sent from -- through an Android app or Google app.

14  Q    This is Bates 1126.13.  Do you recognize this photograph?

15  A    Yes, I do.

16  Q    From where?

17  A    This was also on the phone.

18  Q    Based on the metadata, what can you conclude about how

19  this photograph was taken?

20  A    This was taken on the phone itself.  The date and time

21  were all put in with the other metadata also showing that it's

22  taken on that same make and model of phone.

23  Q    The discrepancy between the times, the date taken and the

24  date modified appear to be four hours off.  What causes that?

25  A    That would have been because of the difference between the

Francis J. Thornton, Jr. - Direct

1  UTC and the Daylight Savings.

2  Q    Is there a date and time depicted on the bottom of the

3  photograph itself?

4  A    Yes.

5  Q    Is it consistent with the metadata?

6  A    Yes, it is.

7  Q    And the date's October 6, 2021; is that correct?

8  A    Yes.  At 11:27 AM.

9  Q    Next is Bates 1126.14.  Do you recognize that photograph?

10 A    Yes.

11 Q    From where?

12 A    This was also on the phone.

13 Q    Based on the metadata, what can you conclude about how

14 this photograph wound up on the phone?

15 A    This came through a Google Android messaging app.

16 Q    What's the date modified?

17 A    It is 11/4/2021 at 5:31 PM.

18 Q    What, if anything, can you conclude from the date modified

19 in relation to when it was received via messaging?

20 A    It -- I can't really tell when it was received in the

21 messaging.  I can tell it was taken via -- via that -- or at

22 that time.

23 Q    So they don't correlate?  The modified date doesn't mean

24 that it was received on that date?

25 A    No, it does not.

Francis J. Thornton, Jr. - Direct

1 Q    This is Bates 1126.15.  Do you recognize that photograph?

2 A    Yes.

3 Q    From where?

4 A    This was also on the phone.

5 Q    And based on the metadata, what can you conclude?

6 A    That this was taken on an LG phone, it was taken on

7 11/17/2021 at -- it would have been 1:00 AM local time.  1:28

8 local time.

9 Q    Can you conclude anything about how it wound up on the

10 Motorola?

11 A    Yes.  It was sent through a messaging app again.

12 Q    This is Bates 1126.16.  Do you recognize that photograph?

13 A    Yes.

14 Q    From where?

15 A    Also on the phone.

16 Q    And based on the metadata, what can you conclude?

17 A    Nothing really other than it was taken on 11/21/2021 at

18 UTC 2045 hours.

19 Q    What can you conclude about whether or not it was taken

20 from -- by the Motorola phone itself?

21 A    I can't determine that, but it did come in through

22 messaging.

23 Q    This is Bates 1126.17.  Do you recognize that photograph?

24 A    Yes.

25 Q    From where?

Francis J. Thornton, Jr. - Direct

1  A     On the phone.

2  Q     And again, the metadata?

3  A     It indicates it came through a messaging app and it was

4  taken on 11/18/2021 at 1558 hours UTC.

5  Q     So the next three I'm going to do in sequence here.

6  1126.18, do you recognize that photograph?

7  A     Yes.

8  Q     1126.19, do you recognize that photograph?

9  A     Yes.

10 Q     And 1126.20, do you recognize that photograph?

11 A     Yes, I do.

12 Q     Where do you recognize those three photographs from?

13 A     These were also within the phone extraction.

14 Q     And how were -- what can you tell about the metadata from

15 those three about how they wound up on the phone?

16 A     They came through a messaging app also, and they were

17 taken at September 22nd, 2021, and they were taken just seconds

18 apart.

19 Q     Bates 1126.22, do you recognize what's depicted in this?

20 A     Yes.

21 Q     What is it?

22 A     This is a screenshot.

23 Q     What's the difference between a screenshot and a

24 photograph?

25 A     A screenshot is taken by manipulating a -- controls on a

Francis J. Thornton, Jr. - Direct

1  phone, typically the side buttons, but there may also be the

2  screen itself, and it takes a shot of -- essentially a

3  photograph of what is on the screen at that given time.

4  Q    What can you tell from the metadata?

5  A    I can tell that it was taken and it was marked as "Sent"

6  on 11/7/2021 at -- it was 22 minutes past midnight on UTC time.

7  Q    Does that "Sent" indication mean that it was sent from the

8  phone extraction -- excuse me.  Let me rephrase.

9       Does that "Sent" mean that it was taken from the phone

10  with which the extraction correlates, or could it be the

11  phone -- could it be another phone?

12  A    It would indicate it's from another phone.

13  Q    Next is Bates 1126.24.  Do you recognize that photograph?

14  A    Yes, I do.

15  Q    From where?

16  A    Also on the phone.

17  Q    Based on the metadata, what's your conclusion as to --

18  well, what can you tell from the metadata?

19  A    I can tell from the metadata this was actually from web

20  browsing to YouTube.  It was contained within the YouTube

21  cache, and it was taken on 11/15/2021 at 1838 UTC.

22  Q    In order for this to be on the phone, would the user have

23  to have taken a screenshot like we saw with the messaging?

24  A    No.  This would have been downloaded when the particular

25  YouTube web page was viewed.

Francis J. Thornton, Jr. - Direct

1  Q    YouTube's videos.  Why is this a still?

2  A    Typically what happens with YouTube is when you go to a

3  page and you get the list of videos to look at and even the

4  first initial video that's called up, you get a single picture,

5  and that's what you see.

6  Q    Why does the phone download that photo?

7  A    It's just a part of the browsing system.

8  Q    Would you call -- is it automatic, or does the user have

9  to do anything?

10  A    No.  That's automatic.

11  Q    What's the text on this photograph?  How does it read?

12  A    It reads, "Taurus Judge Full Review, The Judge Doesn't

13  Suck."

14  Q    Based on the contents of metadata and the photograph, what

15  would you conclude about the user on November 15th, 2021, and

16  what they were doing with the phone?

17  A    It would appear that they were using it to browse this

18  particular video or -- or at least had pulled this in to look

19  at the video on the phone.

20  Q    This is Bates 1126.25.  Do you recognize that photograph?

21  A    Yes.

22  Q    What is it?

23  A    Again, this is a YouTube video capture from the YouTube

24  web page.  It's contained within the cache, and it was taken

25  11/15/2021 at 1839 hours.

Francis J. Thornton, Jr. - Direct

1  Q    What's the text on that photograph?

2  A    It's for Taurus, and it's www.taurususa.com.

3  Q    What can you conclude from both the metadata and this

4  photograph?

5  A    Just that it was -- a video was being looked at again or

6  at least was called up to be looked at on the phone.

7  Q    This is Bates 1126.26.  Do you recognize that photograph?

8  A    Yes, I do.

9  Q    From where?

10 A    This was on the phone.

11 Q    And the metadata, what does that tell you about the

12 photograph?

13 A    Again, this was on -- in the cache area.  It was looked at

14 on YouTube and was taken 11/15/2021 at 1839 hours.

15 Q    This is Bates 1126.27.  Do you recognize that photograph?

16 A    Yes.

17 Q    From where?

18 A    From the phone.

19 Q    And again, what can you tell about the photograph from the

20 metadata?

21 A    Again, this was from a YouTube video.  It was brought in,

22 held in the cache.  It was taken on 11/15/2021 at 1838 hours.

23 Q    What can you conclude about what the user of the phone was

24 doing at the time listed there?

25 A    They were looking at perhaps viewing this video.  They

Francis J. Thornton, Jr. - Direct

1  called this video up.

2  Q    I show you what's been marked as 11- -- I'm sorry.  This

3  is same exhibit, Bates 1126.28.  Do you recognize that

4  photograph?

5  A    Yes.  Also from the phone.

6  Q    And what can you conclude about the metadata?

7  A    This was also from YouTube area cache.  It was on

8  9/22/2021 that it was taken, and it was 10:59 hours UTC.

9  Q    What can you conclude about what the user was doing with

10 the phone on that date?

11 A    Again, they had pulled up a video with -- with this

12 information on it.

13 Q    With this photograph as the likely first frame?

14 A    Yes.

15 Q    Bates 1126.29, do you recognize that photograph?

16 A    Yes, I do.

17 Q    From where?

18 A    This was also in the phone.

19 Q    And based on the metadata, what can you tell about where

20 this photograph originated?

21 A    This was sent via Facebook app or messaging system

22 somehow, and it was contained within the phone within the area

23 of the Facebook cache, and it was taken 11 -- I'm sorry,

24 10/3/2021 at 1816 hours UTC.

25 Q    Last three, Bates 1126.31, 1126.32, 1126.33, do you

Francis J. Thornton, Jr. - Direct

1  recognize those three photographs?

2  A    Yes.  They were also on the phone extraction.

3  Q    And based on the metadata, what can you conclude about

4  those photographs?

5  A    These were taken in rapid sequence, and they were taken on

6  11/7/2021 at 5:02 PM.  They were in the messaging app area

7  also.

8  Q    What -- what about the "Location" field?  What did that

9  information provide?

10 A    They were time stamped -- or, rather, GPS stamped for the

11 latitude and longitude that you see there, the 43.600346/

12 -72.981556, and that results to 100 South Street in Rutland,

13 Vermont.

14 Q    And you correlated the latitude/longitude coordinates with

15 the address, correct?

16 A    Yes.  I did that.

17 Q    If you could flip to 30A, please.  Do you recognize the

18 document that's at 30A?

19 A    Yes.

20 Q    How do you recognize it?

21 A    It was a photograph also contained within the phone

22 extraction.

23 Q    How about the data that is beneath the photograph?

24 A    That indicates that it was taken on that phone.

25 Q    Understood.  Who created that content there beneath the

Francis J. Thornton, Jr. - Direct

1  photograph?

2  A    Well, it was contained within the DCIM folder, so --

3  Q    I'm sorry.  We're not -- I apologize for interrupting.

4      Who created kind of that summary chart that's beneath the

5  photograph itself?

6  A    Oh, I took -- I did.

7  Q    Okay.  From what?

8  A    From the information contained within the phone

9  extraction.

10 Q    And based on the file path, I think you stated before I

11 cut you off, what could you conclude about how this photograph

12 came to be on the phone?

13 A    It was taken on the phone.

14      MR. OPHARDT:  Your Honor, I'd move to admit

15 Government's Exhibit 30A at this time.

16      THE COURT:  Any objection?

17      MR. JACKSON:  No objections, your Honor.

18      THE COURT:  30A is admitted.

19    (Government's Exhibit 30A was received in evidence.)

20      MR. OPHARDT:  May I publish, your Honor?

21      THE COURT:  You may.

22 Q    BY MR. OPHARDT:  What does the metadata tell us about when

23 the photograph was taken?

24 A    It was taken on 11/8/2021, and it was taken at 12:50 local

25 time, 12:50 PM.

Francis J. Thornton, Jr. - Direct

1              MR. OPHARDT:  I'm going to put up 31N, as in November,

2  which I believe, Madam Clerk, has been admitted.

3              THE COURT:  Yes.

4              MR. OPHARDT:  Thank you, your Honor.

5  Q    Prior to coming in today, did you review 31N?

6  A    Yes, I did.

7  Q    And the contents of 31N, as in November, where did --

8  where did the contents of this document -- this series of pages

9  come from?

10 A    This was part of the Cellebrite extraction from the chats

11 area within the phone.

12 Q    And who created this -- I'll withdraw that question.

13      When you made your comparison, were you looking to be sure

14 that the information in the document was consistent with the

15 extraction?

16 A    Yes.

17 Q    I want to talk a little bit about, from the Cellebrite

18 standpoint, the blue and green bubbles.  What do the blue

19 bubbles on the left indicate?

20 A    Usually they indicate that it was an incoming message from

21 someone.

22 Q    And how about the green?

23 A    The greens are typically going out to someone.

24 Q    Where does the -- the name in the blue bubble, where does

25 that come from?

Francis J. Thornton, Jr. - Direct

1  A    That is typically extracted from the contact list within

2  the phone.

3  Q    There is some small print underneath where it says "Source

4  Info."  What is that telling us?

5  A    It tells us that it was extracted from, again, the path of

6  the phone where all this was contained and what database it was

7  contained in.

8  Q    What can you ascertain -- what can you tell from that

9  source info?

10 A    That it came in from the Google messaging app.

11 Q    Would that be consistent with text messaging?

12 A    Yes.  And it's consistent with Motorola Android phones.

13 Q    What's this string of digits with some characters at the

14 end here at the bottom right of the blue bubble?

15 A    That's basically the time that the message came in.

16 Q    As well as the date?

17 A    Yes.

18 Q    What time zone is it in?

19 A    It's marked as being UTC+0.

20 Q    Is that Vermont?

21 A    No.  It's anywhere in the world.  It's the universal time,

22 again.

23 Q    So to get that into Vermont's kind of local time -

24 granted, this is early November - what would we need to do?

25 A    You'd either have to subtract four or five hours depending

Francis J. Thornton, Jr. - Direct

1  upon where you are in the calendar, whether it's gone past the

2  day change -- or time change.

3  Q    Thank you.  What can you conclude from the "Delivered" and

4  "Status" field, let's say on that message?

5  A    Exactly what it says.  The message was read by the user of

6  the phone at the time, and it was delivered at that time.

7  Q    Also in UTC?

8  A    Yes.

9  Q    There are some photographs at the end of 31 November.

10  This is Bates 1167.  Do you recognize that?

11  A    Yes, I do.

12  Q    Where did the photograph come from?

13  A    This was an attachment within the messaging chats.

14  Q    This is 1168.05 of the same exhibit.  Would that be the

15  message it relates to?

16  A    Yes.

17  Q    Where did the information at the bottom beneath the

18  photograph come from?

19  A    This was metadata contained within the messaging app.

20  Q    And who placed it there?

21  A    I did.

22  Q    Next I'll be referring to what's in evidence as 31F.  Do

23  you recognize that document?

24  A    Yes.

25  Q    From where?

Francis J. Thornton, Jr. - Direct

1  A    This was an extraction based on Facebook Messenger that

2  was done through Cellebrite from the extraction.

3  Q    And this is -- at the top it says "Extraction Report -

4  Google Android Generic."  Did I read that accurately?

5  A    Yes.

6  Q    When it says "Extraction Report," is it referring to the

7  full report?

8  A    I think that's placed on there automatically by the --

9  it's just a generic report header that gets put on.

10 Q    And when this was created, how would it have been created?

11 A    Within the program or app of Cellebrite, you can tell it

12 to create reports based on the information you're looking at.

13 You can filter it down and say, "I just want a given set of

14 participants within the chat."  You can even narrow it down to

15 certain dates and times if you want and then say, "Okay.  Give

16 me that report and put it out as a PDF" or any number of

17 different formats.

18 Q    So using the whole data set, you instruct the software to

19 create a particular report with only information that you're

20 interested in having it extract?

21 A    Correct.

22 Q    Based on your review of this data, where was it located in

23 the phone?

24 A    This would have been in the Facebook area.  It would have

25 been part of the Facebook app.

Francis J. Thornton, Jr. - Direct

1  Q    And there are two participants listed; is that correct?

2  A    That's correct.

3  Q    When we were talking about the messaging on 31 November,

4  you stated that that name came from the contact list on the

5  phone, correct?

6  A    Correct.

7  Q    Where did these names come from?

8  A    This would have come through the Facebook app itself.

9  Your username on Facebook can be different from the username on

10  the phone, for instance.

11  Q    This string of digits, what does that correlate to?

12  A    Those are Facebook ID numbers that are internal to the

13  Facebook application.

14  Q    As part of your work on this case, were you asked to

15  create and review a number of similar reports related to

16  messaging from the phone?

17  A    Yes, I did.

18  Q    If you could look in the larger binder there, and we'll

19  start with 31C, as in Charlie.  There's a 31C, as in Charlie,

20  and 31C-1, substantially -- excuse me.  The 31 Charlie is

21  substantially thicker than the 31 Charlie-1.

22  A    Yes.

23  Q    31C is a -- is what?

24  A    This is an extraction from a chat, instant message, that I

25  pulled from the extraction on the phone.

Francis J. Thornton, Jr. - Direct

1  Q    And the report relates to one particular person who was

2  communicating with the phone?

3  A    Yes.

4  Q    And I should rephrase that.  One particular phone number

5  that was communicating into the phone that was extracted?

6  A    Correct.

7  Q    We don't know how many people were on the other side using

8  the phone?

9  A    Correct.

10 Q    Okay.  31C-1, what is that?

11 A    That is a small subset of the larger report.

12 Q    Have you verified that what's in 31C-1 is also in 31C?

13 A    Yes, I have.

14 Q    Let's move on to 31D, 31D-1.  Do you have both of them up

15 there?

16 A    Yes.

17 Q    Again, 31D, what is that?

18 A    Again, this is an instant messaging report, summary, of a

19 conversation that was taking place on the phone that I

20 extracted the report from the extraction of the phone.

21 Q    And 31D-1?

22 A    And that is a subset of that 31 conversation.

23 Q    When you reviewed 31D-1, did you confirm that it is an

24 accurate subset of 31D?

25 A    I did.

Francis J. Thornton, Jr. - Direct

1  Q    31F is in evidence.

2       31G and 31G-1, do you have them up there with you?

3  A    Yes.

4  Q    31G, what is that?

5  A    This was a Facebook Messenger app extraction from the

6  extraction of the phone.

7  Q    And 31G-1, what is that?

8  A    Again, a subset of the earlier conversation.

9  Q    When you were doing the review of 31G-1, were you able to

10 verify that the contents were consistent with 31G?

11 A    I was.

12 Q    Moving on to 31H.  This is just a single one.  There's no

13 dash 1.  Where -- do you recognize this document?

14 A    Yes, I do.

15 Q    From where?

16 A    This is another chat extraction within the messaging

17 system on the phone extraction.

18 Q    Based on your review, was this Facebook or another manner

19 of communicating?

20 A    This is marked as "Native Messages," which is -- indicates

21 that it was taken as part of the built-in messaging system

22 within the Android phone.

23 Q    Now, from your review of it, is it accurate with the data

24 that was in the extraction?

25 A    Yes.

Francis J. Thornton, Jr. - Direct

1  Q    31I and 31I-1.  What's 31I?

2  A    This is, again, extraction of a report from the larger

3  extraction of the phone.  And this is, again, in native

4  messaging.

5  Q    And where was the -- where was the data to create this

6  exhibit?

7  A    This would have been in the messaging system of the phone.

8  Q    And 31I-1?

9  A    It's a subset, again.

10 Q    When you reviewed this subset, was it consistent with 31I?

11 A    Yes, it was.

12 Q    Next 31J and 31J-1.

13 A    Again, this is a subset and -- well, original extraction

14 report from the extraction of the phone and the subset that I

15 verified.

16 Q    When you reviewed 31J-1, was it consistent with the

17 contents of 31J?

18 A    Yes, it was.

19 Q    31K and 31K-1, if you could look at those as well.

20 A    Yes.

21 Q    31K, do you recognize that document?

22 A    Yes.

23 Q    From where?

24 A    This is a report I extracted from the phone extraction,

25 and it's in -- again, in the native messaging app, the chats

Francis J. Thornton, Jr. - Direct

1  area.

2  Q    And 31K-1?

3  A    And that's, again, a subset of 31K.

4  Q    When you reviewed 31K-1, was it accurate with the data

5  that was on 31K?

6  A    Yes, it was.

7  Q    Next stop is 31L.  What's 31L?

8  A    This is a report from the extraction from Facebook

9  Messenger.

10  Q    And 31L-1?

11  A    Again, a subset taken from 31L.

12  Q    Based on your review of 31L, is it consistent with the

13  contents and the extraction in 31 -- let me rephrase.

14       Based on your review of 31L-1, is it consistent with the

15  extraction in 31L?

16  A    Yes.

17  Q    Finally, 31M.  Do you have that up there with you?

18  A    Yes.

19  Q    Do you recognize it?

20  A    Yes.

21  Q    What is it?

22  A    This is a report generated for some native messages that,

23  again, were in the chats area.

24  Q    Of what?

25  A    Of the phone, the extracted phone.

Francis J. Thornton, Jr. - Direct

1  Q    And 31M-1, what is that?

2  A    That is another subset from 31M.

3  Q    And when you reviewed 31M-1, did you confirm that they are

4  accurate with the extraction at 31M?

5  A    Yes.

6  Q    Okay.  Thank you for your patience as we went through

7  that.  I want to talk with you now about the other file that

8  you -- well, let me back up for a second.

9      Were there any video files that you identified on the cell

10  extraction that you were provided?

11  A    Yes.  I was provided a -- another video file.

12  Q    Was one of those video files located within the DCIM

13  folder?

14  A    Yes.

15  Q    Based on your review of that -- well, put a pin in that.

16  We'll come back to it.

17      Were you also provided a separate file not from a -- not

18  from this extraction?

19  A    Yes.

20  Q    And when you were provided that file, where were you told

21  it originated from?

22  A    I was told it had come from another phone.

23  Q    Your review of that phone -- that video, what did it

24  appear to have been recorded with?

25  A    It appeared to have been recorded through an app on a

Francis J. Thornton, Jr. - Direct

1  phone.

2  Q    What type of app?

3  A    I believe it's called Kasa.

4  Q    What's Kasa?

5  A    Kasa is similar to Ring.  It's both a hardware and

6  software solution.  You buy hardware cameras and you can put it

7  up -- put them up where you want, and then any videos you want

8  can be saved to your phone and you can view them on the phone

9  or other device.

10  Q    When you were provided this video, did you watch it?

11  A    Yes, I did.

12  Q    What generally did it depict?

13  A    It depicted an exterior stairway with an entrance to what

14  appeared to be an apartment at the top left of the stairway,

15  and there were several people that were seen going in and out

16  on the video.

17  Q    Anyone depicted on the video wear distinctive clothing at

18  all?

19  A    Yes.

20  Q    What in particular caught your attention?

21  A    There was a white hoodie, and it had large lettering

22  written across the back.

23  Q    What did it say?

24  A    I'm drawing a blank at the moment on it.

25  Q    Okay.  When you were provided this video, did you look at

Francis J. Thornton, Jr. - Direct

1  the metadata associated with that video?

2  A    Yes, I did.

3  Q    And what did the metadata indicate to you?

4  A    That it had been taken on another phone.

5  Q    Okay.  Anything about the day and time?

6  A    It was date and time stamped also, yes.

7  Q    Do you recall it?

8  A    No, I do not.

9  Q    Anything that would refresh your recollection?

10 A    If I could review my report.

11       THE COURT:  Let's make sure we show it to Mr. Jackson.

12       MR. OPHARDT:  Yes, your Honor.  I'm trying to mark it

13 first.  Thank you.

14       MS. CATE:  68.

15       MR. OPHARDT:  Ms. Ruddy, can you pass this up.

16       COURTROOM DEPUTY:  Oh, sorry.

17       THE COURT:  It's marked?

18       COURTROOM DEPUTY:  68.

19       MR. OPHARDT:  Exhibit 68, your Honor.

20       COURTROOM DEPUTY:  And do you need this right back

21 after?

22       MR. OPHARDT:  He's going to refresh his recollection,

23 and I don't need it back, your Honor.  He can just put it face

24 down.

25 Q    Sir, let me know when you've refreshed your recollection.

Francis J. Thornton, Jr. - Direct

1       Is your recollection refreshed?

2   A    Yes.

3   Q    What was the metadata on that?

4   A    The metadata -- let me go back.  I was looking at the date

5   and time.  Sorry.

6   Q    The date and time --

7   A    Oh, the date and time was 11/2/2021, and it was taken at

8   around 9:00 in the evening local time.

9   Q    Okay.  I want to be sure we're talking about the same

10  video.  Just give me a second.

11  A    Sure.

12  Q    Mr. Thornton, we're talking about the video from the other

13  phone?

14  A    Yes.

15  Q    And I'm sorry.  What did you say the date was of that

16  video?

17  A    Local time -- because of the time difference, local time

18  was 11/2/2021, and it was in, I believe, 9:00 something in the

19  evening.

20  Q    Okay.  If you could check your report again, on page 5,

21  the middle of the page.

22  A    11 -- 11/2/2021 and 9:53 PM.

23       MR. OPHARDT:  Ms. Ruddy, may I have that document

24  back, please.

25       COURTROOM DEPUTY:  Um-hum.

Francis J. Thornton, Jr. - Direct

1          MR. OPHARDT:  Thank you.

2    Q    I apologize.  I'm looking at the wrong version.  It's on

3    page 6 where you set out the information about the other phone.

4    I think you were reading about a video on the extraction.

5    A    Oh, I'm sorry.

6    Q    So I just --

7    A    My mistake.

8    Q    -- want to be sure that we're being accurate.  If you can

9    just refresh your recollection by -- take your time.  Look at

10   the report and make sure you're looking at the right metadata,

11   because there's a lot in there.

12        Is your recollection refreshed?

13   A    Yes.

14   Q    When you were providing the day and time earlier, was that

15   for a different video?

16   A    That was for a different video, yes.  Sorry.

17   Q    Okay.  Glad we cleared that up.

18        What's the metadata for the video that came from the other

19   phone that was taken from that stairwell, the security camera?

20   A    That was for 10/13/2021, and it was at 1705 hours, 5:00 PM

21   in the evening.

22   Q    Thank you.  We have another multi-media exhibit.

23          MR. OPHARDT:  Ms. Ruddy, I apologize.  I need you to

24   run something up.  No, just bring it up to Mr. Thornton.  We're

25   not going to publish.

Francis J. Thornton, Jr. - Direct

1  Q    This is Government's Exhibit 31E.  There's a disc in

2  there.  Mr. Thornton, do you recognize 31E?

3  A    Yes, I do.

4  Q    How do you recognize it?

5  A    It is a DVD or compact disc that contains a video file

6  that I reviewed.

7  Q    And when you reviewed it, did you confirm that it is a

8  video file from the extraction of the phone we were talking

9  about where all the text messaging and the other photographs

10 were located?

11 A    Yes.

12 Q    So we're back to that -- I'll call it the primary phone,

13 the Motorola phone?

14 A    Yes.

15 Q    Okay.  Was this the video -- well, based on the metadata

16 for this video, are you able to determine whether it was taken

17 from that Motorola phone extraction or a different phone?

18 A    It was taken from that Motorola.

19 Q    Thank you.  You can just leave that up there.

20     The last thing that I would like to talk with you about is

21 Government's Exhibit 31B, so we're back in the big, thick

22 binder.  If you could flip to B.

23     31B, what is this?

24 A    This is a report extraction from the phone extraction, the

25 primary Motorola phone, and it has a web history on it.

Francis J. Thornton, Jr. - Direct

1  Q    How is this created?

2  A    This is also created through the Cellebrite software.  It

3  pulls down information specific to the web history area and

4  generates a report.

5  Q    And 31B, B, as in bravo, what data set was this created

6  from?

7  A    I'm not sure what you're --

8  Q    I apologize.  What -- what phone -- Cellebrite phone

9  extraction was this created from?

10 A    This was created from the primary phone.

11 Q    Okay.  So that Motorola phone?

12 A    The Motorola phone, yes.

13        MR. OPHARDT:  Your Honor, I'd move to admit

14 Government's Exhibit 31B at this time.

15        THE COURT:  Any objection?

16        MR. JACKSON:  Yes.  I would have to object to this,

17 your Honor, based on -- the web history only lists -- list five

18 web histories and nothing relating to -- I guess to the Taurus

19 Judge and YouTube videos.  I mean, if he's going to list all

20 the videos in the web history, it should have been listed, not

21 just items just been picked out.

22        THE COURT:  So it's permissible to pick something out

23 of the web history as some other videos may not be relevant, so

24 that's okay in terms of admissibility.  Do you have any other

25 objection to it?

Francis J. Thornton, Jr. - Direct

1          MR. JACKSON:  No, ma'am.

2          THE COURT:  All right.  31B is admitted.

3      (Government's Exhibit 31B was received in evidence.)

4          MR. OPHARDT:  Thank you, your Honor.  May I publish?

5          THE COURT:  You may.

6  Q    BY MR. OPHARDT:  Mr. Thornton, what do each of these

7  entries -- what does this data relate to?

8  A    Again, this is data related to the web history from the

9  Motorola phone extraction.

10 Q    Is this all of the web history or only a particular

11 subset?

12 A    It's only a particular subset.

13 Q    If you could look at the first row, we'll talk through

14 each of the columns.  What's the first column?

15 A    The first column is the title of the web page that would

16 have been looked at.

17 Q    Let's go all the way to the left.  What's the first

18 column?

19 A    Oh, that's the number.  That's an index number for the

20 report.

21 Q    Okay.  So that's not from the phone; that's just something

22 that the Cellebrite software creates to organize the data?

23 A    Correct.

24 Q    So the next one, the "Title," where does that data come

25 from?

Francis J. Thornton, Jr. - Direct

1  A    That is pulled from the web page.

2  Q    And what does it list as the title?

3  A    "Raging Judge," registered copyright, "531 *[sic]* 45

4  Colt/554 *[sic]* 410 GA Casull Matte Stainless 6.50 inch."

5  Q    I'm not going to have you read the full URL, but what's

6  the root URL?

7  A    The root URL is from taurususa.com.

8  Q    Have you ever been to that website?

9  A    Yes, I have.

10 Q    What is it?

11 A    It's a firearms manufacturer.

12 Q    The "Last Visited" column, what does that information

13 provide?

14 A    Just exactly what it says.  The last time the phone was

15 used to visit the website in question.

16 Q    Under "Visits," it's blank.  What does that column

17 indicate?

18 A    It records the number of visits typically for a given

19 website.

20 Q    Do you have any idea why it's blank here?

21 A    It would be speculation.

22 Q    The next one with information in it is "Additional info."

23 There's kind of two headers there that have no information

24 after them.  Is that accurate?

25 A    Yes.

Francis J. Thornton, Jr. - Direct

1  Q    Then the last one is the "Source Info."  I'm sorry.  It's

2  not the last one.  I'll correct myself for that error.

3        Second to last one is the "Source Info."  What can you

4  learn from that "Source Info" column?

5  A    Again, this indicates that it was taken from the

6  extraction of the phone that I was provided and shows where the

7  data came from, what database.

8  Q    What about the "Source:  Chrome"?

9  A    Chrome indicates that the Chrome browser was the browser

10 that was being used at the time on the phone.

11 Q    Chrome is an Internet browser?

12 A    Chrome is an Internet browser.

13 Q    And in "Deleted," that column is blank for this one; is

14 that correct?

15 A    Yes.

16 Q    The others on the page in rows 2, 3, and then on the next

17 page, which is Bates 991.02, rows 4 and 5 have a red "Yes"

18 under the "Deleted" column.  What does that indicate?

19 A    That indicates that the data would have been marked for

20 deletion within the phone.

21 Q    Rows 2 -- excuse me.

22       Row 2, the URL listed, what does that relate to?

23 A    Again, taurususa.com.

24 Q    Row 3, what does that relate to?

25 A    Also, again, taurususa.com.

Francis J. Thornton, Jr. - Direct

1  Q    And we don't have "Last Visited" data.  Why would that be?

2  A    Typically these pieces that we can see on some of the --

3  that it's actually small pieces of information, and it just

4  doesn't record it for some of those.

5  Q    Does the small pieces of information relate to its deleted

6  status?

7  A    Not particularly.  It's things like the icons from the web

8  page or the -- something that was being looked at particularly

9  on that page, and it just doesn't particularly record those

10 things.  It's more looking typically at the number of times you

11 go to a given page rather than the times you pull down an icon.

12 Q    Rows 4 and rows 5, the URLs, do they also contain

13 information related to the taurususa.com website?

14 A    Yes, they do.

15       THE COURT:  Is this a logical breaking point for you,

16 Mr. Ophardt?

17       MR. OPHARDT:  Very much so, your Honor.

18       THE COURT:  All right.  We're going to have a break.

19 If you are having trouble staying awake, you would not be the

20 first juror in the universe to have that.  I am here to

21 facilitate that.  If you need more breaks, if you want to stand

22 up.  If it's really a problem, send me a note and I will

23 address it.  You need to be able to fully participate in the

24 trial.  No judgment.  No judgment from the judge.  But let me

25 know, because my goal is to make sure that you are able to

Francis J. Thornton, Jr. - Direct

1  fully engage in the process.

2      I'm going to excuse the jury.  Don't talk about the case.

3  Don't let anybody talk to you about the case.  We'll come back

4  in approximately 15 minutes.

5      The parties are to remain in the courtroom.

6      (Jury out at 2:20 PM.)

7          THE COURT:  I have just a couple issues for you.  So I

8  am hoping if somebody is really having a problem this will

9  flush it out.  It's hard to tell if somebody is sleeping or

10 not.  I'm concerned about Juror No. 6, Harley Crader, but he is

11 also looking down and he's moving his body afterwards, so I

12 will keep an eye on that situation and maybe we'll be taking

13 more breaks.  It hasn't been a significant problem.  Otherwise

14 I would have let you know sooner.

15     The other thing I wanted to tell you is both in the jury

16 verdict form and the jury instructions, I took out the phrase

17 that says "known and unknown to the grand jury."  The jurors

18 don't need to know what the grand jury found.  It's just

19 something that's going to seem like it's official, and unless

20 there's some objection, I don't want them speculating about the

21 grand jury process.

22     Anything that you have to bring to my attention?

23     Let me start with you, Mr. Jackson, this time.

24         MR. JACKSON:  No, Judge Reiss.

25         MR. OPHARDT:  No, your Honor.

Francis J. Thornton, Jr. - Direct

1          THE COURT:  And how much more do you have on direct?

2          MR. OPHARDT:  I just need to consult with Ms. Cate and

3   be sure we're done, but I think we're -- maybe I've got a

4   couple cleanup questions.  Otherwise we're done.

5          THE COURT:  Okay.  All right.  I will see you in 15.

6       (A recess was taken from 2:21-2:39 PM.)

7          THE COURT:  Anything to bring to my attention before

8   we bring back the jury?

9          MR. OPHARDT:  No, your Honor.

10         MR. JACKSON:  No, your Honor.

11         THE COURT:  Let's bring back the jury.  And I see Rick

12  in the window.  Could you tell him?  Yes.

13      (Jury in at 2:41 PM.)

14         THE COURT:  We are back on the record in United States

15  of America v. Jackson.  We have Mr. Thornton on the witness

16  stand.  He is still under oath, and we are in Mr. Ophardt's

17  direct examination.

18      And you may resume.

19         MR. OPHARDT:  Thank you, your Honor.

20  Q   BY MR. OPHARDT:  Mr. Thornton, just a couple questions to

21  clear up a little bit of the confusion with the two videos.

22  31E, the disc, where did that video come from?

23  A   That came from the blue Motorola g -- moto g, the primary

24  phone.

25  Q   And the extraction you received?

Francis J. Thornton, Jr. - Direct

1  A    The extraction from that, yes.

2  Q    The other video that was provided independently, where did

3  you understand that video to have come from?

4  A    I understood that to have come from a different phone.

5  Q    Do you know whose phone?

6  A    Shriner, Shiner.

7  Q    Schaner?

8  A    Schaner.

9  Q    Thank you.

10 A    Thank you.

11       MR. OPHARDT:  No further questions, your Honor.

12       THE COURT:  Any cross-examination?

13       MR. JACKSON:  No, your Honor.

14       THE COURT:  Thank you, sir.  You may step down.

15       THE WITNESS:  Thank you, your Honor.

16     (The witness was excused.)

17       THE COURT:  The Government may call its next witness.

18       MR. OPHARDT:  Your Honor, may we retrieve some of

19 the -- I think there's a disc up there and a report.

20       THE COURT:  Absolutely.

21       MR. OPHARDT:  Thank you, your Honor.

22     Your Honor, the United States calls HSI Special Agent

23 Joseph Dornbierer to the stand.

24       COURTROOM DEPUTY:  Please raise your right hand.

25 State your full name for the record.

Joseph Dornbierer - Direct

1          THE WITNESS:  Joseph Dornbierer.

2                    JOSEPH DORNBIERER,

3      having been first duly sworn by the courtroom deputy,

4              was examined and testified as follows:

5          THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7  BY MR. OPHARDT:

8  Q    Agent Dornbierer, I apologize.  Would you give me one

9  minute, please?

10  A    Sure.

11  Q    Agent Dornbierer, where are you employed?

12  A    I'm employed in the state of Vermont.

13  Q    By whom?

14  A    By Homeland Security Investigations.

15  Q    How long have you been with HSI?

16  A    Since 2016, Octoberish 2016.

17  Q    All here in Vermont?

18  A    No.

19  Q    Where else did you work for HSI?

20  A    I worked in New York City for the Special Agent in Charge

21  Office.

22  Q    During your work in New York City, did you work with any

23  state or local partners?

24  A    I did.

25  Q    Who in particular were you primarily working with?

Joseph Dornbierer - Direct

1  A    NYPD.

2  Q    That's the New York Police Department?

3  A    Correct.

4  Q    Prior to HSI, any law enforcement experience?

5  A    Yes.

6  Q    With whom?

7  A    U.S. Customs and Border Protection.

8  Q    As a Customs and Border Protections officer, what did you

9  do?  What was your primary function?

10  A    To facilitate trade and travel.

11  Q    Was there a particular location you would work?

12  A    My last duty location was in Highgate Springs, Vermont.

13  Q    Where -- what were you doing up there?

14  A    I was an enforcement officer.

15  Q    At the port of entry?

16  A    Correct.

17  Q    Do HSI agents work at ports of entry or elsewhere?

18  A    We work elsewhere.

19  Q    So when you became an HSI agent assigned here to Vermont,

20  where was your primary duty station?

21  A    I focused in Rutland, Vermont.

22  Q    And when were you first assigned to Rutland, Vermont?

23  A    I believe it was around October 2020.

24  Q    So October 2020 through -- we've been talking a lot about

25  November 2021.  Were you working in Rutland that whole time?

Joseph Dornbierer - Direct

1   A    No, I was not.

2   Q    Why not?

3   A    I was deployed with the U.S. military.

4   Q    When did you get back?

5   A    Roughly late November -- mid to late November.

6   Q    And in November --

7   A    Of 2021.  Sorry.

8   Q    Thank you for the correction.

9        In November of 2021, how many HSI special agents worked

10  primarily in Rutland?

11  A    Just one.

12  Q    Just you?

13  A    Just me.

14  Q    How many HSI task force officers were there in Rutland?

15  A    At that time?

16  Q    Yes.

17  A    Zero.

18  Q    Are there task force officers now?

19  A    Yes.

20  Q    What is the difference between a special agent and a task

21  force officer, or TFO?

22  A    So a special agent is employed by the federal government,

23  whereas a task force officer is still employed by their

24  respective state or local departments.

25  Q    A task force officer may have the ability to do certain

Joseph Dornbierer - Direct

1 federal law enforcement functions, though?

2 A    Correct.

3 Q    What was the purpose of you being assigned to Rutland,

4 Vermont, as an HSI agent?

5 A    So HSI did not have a federal presence in southern

6 Vermont, and we felt a need just given with the nature of

7 crimes down there to have a federal presence to provide

8 assistance to the local and state law enforcement authorities,

9 so I was sent down there.

10 Q    While working with state and local law enforcement

11 authorities, what was your goal as a federal agent?

12 A    Basically to assist them in any way to provide government

13 assistance with assets, intelligence.  A lot of times they

14 would take crimes that may not be accepted in the state court

15 or -- or they could have been accepted in state court but they

16 may meet a federal threshold, and I would come in and be

17 that -- that person to gather or investigate.

18 Q    As part of that work, were you assisting with the

19 execution of a search warrant on November 23rd of 2021?

20 A    Yes.

21 Q    Where was that search warrant executed?

22 A    55 Killington Avenue, Apartment 2.

23 Q    Was that a state or federal search warrant?

24 A    That was a state search warrant.

25 Q    And what was your role as part of the search warrant

Joseph Dornbierer - Direct

1  execution?

2  A    My first -- multiple roles, but first was entry team.

3  Q    After the residence had been secured, what role did you

4  take then?

5  A    I was part of the search team.

6  Q    What part of the residence were you searching primarily?

7  A    Primarily bedroom number 3.

8  Q    I'm going to put under the document camera Government's

9  Exhibit 5, which has been admitted.  Do you recognize this

10  schematic?

11  A    I do.

12  Q    Who made it?

13  A    I made it.

14  Q    Where is bedroom number 3 on that schematic?

15       And you circled the bedroom just beneath the bathroom?

16  A    That's correct.

17  Q    During the search of bedroom number 3, what do you recall

18  about locating the Judge firearm?

19  A    I remember it being -- when you come in, there's a

20  dresser.  It was to the right of the doorway.  It was located

21  in the dresser.

22  Q    When you located it in the dresser, anything you recall

23  kind of -- before you knew it was a potential firearm?

24  A    So we knew that there were weapons -- or potential weapons

25  inside the residence.  So there was an area of a dresser that

Joseph Dornbierer - Direct

1 didn't have a drawer.  It had, like, clothing.  Socks is

2 particularly what I remember.  I remember removing the socks

3 and I saw a bag.  I placed my hand on the bag and felt a solid

4 object that I thought perhaps could be a firearm.

5 Q    When you felt that solid object, what did you do?

6 A    I notified the evidence collection team.

7 Q    And who were those people?

8 A    So that would have been Commander Whitehead with the

9 Rutland City Police Department and Detective Sergeant Roy with

10 the Drug Task Force.

11 Q    This has been admitted as Exhibit 10, 99.067.  Do you

12 recognize this photograph?

13 A    I do.

14 Q    What's depicted?

15 A    A bag with a zipper.

16 Q    And where is it located?

17 A    That is located in the dresser.

18 Q    Is this what you were just describing having located?

19 A    Yes.

20 Q    Does this fairly and accurately depict what it appeared to

21 be shortly after you placed your hand on top of that bag?

22 A    Yes.

23 Q    This is Exhibit 10, Bates 99.068.  Do you recognize that

24 photograph?

25 A    I do.

Joseph Dornbierer - Direct

1  Q    What does it depict?

2  A    That depicts a firearm that's located in the bag.

3  Q    99.069.  Do you recognize that photograph as well?

4  A    I do.

5  Q    And what is it?

6  A    That is a revolver.  That's a Taurus Judge.

7  Q    And where was it located?

8  A    It was located inside that bag.

9  Q    In searching bedroom number 3, did you all locate any

10 paperwork?

11 A    Yes.

12 Q    And was some of that paperwork actually seized?

13 A    Yes, it was.

14 Q    When it was seized, what does that -- what does that mean?

15 What was done with it?

16 A    So it was -- the same with every other piece of evidence.

17 When we recognize that it's potential evidence, I notify the

18 evidence team, they document it, and then it's placed in a

19 seizure bag.

20 Q    If you would look at Government's Exhibit 9, please, in

21 the smaller binder, which I think is on your right.

22 A    My right.  I'm sorry.

23 Q    That's okay.  Do you recognize the documents in Exhibit 9?

24 A    I do.

25 Q    How do you recognize them?

Joseph Dornbierer - Direct

1  A    Those were documents that were seized in bedroom number 3.

2  Q    Are they the actual documents or photographs?

3  A    Those are photographs.

4  Q    Who took the photographs?

5  A    I did.

6  Q    When did you take them?

7  A    I took them when I was at the Rutland City Police

8  Department in their evidence room.

9  Q    About how long ago?

10  A    Fairly recently.

11  Q    Was that when there was a review of evidence being done?

12  A    Correct.

13  Q    Do they fairly and accurately depict the documents that

14  you saw during that evidence review earlier this year?

15  A    Yes.

16  Q    Do they fairly and accurately depict the documents you

17  recall being seized back in November 23rd of 2021?

18  A    Yes.

19          MR. OPHARDT:  Your Honor, I move to admit Government's

20  Exhibit 9 at this time.

21          THE COURT:  Any objection?

22          MR. JACKSON:  No objections, your Honor.

23          THE COURT:  Exhibit 9 is admitted.

24      (Government's Exhibit 9 was received in evidence.)

25          MR. OPHARDT:  Your Honor, may I publish?

Joseph Dornbierer - Direct

1          THE COURT:  You may.

2  Q    BY MR. OPHARDT:  This is the first page of Exhibit 9,

3  Bates 1129.  Agent Dornbierer, would you read that exhibit for

4  the record, please.

5  A    It says "Wendy, I love U wit all my heart" and then with a

6  heart shape and "I hope U feel the same."

7  Q    1130, what's this document?

8  A    It is a Vermont civil violation form.

9  Q    And who's listed as the defendant?

10  A    Lawrence Jackson.

11  Q    1131, what's that document?

12  A    That's just a Bank of America form with Lawrence Jackson's

13  name.

14  Q    1132?

15  A    That's another piece of paper with Lawrence Jackson's

16  name.

17  Q    And what's listed as the address?

18  A    157 Porter Place, Rutland, Vermont 05701.

19  Q    Was that the location of the search?

20  A    No.

21  Q    This is 1133.  What's this document?

22  A    Appears to be from Wells Fargo related to an auto, and it

23  has Lawrence Jackson's name on it as well.

24  Q    What's the date on this correspondence?

25  A    Looks like July 8th, 2021.

Joseph Dornbierer - Direct

1  Q    This is 1135.  What's this document?

2  A    Looks like it's a COVID result test, Clear Choice.

3  Q    And who is listed as "Patient Name"?

4  A    Lawrence Jackson.

5  Q    And what's the date on this document?

6  A    October 15th, 2021.

7  Q    1136, what's this document?

8  A    It appears to be a Rutland City Police Department warning

9  for violations.

10 Q    And who's listed as the person?

11 A    Lawrence Jackson.

12 Q    And this is 1139.  What's this document?

13 A    Another document of Wells Fargo, looks like Auto, and it

14 also contains Lawrence Jackson's name.

15 Q    And the address listed, was that the location of the

16 search?

17 A    No, sir.

18 Q    Do you recall the general area in that bedroom where these

19 documents were located?

20 A    The desk.

21 Q    The desk area?

22 A    Yes.

23 Q    As part of your responsibilities as the agent in this

24 case, did there come a time that you moved some property from

25 Rutland City Police Department to HSI custody?

Joseph Dornbierer - Direct

1  A    Yes.

2  Q    What items in particular?

3  A    The three firearms.

4  Q    So I'll have you look at --

5        MR. OPHARDT:  Sorry, Ms. Ruddy.  You just took it

6  down.

7  Q    This is admitted as 1A.  Do you recognize that item?

8  A    I do.

9  Q    The item depicted in the photograph, how do you recognize

10  it?

11  A    That was a firearm that was seized in the residence of 55

12  Killington Avenue, Apartment 2.

13  Q    And was this one of the firearms you're referring to as

14  having taken custody of?

15  A    Correct.

16  Q    2A, do you recognize the item depicted in that photograph?

17  A    I do.

18  Q    And what is it?

19  A    That is another firearm that was seized out of 55

20  Killington, Apartment 2.

21  Q    Another one of the three you took custody of?

22  A    One of the three, correct.

23  Q    Agent Dornbierer, please keep your voice up, please.

24  You're trailing off a little bit.

25  A    Sorry.

Joseph Dornbierer - Direct

1  Q    It's okay.

2      And then this is 3A.  Do you recognize the item depicted

3  in that photograph?

4  A    I do.

5  Q    What is it?

6  A    That's another firearm that was seized.

7  Q    So these are photographs of items 1, 2, and 3.  Were those

8  the firearms that you took custody of from Rutland City Police

9  Department?

10  A    Yes.

11  Q    And why did you take custody of them?

12  A    So there's a forfeiture process that the state and locals

13  cannot do and only the federal side can do those, so that's why

14  those items were adopted by Homeland Security Investigations.

15  Q    So after you took them into custody from Rutland City for

16  purposes of forfeiture, where were they brought?

17  A    They were transported to our evidence storage facility

18  located in St. Albans, Vermont.

19  Q    And when they were obtained for trial, where were they

20  obtained from?

21  A    They were obtained from CBP, Customs and Border

22  Protection, where our storage facility is in St. Albans,

23  Vermont.

24  Q    The same location?

25  A    Same location.

Joseph Dornbierer - Direct

1  Q    Just wait for me to finish the question.

2  A    I'm sorry.

3  Q    Don't apologize over my instruction.

4       Agent Dornbierer, when you checked these three items out

5  of Rutland City Police Department evidence, the two pistols and

6  the revolver, did the two pistols have magazines with them?

7  A    They did.

8  Q    When you left them at the St. Albans facility for HSI, did

9  you also leave the magazines there?

10 A    I did.

11 Q    Were they stored with the firearms?

12 A    No.  They were stored separately.

13 Q    Why is that?

14 A    Our policy is to keep ammunition and the magazines that

15 would feed the ammunition in the firearm separated.

16 Q    Do you have two physical items up there with you?

17 A    I do, sir.

18 Q    And let's start with Government's Exhibit 60.  Do you

19 recognize Government's Exhibit 60?

20 A    Remove it from the bag or --

21 Q    Yes, you can remove it to identify it.

22 A    I do recognize this.

23 Q    What is it?

24 A    It is a magazine that goes to the Diamondback firearm.

25 Q    And based upon the bag that it's in and your knowledge of

Joseph Dornbierer - Direct

1  its kind of path of travel, was that the Diamondback magazine

2  seized from 55 Killington Avenue on November 23rd, 2021?

3  A    Yes, it was.

4         THE COURT:  So let's have it rephrased next time as

5  nonleading:  "What is that based on your review?"

6         MR. OPHARDT:  Yes, your Honor.

7         THE COURT:  Thank you.

8         MR. OPHARDT:  Your Honor, may I move to admit

9  Government's Exhibit 60 at this time?

10        THE COURT:  Any objection?

11        MR. JACKSON:  What exhibit, sir?

12        THE COURT:  60.

13        MR. OPHARDT:  60.  The physical.  60A would be a

14 photograph of the magazine.  I'm going to do 61A as well.

15        MR. JACKSON:  I have no objection, your Honor.

16        THE COURT:  60 is admitted.

17    (Government's Exhibit 60 was received in evidence.)

18 Q   BY MR. OPHARDT:  Looking at the smaller binder, would you

19 take a look at 60A, as in Alpha.  What does 60A depict?

20 A    60A is the magazine that was seized from the firearm,

21 Diamondback.

22 Q    Who took this photograph?

23 A    I do not recall who took the photograph.

24 Q    Okay.  Based upon your analysis of -- excuse me.

25        Based upon your review of Government's Exhibit 60, which

Joseph Dornbierer - Direct

1 is up there, is it fairly and accurately depicted in 60A?

2 A    Yes.

3         MR. OPHARDT:  Your Honor, I'd move to admit 60A at

4 this time.

5         THE COURT:  Any objection?

6         MR. JACKSON:  No objections, your Honor.

7         THE COURT:  60A is admitted.

8     (Government's Exhibit 60A was received in evidence.)

9         MR. OPHARDT:  Your Honor, may I publish?

10        THE COURT:  You may.

11 Q   BY MR. OPHARDT:  Agent Dornbierer, if you could now turn

12 your attention to 61, the other physical exhibit, the physical

13 item.

14 A    Oh, sorry.

15 Q    What is Exhibit 61?

16 A    It's another firearm magazine that was seized.

17 Q    Based upon your knowledge of the bag that's in front of

18 you as well as your actions in this case, where do you

19 understand it to have been seized?

20 A    This was seized at 55 Killington Avenue, Apartment 2.

21        MR. OPHARDT:  Your Honor, I'd move to admit

22 Government's Exhibit 61 at this time.

23        THE COURT:  Any objection?

24        MR. JACKSON:  No objections, your Honor.

25        THE COURT:  61 is admitted.

Joseph Dornbierer - Direct

1    (Government's Exhibit 61 was received in evidence.)

2  Q    BY MR. OPHARDT:  Agent Dornbierer, now turning to 61A, a

3  photograph in the smaller binder, do you recognize the

4  photograph at 61A?

5  A    I do.

6  Q    What does it depict?

7  A    It depicts the firearm -- or the magazine related to the

8  P-380 firearm that was seized at 55 Killington Avenue,

9  Apartment 2.

10 Q    Is that -- is that before you as Government's Exhibit 60?

11 A    I'm sorry?

12 Q    Is that before you as Government Exhibit 60?

13 A    Yes.  60 --

14 Q    I apologize.

15 A    61.

16 Q    You caught my error.  Is it before you as Government's

17 Exhibit 61?

18 A    Correct.

19 Q    So Government's Exhibit 61 is fairly and accurately

20 depicted in 61A?

21 A    Yes.

22      MR. OPHARDT:  Your Honor, may I move to admit 61A at

23 this time?

24      THE COURT:  Any objection?

25      MR. JACKSON:  No objections, your Honor.

Joseph Dornbierer - Direct

1          THE COURT:  61A is admitted.

2      (Government's Exhibit 61A was received in evidence.)

3          MR. OPHARDT:  Your Honor, may I publish?

4          THE COURT:  You may.

5  Q    BY MR. OPHARDT:  Is it common or uncommon for HSI to take

6  custody of items as part of a federal investigation?

7  A    It's common.

8  Q    I'd like to talk with you about Rutland generally.  How

9  long have you been working there now?

10 A    Well, I was assigned, like, late -- somewhere around

11 October 2020 with that break in military service, so when I

12 came back.

13 Q    So about three years --

14 A    Correct.

15 Q    -- on the ground?

16 A    Yes.

17 Q    During that time are you familiar with landmarks, business

18 locations, things of that nature?

19 A    Yes.

20 Q    As part of your work and time in Rutland, are you familiar

21 with Giorgetti Park?

22 A    Yes.

23 Q    What is that, generally speaking?

24 A    So Giorgetti Park, it's like a little sports center, just

25 kind of located in the, let's say, northwestern -- or, yeah,

Joseph Dornbierer - Cross

1  northwestern corridor of town.  There are several trails and

2  things of that nature.  You can mountain bike, hike, walk your

3  dog, and there's a couple parking lots.

4  Q    Are you familiar with a business colloquially known as the

5  Midway Mobil?

6  A    Yes.

7  Q    Where is that located?

8  A    That is located on South Main Street in Rutland.

9  Q    This Mobil, what's its proximity to Killington Avenue?

10 A    It's just a short distance down the hill just south of

11 Killington Avenue.

12 Q    So the Mobil is down the hill from Killington?

13 A    Yes.

14 Q    How long would it take an individual to drive from the

15 Midway Mobil to 55 Killington?

16 A    A couple minutes.

17         MR. OPHARDT:  May I have a moment, your Honor?

18         THE COURT:  You may.

19         MR. OPHARDT:  Your Honor, I pass the witness at this

20 time.

21         THE COURT:  Any cross-examination?

22         MR. JACKSON:  Yes.

23                        CROSS-EXAMINATION

24 BY MR. JACKSON:

25 Q    Good afternoon, Special Agent Dornbierer.

Joseph Dornbierer - Cross

1  A    Good afternoon, sir.

2  Q    Mr. Dornbierer -- I'm sorry about that.  Agent Dornbierer,

3  can you explain to the jury and to the Court what's HSI's

4  function?

5  A    The function of Homeland Security Investigations?

6  Q    Yes, sir.

7  A    So Homeland Security Investigations is -- was comprised of

8  some legacy agencies:  U.S. Customs Service, Immigration and

9  Naturalization Services.  Since 9/11, the Homeland Security Act

10 of 2002 was enacted, which incorporated a lot, created the

11 Department of Homeland Security.  Homeland Security

12 Investigations was created out of that as well, which was a

13 merger of some legacy federal agencies.

14      THE COURT:  So when you say "legacy," you mean

15 existing?

16      THE WITNESS:  Existing.  Correct, your Honor.

17 A    With that, their authorities are very broad for us.  We

18 enforce over 400 laws and regulations with a focus to protect

19 the homeland.

20 Q    And with that authority domestically, you operate under

21 custom laws; isn't that true, sir?

22 A    We do have customs authority, sir.

23 Q    Okay.  When you institute task force officers, what's a

24 task force officer's primary function?  What's the designated

25 function of a task force officer?

Joseph Dornbierer - Cross

1          MR. OPHARDT:  Your Honor, I'm going to object to the

2    task force officer aspect.  There were no task force officers

3    for HSI that participated in this investigation.

4          MR. JACKSON:  Well, your Honor, I disagree with that

5    because of the mere fact Mr. Dornbierer was there.  So if it

6    was a task force officer or agent, period, it's Homeland

7    Security, so what's the difference?

8          THE COURT:  So on direct, there was a discussion of

9    task force officers, who they were employed with, and whether

10   they worked with HSI, so it's within the scope of the direct

11   examination, and on that basis you may ask the question.  And

12   if you want me to read it to the witness, I will do so.

13         MR. JACKSON:  Yes.  That would be great.

14         THE COURT:  "When you institute task force officers,

15   what's a task force officer's primary function?  What's the

16   designated function of a task force officer?"

17   A    So -- sorry.  I didn't know if you had to reask.

18         So I'm not a task force officer.  I am a special agent.

19   So with that, I don't know the full functions of a task force

20   officer; however, you know, their functions are basically -- my

21   management guides them, so -- but overall they can be affiants

22   on affidavits, they can assist in federal search warrants, and

23   they can swear in on federal search warrants.

24   Q    And that's for any law under the United States?

25   A    Any laws that we enforce.

Joseph Dornbierer - Cross

1  Q    And that's under Title 19, custody laws?

2  A    Title 19 is one of them.

3  Q    But when you're acting as a task force officer, you're

4  acting primarily as a federal officer under custom officer

5  laws?

6  A    No.  But I don't know specifically for task force

7  officers.  Again, I'm a special agent.

8  Q    Okay.  Mr. Dornbierer, you said that state courts don't

9  enforce forfeiture laws.  Can you explain that, sir, because I

10 never heard of no court in the United States of America that

11 don't enforce laws.

12 A    I'm sorry?

13 Q    I never heard of any court in the United States that don't

14 enforce laws.  You said that they don't have a forfeiture

15 process, the State do not have.  What did you mean by that?

16 A    So forfeiture is more or less like a civil -- well, I

17 think a lot of times they're a civil process.  I can't go into

18 it so much because I'm not a seized property specialist.

19 That's a whole different function that's outside of the scope

20 of an investigator, but basically I guess the easiest way I can

21 describe it is that certain things, such as a firearm, we would

22 come into possession of it because the State doesn't have the

23 authority to -- to dispose of it, so -- dispose of it properly,

24 so therefore the federal government steps in so that it's not

25 returned to someone who can't have that firearm.

Joseph Dornbierer - Cross

1  Q    So what you're saying is that HSI is in the state of

2  Vermont to collect firearms for disposal?

3  A    It's just a process through, you know -- through the

4  judicial part of it that -- you know, with evidence, things get

5  destroyed, and it's a process, and it's documented.  If things

6  are forfeited, things like currency, for instance, if the

7  Government seizes it, a lot of times that individual has a

8  right to -- to request the return of that money, and they have

9  to provide proof that that wasn't money that was gained from

10 illegal proceeds, so that's just another example of why things

11 go through a forfeiture process.

12 Q    Yes, sir.  But that process wouldn't go directly to

13 Homeland Security agency, would it?  Would it be any agency

14 that's able to process that type of work?

15 A    That I wouldn't know.  I don't work for another agency.

16 Q    I want to direct your attention to November 23rd, the

17 execution of a search warrant at 55 Killington Avenue.  You was

18 there.  You said you was on the entry team.

19 A    Correct.

20 Q    Is that true?

21      I'm sorry.  Just give me one second.

22      As part of the entry team, sir, you were part of the

23 search, the search of the whole house?

24 A    Say again?

25 Q    You was part of searching of 55 Killington Avenue too?

Joseph Dornbierer - Cross

1  A    I participated in the search.

2  Q    In the search.  And collected evidence; isn't that true,

3  sir?

4         THE COURT:  So you're way away from the mic.

5         MR. JACKSON:  I'm sorry, your Honor.

6         THE COURT:  Take your time, find what you need, and

7  then come back to the mic to ask the question, please.

8         MR. JACKSON:  Yes.  Yes.  Yes.

9  Q    You collected evidence as well; isn't that true, Agent

10 Dornbierer?

11 A    Yes.  As part of the function as a search team.

12 Q    According to the Rutland -- Rutland Police Department

13 evidence collection form, you collected 16 items out of that

14 apartment that night; isn't that true, sir?

15 A    I don't have the form in front of me.

16 Q    Would you like to look at it?

17 A    Yes, please, sir.

18        MR. JACKSON:  Can I show it to him to refresh his

19 recollection?

20        THE COURT:  You absolutely may.  Let's mark it for

21 identification unless we already have it in evidence.

22        MR. OPHARDT:  It's not in evidence, your Honor.  This

23 is Government's Exhibit 48, which was not offered and is not

24 admitted.

25        THE COURT:  Okay.  He's just using it for refreshing

Joseph Dornbierer - Cross

 1  recollection.

 2          MR. OPHARDT:  Yes.

 3          THE COURT:  We'll use that same number, 48, so you

 4  don't have to have it, and Ms. Ruddy will take it to the

 5  witness.

 6          MR. OPHARDT:  Your Honor, that's not necessary.  It is

 7  in the binder, I believe.

 8          THE COURT:  Oh, okay.

 9          MR. OPHARDT:  It just was not offered.

10          THE COURT:  Even better.

11          MR. OPHARDT:  It's Government's Exhibit 48.

12  Q    See it?

13  A    See what, sir?

14  Q    That you collected, like, 16 items?

15  A    No.

16  Q    Are you looking at the evidentiary form?

17          MR. JACKSON:  Can I show it to him?

18          THE COURT:  I think he has the same form.  You can ask

19  him how many he thinks he seized.

20          MR. JACKSON:  His name is right next to them, so --

21  A    I count one, two, three, four, five, six, seven, eight,

22  nine, ten.

23  Q    You only have ten?

24  A    That's correct, sir.

25          MR. JACKSON:  Okay.  Well, let me show him this,

Joseph Dornbierer - Cross

1  because I have --

2          THE COURT:  All right.  You may do so.  So we're going

3  to mark this as something else, and --

4          COURTROOM DEPUTY:  I think we're at Z, unless we used

5  the -- stick with the 48, or no?

6          THE COURT:  No.  We're going to use Z.

7          MR. JACKSON:  Your Honor, I'm sorry.  I'm looking

8  at -- because I've got a double page here.  I'm sorry.

9          THE COURT:  Okay.

10 Q    I'm sorry, Agent Dornbierer.  I'm not that good at this.

11 A    No apologies necessary.

12 Q    Your primary focus on the search that day was room 3?

13 A    Correct.

14 Q    Why was that, sir?

15 A    It's just how it fell in.  There was no specific

16 assignment.

17 Q    But the focus of the search was on Lawrence "Boo-Bee"

18 Jackson?

19 A    To be honest, I had no idea.  I literally was about two

20 days returning from Iraq.

21 Q    And before -- before the warrant was executed, I'm pretty

22 much sure all you guys got together and planned entry and where

23 people was going to go in the house?

24 A    The only thing I knew at that time was that I would be --

25 where I was going to be at in the entry stack and that I was

Joseph Dornbierer - Cross

1  going to be a member of the search team.

2  Q    Okay.  So you were invited?  You were asked to be

3  assisting in that search, or was you authorized under the

4  warrant?

5  A    I was asked to participate.

6  Q    And who were you asked by?

7  A    I was asked by the Rutland City Police Department.

8  Q    Anyone in particular?

9  A    I don't recall.

10 Q    Are you aware that the State of Vermont authorizes only

11 their officers to conduct searches in the state of Vermont?

12 Are you aware of that?

13 A    I'm not aware.  I don't work for the State of Vermont.

14 Q    Did you view the search warrant before you entered the

15 place?

16 A    I may have.

17 Q    Huh?

18 A    I may have.

19 Q    Did you see on top of that warrant it said only to certify

20 Vermont law enforcement officers?

21 A    I wouldn't recall.

22 Q    So was your presence there just to make a federal case?

23 A    No, it was not.

24 Q    But you did make a federal case?

25 A    Eventually.

Joseph Dornbierer - Cross

1  Q    I want to turn your attention to -- in order to operate in

2  any state or particular city in your Department of Homeland

3  Security, you have to have a memorandum of understanding

4  between that particular agency and the State as well as a

5  State's Attorney or somebody who represents that particular

6  area; isn't that true, sir?

7  A    I'm not aware of that.

8  Q    You're not aware that you're supposed to have a MOU,

9  memorandum of understanding?

10 A    I work for the federal government.  I don't work for the

11 State.

12 Q    No.  What I'm asking you is this:  In your HIS directives,

13 it says that you're supposed to -- you have to have an MOU and

14 be in accordance with whatever agency or state that you're

15 working in, there has to be a memorandum of understanding of

16 what you're doing there and how you will be doing it in

17 accordance with state laws.

18 A    I don't enforce state laws.

19 Q    Okay.  But you were at 55 Killington Avenue?

20 A    I assist law enforcement officers.

21 Q    In state law?

22 A    Say again?

23 Q    In state law?

24 A    I assist them with whatever -- any laws, but I don't

25 recall what is on a document that's not in front of me or, you

Joseph Dornbierer - Cross

1  know, when I reviewed it at the time.

2  Q    Special Agent Dornbierer, if you execute a warrant with

3  Rutland City Police Department, you're acting under a state

4  judge, true?  Would that be fair to say?  Because they're

5  authorizing it.

6  A    I'm acting as a law enforcement official assisting them.

7  Q    Okay.  I would like to -- I'm going to move away from

8  that.  I'm going to ask you about your grand jury testimony.

9  Do you remember testifying in the grand jury?

10  A    Do I remember testifying in grand jury?

11  Q    Yes.

12  A    I mean, I've testified many times in grand jury.

13  Q    In this particular case right here, sir.

14  A    In -- in matters of this case, yes, I have.

15  Q    Do you recall how many times you testified in the grand

16  jury?

17  A    No, I don't recall.

18  Q    Do you remember two or three times, I think?

19  A    Perhaps.

20  Q    I want to refresh your recollection to your grand jury

21  testimony, December 15th, 2021.  Assistant U.S. Attorney

22  Mr. Ophardt asked you, "In your work with law enforcement right

23  now, fair to say that HSI has kind of become a

24  jack-of-all-trades investigative agency?"

25        And you said, "Yes."

Joseph Dornbierer - Cross

1        Is that true, sir, that statement?

2    A    If I said yes, then that would be correct.

3    Q    HSI is not under the command of the United States Attorney

4    General, is he?

5    A    I work for the Department of Homeland Security and the

6    people within that, so that's above -- above me with those

7    levels on cooperation.

8    Q    Okay.  Let me put it like this, then:  Is the associated

9    director of ICE, which oversees your agency, are they tasked

10   with American citizens' constitutional rights inside states?

11   A    I don't know what you mean by that.

12   Q    Are you tasked to go out and -- if somebody call 911, do

13   HSI pick up the phone?

14   A    No.  That would be the function of your local and state

15   police departments.

16   Q    Okay.  You stated that Rutland, Vermont, needed a federal

17   presence down there to provide assistance, things that couldn't

18   be accepted in state courts had to be moved to federal courts.

19   Was HSI tasked with that duty?

20   A    To assist, to investigate at a federal level, yes.

21   Q    Okay.  In what type of manner would that be, sir?  What

22   kind of domestic crimes?

23   A    Everything ranging from narcotics trafficking, human

24   trafficking, financial fraud, cybercrimes, child exploitation,

25   firearms violations.

Joseph Dornbierer - Cross

1  Q    Sir, I have HSI Directive 18-02.  Are you familiar with

2  that?

3  A    No, I am not.

4  Q    Okay.  I'll show it to you in a second.  This is in your

5  agency's directive.  And you follow those directives, right?

6  A    I follow my superiors.

7  Q    So you don't follow the directives of your agency?

8  A    Well, we all follow within the directions of our agencies,

9  but our superiors are the ones that put forth information to

10 us.

11 Q    So if your superior tell you something that you know is

12 illegal, you're going to do it?

13 A    What do you mean by that?

14 Q    I don't understand your answer.  You said --

15 A    I don't understand your question.

16        THE COURT:  Stop.  Stop.  You're jumping in on each

17 other.  So the last pending question is:  "So if your superior

18 tells you something that you know is illegal, you're going to

19 do it?"

20      The answer was, "What do you mean by that?"

21      The question was, "I don't understand your answer."

22      You said -- the answer was, "I don't understand your

23 question."

24      So let's have a rephrased question.

25      Pause before you answer.

Joseph Dornbierer - Cross

1        And make sure the witness has completed his answer before

2    you ask the next question.

3            MR. JACKSON:  Yes, your Honor.

4    Q    And I apologize, Agent Dornbierer, for being too fast.

5        HSI's governed by -- the Congress has authorized HSI with

6    designated laws to execute in the United States; is that true,

7    sir?

8    A    Yes.  That's true for every agency.

9    Q    And -- I'm sorry.  And like you said, that's roughly

10   around 400 laws?

11   A    Correct.

12   Q    And within them 400 laws, sir, according to HSI Directive

13   18-02, you are not granted authority to enforce administrative

14   violations of immigration laws under Title 8 or controlled

15   substances violations under Title 21.  This is your agency.

16   Would you like to read it?

17           MR. OPHARDT:  Your Honor, I'm going to object.  It's

18   much more efficient for Mr. Jackson to show an exhibit that all

19   parties have agreed can be entered into evidence and ask the

20   witness about them rather than holding it up at the pedestal

21   and having him guess as to what the directive is.

22           THE COURT:  So the question is permissible the way

23   framed, and I'm not going to tell you how to rephrase your

24   questions unless I -- there's a problem with it.  There's no

25   problem with that question.  And then there will probably be a

Joseph Dornbierer - Cross

 1  follow-up question about the exact language of the exhibit.

 2      So the pending question is:  "And within the 400 laws,

 3  sir, according to HSI Directive 18-02, you are not granted

 4  authority to enforce administrative violations of immigration

 5  laws under Title 8 or controlled substance violations under

 6  Title 21.  This is your agency.  Would you like to read it?"

 7          MR. JACKSON:  Yes.  That was the question.

 8  A    Yes, I would like to read it.

 9          COURTROOM DEPUTY:  And is this --

10          THE COURT:  It should be premarked.

11          MR. JACKSON:  This is an exhibit.

12          COURTROOM DEPUTY:  Is it your exhibit, Mr. Jackson?

13          MR. JACKSON:  Yes.

14          THE COURT:  And premarked as?

15          MR. BEHRENS:  J.

16          COURTROOM DEPUTY:  You said J?

17          MR. BEHRENS:  If it's 18-02, it's J.

18  A    Was there a specific paragraph or --

19  Q    I think it was paragraph 3, sir.

20  A    Paragraph 3.  Paragraph 3 on this form that was handed to

21  me talks about definitions.  3.1 is about background

22  investigations.

23  Q    About background investigations?

24  A    Correct, sir.

25          COURTROOM DEPUTY:  Do you want it back?

Joseph Dornbierer - Cross

1            MR. JACKSON:  Yes, ma'am.

2            COURTROOM DEPUTY:  Do you have an extra copy?

3            MR. JACKSON:  No.

4            COURTROOM DEPUTY:  Mr. Behrens does.

5  Q    The second paragraph in paragraph 2.

6  A    Sir, this is talking about task force officers.

7  Q    But it also says Title 19, 1589, which is custom officers,

8  and that's what you act under; isn't that true, sir?

9  A    We -- we do have customs authority, but let me read -- let

10 me continue reading, if I may.

11       This is still talking about task force officers.

12 Q    Okay.  We can move away from that, sir.

13       Do you know who Mr. Zuchman is, Alex?

14 A    I do, sir.

15 Q    Is that one of your supervisors?

16 A    That is my supervisor.

17 Q    Okay.  He had sent a memo, which is Defendant Exhibit O.

18 I think that was submitted in the suppression hearing.

19            THE COURT:  So if you want them admitted at trial, you

20 have to move to admit them.

21            MR. JACKSON:  Okay.  May I move to admit this, your

22 Honor?

23            THE COURT:  Do you want to admit J as well that we

24 just --

25            MR. JACKSON:  Yes, your Honor.

Joseph Dornbierer - Cross

1          THE COURT:  All right.  "So I move to admit Exhibit

2   J."

3      Any objection?

4          MR. OPHARDT:  No, your Honor.

5          THE COURT:  J is admitted.

6      (Defendant's Exhibit J was received in evidence.)

7          THE COURT:  Now you're moving to admit Defendant's

8   Exhibit O, Mr. Jackson?

9          MR. JACKSON:  Yes.

10         THE COURT:  Any objection?

11         MR. OPHARDT:  No, your Honor.

12         THE COURT:  O is admitted.

13     (Defendant's Exhibit O was received in evidence.)

14  Q   BY MR. JACKSON:  Agent Dornbierer --

15         MR. JACKSON:  I would like to hand this over to Agent

16  Dornbierer.

17         COURTROOM DEPUTY:  Um-hum.

18         MR. JACKSON:  I don't think he has that in there.

19         COURTROOM DEPUTY:  And we can also publish as well on

20  the ELMO.

21         MR. JACKSON:  That would be great.  Yes.

22     Your Honor, may I publish this?

23         THE COURT:  Yes.  Of course.

24         COURTROOM DEPUTY:  Give me one second.

25  Q   If I may request -- you can see that pretty well, Agent

Joseph Dornbierer - Cross

1 Dornbierer?

2 A    I can.

3 Q    Can you just read the first paragraph for the Court,

4 please.

5 A    "Jon, I hope all is well.  I wanted to follow up on a

6 couple of conversations I recently had with both AUSAs and Mike

7 McCullagh concerning our enforcement authorities and use of

8 TFOs.  I am not really sure what the origin of the issue, but I

9 wanted to get ahead of it, so thought I would bounce this off

10 you.  I did a bunch of research and also spoke to legal and

11 came up with the following.  Basically, HSI's enforcement

12 authorities are of Title 22, 50, 19, 18, and 8 and 21 (through

13 MOU with Drug Enforcement Administration).  Title 19

14 cross-designated (state and local) TFOs can enforce only

15 Title 19 and Title 18.  I want to be sure that TFOs like Matt

16 Raymond and Jesse Sawyer" from the ICAC "will be allowed to

17 swear out search and arrest warrants, mainly under Title 18 -

18 and that your office is comfortable with that.  I also intend

19 to grow our office through TFOs, including state police."

20 Q    Sir, can you explain to this jury and to the Court the

21 last sentence, "I also intend to grow our office through TFOs,

22 including state police"?  Can you give us a definition of what

23 does that mean, "grow our office"?

24 A    I mean, I can't really speak for my boss.  I'm not -- I'm

25 not the supervisor.

Joseph Dornbierer - Cross

1  Q    Does "grow your office" mean just have Homeland Security

2  in every police department?

3         MR. OPHARDT:  Objection, your Honor.  Calls for

4  speculation.

5         THE COURT:  Sustained.

6      So he's not the author, and you're asking him to step into

7  the officer's mind -- or the author's mind, I should say.  You

8  can ask him what his understanding of that is.

9  Q    Agent Dornbierer, may I ask you what your understanding of

10 that is?

11 A    Of which part again?  I'm sorry.

12 Q    Of "I also intend to grow our office through TFOs,

13 including state police"?

14 A    My understanding would be that -- I mean, task force

15 officers are very crucial to law enforcement agencies -- or

16 federal agencies.  Especially in the state of Vermont, there's

17 a shortage of -- of law enforcement, especially on the federal

18 level, to be able to investigate federal-level crimes, so

19 having task force officers out there really extend the

20 protection of the American citizens, of people that reside in

21 the United States.

22 Q    I have another memo here I would like you to -- this is an

23 overview of HSI's mission and law enforcement authority.  This

24 is right out of your agency.  This is where I got this from.

25 HSI's mission.  Areas of responsibility.

Joseph Dornbierer - Cross

1          THE COURT:  So before we do that, are you moving to
2    admit this?

3          MR. JACKSON:  Yes, ma'am.

4          THE COURT:  Does it have an exhibit number?  What is
5    the exhibit number?

6          MR. JACKSON:  I don't have an exhibit number.

7          COURTROOM DEPUTY:  So this would -- this is a
8    brand-new exhibit?

9          MR. JACKSON:  Yes.

10         COURTROOM DEPUTY:  So I believe this is Z.

11         THE COURT:  Mr. Ophardt, you have an objection?

12         MR. OPHARDT:  Your Honor, I've never seen this
13    document.  I don't know what it is.

14         THE COURT:  All right.  So if it's not on the exhibit
15    list, it needs to be only for impeachment purposes.

16         MR. JACKSON:  Okay.

17         MR. OPHARDT:  Your Honor, I have no objection to its
18    addition to the exhibits.  I'm fine with it being admitted into
19    evidence.

20         THE COURT:  All right.  So, Mr. Jackson, do you move
21    to admit Z, or do you want to just use it for impeachment?

22         MR. JACKSON:  I really don't want to impeach him.  Can
23    I come back to this, your Honor?

24         THE COURT:  Sure.

25         MR. JACKSON:  Thank you.

Joseph Dornbierer - Cross

1          COURTROOM DEPUTY:  Would it be okay if I just put a

2   label on there?

3          MR. JACKSON:  Yes, ma'am.

4   Q    BY MR. JACKSON:  I'm going to move away from your

5   authorities for a second, Agent Dornbierer.  I want to get to

6   the grand jury testimony that you -- that you gave.

7          On December 15th of 2021, U.S. Attorney Ophardt asked you,

8   "How did you come to know Mr. Boo-Bee?"

9          And your answer was, "Through our law enforcement

10  departments here in the community."

11         Do you remember that, sir, that statement?

12  A    If it's in the grand jury testimony transcripts, then --

13  then I said that.

14  Q    Agent Dornbierer, U.S. Attorney Mr. Ophardt asked you,

15  "Who was in the vehicle with Mr. Jackson?"

16         Your answer was, "Two females that we were identified as

17  Brianna Arnold and Danielle Currier."

18         Do you remember that, sir?

19  A    I would have to just look at it.  Once again, if it's

20  stated in the transcripts.

21  Q    Then that's what it is.  And that's the truth and that's

22  your statement, if it's stated in the transcript?

23  A    If it's stated right there.  I haven't reviewed it, but --

24  Q    I'll show it to you, sir.  He asked you, "Okay.  What, if

25  anything, was found under the passenger seat?"

Joseph Dornbierer - Cross

1      You said, "I'm sorry.

2      "QUESTION:  What, if anything, was found under the

3  passenger seat?  What was found?"

4      You said, "Yes."  "ANSWER:  A blue bag.  It was a zip

5  bag."

6          MR. JACKSON:  May I show that to him, your Honor?

7  This is the grand jury minutes.

8          THE COURT:  You may.  This is going to be Exhibit --

9          COURTROOM DEPUTY:  We would be on A1.

10          THE COURT:  A1.

11          COURTROOM DEPUTY:  And did you want me to take that

12  over, Mr. --

13          MR. JACKSON:  Yes.  I just wanted to read lines 19 on

14  page 420 -- on page 16 and -- page 16, line 22, to page 17,

15  line 6.  Thank you, ma'am.

16  A      16, line 6.

17          COURTROOM DEPUTY:  I think he said 22 -- Johanna,

18  would you mind repeating?

19          THE COURT:  It's lines 19 on page 420 -- on page 16,

20  line 22, to page 17, line 6.

21  A      Okay.  I've reviewed it.

22          COURTROOM DEPUTY:  Do you need this back?

23          MR. JACKSON:  Yes.

24  Q      And, sir, you stand by that testimony?

25  A      That's what I stated.

Joseph Dornbierer - Cross

1 Q    And you stand by that testimony?

2 A    What do you mean?

3 Q    Your testimony in grand jury under oath, you stand by

4 that, what you just read?

5 A    I stated in -- in the grand jury proceeding those are my

6 statements.

7 Q    Do you stand by those statements, sir?  Yes or no?

8 A    I guess I'm not quite following what you mean.

9 Q    Your testimony in the grand jury, do you stand by what you

10 told the grand jury?

11 A    Are you talking in particular about --

12 Q    Your testimony.

13 A    But --

14 Q    In answer to the questions --

15 A    Is it something specific in the testimony that you're

16 questioning me about?

17 Q    Line 22, "QUESTION:  Okay.  What, if anything, was found

18 under the -- what, if anything, was under the passenger seat?

19      "I'm sorry.

20      "What, if anything, was found under the passenger seat?

21 What was found?

22      "Yes.  A blue bag.  A ziplock bag."

23      Do you stand by that, sir?

24 A    That's what I said.

25 Q    Okay.  Sir, we heard testimony - you heard it.  You was in

Joseph Dornbierer - Cross

1  here yesterday - that this bag was not found under the

2  passenger seat, it was found under the driver's seat.  How did

3  you come to that conclusion, sir?

4  A    That it was under the right passenger seat or that it was

5  under the --

6  Q    This jury heard that the bag -- that a witness testified

7  right where you were sitting that she observed me hand a bag to

8  another girl in the car and she put it under the passenger

9  seat.  Detective Lucia's testimony was that they found a bag in

10  the back seat of the car under the driver's seat.  You took

11  this statement almost a month after, so you had time to review

12  all the paperwork, all the investigation reports.  Sir, how did

13  this bag, this alleged bag that she seen me pass, get

14  underneath the driver's seat?

15  A    So I don't know how that would get under there, but I can

16  say this as far as my statement.  So, yes, I read reports and,

17  you know, through those reports, those are not generated from

18  me.  Those are investigations by the others at the state and

19  local level.  When I made that statement, it appears that

20  perhaps, as you read, that I didn't clearly hear the question

21  and then I heard was it under the seat, and -- or what was

22  under the seat, and I explained what was under the seat.

23  Q    So are you changing your testimony now, sir?

24  A    I'm saying that what's on there is accurate.  That's

25  exactly what I said.

Joseph Dornbierer - Cross

1  Q    You stated in your testimony -- Mr. Ophardt asked you a

2  question under oath that the bag was found underneath the

3  passenger seat.  That was your testimony, sir.  Yes or no?

4  A    What's written there is accurate.

5          MR. JACKSON:  Your Honor, can you instruct the witness

6  to give a proper answer?  Yes or no.  That's all I ask.

7          MR. OPHARDT:  Your Honor, Mr. Jackson can't ask the

8  Court to instruct the witness to answer a question the way he

9  wants.

10          MR. JACKSON:  The witness is involved in a question --

11          THE COURT:  So just let me hear the objection.  Go

12  ahead.

13          MR. OPHARDT:  Mr. Jackson cannot ask the Court to

14  instruct the witness to answer the question the way he wants.

15          THE COURT:  No, I can't do that.  I can ask the

16  witness to answer the question.

17      So what you need to do is zero in on exactly that portion

18  of the transcript and then ask the witness if that was

19  accurate, if he agrees with it.  I understood what you meant by

20  "stand by":  Do you adopt that as your testimony today?  That's

21  what I understood.  But it's much more important that the

22  witness understands what you're saying.  So ask the question

23  and we'll have the answer.

24  Q    Agent Dornbierer, your testimony in the grand jury on

25  December 15th, 2021, when Assistant United States Attorney

Joseph Dornbierer - Cross

1  Mr. Ophardt asked you, "Do you remember who was seated where?"

2      Your answer.  This is your answer:  "Brianna Arnold was in

3  the front seat, passenger seat, and Danielle Currier was in

4  the -- in the rear.

5      "QUESTION:  Okay.  What, if anything, was found under the

6  passenger seat?

7      "I'm sorry."

8      He asked you again:  "What, if anything, was found under

9  the passenger seat?  What was found?

10     "Yes.  A blue bag.  It was a zip bag."

11     Your testimony that the bag, when the car was searched,

12 was found under the passenger seat.  A witness testified,

13 Danielle Currier, in this courtroom in front of this jury that

14 she observed me give a bag to Brianna Arnold and put it under

15 the passenger -- she put it under the passenger seat.  Upon the

16 searching of this vehicle at 12:38 midnight on the 24th, this

17 bag was moved.  Detective Lucia stated in front of this jury

18 that the bag was underneath the driver's seat.

19     How did the bag get underneath the driver's seat if a

20 witness stated that she seen me pass somebody a bag?

21         THE COURT:  So that's the question.

22         MR. JACKSON:  That's the question.

23 A    So, Mr. Jackson, I wasn't there.  I didn't participate in

24 the search, so I -- I can't answer that question since I wasn't

25 there.

Joseph Dornbierer - Cross

1  Q    From your recollection, sir, was that bag planted

2  underneath the driver's seat?

3  A    I -- I don't recall because I wasn't there.

4  Q    Agent Dornbierer, you made a federal case against me.

5  You're the case agent in this case.  True or false?

6  A    Yes, I am the case agent.

7  Q    That means you're the man.  You're the law enforcement

8  officer who brought this case before this court.  True or

9  false, sir?

10  A    Yes, this is true.

11  Q    Sir, I'm asking you:  How did that bag get underneath the

12  driver's seat unless it was planted by the people who searched

13  that vehicle?

14  A    Mr. Jackson, I wasn't there, so I can't answer that

15  question.  It would be pure speculation on everybody's part, I

16  believe.

17  Q    From what's been here today, sir, was the bag planted

18  underneath the driver's seat?

19  A    I'm sorry.  Say that again.

20  Q    Was the bag planted underneath the driver's seat --

21  A    I --

22  Q    -- to pin it on me?

23  A    I do not know.  I wasn't there, like I keep saying.

24  Q    Your testimony before the grand jury in the state of

25  Vermont in a federal courtroom, you stated, sir, that the bag

Joseph Dornbierer - Cross

1 was underneath the passenger seat.  At the conclusion of the
2 search, Detective Lucia stated in this courtroom before this
3 jury that the bag was underneath the driver's -- back seat of
4 the driver's seat, and nobody else was arrested but me.  Can
5 you explain that, sir?  You're the case agent for this case.
6 I'm just asking for a clear answer.  This jury deserves an
7 answer.  They have to make judgment.
8 A    I understand.  Again, I wasn't present.  I go by reports.
9 If the bag was placed under the driver's seat, I may have
10 misread the report and -- or just misunderstood during grand
11 jury testimony the question, and when you read back the
12 transcript, it's possible that I could have misunderstood the
13 question as I said, "I'm sorry."  To me it feels that perhaps
14 it was hard for me to hear the question.
15 Q    Agent Dornbierer, you had Detective Lucia's report and
16 everybody else report for three weeks, for three weeks.  The
17 search happened on November 24th at 12:38 AM.  You testified
18 before the grand jury on December 15th at 10:23 AM, sir.  Was
19 this evidence planted?  Yes or no?
20 A    Again, I'm -- I wasn't there for the search.
21         MR. JACKSON:  I have no more questions, your Honor.
22         THE COURT:  All right.  Any redirect?
23         MR. OPHARDT:  No questions, your Honor.
24         THE COURT:  Thank you, sir.  You may step down.
25      (The witness was excused.)

Jesse R. Dambrackas - Direct

1        THE COURT:  The Government may call its next witness.

2        MR. OPHARDT:  Your Honor, the United States calls

3   Detective -- I'm sorry.  Trooper -- Detective Trooper Jesse

4   Dambrackas.

5        COURTROOM DEPUTY:  Detective, you can come up front.

6   Please raise your right hand.  State your full name for the

7   record.

8        THE WITNESS:  Jesse Dambrackas.

9                   JESSE R. DAMBRACKAS,

10      having been first duly sworn by the courtroom deputy,

11           was examined and testified as follows:

12        THE WITNESS:  I do.

13                   DIRECT EXAMINATION

14  BY MR. OPHARDT:

15  Q    Good afternoon, Detective.

16  A    Good afternoon.

17  Q    Where are you currently employed?

18  A    I'm with the Vermont State Police.

19  Q    And how long have you been with VSP?

20  A    Since the spring of 2014.

21  Q    What is your current position with the Vermont State

22  Police?

23  A    I'm assigned to the Vermont Drug Task Force as a

24  detective.

25  Q    How long have you worked with the Vermont Drug Task Force?

Jesse R. Dambrackas - Direct

1  A    Since June of 2019.

2  Q    What are your duties as a member of the Vermont Drug Task

3  Force?

4  A    Primarily I investigate violations of narcotics laws at

5  the state and federal level.

6  Q    As part of your duties with the Vermont Drug Task Force,

7  do you have a particular area of focus geographically within

8  the state of Vermont?

9  A    Yes, I do.  My area of responsibility typically is Addison

10  County, Rutland County, and Bennington Counties.

11  Q    The term "task force" as it relates to the Vermont Drug

12  Task Force, what agencies are a part of that?

13  A    Vermont State Police as well as currently Bennington

14  County Sheriff's Department and the FBI.

15  Q    And that's in the areas in which you work?

16  A    Yes.

17  Q    Other areas of the state have components of the Vermont

18  Drug Task Force?

19  A    Yes.

20  Q    And other law enforcement agencies assist with those

21  investigations elsewhere in the state?

22  A    Yes.  Correct.  Other local and federal agencies are

23  involved.

24  Q    Thank you.  What tools does the Vermont Drug Task Force

25  use to investigate drug trafficking?

Jesse R. Dambrackas - Direct

1  A    Controlled buys and search warrants primarily.

2  Q    What is a controlled buy or a controlled purchase?

3  A    A controlled buy is when the Vermont Drug Task Force will

4  utilize a confidential informant to purchase narcotics from

5  somebody selling them.

6  Q    Why is it described as "controlled"?

7  A    Because it is set under the circumstances that we use, and

8  we run it in a controlled manner using circumstances such as

9  searching the CI before and afterwards, issuing them recorded

10 funds, and recording it with electronic surveillance equipment

11 as well as physical surveillance by a team of multiple

12 detectives.

13 Q    When you say "recorded funds," what do you mean by that?

14 A    The funds used to purchase the narcotics are recorded with

15 a photograph so that the serial numbers on the funds are

16 accounted for.

17 Q    As a way to track the currency?

18 A    Yes.

19 Q    So you mentioned searches.  When a confidential informant,

20 or a CI, is searched, what are you looking for?

21 A    We're looking for any money that they may have on their

22 person as well as any contraband or illegal narcotics.

23 Q    And when -- when is a CI searched in relation to the

24 controlled buy?

25 A    We meet with the CI prior to the controlled buy being

Jesse R. Dambrackas - Direct

1  initiated and search them at that point.

2  Q    Do confidential informants, or CIs, do they drive

3  themselves to a deal; do they walk; are they driven by law

4  enforcement?  How does the transportation work?

5  A    It can be any of those circumstances, and it's different

6  for different cases.  And if the CI is using a vehicle, then

7  the vehicle that they are using is searched as well.

8  Q    How long does a typical controlled purchase take?

9  A    It can range anywhere from a few minutes to over an hour

10 depending on the circumstances.

11 Q    In August and September of 2020, were you the case officer

12 investigating a drug trafficker using the nickname Boo-Bee?

13 A    Yes, I was.

14 Q    I want to talk to you about a controlled purchase that

15 occurred on August 21st of 2020.  Who was the confidential

16 informant for this purchase?  What was his name?

17 A    Walter Taylor.

18 Q    And who did Mr. Taylor say he could purchase drugs from?

19 A    A male he knew by the street name of Boo-Bee.

20 Q    What substance did Mr. Taylor tell you he could buy from

21 Boo-Bee?

22 A    Cocaine base.

23 Q    And how was Mr. Taylor going to contact Boo-Bee in

24 relation to this purchase?

25 A    Mr. Taylor advised me that he had a phone number for

Jesse R. Dambrackas - Direct

1  Boo-Bee and he had it saved in his phone under the contact name

2  of Boo.

3  Q    Now, this controlled purchase on August 21st, 2020, were

4  you present when Taylor called the person he knew as Boo-Bee to

5  arrange this transaction?

6  A    Yes, I was.

7  Q    Were you able to hear the call?

8  A    Yes, I was.

9  Q    How is that?

10 A    The CI made the call in -- in my vehicle and had the phone

11 on speakerphone.

12 Q    Who answered the phone?

13 A    Lawrence Jackson answered the call.

14 Q    How do you know it was him?

15 A    In reviewing audio recordings after the fact through the

16 investigation, the -- his voice was consistent.

17 Q    So you became familiar with his voice through this

18 investigation?

19 A    Yes, I was.

20 Q    And from those other recordings and surveillance were able

21 to identify the voice on the first call?

22 A    Yes, I did.

23 Q    What did Mr. Taylor ask Mr. Jackson during the call?

24 A    I believe the terminology Mr. Taylor used was he was

25 looking for a hundo, which he advised would be street

Jesse R. Dambrackas - Direct

1 terminology for $100 worth of cocaine base.

2 Q    How did Mr. Jackson respond during the call?

3 A    Mr. Jackson initially advised that he did not have that

4 much available currently but that he would get back in touch

5 with Mr. Taylor shortly and -- and he was going to be getting

6 some.

7 Q    Is it your understanding that Mr. Taylor was eventually

8 gotten back in touch with by Mr. Jackson?

9 A    Yes.

10 Q    Were you present for that phone call?

11 A    I was not.

12 Q    What did you learn about that phone call from Mr. Taylor

13 as far as how it impacted what happened next?

14 A    A short time later, Mr. Taylor called me again and advised

15 that he had spoken with Mr. Jackson, who advised that he could

16 arrange the $100 sale of cocaine base, he just needed a ride to

17 get the cocaine base.

18 Q    So what was the plan for this -- what was the plan for

19 this controlled purchase?

20 A    Mr. Taylor was directed that he would meet with

21 Mr. Jackson and pick him up and give him a ride to the area of

22 the Quality Inn in Rutland City.

23 Q    What did you do as far as searches prior to Mr. Taylor

24 departing the presence of law enforcement?

25 A    Mr. Taylor's person was searched as well as his vehicle.

Jesse R. Dambrackas - Direct

1  Q    Was anything located during those searches?

2  A    No, it was not.

3  Q    What was Mr. Taylor given prior to leaving the presence of

4  law enforcement?

5  A    He was given $100 as well as covert audio and video

6  electronic recording and transmitting equipment.

7  Q    You said audio and video recording and transmitting

8  equipment.

9  A    Correct.

10  Q    There's a binder in front of you, Detective.  If you

11  could -- the smaller of the two binders.  If you could look at

12  Exhibit 46, please.  Do you recognize that photograph?

13  A    Yes.  This is a photograph of the recorded funds used for

14  the controlled purchase.

15          MR. OPHARDT:  Your Honor, I'd move to admit

16  Government's Exhibit 46 at this time.

17          THE COURT:  Any objection?

18          MR. JACKSON:  Say that again, Mr. Ophardt.

19          THE COURT:  Exhibit 46.

20          MR. JACKSON:  Oh, no objections, your Honor.

21          THE COURT:  It's admitted.

22      (Government's Exhibit 46 was received in evidence.)

23          MR. OPHARDT:  Your Honor, may I publish?

24          THE COURT:  You may.

25  Q    BY MR. OPHARDT:  Detective, when was this photograph

Jesse R. Dambrackas - Direct

1  taken?

2  A    On the date of the controlled purchase.

3  Q    When in relation to when the funds were provided to

4  Mr. Taylor?

5  A    Right before they were provided to Mr. Taylor.

6  Q    Who assisted with surveillance of this controlled

7  purchase?

8  A    Detective Sergeant Jason Johnson, Detective Sergeant

9  Christopher Roy, and Detective Sergeant/FBI Task Force Officer

10 Jeffrey Stephenson.

11 Q    You just said two titles for Jeffrey Stephenson.  What

12 were they again?

13 A    He's a detective sergeant with the state police and he is

14 an FBI task force officer.

15 Q    Thank you.

16       Was Mr. Taylor alone in the vehicle as he drove to meet

17 the target, or did someone go with him?

18 A    Mr. Taylor was alone in the vehicle, and I followed him in

19 my vehicle.

20 Q    While you were following Mr. Taylor, did you observe where

21 he drove?

22 A    Yes, I did.

23 Q    Where did he drive?

24 A    Mr. Taylor drove directly to -- up Woodstock Avenue to the

25 area of the Dunkin' Donuts on Woodstock Avenue.

Jesse R. Dambrackas - Direct

1  Q    Was anyone observed in the area of the Dunkin' Donuts?

2  A    Yes.  Mr. Jackson was waiting near the bus stop in the

3  area of the Dunkin' Donuts.

4  Q    Was anyone -- was anyone observed entering the vehicle

5  Mr. Taylor was driving?

6  A    Yes.  Mr. Jackson got into the front passenger seat of the

7  vehicle Mr. Taylor was driving.

8  Q    Did you observe that yourself?

9  A    Yes, I did.

10  Q    Would you please identify in the courtroom the person who

11  got in Mr. Taylor's vehicle that day, August of 2020.

12  A    The -- Mr. Jackson sitting with the burgundy shirt and

13  suit at the defense table.

14  Q    Is he wearing glasses?

15  A    Yes.

16        MR. OPHARDT:  Your Honor, may the record reflect an

17  identification of Mr. Jackson.

18        THE COURT:  The record so reflects.

19  Q    Anyone else get in the vehicle?

20  A    No, they did not.

21  Q    Where did Mr. Taylor drive the vehicle to after

22  Mr. Jackson got inside of it?

23  A    Mr. Taylor drove back down Woodstock Avenue to Main Street

24  and continued driving towards the Quality Inn and eventually

25  drove into the parking lot of the Dunkin' Donuts and Bowlerama.

Jesse R. Dambrackas - Direct

1  Q    You said the parking lot of the Dunkin' Donuts and the

2  Bowlerama.

3  A    Yes.  Correct.

4  Q    So those are two businesses?

5  A    Yes.  So they have to share a parking lot.

6  Q    During the drive, were you able to hear any conversation

7  over the live transmitting device?

8  A    Yes, I was.

9  Q    What were you able to hear?

10 A    I heard two phone calls that Mr. Jackson was on.  The

11 first one he was speaking to somebody asking if they had work,

12 which I know to be common street slang for cocaine base or

13 drugs to be sold, and then there was a second phone call in

14 which he advised that he had somebody looking for a hundred

15 piece, which is another common street term for $100 worth of

16 cocaine base.

17 Q    When Mr. Taylor's vehicle went into the shared parking lot

18 between the Dunkin' Donuts and the Bowlerama, where did it

19 park?

20 A    Kind of in the center of the two businesses.

21 Q    Where did you park in relation to that vehicle?

22 A    I was parked in front of the Dunkin' Donuts.

23 Q    Were you able to observe Mr. Taylor's vehicle?

24 A    Yes.

25 Q    While parked there, what, if anything -- who, if anyone,

Jesse R. Dambrackas - Direct

1  did you observe walking in the area of Mr. Taylor's vehicle?

2  A    I observed a white male that I did not know walking down

3  the sidewalk, and during that time Mr. Jackson made a comment

4  about "Is that Adam?" and then yelled out the window to the

5  male, calling him Adam.

6  Q    And you were able to hear this over the transmitter?

7  A    Yes, I was.

8  Q    While parked in the parking lot, did another vehicle of

9  interest arrive?

10  A    Yes.  A white SUV pulled into the parking lot.

11  Q    And after that vehicle arrived, what did Mr. Jackson do?

12  A    Mr. Jackson got out of Mr. Taylor's vehicle and got into

13  the front passenger seat of the white SUV.

14  Q    Were you able to personally observe Mr. Jackson in that

15  white SUV?

16  A    Yes, I was.

17  Q    Where was he seated?

18  A    The front passenger seat.

19  Q    Where did the white SUV go?

20  A    The white SUV entered the drive-through lane of the

21  Dunkin' Donuts and made an order at the drive-through.

22  Q    After it made an order, did you observe where the vehicle

23  went?

24  A    Yes.  It pulled around past my vehicle and pulled into a

25  parking spot, again, near Mr. Taylor's vehicle.

Jesse R. Dambrackas - Direct

1 Q    After it parked in the lot close to Mr. Taylor's vehicle,

2 what, if anything, did you observe?

3 A    I observed Mr. Taylor and Mr. Jackson exchange words from

4 their vehicles, and Mr. Taylor got out and approached the

5 passenger side window where Mr. Jackson was sitting of the

6 white SUV.

7 Q    After Mr. Taylor approached the passenger side window,

8 what did you see?

9 A    I saw them conversing and a brief hand-to-hand transaction

10 in which Mr. Taylor reached into the window of the white SUV.

11 Q    After Mr. Taylor had reached into the window, what did he

12 do?

13 A    Mr. Taylor got back into his vehicle and left the parking

14 lot, with me following him.

15 Q    Where did Mr. Taylor drive?

16 A    To our predetermined meeting location.

17 Q    When Mr. Taylor arrived at that location, what, if

18 anything, did he provide to you?

19 A    Mr. Taylor provided me with a plastic package that

20 contained cocaine.

21 Q    Well, were you positive at the time you received it it

22 contained cocaine?

23 A    I believed it was cocaine base at that time.

24 Q    And why did you believe that?

25 A    It appeared to be cocaine base, and that was what

Jesse R. Dambrackas - Direct

1 Mr. Taylor had advised that he would be purchasing from

2 Mr. Jackson.

3 Q    As of August of 2020, how many times had you observed

4 suspected cocaine base?

5 A    I'm not sure.  Multiple times.

6        THE COURT:  What is "multiple times"?  Ten, 50, 100?

7 Four?

8        THE WITNESS:  I guess I would estimate 10 to 20 times.

9 Q    After Mr. Taylor provided you with the substance in the

10 plastic baggy, what, if anything, did you search?

11 A    I searched Mr. Taylor's person and his vehicle again.

12 Q    What, if anything, did you find during those searches?

13 A    I did not find anything of note.

14 Q    What did you do with the suspected cocaine base?

15 A    The suspected cocaine base was later photographed and

16 field-tested and weighed.

17        MR. OPHARDT:  Apologize, your Honor.  I am out of

18 order.  That did not sound the way I meant.  My exhibits are

19 out of order.

20 Q    I have Government's Exhibit 44.  Would you please look at

21 it in your binder.  Do you recognize Government's Exhibit 44?

22 A    Yes.  That is the photo sheet with the package of

23 cocaine -- what I believed to be cocaine base at the time on

24 it.

25 Q    And who took this photograph?

Jesse R. Dambrackas - Direct

1  A    I did.

2         MR. OPHARDT:  Your Honor, I'd move to admit

3  Government's Exhibit 44 at this time.

4         THE COURT:  Any objection?

5         MR. JACKSON:  No objections, your Honor.

6         THE COURT:  44 is admitted.

7      (Government's Exhibit 44 was received in evidence.)

8         MR. OPHARDT:  Your Honor, may I publish?

9         THE COURT:  Yes, you may.

10 Q    BY MR. OPHARDT:  Detective, who wrote the information here

11 at the top?

12 A    I did.

13 Q    If you would look at Exhibit 45.

14 A    Yes.

15 Q    Do you recognize Government's Exhibit 45?  If you could

16 just generally state why you recognize this photograph.

17 A    Yes.  This is a photograph of the evidence on the scale.

18 Q    Who took the photograph?

19 A    I did.

20 Q    When did you take it?

21 A    The same day of the controlled purchase.

22        MR. OPHARDT:  Your Honor, I move to admit Government's

23 Exhibit 45 at this time.

24        THE COURT:  Any objection?

25        MR. JACKSON:  No objections, your Honor.

Jesse R. Dambrackas - Direct

1          THE COURT:  It's admitted.

2      (Government's Exhibit 45 was received in evidence.)

3          MR. OPHARDT:  Your Honor, may I publish?

4          THE COURT:  You may.

5  Q    BY MR. OPHARDT:  What's the weight indicated in the

6  photograph?

7  A    0.6 grams.

8  Q    And that would include the weight of the packaging; is

9  that correct?

10  A    Yes, it does.

11          MR. OPHARDT:  If I could have Exhibit 27, I believe,

12  brought -- physical exhibit brought up, please.

13  Q    While they're looking for that, I'm going to go back, and

14  find it in my ever messier pile, to Exhibit 44, which is in

15  evidence.  Detective Dambrackas, what's the case number for

16  this controlled purchase?

17  A    20H200459.

18  Q    How does the Vermont Drug Task Force handle case numbers?

19  Is that the same number used for each transaction, or would you

20  assign a different number for subsequent transactions?

21  A    A different number will be assigned for each controlled

22  purchase.

23  Q    So it's in essence a unique identifier for this controlled

24  buy?

25  A    Yes, correct.

Jesse R. Dambrackas - Direct

1  Q    Now, if you could look at the physical exhibit in front of

2  you, which I believe is marked 27.  Just confirm that you have

3  a yellow exhibit sticker on it with Government Exhibit 27.

4  A    Yes, I do.

5  Q    Okay.  Do you recognize anything within Government's

6  Exhibit 27?

7  A    Yes.  I recognize the label on the packaging as the label

8  that I printed for the evidence.

9  Q    And where is that label in relation to -- there's a few

10  labels on this exhibit, so what in particular is that label on?

11  A    On the evidence packaging that I packaged it in

12  originally.

13  Q    Is it as you submitted it -- I'm sorry.

14      Is it as you packaged it, or has it been altered in any

15  way, the whole exhibit, the whole evidence bag?

16  A    It appears the bag was opened and the contents were

17  removed from it.

18  Q    Okay.  What case number is listed on the evidence bag that

19  you recognize?

20  A    20H200459.

21  Q    And what -- who's listed as the case officer?

22  A    Myself, Jesse Dambrackas.

23  Q    And what's listed as the date and time collected?

24  A    August 21st, 2020, approximately 12:29 hours.

25  Q    Who would have put that information on to that sticker?

Jesse R. Dambrackas - Direct

1  A    I would.

2  Q    Now, what happened to this evidence bag after the date of

3  the controlled purchase?  Where was it brought?

4  A    The -- after processing, the evidence is put into the

5  temporary evidence locker, where it is then brought by the

6  evidence officer typically to the Vermont Forensic Laboratory

7  for further analysis.

8  Q    I'd like to -- well, as part of your after-buy checklist,

9  what do you do with the audio and video from the recording

10 devices?

11 A    They're downloaded and then reviewed.

12 Q    Did you do that in this case?

13 A    Yes, I did.

14 Q    What, if anything, did you note from the video recording

15 device in this case?  Was there anything helpful?

16 A    Not that I recall.

17 Q    Well, why don't you look at Government's Exhibit 41 in the

18 binder.

19 A    Yes.

20 Q    Do you recognize that?

21 A    Yes.

22 Q    What is it?

23 A    This is a screenshot from the covert video device that was

24 in Mr. Taylor's vehicle that has a partial image of Mr. Jackson

25 in the vehicle.

Jesse R. Dambrackas - Direct

1  Q    And how do you recognize it to be a screenshot?

2  A    Based off of the date and time stamp.

3  Q    Who made the screenshot?

4  A    I did.

5        MR. OPHARDT:  Your Honor, I move to admit Government's

6  Exhibit 41 at this time.

7        THE COURT:  Any objection?

8        MR. JACKSON:  What number is that again, Mr. --

9        MR. OPHARDT:  41, Mr. Jackson.

10       MR. JACKSON:  Okay.  No objections, your Honor.

11       THE COURT:  41 is admitted.

12    (Government's Exhibit 41 was received in evidence.)

13       MR. OPHARDT:  Your Honor, may I publish?

14       THE COURT:  You may.

15 Q    BY MR. OPHARDT:  You mentioned the date and time stamp.

16 Is that the text down here at the bottom?

17 A    Yes.

18 Q    Based on your recollection and your review of the video,

19 where was the recording device located in the vehicle?

20 A    I believe it was somewhere in the area of the center

21 console.

22 Q    And how was it oriented in the vehicle?

23 A    It was oriented to try to capture the passenger in the

24 vehicle.

25 Q    So it was pointed up?

Jesse R. Dambrackas - Direct

1  A    Yes.

2  Q    And that's why this is from-beneath-looking footage?

3  A    Yes.

4  Q    Was there any audio captured by the recording devices?

5  A    Yes, there was.

6  Q    Did you review it?

7  A    Yes, I did.

8        MR. OPHARDT:  If I could have -- nope.  I have it.

9  Plaintiff's Exhibit 50.  I have 50A, B, and C, but I do not

10 have 50 itself.  I apologize.  Ms. Collins, I have it.

11     Too many folders, your Honor.  I apologize.

12     Ms. Ruddy, I'm going to need your assistance, if you don't

13 mind.  I'm going to save you some trips.  This is 50, 50A, 50B,

14 and 50C.

15 Q    Detective Dambrackas, do you recognize those?

16 A    Yes, I do.

17 Q    What is Exhibit 50?

18 A    An audio recording that I reviewed.

19 Q    It's a disc containing an audio recording?

20 A    Yes, correct.

21 Q    What is the audio recording of?

22 A    Of this controlled buy.

23 Q    And 50A, 50B, and 50C, what are those?

24 A    These are excerpts from the same full-length audio

25 recording.

Jesse R. Dambrackas - Direct

1  Q    And when you reviewed A, B, and C, what did you do with

2  the disc?

3  A    I initialed the disc and put the date on it as well.

4  Q    So you did that prior to your testimony?

5  A    Yes, I did.

6  Q    When you reviewed A, B, and C, did you compare it with the

7  full-length recording on Exhibit 50?

8  A    Yes.  I reviewed that as well.

9  Q    Were they accurate excerpts from the longer recordings?

10  A    Yes.

11  Q    And these recordings, when were they created?

12  A    On the date of the controlled purchase, August 21st.

13        MR. OPHARDT:  Your Honor, I'd move to admit 50A, 50B,

14  and 50C at this time.

15        THE COURT:  And you're not moving to admit 50?

16        MR. OPHARDT:  No, your Honor.  We're simply moving for

17  the excerpts.

18        THE COURT:  All right.  Any objection to the

19  admissions of 50A, B, and C?

20        MR. JACKSON:  These are video discs, right?

21        THE COURT:  Right.  But these are excerpts from a

22  longer video.

23        MR. OPHARDT:  Your Honor, just to correct the record,

24  it's actually just audio.

25        THE COURT:  It's just audio.  Okay.  Thank you.

Jesse R. Dambrackas - Direct

1             MR. JACKSON:  I have no objection, your Honor.

2             THE COURT:  50A, B, and C are admitted.

3         (Government's Exhibits 50A, 50B, and 50C were received in

4    evidence.)

5             MR. OPHARDT:  Your Honor, may we publish 50A?

6             THE COURT:  You may.

7         (Government's Exhibit 50A was played in open court.)

8    Q    BY MR. OPHARDT:  Detective Dambrackas, who was speaking in

9    that recording?

10   A    Mr. Jackson speaking on the phone initially and then

11   speaking with Mr. Taylor in the vehicle.

12   Q    So both Mr. Jackson and Mr. Taylor?

13   A    Yes, correct.

14   Q    What's the Quality in Rutland?

15   A    The Quality Inn is a motel in Rutland.

16   Q    Where is it located?

17   A    Next to the Mac's Market gas station.

18   Q    Where is that in relation to the Dunkin' Donuts/Bowlerama

19   on Route 7 that we were talking about during the buy?

20   A    They're positioned a little bit farther south than where

21   the Dunkin' Donuts is on -- Dunkin' Donuts would be on the way

22   to the -- those locations.

23            MR. OPHARDT:  Your Honor, I'd request to publish 50B,

24   as in Bravo.

25            THE COURT:  You may.

Jesse R. Dambrackas - Direct

1    (Government's Exhibit 50B was played in open court.)

2  Q    BY MR. OPHARDT:  Agent Dambrackas -- excuse me.

3    Detective Dambrackas, who -- well, when does this clip

4  correlate to during the controlled purchase?

5  A    This was when Mr. Jackson and Mr. Taylor were waiting in

6  their vehicle in the parking lot of the Dunkin' Donuts and

7  Bowlerama and the male that we did not know was walking by and

8  Mr. Jackson called the male over to the -- towards the

9  passenger window of the vehicle.

10    MR. OPHARDT:  Your Honor, I'd ask to publish 50C, as

11  in Charlie.

12    THE COURT:  You may do so.

13    (Government's Exhibit 50C was played in open court.)

14  Q    BY MR. OPHARDT:  Detective Dambrackas, what color car was

15  Mr. Taylor in for this controlled purchase?

16  A    Gray -- gray or silver car.

17  Q    The sound we heard at the end, what did that correlate

18  with during your surveillance of the controlled purchase?

19  A    That was Mr. Jackson getting out of Mr. Taylor's vehicle

20  to go into the white SUV that had just pulled in.

21  Q    So that was the sound of the door opening?

22  A    Yes, correct.

23  Q    I want to talk with you about another controlled purchase

24  that occurred on September 24th, 2020.  Who was the

25  confidential informant for this purchase?

Jesse R. Dambrackas - Direct

1  A    Walter Taylor.

2  Q    And who did Mr. Taylor say he could purchase drugs from

3  that day?

4  A    Boo-Bee.

5  Q    And what substance did Mr. Taylor say he could buy from

6  Boo-Bee?

7  A    Cocaine base.

8  Q    How was Mr. Taylor going to contact Boo-Bee?

9  A    Through the same phone number he had used prior.

10 Q    And were you present when Mr. Taylor called this person he

11 knew as Boo-Bee to arrange the purchase?

12 A    Yes, I was.

13 Q    Were you able to hear the call?

14 A    Yes, I was.

15 Q    Why is that?

16 A    The call was made in my vehicle on speakerphone.

17 Q    And who answered Mr. Taylor's phone call?

18 A    Mr. Jackson.

19 Q    And how is it that you recognized his voice?

20 A    Through the -- it was consistent with the recordings from

21 the last controlled purchase that we had done.

22 Q    The ones we just listened to?

23 A    Yes, correct.

24 Q    What did Mr. Taylor ask Mr. Jackson for during the call?

25 A    I believe he used the phrase "a hundo" again.

Jesse R. Dambrackas - Direct

1 Q    And how did Mr. Jackson respond to that request?

2 A    Mr. Jackson advised that he could make that sale and that

3 he was at the Rodeway on Woodstock Avenue.

4 Q    What's the Rodeway on Woodstock Avenue?

5 A    A motel on Woodstock Avenue.

6 Q    What highway is Woodstock Avenue in Rutland?

7 A    Route 4.

8 Q    What's the two cities it kind of connects?

9 A    It would be Rutland towards Killington.

10 Q    And prior to Mr. Taylor leaving law enforcement's

11 presence, what did you search?

12 A    I searched Mr. Taylor as well as the vehicle he was using

13 that day.

14 Q    What, if anything, did you find?

15 A    I did not find anything of note.

16 Q    What was given to Mr. Taylor prior to him leaving to --

17 excuse me.

18    What was given to Mr. Taylor prior to him leaving law

19 enforcement's presence?

20 A    $100 of recorded funds again as well as covert audio and

21 video electronic recording and transmitting devices.

22 Q    I want you to look at Exhibit 56, which is in the smaller

23 binder in front of you.

24 A    Yes.

25 Q    Do you recognize Government's Exhibit 56?

Jesse R. Dambrackas - Direct

1  A    I do.

2  Q    What is it?

3  A    The recorded funds.

4  Q    "Recorded funds" meaning what funds?

5  A    The funds that were used for this controlled purchase of

6  cocaine base.

7       THE COURT:  So let's -- let's do this the right way.

8  Currency.  And then you move to admit it, and then he can

9  describe the contents.

10      MR. OPHARDT:  Yes, your Honor.

11 Q    Generally speaking, without specifics, what is depicted in

12 Government's Exhibit 56?

13 A    Currency.

14      MR. OPHARDT:  Your Honor, I'd move to admit

15 Government's Exhibit 56 at this time.

16      THE COURT:  Any objection?

17      MR. JACKSON:  No objections, your Honor.

18      THE COURT:  56 is admitted.

19    (Government's Exhibit 56 was received in evidence.)

20      MR. OPHARDT:  Your Honor, may I publish?

21      THE COURT:  You may.

22 Q    BY MR. OPHARDT:  Why did you take this photograph of this

23 currency?

24 A    To record the serial numbers of the currency.

25 Q    And where was the money provided after the photograph?

Jesse R. Dambrackas - Direct

1  A    The money was provided to Mr. Taylor.

2  Q    Who conducted surveillance of this controlled purchase?

3  A    Again, it was the same team of Detective Sergeant Jason

4  Johnson, Detective Sergeant Christopher Roy, Detective

5  Sergeant/FBI Task Force Officer Jeffrey Stephenson, and myself.

6  Q    And when Mr. Taylor left law enforcement's presence from

7  the meeting location, was he alone in the vehicle, or were

8  people with him?

9  A    He was alone in the vehicle.

10 Q    And where did Mr. Taylor drive?

11 A    He drove to the area of Porter Street at the intersection

12 of Woodstock Avenue, which is positioned just to the west of

13 the Rodeway Inn.

14 Q    And what did you do while Mr. Taylor was driving?

15 A    I followed his vehicle.

16 Q    Was anyone waiting there for Mr. Taylor to arrive?

17 A    No, they were not.

18 Q    Approximately how long did Mr. Taylor have to wait?

19 A    A few minutes, I believe.

20 Q    While Mr. Taylor was waiting, what did he do?

21 A    Mr. Taylor called Mr. Jackson again to let him know that

22 he had arrived, and Mr. Taylor advised me after the fact that

23 Mr. Jackson had asked him to come to Room 132 at the Rodeway

24 Inn and that he declined and that eventually Mr. Jackson

25 advised that he would come out and meet him in his vehicle.

Jesse R. Dambrackas - Direct

1 Q    What were you doing during this time frame?

2 A    I was conducting surveillance on Mr. Taylor's vehicle.

3 Q    Did you observe anyone leaving the area of the Rodeway Inn

4 and walking towards Mr. Taylor?

5 A    Yes.  Detective Sergeant Johnson advised me that he could

6 see Mr. Jackson leaving the Rodeway Inn, and then shortly

7 thereafter, once he got to the sidewalk next to Woodstock

8 Avenue, I could see Mr. Jackson approaching the CI's -- or

9 Mr. Taylor's vehicle.

10 Q    Where did you see Mr. Jackson go?

11 A    Into the front passenger seat of the vehicle.

12 Q    Did anyone else get into the vehicle when Mr. Jackson did?

13 A    No, they did not.

14 Q    After Mr. Jackson got in the vehicle, were you able to

15 hear anything on the transmitter?

16 A    Yes, I was.

17 Q    What did you hear?

18 A    I heard some conversation between Mr. Jackson and

19 Mr. Taylor in which Mr. Jackson was asking Mr. Taylor to drive

20 him up the street to the store, being the Circle K on the other

21 side of Woodstock Avenue.

22 Q    And where did Mr. Taylor drive his vehicle?

23 A    To that gas station/store.

24 Q    And during that drive, were you able to hear any

25 conversation via the live transmitter?

Jesse R. Dambrackas - Direct

1  A    Yes.  I was able to hear Mr. Taylor ask something to the

2  effect of, "Is this good shit?"  To which Mr. Jackson replied

3  something to the effect of, "I don't have any bullshit."

4  Q    Was surveillance continued on Mr. Taylor's vehicle during

5  this drive?

6  A    Yes, it was.

7  Q    After Mr. Taylor arrived at the convenience store, who got

8  out of the vehicle?

9  A    Mr. Jackson got out of the vehicle and went into the

10 convenience store.

11 Q    And after Mr. Jackson got out of the vehicle, where did

12 Mr. Taylor's vehicle go?

13 A    Mr. Taylor's vehicle left the parking lot and drove back

14 to our predetermined meeting location with me following it.

15         THE COURT:  Is this a logical breaking point?

16         MR. OPHARDT:  We're close, Judge.

17         THE COURT:  Okay.

18         MR. OPHARDT:  A couple more questions, if you don't

19 mind.

20         THE COURT:  That's fine.  Yes.  Go ahead.

21 Q    During that surveillance, did Mr. Taylor make any stops at

22 all?

23 A    No, he did not.

24 Q    Did you see him meet with anyone, have anyone walk up to

25 the car windows?

Jesse R. Dambrackas - Direct

1  A    No.

2  Q    After Mr. Taylor got back to the meeting location, what,

3  if anything, did he provide to you?

4  A    Mr. Taylor provided a package of cocaine base.

5  Q    And what did you search after you were provided that

6  baggy?

7  A    Mr. Taylor and his vehicle were both searched afterwards.

8  Q    Anything located?

9  A    No, it was not.

10 Q    I have one cleanup question to do, and I apologize for

11 this being out of order.  I want to refer you back to the

12 August buy.  I forgot to ask you a question about that buy.

13      The August 2020 buy, after Mr. Taylor gets back in the

14 vehicle at the Dunkin' Donuts, where did he drive?

15 A    To our predetermined meeting location.

16 Q    Along that route, did he stop at all?  Did anyone get in

17 the vehicle?  Did anyone appear to approach the vehicle?

18 A    No.

19      MR. OPHARDT:  Your Honor, that's a logical stopping

20 point.

21      THE COURT:  Sure.

22      MR. OPHARDT:  Thank you.

23      THE COURT:  All right.  We're going to break for the

24 day.  Remember, members of the jury, that we're going to stop

25 at 2:00 tomorrow.  We'll start promptly at 9:00.

1      Don't talk about the case.  Don't let anybody talk to you
2  about the case.  Don't do any research.  Don't do anything that
3  would alter the evidence that's presented in the courtroom by
4  bringing outside evidence.  As you know, that would be unfair.
5  It would cause a mistrial, various other things.
6      I wish you a good evening.
7      And we'll excuse the jury and we'll have the parties
8  remain in the courtroom.
9      (Jury out at 4:30 PM.)
10      THE COURT:  I have no issues for you.  Any issues for
11  me?
12      This time I'll start with Mr. Jackson.
13      MR. JACKSON:  No, your Honor.  Not at this time.
14      THE COURT:  Mr. Ophardt, any issues from you?
15      MR. OPHARDT:  No, your Honor.
16      THE COURT:  Okay.  We will see you tomorrow.  If
17  you -- you're going to go through the exhibits with Ms. Ruddy.
18  Make sure we have the same thing.  If you need to talk to me
19  prior to 9 o'clock, I will be here and ready to talk to you.
20      (Court was in recess at 4:31 PM.)
21
22
23
24
25

C E R T I F I C A T I O N

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

May 10, 2024                              _____
                                          Johanna Massé, RMR, CRR